UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MIGUEL DIAZ,

                                        Plaintiff,

v.                                                                    9:19-cv-1438
                                                                        (LEK/TWD)

ERIC J. SMITH, et al.,
                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

MIGUEL DIAZ
*Plaintiff, pro se*
18-A-2702
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

HON. LETITIA JAMES                        LAUREN ROSE EVERSLEY, ESQ.
Attorney General for the State of New York   DAVID C. WHITE, ESQ.
*Attorney for Defendants*                 Ass't Attorney General
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

I.      **INTRODUCTION**

        On November 20, 2019, *pro se* Plaintiff Miguel Diaz ("Plaintiff"), an inmate in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), commenced this 42 U.S.C. § 1983 action asserting his constitutional rights were

violated at Upstate Correctional Facility ("Upstate").  (Dkt. No. 1.)  The amended complaint was

accepted for filing on August 4, 2021.  (Dkt. Nos. 118, 119.)

Generally, Plaintiff's claims arise out of two separate documented use of force incidents that occurred on February 22, 2019.  (Dkt. No. 119.)  Construed liberally, Plaintiff brings: (1) Eighth Amendment excessive force and failure-to-intervene claims against Corrections Officer ("C.O.") Adam J. Gallagher ("Gallagher"), C.O. Robert J. Lamica, II ("Lamica"), C.O. Eric J. Smith ("Smith"), C.O. Joshua Tulip ("Tulip"), C.O. James B. Trombley ("Trombley"), C.O. Bryan T. LeClair ("LeClair"), C.O. Eric E. Marshall ("Marshall"), C.O. Gabriel Obregozo ("Obregozo"), Sergeant Trevor Dunning ("Dunning"), Lieutenant ("Lt.") Gary Gettmann ("Gettmann"), Lt. Steven Salls, Jr. ("Salls"), Captain Stacy Dominic ("Dominic"), Superintendent Donald Uhler ("Uhler"), and Nurse Geraldine Wilson ("Wilson") (together, "Defendants"); (2) Eighth Amendment sexual abuse claim against Smith; and (3) Eighth Amendment medical indifference claim against Wilson.  (Dkt. No. 118 at 5.[1])  Defendants answered the amended complaint and discovery ensued.  (Dkt. No. 145.)

On November 1, 2021, Plaintiff moved for summary judgment.  (Dkt. No. 156.[2])  On January 31, 2022, Defendants opposed the motion and cross-moved for summary judgment. (Dkt. No. 166.[3])  Plaintiff, in turn, filed a reply and opposed the cross-motion among other

---

[1]  Unless otherwise noted, page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

[2]  Plaintiff's motion includes a Notice for Summary Judgment (Dkt. No. 156) and Exhibits (Dkt. No. 156-1).

[3]  Defendants' cross-motion includes a Notice for Summary Judgment (Dkt. No. 166), Memorandum of Law (Dkt. No. 166-1), Statement of Material Facts ("SMF") (Dkt. No. 166-2), Affidavit from Counsel, with Exhibit "A" – Transcript of Plaintiff's September 3, 2021, Deposition ("Dep.") (Dkt. No. 166-3), and Declarations (Dkt. Nos. 166-4 through 166-17).

things.  (Dkt. Nos. 169, 170, 171, 178,[4] *see also* Docket Report.)  The parties' motions for summary judgment are fully briefed and have been referred for a Report-Recommendation by the Hon. Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

For the reasons set forth below, the Court recommends that Plaintiff's motion be denied, and Defendants' cross-motion be granted in part and denied in part.

## II.    BACKGROUND

It is undisputed that two separate documented use of force incidents occurred on February 22, 2019.  However, the record and materials submitted in connection with the competing motions for summary judgment make clear that Plaintiff and Defendants allege significantly different narratives surrounding the incidents at issue.  Their respective versions of events are set forth below.

### A.    Plaintiff's Version of Events

On or about February 8, 2019, Plaintiff filed a "PREA Complaint" against Smith for sexual harassment.  (Dkt. No. 156-1 at 51.)  He also asked for a "separation" order due to Smith's "continued harassment."  *Id.*  Specifically, on February 8, 2019, Smith walked by Plaintiff's cell and "winked and blew a kiss."  *Id.* at 52.  Plaintiff testified that for "several weeks" Smith "had been sexually harassing" him (i.e., "blowing kisses" and "licking at [Plaintiff] how a snake would move his tongue, putting his fingers on his mouth" and making "homosexual gestures") and "violating his food" (i.e., droplets of Smith's saliva from the

---

[4]  Plaintiff's submissions include a Reply (Dkt. No. 169), Response to Cross-Motion (Dkt. No. 170), Response Exhibits (Dkt. No. 171), and Response Memorandum of Law with Exhibits (Dkt. No. 178).

foregoing actions fell onto Plaintiff's breakfast and lunch trays).  (Dkt. No. 166-3 ("Pl.'s Dep.") at 21, 26, 29-30, 38-39.[5])

On the morning of February 22, 2019, when Smith "did it again," Plaintiff refused to return his breakfast tray and told Smith to "call the sergeant."  *Id*. at 40.  "When the sergeant came around," Plaintiff explained that Smith had been "sexually harassing" him and tampering with his food "for a good amount of time."  *Id*.  Plaintiff asked for another breakfast tray and to be "removed" or "separated" from Smith, but the sergeant "storm[ed] off" and returned with an extraction team.  *Id*. at 40-41.

Plaintiff admits he refused multiple direct orders to "cuff up" and exit the cell for a search.  *Id*. at 41-43.  Consequently, several applications of a chemical agent were administered and an extraction team, consisting of Lamica, Obregozo, Marshall, and Gallagher, entered the cell to remove Plaintiff.  *Id*. at 16.  Plaintiff claims, however, the extraction team subjected him to excessive force while Dunning, Salls, and Dominic failed to intervene.  *Id*. at 16-17.  To that end, Plaintiff states that his head was "banged" against the side of the shower, and he was "slammed" to the floor on his stomach.  *Id*.  Plaintiff maintains he was repeatedly kicked, stomped, and punched while the extraction team was within his cell and even after mechanical restraints were applied to his wrists.  *Id*.

After this initial "beating," Plaintiff was removed from his cell.  *Id*. at 22.  Plaintiff turned to Smith and said, "hey man, is that what it's all worth?  Is this what it's all about?"  *Id*.  In response, Plaintiff was "slammed" to the floor on his face, which caused his "whole top mouth to shift."  *Id*.  While on the ground and restrained, the officers proceeded to hit and kick Plaintiff a

---

[5]  Page references to Plaintiff's deposition are to the original pagination.

"couple" more times and then threw a spit net over Plaintiff's head, even though Plaintiff "didn't spit on nobody." *Id*.

Plaintiff was escorted to medical and briefly examined by Wilson. *Id*. at 23. Plaintiff claims Wilson failed to properly document and treat his injuries. *Id*. Plaintiff claims that "even though his right eye was bleeding" and there was a "hole the size of nickel on his left eye," Wilson documented "no injury" to Plaintiff's eyes. *Id*. at 24, 35.

Thereafter, during the morning rounds, Plaintiff proceeded to tell "everyone", including a staff member of the Office of Mental Health ("OMH"), that he needed stitches for his eye injury, but was ignored. *Id*. Several hours later, Wilson stopped by Plaintiff's cell asking, "what's going on?" *Id*. at 25. Plaintiff showed Wilson his left eye, and she said, "Oh God, where'd that come from?" *Id*. Plaintiff replied, "Ms. Wilson, had you . . . checked me, you would have seen it. And I would have been sent to the hospital." *Id*. Wilson walked away and mumbled, "well, let it dry." *Id*.

After his eye injury was dismissed by Wilson, Plaintiff's desperation to receive medical attention "kicked in." *Id*. at 56. Plaintiff started saying, "I'm going to hang up", meaning, "like attempt to kill yourself and put something around your neck, to that nature." *Id*. at 56-58. In response, a non-party C.O. called Dunning. *Id*. at 59. Dunning arrived and told Plaintiff, "we're going to get you to the infirmary," but Plaintiff "knew" it "was just a brush off." *Id*. When Plaintiff's cell door was opened, he tried "to get out" but he was stopped and subjected to excessive force. *Id*.

Plaintiff maintains Smith blocked the cell door opening and struck Plaintiff with a shield. *Id*. at 59, 116. Plaintiff was thrown down and "slammed" onto his stomach. *Id*. at 59. Thereafter, Tulip, Trombley, Lamica, and LeClair beat Plaintiff with their batons. *Id*. at 59, 61,

98-99, 102.  Smith put Plaintiff in a chokehold and said, "I should kill you right now."  *Id.* at 60.

Smith then proceeded to choke Plaintiff with his left hand, leaving marks around Plaintiff's neck.

*Id.*

Even after Plaintiff was restrained and handcuffed, these Defendants continued to punch,

kick, and beat Plaintiff with the shield and their batons "trying to kill" him.  *Id.* at 60, 61.

Throughout this beating, Dunning was "just sitting there, yelling, 'stop resisting'" even though

Plaintiff was not resisting.  *Id.* at 64-65.  Plaintiff was then forced to his feet with his arms

restrained behind his back.  *Id.* at 61.  Smith "reached his left hand into Plaintiff's boxer shorts

and pulled on Plaintiff's "scrotum sack and . . . penis" in a "nightmarish way, which is like he

[was] trying to pull it off."  *Id.*  Plaintiff was taken to the infirmary, and it was determined he

needed further outside medical care.  *Id.* at 67-68.

Several hours later, at approximately 4:00 p.m., Plaintiff was transported to the Alice

Hyde Hospital.  *Id.* at 71.  There, he was diagnosed with a broken nose, major trauma to his

mouth, bruised ribs, arm laceration, and bleeding fingers.  *Id.* at 73.  He received four stitches to

his left eye.  *Id.*  Plaintiff testified that because of the foregoing incidents, he experienced, and

continues to experience, "extreme" and "major" pain.  *Id.* at 54, 78-79.

### B.    Defendants' Version of the Events

Defendants maintain that at approximately 7:30 a.m. on February 22, 2019, Smith was

distributing breakfast and placed Plaintiff's tray in the feed-up hatch.  (Dkt. No. 166-6 ("Smith

Decl.") at ¶ 6.)  Plaintiff refused to bring his hands into the cell so that his feed-up hatch could be

secured.  *Id.*  Smith notified Dunning, the area supervisor, who responded and gave Plaintiff

several direct orders to bring his hands into the cell.  (Dkt. No. 166-9 ("Dunning Decl.") at ¶ 5.)

Plaintiff did not comply.  *Id.*  Dunning ordered Plaintiff out of his cell for a cell search and

6

Plaintiff continued to refuse. *Id*. Dunning contacted Gettmann, the watch commander, and informed him that Plaintiff had refused multiple direct orders and requested that a cell extraction team be gathered. (Dkt. No. 166-12 ("Gettmann Decl.") at ¶¶ 10, 11; Dunning Decl. at ¶ 5.) Gettmann directed Salls to organize an extraction team to remove Plaintiff from his cell. (Gettmann Decl. at ¶ 12; Dkt. No. 166-17 ("Salls Decl.") at ¶ 5.[6]) Gettmann also contacted Uhler, the superintendent, who authorized the cell extraction and, if necessary, the use of chemical agents. (Gettmann Decl. at ¶ 13; Dkt. No 166-11 ("Uhler Decl.") at ¶ 11.)

Dominic issued Plaintiff a final direct order to exit his cell for the cell search and advised Plaintiff that if he continued to refuse orders, force would be utilized. (Gettmann Decl. at ¶ 15; Dkt. No. 166-15 ("Dominic Decl.") at ¶¶ 11, 12.) Plaintiff refused Dominic's final direct order. *Id*. Consequently, Dunning released chemical agents into Plaintiff's cell to gain compliance without the need for force. (Dunning Decl. at ¶ 6.) Trombley observed Dunning administer a burst of chemical agent into Plaintiff's cell five times. (Dkt. No. 166-16 ("Trombley Decl.") at ¶ 12.) Plaintiff continued to ignore all directions and refused to leave his cell. *Id*. Trombley was directed by Dunning to manually open Plaintiff's cell door. *Id*. at ¶¶ 13, 14. Trombley opened and secured the cell door during the entirety of the documented use of force incident. *Id*.

According to Defendants, Lamica, Gallagher, Marshall, and Obregozo entered the cell and subdued Plaintiff using the minimal amount of force necessary and applied mechanical restraints. (Dunning Decl. at ¶ 7; Dkt. No. 166-4 ("Gallagher Decl.") at ¶¶ 7, 9; Dkt. No. 166-8 ("Lamica Decl.") at ¶¶ 8, 9; Dkt. No. 166-7 ("Obregozo Decl.") at ¶¶ 7,8; Dkt. No. 136-5 ("Marshall Decl.") at ¶ 7.) Plaintiff was then removed from his cell in a standing position with his hands in mechanical restraints behind his back. (Trombley Decl. at ¶¶ 15, 16.) After all

---

[6] The Court notes Salls' Declaration, though signed, is not dated.

necessary force ceased, Tulip arrived on the B gallery to escort Plaintiff to medical.  (Dkt. No. 166-14 ("Tulip Decl.") at ¶ 11.)

However, during the escort, Plaintiff "aggressively" spit on Lamica.  (Lamica Decl. at ¶ 10; Tulip Decl. at ¶ 12; Gallagher Decl. at ¶ 8.)  As a result, Lamica brought Plaintiff to the ground and Tulip was instructed to retrieve a spit net.  (Lamica Decl. at ¶ 10; Tulip Decl. at ¶ 12; Gallagher Decl. at ¶ 8.)  The spit net was applied, Plaintiff was assisted to his feet, and he was escorted to medical without further incident.  (Lamica Decl. at ¶ 10; Gallagher Decl. at ¶ 8.)

At approximately 9:50 a.m., Wilson reported to the 10 block holding pen.  (Dkt. No. 166-13 ("Wilson Decl.") at ¶ 14.)  When she arrived, she observed Plaintiff standing in the holding pen in his boxer shorts.  *Id*.  Plaintiff's vital signs were in the normal range for an adult male and she noted the following injuries: (1) missing front tooth from his upper gum from a previous injury; (2) a quarter of an inch bruise to Plaintiff's upper right lip; (3) a bruise on the side and under Plaintiff's left eye; (4) a one and a half inch scratch on Plaintiff's left shoulder; and (5) a scrape on Plaintiff's right middle finger with tearing of the skin which measured a quarter of an inch in length.  *Id*. at ¶¶ 15, 16, 17.  Wilson treated Plaintiff's open areas with Hibiclens and an antibiotic ointment.  *Id*. at ¶ 18.  She advised Plaintiff to keep the open areas clean and dry and to follow-up with DOCCS health services as needed.  *Id*. at ¶ 19.

Plaintiff continued to complain of an eye injury.  *Id*. at ¶ 20.  Wilson closely examined Plaintiff's eye and, apart from bruising roughly the size of a pencil head, she did not observe any additional injuries.  *Id*.  Wilson then returned to the medical office to resume her assigned duties and Plaintiff was taken back to his cell.  *Id*. at ¶ 21.

Not long thereafter, an OMH staff member advised Wilson that Plaintiff had a cut on his eye.  *Id*. at ¶ 22.  She responded to Plaintiff's cell and observed a cut on his left eye that was not

present during her initial evaluation of Plaintiff. *Id*. at ¶¶ 24, 25. Wilson returned to the medical office on 10 block and contacted a non-party Physician's Assistant, who ordered that Plaintiff be escorted to Upstate's emergency room for evaluation. *Id*. at ¶ 24. Wilson then notified Dunning that arrangements were being made for further medical treatment. *Id*. at ¶ 25.

At approximately 12:30 p.m., Dunning was also notified by a non-party C.O. that Plaintiff was experiencing suicidal thoughts and was attempting to hang himself in his cell. (Dunning Decl. at ¶ 10.) Dunning responded and observed Plaintiff sitting on the bottom bunk with a headphone extension cord tied to the top bunk and around his neck. *Id*. Dunning gave Plaintiff several direct order to remove the cord from around his neck, but he refused; Plaintiff started slipping off the bottom bunk with the cord tightening around his neck. *Id*. As this represented an immediate threat to Plaintiff's health and safety, Dunning ordered that Plaintiff's cell door be opened and for staff to enter the cell. *Id*. at ¶¶ 10, 11.

As Trombley opened the cell door, Plaintiff removed the cord from around his neck and charged toward the opening. (Dunning Decl. at ¶ 11; LeClair Decl. at ¶ 10; Trombley Decl. at ¶ 23; Tulip Decl. at ¶ 19; Lamica Decl. at ¶ 13; Smith Decl. at ¶ 21.) Plaintiff then grabbed the cell door and prevented the officers from entering the cell. (Lamica Decl. at ¶ 13; LeClair Decl. at ¶ 13.) According to Defendants, minimal force was used to subdue and restrain Plaintiff. To that end, Lamica struck Plaintiff with his state-issued baton one time on the left hand. (Lamica Decl. at ¶ 13; LeClair Decl. at ¶ 14.) Plaintiff released his grip on the cell door and Smith, who was carrying a state-issued shield, struck Plaintiff with the shield in the upper body and used the shield to force Plaintiff to the floor. (Lamica Decl. at ¶ 13; LeClair Decl. at ¶ 15; Tulip Decl. at ¶¶ 20, 21; Trombley Decl. at ¶ 24.)

Once on the floor, Plaintiff used his right arm and grabbed Tulip around his left leg. (Trombley Decl. at ¶ 25; LeClair Decl. at ¶ 16.)  Plaintiff continued to refuse directions and struggle with staff.  (Tulip Decl. at ¶ 23, Trombley Decl. at ¶ 27; LeClair Decl. at ¶ 16.)  Lamica then struck Plaintiff in the upper right arm three times with his baton, at which point Plaintiff released Tulip's leg.  (Lamica Decl. at ¶ 13; Tulip Decl. at ¶ 24.)  While Plaintiff was still on the floor, Tulip, LeClair, and Trombley used "body holds" on top of Plaintiff to maintain control and cease Plaintiff's resistance.  (Tulip Decl. at ¶¶ 25, 26; LeClair Decl. at ¶ 17; Trombley Decl. at ¶¶ 28, 29.)  Tulip secured Plaintiff's right arm; LeClair secured Plaintiff's left arm; Trombley secured Plaintiff's legs; and Tulip applied mechanical restraints to Plaintiff's wrists.  (Tulip Decl. at ¶ 26; LeClair Decl. at ¶ 17; Trombley Decl. at ¶ 28.)

After the restraints were applied, Plaintiff became compliant, and all force ceased.  (Tulip Decl. at ¶ 26; LeClair Decl. at 17; Trombley Decl. at ¶ 29.)  Plaintiff was then escorted to the infirmary for evaluation without further incident.  (Tulip Decl. at ¶ 27; LeClair Decl. at ¶ 18; Trombley Decl. at ¶ 30.)

## III.   STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

On summary judgment motions, the Second Circuit has held "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the court should not weigh evidence or assess the credibility of witnesses.  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up).  However, where the motion and cross-motion "seek a determination of the same issues," as is the case here, the court considers them together.  *Gilani v. Teneo, Inc.*, No. 20-CV-1785 (CS), 2021 WL 3501330, at *10 (S.D.N.Y. Aug. 4, 2021).  "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other."  *Bedi*, 453 F. Supp. 3d at 570; *see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.").

## IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Liberally construed, Plaintiff argues he is entitled to summary judgment because the record evidence establishes Defendants subjected him to excessive force and sexual assault, failed to intervene, and denied him medical care in violation of his Eighth Amendment rights. (Dkt. No. 156.)  Defendants argue Plaintiff's motion is procedurally deficient and fails to

demonstrate his entitlement to summary judgment on the merits.  (Dkt. No. 166-1 at 23-25.)  The Court agrees with Defendants.

### A.   Plaintiff's Failure to Submit a Statement of Material Facts

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a separate Statement of Material Facts.  L.R. 56.1(a).  "The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." *Id.*  "Each fact listed shall set forth a specific citation to the record where the fact is established." *Id.*  "<u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.</u>" *Id.* (emphasis in the original).

Plaintiff is aware the Local Rules are not "empty formalities," and the "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts *shall* result in a denial of the motion."  (Dkt. No. 73 at 8 (denying Plaintiff's first motion for summary judgment for failure to comply with L.R. 56.1(a)).).

Here, Plaintiff's motion for summary judgment blends a notice of motion with a memorandum of law and requires the Court and Defendants to "look" at the attached exhibits as "evidence" of his claims.  (Dkt. Nos. 156, 156-1.)  Because Plaintiff has not complied with L.R. 56(1)(a) by including the required Statement of Material Facts, the Court recommends denying Plaintiff's motion for summary judgment.[7]  (*See, e.g.*, *A'Gard v. Locke*, No. 14-CV-0613 (GTS/DEP), 2016 WL 8735653, at *4 (N.D.N.Y. June 24, 2016) (denying summary judgment motion because the *pro se* plaintiff did not comply with the applicable local rules governing

---

[7]  As pointed out by Defendants, because Plaintiff failed to submit the required Statement of Material Facts, they were unable to respond.  (*See* Dkt. No. 166-1 at 23-25; Dkt. No. 166-2 at 1.)

motion practice by including a Statement of Material Facts) (citing *Riley v. Town of Bethlehem*, 5

F. Supp. 2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving

party's failure to file a properly supported Statement of Material Facts as required under the

Local Rules)), *report-recommendation adopted by* 2016 WL 5137273 (N.D.N.Y. Sept. 21,

2016); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426-27 & n.4 (N.D.N.Y. 2009)

(Suddaby, J.) ("As has often been recognized by both the Supreme Court and Second Circuit,

even *pro se* litigants must obey a district court's procedural rules.") (collecting cases).

### B.   Merits

Even if the Court overlooked Plaintiff's failure to comply with the Local Rules, *see Holtz*

*v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001), Plaintiff's motion is legally deficient

and is replete with conclusory allegations and, as noted, directs the Court to "look" at the

"massive amounts of evidence" that allegedly support his claims.  (Dkt. No. 156 at 3; *see also id*.

at 78-79.)

As set forth in Part V.C., *infra*, the Court finds no reasonable factfinder could conclude

Wilson was deliberately indifferent to Plaintiff's serious medical needs.  Thus, Plaintiff is not

entitled to summary judgment on the medical indifference claim.

Moreover, although Plaintiff claims he was "haynessly [sic] and brutally assaulted" and

"sexually violated" on February 22, 2019, construing the evidence in the light most favorable to

the nonmoving party, *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621-22 (2d Cir. 2008),

the two documented use of force incidents resulted from Plaintiff's non-compliance with staff

directives and attempted self-harm.  (*See generally* Dkt. No. 166-2 ("Defs.' SMF") at ¶¶ 11-31

36-44.)  Indeed, as set forth in Part V.D., *infra*, Defendants have submitted declarations detailing

their involvement, if any, in each of the documented use of force incidents at issue, to wit: they

either did not participate in or observe the actual force at issue and/or the minimal force was reasonably applied in response to Plaintiff's own actions and in a good-faith effort to maintain or restore discipline.  Furthermore, though Plaintiff has presented evidence that tends to support his allegation that he was *injured* during the incidents as issue, questions of material fact remain as to whether Defendants acted wantonly and in bad faith.  Thus, Plaintiff is not entitled to summary judgment on the excessive force, failure-to-intervene, and sexual assault claims.

Accordingly, the Court recommends denying Plaintiff's motion for summary judgment in its entirety.

## V.    DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants cross-move for summary judgment and seek dismissal of the amended complaint in its entirety with prejudice on the following grounds: (1) Uhler, Gettmann, and Wilson were not personally involved in the alleged excessive force incidents; (2) Plaintiff's medical indifference claim against Wilson fails on the merits; (3) Plaintiff's excessive force, failure-to-intervene, and sexual assault claims fail on the merits; and (4) Defendants are entitled to qualified immunity.  (Dkt. No. 166-1 at 6-25.)  Plaintiff opposed the motion.  (Dkt. Nos. 169, 170, 178.)  For the reasons discussed below, the Court agrees Uhler, Gettmann, and Wilson are entitled to summary judgment, but otherwise finds questions of material fact preclude dismissal of Plaintiff's Eighth Amendment excessive force, failure-to-intervene, and sexual assault claims.

### A.    Plaintiff's Response to Defendants' Statement of Material Facts

As required by the Local Rules, Defendants submitted a Statement of Material Facts and advised Plaintiff of the consequences of failing to file a response.  (Dkt. No. 166 at 3.)  Although Plaintiff opposed Defendants' cross-motion, he failed to do so in the manner required under the

Local Rules.[8]  (Dkt. Nos. 169, 170, 178.)  "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'"  *Cao-Bossa v. New York State Dep't of Lab.*, No. 18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021); *see Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

Where, as in this case, a party has failed to respond to the movant's Statement of Material Facts in the manner required under Local Rule 56.1(b), the facts in the movant's statement to which the nonmovant has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Accordingly, the facts set forth in Defendants' Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified amended complaint and opposition papers will be accepted as true.[9]  *See McAllister v. Call*, No. 10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material

---

[8]  Local Rule 56.1(b) requires the opposing party to file a response to the movant's Statement of Material facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  L.R. 56.1(b).

[9]  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [the] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

facts on motion for summary judgment); *Douglas v. Perrara*, No. 11-CV-1353 (GTS/RFT), 2013
WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any
question of material fact, the Court will accept the facts as set forth in Defendants' Statement of
Facts . . . supplemented by Plaintiff's verified complaint . . . as true.").  As to any facts not
contained in Defendants' Statement of Material Facts, the Court is "required to resolve all
ambiguities and draw all permissible factual inferences" in favor of Plaintiff.  *Terry v. Ashcroft*,
336 F.3d 128, 137 (2d Cir. 2003).

### B.      Personal Involvement

Defendants contend Plaintiff fails to establish the personal involvement of Uhler and
Gettmann in any Eighth Amendment violation.  (Dkt. No. 166-1 at 6-10.)  Similarly, Defendants
argue insofar as Plaintiff intended to bring an excessive force or failure-to-intervene claim
against Wilson, the claim must be dismissed for lack of personal involvement.  *Id.* at 12.  The
Court agrees.

#### 1.      Legal Standards

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a
prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.
1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to
prevail on a § 1983 cause of action against an individual, a plaintiff must show "a tangible
connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d
260, 263 (2d Cir. 1986).  "[D]irect participation as a basis of liability in this context requires
intentional participation in the conduct constituting a violation of the victim's rights by one who
knew of the facts rendering it illegal."  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.
2001) (internal quotation marks omitted).

Recently, the Second Circuit concluded "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). To avoid summary judgment, a plaintiff must establish the defendant violated the constitution by his or her "own conduct, not by reason of [the defendant's] supervision of others who committed the violation" and cannot "rely on a separate test of liability specific to supervisors." *Id*. The "factors" necessary to plead and establish a § 1983 violation "'will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Briefly, to establish an Eighth Amendment excessive force claim, a plaintiff must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). To establish liability based on the failure to intervene, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010).

### 2.   Analysis

The record evidence establishes neither Uhler, Gettmann, or Wilson were present for, or participated in, the use of force incidents at issue. (Defs.' SMF at ¶ 44; Uhler Decl. at ¶¶ 12, 23, Gettmann Decl. at ¶¶ 16, 27; Wilson Decl. at ¶¶ 13, 26; Pl.'s Dep. at 12-19, 105-07, 107-110,

112.)  In short, the Court agrees with Defendants that Gettmann's and Uhler's involvement in this action was limited to their supervisory roles as the watch commander and superintendent, respectively,[10] while Wilson's role was limited to her medical care after the first incident.  (Dkt. No. 166-1 at 8, 12.)

As to the 9:20 a.m. incident, Gettmann approved Dunning's request for an extraction team after being informed that Plaintiff was refusing multiple direct orders from staff to bring his hands into the cell, return his breakfast tray, and exit his cell, while Uhler approved the cell extraction and use of chemical agents to assist in the removal of Plaintiff from his cell, if necessary.  (Gettmann Decl. at ¶¶ 10, 11; Uhler Decl. at ¶ 11.)  With respect to the 12:30 p.m. incident, Gettmann and Uhler were not contacted prior to the use of force because the incident arose from a perceived medical emergency.  (Defs.' SMF at ¶ 40, Dunning Decl. at ¶ 10; Pl.'s Dep. at 59-60 (Plaintiff testifying that he threatened to "hang up" for attention).)  As to Wilson, it is undisputed that she was not present for either use of force incident.  (Wilson Decl. at ¶¶ 13, 26.)

Thus, the Court finds there is no showing that Uhler, Gettmann, or Wilson had the necessary level of culpability to satisfy the subjective component of Plaintiff's excessive force claim and failure-to-intervene claim.  *See Scarbrough v. Thompson*, No. 10-CV-901 (TJM/CFH), 2012 WL 7761439, at *10 (N.D.N.Y. Dec. 12, 2012) (granting summary judgment to supervisory officials who authorized the use of chemical agents but were not present for the cell extraction for lack of personal involvement); *Reeder v. Bell*, No. 15-CV-01078 (MAD/TWD), 2019 WL 2997513, at *8 (N.D.N.Y. May 7, 2019) (same); *see also Ridge v. Davis*, No. 18-CV-8958, 2022 WL 357020, at *10 (S.D.N.Y. Feb. 7, 2022) (granting summary judgment to certain

---

[10]  The watch commander and superintendent are supervisory officials in the chain of command at the facility whom lower-level officials must contact to authorize and facilitate cell extractions and the use of chemical agents.  (Getttmann Decl. at ¶ 8.)

defendants in a § 1983 suit bringing excessive force claims where "the record fails to establish that [these defendants] were directly involved in the alleged assault of [the] plaintiff"); *Allah v. Annucci*, No. 16-CV-1841, 2020 WL 3073184, at *8 (S.D.N.Y. June 10, 2020) (granting summary judgment to a § 1983 defendant where the record did not establish the defendant's personal involvement).

Accordingly, the Court recommends granting Defendants' cross-motion for summary judgment to Uhler, Gettmann, and Wilson on this ground.

### C.      Medical Indifference

Defendants contend Plaintiff fails to demonstrate Wilson was deliberately indifferent to his serious medical needs.  (Dkt. No. 166-1 at 6-10.)  The Court agrees.

#### 1.      Legal Standard

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This standard contains objective and subjective components.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures the defendant acted with a sufficiently culpable state of mind.  *Id*. at 184 (citing, *inter alia*, *Chance*, 143 F.3d at 702).

To satisfy the objective element, the alleged deprivation must be "sufficiently serious."  *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious involves two inquiries.  *Id*.  The first question is whether the plaintiff was deprived of adequate medical care.  *Id*.  Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth

Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47); *see Spavone v. New York State Dep't of Corr. Svcs.*, 719 F.3d 127, 123 (2d Cir. 2013) ("A prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.").

The second question is whether the purported inadequacy in the medical care is "sufficiently serious." *Salahuddin*, 467 F.3d at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id.* (citing *Smith*, 316 F.3d at 185-86).  A condition is "sufficiently serious" in objective terms if it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain . . . ."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted).  Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'"  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702).

"Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on 'the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.'"  *Revels v. Corr. Med. Care, Inc.*, No. 17-CV-0088 (MAD/TWD), 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Smith*,

316 F.3d at 186); *Salahuddin*, 467 F.3d at 280 (noting that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability) (citation omitted).

To satisfy the subjective element, the plaintiff must demonstrate the defendants had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden*, 186 F.3d at 262. "In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40). Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.'" *Wright v. Genovese*, 694 F. Supp. 2d 137, 154-55 (N.D.N.Y. 2010) (quoting *Salahuddin*, 467 F.3d at 281).

### 2.    Analysis

Here, no reasonable jury could find Wilson deprived Plaintiff of adequate medical care. The record establishes Wilson examined Plaintiff after the 9:20 a.m. incident.  (Defs.' SMF at ¶¶ 32, 33, 34.)  As set forth herein, Wilson checked Plaintiff's vital signs, all of which were in the

normal range for an adult male.  (Wilson Decl. at ¶¶ 14, 15, 16.)  She evaluated Plaintiff for any injuries and observed a missing front tooth from his upper gum from a previous injury; a quarter of an inch bruise to Plaintiff's upper right lip; a bruise on the side and under Plaintiff's left eye; a one and a half inch scratch on Plaintiff's left shoulder; and a scrape on Plaintiff's right middle finger with tearing of the skin which measured a quarter of an inch in length.  *Id*. at ¶ 17.  In her sworn declaration, Wilson states she did not observe any open wounds on Plaintiff's left eye during her initial examination.  *Id*. at ¶¶ 17, 23.  She treated Plaintiff's open areas with Hibiclens and an antibiotic ointment, advised him to keep the areas clean and dry, and to follow-up with DOCCS health services as needed.  *Id*. at ¶¶ 18, 19.

Not long after, Wilson was informed Plaintiff had a cut on his eye.  *Id*. at ¶ 22.  She responded to Plaintiff's cell at which time she observed a cut that was not present during her initial evaluation of Plaintiff.  *Id*. at ¶ 23.  This was Wilson's last interaction with Plaintiff on February 22, 2019.  *Id*.  She returned to her office to arrange for additional treatment at Upstate's emergency room.  *Id*.  At approximately 12:20 p.m., Plaintiff threatened self-harm, which resulted in the 12:30 p.m. use of force incident.  *See id*. ¶¶ 24, 25, 28.  Thus, the record evidence demonstrates Plaintiff's medical needs were reasonably treated and monitored by Wilson.

Even assuming Plaintiff could satisfy the objective prong, the Court finds no reasonable jury could find Wilson acted with a sufficiently culpable state of mind.  Here, Plaintiff claims that after the 9:20 a.m. incident, Wilson "sent [him] back to [his] cell when [he] should have [gone] to the hospital" because there was "a hole in [his] eye lid the size of a nick[el] bleeding[.]"  (Dkt. No. 119 at 6; *see also* Pl.'s Dep. at 24, 35.)  However, disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a § 1983 claim since those issues implicate medical judgment and at worst negligence

constituting malpractice. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d

303, 312 (S.D.N.Y. 2001); *see also Polletta v. Farinella*, No. 11-CV-660, 2012 WL 6115101, at

*2 (D. Conn. Dec. 10, 2012) ("That Plaintiff did not receive the treatment of his choice, *i.e.*,

being taken to an outside hospital, is insufficient to state a claim for deliberate indifference.").

Thus, while Plaintiff takes issue with the medical treatment he received from Wilson after the

9:20 a.m. incident, such claims do not rise to the level of a constitutional violation. *See Dean v.

Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) (holding an inmate does not have the right to

treatment of his choice); *Washington v. Westchester Cty. Dep't of Corr.*, No. 13-CV-5322, 2014

WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of

whether or not to administer a treatment or medication is a medical judgment that, without more,

does not amount to deliberate indifference." (citation omitted)).

Additionally, the record demonstrates that at approximately 4:00 p.m., Plaintiff was

transferred to the Alice Hyde Hospital where he was examined and received four stiches to his

left eye.  (Pl.'s Dep. at 71-73.)  Even assuming Wilson failed to initially observe and/or treat

Plaintiff's eye injury, "negligence in diagnosing or treating an inmate's medical condition does

not constitute deliberate indifference."  *Ahlers v. Kaskiw*, No. 12-CV-501 (GLS/ATB), 2014 WL

4184752, at *7 (N.D.N.Y. Aug. 21, 2014) (citing *Farmer*, 511 U.S. at 835).

Moreover, "a delay in treatment does not violate the constitution unless it involves an act

or failure to act that evinces a conscious disregard of a substantial risk of serious harm."  *Pabon

v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) (citation and

quotation marks omitted), *aff'd*, 459 F.3d 241 (2d Cir. 2006).  That is, "denying or delaying

needed treatment for a serious medical condition constitutes deliberate indifference for Eighth

Amendment purposes only if," for example, the "official[ ] delayed care as a form of

punishment, ignored a life-threatening and fast-degenerating condition for several days, or delayed major surgery." *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (citation omitted); *see also Perez v. Hawk*, 302 F. Supp. 2d 9 21 (E.D.N.Y. 2004) (treatment of a plaintiff's medical conditional generally defeats a claim of deliberate indifference).  The record is devoid of any such evidence.

Accordingly, based on the foregoing, the Court recommends granting Defendants' cross-motion for summary judgment to Wilson on this ground.

### D.      Excessive Force, Failure-to-Intervene, and Sexual Assault

Defendants contend Plaintiff's excessive force, failure-to-intervene, and sexual assault claims fail on the merits because, as detailed herein, Defendants maintain they either did not participate in or observe the force used and/or that such force was applied in response to Plaintiff's own actions and in a good-faith effort to maintain or restore discipline.  (Dkt. No. 166-1 at 14-21.)  Alternatively, Defendants maintain they are entitled to qualified immunity.  *Id*. at 22-23.  The Court disagrees and finds questions of material fact preclude granting summary judgment in Defendants' favor.

### 1.      Legal Standards

"A prison official's use of force violates the Eighth Amendment when, objectively, 'the alleged punishment [was] . . . sufficiently serious,' and, subjectively, 'the prison official . . . [had] a sufficiently culpable state of mind.'"  *Torres v. City of New York*, No. 17-CV-06604, 2019 WL 7602181, at *6 (S.D.N.Y. Aug. 14, 2019) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (alterations in original)), *report-recommendation adopted by* 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019).  "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'"  *Wright*

*v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson*, 503 U.S. at 8).  This objective component requires, in the abstract, "that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions."  *Bradshaw v. City of New York*, 855 F. App'x 6, 9 (2d Cir. 2021) (quoting *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016)).  The subjective component, on the other hand, requires a "showing that 'the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct.'"  *Randolph v. Griffin*, 816 F. App'x 520, 523 (2d Cir. 2020) (quoting *Harris*, 818 F.3d at 63).  "[T]he test for wantonness is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Fabricio v. Annucci*, 790 F. App'x 308, 310 (2d Cir. 2019) (quoting *Harris*, 818 F.3d at 63).

In evaluating an excessive force claim, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted), and "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Id*. at 9-10 (internal quotation marks omitted).

Still, "[w]hen prison officials maliciously and sadistically use force to cause harm, a plaintiff need not demonstrate significant injury because, in those circumstances, contemporary standards of decency always are violated.  Thus, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se*."  *Greenburger v. Roundtree*, No. 17-CV-

03295, 2020 WL 6561598, at *4 (S.D.N.Y. Jan. 16, 2020) (internal citations and quotation marks omitted), *report-recommendation adopted by* 2020 WL 4746460 (S.D.N.Y. Aug. 16, 2020); *see also Wright*, 554 F.3d at 269 ("[W]here a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak."); *White v. Marinelli*, No. 17-CV-01094 (LEK/ATB), 2019 WL 1090802, at *10 (N.D.N.Y. Mar. 8, 2019) ("[P]hysical assaults by guards to humiliate an inmate, or in retaliation for past conduct, violate the Eighth Amendment.").

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832). Prison officials can be held liable under § 1983 for failing to intervene when another official violates an inmate's constitutional right in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). As set forth above, in order to establish liability for failure to prevent another officer from committing a constitutional violation, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene." *Tafari*, 714 F. Supp. 2d at 342.

Moreover, "[b]ecause sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." *Boddie*, 105 F.3d at 861. "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no

penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford v. Cuomo*, 796 F.3d 252, 256-57 (2d Cir. 2015).

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In examining whether a right is clearly established, courts look to prior precedent to determine if is "it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah*, 142 S. Ct. at 11 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citations and internal quotations marks omitted)). While prior caselaw need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 7-8 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotations marks omitted)).

### 2. The Morning Incident

Generally, as to the 9:20 a.m. incident, Defendants contend Dominic, Trombley, Tulip, Dunning, and Smith are entitled to summary judgment for lack of personal involvement, while Lamica, Gallagher, Marshall, Obregozo, and Salls are entitled to summary judgment because only minimal force was used to maintain order. (Dkt. No. 166-1 at 16-18.) However, as

discussed below, the Court finds there are genuine issues of fact precluding the grant of summary judgment.

Defendants submit evidence demonstrating Smith was not a part of the extraction team and did not use or witness any physical force against Plaintiff and that Smith's only involvement was interacting with Plaintiff during the breakfast run and reporting Plaintiff's failure to remove his hands from the feed-up hatch.  (Smith Decl. at ¶ 8.)  Similarly, Dominic asserts he did not participate in the cell extraction or use any physical force against Plaintiff and his role was limited to negotiating with Plaintiff.  (Dominic Decl. at ¶¶ 11, 12, 14.)  Trombley avers his only role in the cell extraction was to manually open Plaintiff's cell gate and secure it while the extraction took place.  (Trombley Decl. at ¶¶ 10, 13, 14.)  Dunning's involvement was limited to the application of chemical agents prior to the cell extraction.[11]  (Dunning Decl. at ¶ 6.)  Both Dominic and Dunning state once the extraction team entered the cell, they could no longer see inside of Plaintiff's cell and, therefore, they did not possess actual knowledge of any force used nor did they have a realistic opportunity to intervene in any alleged excessive force.  (Dominic

---

[11]  "The use of chemical agents alone does not represent 'malicious or sadistic' actions." *Flemming v. Kemp*, No. 09-CV-1185 (TJM/DRH), 2012 WL 4094196, at *13 (N.D.N.Y. Aug. 30, 2012), *report-recommendation adopted* by 2012 WL 4094009 (N.D.N.Y. Sept. 17, 2012); *see also Reeder v. Hogan*, No. 09-CV-520 (NAM/ATB), 2013 WL 2632600, at *5 (N.D.N.Y. June 11, 2013) (use of chemical agent constituted force that was necessary "to restore discipline and subdue plaintiff, who was aggressively refusing to comply with orders" to exit cell peacefully); *cf. Reeder v. Artus*, No. 09-CV-0575 (DNH/DRH), 2010 WL 3636138, at *9 (N.D.N.Y. July 27, 2010) ("[T]he deployment of chemical weapons solely for the purposes of harming an inmate who had planned to cooperate and voiced such intentions to multiple parties represents a malicious use of force which would constitute a *per se* Eighth Amendment violation."), *report-recommendation adopted*, 2010 WL 3636132 (N.D.N.Y. Sept. 9, 2010). Here, there is no dispute that Plaintiff refused multiple direct orders to exit his cell and was advised that if he continued to use refuse order, chemical agents would be administered.  (Defs.' SMF at ¶¶ 11-28.)

Decl. at ¶ 17; Dunning Decl. at ¶ 17.)  Tulip avers he did not observe the cell extraction and arrived after Plaintiff was restrained and removed from the cell.  (Tulip Dec. at ¶ 12.)

Defendants also submit evidence that Lamica, Gallagher, Marshall, and Obregozo, under the direction of Salls, used only the minimal force necessary to maintain the safety and security of the facility and to protect staff and other incarcerated individuals.  (Dunning Decl. at ¶ 7; Lamica Decl. at ¶¶ 8, 9, 10; Gallagher Decl. at ¶¶ 7, 9; Marshall Decl. at ¶¶ 7, 9; Obregozo Decl. at ¶¶ at 7, 8; Salls Decl. at ¶¶ 6, 7, 9.)

To be sure, based on the foregoing, Defendants have marshalled evidence demonstrating minimal force was used only after Plaintiff refused multiple opportunities to comply with directions.[12]  Nevertheless, Plaintiff testified under oath that Lamica, Gallagher, Marshall, and Obregozo struck him while he was face down, already subdued, and defenseless, while Salls failed to intervene.  (Pl.'s Dep. at 16-19.)  He also claims he was attacked, while restrained, under the pretext he spit at Lamica.  *Id.* at 22.  Accordingly, when viewed in the light most favorable to Plaintiff, summary judgment is not warranted as to Lamica, Gallagher, Marshall, Obregozo, and Salls.

Moreover, on this record, questions of fact remain as to the personal involvement of Dominic, Dunning, Trombley, Tulip, and Smith.  To that end, Plaintiff testified Dominic and Dunning were present during the cell extraction and the record demonstrates Trombley was

---

[12]  Defendants' reliance on *Reeder v. Hogan* is misplaced.  (*See* Dkt. No. 166-1 at 19.)  In *Reeder v. Hogan*, summary judgment was granted to the defendant corrections-officers where "[t]he defendants used necessary force to restore discipline and subdue plaintiff, who was aggressively refusing to comply with orders" because no reasonable finder of fact would credit the plaintiff's claims that he was compliant with orders to exit his cell peacefully where video evidence corroborated the defendants' version of events.  *Reeder v. Hogan*, 2013 WL 2632600, at *5.  Here, unlike in *Reeder v. Hogan*, Defendants have not submitted video evidence of the cell extraction at issue.

present, manually opened Plaintiff's cell gate and secured it while the extraction and alleged

excessive force took place.  (Pl.'s. Dep. at 16-18.)  Additionally, Plaintiff testified Smith and

Tulip were present when he was slammed on his face, kicked, and punched while restrained

under the pretext he spit on Lamica.  *Id*. at 22.  Therefore, viewed in the light most favorable to

Plaintiff, a question of fact remains whether Dominic, Dunning, Trombley, Smith, and Tulip

could have intervened in the foregoing alleged excessive force.  *See Terebesi v. Torreso*, 764

F.3d 217, 244 (2d Cir. 2014) (cleaned up) ("Whether the officer had a realistic chance to

intervene is normally a question for the jury, unless, considering all the evidence, a reasonable

jury could not possibly conclude otherwise."); *see also Mason v. Moore*, No. 17-CV-1086

(GLS/DJS), 2020 WL 555943, at *5 (N.D.N.Y. Jan. 13, 2020) (rejecting the defendant officers'

argument that because the excessive force incident in question lasted only approximately fifteen

to twenty seconds, summary judgment was appropriate on the ground that the defendants would

not have had an opportunity to intervene), *report-recommendation adopted by* 2020 WL 554816

(N.D.N.Y. Feb. 4, 2020).

   In short, the record evidence provides differing accounts of what transpired on the

morning of February 22, 2019, and resolving what happened is a question for the jury.  "While

the weight of the evidence may favor [Defendants], the evidence is not so conclusive that a

reasonable jury could not believe Plaintiff's assertions."  *Lewis v. Hanson*, No. 18-CV-0012

(LEK/DJS), 2022 WL 991729, at *9 (N.D.N.Y. Mar. 31, 2022) (citing *Franklin v. Oneida Corr.*

*Facility*, No. 03-CV-1452 (LEK), 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) ("As

tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants'

invitation to make a credibility determination and reject plaintiff's version of the events on

motion for summary judgment is plainly unwarranted.")); *see, e.g.*, *Cicio v. Lamora*, No. 08-CV-

431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted by* 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by [Defendant] stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges.  Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact."); *see also Harris v. Miller*, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically . . . [even where] the proof of excessive force [is] weak.").

Relatedly, the Court finds Defendants are not entitled to qualified immunity at this stage of the proceeding.  *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *see also Gjenashaj v. City of New York*, No. 19 Civ. 4142, 2020 WL 7342723, at *4 (S.D.N.Y. Dec. 14, 2020) (denying summary judgment on defendants' qualified immunity claim because material facts remain in dispute as to plaintiff's excessive force claim); *Bennett v. Falcone*, No. 05 Civ. 1358, 2009 WL 816830, at *6 (S.D.N.Y. Mar. 25, 2009) ("For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient.").

In sum, as to the 9:20 a.m. incident, Defendants have not met their burden of showing there is no genuine issue of material fact as to Plaintiff's excessive force and failure-to-intervene claims.  Accordingly, the Court recommends denying Defendants' cross-motion for summary judgment to Dominic, Trombley, Tulip, Dunning, Smith, Lamica, Gallagher, Marshall, Obregozo, and Salls on these grounds.

### 3.       The Afternoon Incident

Defendants maintain LeClair, Trombley, Tulip, Lamica, Smith, and Dunning are entitled to summary judgment as to the 12:30 p.m. incident because they used minimal force in an emergency to protect Plaintiff from harming himself.  (Dkt. No. 166-1 at 20-21.)  Again, the Court finds there are genuine issues of fact precluding the grant of summary judgment.

In support of their motion, Defendants have submitted evidence demonstrating LeClair, Trombley, Tulip, Lamica, Smith, and Dunning responded to a call that Plaintiff was experiencing suicidal thoughts and was found with a cord tied to the top bunk and around his neck.  (Dunning Decl. at ¶ 10; LeClair Decl. at ¶ 10; Trombley at ¶ 22; Tulip Decl. at ¶ 18; Lamica Decl. at ¶ 12; Smith Decl. at ¶ 11.)  Plaintiff also refused several direct orders to remove the cord from around his neck.  (Dunning Decl. at ¶ 10.)  As a result, Dunning directed Plaintiff be immediately removed from his cell.  *Id*.  According to Defendants, once Plaintiff's cell door was opened, Plaintiff removed the cord from around his neck and charged at the officers, at which point minimal force became necessary to subdue and restrain Plaintiff.  (Dunning Decl. at ¶ 11; LeClair Decl. at ¶ 10; Trombley Decl. at ¶ 23; Tulip Decl. at ¶ 19; Lamica Decl. at ¶ 12; Smith Decl. at ¶ 21.)  Once Plaintiff became compliant, all force ceased.  (Dunning Decl. at ¶ 11; LeClair Decl. at ¶ 18; Trombley Decl. at ¶ 29; Tulip Decl. at ¶ 26; Lamica Decl. at ¶ 13; Smith Decl. at ¶ 13.)  Defendants deny subjecting Plaintiff to excessive force or failing to intervene.  *Id*.  Smith also denies sexually assaulting Plaintiff.  (Smith Decl. at ¶ 13.)

However, Plaintiff testified Tulip, Trombley, Lamica, and LeClair repeatedly beat him with batons.  (Pl.'s Dep. at 59, 60, 99.)  He testified Smith choked him and said, "I should kill you right now."  *Id*. at 60.  Notably, even after Plaintiff was facedown, subdued, and restrained, Plaintiff's avers they continued to punch, kick, and beat Plaintiff with the shield and their batons.

*Id.* at 60, 61.  Additionally, Plaintiff testified Dunning witnessed the foregoing and failed to intervene.  *Id.* at 64-65.  Plaintiff was then forced to his feet with his arms restrained behind his back.  *Id.* at 61.  Smith proceeded to reach his left hand into Plaintiff's boxer shorts and pulled on Plaintiff's "scrotum sack and . . . penis" in a "nightmarish way, which is like he's trying to pull it off."  *Id.*

Considering the foregoing, this Court cannot conclude that no rational jury could find in favor of Plaintiff and, therefore, summary judgment is not appropriate.  *See, e.g.*, *Dallio v. Sanatamore*, No. 06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (denying summary judgment due to hesitancy to resolve credibility issues and weighing evidence on summary judgment where the plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, despite both evidence showing minor injuries the plaintiff suffered and defendant's contrary evidence); *Cicio*, 2010 WL 1063875, at *7-8 (denying summary judgment on excessive force claim despite "seemingly overwhelming" contradictory evidence, including plaintiff's very minor injury).  Moreover, because material issues of fact exist, Defendants are not entitled to summary judgment on the merits or qualified immunity at this stage of the proceeding.  *See Thomas* 165 F.3d at 143.

In sum, as to the 12:20 p.m. incident, Defendants have not met their burden of showing that there is no genuine issue of material fact as to Plaintiff's excessive force, failure-to-intervene, and sexual assault claims.  Accordingly, the Court recommends denying Defendants' cross-motion for summary judgment to LeClair, Trombley, Tulip, Lamica, Smith, and Dunning on these grounds.

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court recommends denying Plaintiff's motion for summary judgment and granting in part and denying in part Defendants' cross-motion for summary judgment.  If this recommendation is accepted and adopted, Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Dominic, Trombley, Tulip, Dunning, Smith, Lamica, Gallagher, Marshall, Obregozo, and Salls, and Eighth Amendment sexual assault claim against Smith remain for trial.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 156) be **DENIED**; and it is further

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 166) be **GRANTED IN PART AND DENIED IN PART** as follows: (1) granted insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Uhler, Gettmann, and Wilson for lack of personal involvement; (2) granted insofar as it seeks dismissal of Plaintiff's Eighth Amendment medical indifference claim against Wilson on the merits; and (3) denied in all other respects; and it is further

**RECOMMENDED** that the Clerk be directed to terminate Uhler, Gettmann, and Wilson from this action; and it is further

**ORDERED** that the Clerk provide a copy of this Report-Recommendation and Order to the parties in accordance with the Local Rules of Practice, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated:  June 21, 2022
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[13]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2021 WL 3501330
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Asad GILANI, Plaintiff,

v.

TENEO, INC., Piers Carey, Rachel Head, Brett Ayres,
Steve Evans, and Teneo USA, Inc., Defendants.

No. 20-CV-1785 (CS)
|
Signed 08/04/2021

**Attorneys and Law Firms**

Asad Gilani, Armonk, New York, Pro Se Plaintiff.

Laura L. Rubenstein, Marc A. Campsen, Wright, Constable
& Skeen, LLP, Baltimore, Maryland, Jane B. Jacobs, Klein
Zelman Rothermel Jacobs & Schess LLP, New York, New
York, Counsel for Defendants.

**OPINION & ORDER**

CATHY SEIBEL, U.S.D.J.

 **\*1** Before the Court are the parties' cross-motions for
summary judgment. (Docs. 151, 163.) For the following
reasons, Defendants' motion is GRANTED in part and
DENIED in part, and Plaintiff's motion is DENIED.

**I. BACKGROUND**

This case arises out of the alleged discrimination and
retaliatory termination that Plaintiff Asad Gilani claims
to have experienced at his former workplace, Teneo, Inc.
("Teneo").

 **A. Facts**

The following facts are based on the parties' Local Civil Rule
56.1 Statements, responsive 56.1 Statements, declarations,
and supporting materials.[1] The facts are undisputed except
as noted.

[1]     Plaintiff's responsive 56.1 Statement, (Doc. 182-1
       ("P's 56.1 Resp.")), fails to comply with item
       2.C.i of my Individual Practices, which requires

the opposing party to reproduce each entry in
the moving party's Rule 56.1 Statement before
setting out its response thereto. Plaintiff's failure to
reproduce Defendants' Rule 56.1 Statement defeats
the purpose of my individual practice, which is
designed to obviate the need to go back and forth
between the two Rule 56.1 Statements.

Plaintiff's responsive 56.1 Statement does not
address paragraphs 1, 2, 4, 47, 53, 58-59, 64-66, 71,
82-94, 96-108, 110-121, 123-124, 143-146, 154,
and 157 of Defendants' 56.1 Statement, so the
Court deems any properly supported facts in those
paragraphs admitted.

Plaintiff did not submit a proper 56.1 Statement
in support of his cross-motion. That alone would
justify denial of the cross-motion, *see, e.g., Antwi
v. Health & Hum. Sys. (Ctrs.) F.E.G.S.*, No. 13-
CV-835, 2014 WL 4548619, at \*5 (S.D.N.Y.
Sept. 15, 2014), but in light of Plaintiff's *pro
se* status I will not deny his motion on that
ground. To the extent Plaintiff may have intended
a document entitled "Plaintiff's Declaration in
Motion of Partial Summary Judg[ ]ment Against
Defen[d]ants and Against Defendants Summary
Jud[ ]g[ ]ment," (Doc. 172 ("P's Decl.")), to be
his 56.1 Statement, I do not regard it as such
(despite his certification of service, on page 30 of
that document, referring to the document as "Local
56.1 Statement of Undisputed Facts"). It is full
of argument, insults, irrelevancies, conclusions,
tangents and descriptions of events the significance
of which is unexplained and incomprehensible.
Defendants, who argue that the Court should
disregard the document for failure to comply with
Local Rule 56.1(a), (Doc. 194 ("Ds' Opp.") at 2),
will not be penalized for failing to respond to it, as
that would have been essentially impossible. But,
granting Plaintiff special solicitude, I will consider
any properly supported facts in his Declaration.

**1. Plaintiff's Hiring at Teneo**

Teneo provides technology solutions along with software
and hardware produced by several manufacturing partners.
(Doc. 154 ("Ds' 56.1 Stmt.") ¶ 1.) Its operations are based in
Virginia and the United Kingdom. (*Id.* ¶ 2; *see* note 1 above.)

Plaintiff was born in Pakistan in 1956 and is Muslim, and he
describes his race as "Asian-Middle East." (Ds' 56.1 Stmt.

¶ 4; *see* note 1 above.) In August 2016, Vice President of Human Resources Rachel Head and Senior Vice President of Solutions Engineering Steve Evans interviewed Plaintiff for a solutions engineer position at Teneo and recommended to CEO Piers Carey that Teneo hire Plaintiff, which Carey approved. (Doc. 154-1 ("Carey Aff.") ¶ 6; Doc. 154-5 ("Head Aff.") ¶¶ 3-4; Doc. 154-6 ("Evans Aff.") ¶¶ 3-4.) [2] Plaintiff received an offer letter from Head shortly thereafter, which specified that his position was solutions engineer and that he would report to Evans on Teneo's U.S. Technical Team. (Doc. 154-7.) Plaintiff began working for Teneo on September 26, 2016 (shortly before his sixtieth birthday) from his home in Armonk, New York. (P's 56.1 Resp. ¶ 4.) As a solutions engineer, Plaintiff provided "pre-sales" technical support for products; he was not responsible for managing any Teneo employees. (*Id.* ¶¶ 4, 6; Doc. 154-2 at 74:5-15.)

[2]   Plaintiff disputes this and asserts that a Teneo employee named Scott Gibson decided to hire him. (P's 56.1 Resp. ¶ 2.) For support, Plaintiff cites paragraph two of his Declaration, which, in turn, cites several exhibits that do not support that proposition. (*See* P's Decl. ¶ 2.) I will assume, as Plaintiff asserts, that Gibson interviewed him, but Plaintiff does not dispute that Head and Evans also interviewed him and that Carey approved the decision to hire him. (Ps' 56.1 Resp. ¶ 2.) Confusingly, although Plaintiff states that Evans interviewed him on August 24, 2016, (*id.*; *see* Doc. 180-18 at 41:14-18), Plaintiff also asserts that Evans did not pick up his phone during Plaintiff's interview, because a white, non-Muslim employee who was not from Pakistan had a heart attack, (P's Decl. ¶¶ 5, 9; Doc. 171 ("P's Mem.") at 5, 9, 22, 26-27; Doc. 180-18 at 41:14-18). The Court cannot discern what is wrong with a supervisor missing a call because he is attending to a sick employee, or why Plaintiff believes this episode to be indicative of discrimination.

## 2. Complaints About Plaintiff

**\*2**  Over the course of Plaintiff's employment at Teneo, Evans received numerous complaints about Plaintiff's behavior. On February 7, 2017, Evans received a forwarded email from the sales manager for one of Teneo's partners. (Doc. 154-10.) The sales manager wrote that he was "uncomfortable" with what he was seeing from Plaintiff, who

was not "thinking through things or taking time before saying things or sending e-mails." (*Id.* at TI-000161.) As a result of Plaintiff's conduct, the sales manager feared he would miss an opportunity, and he requested that others take the technical lead on the project rather than Plaintiff. (*Id.*)

On March 20, 2017, Plaintiff sent an email asking to be excluded from any account planning and stating that he was not interested in sharing his contacts. (Doc. 154-11 at TI-000166.) [3] Evans replied that Plaintiff did not need to share his personal contacts, but reminded Plaintiff that he could not engage personal contacts on Teneo's behalf and that he needed to go through a sales representative instead. (*Id.* at TI-000165.)

[3]   Plaintiff asserts that he did not refuse to participate in account planning but does not dispute that he sent this email. (*See* P's 56.1 Resp. ¶ 9.)

On April 26, 2017, Plaintiff notified Evans that he would be out of the office, and Evans emailed Plaintiff the procedure for taking days off for a "family emergency," adding that he "hope[d] everything [wa]s ok." (Doc. 154-14 at TI-00469.) Evans's email explained that Plaintiff could get compassionate leave for the death or serious illness of a family member; that if the emergency leave was for other reasons, Plaintiff would need to disclose some details to receive paid leave; and that if he preferred not to share any details, Plaintiff could instead take a vacation day. (*Id.*) Plaintiff replied (copying Head) that patient privacy laws prevented Evans from asking for details and that he would take a vacation day. (*Id.* at TI-00468.) Evans responded that he was not asking Plaintiff to disclose any private medical information and he simply wanted more details about the nature of the emergency so that he could determine what type of leave was appropriate. (*Id.* at TI-00467 to 68.) Evans suggested that Plaintiff could share the details with Head if he felt uncomfortable disclosing them to Evans, and stated that Plaintiff was under no obligation to provide any additional information if he still wanted to use a vacation day. (*Id.*) Plaintiff replied, adding Carey to the thread, and wrote that Evans's conduct was "sad" and a "disgrace," and that the way Teneo treated its employees was "a shame." (*Id.* at TI-00467.) Evans wrote back, commending Plaintiff for his hard work, expressing his hopes that Plaintiff's family emergency would work out well, and offering Plaintiff a paid day of leave instead of a vacation day. (*Id.*) Evans did, however, note that he was concerned about Plaintiff's "accusatory statements" about Teneo and suggested that a discussion with Head would

be helpful to "clear the air." (*Id.*) Plaintiff replied that he was not interested in having a discussion with Head and repeated his comments that Evans's conduct was "sad" and a "disgrace." (*Id.* at TI-00466.)

On April 27, 2017, Evans completed a performance review of Plaintiff. (Doc. 154-12.) [4] In his review, Evans wrote that Plaintiff needed to work on teamwork and respect. (*Id.* at TI-00340.) As an example, Evans noted that he had observed Plaintiff telling others what to do instead of asking them or working collaboratively with them, and he added that people felt bullied by Plaintiff. (*Id.*) Evans noted that refusing to participate in account planning hurts the business and team relationships, and he reiterated that although Plaintiff did not need to share his personal contacts and was not being asked to do so, Plaintiff could not engage personal contacts on behalf of Teneo directly and needed to go through the sales team instead. (*Id.* at TI-00340 to 41.) Evans also wrote that he had spoken to Plaintiff about the February email from the sales manager, and that Plaintiff denied the incident and blamed the sales manager for it. (*Id.* at TI-00341.) Evans noted that Plaintiff needed to improve his relationship with partners, allow the sales team to lead calls and sales strategy, and be more receptive to feedback and constructive criticism. (*Id.*)

[4]     Plaintiff disputes the accuracy of this review. (*See* P's Decl. ¶ 87.) Specifically, he asserts that the goals at Teneo differed from quarter to quarter, and he argues that because this review contains some of the same goals as the previous quarter, it must have been modified at some unspecified time. (*See id.*) The Court has reviewed Plaintiff's record cites, and they do not support this proposition. Regardless, the Court is not considering Evans's comments for their truth, but rather for the fact that they were made. And even if I were to disregard the review entirely, it would not affect the outcome of the case, because the substance of the comments was repeated in other documents the authenticity of which is not disputed, such as the May 23 email discussed below. (*See* note 5 and accompanying text.)

**\*3** Defendants assert that Evans received several additional complaints about Plaintiff, which I will not describe because Plaintiff disputes the truth of them. (*See* Ds' 56.1 Stmt. ¶¶ 19, 26-32; P's 56.1 Resp. ¶¶ 8, 14.) The upshot is that they culminated in Evans emailing Head and Carey on May 23 about Plaintiff's various behavioral problems. (*See*

Doc. 154-16.) [5] Evans wrote that he had spoken to Plaintiff over the phone, but "could not seem to get [Plaintiff] to understand some of the issues around the value of respect with regards to dealings with partners and others at Teneo." (*Id.* at TI-00558.) As an example, Evans described how he had observed Plaintiff bullying an engineer at a partner company. (*Id.*) Evans also recounted the behavioral issues noted in Plaintiff's performance review, described above. (*See id.*) Evans wrote, "I will continue to work with [Plaintiff] to see if we can get these things inline as it would be a shame to lose someone with such strong technical capabilities." (*Id.* at TI-00559.)

[5]     Plaintiff disputes the veracity of the complaints about him but not the fact that they were conveyed to Head and Carey. (*See* P's 56.1 Resp. ¶ 15.)

In October 2017, Plaintiff posted a picture on LinkedIn of himself with Teneo customers who had purchased Cisco products. (Evans Aff. ¶ 27; Doc. 163-12 at 24.) [6] According to Evans, one of Teneo's partners – a Cisco competitor – observed the post and complained to Evans. (Evans Aff. ¶ 28.) This led Evans to call Plaintiff to tell him not to post about Teneo's customers without approval, which Evans then memorialized in an email to Plaintiff. (Doc. 154-18 at TI-00636.) Plaintiff agreed to Evans's terms but noted that he had "started to block [the] Teneo Team from LinkedIn." (*Id.* at TI-00635 to 36.) Evans forwarded the email to Head (changing the subject line from "RE: Linked-in" to "Linked-in Asad explosion in progress"), updated her about the upset partner, and asked for her input on a draft response. (*Id.* at TI-00635.) He noted that if Plaintiff refused to unblock Teneo on LinkedIn, he would "have to look at this as his determination to leave the company." (*Id.*) According to Evans, Plaintiff ultimately agreed to unblock Teneo. (Evans Aff. ¶ 32.) Plaintiff asserts that he did not unblock Teneo. (P's 56.1 Resp. ¶ 34.)

[6]     Cites to nonconsecutively paginated docket materials refer to the page numbers generated by the Court's Electronic Case Filing system.

On June 14, 2018, Evans posted on another social networking site about the technical requirements for a product and asked to speak to Plaintiff "offline" about them. (*See* Doc. 154-19.) Plaintiff replied on the site that "you have to be a Network Professional to understand" the product. (*Id.*) Evans emailed Plaintiff about the reply, letting him know that he "had

2021 WL 3501330

specifically said that we would discuss it [offline]" and that he "also found [Plaintiff's] reply disrespectful." (*Id.*)

In July 2018, the winners of Teneo's "CEO Club," a performance incentive program with a trip to Iceland as a reward, were announced. (Doc. 154-39 at TI-00617-18; Ds' 56.1 Stmt. ¶ 154; *see* note 1 above.) The criteria for non-sales personnel such as Plaintiff were (1) "[a]chievement against objectives," (2) "[s]ubscription to the Teneo values," and (3) "[g]enerally doing a wonderful job!" (Doc. 154-39 at TI-00618.) Plaintiff was nominated for the CEO Club but did not win. (*Id.* at TI-00622 to 23.) According to Plaintiff, Evans recommended a white, non-Muslim, non-Pakistani, younger employee over Plaintiff for the CEO Club. (P's Decl. ¶ 91.) Among the ten winners were a Muslim employee of Pakistani descent and an employee who was slightly older than Plaintiff. (Carey Aff. ¶¶ 13-14; Doc. 154-39 at TI-00620, TI-00628.) [7] This was the only year Plaintiff was eligible for the CEO Club. (Ds' 56.1 Stmt. ¶ 157; *see* note 1 above.)

[7]    Plaintiff asserts that these employees had different supervisors, but he does not dispute that one was Muslim and of Pakistani descent and the other was older than he. (*See* Ds' 56.1 Stmt. ¶¶ 155-156; P's 56.1 Resp. ¶¶ 42-43.)

### 3. 2019 Position Changes

**\*4**  In January 2019, Brett Ayres was appointed to the position of global SD-WAN [8] practice director and began managing five Teneo employees in Europe, the Middle East, Africa ("EMEA"), and the United States, including Plaintiff. (Ds' 56.1 Stmt. ¶ 53; P's 56.1 Resp. ¶ 22; *see* note 1 above.) Ayres had joined Teneo in 2013 as a sales manager in the United Kingdom, where he managed nine senior account managers. (Ds' 56.1 Stmt. ¶ 47; *see* note 1 above.) In 2016, he started working as technical sales manager of EMEA, and he managed five sales engineers (the U.K. equivalent of solutions engineers) in that position. (Ds' 56.1 Stmt. ¶ 47; *see* note 1 above.)

[8]    "SD-WAN" is short for "software-defined wide area network." (Ds' 56.1 Stmt. ¶ 15 n.2.)

According to Carey, Ayres was appointed global SD-WAN practice director after Ayres's old position was eliminated as part of a restructuring. (Carey Aff. ¶ 16.) Carey asserts that no other individuals were considered and that no applications

were solicited or received for this new position. (*Id.* ¶ 17.) Carey also states that the position was intended to and did remain U.K.-based, and that it was a lateral change for Ayres rather than a promotion. (*Id.* ¶¶ 20-21.) [9] According to Carey, Ayres "had an exemplary employment history at Teneo and none of Plaintiff's documented conduct issues." (*Id.* ¶ 21.)

[9]    Plaintiff characterizes Ayres's new position as a promotion based on Ayres's deposition testimony. (P's 56.1 Resp. ¶ 22.) But Plaintiff cites his own statement during his questioning of Ayres; Ayres's answer confirmed that Ayres did not have a particular certification, not that he was promoted. (*See* Doc. 180-13 at 31:20-32:5 ("Q: During that time you did not have Meraki during that time; correct? A: (Audio inaudible.) Court Reporter: Sorry to interrupt. Apologies. I didn't get your full question. It trailed off. Can you repeat? Q: Yeah, when he was promoted he did not have Meraki. During that time he did not have Meraki certificate. A: That's correct.").)

According to Plaintiff, he had spoken to Carey about the position at a company meeting in July 2018. (Doc. 180-20 at 127:2-8.) Plaintiff told Carey that he was interested in the position, and Carey said that he would get back to him but never did, even after Plaintiff reminded him in December 2018. (*Id.* at 127:2-128:16.) According to Plaintiff, Ayres – who Plaintiff asserts is younger, white, British, and non-Muslim, (P's 56.1 Resp. ¶ 23; P's Decl. ¶ 93) – was less qualified for the position because Ayres was a "sales guy" with less technical experience, (Doc. 180-20 at 133:12-15). For support, Plaintiff points to the fact that Ayres attended a product training session that Plaintiff did not need to attend because Plaintiff already had years of experience with the product. (*Id.* at 129:21-130:20.) Ayres testified that he had been working with SD-WAN technology since he joined Teneo in 2013. (Doc. 180-13 at 31:7-32:8.) [10]

[10]    Plaintiff asserts that Ayres had only two years' experience with SD-WAN, but the portions of the record that he cites do not support that proposition. (*See* P's 56.1 Resp. ¶ 23.) To the extent Plaintiff intended to cite Exhibit Z7, the Affidavit of Doug Houghton, that affidavit also fails to support the propositions for which it is cited. (*See id.*; Doc. 179-7.)

Around the same time that Ayres was appointed to his new position in January 2019, Plaintiff was promoted from solutions engineer to solutions architect. (Doc. 154-2 at 58:6-10, 60:12-20.) [11] Plaintiff described this position as a consultant role that focused more on software networks and less on pre-sales and hardware sales than his previous role. (*Id.* at 63:1-10.) The position also involved less travel and was mostly remote. (*Id.* at 187:6-16.)

[11]   In his Declaration, Plaintiff asserts that the solutions architect position was a lateral move and not a promotion, (P's Mem. at 20; P's Decl. ¶ 13), but the evidence he cites does not support that proposition, and he testified at his deposition that the solutions architect position was a promotion, (Doc. 154-2 at 58:6-10, 60:12-20).

### 4. Plaintiff's Termination

**\*5**  On Friday, June 14, 2019, Evans emailed Head to tell her that he had been told by a colleague that two sales representatives had asked for "an engineering resource other than [Plaintiff]" because Plaintiff made "negative statements about Teneo in front of partners and has indicated management doesn't know what they are doing and he [is] interviewing." (Doc. 154-22 at TI-000197.) [12] Plaintiff had purportedly said that one client was "not a Teneo account" but was "his account" and that the sales representatives needed "to go through him." (*Id.*) Plaintiff had also allegedly said that the company worked with another client only because of him, not Teneo, and "if I go, they go." (*Id.*) Plaintiff had apparently also indicated that he was not selling the products of one of Teneo's partners. (*Id.*) Head added Carey to the email chain and told Evans to investigate. (*Id.* at TI-000196.)

[12]   Plaintiff disputes most of the underlying conduct described in the email but does not dispute that this information was conveyed to Evans, Head, and Carey. (*See* P's 56.1 Resp. ¶¶ 39-41.) Plaintiff admits that he said, "Teneo CEO Piers Carey did not know what he was doing." (P's Decl. ¶ 125.)

That same day, Evans spoke to the sales representatives and confirmed their complaints about Plaintiff's behavior. (Ds' 56.1 Stmt. ¶ 66; *see* note 1 above.) He emailed Head and Carey about his findings and wrote:

> Normally, we would have a call with [Plaintiff] Monday to get his side, explain that this behavior is not acceptable, and implement a [performance improvement plan]. However, I really think his behavior is toxic to the team .... He apparently is very good at telling his managers what they want to hear, but he slipped up in revealing his true self to his co-workers. I'm of the o[pi]nion that once validated, we need to let him go, or encourage him to take a position elsewhere if that is what we prefer.

(Doc. 154-22 at TI-000195.) Carey replied that he had spoken to yet another Teneo employee who requested not to work with Plaintiff because he could not trust him to support the products of one of Teneo's partners. (*Id.* at TI-000194.)

On Monday, June 17, 2019, Head responded that she had checked Teneo's "legal obligations relating to [Plaintiff] in New York state and drafted a termination letter and settlement agreement." (*Id.*) The draft provided that Plaintiff's termination would be effective June 18 and that Plaintiff had until June 21 to accept his severance package. (Doc. 154-25 at TI-00507 to 08.) [13] Head asked Evans to talk to Plaintiff to raise the complaints with him and get his side of the story, and then set up a call with all three of them regarding the "action to be taken." (Doc. 154-22 at TI-000194.)

[13]   The termination letter dated June 18 was never provided to Plaintiff, for reasons discussed below. Plaintiff asserts that the decision to terminate him was not made until June 21 (after he had complained of discrimination) because the document properties for the termination letter he eventually received on June 26 show that it was drafted on June 21. (P's Mem. at 21; P's Decl. ¶ 23; *see* Doc. 163-4 at 24.) The Court does not see what the creation date of Plaintiff's June 26 termination letter has to do with the creation date of his June 18 termination letter, which he never received and the content of which differs significantly from the content of the June 26 letter.

(*Compare* Doc. 154-25 at TI-00507, *with* Doc. 154-31 at TI-00491.) Plaintiff has not produced any evidence that calls into question the creation date of the June 18 termination letter. In any event, Plaintiff does not dispute that Head stated on June 17 that she had drafted Plaintiff's termination letter and settlement agreement, or that both letters exist within Teneo's records.

The next day – Tuesday, June 18 – Evans replied with a summary of his call with Plaintiff. (*Id.* at TI-000193.) Evans wrote that Plaintiff did not think he had done anything wrong, defended everything he had said on the grounds that he was just voicing his opinion, and denied that he was interviewing for other jobs. (*Id.*) Per Evans's notes from the call, Plaintiff indicated that if Teneo was going in the "wrong direction," he could leave the company, and that Teneo had to decide if a certain project was "just about money or reputation" because "[i]f it's just money, it's not for [Plaintiff]." (*Id.*)

 **6** After the call, Plaintiff emailed Head and told her that on March 29, 2019, Dan Sabol (a solutions engineer) had yelled at Plaintiff on a call, "was very abusive," and had called himself a "Red Neck." (Doc. 154-26 at TI-00497; Ds' 56.1 Stmt. ¶ 82; *see* note 1 above.) [14] Plaintiff noted that other Teneo employees were from the South as well, and he wrote: "This is a discrimination against me as a Muslim and Pakistani and Old. This needs to be corrected and I plan to file EEOC report against Teneo." (Doc. 154-26 at TI-00497.) [15] Plaintiff also forwarded messages he had exchanged with Sabol on March 29, in which Sabol apologized to Plaintiff and said they could "handle this like men" and "work through this....without intervention from others." (*Id.* at TI-00498 (ellipsis in original)). Plaintiff responded that he would call him to discuss but that Sabol could not "raise [his] voice and abuse [Plaintiff]." (*Id.*) This June 18 email was the first time that Plaintiff notified anyone at Teneo about this alleged incident, and it was also the first time that Plaintiff notified anyone at Teneo about an EEOC complaint. (Ds' 56.1 Stmt. ¶¶ 83, 86; *see* note 1 above.)

[14]     In his email, Plaintiff spells Sabol's name "Sobel," but based on the parties' submissions, the correct spelling appears to be "Sabol." (*See, e.g.*, Ds' 56.1 Stmt. ¶ 82; P's Decl. ¶ 29.)

[15]     "EEOC" refers to the Equal Employment Opportunity Commission.

Head forwarded the email to Carey and Evans and told them, referring to the termination call she planned to have with Evans and Plaintiff, that she "was all set to go with the meeting, having drawn up a settlement agreement, and then received this email from [Plaintiff]. I am awaiting legal advice so we may not be able to go ahead at 8pm Steve." (Doc. 154-26 at TI-00497.) Based on Plaintiff's allegation against Sabol, Teneo decided to delay Plaintiff's termination and investigate. (Ds' 56.1 Stmt. ¶ 87; *see* note 1 above.) Accordingly, Head emailed Plaintiff "to schedule a call ... as soon as possible to gain a greater understanding," and noted that she was "concerned to hear that [he felt] discriminated against" and that she took his "allegations very seriously." (Doc. 154-27.)

On June 20, Head spoke to Plaintiff over the phone about his allegations. (Ds' 56.1 Stmt. ¶ 89; *see* note 1 above.) Plaintiff said that he found Sabol's use of the term "redneck" offensive because he believed that a "redneck" is a racist white supremacist. (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶ 91; *see* note 1 above.) Plaintiff said that he did not accept the apology that Sabol offered on March 29 but that he did not notify anyone about the incident because he wanted to give Sabol the chance to put things right. (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶ 92; *see* note 1 above.) Although Plaintiff would later allege that Sabol had called him a "Paki," (Doc. 154-3 at TI-00355; Doc. 94 ("SAC") ¶ 67), it is undisputed that during this call, Plaintiff did not tell Head that Sabol used that slur, (Ds' 56.1 Stmt. ¶¶ 93, 101; *see* note 1 above).

During the phone call, Plaintiff also raised three additional instances of alleged discrimination. He complained that Ayres let two other employees attend a Cisco conference but declined Plaintiff's request to attend because Plaintiff is Muslim, Pakistani, and old. (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶ 96; *see* note 1 above.) Plaintiff also complained about an occasion when Ayres and Sabol attended a Silver Peak training without Plaintiff, which Plaintiff viewed as discriminatory in light of Plaintiff's forty years of experience with the product. (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶ 97; *see* note 1 above.) Additionally, Plaintiff accused Evans of disability discrimination because he kept asking Plaintiff to lift equipment even though Plaintiff had sustained a back injury in 2017. (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶¶ 98, 120; *see* note 1 above.)

Head investigated all four allegations. (Ds' 56.1 Stmt. ¶ 99; *see* note 1 above.) First, she spoke to Sabol, who confirmed

that he had had an argument with Plaintiff while on a Skype call in March. (Ds' 56.1 Stmt. ¶ 100; *see* note 1 above.) Sabol said that the argument was about technology and that Plaintiff hung up on him after Sabol raised his voice. (*See* Doc. 154-28 at TI-000208.) Regarding the "redneck" comment, Sabol described himself as such in reference to his love of the outdoors and fishing while he and Plaintiff were attempting to get to know each other better months later. (*Id.* at TI-000208; Ds' 56.1 Stmt. ¶ 100; *see* note 1 above.)

**\*7** Next, Head spoke to Ayres. Ayres explained that two U.K.-based employees attended a 2019 Cisco conference in Spain because they had free tickets and that Plaintiff's request to attend a 2019 Cisco conference in California (for which free tickets were unavailable) was denied because it was too costly. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 102-105; *see* note 1 above.) Regarding the Silver Peak training, Ayres told Head that Teneo had two free tickets and that he and Sabol were selected to attend because they could benefit from additional training on that product, whereas Plaintiff already had years of experience with Silver Peak and did not need the training. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 106; *see* note 1 above.)

Head also spoke to Evans, who told her that he had checked in with Plaintiff occasionally about the status of his back injury to see if he could lift equipment, and whenever Plaintiff said that he could not, Evans made other arrangements. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 108; *see* note 1 above.)

After her investigation, Head concluded that no discriminatory conduct had occurred. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 110; *see* note 1 above.) She did, however, conclude that Sabol should not have raised his voice during his March 29 call with Plaintiff and should think more carefully about describing himself as a "redneck," so she recommended that Sabol attend workplace diversity training, which Sabol subsequently completed. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 111-112; *see* note 1 above.)

Having concluded that Plaintiff's allegations of discrimination were unfounded, Teneo decided to proceed with Plaintiff's termination. (Ds' 56.1 Stmt. ¶ 113; *see* note 1 above.) But on June 21 – the day after his phone call with Head – Plaintiff went on sick leave and did not return until June 26. (Ds' 56.1 Stmt. ¶ 114; *see* note 1 above.) During this time, Plaintiff sought treatment for his back for the first time since November 27, 2017. (Doc. 154-2 at 183:4-7.) He obtained a doctor's note dated June 21 stating that he could return to work

on June 26, and also stating, "Activity is restricted as follows: none." (Doc. 154-34 at TI-00528.)

When he returned on June 26, Head and Evans spoke to Plaintiff over the phone; Head told Plaintiff the results of her investigation; and Evans terminated Plaintiff. (Ds' 56.1 Stmt. ¶¶ 114-116; *see* note 1 above.) [16] Head then sent Plaintiff an email attaching the results of her investigation along with an updated termination letter and settlement agreement. (Doc. 154-31; Ds' 56.1 Stmt. ¶ 117; *see* note 1 above.) As of December 2020, Plaintiff's solutions architect position had not been filled. (Ds' 56.1 Stmt. ¶ 119; *see* note 1 above.) [17]

[16]   Plaintiff asserts that Ayres was the decision maker regarding his termination even though Ayres had no personal knowledge of the reasons for the termination. (P's Decl. ¶ 19.) But the portion of Ayres's deposition that Plaintiff cites in support says only that Teneo's position statement to the EEOC stated that Ayres was part of the decision to terminate Plaintiff. (*See id.*; Doc. 180-14 at 39.)

[17]   Plaintiff alleges that his solutions architect position was "reverted ... back" to a solutions engineer position and filled in September 2019 with a younger, non-Muslim, non-Pakistani individual. (P's Decl. ¶ 52.) While Head states in her affidavit that the solutions engineer position was filled by a "younger, non-Muslim, non-Pakistani person," she does not say anything about Teneo "revert[ing]" Plaintiff's solutions architect position to a solutions engineer position; instead, Head indicates that the solutions architect position remains a separate and (as of December 2020) unfilled position. (Ds' 56.1 Stmt. ¶¶ 55 n.4, 119; Head Aff. ¶ 34-35.)

**\*8** On July 1, 2019, Plaintiff filed a charge of discrimination with the EEOC. (Ds' 56.1 Stmt. ¶ 118; *see* note 1 above.)

### 5. Plaintiff's Back Injury

On or about September 25, 2017, Plaintiff injured his back at work while installing equipment, and he notified Evans and Head about his injury by email on October 2, 2017. (Doc. 154-32; Ds' 56.1 Stmt. ¶¶ 120-121; *see* note 1 above.) Shortly after his injury, Plaintiff traveled at least once, to France, for work. (Doc. 180-21 at 188:2-9.) [18] Afterward, Plaintiff asked

Evans for "some accommodation" regarding travel. (*Id.* at 187:24-188:14.)

18   Plaintiff also states that on October 10, he traveled to Poland for the same customer. (SAC ¶ 23; P's 56.1 Resp. ¶ 19.) It is not clear from the record whether the trip to France and the trip to Poland were part of the same trip or were different trips.

Plaintiff eventually obtained an MRI, (*see* Doc. 154-34 at TI-00534, TI-00538), and on October 20, Head emailed Carey and Evans to let them know that she had spoken to Plaintiff about his back and insurance coverage, noting that his "MRI scan results aren't looking good apparently," (Doc. 154-33). Evans replied:

> On our call, he mentioned that his back is hurting, but he is passionate about his work so will keep working. He says not working won't make his back feel better. Earlier this week, he said the MRI shows 3 herniated discs. I encouraged him to be sure to take care of his back and do what is necessary. But he doesn't appear to be slowing down. Should we restrict him from traveling or take any other preventative actions?

(*Id.*) There is no evidence in the record that either Head or Carey responded to Evans's email. And according to Plaintiff, he never received a response to his request for an accommodation, (P's Decl. ¶ 99), and was "forced" to travel on numerous occasions, (P's Decl. ¶¶ 50-51, 92. 98). Defendants state that Plaintiff was not required to travel after his back injury if he declined to do so. (Evans Aff. ¶ 26.)

Plaintiff saw a doctor for his back injury on November 3 and again on November 27. (Doc. 154-34 at TI-00534 to 41; Ds' 56.1 Stmt. ¶ 123; *see* note 1 above.) At his deposition, Plaintiff testified that he did not request or receive a doctor's note excusing him from any work responsibilities. (Doc. 154-2 at 182:7-17, 185:23-186:2; Ds' 56.1 Stmt. ¶ 124; *see* note 1 above.) But during discovery, Plaintiff produced a document from the doctor he saw on November 3; it said that as of that date, Plaintiff's weight-lifting capabilities were limited to ten pounds and that Plaintiff was restricted from

lifting from the floor, squatting, bending, or traveling until further notice because of his back injury. (Doc. 163-12 at 7.) Defendants dispute the authenticity and admissibility of this note. (Ds' 56.1 Stmt. at 20 n.6.) [19] In any case, it is undisputed that Plaintiff did not provide this or any other doctor's note to Teneo while he was employed there, (Doc. 154-2 at 157:18-158:3.)

19   Defendants point out that this November 3 note was not part of the set of certified medical records they received from Plaintiff's medical provider. (Ds' 56.1 Stmt. at 20 n.6; *see* Doc. 154-34.) Rather, Plaintiff produced this note on October 20, 2020, after Plaintiff had been deposed and two weeks past the deposition deadline. (Ds' 56.1 Stmt. at 20 n.6.) A note from Plaintiff's doctor explained that the November 3 note had not been produced earlier because it was "misfiled in a separate folder." (Doc. 163-12 at 12.)

**\*9**  On December 3, 2017, Teneo asked Plaintiff to perform a hardware installation, which Plaintiff completed. (Doc. 180-18 at 64:2-11.) Plaintiff did not tell Teneo that he could not perform the installation, he did not ask to be excused from the installation, and he was able to lift and move the equipment involved. (Doc. 180-20 at 159:8-23.) Plaintiff testified that this installation caused him pain, which he "managed." (Doc. 180-21 at 184:15-17.) This was the last time Plaintiff installed equipment for Teneo; afterward, whenever Teneo asked Plaintiff to perform an installation, Plaintiff declined and was not required to perform the installation. (Doc. 154-2 at 162:25-163:17; *see* Doc. 163-9 at 30.) After Plaintiff was promoted to solutions architect in 2019, lifting and installing equipment was no longer one of his responsibilities. (Doc. 180-18 at 63:11-14, 64:12-16, 65:23-25.)

Plaintiff also traveled from December 12-14, 2017. According to Defendants, Plaintiff was supposed to be attending a training course in Maryland that he had asked to attend. (Ds' 56.1 Stmt. ¶ 146; Doc. 154-37; *see* note 1 above.) According to Plaintiff, he traveled to Georgia and Florida. (P's 56.1 Resp. at 28; Doc. 163-9 at 11-16).

In June 2018, at his request, Plaintiff attended a Cisco conference in Florida. (Doc. 154-36; Ds' 56.1 Stmt. ¶¶ 144-145; *see* note 1 above.) In February 2019, Plaintiff accepted an invitation from Ayres to travel to the United Kingdom for work, and Ayres approved an early arrival

so that Plaintiff could visit his sister in England. (Doc. 154-29 ("Ayres Aff.") ¶ 6; *see* Doc. 181-13 at 1.) [20] In April 2019, Plaintiff traveled to Maryland to do a workshop for a customer. (Doc. 181-13 at 4-6.) Plaintiff also traveled to Illinois in April 2019. (*Id.* at 7-8.) In June 2019, Plaintiff traveled to attend another conference, the location of which is not apparent from the record. (*See* Head Aff. ¶ 36; P's Mem. at 23.) [21] Plaintiff testified that when he traveled, he experienced pain and issues with incontinence as a result of his back injury. (Doc. 180-20 at 154:13-155:3; Doc. 180-21 at 192:3-24, 193:14-19.)

[20]     Plaintiff disputes the purpose of the trip – Defendants assert that it was for a team meeting and Plaintiff asserts that it was for a workshop – but he does not dispute that he traveled to the United Kingdom in February 2019. (*See* Ds' 56.1 Stmt. ¶¶ 148-150; P's 56.1 Resp. at 28.) Plaintiff also contends that Ayres's affidavit "is not a signed valid Affidavit and should be ignored," (P's 56.1 Resp. at 1), but Ayres's affidavit is signed, under penalty of perjury, (Ayres Aff. at 2).

[21]     Plaintiff also asserts that he was "suppose[d] to travel" to North Carolina and Virginia and in March and May 2019, respectively, (P's Decl. ¶ 50; Doc. 181-13 at 9, 11, 13), but it is not clear whether he did.

### B. Procedural History

Plaintiff brought this suit on February 28, 2020, asserting discrimination on the bases of race, religion, national origin, and disability, as well as retaliation. (Doc. 1.) He originally named only Teneo as a defendant. (*Id.*) Shortly afterward, Plaintiff filed an Amended Complaint adding Carey as a defendant. (Doc. 3.) Teneo and Carey answered, (Doc. 10), and the Court held an initial conference and entered a scheduling order, (Minute Entry dated May 14, 2020; Doc. 24).

On the deadline to file amended pleadings and join additional parties, Plaintiff sought leave to file a Second Amended Complaint adding Head, Ayres, Evans, and Teneo USA, Inc. as defendants. (Doc. 26.) That motion was opposed. (Doc. 30). I then referred the case to Magistrate Judge Paul E. Davison for scheduling, discovery, non-dispositive pretrial motions, and settlement. (Doc. 38.) Judge Davison granted Plaintiff's motion to amend in part, allowing Plaintiff to add Head, Ayres, Evans, and Teneo USA, Inc. as defendants, but

denying the motion to the extent it sought to add claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and the American with Disabilities Act of 1990 ("ADA") against individual defendants. (*See* Doc. 90.)

**\*10**   After extensive discovery litigation, Defendants filed a pre-motion letter in anticipation of a motion for summary judgment. (Doc. 142.) The Court held a pre-motion conference, (Minute Entry dated Nov. 24, 2020), and the instant cross-motions followed, (Docs. 151, 163).

Among his supporting papers, Plaintiff filed a 149-page declaration. (*See Doc.* 168.) I ordered Plaintiff to resubmit this document in accordance with the thirty-page limit I had set at the pre-motion conference, and I allowed Plaintiff to resubmit his other supporting papers. (Doc. 169.) Because of the confusing state of the docket – Plaintiff filed his supporting exhibits in several stages using an unconventional numbering system – I also ordered the parties to submit tabbed binders of their exhibits to my chambers. (Doc. 187.) Indexes cross-referencing Plaintiff's exhibits with their corresponding docket numbers can be found in docket entries 188-1 and 191-1.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at \*5 (S.D.N.Y. Mar. 24, 2014). Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp.

3d 171, 179 (S.D.N.Y. 2014). But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together. *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros*, 3 F. Supp. 3d at 179.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

**\*11** "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Documents are admissible only if they are authenticated by extrinsic evidence or self-authenticating. *E.g.*, *Sys. Agency v. Villanueva*, No. 19-CV-6486, 2020 WL 7629879, at *1 (S.D.N.Y. Dec. 22, 2020). Accordingly, "documents that are not attached to an affidavit made on personal knowledge setting forth facts that would be admissible in evidence and sufficient to authenticate the document cannot be considered on summary judgment." *Id.* (cleaned up). "If the party moving for summary judgment 'fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied.' " *Id.* (quoting *Giannullo v. City of N.Y.*, 322 F.3d 139, 140-41 (2d Cir. 2003)). But "[m]aterial relied upon at summary judgment need not be admissible in the form presented on the motion; as long as the evidence will be presented in admissible form at trial, it may be considered on summary judgment." *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459, 2018 WL 3364388, at *2 (S.D.N.Y. July 9, 2018) (cleaned up). The proponent of the evidence "must show that the evidence could be rendered in an admissible form at trial." *Metro. Enter. Corp. v. United Techs. Int'l Corp.*, No. 03-CV-1685, 2005 WL 2300382, at *6 (D. Conn. Sept. 21, 2005).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). But *pro se* plaintiffs are not exempt from the "rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (cleaned up).

## III. DISCUSSION

Liberally construed, Plaintiff's Second Amended Complaint alleges (1) wrongful termination, (2) retaliation, (3) failure to promote, (4) disparate treatment, and (5) a hostile work environment, based on (a) race, (b) religion, (c) national origin, (d) age, and (e) disability, in violation of (i) Title VII, (ii) the ADEA, (iii) the ADA, and (iv) the New York State Human Rights Law ("NYSHRL").[22] (*See* SAC at 31-43; Doc. 90 at 2.) It also asserts a failure-to-accommodate claim under the ADA. (*See* SAC at 5-6; Doc. 90 at 2.) Both sides argue that they are entitled to summary judgment on all claims.[23]

[22]    Plaintiff's Second Amended Complaint cites the New York City Human Rights Law ("NYCHRL"), (SAC at 43), but Plaintiff apparently intended to bring his claims under the NYSHRL instead, (Doc. 119 ¶ 2, *see* P's Mem. at 1), and he has explicitly stated that he is not asserting any claims under the NYCHRL, (*id.* at 20 & n.1; P's 56.1 Resp. at 3).

[23]    Plaintiff titles his motion "Plaintiff's Cross-Motion for Partial Summary Judgment," but the

Gilani v. Teneo, Inc., Slip Copy (2021)

2021 WL 3501330

Court is unable to decipher which claim(s), if any, Plaintiff is not moving on. (Doc. 161.) Plaintiff's Memorandum of Law in support of his motion presents arguments in support of summary judgment on each claim. (Doc. 171 at 1-17.) Accordingly, the Court treats Plaintiff's motion as one for summary judgment on all counts in the Second Amended Complaint.

**\*12** All of Plaintiff's discrimination claims are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016); *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013); *Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 1809772, at \*4 n.5 (S.D.N.Y. Apr. 30, 2013). [24]

> Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which causes the burden of production to shift to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case, such that at the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.

*Kovaco*, 834 F.3d at 136 (cleaned up). In demonstrating that the employer's proffered reason was not the true reason for the employment decision, a plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (cleaned up). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.*

[24] Because "discrimination claims brought pursuant to the NYSHRL are governed by the same standards as govern ADA, ADEA, and Title VII claims," *Kantrowitz v. Uniondale Union Free Sch. Dist.*, 822 F. Supp. 2d 196, 215 n.13 (E.D.N.Y. 2011), I analyze Plaintiff's NYSHRL claims together with their federal counterparts.

### A. Wrongful Termination

To establish *a prima facie* case for wrongful termination, a plaintiff must allege that "(1) he falls within a protected group; (2) he held a position for which he was qualified; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014) (cleaned up). "Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent. Rather, Plaintiff must point to facts that suggest that the adverse action was motivated, at least in part, [25] by discriminatory animus." *Henny v. N.Y. State, Off. of Mental Health*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (cleaned up); *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."). For purposes of the *prima facie* case,

> an inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.... [A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.

**\*13** *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312-13 (2d Cir. 2015) (cleaned up).

2021 WL 3501330

25

A plaintiff has a heavier burden under the ADA, which "requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of N.Y.*, 921 F.3d 337, 348 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2668 (2020).

Plaintiff has failed make even a minimal showing of circumstances that could give rise to an inference of discrimination based on membership in a protected class. Up until June 18, 2019 – when Plaintiff, seeing the writing on the wall, belatedly complained about an argument with Sabol from March 2019 – none of the events leading to Plaintiff's termination had anything to do with Plaintiff's race, religion, national origin, age, or disability. For example, the numerous complaints about Plaintiff's behavior were unrelated to any protected class, there is no evidence that behavior similar to Plaintiff's was tolerated for employees outside of Plaintiff's protected classes, and Plaintiff's former position at Teneo had not, as of December 2020, been filled by an employee outside of Plaintiff's protected classes.

Indeed, any such inference of discrimination is particularly unjustified in this case, where several of the same people who interviewed and hired Plaintiff less than three years earlier – Evans, Head, and Carey – decided to terminate his employment. *See Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003); *Young v. Daughters of Jacob Nursing Home*, No. 09-CV-7475, 2011 WL 2714208, at *6 (S.D.N.Y. July 12, 2011), *aff'd*, 491 F. App'x 263 (2d Cir. 2012) (summary order). "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). Plaintiff argues that Gibson hired him, (P's Mem. at 20; *see* note 2 above), and notes that Ayres was involved in the decision to fire him, (*see* note 16 above), but this would not undermine the same-actor inference. "The decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions," *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 250 (S.D.N.Y. 2000), and it is undisputed that Evans and Head interviewed Plaintiff and recommended that Carey hire him, (*see* note 2 and accompanying text above), and concluded that he should be fired, (*see* notes 12-16 and accompanying text above). 26

26

Defendants argue that Teneo's diverse workforce also undermines an inference of discrimination. (Ds' Mem. at 6.) According to Carey, Teneo employed approximately thirty-three people when Plaintiff was terminated, nine of whom were African American or Asian and fourteen of whom were over fifty years old. (Carey Aff. ¶ 5.) Plaintiff disputes this and asserts that Teneo had 184 employees when Plaintiff was terminated and that only 3 were over the age of fifty, that fewer than one percent were Muslim, and that most were white, younger than he, and non-Pakistani. (P's 56.1 Resp. at 2; *id.* ¶ 1.) (Confusingly, though, Plaintiff asserts in one instance that Teneo had 186 employees when he was terminated, (*id.* ¶ 1), and in others, he asserts that Teneo had 108 employees and that two percent were Muslim, (*e.g.*, P's Decl. ¶ 13).) Although Defendants provide a plausible explanation as to why their figures are correct and Plaintiff's are not, (*see* Ds' Opp. at 8-9), neither side cites admissible evidence other than their own say-so regarding Teneo's employment demographics, so this issue, were it material, would need to be decided by a jury. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (on motion for summary judgment, district court "must disregard all evidence favorable to the moving party that the jury is not required to believe"); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (same); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 377 (S.D.N.Y. 2010) (evidence that court should disregard on summary judgment "includes testimony and affidavits from interested witnesses").

**\*14** The only protected characteristic that changed in the short time between Plaintiff's hiring and firing was his back injury, but there is no evidence from which a reasonable jury could infer that his injury was connected to his termination. Plaintiff was terminated a year and a half after the last time he installed equipment, (*see* Doc. 154-2 at 162:25-163:17; Doc. 163-9 at 30), and he was no longer required to lift or install equipment once he became a solutions architect, (Doc. 180-18 at 63:11-14, 64:12-16, 65:23-25), so there is no reason to believe, or evidence, that any alleged lifting restrictions factored into his termination. Further, there is nothing to suggest that any alleged travel restrictions motivated Plaintiff's termination, as he traveled throughout his employment for Teneo, including in June 2019

– the month he was terminated. (Head Aff. ¶ 36; P's Mem. at 23.)

Even if Plaintiff were able to meet his burden of establishing a *prima facie* case for wrongful termination, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination – namely, his documented behavioral problems that began shortly after his hiring and continued up until his termination. Employee insubordination and other conduct that is disruptive to the workplace are legitimate, nondiscriminatory reasons for terminating an employee. *Tebbenhoff v. Elec. Data Sys. Corp.*, 244 F. App'x 382, 384 (2d Cir. 2007) (summary order); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 409 (E.D.N.Y. 2010); *see Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000). Here, Evans, Head, and Carey received numerous complaints about Plaintiff during his relatively short tenure at Teneo: that he bullied co-workers and Teneo partners, (*see* Doc. 154-12 at TI-00340; Doc. 154-16 at TI-00558), refused to participate in meetings, (*see* Doc. 154-11 at TI-000166), disparaged Teneo and upset Teneo partners, (*see* Doc. 154-22 at TI-000197; Doc. 154-18 at TI-00635), and was disrespectful to his supervisors, (*see* Doc. 154-19). His colleagues began to ask to not work with him because in their view he had a bad attitude, was toxic and demoralizing, treated Teneo's clients as his own, and said that he was interviewing for other jobs, (*see* Doc. 154-22 at TI-000194 to 97). And when confronted, Plaintiff defended his behavior and asserted that it was not inappropriate. (*See id.* at TI-000193). All of these are legitimate, nondiscriminatory reasons for Plaintiff's termination.

Because Defendants have met their burden to offer a legitimate, non-discriminatory reason for terminating Plaintiff, the burden shifts to Plaintiff to produce evidence that Defendants' reason is pretextual. *E.g., Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Plaintiff argues that pretext is shown because Teneo has articulated "shifting" reasons for his termination. (*See* P's Mem. at 10-13.) He says he was told on June 26, 2019 that he was being terminated for making damaging statements about Teneo's partners, but that Teneo is now asserting that Plaintiff was terminated for performance issues, "working as a [b]usiness," applying for a job at a competitor, trying to leave Teneo, client issues, and partner issues. (P's Mem. at 10-12, 20-21.) First, Teneo has not asserted that Plaintiff was terminated for performance issues. To the contrary, Evans had remarked that "it would be a shame to lose someone with such strong technical capabilities." (Doc. 154-16 at TI-00559.) Consequently, Plaintiff's citations to his positive performance

reviews are unavailing. (*See* P's Mem. at 8; P's Decl. ¶ 58-61.) Either way, "courts have typically found evidence such as positive performance reviews, bonuses, and salary increases sufficient to establish pretext only when paired with other evidence demonstrating a discriminatory motive." *Forte v. Liquidnet Holdings, Inc.*, No. 14-CV-2185, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015), *aff'd*, 675 F. App'x 21 (2d Cir. 2017) (summary order).

**\*15** Second, although "[i]nconsistent explanations for a challenged employment action can be evidence of pretext," *Zimmitti v. Aetna Life Ins. Co.*, 64 F. Supp. 2d 69, 81 n.24 (D. Conn. 1999), Teneo's explanations have not " 'shifted' in a way that would demonstrate pretext," *Fahrenkrug v. Verizon Servs. Corp.*, No. 11-CV-1014, 2015 WL 13021890, at *17 (N.D.N.Y. May 14, 2015), *aff'd*, 652 F. App'x 54 (2d Cir. 2016) (summary order). Teneo may have identified multiple reasons for Plaintiff's termination, but not shifting ones. *See id.* ("The individual examples of poor job performance that [Defendant] provided to Plaintiff are not shifting, contradictory explanations for [the termination] decision, but rather a sampling of the factors that led to [Defendant's] decision that Plaintiff needed [to be terminated]."). All of the examples provided by Teneo relate to inappropriate comments by Plaintiff that disturbed his colleagues. Teneo still maintains that Plaintiff was terminated for making damaging statements about its partners, (*e.g.*, Ds' Mem. at 7-8), among other things, and none of the reasons that Teneo has proffered for Plaintiffs' termination are inconsistent with each other. "Although [Defendant] might have given Plaintiff multiple examples of [its] concerns with [his] work, [its] overall explanation for [terminating him] never changed." *Fahrenkrug*, 2015 WL 13021890, at *17.

Plaintiff also denies that he engaged in the conduct that resulted in his termination. (P's Mem. at 18-19.) But it does not matter whether Plaintiff actually engaged in the conduct; what matters is whether Defendants had a good-faith basis for believing that he had when they terminated him. *See Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 933 F. Supp. 2d 534, 550 (S.D.N.Y. 2013), *aff'd*, 748 F.3d 471 (2d Cir. 2014). "In a discrimination case ... [courts] are decidedly not interested in the truth of the allegations against plaintiff." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Rather, courts are "interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue." *Id.* (emphasis in original) (cleaned up); *see Eisner v. Cardozo*, 684 F. App'x 29, 31 (2d Cir. 2017) (summary order). Plaintiff

has made no showing that the complaints to Evans, Head, and Carey were known to be false or otherwise generated to mask illegal discrimination. *See McPherson*, 457 F.3d at 216 n.7; *see also Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (explaining that because "[e]vidence that [defendant] made a poor business judgment in [its adverse employment decision] generally is insufficient to establish a genuine issue of fact as to the credibility of the [defendant's] reasons ... [,] the reasons tendered need not be well-advised, but merely truthful"); *Duckett v. Wal-Mart Stores, Inc.*, No. 07-CV-6204, 2009 WL 995614, at *11-12 (W.D.N.Y. Apr. 14, 2009) (noting that "when analyzing a pretext claim the inquiry is whether the employer's stated reason is the actual reason for the challenged action and not whether the employer's stated reason for its decision is ill-advised, mistaken, or unreasonable," and granting summary judgment where defendant claimed that it terminated plaintiff due to her unauthorized use of a discount, a claim plaintiff disputed).

Plaintiff may dispute whether he behaved inappropriately, but his evidence does not raise a question as to whether Evans, Head, and Carey *thought* he had. "In short, although [Plaintiff] may consider [Defendants'] termination decision an over-reaction to [his] perceived mishaps, [he] can point to no evidence in the record indicating that [his] employer was not, in fact, displeased with [his] actions, much less that the real reason for [his] termination was ... discrimination." *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) (summary order); *see Henkin v. Forest Labs., Inc.*, No. 01-CV-4255, 2003 WL 749236, at *6 (S.D.N.Y. Mar. 5, 2003) ("[A]n employee's disagreement with her employer's perception of her work does not satisfy her burden of showing that the employer's proffered reason for termination was a pretext for discrimination."), *aff'd*, 88 F. App'x 478 (2d Cir. 2004) (summary order).

**\*16** To support his age discrimination claim, Plaintiff cites to a LinkedIn conversation he had with a former Teneo employee who stated, "I believe age discrimination played a part in me being let go by the new sales management." (Doc. 163-28 at 25.) This conversation is inadmissible hearsay. But even if I were to consider it, this employee's conclusory assertion about his situation – like Plaintiff's own conclusory assertions – would not be enough to avoid summary judgment. *See Schwapp*, 118 F.3d at 110.

Overall, Plaintiff's evidence is insufficient to support a rational finding that Defendants' proffered reasons were false and that more likely than not discrimination was the real

reason for the employment action. *See Weinstock*, 224 F.3d at 42. Plaintiff has not presented any statements reflective of bias against those in a protected class or pointed to conduct that would reasonably lead a jury to conclude that Defendants more likely than not harbored a discriminatory motive when firing Plaintiff. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 744 (2d Cir. 2014) (summary order).

While direct evidence of discriminatory intent is not required, and "credible evidence that a defendant's explanation is false along with a strong *prima facie* case may support an inference that the adverse action was motivated by discrimination," *Widomski*, 933 F. Supp. 2d at 551, here, there is neither a strong *prima facie* case, nor credible evidence that the employer's explanation was not held in good faith. "Plaintiff's subjective belief that he was not treated fairly is simply not enough to demonstrate pretext." *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's wrongful termination claims.

**B. Retaliation**

Plaintiff alleges that Teneo terminated his employment in retaliation for complaining about discrimination. (P's Mem. at 1.) To establish a *prima facie* case of retaliation, an employee must show that (1) the employee "was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).

Here, Plaintiff cannot show a causal connection between his protected complaints and his termination because the decision to terminate his employment preceded his complaints. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order). By June 14, 2019, Evans had already decided that once the complaints about Plaintiff were validated, Teneo "need[ed] to let him go, or encourage him to take a position elsewhere if that is what [Teneo] prefer[red]." (Doc. 154-22 at TI-000195.) By June 17, Head had checked Teneo's "legal obligations relating to [Plaintiff] in New York state and drafted a termination

letter and settlement agreement" to be presented to Plaintiff unless "his side of the story" suggested otherwise (which it did not end up doing). (*Id.* at TI-000194.) It was not until the next day, June 18, after Head had already arranged with Evans to terminate Plaintiff in a call that night, (*id.* at TI-000193 to 94; Doc. 154-26 at TI-00497), that Plaintiff made his first complaint alleging discrimination.[27] Acting on legal advice, Teneo decided to delay Plaintiff's termination to conduct an investigation into his allegations, but this only postponed the inevitable. Because Teneo had decided to terminate Plaintiff's employment before he complained of allegedly discriminatory conduct, no reasonable jury could conclude that the decision was motivated by a desire to retaliate against him for that complaint. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 71 n.8 (2d Cir. 2015); *see also Stephan v. W. Irondequoit Cent. Sch. Dist.*, 450 F. App'x 77, 80 (2d Cir. 2011) (summary order) (no causal connection where defendant made decision to terminate plaintiff before she filed any complaint).

[27] Plaintiff alleges that he complained to Scott Gibson on October 14, 2016 that Evans was "toxic and raci[ ]st," (P's Decl. ¶ 9), but he does not allege that he suffered any retaliation as a result, (*see* SAC ¶¶ 108, 112 (identifying protected activity as June 18, 2019 reference to EEOC and adverse action as June 26, 2019 termination); P's Mem. at 1-2 (describing termination as adverse action and alleging it was retaliation for June 2019 complaint of discrimination)). Nor could he. There is no evidence that Gibson was involved in the termination or that any individual who was involved in the termination was aware of the alleged complaint to Gibson, *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002) ("Defendants must have knowledge of the protected activity to be able to engage in retaliation.") (cleaned up), and it was too far removed in time for an inference of retaliation to arise from temporal proximity, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (cleaned up); *Frisenda v. Incorporated Village of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y.

2011) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

**\*17** Even if Plaintiff were able to establish a *prima facie* case of retaliation, as discussed above, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and consequently "the burden shifts back to [the plaintiff] to establish, through either direct or circumstantial evidence, that [the employer's] action was, in fact, motivated by discriminatory retaliation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (cleaned up). A plaintiff may do so in two ways: "either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Id.* (cleaned up). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered ... reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). For example, "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer ... are pretextual." *Summa*, 708 F.3d at 130. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. However, a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847.

Plaintiff argues that Teneo's reasons for his termination are pretextual, as evidenced by the fact that he was not previously warned about or reprimanded for the alleged misconduct. (P's Mem. at 2-3.) But this is belied by the record, which contains several documented discussions with Plaintiff about his behavioral issues. (*See* Doc. 154-14 at TI-00467; Doc. 154-16 at TI-00558; Doc. 154-18 at TI-00636; Doc. 154-19.) He also submits affidavits from former colleagues (at Teneo and elsewhere) attesting that, in their experience, Plaintiff was courteous and respectful. (*See* P's 56.1 Resp. ¶¶ 32-33; P's Decl. ¶ 19B.) Not only do these affidavits cast no light on the experiences of others or the specific incidents at issue, but they do not change the fact that Evans received complaints

about Plaintiff's behavior issues (and observed some of them firsthand). Further, as Defendants note, these affidavits are not from people who worked with Plaintiff around the time he was terminated. (Ds' Opp. at 6-7 & n.4.)

Plaintiff also argues that it is unbelievable that an employer would tolerate a deficient employee for three years, and that his termination can therefore only be explained by his protected activity. (P's Mem. at 2.) But Defendants do not argue that Plaintiff was a deficient employee; in fact, the record shows that Teneo was willing to work with him on his behavioral issues because of his "strong technical capabilities." (Doc. 154-16 at TI-00559.) The fact that Plaintiff's behavior reached a breaking point after less than three years of employment and not sooner is not evidence that the reason for his termination is pretextual.

Ultimately, Plaintiff is left with the close temporal proximity between his complaint and his termination as the only fact even suggesting retaliatory animus. Without more, though, "such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*); *accord Ya-Chen Chen*, 805 F.3d at 72 (noting that the Second Circuit has "long held that temporal proximity between a protected complaint and an adverse employment action is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext") (cleaned up). As Plaintiff has not produced any evidence of pretext, the mere fact that he was terminated shortly after making his complaints to Head is insufficient to raise a genuine issue of material fact as to whether a desire to retaliate motivated his termination.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

## C. Failure to Promote

Plaintiff argues that he was denied a promotion to global SD-WAN practice director because of his age, race, national origin, religion, and disability when Ayres was appointed to the position instead of Plaintiff. (P's Mem. at 14, 16.) [28] To establish a *prima facie* case for failure to promote, a plaintiff must demonstrate that (1) he "was within the protected class"; (2) he "was qualified for the position"; (3) he "was subject to an adverse employment action"; and (4) "the adverse action occurred under circumstances giving rise to an inference of discrimination." *Naumovski v. Norris*, 934 F.3d 200, 214 n.39

(2d Cir. 2019) (cleaned up); *see Coger v. Conn. Dep't of Pub. Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) (summary order).

[28]     Why Plaintiff would want this U.K.-based global role, when he was not willing to work globally, (Doc. 180-13 at 29:11-16), and threatened to resign over the issue when he was forced to work on non-U.S. projects, (Doc. 180-9 at 84:4-85:2), is beyond the Court's understanding. Indeed, as discussed further below, Plaintiff argues that Evans and Ayres subjected him to a hostile work environment by asking him to work on non-U.S. projects. Regardless, on summary judgment, a court may not construe one claim as an admission in connection with an inconsistent claim. *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95-96 (2d Cir. 1994); *see also Polanco v. City of N.Y.*, No. 14-CV-7986, 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018) ("It is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation.") (collecting cases).

**\*18**  "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal," *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (cleaned up), and thus there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed directly to the second or third step of *McDonnell Douglas, see id.* at 75-76 ("In part because [plaintiff's] burden at the *prima facie* stage is minimal, and because [plaintiff] does not argue that [defendant] failed to proffer a legitimate, nondiscriminatory explanation for its adverse employment action, ... [w]e thus proceed directly to the third step of the *McDonnell Douglas* analysis ...."); *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840, 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019) (collecting cases), *appeal dismissed*, No. 19-2570 (2d Cir. Dec. 2, 2019). "This is because a plaintiff who can prevail at the third stage of the *McDonnell Douglas* process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination." *Johnson v. Ultravolt, Inc.*, No. 13-CV-3518, 2015 WL 541519, at *4 (E.D.N.Y. Feb. 10, 2015). Accordingly, to "avoid redundancy" between the first and third stages of the *McDonnell Douglas* test, *id.* at *4, the Court will assume for this claim that plaintiff has established

a *prima facie* case and move directly to the second and third stages of the *McDonnell Douglas* analysis.[29]

[29]    Defendants assert that Plaintiff cannot establish a *prima facie* case because the global SD-WAN practice director position was never advertised or open for applications, no one other than Ayres was considered for the position, and Plaintiff never applied for the position and was therefore never rejected. (Ds' Mem. at 15.) For support, however, they rely solely on Carey's affidavit, which a jury is not required to believe over Plaintiff's testimony that he applied for the position in a conversation with Carey. *See, e.g., Reeves*, 530 U.S. at 151; *Davis-Garett*, 921 F.3d at 46; *Williams*, 718 F. Supp. 2d at 377.

Defendants have proffered a legitimate, nondiscriminatory reason for appointing Ayres to the role of global SD-WAN practice director: Ayres was more qualified for the role because he was already serving in a management position, whereas Plaintiff had no management experience at Teneo. (Ds' Mem. at 15.) In fact, it is undisputed that Ayres had been managing employees at Teneo since 2013, whereas Plaintiff was not responsible for managing any Teneo employees. (P's 56.1 Resp. ¶ 6; Ds' 56.1 Stmt. ¶ 47; *see* note 1 above.)

Accordingly, the burden shifts to Plaintiff to prove that this was not Teneo's true reason for appointing Ayres to the position but rather is a pretext for unlawful discrimination. *See Reeves*, 530 U.S. at 143; *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001), *as amended* (June 6, 2001). Plaintiff asserts that Ayres was less qualified for the position, (P's Mem. at 14), and that Plaintiff had "deeper skills than Ayres," (P's Decl. ¶ 93 (citing Doc. 180-15 at 19:13-23, in which a former colleague testified, "[Ayres] seemed pretty competent, ... and I can't judge, ... between [Ayres and Plaintiff], ... who had more skills. [Ayres] may have had broader skills. [Plaintiff] may have had deeper skills in certain things ....")). But a plaintiff can establish pretext based on qualifications evidence only where the plaintiff's qualifications were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Szewczyk v. Saakian*, 774 F. App'x 37, 40 (2d Cir. 2019) (summary order) (cleaned up); *see Abraham v. N.Y.C. Dep't of Educ.*, 398 F. App'x 633, 635 (2d Cir. 2010) (summary

order) (same); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 21 (2d Cir. 2007) (summary order) ("[A]bsent a striking disparity in such credentials, one should be very hesitant to draw any inference from a battle of credentials."). The relevant inquiry is not simply who had the most experience. *See Patel v. City of N.Y.*, 699 F. App'x 67, 69 (2d Cir. 2017) (summary order) ("We have held ... that greater experience cannot alone establish that a candidate's qualifications are so superior to another's that the employer's hiring decision may be found to have been discriminatory."). If it were, ADEA plaintiffs would almost automatically succeed in establishing pretext because they have had more time to work and advance than their younger counterparts. "Only where an employer's business decision is so implausible as to call into question its genuineness should th[e] Court conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order).

**\*19** Plaintiff has not shown that his qualifications were so superior to Ayres's that no reasonable person could have selected Ayres for the global SD-WAN practice director over Plaintiff. Viewing the evidence in the light most favorable to Plaintiff, he has established – at most – that he had more SD-WAN experience than Ayres. But it is undisputed that the global SD-WAN practice director position was a management position, and Ayres had management experience at Teneo, whereas Plaintiff did not. The Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (*per curiam*) (cleaned up). Plaintiff's subjective "disagreement with the way [Defendants] weighed his and [the other applicants'] qualifications does not create an issue of material fact. An employer has the right to decide how it will value the various qualifications different candidates bring to the table." *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (citation omitted).

Overall, "the plaintiff's conclusory allegations of discrimination and [his] own subjective evaluations that [he] was better qualified than [his] coworkers are insufficient to demonstrate discrimination." *Richetts v. Ashcroft*, No. 00-CV-1557, 2003 WL 1212618, at *7 (S.D.N.Y. Mar. 17, 2003). Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure-to-promote claims.

### D. Disparate Treatment

Plaintiff cites four instances in which he was allegedly treated differently because of one or more of his protected traits: not

being selected for the CEO Club in 2018, (P's Mem. at 4-5), not being allowed to attend a 2019 Cisco conference, (*id.* at 9), not being chosen to attend a 2019 Silver Peak training, (*id.* at 6-8), and the change in his appointment from solutions engineer to solutions architect, (P's Decl. ¶ 35). To establish *a prima facie* case of disparate treatment, Plaintiff must show that he was (1) a member of a protected class, (2) qualified for the position, and (3) subjected to an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

In the context of a disparate-treatment claim, an adverse employment action is one that constitutes "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (cleaned up). "Such action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014) (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (cleaned up). But "a 'bruised ego,' a 'demotion without change in pay, benefits, duties, or prestige,' or 'reassignment to [a] more inconvenient job' are all insufficient to constitute a tangible or materially adverse employment action." *Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396, 2013 WL 6231164, at *5 (E.D.N.Y. Dec. 2, 2013) (alteration in original) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Mere inconveniences like these do not constitute adverse employment actions unless they are accompanied by "some attendant negative result, such as a deprivation of a position or opportunity." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 354-55 (S.D.N.Y. 2006) (cleaned up).

The Court agrees with Defendants that none of the incidents of alleged disparate treatment affected the terms or conditions of Plaintiff's employment. (*See* Ds' Mem. at 11; Ds' Opp. at 10.) Regarding the CEO Club, the "failure to receive recognition and merit awards," such as the trip to Iceland offered in 2018, "is insufficient to adversely [affect] the terms and conditions of [plaintiff's] employment." *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 149 (E.D.N.Y. 2002).

**\*20** Regarding the Cisco and Silver Peak trainings in 2019, "[t]he denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show material harm from the denial, such as a failure to promote or a loss of career advancement opportunities." *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 55 (S.D.N.Y. 2019) (cleaned up). Plaintiff has not introduced any evidence that missing these trainings resulted in material harm, and he has therefore failed to establish that either of these incidents were adverse employment actions. *See Sekyere v. City of N.Y.*, No. 05-CV-7192, 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff does not contend that her position was altered in any way by not receiving some specific training, nor does she contend that she was disciplined, demoted, transferred, or terminated for lack of some fundamental knowledge that should have been provided for her through training. Accordingly, any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse employment action.").

Regarding Plaintiff's change in appointment from solutions engineer to solutions architect, Plaintiff testified that this move was a promotion. (*See* Doc. 154-2 at 58:6-10, 60:12-20.) Even accepting for the sake of argument Plaintiff's unsupported assertion that it was a lateral move, (*see* P's Mem. at 20; P's Decl. ¶ 13), according to Plaintiff's own allegations his monthly income went up in this position, (*see* P's Decl. ¶¶ 59-60), which suggests that it was not an adverse employment action, *cf. Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (a transfer may amount to a adverse employment action where it is accompanied by a reduction in pay or benefits). A lateral transfer that is not accompanied by a reduction in pay or benefits may still be considered adverse where "the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." *Id.*; *see Rodriguez v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 366 (2d Cir. 1980) (transfer to elementary school was adverse action where "radical change" to "profoundly different" program rendered "utterly useless" plaintiff's twenty years of experience and study); *Alvarado v. Metro. Transp. Auth.*, No. 07-CV-3561, 2012 WL 1132143, at *7 (S.D.N.Y. Mar. 30, 2012) ("reassignment [that] would require [plaintiff] to undergo training and recertification and would render largely unusable her eight years of experience" plausibly alleged adverse employment action). But Plaintiff has failed to explain how becoming a solutions architect altered the terms and conditions of his employment in a materially negative way. For example, he mentions that he

2021 WL 3501330

had to support global projects in this role, but he does not articulate why this was a bad thing. (*See* P's Decl. ¶ 35.) [30] *Cf. James v. Mun. Credit Union*, No. 13-CV-4568, 2016 WL 698136, at *7 (S.D.N.Y. Feb. 19, 2016) (change in hours and longer commute from lateral transfer was not adverse action). Plaintiff's apparent preference to not work on global projects, without more, is not a materially adverse change in the terms and conditions of his employment. *See Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (summary order) ("[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action.") (cleaned up); *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, 205 F. App'x 858, 861 (2d Cir. 2006) (summary order) (conclusory assertions that a position is undesirable because it tended to require more work than others are insufficient to survive summary judgment).

[30]     Plaintiff does not explain what disadvantage there is to supporting global projects, and concedes that the solutions architect position involved less travel than the solutions engineer position, which involved "quite a lot" of travel. (Doc. 154-2 at 186:3-187:13.)

**\*21** Even if any of these incidents of alleged disparate treatment affected the terms or conditions of Plaintiff's employment, Defendants have met their burden of articulating legitimate, nondiscriminatory reasons for their decisions regarding the CEO club and 2019 trainings, and Plaintiff has failed to demonstrate that the proffered reasons are pretextual. [31] Plaintiff asserts that he was treated differently than similarly situated employees because Evans allegedly recommended a white, non-Muslim, non-Pakistani, younger employee over Plaintiff for the CEO Club. (P's Mem. at 4-5; P's Decl. ¶ 91.) But the only evidence Plaintiff cites that Evans recommended this employee over Plaintiff is a LinkedIn conversation with a former colleague who was "99% sure" Evans recommended another employee over Plaintiff. (Doc. 181-9 at 9.) This conversation is inadmissible hearsay, but even if it were not, there is no evidence that Evans's recommendation was related to any protected characteristic. Plaintiff alleges that this other employee "did not sell any SD-WAN," (P's Decl. ¶ 91), and sold hardware instead, (Doc. 180-18 at 75:8-20), but this does not appear to have been a qualification for the CEO Club, (*see* Doc. 154-39 at TI-00618). Assuming that Evans did recommend this

employee over Plaintiff, though, Defendants have articulated a legitimate, nondiscriminatory reason for doing so: Plaintiff's conduct did not accord with one of the criteria for the CEO Club – subscription to Teneo's values. (Ds' Mem. at 11-12.) It would hardly be surprising if Evans had not recommended Plaintiff for this award when, one month earlier, Plaintiff had posted a reply on a social networking site that Evans found disrespectful. (*See* Doc. 154-19.) Moreover, it is undisputed that two of the ten winners shared Plaintiff's protected traits, (Carey Aff. ¶¶ 13-14; Doc. 154-39 at TI-00620, TI-00628; *see* note 7 above), which undermines any inference that the award-selection process was discriminatory.

[31]     Defendants contend that Plaintiff has failed to establish a *prima facie* case that Plaintiff's move from solutions engineer to solutions architect constitutes disparate treatment, but they do not argue a legitimate, nondiscriminatory reason for this personnel decision in the alternative. (*See* Ds' Mem. at 14; Ds' Opp. at 12.)

Defendants have also articulated legitimate, nondiscriminatory reasons why Plaintiff did not attend the Cisco and Silver Peak trainings in 2019. Teneo did not grant Plaintiff's request to attend the 2019 Cisco conference in California because it was too costly, in contrast to the 2019 Cisco conference in Spain, for which free tickets were available to the U.K.-based employees who attended but which Plaintiff did not request to attend. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 102-105; *see* note 1 above.) [32] Teneo had only two free tickets to attend the 2019 Silver Peak training, and Ayres and Sabol were selected to attend because they could benefit from additional training on that product, whereas Plaintiff already had years of experience with Silver Peak and did not need the training. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 106; *see* note 1 above.)

[32]     This Cisco conference involved the same training that Plaintiff alleges he was "forced" to attend in 2018. (P's Mem. at 23.)

Ultimately, Plaintiff offers only his unsupported, subjective belief that the above actions were discriminatory. For example, his only basis for believing that he was discriminated against when he was not chosen for the CEO club is that he "felt it." (Doc. 180-18 at 75:21-76:11.) Such conclusory allegations are insufficient for Plaintiff to meet his burden of demonstrating pretext. *See Hill*, 467 F. Supp. 2d at 358 ("Evidence of disparate treatment cannot be based on conclusory allegations.").

Because Plaintiff has not established that the incidents of alleged disparate treatment affected the terms or conditions of his employment or, alternatively, because Plaintiff has not met his burden of establishing that Defendants' legitimate, nondiscriminatory reasons for its actions were pretextual, Defendants are entitled to summary judgment on Plaintiff's disparate treatment claims.

### E. Hostile Work Environment

Plaintiff alleges that various incidents at his workplace created a hostile work environment. To prove a hostile work environment claim, "a plaintiff must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Legg v. Ulster County*, 979 F.3d 101, 114 (2d Cir. 2020) (cleaned up). "This showing has both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (cleaned up). Furthermore, a plaintiff must demonstrate that the conduct occurred "because of" the plaintiff's protected status and "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Agosto*, 982 F.3d at 102 (cleaned up).

 **\*22** "The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances[,] including the social context in which particular behavior occurs and is experienced by its target." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (cleaned up). Accordingly, courts must take care "not to view individual incidents in isolation" or "view the record in piecemeal fashion." *Id.* Factors considered as part of the totality of the circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Legg*, 979 F.3d at 114-15 (cleaned up).

To be deemed "pervasive," discriminatory incidents "must be more than episodic; they must be sufficiently continuous and concerted." *Agosto*, 982 F.3d at 102 (cleaned up). A single incident may suffice to create a hostile work environment, "but to do so it must be extraordinarily severe." *Id.* (cleaned

up). "A plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Rodriguez v. County of Nassau*, 830 F. App'x 335, 339 (2d Cir. 2020) (summary order) (cleaned up). Antidiscrimination laws, however, do not "set forth a general civility code for the American workplace," *Redd*, 678 F.3d at 176 (cleaned up), and do not "prohibit employers from maintaining nasty, unpleasant workplaces," *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010).

"The question of whether a work environment is sufficiently hostile ... is one of fact," and "summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (cleaned up). "While this determination may involve difficult line-drawing that is sometimes best left for a jury, summary judgment is appropriate when reasonable minds could not differ on the issue of whether a work environment is hostile." *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 386 n.3 (S.D.N.Y. 2001) (cleaned up), *aff'd*, 40 F. App'x 628 (2d Cir. 2002) (summary order).

Here, none of the alleged conduct, considered in combination, amounts to a discriminatory hostile work environment.

### 1. Sabol's Alleged Use of Racist Terms

Starting with Sabol's alleged conduct – his use of the terms "redneck" and "Paki" during a single incident – while "offensive and inappropriate," does not fall into the category of "extraordinarily severe" isolated occurrences that create a hostile work environment. *Agosto*, 982 F.3d at 103; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("[M]ere utterance of an epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment ....") (cleaned up); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 459 (S.D.N.Y. 2013) (collecting cases), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order). [33]

33      Sabol is alleged to have used the term "redneck" in describing himself. A "redneck" could be perceived as someone who is prejudiced, and

therefore Sabol's use of the term to describe himself could cause offense, but the alleged comment is not as harmful as a slur, such as "Paki," directed at another person.

Additionally, an employer is liable for harassment by a nonsupervisory coworker (such as Sabol – a solutions engineer) only "if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (cleaned up); *see Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004); *see also Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 482 (S.D.N.Y. 2017) (an employer "cannot be liable for a comment made by Plaintiff's coworker where Plaintiff never reported the comment to anyone"); *Toyama v. Hasaki Rest., Inc.*, No. 13-CV-4892, 2014 WL 7234602, at *3 (S.D.N.Y. Dec. 18, 2014) (employer entitled to summary judgment on hostile work environment claim where "Plaintiff testified that she never reported the alleged ... incident to her superiors or to anyone else"). Here, Plaintiff has not established that there was no reasonable avenue to complain of the conduct at Teneo – which had a responsive human resources department led by Head – and it is undisputed that Plaintiff did not notify anyone at Teneo about his argument with Sabol until June 18, (Ds' 56.1 Stmt. ¶ 83; *see* note 1 above), after which Teneo took immediate remedial action by speaking to Sabol about the issue and having him attend a diversity and inclusion workshop, (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 111-112; *see* note 1 above). Consequently, even if Sabol's conduct were sufficiently severe to create a hostile work environment, Teneo still would not be liable.

### 2. Alleged Shouting Incidents

**\*23** Plaintiff also alleges that he was yelled at, shouted at, or berated on a number of occasions: (1) Sabol yelled at him in March 2019, (P's Mem. at 9, 28), (2) a U.K.-based employee shouted at him twice, (*id.* at 4; P's Decl. ¶ 100; Doc. 154-2 at 144:10-147:24), (3) Evans and Ayres shouted at him on one occasion, (P's Decl. ¶ 2A), (4) Evans berated him in October 2016, (P's Mem. at 5; P's Decl. ¶ 9), and (5) another Teneo employee berated him in October 2016, (P's Mem. at 5; P's Decl. ¶ 53).

First, it is not clear that Plaintiff's view of hostile conduct is objectively reasonable. Although Plaintiff alleges that Evans "berated" him on October 14, 2016, (P's Mem. at 5; P's Decl.

¶ 9), the evidence he cites in that regard either has nothing to do with that alleged incident, (*see* Doc. 180-17 at 39-40 (discussing Plaintiff's introduction to Teneo)), or concerns an innocuous email, (Doc. 181-19 at 2 (October 12, 2016 email in which Evans points out a typo in Plaintiff's email to a customer and writes, "Please be sure to double check customer facing emails to make sure there are no such errors. First impressions are critically important as I'm sure you know. Thanks.")). But I will assume Evans did something else that amounts to "berat[ing]."

Second, there is no evidence that any of these incidents occurred because of Plaintiff's membership in a protected class. For example, Plaintiff asserts that a Teneo employee "berated" him in October 2016. (P's Mem. at 5; P's Decl. ¶ 53.) In support of this allegation, one of Plaintiff's former colleagues submitted an affidavit attesting that this Teneo employee "loudly berated" Plaintiff and another employee on one occasion about training scheduling. (Doc. 163-27 at 40.) But there is no indication that this was because of a protected characteristic: there is no evidence that the other employee who was berated shared Plaintiff's protected characteristics, and the affiant attested that "[i]t was not unusual for the management to publicly shame an account executive or Solutions Engineer." (Doc. 163-27 at 40.) Thus, to the extent that Teneo employees shouted at Plaintiff, the evidence shows that it was because people sometimes shout in stressful work situations, not because he belonged to a protected group. *See Sherman v. Fivesky, LLC*, No. 19-CV-8015, 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020) ("Conduct that is offensive but that is directed at and impacts members of protected classes equally is not actionable .... 'Put bluntly, the equal opportunity harasser escapes the purview of [discrimination] liability.' ") (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 n.88 (2d Cir. 2019)); *see Dabney*, 958 F. Supp. 2d at 457 n.17 ("Simply put, animosity on the job is not actionable.") (cleaned up).

Third, even if all of these incidents occurred because of Plaintiff's membership in a protected class, they are neither severe enough nor pervasive enough to create a hostile work environment. *See Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (affirming summary judgment for defendants where "the record indicates only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment"); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)

("Generally, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (cleaned up); *Kearse v. ATC Healthcare Servs.*, No. 12-CV-233, 2014 WL 958738, at *8-9 (S.D.N.Y. Mar. 11, 2014) (repeated reprimands in front of other coworkers, keeping plaintiff at work past end of shift, ignoring plaintiff's questions about his paychecks, supervisors' restricting of plaintiff's use of his paid time off, and comment that plaintiff was getting married to avoid paying child support together did not amount to hostile work environment); *Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at *16 (E.D.N.Y. Jan. 14, 2009) (noting that shouting "may be a rude breach of etiquette but it is hardly sufficient to alter one's working conditions"), *aff'd*, 383 F. App'x 34 (2d Cir. 2010) (summary order); *Salerno v. City Univ. of N.Y.*, No. 99-CV-11151, 2003 WL 22170609, at *10 (S.D.N.Y. Sept. 18, 2003) ("four isolated incidents spanning a ten-year period" did not amount to hostile work environment).

### 3. Miscellaneous Incidents

**\*24** Additionally, Plaintiff asserts that Evans and Ayres "harassed" him by asking him to work on global rather than U.S. projects. (P's Mem. at 4, 6; P's Decl. ¶¶ 2A, 11.) Plaintiff has failed to explain how working on global projects constitutes harassment, and even if it could, Plaintiff has not produced any evidence suggesting that Evans and Ayres asked him to work on global projects because Plaintiff belonged to a protected class.

Plaintiff also alleges that miscellaneous conduct by Evans constitutes harassment, such as when Evans did not call him during his interview, because a white, non-Muslim employee who was not from Pakistan had a heart attack, (P's Mem. at 5; P's Decl. ¶ 9), and when Evans emailed Plaintiff while he was having a family emergency on April 26, 2017 and advised him of his options for leave, (*see* P's Mem. at 5, 9; P's Decl. ¶ 9). But this conduct is not even objectively offensive, let alone sufficiently severe or pervasive enough to create a hostile work environment.

Finally, Plaintiff asserts that a Teneo employee "harassed" him in January 2017. (P's Mem. at 5; P's Decl. ¶ 53.) This employee sent Plaintiff an email asking him to "[p]rovide the names of the retail organizations where you have relationships so we can target them appropriately" and "[i]ndicate any accounts or people [with whom] you have

personal relationships that you would prefer me not to engage with" so that Plaintiff could "approach them as [he] see[s] fit." (Doc. 163-9 at 4.) Plaintiff responded that he would not provide the names and did not want to reach out, and added, "Please stop. This is [h]arassment." (*Id.*) Even if Plaintiff subjectively perceived this to be harassment, this type of request is not objectively hostile or abusive. Additionally, like so many of Plaintiff's alleged instances of harassment, there is no indication that this conduct was directed at Plaintiff because of a protected characteristic.

In the end, almost all of the conduct that allegedly created a hostile work environment for Plaintiff consists of nothing more than ordinary workplace tension, and there is no evidence that it was directed at Plaintiff because he belonged to a protected group. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race.") (cleaned up); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42, 63 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (cleaned up).

Considering the totality of the circumstances, Plaintiff has failed to establish that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Legg*, 979 F.3d at 114. Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims.

### F. Failure to Accommodate

Finally, Plaintiff asserts a failure-to-accommodate claim on the basis that he requested an accommodation to not travel after his back injury but never received one, and was forced to lift things in the course of installing equipment. (P's Mem. at 3-4, 15-16.) To make out *a prima facie* case of failure to accommodate, a plaintiff must establish that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC*

*Consumer Prod. Mfg. Co.,* 583 F.3d 92, 97 (2d Cir. 2009) (cleaned up).

### 1. Disability Under the ADA

**\*25**  To establish a disability, a plaintiff must (1) "show that she suffers from a physical or mental impairment," (2) "identify the activity claimed to be impaired and establish that it constitutes a major life activity," and (3) "show that her impairment substantially limits the major life activity previously identified." *Weixel v. Bd. of Educ.,* 287 F.3d 138, 147 (2d Cir. 2002) (cleaned up); *see Bragdon v. Abbott,* 524 U.S. 624, 631 (1998); *Brandon v. O'Mara,* No. 10-CV-5174, 2011 WL 4478492, at \*5 (S.D.N.Y. Sept. 28, 2011).

An impairment need not be permanent or chronic to qualify as a "disability" under the ADA. *Hamilton v. Westchester County,* 3 F.4th 86, 93 (2d Cir. 2021) ("[U]nder the expanded definition of 'disability' under the [2008 ADA Amendments Act], which now covers impairments lasting or expected to last less than six months, a short-term injury *can* qualify as an actionable disability under the ADA.") (emphasis in original) (cleaned up).

The 2008 ADA Amendments Act (ADAAA) "ma[d]e clear that the clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one," *Hamilton,* 3 F.4th at 92 (cleaned up); *see* 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," 29 C.F.R. § 1630.2(j)(1)(iii); *see Brtalik v. S. Huntington Union Free Sch. Dist.,* No. 10-CV-0010, 2012 WL 748748, at \*4 (E.D.N.Y. Mar. 8, 2012).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a

disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii); *see Parada v. Banco Indus. De Venez., C.A.,* 753 F.3d 62, 69 (2d Cir. 2014). This inquiry "usually will not require scientific, medical, or statistical analysis," although such evidence is of course not prohibited, 29 C.F.R. § 1630.2(j)(1)(v); *Clark v. Stop & Shop Supermarket Co.,* No. 5-CV-304, 2016 WL 4408983, at \*4 (D. Conn. Aug. 16, 2016), and is made "without regard to the ameliorative effects of mitigating measures," 42 U.S.C. 12102(4)(E); 29 C.F.R. § 1630.2(j)(1)(vi). In determining whether an individual is disabled under the ADA, the Second Circuit has "rejected bright-line tests" and instructed courts to engage in a "fact-specific inquiry." *Parada,* 753 F.3d at 69. Appropriate considerations include "the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function." 29 C.F.R. § 1630.2(j)(4)(ii).

The ADA also provides that "major life activities include, but are not limited to ... lifting" as well as "the operation of major bodily functions, including ... bowel [and] bladder functions." 42 U.S.C. § 12102(2). Sitting is also a major life activity for purposes of the disability analysis. *Parada,* 753 F.3d at 69.

Plaintiff was injured on September 25, 2017. (Doc. 154-32; Ds' 56.1 Stmt. ¶¶ 120-121; *see* note 1 above.) On November 3, 2017, due to this injury, Plaintiff's doctor purportedly restricted him from "lifting from floor, squatting, or bending," indicated he should lift no more than ten pounds, and noted "No travel due to back injury until further notice." (Doc. 163-12 at 7.) [34] Plaintiff saw a different doctor on November 27, 2017, who noted that Plaintiff's pain and incontinence issues persisted at that time (although that doctor did not state whether Plaintiff should continue to be restricted in his work). (Doc. 154-34 at TI-00534 to 37.)

[34]  As noted above, (*see* note 19 and accompanying text above), Defendants dispute the authenticity and admissibility of this note, (Ds' 56.1 Stmt. at 20 n.6), but it (if admissible) or testimony by its author would be evidence of disability.

**\*26**  Plaintiff traveled out of state in December 2017, (P's 56.1 Resp. at 28; Doc. 163-9 at 11-16), to Florida in June

2018, (Doc. 154-36; Ds' 56.1 Stmt. ¶¶ 144-145; *see* note 1 above), to the United Kingdom in February 2019, (Ds' 56.1 Stmt. ¶¶ 148-150; P's 56.1 Resp. at 28; P's Decl. ¶ 50), to Maryland and Illinois in April 2019, (Doc. 181-13 at 4-7), and to an unstated location in June 2019, (Ds' 56.1 Stmt. ¶ 141; P's Mem. at 23-24). [35] Plaintiff testified that his back injury resulted in limited control over his bladder and bowels, that he would often lose control of these functions, and he began to travel with a second pair of pants as a result of the problem. (Doc. 180-21 at 192:3-24, 193:14-19.) Plaintiff also testified that travelling caused him "pain," explaining specifically that "the pain was there. You cannot stand up." (Doc. 180-21 at 192:18-24.) His medical records reflect that he reported symptoms of incontinence and pain to doctors at his November 3 and November 27 appointments. (Doc. 154-34 at TI-00534 to 41.)

[35]  The parties dispute the extent to which this travel was voluntary or requested by Plaintiff. (*Compare* P's Decl. ¶¶ 50-51, 92, 98, *and* Doc. 154-2 at 158:13-15, *with* Ds' 56.1 Stmt. ¶¶ 141.).

Defendants argue that Plaintiff could not be disabled with regard to travel (or, alternatively, that he needed no accommodation) because he did in fact travel. (Doc. 152 at 25-26.) But Plaintiff is not required to show that travel was impossible. *Parada*, 753 F.3d at 69. His testimony regarding his difficulty sitting and the incontinence caused by his injury – both of which were exacerbated, according to him, by travel – are sufficient bases from which a reasonable juror could conclude that Plaintiff had a disability under the ADA based on substantial limitations to the major life activities of sitting and the operation of bodily functions. *See* 42 U.S.C. § 12102(2) ("[M]ajor life activities include, but are not limited to ... the operation of major bodily functions, including ... bowel [and] bladder functions ...."); *Parada*, 753 F.3d at 69 ("If a plaintiff offers evidence that she cannot sit for a prolonged period of time, she may well be disabled under the ADA, depending on her specific factual circumstances."); *cf. Hamilton*, 2021 WL 2671311, at *5 ("[F]ollowing the enactment of the ADAAA, for purposes of establishing a disability under the ADA, the term 'substantially limits' should now be construed broadly in favor of expansive coverage, to the maximum extent permitted.") (cleaned up).

A jury could also conclude that Plaintiff was substantially limited in performing the major life activity of lifting. His doctor's note stated that as of November 3, 2017, he should not lift more than ten pounds or from the floor. (Doc. 163-12.)

It is uncontested that Plaintiff was asked to and did perform a hardware installation on December 3, 2017. (*See* Ds' 56.1 Stmt. ¶ 125; Doc. 180-20 at 159:8-23.) Plaintiff testified that he had to "manage[ ] his pain" in order to complete the installation. (Doc. 180-21 at 184:15-17.) Thereafter, Plaintiff declined to perform any more installations, (*id.* at 183:16-19), and his wishes were honored, (Doc. 154-2 at 163:14-17; Ds' 56.1 Stmt. ¶ 108; *see* note 1 above). Construing this evidence in a light most favorable to the Plaintiff, a rational factfinder could conclude that Plaintiff's back injury substantially limited his ability to lift. *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 264 (E.D.N.Y. 2015) (holding that a back injury that prevented plaintiff from lifting more than twenty pounds "may be, for purposes of [a summary judgment] motion, considered a disability under the ADA post passage of the ADAAA").

### 2. Teneo's Notice of Plaintiff's Disability

Regarding the second element, which concerns notice, "[a]n employee must ... tell his employer about [his] disability before [his] employer has any obligation to accommodate the disability." *MacEntee v. IBM (Int'l Bus. Machs.)*, 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011) (cleaned up), *aff'd*, 471 F. App'x 49 (2d Cir. 2012) (summary order). "It is also the employee's responsibility to demonstrate to an employer that she needs an accommodation for reasons related to a medical condition disability." *Id.* General awareness that a plaintiff suffered from certain medical conditions is insufficient. *See id.* at 443-44. In *MacEntee*, for example, this Court dismissed a failure-to-accommodate claim where the plaintiff "fail[ed] to provide medical documentation" or "notify her supervisor of her unknowable [psychiatric] limitations" because she gave her employer "no notice of her disability and ... [no] opportunity to offer, or refuse, ... reasonable accommodations." *Id.* at 444. But "if the employer knew or reasonably should have known that the employee was disabled," that employer has an "obligation" to "engage in an interactive process ... and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (cleaned up).

**\*27**  It is undisputed that Plaintiff did not provide Teneo with any doctors' notes while he was employed there. (Doc. 154-2 at 157:18-158:3; Ds' 56.1 Stmt. ¶ 124.) Even so, Teneo had more than a general awareness that Plaintiff had injured his back. Evans and Head acknowledged that they

2021 WL 3501330

had discussed the specifics of Plaintiff's MRI results with Plaintiff in October 2017. (*See* Doc. 154-33.) Plaintiff alleges that he asked Evans for "some accommodation" regarding travel because of his back. (Doc. 180-21 at 187:24-188:14.) Evans' October 20, 2019 email to Head and Carey, on the other hand, suggests that Plaintiff disclaimed any inability to travel. (Doc. 154-33.) Construing the evidence in the light most favorable to Plaintiff, he did not fail to notify Teneo of unknowable limitations: his alleged request for a travel accommodation was sufficient to trigger Teneo's duty to engage in an "interactive process" with Plaintiff to assess whether Plaintiff's disability with regard to travel could be "reasonably accommodated." *Brady*, 531 F.3d at 135 (cleaned up). Defendants have not offered evidence to show that they followed through on such a process – the record reflects that the question of the impact of Plaintiff's injury on his travel was raised but not pursued by Teneo. (Doc. 154-33.) [36] Given this evidence, there is a question of fact regarding whether Teneo had notice that Plaintiff was substantially limited in his ability to travel.

[36]     Evans states in his affidavit that he "raised preventative actions" with Plaintiff in a phone call on October 20, 2017, and that Plaintiff told him he wanted to continue working. (Ds' 56.1 Stmt. ¶ 122; Evans Aff. ¶ 25.) It is not clear, from this account, what "preventative actions" were discussed and whether those included a modification or restriction to Plaintiff's work-related travel going forward. Plaintiff states that he asked for travel accommodations but never heard back. (Doc. 180-20 at 155:24-156:10; Doc. 180-21 at 188:1-11.) Evans's October 20, 2017 email to Head and Carey suggests both that Plaintiff disclaimed a desire for any accommodation and that Teneo was still considering one but did not follow up on the issue. (Doc. 154-33.) To the extent the "interactive process" broke down, responsibility for this breakdown is unclear and the Court cannot grant summary judgment. *See Berger v. N.Y. City Police Dep't*, 304 F. Supp. 3d 360, 371-72 (S.D.N.Y. 2018) (denying summary judgment where "a reasonable trier of fact could find that Plaintiff was not responsible for the breakdown of the interactive process").

But the same cannot be said for Plaintiff's disability with regard to lifting. Plaintiff only performed one installation after his injury, on December 3, 2017. (*See* Doc. 154-2 at 162:25-163:17; Doc. 163-9 at 30.) Plaintiff did not ask to be excused from or ask for any accommodation regarding that installation, (Doc. 180-20 at 159:8-23), and he did not provide any documentation regarding any limitations on his ability to lift, (Doc. 154-2 at 157:18-21). [37] Therefore, his failure-to-accommodate claim with regard to the December 3, 2017 installation cannot go forward. [38]

[37]     While Plaintiff alleges that Evans "should have known" Plaintiff was limited in lifting on December 3, 2017, (Doc. 180-20 at 159:23), he concedes that "the only thing [he] told Steve [Evans], the travel, that there should be a limit for the travel," (Doc. 154-2 at 182:15-16).

[38]     It is undisputed that after December 3, 2017, Teneo did not require Plaintiff to do any lifting. (Doc. 154-2 at 163:14-17.)

### 3. Whether Reasonable Accommodation Was Possible

The third element asks whether Plaintiff could have performed his essential job functions while being provided reasonable accommodation for his disability. Mr. Evans testified via affidavit that Plaintiff was not required to travel for his job if he declined to do so. (Evans Aff. ¶ 26.) This statement suggests that some accommodation adjusting Plaintiff's travel requirements was reasonable under the circumstances, and that Plaintiff would have been able to fulfill the essential requirements of his job with these accommodations in place, to the extent they were not.

### 4. Refusal to Grant Reasonable Accommodation

Finally, as discussed above, there is some evidence that Plaintiff sought an accommodation with regard to travel and that Defendants did not follow up. (Doc. 154-33.) There is also some evidence that Plaintiff declined any accommodation because "not working won't make his back feel better," (*id.*), and that he was not required to travel if he declined, (Evans Aff. ¶ 26). It is undisputed that Plaintiff traveled for work on several occasions, but Plaintiff asserts, and Defendants dispute, that he was forced to take these trips against his will. (*See* note 35 and accompanying text above.) There is thus a triable question of fact as to whether Defendants failed to accommodate Plaintiff's disability by

requiring him to travel in the wake of his request for an accommodation.

## IV. CONCLUSION

**\*28**  For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part. All claims are dismissed except Plaintiff's ADA failure-to-accommodate claim as it relates to travel. Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to terminate the pending motions. (Docs. 151, 163.) The parties shall attend a telephonic status conference on August 12, 2021, at 12:00 p.m.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3501330

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

KeyCite Yellow Flag - Negative Treatment

Supplemented by  A'Gard v. Locke,  N.D.N.Y.,  August 17, 2016

2016 WL 8735653
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith M. A'GARD, Plaintiff,
v.
N. LOCKE, [1] et al., Defendants.

[1]    Defendant Locke was sued by plaintiff as N. Lock.
       *See* Dkt. No. 1 at 7. The clerk of the court will
       respectfully be directed to revise the docket in this
       matter to reflect the correct spelling of defendant
       Locke's name.

Civil Action No. 9:14-CV-0613 (GTS/DEP)
|
Signed 06/24/2016

**Attorneys and Law Firms**

KENITH    M.    A'GARD,    10-A-3008,    Shawangunk
Correctional Facility, P.O. Box 700, Wallkill, NY 12589, Pro
Se.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol, Albany, NY 12224.

REPORT, RECOMMENDATION AND ORDER

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1**  *Pro se* plaintiff Kenith M. A'Gard, a New York State
prison inmate, has commenced this action against several
defendants, both named and unidentified "Doe" defendants,
all of whom are corrections employees stationed at the prison
facility in which plaintiff was confined at the relevant times,
pursuant to 42 U.S.C. § 1983, alleging the deprivation of
his civil rights. Liberally construed, plaintiff's complaint
asserts claims under the Eighth Amendment for (1) failure to
protect, against defendant Nathan Locke and four unnamed
individuals, based on allegations that they failed to take
reasonable steps to prevent plaintiff from being assaulted by a
fellow inmate, and (2) deliberate medical indifference, against

an unidentified nurse, based on allegations that she provided
inadequate medical care following the assault on plaintiff.

Currently pending before the court are cross-motions brought
by defendant Locke and the plaintiff, each seeking the entry
of summary judgment in their favor. For the reasons set
forth below, I recommend that plaintiff's motion be denied and
defendant Locke's motion be granted. In addition, based on
the record evidence adduced by defendant Locke in support
of his motion, which demonstrates his knowledge as to the
identities of the Sergeant John Doe and Lieutenant John
Doe named as defendants in the complaint, the previous
efforts of plaintiff to identify these defendants, and my
recommendation with respect to the claim asserted against
defendant Locke, defense counsel will be directed to provide
plaintiff with the names of these individuals. [2] Finally, in light
of plaintiff's failure to take reasonable steps to identify and
join the other unnamed defendants in this action during the
pendency of discovery and the absence of any record evidence
that would appear to support a claim against any of those
defendants, I recommend that the claims asserted against the
remaining three unnamed defendants be dismissed without
prejudice for failure to prosecute.

[2]    After plaintiff has been provided with the true
       names of Sergeant John Doe and Lieutenant John
       Doe, plaintiff will be granted leave to amend
       his complaint, after which point the court will
       issue a new scheduling order allowing for limited
       discovery relative to the Eighth Amendment claim
       asserted against these defendants.

I. BACKGROUND [3]

[3]    In light of the procedural posture of the case,
       the following recitation is derived from the
       record now before the court. Ordinarily, when
       a motion for summary judgment is made, the
       record evidence is construed with all inferences
       drawn and ambiguities resolved in the non-moving
       party's favor. *Terry v. Ashcroft,* 336 F.3d 128,
       137 (2d Cir. 2003). In this case, in light of the
       parties' cross-motions, the court draws "all factual
       inferences ... against the party whose motion is
       under consideration." *Tindall v. Poultney High
       Sch. Dist.,* 414 F.3d 281, 284 (2d Cir. 2005)
       (quotation marks omitted). It is worth noting that,
       generally, the material facts underlying plaintiff's

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 64 of 443

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

claim against defendant Locke in this matter are not in dispute.

**\*2** Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. While he is now incarcerated at the Shawangunk Correctional Facility, at the times relevant to his claims in this action, plaintiff was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [4] *Id.* at 6.

[4] Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at \*4 n.11 (S.D.N.Y. Sept. 12, 2002).

Plaintiff arrived at Upstate on April 19, 2013. Dkt. No. 63 at 4. Upon his arrival, he was assigned to a double-occupancy cell with inmate James Heath following an assessment of his suitability and compatibility for double-cell housing. [5] *Id.*; Dkt. No. 53-3 at 3, 16. Accompanied by defendants Corrections Officers Doe 1 and Doe 2, defendant Locke escorted plaintiff to his cell as instructed by his area supervisor, a sergeant. Dkt. No. 53-2 at 2. Upon the group's arrival at the cell, Inmate Heath refused to allow plaintiff to enter, told defendant Locke and the other officers that he did not want plaintiff in the cell with him, and became "hostile." Dkt. No. 1 at 15; Dkt. No. 63 at 4; Dkt. No. 53-1 at 11-12; Dkt. No. 53-2 at 2. Defendant Locke then informed his sergeant by radio communication of Inmate Heath's behavior. Dkt. No. 63 at 4; Dkt. No. 53-1 at 11; Dkt. No. 53-2 at 2. Plaintiff was escorted back to a holding pen, and defendant Locke met with the Sergeant and Lieutenant Watch Commander to discuss the situation. Dkt. No. 63 at 4; Dkt. No. 53-1 at 13-14; Dkt. No. 53-2 at 2. According to defendant Locke, defendant Sergeant Doe "then ordered [him], along with [his] fellow officers, to escort plaintiff ... into the cell." Dkt. No. 53-2 at 2; *see also* Dkt. No. 63 at 4-5. Defendant Locke, in the company of Sergeant John Doe and two other officers, then escorted plaintiff back to the cell. Dkt. No. 53-2, at 3.

[5] Although plaintiff refers to this individual as "Scott Heath" in his complaint, *see, e.g.,* Dkt. No. 1 at 1, 8, it appears the inmate who plaintiff intends to reference is "James Heath," DIN 03-B-2618. *See* Dkt. No. 63 at 4.

Prior to plaintiff's entry into the cell, defendant Lieutenant Doe allegedly told plaintiff in the presence of defendant Locke that he wanted plaintiff to "kick [Inmate] Heath's ass." Dkt. No. 53-1 at 14-15; *see also* Dkt. No. 1 at 15. Once plaintiff was locked in his new cell, defendant Locke returned to his post. Dkt. No. 53-2 at 3.

Shortly after plaintiff was locked into the cell, he was assaulted by Inmate Heath. Dkt. No. 1 at 15; Dkt. No. 63 at 5-6. Defendant Locke responded to the cell and issued plaintiff a misbehavior report based on the incident. Dkt. No. 1 at 17; Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 3, 6. Although the misbehavior report issued to plaintiff suggests that defendant Locke witnessed Inmate Heath and plaintiff "exchanging striking blows," [6] plaintiff disputes this, [7] and a declaration submitted by defendant Locke in support of his motion for summary judgment is vague regarding this point. *See* Dkt. No. 53-2 at 3. In any event, defendant Locke wrote in a misbehavior report issued concerning the incident that "Inmate Agard, K Din #10A3008 did not appear to be the aggressor but was attempting to defend himself." Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 6.

[6] *See, e.g.,* Dkt. No. 1-1 at 1.

[7] *See* Dkt. No. 1 at 25; Dkt. No. 63 at 5.

**\*3** Following plaintiff's altercation with Inmate Heath, he was taken out of the cell and seen by medical staff. Dkt. No. 53-2 at 3. Plaintiff claims that Nurse Jane Doe, a defendant in this action, acted with deliberate indifference to his serious medical needs by failing to provide adequate medical care to address his injuries, which allegedly included "a concussion, a split-lip, a stab wound to the left side of the nose, chipped and cracked teeth, and a swelling to [his] face and skull." Dkt. No. 1, at 44.

Plaintiff contends that his "Institutional History" records reflect that he "was not suppose[d] to be in 'double-occupancy-housing' at Upstate" and that he is " ' victim prone.' " Dkt. No. 1 at 19, 21. Plaintiff testified at his deposition in this matter that he informed defendant Locke, prior to being escorted into Inmate Heath's cell, that he "couldn't double bunk." Dkt. No. 53-1 at 16. In addition, plaintiff contends, and there is no evidence disputing, that defendant Locke was aware that Inmate Heath had a history of violence against other prisoners while incarcerated at Upstate. Dkt. No. 1 at 24; Dkt. No. 63 at 5 & n.2. Defendant Locke maintains that he "had no authority to change the approval of plaintiff to be housed with Inmate Heath." Dkt. No. 53-2 at 3.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 27, 2014, with the filing of a complaint and accompanying applications to proceed *in forma pauperis* ("IFP") and for permission to proceed in the action anonymously, utilizing a pseudonym, for safety reasons.[8] Dkt. Nos. 1-3. Named as defendants in plaintiff's complaint were Corrections Officer N. Locke, Inmate James Heath, Deputy Superintendent Rock, Inspector General Vern Fonda, Administrative Assistant Chad Powell, Nurse Doe, Corrections Officers Doe 1 and Doe 2, Corrections Sergeant Doe, and Corrections Lieutenant Doe. Dkt. No. 1 at 1, 6-10. On December 23, 2014, Chief District Judge Glenn T. Suddaby issued a decision and order pursuant to 28 U.S.C. §§ 1915(e)(2)B(ii), 1915A(b) in which he (1) granted plaintiff's IFP application; (2) denied plaintiff's request to proceed under a pseudonym in this action; and (3) dismissed all of plaintiff's claims, except plaintiff's Eighth Amendment failure to protect claim asserted against defendants Locke, Corrections Officers Doe 1 and 2, Corrections Lieutenant Doe, and Corrections Sergeant Doe, and plaintiff's Eighth Amendment deliberate medical indifference claim against Nurse Doe. *See generally* Dkt. No. 14.

[8] Plaintiff's original IFP application was denied as incomplete on June 3, 2014. Dkt. No. 6. Plaintiff thereafter filed a renewed and complete request on June 10, 2014. Dkt. No. 7.

Following the close of discovery, defendant Locke filed a motion seeking the entry of summary judgment in his favor on December 24, 2015. Dkt. No. 53. In his motion, defendant Locke argues that no reasonable factfinder could conclude he is liable for failing to protect plaintiff from Inmate Heath's attack, and, in any event, he is entitled to qualified immunity from suit. *See generally* Dkt. No. 53-5. Plaintiff filed a response to defendant Locke's motion on February 4, 2016, which he has characterized as a cross-motion for summary judgment. Dkt. No. 63. Defendant Locke subsequently filed an opposition to plaintiff's cross-motion on March 15, 2016. Dkt. No. 67.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Plaintiff's Cross-Motion for Summary Judgment and Failure to Respond to Defendant Locke's Statement of Material Facts

**\*4** Although plaintiff characterizes his response to defendant Locke's motion as a " 'cross-motion' for summary judgment," and "submits that plaintiff's complaint and the relief requested be granted in its entirety," Dkt. No. 63 at 1, 3, his submission fails to comply with the local rules of this court governing motion practice. In particular, Local Rule 7.1 requires a moving party to submit a "supporting affidavit," as well as a statement of material facts. N.D.N.Y. L.R. 7.1(a)(2)-(3). In this case, plaintiff has submitted only a memorandum of law in support of his cross-motion. Dkt. No. 63. Because plaintiff has not complied with the applicable local rules governing motion practice by including an affidavit and statement of material facts, I recommend that his motion be denied. *See, e.g., Riley v. Town of Bethlehem,* 5 F.Supp.2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Local Rule 7.1 Statement of Material Facts).

Plaintiff's failure to respond to the Local Rule 7.1(a)(3) Statement submitted by defendants in support of their motion is also significant. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).[9] Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

9       Copies of all unreported decisions cited in this
        document have been appended for the convenience
        of the *pro se* plaintiff.

Here, because plaintiff was warned of the consequences of
failing to properly respond to defendant Locke's statement of
material facts, *see* Dkt. No. 53 at 2; Dkt. No. 54 at 2, but
nonetheless has failed to do so, I recommend that the court
deem the facts contained in defendant's statement as having
been admitted, to the extent they are supported by accurate
record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1;
*see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996).
As to any facts not contained in defendant Locke's statement
of material facts, in light of the procedural posture of this case,
the court is "required to resolve all ambiguities and draw all
permissible factual inferences" in favor of plaintiff. *Terry,* 336
F.3d 1 at 137.

### B. Defendant Locke's Motion

### 1. Legal Standard Governing
### Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of
the Federal Rules of Civil Procedure. Under that provision,
the entry of summary judgment is warranted "if the movant
shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S.
317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is
"material" for purposes of this inquiry if it "might affect the
outcome of the suit under the governing law." *Anderson,* 477
U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553
(2d Cir. 2005). A material fact is genuinely in dispute "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Anderson,* 477 U.S. at 248.

*5 A party moving for summary judgment bears an initial
burden of demonstrating that there is no genuine dispute
of material fact to be decided with respect to any essential
element of the claim in issue; the failure to meet this burden
warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4;
*Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden
is met, the opposing party must show, through affidavits or
otherwise, that there is a material dispute of fact for trial. Fed.
R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S.
at 250.

When deciding a summary judgment motion, a court must
resolve any ambiguities, and draw all inferences, in a light
most favorable to the non-moving party. *Anderson,* 477 U.S.
at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d
133, 137-38 (2d Cir. 1998). The entry of summary judgment
is justified only in the event of a finding that no reasonable
trier of fact could rule in favor of the non-moving party. *Bldg.
Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501,
507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250
(finding summary judgment appropriate only when "there can
be but one reasonable conclusion as to the verdict").

### 2. Merits of Plaintiff's Claim
### Asserted Against Defendant Locke

Plaintiff asserts an Eighth Amendment failure to protect
claim against Corrections Officer Locke based on allegations
that he was aware of the risk of harm plaintiff faced
from Inmate Heath prior to being escorted and housed in
his cell. *See generally* Dkt. Nos. 1, 63. Defendant Locke
contends that, even assuming plaintiff's allegations are true,
he had no authority to change plaintiff's housing assignment,
and, therefore, he is not responsible for violating plaintiff's
constitutional rights. [10] *See generally* Dkt. No. 53-5.

10      Defendant Locke also argues that he was unaware
        that plaintiff was a homosexual and victim-prone
        prior to directing plaintiff to bunk with Inmate
        Heath. Dkt. No. 53-5 at 8-9. Whether this is true
        is not relevant because plaintiff's claim is based on
        allegations that defendant Locke was aware that
        (1) plaintiff could not double-bunk, (2) defendant
        Sergeant Doe told plaintiff to fight Inmate Heath,
        (3) Inmate Heath refused to permit plaintiff to enter
        the cell, and (4) Inmate Heath had a history of
        assaulting other prisoners while at Upstate.

The Eighth Amendment prohibits punishment that is
"incompatible with 'the evolving standards of decency that
mark the progress of a maturing society[,]' or 'involve[s]
the unnecessary and wanton infliction of pain[.]' " *Estelle
v. Gamble,* 429 U.S. 97, 102-03 (1976) (quoting *Trop v.
Dulles,* 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia,*
428 U.S. 153, 169-73 (1976) (citations omitted)). While
the Eighth Amendment " 'does not mandate comfortable
prisons,' neither does it permit inhumane ones." *Farmer
v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.*

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

*Chapman,* 452 U.S. 337, 349 (1981)); *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013).

Law enforcement officers have a duty to intervene and prevent a cruel and unusual punishment, prohibited by the Eighth Amendment, from occurring or continuing. *Farmer,* 511 U.S. at 836 (1994); *Hayes v. N.Y. City Dep't of Corrs,* 84 F.3d 614, 620 (2d Cir. 1996); *see also Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment."). A plaintiff asserting a claim that prison officials have failed to protect him from harm must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes,* 84 F.3d at 620. This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.,* 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted); *see also Hayes,* 84 F.3d at 620 ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."). Said differently, to establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson,* 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer,* 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."); *O'Neill v. Krzeminski,* 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in ... rapid succession"); *accord, Henry,* 2011 WL 5975027, at *4. From a constitutional perspective, "deliberate indifference ... requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006); *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

**\*6** In this case, plaintiff has submitted undisputed admissible record evidence establishing that defendant Locke was present when Inmate Heath told defendant Locke and the other corrections officers escorting plaintiff that he did not want plaintiff to be housed in his cell and refused to allow plaintiff entry into the cell. Dkt. No. 1 at 15; Dkt. No. 53-1 at 11; Dkt. No. 63 at 4. In addition, defendant Locke does not dispute that he learned plaintiff was not supposed to be housed in a double-bunk cell prior to placing plaintiff in Inmate Heath's cell. Dkt. No. 53-1 at 16. The undisputed record also reflects that defendant Locke was present when defendant Lieutenant Doe allegedly told plaintiff that he wanted plaintiff to "kick [Inmate Heath's] ass" once he was placed inside the cell. [11] Dkt. No. 1 at 15; Dkt. No. 53-1 at 14-15. Finally, plaintiff contends that, prior to placing plaintiff in Inmate Heath's cell, defendant Locke was aware of Inmate Heath's violent disciplinary history while at Upstate, including the issuance of three Tier III misbehavior reports involving assaults on Inmate Heath's former cellmates. Dkt. No. 63 at 4, 5 & n.2.

[11]      In my view, this evidence is not hearsay and is properly relied on when analyzing defendant Locke's pending motion. Plaintiff is not relying on the statement made by defendant Lieutenant Doe for the truth of the matter asserted. Instead, plaintiff offers the lieutenant's statement to show defendant Locke's state of mind and that defendant Locke was on notice that plaintiff may be at risk of harm. Accordingly, the statement is not hearsay. *See* Fed. R. Evid. 801(c), Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *accord, United States v. Dupree,* 706 F.3d 131, 136 (2d Cir. 2013); *see also George v. Celotex Corp.,* 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

Although it is not disputed that defendant Locke contacted his supervisors after Inmate Heath refused plaintiff access to his cell, Dkt. No. 53-1 at 12, the accumulation of all of the record evidence gives rise to a genuine dispute of material fact as to whether defendant Locke was aware of a serious risk to plaintiff's health and safety immediately prior to ordering plaintiff to bunk with Inmate Heath, and recklessly

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 68 of 443

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

disregarded that risk by failing to intervene and stop plaintiff from being housed with Inmate Heath. In my view, reasonable factfinders could disagree as to whether notifying his supervisor of Inmate Heath's conduct but otherwise failing to take any further action to protect plaintiff from impending harm was sufficiently reasonable on defendant Locke's part for purposes of an Eighth Amendment claim, or whether defendant Locke had a realistic opportunity to intervene and prevent the attack on the plaintiff. Accordingly, I recommend defendant Locke's request for summary judgment dismissing the claim asserted against him on the merits be denied.

### 3. Qualified Immunity

Defendant Locke also seeks dismissal of plaintiff's claim against him based on the doctrine of qualified immunity. Dkt. No. 53-5 at 11-12.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

 **\*7** Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

In this case, even when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, it was objectively reasonable for defendant Locke to believe his acts were lawful. As was discussed above, the record establishes that defendant Locke had no authority to alter plaintiff's cell assignment, and plaintiff does not otherwise contend that defendant Locke should have acted beyond the scope of his authority. Dkt. No. 53-2 at 1. Upon being confronted with Inmate Heath's refusal to permit plaintiff to enter the cell, defendant Locke conferred with his supervisors, who then ordered that he direct plaintiff to enter the cell through the recreational pen door in order to effectuate the housing assignment. Dkt. No. 53-2 at 2; Dkt. No. 63 at 4. These actions, which are not disputed by plaintiff, were within the scope of defendant Locke's duties and approved by supervisors. Dkt. No. 53-2 at 1-3.

 **\*8** It was certainly reasonable for defendant Locke to believe he was not violating plaintiff's constitutional rights by notifying his supervisor of a potential risk to plaintiff's safety.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

It was likewise objectively reasonable for defendant Locke to rely on his superiors' instructions in returning plaintiff to the cell with Inmate Heath because, at a minimum, officers of reasonable competence could disagree as to the legality of defendant Locke's actions in light of this directive from his superiors. *See Anthony v City of New York, et al.,* 339 F.3d 129, 138 (2d Cir. 2003) (" 'Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.... ' ") (quoting *Bilida v. McCleod,* 211 F.3d 166, 174–75 (1st Cir. 2000)); *Kraft v. City of N.Y.,* 696 F.Supp.2d 403, 420 (S.D.N.Y. 2010) (reliance on an "apparently valid" order supports finding of qualified immunity); *cf. Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir. 2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable because they lack the authority to intervene in medical decisions). For these reasons, I recommend a finding that defendant Locke is entitled to qualified immunity from suit, and that defendant Locke's motion be granted on this basis.

C. Status of Doe Defendants

On November 30, 2015, plaintiff moved to file an amended complaint to add the names of two defendants previously identified as Sergeant John Doe and Lieutenant John Doe. Dkt. No. 47. In his motion, plaintiff provided the court with only the last name of Sergeant John Doe, and asked the court to order defense counsel to provide him with the name of the lieutenant listed on page 252 of a log book. [12] *Id.*

[12]    Although plaintiff stated in his letter motion that he had attached the relevant page of the log book, it was not received by the court with plaintiff's filing. *See* Dkt. No. 47.

On December 1, 2015, I denied plaintiff's motion because, pursuant to the court's mandatory pretrial discovery and scheduling order, the deadline for joinder of parties expired on August 2, 2015, and plaintiff failed to show good cause to amend. Dkt. No. 49. Thereafter, defendant Locke filed his motion for summary judgment. Dkt. No. 53. In support of that motion, defendant Locke submitted, *inter alia,* a declaration in which he acknowledges that his "area supervisor, a Sergeant," and the "Watch Commander, a Lieutenant," discussed the situation involving plaintiff and Inmate Heath, after which point the Sergeant "ordered" defendant Locke and two of his fellow officers to escort

plaintiff back to the cell occupied by Inmate Heath. Dkt. No. 53-2. Based on defendant Locke's sworn statement, there is no question that at least defendant Locke is aware of the identities of Sergeant John Doe and Lieutenant John Doe. As a result, in the interests of justice, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action. [13] *See Valentin v. Dinkins,* 121 F.3d 72 (2d Cir. 1997).

[13]    Plaintiff attempted to obtain the names of these defendants while discovery was ongoing. *See* Dkt. Nos. 31, 31-1, 47. Moreover, the undisputed record now shows that defense counsel knew, or could have known with relative ease, the names of Lieutenant Doe and Sergeant Doe. Under such circumstances, the court finds "good cause" to amend the scheduling order to allow plaintiff leave to amend the complaint. The court also does not find any bad faith or dilatory motive on the part of plaintiff in seeking to identify these defendants based on the efforts he made during discovery, nor does the court find any undue prejudice to defendants in granting plaintiff leave to amend. *See, e.g., Morales v. County of Suffolk, et al.,* 952 F. Supp.2d 433, 435-436 (E.D.N.Y. 2013) (finding the absence of undue prejudice under similar circumstances because the Doe defendant sought to be added "plainly knew" about his involvement in the actions that gave rise to the claim and the need to re-open discovery "is not, in itself, sufficient to constitute prejudice"). Because plaintiff remains within the three-year limitations period to assert claims against Lieutenant Doe and Sergeant Doe, the court need not decide whether an amendment properly naming these defendants would relate back to the original filing date of the complaint.

**\*9** As it relates to the other Doe Corrections Officers and Nurse Doe, plaintiff has not taken the same steps to identify these unnamed defendants that he took with respect to naming Lieutenant Doe and Sergeant Doe. Indeed, in his motion for leave to amend, he only sought to properly name Lieutenant Doe and Sergeant Doe. *See* Dkt. No. 47.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock,*

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 70 of 443

No. 12-CV-0447, 2015 WL 791547, at \*21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.,* 07-cv-2027, 2010 WL 882990, at \* 5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.").

The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against defendants Corrections Officers Doe 1 and Doe 2, Lieutenant Doe, Sergeant Doe, and Nurse Doe, provided that plaintiff take "reasonable steps through discovery to ascertain the name of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them." Dkt. No. 14 at 12, 14. That order warned plaintiff, however, as follows: "If plaintiff fails to learn their identities, this action will be dismissed as against the Doe defendants." *Id.* at 12 n.9. The deadline for joining parties to this lawsuit passed on August 2, 2015. Dkt. No. 24 at 5. Discovery in this matter was originally scheduled to close on October 2, 2015. Dkt. No. 24 at 5. That deadline was subsequently extended until December 2, 2015, at defendant Locke's request. Dkt. Nos. 39-40.

It is now more than five months past the extended deadline for joinder of parties, yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed Corrections Officers or Nurse. As such, I recommend that the claims brought against these three unnamed defendants be *sua sponte* dismissed without prejudice for failure to prosecute.

## IV. SUMMARY AND RECOMMENDATION

Notwithstanding the existence of a genuine dispute of material fact with respect to whether defendant Locke acted reasonably in ordering plaintiff to bunk with Inmate Heath I find, based upon the record now before the court, that it was objectively reasonable for defendant Locke to believe

he was not violating plaintiff's rights when he contacted his supervisor after learning of Inmate Heath's refusal to allow plaintiff in the cell and thereafter followed orders from his supervisors in pursuing plaintiff's housing assignment. Accordingly, I recommend that the court find defendant Locke is entitled to qualified immunity.

 **\*10**  With respect to Sergeant John Doe and Lieutenant John Doe identified in plaintiff's complaint, I find that the identities of these individuals is known, or can be determined with relative ease, by defense counsel, and that good cause now exists for amending the scheduling order to name these individuals as defendants in this action. As a result, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.

With respect to the other three Doe defendants identified in plaintiff's complaint, because discovery is now closed and plaintiff has failed to take reasonable steps to identify those individuals and join them in the action, I recommend that the claims asserted against those individuals be dismissed without prejudice for failure to prosecute.

Accordingly, it is hereby respectfully

ORDERED that, within forty-five (45) days of the filing date of this decision and order, defense counsel produce the information specified above regarding the identities of defendant Sergeant John Doe and defendant Lieutenant John Doe. Upon receipt of defense counsel's response, the clerk shall return this file to the court for further review; and it is hereby further

ORDERED, that the clerk adjust the court's records to reflect the correct spelling of defendant's name to N. Locke; and it is hereby respectfully

RECOMMENDED that defendant Locke's motion for summary judgment (Dkt. No. 53) be GRANTED and that plaintiff's claims against defendant N. Locke be DISMISSED, and plaintiff's cross-motion for summary judgment (Dkt. No. 63) be DENIED; and it is hereby further respectfully

RECOMMENDED that plaintiff's claims against defendant Corrections Officer John Doe 1, Corrections Officer John Doe 2, and Nurse Doe be *sua sponte* DISMISSED WITHOUT PREJUDICE.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8735653

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

A'Gard v. Lock e, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

2016 WL 5137273
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith A'GARD, Plaintiff,

v.

N. LOCKE, Corr. Officer a/k/a N. Lock; John
Doe 1, Corr. Officer, Upstate Corr. Facility; John
Doe 2, Corr. Officer, Upstate Corr. Facility; John
Doe, Corr. Sergeant, Upstate Corr. Facility; John
Doe, Lieutenant, Upstate Corr. Facility; and Jane
Doe, Nurse, Upstate Corr. Facility, Defendants.

9:14-CV-0613 (GTS/DEP)
|
Signed 09/20/2016
|
Filed 09/21/2016

**Attorneys and Law Firms**

KENITH A'GARD, 10-A-3008, Sullivan Correctional
Facility, Box 116, Fallsburg, New York 12733, Plaintiff, Pro
Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, Albany, New York 12224, Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Kenith A'Gard ("Plaintiff")
against the six above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Upstate Correctional Facility ("Defendants")
are the following: (1) Defendant Locke's motion for summary
judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiff's cross-
motion for summary judgment; (3) United States Magistrate
David E. Peebles' Report-Recommendation recommending
that Defendant Locke's motion be granted, that Plaintiff's
cross-motion be denied, and that Plaintiff's claims against
Defendants Corrections Officer John Doe 1, Corrections
Officer John Doe 2, and Nurse Jane Doe be *sua sponte*
dismissed without prejudice based on Plaintiff's failure to

prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants
pursuant to Fed. R. Civ. P. 41(b); (4) Plaintiff's Objections to
the Report-Recommendation; (5) Magistrate Judge Peebles'
Supplemental Report-Recommendation recommending that
Plaintiff's claims against Defendants Sergeant John Doe
and Lieutenant John Doe also be *sua sponte* dismissed
without prejudice based on Plaintiff's failure to prosecute
those claims and/or failure to comply with a Court Order to
take reasonable steps to identify those Defendants pursuant
to Fed. R. Civ. P. 41(b); (6) Plaintiff's Objection to
the Supplemental Report-Recommendation; and (7) Plaintiff's
motion to amend his Complaint. (Dkt. Nos. 53, 63, 71,
73, 78, 81, 82.) For the reasons set forth below, the Court
accepts and adopts both the Report-Recommendation and the
Supplemental Report-Recommendation for the reasons stated
therein; Defendant's Locke's motion for summary judgment
is granted and Plaintiff's claims against Defendant Locke are
dismissed; Plaintiff's cross-motion for summary judgment is
denied; his motion to amend his Complaint is denied; and his
claims against Defendants Corrections Officer John Doe 1,
Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant
John Doe and Lieutenant John Doe are dismissed without
prejudice.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Peebles' Report-
Recommendation**
Generally, in his Report-Recommendation, Magistrate Judge
Peebles rendered the following three recommendations: (1)
that Plaintiff's claims against Defendant Locke be dismissed
based on the doctrine of qualified immunity, especially in
light of Plaintiff's willful failure to submit a response to
Defendant Locke's Statement of Material Facts, as required
by Local Rule 7.1(a)(3) of the Local Rules of Practice for
this Court; (2) that Plaintiff's claims against Defendants
Corrections Officers John Doe 1, John Doe 2, and Nurse
Jane Doe be *sua sponte* dismissed due to Plaintiff's failure to
prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants;
and (3) that Plaintiff's cross-motion for summary judgment be
denied due to his willful failure to comply with Local Rule
7.1(a)(2),(3) of the Local Rules of Practice for this Court.
(Dkt. No. 71, Part III.)

**B. Plaintiff's Objections to the Report-
Recommendation**

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 73 of 443

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

**\*2** Generally, in his Objections to the Report-Recommendation, Plaintiff argues that the Court should reject the Report-Recommendation for the following three reasons: (1) Magistrate Judge Peebles erred in recommending that the factual assertions contained in Defendant Locke's Statement of Material Facts be deemed admitted due to Plaintiff's failure to properly respond to them under Local Rule 7.1(a)(3), because Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts asserted; (2) Magistrate Judge Peebles erred in recommending that the Court penalize Plaintiff for failing to comply with Local Rule 7.1(a), because that failure was due to his lack of understanding of that rule as a *pro se* litigant, which was due to the Court's prior denial of Plaintiff's request for the appointment of counsel; and (3) Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because a finding that it was objectively reasonable for Locke to believe he was not violating Plaintiff's rights is inconsistent with (a) the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health (thus demonstrating that Locke knew that the placement violated Plaintiff's rights), (b) the point of law that Defendant Locke cannot escape liability based on the defense that he was "just following orders," and (c) Magistrate Judge Peebles' prior finding that a genuine dispute of material fact exists regarding the merits of Plaintiff's claims against Defendant Locke. (Dkt. No. 73.)

### C. Magistrate Judge Peebles' Supplemental Report-Recommendation

Generally, in his Supplemental Report-Recommendation, Magistrate Judge Peebles recommended that Plaintiff's claims against Defendants Sergeant John Doe and Lieutenant John Doe be *sua sponte* dismissed due to Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants. (Dkt. No. 78.) In doing so, Magistrate Judge Peebles found that, in response to having been ordered to produce to Plaintiff the true identities of the Defendants named in the Complaint as Sergeant John Doe and Lieutenant John Doe, defense counsel filed a letter on August 4, 2016, representing to the Court (as an officer of it) that, although defense counsel conferred with Defendant Locke regarding the identity of these two Defendants, Defendant Locke cannot recall the names of either Defendant, despite having reviewed the 11-Building console log book from the date of the incident. (*Id.*)

### D. Plaintiff's Objection to the Supplemental Report-Recommendation

Generally, in his Objection to the Supplemental Report-Recommendation, Plaintiff asserts two arguments: (1) while he does not know the name of Defendant Lieutenant John Doe, he does know the name of Defendant Sergeant John Doe, which is Sergeant "Smith"; and (2) because he can identify Defendant Sergeant John Doe, the Court should not dismiss his claims against that Defendant but permit him to amend his Complaint (so as to identify that Defendant as "Sergeant Smith" and voluntarily discontinue his claims against Defendant Lieutenant John Doe). (Dkt. No. 81.)

### E. Plaintiff's Motion to Amend His Complaint

Generally, in his motion to amend his Complaint, Plaintiff requests leave to do the following: (1) discontinue his claims against Defendant Lieutenant John Doe; (2) discontinuing his claims against Defendant Locke; and (3) identifying Defendant Sergeant John Doe as Defendant Sergeant "Smith"; and (3) adding claims against Defendant James C. Heath. (Dkt. No. 82.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate judge but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in

A'Gard v. Lock e, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

1   See also *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2   See *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P.

72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

3   See *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4   See also *Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Peebles' thorough Report-Recommendation and Supplemental Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation and Supplemental Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation and Supplemental Report-Recommendation: Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, both the Report-Recommendation and Supplemental Report-Recommendation are accepted and adopted in their entirety for the reasons stated therein. To those reasons, the Court adds the following five points.

As to the first ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts he asserted in his Statement of Material Facts; Locke did so. (*See* Dkt. No. 53, Attach 4 [Def. Locke's Rule 7.1 Statement, supporting factual assertions with accurate citations to admissible record evidence].) Indeed, the lack of merit of Plaintiff's claims against Defendant Locke is apparent from Plaintiff's attempt to abandon his claims against Locke in his proposed Amended Complaint. (Dkt. No. 82.)

 **\*4** As to the second ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that imposing the consequences of violating Local Rule 7.1(a)(3) on a *pro se* litigant who has been specifically advised of those consequences and nonetheless violated that rule effectively "penaliz[es]" that litigant for his *pro se* status. As Magistrate Judge Peebles' correctly stated in his Report-Recommendation, even *pro se* litigants must obey a district court's procedural rules. (*See* Dkt. No. 71, at 9 [Report-Recommendation, citing cases].) *See also* Cusamano v. Sobek, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

The Court notes that Plaintiff was sufficiently and repeatedly advised of the consequences of failing to submit such a proper response through his receipt of, and/or access to, the following documents: (1) the courtesy copies of Local Rule 7.1(b)(3) of the District's Local Rules of Practice and pages 39 and 40 of the District's *Pro Se* Handbook, which were on file at his Correctional Facility during the time in question; and (2) the Notice of Consequences of Failing to Respond that was provided to Plaintiff by Defendants with their motion papers (Dkt. No. 53, page 2); and (3) a Notice from the Court advising Plaintiff of the motion response deadline, including a Notice of Consequences of Failing to Respond (Dkt. No. 54, at 1-2).

As to the third ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), as an initial matter, this Objection gives rise to only a clear-error review, because it is simply a reiteration of an argument asserted in his opposition memorandum of law. (*Compare* Dkt. No. 73, at Paragraphs 3-5 [Obj.] *with* Dkt. No. 63, at Points 1-3 [Opp'n Memo. of Law].) In any event, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because of the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health: that evidence does not demonstrate that Locke knew that the placement violated Plaintiff's rights. In addition, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because Defendant Locke cannot escape liability based on the defense that he was "just following orders," and he had previously found a genuine dispute of material fact regarding the merits of Plaintiff's claims against Defendant Locke: as Magistrate Judge Peebles stated, qualified immunity is an immunity from suit rather than a mere defense to liability. (Dkt. No. 71, at 18 [Report-Recommendation].)

As to Plaintiff's Objection to the Supplemental Report-Recommendation (summarized above in Part I.D. of this Decision and Order), the Court rejects that Objection on each of two alternative grounds: (1) the Objection is untimely in that it is dated September 9, 2016, and the deadline for objections was September 6, 2016 (Dkt. No. 81); and (2) in any event, the Objection presents no specific challenge to any portion of the Supplemental Report-Recommendation, but merely an argument that Plaintiff "can amend [his] Complaint." (*compare* Dkt. No. 81 *with* Dkt. No. 78.) With regard to this second ground, the Court notes that a district court will ordinarily refuse to consider evidentiary material and arguments that could have been, but were not, presented

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 76 of 443

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

to the magistrate judge in the first instance. *See, supra,* Part II of this Decision and Order.

**\*5**  As for Plaintiff's motion to amend his Complaint, that motion is in fact Plaintiff's second such motion, the first such motion having been filed on November 30, 2015, and denied on December 1, 2015. (Dkt. No. 47; Text Order filed Dec. 1, 2015.) Plaintiff's second motion is denied on each of six alternative grounds: (1) it is untimely (the motion filing deadline having expired on August 2, 2015) and Plaintiff has not shown good cause for an extension of the deadline (*compare* Dkt. No. 24, at 5 *with* Dkt. No. 82); [5] (2) it is barred by the law of the case doctrine, given that it is based on the same unsuccessful ground that supported his first such motion (*compare* Dkt. No. 47 *with* Dkt. No. 82 *and* Text Order filed Dec. 1, 2015); (3) it does not identify the amendments in the proposed pleading through the redline/strikeout method or other equivalent means, as required by Local Rule 7.1(a)(4) of the Local Rules of Practice for this Court (Dkt. No. 82, Attach. 1); [6] (4) it is unsupported by a memorandum of law, in violation of Local Rule 7.1(a)(1); (5) it is unsupported by an affidavit, in violation of Local Rule 7.1(a)(2); and (6) it is unsupported by a showing of cause (e.g., the lack of undue delay, the lack of bad faith or dilatory motive on the part of Plaintiff, the lack of undue prejudice to Defendants by virtue of allowance of the amendment, the lack of futility of the amendment). [7]

[5]  See *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."); Fed. R. Civ. P. 16(b)(4), (f)(C) ("A schedule may be modified only for good cause and with the judge's consent.... On motion or its own, the court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling or other pretrial order.").

[6]  The Court notes that the underlined portions of Plaintiff's proposed Amended Complaint do not signify additions (or deletions) of language, but apparently merely portions of text that Plaintiff deems particularly relevant–a practice in which

he engaged while drafting his original Complaint. (Compare Dkt. No. 1 with Dkt. No. 82, Attach. 1.)

[7]  See *Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that permissible grounds upon which to base the denial of a motion for leave to file an amended complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

**ACCORDINGLY**, it is

**ORDERED** that both Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 71) and his Supplemental Report-Recommendation (Dkt. No. 78) are **ACCEPTED** and **ADOPTED** in their entirety; and it is further

**ORDERED** that Defendant Locke's motion for summary judgment (Dkt. No. 53) is **GRANTED**, and Plaintiff's claims against Defendant Locke are **DISMISSED** from this action; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 63) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion to amend his Complaint (Dkt. No. 82) is **DENIED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Corrections Officer John Doe 1, Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant John Doe and Lieutenant John Doe are *sua sponte* **DISMISSED** without prejudice based on Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants pursuant to Fed. R. Civ. P. 41(b).

The Court certifies, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from this Decision and Order would not be taken in good faith.

Dated: September 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5137273

---

                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Supplemented by   Cao-Bossa v. New York State Dep't of Labor,   N.D.N.Y.,
November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,

v.

NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country
Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendant, 300 South State Street,
Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE
COWAN, ESQ., Assistant Attorney General.

## DECISION and ORDER

Glenn T. Suddaby, Chief U.S. District Judge

 *1  Currently before the Court, in this employment
discrimination action filed by Weili Cao-Bossa ("Plaintiff")
against the New York State Department of Labor
("Defendant"), are the following two motions: (1)
Defendant's motion for summary judgment; and (2)
Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt.
Nos. 58, 70.) For the reasons set forth below, Defendant's
motion for summary judgment is granted, and its motion to
strike Plaintiff's sur-reply is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Second Amended Complaint
Generally, in her Second Amended Complaint, Plaintiff
claims that Defendant discriminated against her based on
her national origin and age in violation of Title VII of the
Civil Rights Act of 1964 and the Age Discrimination in
Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second
Am. Compl.].) In support of her claims, Plaintiff alleges that
Defendant discriminated against her by (a) refusing to hire
her for a position for which she interviewed in March 2016,
and (b) terminating her employment in another position after
six months. (Id.) More specifically, Plaintiff, who is Chinese
and was 45 years old at the time of her termination, alleges
that she received unfairly poor performance reviews based
on a few sporadic mistakes that resulted in her termination,
but that other American and/or younger employees did not
receive similar negative performance reviews and were not
terminated. (Id.)

### B. Undisputed Material Facts on Defendant's Motion
for Summary Judgment
Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule
7.1[a][3]), a party opposing summary judgment must file a
response to the moving party's Statement of Material Facts
that "shall mirror the movant's Statement of Material Facts
by admitting and/or denying each of the movant's assertions
in a short and concise statement, in matching numbered
paragraphs," supported by "a specific citation to the record
where the factual issue arises." N.D.N.Y. Local R. 56.1(b).
This requirement is not a mere formality; rather "this and
other local rules governing summary judgment are essential
tools intended to relieve the district court of the onerous
task of hunting through voluminous records without guidance
from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL
921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting
*Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y.
2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's
statement of material facts streamlines the summary judgment
analysis 'by allocating responsibility for flagging genuine
factual disputes on the participants ostensibly in the best
position to do so: the litigants themselves.' " *LaFever*, 2021
WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018
WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).
"The Court may deem admitted any properly supported facts
set forth in the Statement of Material Facts that the opposing
party does not specifically controvert." N.D.N.Y. Local R.
56.1(b).

In this case, Plaintiff entirely failed to provide any response
to Defendant's Statement of Material Facts, much less one
that complies with Local Rule 56.1. Where a party has failed
to respond to the movant's statement of material facts in
the manner required under Local Rule 56.1, the facts in the
movant's statement will be accepted as true (1) to the extent
that they are supported by evidence in the record, and (2)

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). [1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

[1]      Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

*2 Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 79 of 443
Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)
2021 WL 3674745

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

 *3 22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

**\*4** 45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

**\*5** 66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

   a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

   b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

   c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

   d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

   e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

   f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

   was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

   g. On March 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

   h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

   **\*6** i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

**\*7** 92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

**\*8** 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

## C. Parties' Briefing on Defendant's Motion for Summary Judgment

### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (*Id.* at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (*Id.*) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (*Id.*)

**\*9** Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (*Id.* at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it is is not sufficient to sustain her claim. (*Id.*)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (*Id.* at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

show that her age was the but-for cause of her termination. (*Id.*)

## 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

## 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

## 4. Plaintiff's Sur-Reply

**\*10** Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

## 5. Defendant's Letter-Motion to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[2]     As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [3]

[3]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.). [4] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [5]

[4]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Sudday, J.) (citing cases).

[5]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

 **\*11**  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,*

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [6] – even where the non-movant was proceeding *pro se*. [7]

[6]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Sudday, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Sudday, J.) (collecting cases).

[8]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

**\*12** Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

**B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

2021 WL 3674745

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

### C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may— as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

**\*16** Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiates multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at *1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

**\*18** Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same

person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)

2021 WL 3674745

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Slip Copy, 2021 WL 3674745

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

McAllister v. Call, Not Reported in F.Supp.3d (2014)

2014 WL 5475293

KeyCite Yellow Flag - Negative Treatment

Distinguished by McDonald v. Zerniak,   N.D.N.Y.,   November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1**  Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, see Dkt. No. 81, and Plaintiff's objections thereto, see
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. See Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. See Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." See Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. See Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. See Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. See Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. See Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. See Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a de novo review of those recommendations. See
Trombley v. Oneill, No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. See Salmini v. Astrue, 3:06–CV–
458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. See Linares v. Mahunik, No. 9:05–CV–
625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his pro se status, the Court has conducted
a de novo review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2  ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant —hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2] McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

McAllister v. Call, Not Reported in F.Supp.3d (2014)

2014 WL 5475293

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]    Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]    Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4**  McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]    All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5**  The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

*6 Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]     Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvement with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

 **\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections when inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. Procedural Due Process

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

 **\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

 **\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

**McAllister v. Call, Not Reported in F.Supp.3d (2014)**
Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 104 of 443
2014 WL 5475293

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in

this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph*, 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin*, No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray*, No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based on some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. Directive 4913

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer*, 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 \*17  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

### **All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.;
Whittier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

2013 WL 5437617

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]   Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

2013 WL 5437617

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

### B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]   Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

**C. Eleventh Amendment**

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

2013 WL 5437617

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

 **\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)

2012 WL 7761439

2012 WL 7761439
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lester Lee SCARBROUGH, Jr., Plaintiff,

v.

Steven D. THOMPSON, Sergeant, Upstate Correctional
Facility; Timothy Arquitt, Correctional Officer,
Upstate Correctional Facility; Thomas Smith,
Correctional Officer, Upstate Correctional Facility;
Brian Gary, Correctional Officer, Upstate Correctional
Facility; Bruce Truax, Correctional Officer, Upstate
Correctional Facility; Bryan Clark, Correctional
Officer, Upstate Correctional Facility; Paul Burgess;
Robert H. Reynolds; John Matejaik; Steven Salls;
Thomas Quinn; Donald Quinn; Gary Gettmann;
Marla Travers; and David Rock, Defendants. [1]

[1]  The following defendants have been identified
with their job positions: Paul Burgess, corrections
officer; Robert H. Reynolds, corrections officer;
John Matejaik, corrections officer; Steven Salls,
lieutenant; Thomas Quinn, superintendent; Donald
Quinn, captain; Gary Gettmann, sergeant; Marla
Travers, nurse; and David Rock, superintendent.
Am. Compl. (Dkt. No. 37) ¶ 31; Reynolds Decl.
(Dkt. No. 76–20) ¶ 2; Matejaik Decl. (Dkt. No. 76–
16) ¶ 2; Scarbrough Dep. (Dkt. No. 76–3) at 57; T.
Quinn Decl. (Dkt. No. 76–24) ¶ 2; D. Quinn (Dkt.
No. 76–11) ¶ 2; Gettmann Decl. (Dkt. No. 76–12) ¶
2; Travers Decl. (Dkt. No. 76–18) ¶ 2; Rock Decl.
(Dkt. No. 76–10) at ¶ 2.

No. 10–CV–901 (TJM/CFH).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Lester Lee Scarbrough, Jr., Niagra Falls, NY, pro se.

Hon. Eric T. Schneiderman, Michael G. Mccartin, Esq., of
Counsel, Assistant Attorney General, Attorney General for
the State of New York, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [2]

[2]  This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

**\*1** Plaintiff pro se Lester Lee Scarbrough, Jr.
("Scarbrough"), a former inmate in the custody of the New
York State Department of Correctional and Community
Supervision ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983 alleging that fifteen officials and employees of
DOCCS violated his constitutional rights under the First and
Eighth Amendments. Am. Compl. (Dkt. No. 37). Presently
pending is defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. Dkt. No. 76. Scarbrough opposes
this motion. Dkt. No. 82. For the following reasons, it is
recommended that defendants' motion for summary judgment
be granted in part and denied in part.

### I. Background

The facts are related in the light most favorable to Scarbrough
as the non-moving party. *See* subsection II(A) *infra*. At all
relevant time periods, Scarbrough was an inmate at Upstate
Correctional Facility ("Upstate"). Am. Compl. ¶ 3.

#### A. Cell Flooding

On the morning of December 31, 2009, Scarbrough was
flushing the toilet in his cell when it began to overflow.
Am. Compl. ¶ 25. Upon Scarbrough's call out for assistance,
defendant Burgess, a corrections officer, arrived at the cell.
*Id.* ¶¶ 28, 31. Despite Scarbrough's explanation that the
flooding was accidental, Burgess informed Scarbrough that
he was lodging a misbehavior report against Scarbrough
for intentionally flooding the prison gallery, resulting in
the reduction of Scarbrough's Progressive Inmate Movement
System ("PIMS") Level from a 3 to a 1. *Id.* ¶ 32. This
required Scarbrough to move to another cell. [3] *Id.* ¶ 32;
Scarbrough Dep. at 21–22. Scarbrough refused to move
before a disciplinary hearing was conducted. Am. Compl. ¶¶
36, 38, 88. Thereafter, Burgess left Scarbrough's cell. *Id.* ¶ 39.

3    According to Scarbrough, Upstate employs a Progressive Inmate Movement System ("PIMS"), which categorizes inmates on a three-level merit system. Am. Compl. ¶¶ 33–34. Level–3 being the highest, it offers inmates various amenities that are unavailable to lower levels. *Id.* ¶ 35. For example, a Level–3 inmate has recreation twice a day, four showers a week, and can keep thirty books in his cell. Scarbrough Dep. at 23.

During his deposition, Scarbrough testified to the following on the issuance of a misbehavior report before a cell transfer:

Q: Isn't it true that the officers do not have to wait to have a misbehavior report written, and then have that misbehavior report acted upon before an inmate is moved from one cell to another?

A: They do that. But I also seen people cash tickets and stay in the same cell until they are given their hearing. And then they go downstairs because they were found guilty.

Q: That's the decision of the officers to make, not the inmates to make, though[,] correct?

A: I'm not saying that I made any decision. I didn't do nothing wrong. You know what I'm saying? ... The people that came to my cell wasn't trying to hear me.... Scarbrough Dep. at 28–29. As to whether he refused to move out of the cell, Scarbrough testified to the following:

Q: What I'm talking about is what happened. And an officer came and told you [that] you had to move out of your cell—

A: Yes.

Q: —and you refused that?

A: Yeah. I wasn't really thinking, ... I ain't do nothing wrong.

...

Q: You realize that as you sit here today that the officers have the right to put you in whatever cell they choose[,] correct?

**\*2** A: They shouldn't ....

...

Q: So ... if you were up at Upstate and an officer told you, you got to move out of your cell today, pack up, you're moving out of your cell, is it your position as you sit here today that you have the authority as an inmate to refuse that order? ...

A: That's when they got to have a sergeant come to your cell. And you explain to the sergeant what's going on.

*Id.* at 30–32.


**B. Cell Extraction**

Shortly after Burgess left Scarbrough's cell, three other officers came to Scarbrough's cell and ordered him to voluntarily move to another cell. Defendant Thompson, a sergeant, entered Scarbrough's cell and told him to move to another cell because of his PIMS-level reduction. Am. Compl. ¶¶ 40, 42. Regardless of Thompson's order, Scarbrough refused to move and Thompson left the cell. *Id.* ¶ 43. The same exchange occurred between Scarbrough and defendant Salls, a lieutenant. *Id.* ¶ 45. Salls said to Scarbrough, "[m]ake sure you have your boots on tight because we're coming in there, mother fu\* \* er...." *Id.* ¶ 46. Finally, defendant Donald Quinn, a captain, ordered Scarbrough to exit his cell. *Id.* ¶ 47. Scarbrough remained adamant that he did nothing wrong and refused to leave his cell. *Id.*

Certain DOCCS officials and employees granted authorization for the use of a chemical agent, the medical clearance for such use, and a potential cell extraction. Defendant Rock, a superintendent, authorized Thompson to use a chemical agent on Scarbrough and to conduct a cell extraction if necessary. Rock Decl. ¶ 5. Donald Quinn gave Thompson the final order to use a chemical agent and conduct a cell extraction if necessary. D. Quinn Decl. ¶ 5. Based on Scarbrough's medical records, defendant Travers, a nurse, determined that nothing in the records showed that a chemical agent could not be used against Scarbrough. Travers Decl. ¶ 6. Thereafter, Travers gave medical clearance for the use of a chemical agent against Scarbrough. *Id.*

Thompson returned to administer five applications of a chemical agent. Am. Compl. ¶ 49. Between each application of the chemical agent, Thompson repeatedly ordered Scarbrough to come to the door. Ex. B—Handheld video (submitted with Defs.' Mot. for Summ. J.) (Dkt. No. 76–14).[4] Before the last application, an officer remarked, "appears

hiding something in his hand" and "appears to be sock with something in it." *Id.*

[4]    Despite Scarbrough's complaints with regard to certain liberties he had while watching the videos as well as issues with identifying people in the videos, defendants satisfied the Court's text order by ensuring that Scarbrough reviewed the video recordings of his cell extraction. Dkt. report entry dated 3/22/2012; Dkt. Nos. 84, 85.

After the last application of the chemical agent, Thompson ordered corrections officers and defendants Arquitt, Smith, Gary, Truax, and Clark to enter the cell. Am. Compl. ¶¶ 50–51. Defendant Matejaik manually opened the hatch cover to the cell door and defendant Reynolds manually opened the cell door for the correction officers to enter. *Id.* ¶¶ 52–53. Before entering the cell, something had to be pushed away from the door to the cell in order for the officers to enter the cell. [5] Ex. B—Handheld Video.

[5]    Defendants identified the barrier as a mattress and a pillow. Use of Force Report (Dkt. No. 76–23) at 12.

**\*3** When the extraction team entered the cell, one of them held what resembled a broom handle. Ex. B—Handheld Video. Scarbrough alleged that he was already down, subdued, and not resisting, when the officers entered and beat him with batons, kicked him in the face, head, and back, and told him to stop litigating against the staff. Am. Compl. ¶¶ 54, 89. While he was unable to identify precisely what each officer did because he was blinded by the chemical agent, Scarbrough contends that the officer who was on the ground told him to stop filing lawsuits. Am. Compl. ¶ 60; Scarbrough Dep. at 40–41. Gary was the officer on the ground with Scarbrough. Gary Decl. ¶ 5.

The named defendants involved in the extraction identified the conduct that they carried out. As an initial matter, defendants contend that when the extraction team entered the cell, Scarbrough used a tube sock loaded with four bars of soap to strike the team. [6] Arquitt entered first, using a shield. Arquitt Decl. ¶ 2. Gary was the second officer to enter the cell and saw Scarbrough swing a weapon that struck Arquitt's shield. Gary Decl. ¶ 5; Arquitt Decl. ¶ 2. Gary struck Scarbrough with a baton in the upper right forearm and Scarbrough released the weapon. [7] Gary Decl. ¶ 5; Dkt. No. 76–23, at 2. Arquitt grabbed Scarbrough by the shoulder area with both hands and forced him to the floor. Dkt. No. 76–23 at

2. Gary dropped to the floor with Scarbrough and grabbed his right shoulder. Gary Decl. ¶ 5. Truax grabbed Scarbrough's left shoulder with his left hand and the right shoulder with his right hand. Truax Decl. ¶ 5. Smith grabbed Scarbrough's left arm. Smith Decl. ¶ 5. Clark, the last officer to enter the cell, placed his hands on Scarbrough's left shoulder area while Scarbrough was on the ground. Clark Decl. ¶ 5. Gary grabbed Scarbrough's right arm with both hands and applied the handcuffs. Gary Decl. ¶ 5. The video does not clearly capture the events of the cell extraction, including the officers' entry and restraining of Scarbrough, all of which took approximately fifty seconds. Ex. B—Handheld video. However, the viewer's first sighting of Scarbrough is him already down on the ground. *Id.*

[6]    Defendants submitted a photo of the sock of soaps on the ground. Dkt. No. 76–15 at 8, 9. Defendants maintain that the sock of soaps was found on the floor near the shower in Scarbrough's cell. Dkt. No. 76–23 at 24.

[7]    Scarbrough maintains that he was never hit with a baton in the right arm; instead, he was hit in the back. Scarbrough Dep. at 43.

Gary and Arquitt removed Scarbrough's clothes with scissors. Gary Mem. at 1; Dkt. No. 76–23 at 12. Clark escorted Scarbrough to the decontamination shower, then to the lower holding area for a medical examination and photos to be taken, and finally, returned Scarbrough to his cell where a retention strap was applied. Clark Mem. at 1.

Scarbrough denies that he swung a sock of soaps against the extraction team or placed a mattress in front of the door to prevent the cell extraction. Scarbrough Dep. at 82, 110, 162; Am. Compl. ¶ 86. A DOCCS videotape showed that something was kicked out of the cell before the extraction team entered and something was then handed out of the cell shortly after the team entered the cell and encountered Scarbrough. Ex. A—Corridor Camera at 20:58, 21:35.

**\*4** Scarbrough sustained a cut above his left eye-brow and bruising over his right eye as a result of the assault. Scarbrough Dep. at 45; Dkt. No. 76–19 at 2. Video evidence showed that when Scarbrough emerged from his cell, his entire face was covered with blood. Ex. B—Handheld Video. Scarbrough was bleeding and spitting up blood while undergoing decontamination in the shower. *Id.*

Scarbrough contends that his head was pushed against a wall with "blunt force" while the officers who cut off his clothing had also purposely cut him. Am. Compl. ¶¶ 61–62; Scarbrough Dep. at 92. Video evidence only showed that Scarbrough was held up in a stationary position against a wall while his clothing was removed. Ex. B—Handheld Video. Scarbrough felt that he was going to fall but the officers told him that they were holding him up. *Id.* Scarbrough complained about his foot because it was held against the wall and his fingers because they were being bent. *Id.* At one point, Scarbrough said that his face was bleeding because he was kicked in the face but someone responded, "nobody kicked you in the face," to which Scarbrough replied, "I know." *Id.*

Scarbrough was taken to a holding pen for photos to be taken by defendant Gettmann, a sergeant, as well as a medical examination administered by Travers. [8] Am. Compl. ¶¶ 63, 66. Despite his complaints regarding pains in his head and back, Scarbrough refused Travers's medical care, claiming that he had pre-existing conflicts with Travers and requested medical attention provided by another nurse. *Id.* ¶¶ 64, 67. Scarbrough testified that Travers should have sent him to another medical staff member for treatment and ensured that he received medical care before returning to his cell. Scarbrough Dep. at 36–37.

[8]    Scarbrough suspects that there is some sort of connection between Gettmann and Travers because Gettmann whispered something to Travers. Scarbrough Dep. at 47.

Scarbrough received two misbehavior reports, one for flooding his cell and one for the cell extraction. Scarbrough Dep. at 99. DOCCS records noted that the incident was triggered by a denial of a sick call by a nurse because Scarbrough did not follow proper procedures and was told to sign up for sick call the following day. Dkt. No. 76–23 at 35. Scarbrough contends that had non-party Lieutenant Durgan properly reviewed the report, the report would have showed that he called out for assistance, there were problems with the pipes at Upstate prior to the alleged over flowing, and he did not swing a weapon at the officers. Pl.'s Response at 7.

### C. Post–Cell Extraction

At 12:10 am the next day, Scarbrough agreed to a medical evaluation, was escorted to the outside facility Alice Hyde Medical Center ("Alice Hyde"), and was seen by non-party

Nurse Atkinson. Am. Compl. ¶ 70. Scarbrough received approximately twenty-five stitches for a cut above his upper left eye-brow. *Id.* ¶ 80. Since the cell extraction, Scarbrough continued to experience problems with his breathing and vision as well as pains in the head, back, spine, and collar bone. Am. Compl. ¶ 81.

**\*5** Upon Scarbrough's return to Upstate, he was assigned a cell mate. Am. Compl. ¶ 74. Shortly after his return, Scarbrough was attacked by that cell mate after he "exhibited complications with mental disorders." *Id.* ¶ 75. Scarbrough received a misbehavior report for engaging in a fight. [9] Pl.'s Response at 6.

[9]    Scarbrough contends that had non-party Lieutenant Anctil properly reviewed the misbehavior report, DOCCS would not have assigned him a cell mate, which presented an opportunity for the fight that ensued. Pl.'s Response at 7. Scarbrough was attempting to allege a failure to intervene claim under the Eighth Amendment. However, Scarbrough does not allege any facts indicating which defendant assigned him a cell mate or placed him in the cell with a cell mate. Further, even if Scarbrough had alleged the claim against Anctil, Anctil is not a defendant in this action. Moreover, to establish liability under a failure to intervene claim, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). Because the record is devoid of any evidence supporting these three elements, such a speculative conclusion cannot survive a motion for summary judgment. *See McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("speculation alone is insufficient to defeat a motion for summary judgment"). Accordingly, Scarbrough's potential failure to intervene claim against Anctil or any defendant with respect to the cell mate assignment must fail as a matter of law.

As a result of the cell extraction, Scarbrough was sentenced to twelve months of confinement in the Special Housing Unit ("SHU") [10] and loss of good time credits. Scarbrough

Dep. at 48–49. Scarbrough appealed this disciplinary hearing disposition; however, it was denied. *Id.* at 49–50. Scarbrough also filed grievances with regard to the cell extraction incident; however, all such grievances were denied and affirmed on appeal. Am. Compl. ¶¶ 83–84.

[10]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On January 12, 2010, between two and five o'clock in the afternoon, an unnamed sergeant came to Scarbrough's cell and told Scarbrough that the reason for the assault was partly due to his ongoing litigation and partly due to talking back at officers. Am. Compl. ¶ 85. [11]

[11]    Here, Scarbrough attempts to allege a retaliation claim against an unnamed sergeant. However, Scarbrough does not name such a sergeant as a defendant in his amended complaint. Moreover, even if Scarbrough named this sergeant as a "John Doe," more than 120 days has passed since the filing of Scarbrough's amended complaint, the statutory limit for service of process on a defendant. FED. R. CIV. P. 4(m). Accordingly, all claims, if any, alleged against the said sergeant should be dismissed.

On July 23, 2010, Scarbrough commenced this instant action. Compl. (Dkt. No. 1). On July 19, 2011, the Court granted Scarbrough's motion to amend his complaint, adding the following parties as defendants: Paul Burgess; Robert H. Reynolds; John Matejaik; Steven Salls; Thomas Quinn; Donald Quinn; Gary Gettmann; Marla Travers; and David Rock. Decision and Order (Dkt. No. 34) at 3; Am. Compl. Scarbrough seeks a declaratory judgment against defendants for violating his constitutional rights, injunctive relief in the form of both a physical and mental health medical examination, nominal damages, compensatory damages, and punitive damages. Am. Compl. ¶¶ 97–102.

## II. Discussion

Liberally construing Scarbrough's complaint, Scarbrough has alleged that: (1) defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark violated his Eighth Amendment rights by using excessive force during the cell extraction on December 31, 2009; (2) defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann violated his Eighth Amendment rights by failing to intervene to protect him from the use of excessive force; (3) defendant Travers violated his Eighth Amendment rights by acting with deliberate indifference when she failed to provide him with medical care; (4) defendant Burgess violated his constitutional rights solely by lodging a false misbehavior report against him; and (5) defendant Gary violated his First Amendment rights by using excessive force against him in retaliation for filing lawsuits.

Defendants contend that Scarbrough's: (1) excessive force claims must fail because the video evidence of the cell extraction proves that no rational finder of fact would find in Scarbrough's favor; (2) failure to intervene claims must fail based on the lack of personal involvement of the named defendants; (3) medical indifference claim against Travers must fail because Scarbrough refused medical care that Travers had offered; and (4) claim that is based upon an alleged false misbehavior report is without merit. Alternatively, defendants claim that they are entitled to qualified immunity. Defendants do not address Scarbrough's retaliation claim against Gary.

### A. Legal Standard

**\*6** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

2012 WL 7761439

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eighth Amendment

**\*7** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970); *Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d

63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*8** Here, Scarbrough has satisfied the objective prong of the analysis. Considering it is undisputed that as a result of the cell extraction, Scarbrough sustained a cut above his left eyebrow requiring twenty-five stitches, such an injury can be fairly classified as a serious medical need. Moreover, when viewing the facts in the light most favorable to the plaintiff, and considering how Scarbrough acquired the injuries, an issue of material fact arises with respect to the subjective prong of the analysis.

Scarbrough and the defendants posit contrary recitations of fact with regard to the cell extraction. Defendants contend that upon the extraction team's entry into the cell, Scarbrough swung a sock of soaps at them, to which Arquitt blocked with a shield. Gary then struck Scarbrough's upper right forearm in order to compel Scarbrough to release the weapon. Conversely, Scarbrough maintains that he was already down on the ground, subdued, and not resisting, when the team entered. Further, Scarbrough adamantly maintains that he did not swing any weapon at the extraction team. What is undisputed is the fact that Scarbrough emerged from the cell with a gash above one eyebrow and a bruise above the other. The video evidence does not resolve these issues of fact to the point that no rational finder of fact could find in favor of Scarbrough because the video does not show: (1) Scarbrough and what he was holding before defendants entered his cell; (2) how Scarbrough ended up on the ground; and (3) how defendants applied the restraints. This competing evidence rests on the credibility of Scarbrough on one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Scarbrough's version of the events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility

determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Moreover, Scarbrough's evidence would also establish that he was weaponless and incapacitated by the chemical agents when the extraction team entered and that the use of force was unnecessary to extract Scarbrough from the flooded cell. Despite Scarbrough's repeated refusals to voluntarily exit his cell, defendants' actions in assaulting this inmate could constitute a *per se* constitutional violation that could not be resolved by a motion for summary judgment. Thus, viewing the facts in the light most favorable to Scarbrough, he has proffered sufficient evidence to raise an issue of material fact as to the subjective prong of the Eighth Amendment analysis to require resolution by a jury. Accordingly, defendants' motion on this ground should be denied.

### 2. Personal Involvement

**\*9** Defendants contend that Scarbrough failed to establish the personal involvement of Reynolds, Matejaik, Salls, Gettmann, Rock, Thomas Quinn, and Donald Quinn. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [12]

[12]     Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010)* (noting that although the Second Circuit has not yet addressed *Iqbal*' s impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard). The unpublished opinion cited *supra, McCarroll v. Fed. Bureau of Prisons,* is attached to this Recommendation.

### a. Reynolds and Matejaik

Scarbrough contends that Reynolds opened the door, and Matejaik opened the hatch cover, to his cell; therefore, their actions allowed for the alleged use of excessive force that ensued. However, these claims did not involve either defendants' direct participation in the alleged constitutional violation as Scarbrough does not claim that the defendants were present during the assault such that they either directly participated in, or could have directly prevented its occurrence. Even assuming defendants remained at their positions when the extraction team entered, the record is devoid of evidence supporting the defendants' availability to intervene. Accordingly, defendants' motion on this ground should be granted.

### b. Salls

Scarbrough contends that Lieutenant Salls verbally harassed him before the extraction team entered his cell; thereby, failing to intervene to protect him from the assault that ensued. This allegation neither demonstrates that Salls directly participated in the failure to intervene to protect Scarbrough from the use of excessive force nor that Salls had knowledge

of the alleged constitutional violation prior to its occurrence and failed to prevent its occurrence. While Scarbrough alleged that Salls warned him to tighten his boots in preparation for the extraction, no facts were alleged to support that Salls knew excessive force was to be used on Scarbrough during the extraction. Further Scarbrough does not allege that Salls created or allowed the continuance of any policy or custom under which unconstitutional practices occurred, was grossly negligent in his supervision of other subordinates, or exhibited deliberate indifference to his rights by failing to act on information indicating that unconstitutional acts had occurred. Moreover, a claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Thus, Scarbrough has failed to allege the personal involvement of Salls. Accordingly, defendants' motion on this ground should be granted.

### c. Gettmann

**\*10**  Scarbrough contends that Gettmann failed to protect him from the use of excessive force by videotaping the cell extraction. Assuming excessive force was used on Scarbrough, because Scarbrough's claim concerned Gettmann's presence during the assault and direct failure to intervene, Scarbrough has sufficiently alleged Gettmann's personal involvement. Accordingly, defendants' motion on this ground should be denied.

### d. Rock and Donald Quinn

Scarbrough contends that both Rock and Donald Quinn failed to intervene to protect him from the use of excessive force because they were supervisors who authorized the use of chemical agents against him and a cell extraction if necessary. Such claims do not allege that Rock or Donald Quinn had directly failed to intervene to protect Scarbrough from excessive force or they knew that excessive force was to be used on Scarbrough. Further, "mere linkage in the prison

chain of command is insufficient to implicate" a defendant's personal involvement. *Richard v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal citations omitted). While Scarbrough alleged that Donald Quinn ordered him to leave his cell, there is nothing in the record indicating that Donald Quinn was present for the extraction and available to intervene in the alleged excessive use of force. Accordingly, defendants' motion on this ground should be granted.

### e. Thomas Quinn

Scarbrough names Thomas Quinn as a defendant. However, because Scarbrough does not allege any facts concerning any wrongdoing against Thomas Quinn, and the record does not show otherwise, Scarbrough has failed to allege that Thomas Quinn was either directly or indirectly involved in any of the alleged constitutional violations. Even drawing all inferences in Scarbrough's favor, without having any indication of what Thomas Quinn allegedly did, or did not do, there is no way to conclude that he was personally involved in any of the complained of events. Accordingly, defendants' motion should be granted on this ground and Thomas Quinn should be dismissed as a defendant.

### 3. Failure to Intervene

Assuming none of the defendants' personal involvement defenses are granted, Scarbrough's contention that defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann failed to intervene to protect him from excessive force must be addressed. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

**\*11** Here, construing the complaint liberally, Scarbrough first contends that Salls knew or should have known that Scarbrough was to face excessive force when the extraction team was later called to remove Scarbrough from his cell

because Salls warned him to tighten up his boots. However, such a conclusory and speculative statement does not show that a reasonable person has been warned that a constitutional violation was about to occur. In addition, there is nothing in the record demonstrating that Salls was aware that an assault was planned or had a realistic opportunity to intervene and prevent the harm when the video evidence showed that the alleged use of excessive force took place within fifty seconds. Thus, Scarbrough's claim against Salls must fail.

Second, Scarbrough contends that because Reynolds and Matejaik opened the cell door and hatch cover to his cell, they could have intervened in the alleged excessive use of force that ensued. However, a reasonable person carrying out the same actions would not be alerted that a constitutional violation would follow. Moreover, assuming both defendants stayed at their positions—outside of the cell while the extraction team entered—the record does not support an inference that there was a reasonable opportunity to intervene in light of the brief extraction time of fifty seconds. Thus, Scarbrough's claim against Reynolds and Matejaik must fail.

Third, Scarbrough contends that because Gettmann videotaped the entire cell extraction, Gettmann saw the use of excessive force and could have intervened to prevent the constitutional violation from occurring. However, in light of the number of people in the cell and the relatively short period of time of fifty seconds when the alleged excessive force was used, it is unreasonable to conclude that Gettmann was confronted with a reasonable opportunity to identify a constitutional violation in which he could have intervened. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (holding that an Eighth Amendment violation does not occur for failing to intervene when the assault occurs so quickly that the defendant "had no realistic opportunity to attempt to prevent them [because the event was not] of sufficient duration to support a conclusion that an officer who stood by without trying to assist ... became a tacit collaborator."). Therefore, Scarbrough's claim against Gettmann must also fail.

Lastly, Scarbrough contends that because Rock and Donald Quinn authorized the cell extraction, both Rock and Donald Quinn had a reasonable opportunity to intervene on his behalf. Similar to the reasoning above, such actions would not warn a reasonable person that a constitutional violation was about to occur.

Accordingly, defendants' motion on this ground should be granted.

### 4. Medical Indifference

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*12** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, it is undisputed that Scarbrough's injuries constituted a serious medical condition since Travers offered Scarbrough medical care. However, Scarbrough's contention that upon his refusal of Travers's care, Travers should have sought medical care on his behalf from another nurse is without merit. First, since Scarbrough is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice. Thus, any alleged delay or interference in treatment was due to Scarbrough's own actions. This cannot now be

transformed into an Eighth Amendment claim. Moreover, Scarbrough ultimately received medical treatment. *Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (citation omitted) ("treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference.' "). Such treatment was provided the following day and resolved the condition, despite Scarbrough's prior refusals. In addition, any complaints regarding such treatment were not against Travers because she did not provide it. Therefore, the record shows that Scarbrough has failed to establish deliberate indifference on the part of Travers. Accordingly, defendants' motion on this ground should be granted and Travers should be dismissed from this action.

### C. False Misbehavior Report

Construing the plaintiff's complaint liberally, Scarbrough alleged that Burgess violated his constitutional rights solely by lodging a false misbehavior report against him. The Second Circuit has repeatedly held that the issuing of false charges by a corrections officer against an inmate does not constitute a *per se* constitutional violation under § 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1007) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). A false misbehavior report may constitute a constitutional violation when there is more such as "retaliation against the prisoner for exercising a constitutional right." *Id.* (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in [any] constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). Here, because Scarbrough's claim is based solely on an allegedly false misbehavior report without alleging more wrongdoing on Burgess's part, Scarbrough's assertion against Burgess must fail as a matter of law. Accordingly, defendants' motion on this ground should be granted.

### D. Retaliation

**\*13** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal

2012 WL 7761439

quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action

against the plaintiff absent his exercising of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Here, Scarbrough successfully meets the first element for the filing of lawsuits is a constitutionally protected activity. *Graham,* 89 F.3d at 80. Scarbrough also meets the third element because he filed a lawsuit against Upstate employees on July 28, 2009, which satisfies the temporal proximity for a causal connection. Am. Compl. ¶ 21 (*Scarbrough v. Evans,* No. 09–CV–0850 (NAM) (DEP) (appeal dismissed on September 26, 2011)). However, a genuine issue of material fact arises with the second element. Even though Scarbrough alleged that Gary told him to stop filing lawsuits while Gary was assisting in the cell extraction, the record evidence is in dispute as to whether the excessive use of force flowed from Scarbrough's lawsuit or Scarbrough's refusal to exit his cell. A determination of the second element cannot be clearly established, which results in an issue of credibility that is inappropriate to be decided for purposes of this motion. Noteworthy is the fact that defendants do not address this retaliation claim in their motion. Accordingly, Scarbrough's retaliation claim against Gary should remain.

### E. Qualified Immunity

**\*14** Defendants claim that even if Scarbrough's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at

the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Scarbrough's Eighth Amendment excessive force and First Amendment retaliation claim. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Scarbrough's constitutional rights.

There is no question that it was well-settled on December 31, 2009 that the Eighth Amendment prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate. *See Hudson,* 503 U.S. at 9–10. It was also well-settled on the same day that the First Amendment protected an inmate's right to file lawsuits. *Graham,* 89 F.3d at 80. Thus, accepting all of Scarbrough's allegations as true, qualified immunity cannot be granted to Thompson, Arquitt, Smith, Gary, Truax, and Clark for their alleged use of excessive force and Gary's alleged retaliatory conduct during the extraction. However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be:

A. **DENIED** as to Scarbrough's excessive force claims against defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark; AND

B. **GRANTED** as to all other claims and all other moving defendants and that the complaint be **DISMISSED** with prejudice as to those defendants; AND

2. Further **RECOMMENDED** that Scarbrough's retaliation claim against defendant Gary remain in this action.

**\*15** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7761439

---

End of Document     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Reeder v. Bell, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 126 of 443

2019 WL 2997513

2019 WL 2997513
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raszell REEDER, Plaintiff,
v.
DDS BELL, et al., Defendants.

9:15-CV-01078 (MAD/TWD)
|
Signed 05/07/2019

**Attorneys and Law Firms**

RASZELL REEDER, 94-A-6388, Plaintiff pro se, Upstate Correctional Facility, P.O. Box 2001, Malone, New York 12953.

LETITIA JAMES, Attorney General for the State of New York, OF COUNSEL: JOHN F. MOORE, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** Plaintiff Raszell Reeder commenced this *pro se* civil rights action under 42 U.S. § 1983 on September 3, 2015. (Dkt. No. 1.) The claims remaining in the action following initial review under 28 U.S.C. §§ 1915(e) and 1915A by the Hon. Mae A. D'Agostino, U.S. District Judge, are: (1) Eighth Amendment excessive force/failure to intervene claims against Defendants former Deputy Superintendent for Security at Upstate Correctional Facility ("Upstate") Bell ("DSS Bell"), Captain Bishop ("Bishop"), Sergeant Smith ("Smith"), Corrections Officer ("C.O.") Reif ("Reif"), C.O. Ramsdell ("Ramsdell"), and Lieutenant Salls ("Salls"); and (2) Eighth Amendment conditions of confinement claim against Defendants Lieutenant Quinn ("Quinn") and Smith. (Dkt. No. 17 at 20-21. [1] ) Plaintiff's claims arise out of events that occurred during his confinement at Upstate where all of the Defendants, employees of the Department of Corrections and Community Supervision ("DOCCS"), were working during the relevant time period. (*See generally* Dkt. No. 1.)

[1]     Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Following the September 17, 2018, denial of Plaintiff's motion to amend his complaint (Dkt. Nos. 95, 118), Defendants Bell and Quinn moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 121.) Plaintiff has filed responsive papers. (Dkt. No. 126.) For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

**II. RELEVANT FACTUAL BACKGROUND**

**A. Defendant Bell**
On April 8, 2015, Plaintiff was being housed in the Special Housing Unit ("SHU") at Upstate. (Dkt. No. 121-5 at 21.) The door on Plaintiff's cell had two hatches, one at the bottom for the transfer of cleaning supplies, and the feed-up hatch in the middle for things like meals and being handcuffed. *Id.* at 23. Plaintiff became frustrated and kicked the lower hatch breaking the lock. *Id.* at 24. Approximately thirty minutes later, he mixed a combination of urine and feces and put the liquid into milk cartons to throw on whoever happened to walk by his cell. *Id.* at 24. Plaintiff threw the mixture out the open bottom hatch as Upstate Superintendent Uhler ("Uhler") walked by his cell, hitting Uhler and A DOCCS Assistant Commissioner. (Dkt. Nos. 121-4 at ¶ 10; 126 at 31; 121-5 at 25-26.)

DSS Bell was informed by Bishop that Plaintiff had broken the bottom hatch of the door to his cell and thrown a brownish liquid at Uhler and a DOCCS Assistant Commissioner. (Dkt. No. 121-4 at ¶ 10. [2] ) According to Plaintiff, DSS Bell and Sall, along with other members of the security staff, a contamination unit, and an extraction unit responded to the incident. *Id.* at 28-31.

[2]     Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

DSS Bell left before the door to Plaintiff's cell was opened. *Id.* at 33-34. According to DSS Bell, procedures required that Plaintiff be moved to another cell so the hatch could be repaired and the cell searched for evidence. (Dkt. No. 121-4 at ¶ 11.) DSS Bell states in his declaration that Bishop

2019 WL 2997513

informed him Plaintiff refused to leave his cell and requested authorization from DSS Bell to extract Plaintiff by force. *Id.* at ¶ 11. The Unusual Incident and Use of Force Reports prepared in connection with the incident, submitted by Plaintiff, state that prior to the extraction, Plaintiff refused to exit his cell after being spoken to by all available staff. (Dkt. No. 126 at 17, 24). When DSS Bell was informed that Plaintiff had refused to comply with a lawful order to leave his cell, Bell authorized his staff to use chemical agents and, if Plaintiff still refused to exit his cell, to use physical force to extract him. *Id.* at ¶ 12. Plaintiff was thereafter subjected to the use of chemical agents and physical force by Upstate security staff members in extracting him from his cell. (Dkt. Nos. 121-4 at 36-77; 126 at 24.)

 **\*2** Section five of DOCCS Directive 4903, entitled "Use of Chemical Agents," authorizes the use of chemical agents when necessary to remove an inmate from his cell. (Dkt. Nos. 121-4 at ¶¶ 2-3; 124-1 at 3.) When practicable, the inmate's health record is to be reviewed prior to the administration of a chemical agent to determine whether the inmate has a health condition that would make exposure of the agents dangerous. (Dkt. Nos. 121-4 at ¶ 4; 124-1 at 3.) In this case, Upstate Nurse Rosanna Lordi reviewed Plaintiff's medical records and determined the agents would not be harmful to his health. (Dkt. No. 121-4 at ¶ 14.) When employing chemical agents, security staff is to use two one-second bursts (one application) until the inmate complies, with no more than five applications. (Dkt. Nos. 121-4 at ¶ 5; 124-1 at 3.)

DOCCS Directive 4944, entitled "Use of Physical Force," provides at III(E) that "[a]n employee shall not lay hands on or strike an inmate unless the employee reasonably believes that the physical force to be used is reasonably necessary "for self-defense; to prevent injury to person or property; to enforce a lawful direction; to quell a disturbance; or to prevent an escape." (Dkt. No. 121-8 at 2.) According to DSS Bell, in accordance with Directives 4903 and 4944, chemical agents may be employed when an inmate refuses to leave his cell after being directed to do so by security staff, and an inmate may be forcibly removed from his cell if he refuses to leave his cell after five applications of the chemical agents. (Dkt. No. 121-4 at ¶¶ 8-9.)

Plaintiff claims he complied with all orders and put his hands in the feed-up hatch when directed so that he could be handcuffed for removal from his cell. (Dkt. Nos. 1-1 at 2; 121-5 at 36-38.) According to Plaintiff, instead of handcuffing him, Sall slammed the hatch door on his hands. (Dkt. No.

121-5 at 36-77.) Plaintiff claims two canisters of chemical agents were improperly used on him, and he was physically assaulted when he was extracted from his cell following the use of the chemical agents. *Id.*

Plaintiff has submitted no evidence that DSS Bell had any reason to disbelieve Bishop at the time of the authorization or that Bell was aware of what transpired in the extraction until he reviewed video of the incident after the fact. (Dkt. Nos. 121-5 at 84; 126 at 7.) Plaintiff acknowledged at his deposition that Bell was not present during the extraction and used no force against Plaintiff. (Dkt. No. 121-5 at 33-34, 80.) Bell also denies being present when his staff administered the chemical agents and forcibly extracted Plaintiff from his cell. (Dkt. No. 121-4 at ¶ 16.)

At his deposition, Plaintiff testified that his claim against DSS Bell is limited to authorization of the use of chemical agents, authorization of the use of two rather than just one canister, and knowledge that both canisters were faulty causing them to release too much chemical agent. (Dkt. No. 121-5 at 82-86, 107-08.) According to Bell, it was standard procedure to bring two canisters to the inmate's cell in case one malfunctions, and Plaintiff's claim that Bell authorized the use of two canisters is inaccurate, as is his claim that Bell knew the two canisters were defective. (Dkt. No. 121-4 at ¶ 13.)

### B. Defendant Quinn

After Plaintiff was extracted from his cell on April 8, 2015, he was seen by a nurse, decontaminated, and moved to cell 11-C-10. (Dkt. Nos. 121-3 at ¶3; 121-9 at 115.) Plaintiff alleged in his complaint and testified at his deposition that he was left in the cell for three weeks with only undershorts and no sheets, blanket, or pillow, and that two air vents blew cold air into his cell leaving him very cold during the three weeks.[3] *Id.* (Dkt. Nos. 1 at 5; 121-5 at 112-16, 119.) At his deposition, after his recollection was refreshed by a grievance he had submitted, Plaintiff acknowledged that he remained in the cell with only his undershorts from April 8 to April 23, 2015, less than three weeks. (Dkt. No. 121-5 at 125.) In Grievance No. UTS-55995-15, dated April 23, 2015, Plaintiff claimed he was without clothing, bed linen, underwear, blankets, towels, and wash cloths, and that two air vents blew very cold air into his cell.[4] (Dkt. Nos. 121-5 at 127, 134; 126 at 29.) According to Plaintiff, everything was returned to him by Defendant Smith and another officer on April 23, 2015. (Dkt. No. 121-5 at 126-27, 143.)

Reeder v. Bell, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 128 of 443

2019 WL 2997513

[3]

When questioned at his deposition whether Quinn had anything to do with the temperature in his cell, Plaintiff replied "no." (Dkt. No. 121-5 at 116.) Moreover, Plaintiff testified that he never complained to Quinn about the temperature of his cell. *Id.* at 117. Therefore, the Court has construed Plaintiff's conditions of confinement claim against Quinn to be limited to personal necessities such as clothing, footwear, bed linen, underwear, blankets, pillow, towels, and toiletries.

[4]

On appeal of Grievance No. UST-55995-15, the Central Office Review Committee ("CORC") found that Defendant Smith had stated that Plaintiff's clothes became unusable during the decontamination process and were replaced, other clothing in his cell was decontaminated and returned to him, and bedding supplies were issued in a timely manner. (Dkt. No, 126 at 31.)

**\*3** Plaintiff testified at his deposition that it was Smith who deprived him of his clothes (other than one pair of undershirts), sheets, blankets, and toiletries because he was the area supervisor and the one who gave the orders. *Id.* at 113-14. However, Plaintiff claims that Quinn was responsible for getting Plaintiff's clothes back because Office of Mental Health ("OMH") psychologist John Marinelli ("Marinelli"), who saw Plaintiff regularly during the time he was confined in the cell, reported the conditions to Quinn in his capacity as Watch Commander, and Quinn did nothing. (Dkt. Nos. 1 at 5; 121-9 at 117, 120-21.)

Plaintiff testified at his deposition that he did not know exactly what Marinelli told Quinn about the conditions under which he was being housed from April 8 through April 23, 2015. (Dkt. No. 121-9 at 122.) However, both Plaintiff and Defendants have submitted copies of a July 20, 2015, note Plaintiff sent to Marinelli in which he asked Marinelli to confirm that he had spoken to Quinn and Smith about Plaintiff being in cell 11-C-10 without "sheets, blankets, pillow, property, cosmetics, sneakers, slippers" and that he "only had on one undershorts and the two cold ventillators was on." [5] (Dkt. Nos. 121-6 at 2; 126 at 34.) The note includes Marinelli's July 21, 2015, response in which he wrote "[y]es I spoke to them, several times. I remember you telling me this, I do not remember the dates. Check w/DOCCS about when you received the return of your items. [initialed by Marinelli]." *Id.*

[5]

Quotations are as written unless otherwise indicated.

### 1. Marinelli Declaration

Marinelli has submitted a declaration in support of Quinn's motion for summary judgment. (Dkt. No. 121-3.) According to Marinelli, he had several conversations with Plaintiff while making rounds on C Gallery in 11 building for three weeks beginning April 9, 2015, and to the best of his knowledge Plaintiff "was not just in his underwear during these conversations and was not missing any necessities such as clothes, sheets, blankets, or toiletries." *Id.* at ¶ 5. Marinelli has also stated that Plaintiff was fully clothed when Marinelli saw him being taken from his cell to be interviewed by the State Police on April 9, 2015. [6] *Id.* at ¶ 4.

[6]

Plaintiff acknowledges in his response papers that two corrections officers gave him clothes to wear when he spoke with Inspector General Skiff on April 9, 2015, but told him he had to return all of the clothing and sneakers when he returned to the cell. (Dkt. No. 126 at 27.)

Marinelli claims Plaintiff complained about many things, including his desire to return to A gallery and wanting a pair of headphones, but in direct conflict with the representations made in his July 21, 2015, note to Plaintiff, claims to have no recollection of Plaintiff "ever complaining to him about being deprived of any necessities such as clothes, sheets, blankets, or toiletries." *Id.* at ¶ 6. Marinelli claims that if such complaints had been made, he would have intervened on Plaintiff's behalf. *Id.* According to Marinelli, shortly after Plaintiff complained about the headphones and housing, Marinelli informed Smith about the headphones, who shortly thereafter arranged for Plaintiff to receive them. *Id.* at ¶¶ 7-8. Marinelli also claims to have told Quinn about Plaintiff's wish to return to A Gallery. *Id.* at ¶ 7.

Contrary to his July 21, 2015, note, Marinelli now denies ever having advised either Smith or Quinn that Plaintiff had complained about being deprived of any necessities such as clothes, sheets, blankets, or toiletries. *Id.* at ¶ at 9. Marinelli does acknowledge his receipt of Plaintiff's note of July 20, 2015, seeking confirmation that Marinelli had spoken to Quinn and Smith about Plaintiff having only his undershorts, being without sheets, blankets, pillow, property, cosmetics, sneakers, and slippers, and the cold air vents, as well as his

Reeder v. Bell, Not Reported in Fed. Supp. (2019)
Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 129 of 443
2019 WL 2997513

July 21, 2015, response to Plaintiff acknowledging that he had done so. (Dkt. 121-6 at ¶ 6.)

 **\*4** However, Marinelli attempts to explain away the conflict between his July 21, 2015, affirmative response to Plaintiff and his present denial that he ever spoke to Smith or Quinn about complaints by Plaintiff that he was being deprived of those items by claiming that "[he] did not carefully read the plaintiff's request, which I now realize inaccurately stated that the plaintiff had complained to me about being deprived of " 'sheets, blankets, pillow, property, cosmetics, sneakers, slippers ...' and that I had so notified Lieutenant Quinn and Sergeant Smith." (Dkt. No. 121-3 at ¶ 10.) Plaintiff questions Marinelli's claim that he had not carefully read Plaintiff's July 20, 2015, note before responding. (Dkt. No. 126 at 28.)

Plaintiff challenges the veracity of other statements in Marinelli's declaration as well. *Id.* at 27-28. According to Plaintiff, Marinelli is aware that inmates are denied headphones from a Tier III disciplinary report, and that when an inmate is removed from a Company for a violent act, he cannot return to that Company. *Id.* at 27. Moreover, Plaintiff contends he did not ask that he be moved back to A Gallery. *Id.* Rather, he asked Marinelli that he be moved to another cell because of the two vents blowing cold air on him. *Id.*

Plaintiff also claims Marinelli is being dishonest by denying that he noticed Plaintiff had no clothes on each time he visited, and that Plaintiff had no cosmetics, underwear, footwear, mattress, or bed linen. *Id.* Plaintiff relies on the April 23, 2015, Male Inmate Call Out Sheet, which schedules him for a Shop Call-Out to obtain items of clothing to replace pants, shirts, socks, T-shirts, and undershorts damaged by the use of force as soon as possible. *Id.* at 37. Plaintiff was given a Shop Call-Out date of May 6, 2015. *Id.*

### 2. Quinn Declaration

Defendant Quinn also submitted a declaration in support of his motion. (Dkt. No. 121-2.) Quinn acknowledges being Watch Commander at Upstate from 2006 to 2016. *Id.* at ¶ 1. According to Quinn, as Watch Commander he was responsible for supervising the security staff at Upstate during one of the three eight hour tours of duty. *Id.* Quinn does not describe his duties and responsibilities in supervising the security staff in any detail, stating only that he "had no responsibility for ensuring that inmates at Upstate Correctional Facility were provided with clothes, bedding,

toiletries, or any other property." *Id.* at ¶ 3. Quinn says nothing about whether his supervision of the security staff would have included taking action if he learned that the security staff was intentionally depriving an inmate of clothing, bedding, and the other items Plaintiff claims he did not have from April 8 through April 23, 2015. (Dkt. No. 121-2.)

Quinn denies ever being advised by Marinelli that Plaintiff had complained about being deprived of any necessities such as clothes, sheets, blankets, or toiletries. *Id.* at ¶ 4. Quinn claims Marinelli only told him of Plaintiff's wish to be moved to A Gallery. *Id.* According to Quinn, "he had absolutely no involvement with, or knowledge of, what clothes, bedding, toiletries, or other property the plaintiff did or did not have." *Id.* at ¶ 5.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

 **\*5** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation). *Colon v. Coughlin*, 58 F.3d 865, 872

Reeder v. Bell, Not Reported in Fed. Supp. (2019)

2019 WL 2997513

(2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, ... nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) [7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[7]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## IV. FAILURE TO RESPOND TO MOVANTS' STATEMENT OF MATERIAL FACTS

Plaintiff has failed to respond to Defendants' Statement Pursuant to L.R. 7.1(a)(3) setting forth the material facts as to which Defendants assert no genuine issue of fact exists. (*See generally* Dkt. No. 126.) L.R. 7.1(a)(3) provides that

<u>"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>."

**\*6**  While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to pro se litigants ... does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Liberati v. Gravelle*, No. 12-CV-00795 (MAD/DEP), 2013 WL 5372872, at *7 (N.D.N.Y. Sept. 24, 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *Latouche v. Tompkins*, No. 09-CV-0308 (NAM), 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2911) ("a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a summary judgment motion").

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [8] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (requirement that pro se be advised of possible consequences of failing to respond to summary judgment motion, including movant's statement of material facts pursuant to local rules); L.R. 56.2 ("Notice to Pro Se Litigants of the Consequences of Failing to Respond to a Summary Judgment Motion").

[8]    Both defense counsel and the Clerk's Office provided Plaintiff with copies of the requisite notice of the consequences of his failure to respond properly to Defendants' summary judgment motion, including the failure to respond to Defendants statement of material facts. (Dkt. Nos. 121 at 4; 122 at 2.)

Courts in this district have found it appropriate to enforce L.R. 7.1(a)(3) and its predecessor L.R. 7.1(f), by deeming

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 131 of 443

Reeder v. Bell, Not Reported in Fed. Supp. (2019)

2019 WL 2997513

facts set forth in a statement of material facts not in dispute to have been admitted based upon the opposing party's failure to properly respond to the statement. *See, e.g., Borihane v. Outhouse*, No. 9:05-CV-1256 (NAM/DEP), 2007 WL 2071698, at *3 (N.D.N.Y. July 18, 2007) (following L.R. 7.1(a)(3) and accepting statement of material facts as uncontroverted (citing *Elgamil v. Syracuse Univ.*, No. 99-CV-611 (NPM/GLS), 2000 WL 1264122, at * 1 (N.D.N.Y. Aug. 22, 2000) (listing cases)).

However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules, "including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record on the Defendants' motion.

# V. ANALYSIS

## A. Defendant Bell

**\*7** Plaintiff claims that Defendant Bell violated his Eighth Amendment right to be free from excessive force by authorizing the use of force and chemical agents by DOCCS personnel in extracting Plaintiff from his cell. (Dkt. Nos. 1 at 5; 121-5 at 82-83.) Plaintiff further claims that Bell authorized the use of two containers of chemical agents when only one was allowed, and that Bell knew both containers were faulty and released too much of the chemical agent. (Dkt. Nos. 1 at 5; 121-5 at 86.)

### 1. Legal Standards for Eighth Amendment Excessive Force

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments ... including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and internal quotation marks omitted). An Eighth Amendment excessive force claim has two components – "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

### 2. Application

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Reeder v. Bell, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 132 of 443

2019 WL 2997513

**\*8** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.

Plaintiff makes no claim that DSS Bell was present during the use of chemical agents or any use of physical force in extracting Plaintiff from his cell. (Dkt. No. 121-5 at 33-34.) The undisputed evidence establishes that DSS Bell authorized the use of chemical agents and, if necessary, physical force to extract Plaintiff from his cell only after being informed by Bishop that Plaintiff was refusing to leave his cell. (Dkt. No. 121-4 at ¶ 11.) There is no evidence whatsoever in the summary judgment record supporting Plaintiff' conclusory assertions that DSS Bell was aware that the chemical agents he had authorized were used improperly, *i.e.,* two instead of only one canister, that the canisters were defective thus allowing too much of the chemical agents to be released, or that Plaintiff was subjected to excessive physical force during the extraction. To the contrary, DSS Bell has stated in his declaration that it was standard procedure for staff to bring a back-up canister in case one malfunctioned, and there was no indication that either canister taken to Plaintiff's cell was defective. (Dkt. No. 121-4 at ¶¶ 13-14.) Moreover, Plaintiff appears to be claiming that DSS Bell only learned about the manner in which the chemical agents were used and alleged excessive force when he watched videos of the incident after the fact when it would have been too late for him to intervene. (Dkt. No. 126 at 7.)

In light of the foregoing, the Court finds that none of the *Colon* criteria apply, and there is no showing that DSS Bell had the necessary level of culpability to satisfy the subjective component of Plaintiff's excessive force claim. *See Scarbrough v. Thompson,* No. 10-CV-901, 2012 WL 7761439, at \*10 (N.D.N.Y. Dec. 14, 2012) (summary judgment granted to supervisory officials who authorized the use of chemical agents in a cell extraction but were not present at the extrication and were unaware that excessive force would be used on the plaintiff). Therefore, the Court finds that

DSS Bell is entitled to summary judgment and recommends the District Court grant his motion.

**B. Defendant Quinn**

1. Legal Standards for an Eighth Amendment Conditions of Confinement Claim

Plaintiff has alleged an Eighth Amendment conditions of confinement claim against Quinn for his failure to remedy certain conditions under which Plaintiff was housed in cell 11-C-10 from April 8 to April 23 of 2015. (Dkt. No. 1 at 5.) While the Eighth Amendment "does not mandate comfortable prisons ... neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Champion,* 452 U.S. 337, 349 (1981) (internal quotation marks omitted)); *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013).

A claim alleging prison conditions have violated the Eighth Amendment must satisfy both an objective and a subjective component. *Walker,* 717 F.3d at 125. To satisfy the objective component, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm." *Farmer,* 511 U.S. at 834. An inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker,* 717 F.3d at 125. Health includes the risk of serious damage to "physical and mental soundness." *Darnell v. Pineiro,* 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972)). Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker,* 717 F.3d at 125 (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted).

**\*9** To satisfy the subjective component a plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker,* 717 F.3d at 125 (citations and

Reeder v. Bell, Not Reported in Fed. Supp. (2019)
Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 133 of 443

2019 WL 2997513

internal quotation marks omitted). To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). "The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence is not enough. *Id.* at 835.

### 2. Application

Plaintiff claims Marinelli, whom he saw regularly during the period of deprivation, spoke to Quinn in his capacity as Watch Commander about the deprivations from which Plaintiff was suffering, and Quinn took no action. (Dkt. Nos. 1 at 5; 121-9 at 117, 120-21.) Plaintiff relies, in part, on the notes he and Marinelli exchanged on July 20 and 21, 2015, in which Marinelli confirmed he had spoken to Quinn and Smith about the deprivations several times in support of his conditions of confinement claim against Quinn. (Dkt. 1-1 at 6.)

In opposing Plaintiff's motion, Marinelli denies the representation he made in his July 21, 2015, note to Plaintiff, and Quinn denies ever being told or knowing about the deprivations. (Dkt. Nos. 121-2 at ¶ 5; 121-3 at ¶ 9.) Moreover, although Quinn denies that he had any responsibility for ensuring that inmates were provided with clothes, bedding, toiletries, or any other property, he does not address what duties, if any, he would have as Watch Commander if he were informed that the security staff he supervised was depriving Plaintiff of those things. (*See* Dkt. No. 121-2.)

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id.* at 856. *See also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility

of witnesses.... These determinations are within the sole province of the jury.").

The Court finds that viewing the evidence most favorable to Plaintiff, Marinelli's July 21, 2015, note acknowledging he had spoken to Quinn several times regarding the deprivations, raises a credibility issue with regard to Quinn's knowledge of the deprivations. The Court further finds that the credibility assessment is not one for the Court, and that the weighing of the evidence and determinations as to which version of events to accept is for the jury. Therefore, the Court recommends that Defendant Quinn's motion for summary judgment be denied.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 121) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that the motion be **GRANTED** as to Defendant Bell and **DENIED** as to Defendant Quinn; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

**\*10** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[9]   If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the

**Reeder v. Bell, Not Reported in Fed. Supp. (2019)**

2019 WL 2997513

next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2997513

---

**End of Document**                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 357020
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Melbourne RIDGE, Jr., Plaintiff,

v.

Michael G. DAVIS, Emmanuel Leon-
Martinez, Yermia Solomon, David A.
Lindsay, and Dillon A. Ottino, Defendants.

18 Civ. 8958 (JCM)
|
Signed 02/07/2022

**Attorneys and Law Firms**

Melbourne Ridge, Jr., Ogdensburg, NY, Pro Se.

Ralph Puglielle, Drake Loeb PLLC, New Windsor, NY, for
Defendants.

**OPINION AND ORDER**

JUDITH C. McCARTHY, United States Magistrate Judge

 **\*1** Plaintiff Melbourne Ridge ("Plaintiff"), proceeding
*pro se*, brings this action pursuant to 42 U.S.C. §
1983 against Defendants Detective-Sergeant Michael G.
Davis ("Davis"), Officer Emmanuel Leon-Martinez ("Leon-
Martinez"), Officer Yermia Solomon ("Solomon"), Sergeant
David A. Lindsay ("Lindsay"), and Detective Dillon A.
Ottino ("Ottino") (collectively, "Defendants"). (Docket Nos.
2, 37). Plaintiff filed an amended complaint on July 18,
2019 ("Amended Complaint"). (Docket No. 37). Defendants
moved for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure ("Motion"). (Docket No.
93). Plaintiff opposed the Motion, (Docket No. 100), and
Defendants replied, (Docket No. 102). For the reasons set
forth below, the Court grants in part and denies in part
Defendants' Motion. [1]

[1]    This action is before this Court for all purposes on
the consent of the parties, pursuant to 28 U.S.C. §
636(c). (Docket No. 87).

**I. BACKGROUND**

The following facts are gathered from Defendants' Rule 56.1
Statement of Material Facts, (Docket No. 97), Plaintiff's
Affidavit in Opposition to Defendants' Motion for Summary
Judgment, [2] (Docket No. 100), the exhibits attached to
the parties' submissions, and the affidavits submitted by
Defendants in support of their contentions. The facts are
construed in the light most favorable to Plaintiff as the non-
moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d
20, 30 (2d Cir. 2018). The facts are not in dispute, unless
otherwise noted.

[2]     Plaintiff's response to Defendants' Rule 56.1
Statement is presented as an affidavit with
numbered paragraphs that address the factual
contentions in each separately numbered paragraph
in Defendants' Rule 56.1 Statement. (*See* Docket
Nos. 97; 100 at 1-2). Although the affidavit
disputes several of Defendants' contentions, it does
not explain the factual bases for these disputes
or cite to any supporting evidence. (*See* Docket
No. 100 at 1-2). Therefore, Plaintiff has not
complied with Rule 56.1 of the Local Rules
of the United States District Courts for the
Southern and Eastern Districts of New York and
Federal Rule of Civil Procedure 56(c) in that he
failed to "include ... correspondingly numbered
paragraph[s] responding to each numbered
paragraph in the statement of [Defendants]," and
did not cite admissible evidence following "each
statement controverting [Defendants'] statements
of material fact." *See* Local Civil Rule 56.1(b),
(d); *see also* Fed. R. Civ. P. 56(c). However,
Plaintiff testified about the incident on which
his lawsuit is based in a deposition transcript
attached by Defendants. (Docket No. 106-1).
Plaintiff also references an exhibit attached to
the Amended Complaint in the legal argument
section of his opposition. (Docket No. 100 at 7;
*see also* Docket No. 37 at 9-10). In light of the
"liberal treatment afforded [to] pro se litigants[,] ...
particularly at summary judgment[,]" the Court
considers this evidence and the entire record to
resolve Defendants' motion. *See Aikens v. Jones*,
No. 12 Civ. 1023(PGG), 2015 WL 1262158, at \*1
n.2 (S.D.N.Y. Mar. 19, 2015); *see also Melendez
v. DeVry Corp.*, No. 03-CV-1029 (NGG) LB,
2005 WL 3184277, \*2 (S.D.N.Y. Nov. 29, 2005)
(examining "the entire record[,] ... glean[ing] the
material facts therefrom, and decid[ing] the motion

based on those facts" despite *pro se* plaintiff's failure to comply with Local Rule 56.1).

**\*2** This action concerns the events leading up to Plaintiff's arrest by the Village of Monticello Police Department and subsequent medical treatment on October 26, 2016 in Monticello, New York. (Docket Nos. 97 ¶ 23; 100 ¶ 3).

### A. The Arrest

At approximately 2:05 p.m. on the date of the incident, Lindsay and Solomon[3] responded to a call reporting a burglary at 14 Bennett Street. (Docket Nos. 97 ¶ 25; 94-11 ¶ 2). When they arrived, Plaintiff was standing along the side of the road over a pile of copper pipes.[4] (Docket Nos. 97 ¶ 25; 94-11 ¶ 2; *see also* Docket Nos. 37 ¶ 1; 106-1[5] at 27:1-4). As Lindsay and Solomon approached Plaintiff in their patrol vehicles, Plaintiff crossed the street and walked toward his parked car. (Docket Nos. 94-11 ¶ 2; 97 ¶ 26; 100 ¶ 7). At least one of the officers exited his patrol vehicle and instructed Plaintiff to stop and return, but Plaintiff did not. (Docket Nos. 94-11 ¶ 2; 97 ¶ 26; 100 ¶ 7; 106-1 at 33:12-20). Plaintiff began to run into a wooded area with both officers pursuing him on foot.[6] (Docket Nos. 94-11 ¶ 3; 97 ¶¶ 26-27; 100 ¶¶ 7-8). According to Plaintiff, after he started running, Solomon said "he was gonna kick my ass." (Docket No. 106-1 at 33:24-34:22).

[3]   At all times relevant to this action, all Defendants were employed by the Village of Monticello Police Department. (Docket Nos. 97 ¶¶ 18-22; 100 ¶¶ 3, 6).

[4]   According to Plaintiff, he intended to load the copper into his car and use it for "scrap." (Docket No. 106-1 at 29:3-13).

[5]   All page number citations to the record refer to the ECF page number unless otherwise noted.

[6]   Plaintiff testified that he ran away due to an existing warrant for his arrest. (Docket No. 106-1 at 36:22-23).

The parties dispute what happened next. Defendants assert that Lindsay and Solomon continued to call out to Plaintiff to stop running, stating that he was under arrest, to no avail. (Docket Nos. 94-11 ¶ 3; 97 ¶ 27; 100 ¶ 8). Plaintiff ran toward a fence, at which point Lindsay used his taser once, from a twelve-foot distance. (Docket Nos. 94-11 ¶ 3; 97 ¶

28). However, the taser was ineffective because Lindsay was "not able to make contact with both probes." (Docket Nos. 94-11 ¶ 3; 97 ¶ 28). Plaintiff then climbed over the fence. (Docket Nos. 94-11 ¶ 3; 97 ¶ 29). By the time Lindsay did the same, he had lost sight of Plaintiff because of the thick brush and vegetation. (Docket Nos. 94-11 ¶ 3; 97 ¶ 29). Thus, Lindsay stopped running and reported Plaintiff's flight on the police radio, and included Plaintiff's approximate location, his clothing, and that he was running towards the Mountain Mall on East Broadway.[7] (Docket Nos. 94-11 ¶ 3; 97 ¶ 30). Lindsay and Solomon did not see Plaintiff again until they learned over the radio that Plaintiff was in custody at the Butcher Boys store, at which point they returned to their vehicles and drove to that location. (Docket No. 94-11 ¶ 3).

[7]   The Mountain Mall is a "strip mall" on East Broadway that contains various shops. (Docket Nos. 94-11 ¶ 3; 97 ¶ 27).

Defendants further assert that shortly after the incident was reported, Davis, who was on duty at the police station, learned from the dispatcher that a burglary suspect was attempting to evade arrest by fleeing from other officers and was heading toward the Mountain Mall. (Docket Nos. 94-12 ¶ 2; 97 ¶ 31). Davis drove to the area and observed Plaintiff cutting through a parking lot. (Docket Nos. 94-12 ¶ 2; 97 ¶ 32). Davis then exited his vehicle and began pursuing Plaintiff on foot behind the Butcher Boys store. (Docket Nos. 94-12 ¶ 2; 97 ¶ 32; 100 ¶ 9).

**\*3** Meanwhile, Leon-Martinez, who was also on patrol, heard about the pursuit over the police radio and began driving toward the Mountain Mall. (Docket Nos. 94-13 ¶ 2; 97 ¶ 33). While en route, he decided to drive to the Butcher Boys store because he heard on the radio that Plaintiff had run there. (Docket Nos. 94-13 ¶ 2; 97 ¶ 34). When Leon-Martinez arrived, he saw Davis pursuing Plaintiff, drove to the opposite side of the store, exited his vehicle, and began pursuing Plaintiff, too. (Docket Nos. 94-13 ¶ 2; 97 ¶ 34).

When Plaintiff saw Leon-Martinez, he changed directions and ran through a wooded area with "thick bushes and debris." (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35). However, Plaintiff fell backwards when trying to climb another fence so Leon-Martinez was able to grab him. (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35). They both fell to the ground. (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35). According to Defendants, Plaintiff resisted arrest. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 36). However, after a brief struggle, Leon-Martinez

2022 WL 357020

successfully handcuffed Plaintiff. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 37). Davis and Leon-Martinez assert that Leon-Martinez did not hit or kick Plaintiff while handcuffing him or anytime thereafter. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 39). Davis also contends that he did not use force against Plaintiff, and said that his only physical contact with Plaintiff was helping Leon-Martinez stand him up and escort him to the police car after he was already handcuffed, a process which occurred without incident. (Docket No. 94-12 ¶ 3; *see also* Docket Nos. 94-13 ¶¶ 3-4; 97 ¶¶ 38, 40). Leon-Martinez then drove Plaintiff to the police station. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 4; 97 ¶ 40). Defendants assert that Ottino, Lindsay and Solomon were not present when Plaintiff was handcuffed and put into Leon-Martinez's vehicle, [8] and therefore, had no physical contact with him. (Docket Nos. 94-11 ¶ 4; 94-12 ¶ 3; 94-13 ¶ 3; 94-14 ¶ 2; 97 ¶¶ 41, 44).

[8]   Specifically, according to Defendants, Ottino was off duty on the date of the incident, and did not get involved until after Plaintiff was arrested, when Davis requested that he work overtime at the police station to assist in gathering and processing evidence. (*See* Docket No. 94-14 ¶ 2). Defendants assert that Plaintiff was already in custody at the police station when Ottino arrived. (Docket Nos. 94-12 ¶ 5; 94-14 ¶ 2; 97 ¶ 44). According to a timesheet submitted by Defendants, Ottino started working at approximately 3:00 p.m. and stopped at approximately 9:30 p.m. (Docket No. 94-5). As for Lindsay and Solomon, they maintain that they arrived at the Butcher Boys store when Plaintiff was already in Leon-Martinez's vehicle. (Docket Nos. 94-11 ¶ 4; 94-12 ¶ 3; 97 ¶ 43).

Plaintiff admitted at his deposition that when Solomon and Lindsay started pursuing him, he ran through wooded "back yards" and a parking lot, and ended up behind the Butcher Boys store. (Docket No. 106-1 at 36:24-37:18). However, he testified that contrary to Defendants' claims, Ottino joined the pursuit when he reached the parking lot, shortly before Leon-Martinez's arrival. (*Id.* at 42:13-44:18, 46:2-48:9). Furthermore, Plaintiff denied that he ever had "difficulty jumping or climbing over [a] fence," and maintained that he encountered only one fence, not two. (*Id.* at 41:7-17). Plaintiff also maintains that he was not tased by Lindsay until he reached the back of the store – not in the wooded area as Defendants assert – and the taser's two probes left scars on the right side of his head and his upper right shoulder. [9] (*Id.* at 37:19-23, 40:21-41:3, 48:10-12, 52:20-22,

89:16-22, 91:8-15; *see also* Docket Nos. 97 ¶ 28; 100 ¶ 3). Plaintiff additionally asserts that he was "assaulted by several officers" behind the store and was eventually placed in handcuffs. (Docket No. 106-1 at 36:6-21, 37:4-18, 48:10-20). Plaintiff claims he was "brutally ... kicked, kicked in the face by ... Leon-Martinez" and punched in the "upper back of the head." (*Id.* at 44:19-45:5, 48:14-15). He also "felt other officers" "hitting" and "kicking" him,[10] but cannot identify them because his face was pressed to the ground. (*Id.* at 60:24-62:1). Plaintiff testified that Davis may have participated in the beating, because Plaintiff saw him behind the store before losing consciousness, and the first thing Plaintiff saw when he "woke up" was Davis "dragg[ing]" him into a police vehicle with Leon-Martinez's help.[11] (*Id.* at 49:11-20, 57:15-17, 59:23-60:8). Plaintiff explained that immediately before the "assault," he "dropped to [his] knees" and lay down because he "realized [he] was surrounded." (*See id.* at 50:5-11, 51:15-20, 54:14-17). Moreover, for at least a portion of his alleged beating, he claims he was already handcuffed. (*See id.* at 51:19-20). Plaintiff asserts that none of the Defendants told him that he was under arrest until he was actually arrested. (*Id.* at 50:24-51:5).

[9]   Plaintiff initially testified that he was tased specifically after he dropped to his knees in surrender. (Docket No. 106-1 at 50:5-11). However, in his deposition, Plaintiff stated that he "could have been" tased "while [he] was running, it could have been while [he] was on [his] knees, but [he] believe[d] [he] was tased prior to the assault." (*Id.* at 53:21-54:1).

[10]   Plaintiff explained that "[i]t felt like it was more than" one person assaulting him and "it was like a gang kind of assault." (*Id.* at 61:21-62:1).

[11]   According to Plaintiff, Davis stated: "[Y]ou shouldn't have made me run like that, asshole." (*Id.* at 57:12-17).

**\*4** Plaintiff also disputes Defendants' assertions that Leon-Martinez and Davis were the only ones who participated in arresting Plaintiff behind the store. (*See* Docket Nos. 97 ¶ 41; 100 ¶ 4). Plaintiff testified that although he lost consciousness when he was kicked, Lindsay and Solomon [12] were also present when he dropped to his knees. (Docket No. 106-1 at 48:24-49:15, 51:6-11, 58:24-59:3). At one point during Plaintiff's deposition, he conceded that he did not see Ottino behind the store before he was kicked, but maintained that

Ottino was also present while he was assaulted because he saw Ottino both before he reached the parking lot, and after he was apprehended and had regained consciousness. [13] (*Id.* at 56:16-57:7, 62:12-24). Later in his deposition, however, Plaintiff testified that he saw Ottino with Davis behind the store *before* he lost consciousness, ten to fifteen feet away. (*Id.* at 63:1-15).

[12]   According to Plaintiff, Lindsay and Solomon had caught up with Plaintiff by the time he reached the back of the store. (*Id.* at 48:24-49:15).

[13]   Plaintiff alleges that Ottino "follow[ed]" him "across the street" toward the back of the store. (*Id.* at 62:12-19).

Plaintiff does not dispute that after being handcuffed, he was placed into a police vehicle and Leon-Martinez drove him to the police station. (Docket Nos. 97 ¶ 45; 100 ¶ 11).

**B. Processing at the Police Station and Medical Treatment**

Plaintiff concedes that he did not complain of any injuries or request medical care during the drive to the police station. (Docket Nos. 94-13 ¶ 4; 97 ¶ 45; 106-1 at 65:20-66:8). Neither Leon-Martinez nor Davis observed any injuries on Plaintiff. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46). Nevertheless, as a precaution, Davis instructed Leon-Martinez to contact Mobile Medic to conduct a medical examination of himself [14] and Plaintiff upon arrival at the police station. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46).

[14]   Leon-Martinez sustained a laceration above his left eyebrow that also needed treatment. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46).

Records from Mobile Medic indicate that they received Leon-Martinez's call at 2:15 p.m. and arrived at the police station at 2:18 p.m. (Docket No. 94-6 at 4). The records also reflect that Plaintiff "initially refused any exam/treatment" and signed a Refusal of Medical Attention form as well as a release. (*Id.* at 2-4). However, Plaintiff permitted an examination at 2:22 p.m., appearing alert and oriented and demonstrating "[r]egular" respiration as well as normal movement in his extremities. (*Id.* at 4). The "Physical Assessment" and "Comments" reflect that Plaintiff had a "scratch on [the] bridge of [his] nose" and that his left eye "appear[ed] to have a broken blood vessel," but Plaintiff "denie[d] p[ai]n," [15] had "mild blurred vision," and had "no apparent leakage

of visceral fluid." (*Id.*). Plaintiff had scratches on his right wrist close to his handcuffs. (*Id.*). His scratches were cleaned and bandaged. (*Id.*). Plaintiff was advised that "if he was released to have his doctor or [the emergency room] look at his eye," and that "if anything changed to call [Mobile Medic] back." (*Id.* at 5).

[15]   Plaintiff's "[c]hief [c]omplaint" was: "I want to know why I have been arrested!" (*Id.*).

About four hours after the initial examination, Davis interviewed Plaintiff for approximately forty-three minutes [16] with Ottino present. (Docket Nos. 94-8; 94-12 ¶ 5; 94-14 ¶ 3). Davis and Ottino assert that between the medical examination and the start of the interview, Plaintiff did not complain of any injuries or request further medical treatment. (Docket Nos. 94-12 ¶ 5; 94-14 ¶ 3; 97 ¶ 51). However, they concede that during the interview, Plaintiff "generally complained about his eye." (Docket No. 97 ¶ 52; *see also* Docket Nos. 94-12 ¶ 5; 94-14 ¶ 3). Indeed, a video of the interview reflects that Plaintiff intermittently expressed discomfort in his eye area five times, at approximately 6:48 p.m., 6:55 p.m., 7:03 p.m., 7:21 p.m. and 7:24 p.m. (Docket No. 94-8; *see supra* n.16). The first three times, at 6:48 p.m., 6:55 p.m. and 7:03 p.m., Plaintiff complained that he had unusual sensations and pain in his eye area, but did not request further treatment. (Docket No. 94-8). At approximately 7:19 p.m., a substance that Plaintiff identified as blood dripped from the left side of his face onto his hand, which prompted Davis to get him a tissue. (*Id.*). Plaintiff wiped his face and at 7:21 p.m., complained that his eye "hurt." (*Id.*). In response, Davis asked Plaintiff if he wished to be examined by the medics again, and Plaintiff responded, "I told you, I need to go to the hospital." (*Id.*; *see also* Docket No. 94-12 ¶ 6). Davis then advised Plaintiff that he would arrange for medical treatment and that in the meantime, Plaintiff could speak to his partner on the phone. (Docket No. 94-8). At 7:24 p.m., Plaintiff stated: "I feel like I just made it worse." (*Id.*). However, throughout the interview and Plaintiff's subsequent phone call, Plaintiff was able to hold a cogent conversation while sitting comfortably in a chair, and appeared to be in only mild physical distress. (*Id.*).

[16]   A video of the interview at the precinct reflects that it began at 6:42 p.m. and concluded at 7:25 p.m. (Docket No. 94-8; *see also* Docket No. 94 ¶ 9). When the interview ended, Plaintiff spoke with his partner on the phone for approximately nine minutes, until 7:34 p m. (Docket No. 94-8).

This phone conversation was also captured on video. (*Id.*). An electronic version of the video was delivered to the Court and served on Plaintiff. (Docket No. 95).

**\*5** According to Plaintiff, upon arriving at the police station and before the interview, he was placed in a holding cell for "a while [sic], at least an hour"[17] and "experience[d] some, a lot of pain." (Docket No. 106-1 at 66:9-13, 67:2-6). Plaintiff testified that while he was in the cell, he requested medical care from either Davis or Ottino because he "couldn't see out of [his] eye" and at that point, one of these officers "said he's gonna bring a [sic] EMS." (*Id.* at 67:17-68:-17). Plaintiff claims that he did not "complain of an eye injury to anyone at the police station" before the interview because he feared for his safety. (*Id.* at 71:17-72:18). He also maintained that he "did not decline treatment by EMS;" rather, he told Mobile Medic that he "wanted outside treatment" "through a hospital" because he believed Mobile Medic "w[as] representing Monticello Police Department." (*Id.* at 68:18-69:13). Plaintiff conceded that Davis and Ottino "may have offered EMS" and that he ultimately accepted Mobile Medic's treatment, but he also could not recall whether that was before or after the interview, explaining that he believes he was experiencing the symptoms of a concussion. (*Id.* at 70:8-71:6). Moreover, although he was transported to the hospital shortly after the interview, he was "definitely in some pain in the holding cell" and believes that he "should have [been brought] straight to the hospital" rather than being "interrogated." (*Id.* at 73:24-75:6). Once at the hospital, he was given a CAT scan and pain medications. (*Id.* at 78:13-19).

[17]   Plaintiff also testified that he was shuffled back and forth between the holding cell and the interview room "at least two or three different times," and that he was placed in the holding cell after the interview. (Docket No. 106-1 at 72:19-73:3, 74:11-15).

The Mobile Medic records reflect that they were called back to the precinct at 7:41 p.m., approximately sixteen minutes after the interview ended. (Docket No. 94-6 at 7). The medics arrived at 7:45 p.m. (*Id.*). At that point, Plaintiff complained of pain in his left eye, which was "obvious[ly] swollen." (*Id.*). The medics categorized his "[p]resenting [p]roblem" as "[t]rauma – [b]lunt." (*Id.*). They then transported Plaintiff to Catskill Regional Medical Center ("Catskill") for further examination, leaving the police station at 7:57 p.m. and arriving at Catskill at 8:07 p.m. (Docket Nos. 94-6 at 7; 97 ¶ 53).

Medical notes from Kristen M. Peace, M.D. at Albany Medical Center ("Albany"), where Plaintiff was transported after Catskill, identify a closed fracture of Plaintiff's left eye socket and a corneal abrasion. (Docket Nos. 101-1; 106-1 at 85:22-86:3). They also state: "Given the isolated left lamina fracture with likely left medial orbital fracture, with no signs of entrapment, I do not feel there is an urgent need to consult ENT who is on for facial surgery at this time." (Docket No. 101-1). Plaintiff was given erythromycin as well as tetracaine, and was told to seek further treatment at a "clinic" within five to six days, and "ophthalmology" within one to two days. (*Id.*). Plaintiff "otherwise denie[d] headache, neck pain, or any other complaints" and reported "significant improvement of his eye[ ] scratchiness upon application of [the] tetracaine." (*Id.*). There is no indication that Plaintiff was ever diagnosed with a concussion.

Plaintiff testified that an unnamed physician at Albany recommended a surgical procedure to repair his eye socket by "plac[ing] a metal film around the eye," but he declined it because he "feared for his safety." (Docket No. 106-1 at 85:24-87:19). After "a few hours," Plaintiff was discharged and transported to Sullivan County Jail. (*See* Docket Nos. 101-1; 106-1 at 87:24-88:4). Plaintiff alleges that since the incident, he has experienced "frequent" migraines as well as blurred vision, light sensitivity, pain and pressure in his left eye. (Docket No. 106-1 at 80:22-82:11, 88:17-22). In addition, he needs a stronger prescription for his eyeglasses now. (*Id.* at 88:8-12). Plaintiff has not been able to schedule the recommended surgery because he is currently incarcerated and "that w[ould] be very difficult to do." (*Id.* at 87:20-23).

On September 8, 2017, Plaintiff was convicted of three counts of felony burglary in the third degree in connection with the above incident. (Docket No. 94-4). He received a six to twelve-year sentence. (Docket No. 94-10).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)) (internal quotations omitted). [18]

[18]    In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Opinion and Order and shall be simultaneously delivered to the *pro se* Plaintiff.

**\*6** In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotations omitted). However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The nonmovant must also do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotations omitted). To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable factfinder could decide in its favor." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467–68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

Plaintiff advances three theories of liability against Defendants. First, Plaintiff appears to argue that Defendants are liable for excessive force in connection with Lindsay's use of the taser, Leon-Martinez's alleged kick, and the alleged assault behind the Butcher Boys store. (Docket Nos. 97 ¶¶ 11-13; 100 at 1 ¶¶ 3-4, 4; 106-1 at 61:21-62:1). Second, Plaintiff argues that Lindsay, Solomon, Davis and Ottino are liable for failing to intervene when Plaintiff was tased and beaten. (Docket Nos. 97 ¶ 13; 100 at 1 ¶ 3, 9). Third, Plaintiff argues that both Ottino and Davis are liable for deliberate indifference to Plaintiff's medical needs because they failed to

provide medical treatment in a timely fashion. (Docket Nos. 97 ¶ 13; 100 at 1 ¶ 3, 6-9). The Court addresses each theory in turn.

### A. Excessive Force

#### 1. Use of the Taser

Defendants assert that Lindsay is entitled to summary judgment with respect to the use of his taser because he deployed it when Plaintiff was attempting to evade arrest, rendering this action objectively reasonable. (Docket Nos. 96 at 5-7; 102 at 9-10). They also assert that Lindsay is entitled to qualified immunity. (Docket No. 96 at 7-9). In opposition, Plaintiff argues that there are issues of material fact regarding whether Lindsay's action was reasonable and subject to qualified immunity because Lindsay tased Plaintiff after he had already surrendered and was on the ground. (Docket No. 100 at 3-5). Plaintiff further argues that the physical evidence of his scars belie Lindsay's version of these events, which is not supported by any evidence except for Lindsay's own affidavit. (*Id.* at 5). Defendants respond that Plaintiff cannot use his affidavit to create an issue of material fact because his assertions regarding when he was tased contradict his prior deposition testimony. (Docket No. 102 at 9-10).

#### i. Sham Affidavit Rule

The "sham affidavit rule" provides that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." [19] *See Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)) (internal quotations omitted). However, this rule is inapplicable if (1) the subject "deposition testimony and later affidavit are not actually contradictory," *see Palazzo ex rel. Delmage*, 232 F.3d 38, 43 (2d Cir. 2000); (2) " 'there is a readily apparent, plausible explanation' for the inconsistency," *see Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (quoting *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205–06 (2d Cir. 2014)); or (3) the statements at issue are ambiguous but "only arguably contradictory," *see Hayes*, 84 F.3d at 620; *see also In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) ("In the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not 'real, unequivocal, and inescapable,' the general rule remains

2022 WL 357020

that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment.' ") (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (noting that when "subsequent sworn testimony amplifies or explains, but does not merely contradict ... [the subject] prior testimony," a party may show that a triable issue of fact exists). Indeed, "mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) (citing *Moll*, 760 F.3d at 206).

19    The rule seeks to prohibit "a party who has been examined at length on deposition [from] ... rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony" because "this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).

**\*7** Here, the statements at issue are only "arguably contradictory." *See Hayes*, 84 F.3d at 620. Rather than setting forth a completely different version of events than he relayed at his deposition, Plaintiff's affidavit "amplifies" his prior testimony. *See Rule*, 85 F.3d at 1011. Plaintiff's affidavit states that he was tased when "he dropped to his knees to surrender." (Docket No. 100 at 3-4). Defendants correctly note that when asked during his deposition if he was tased "while [he was] running or after [he] went to [his] knees," Plaintiff stated: "It could have been while I was running, it could have been while I was on my knees, but I believe I was Tased prior to the assault." (Docket Nos. 102 at 10; 106-1 at 53:21-54:1). However, at another point in the deposition, Plaintiff also explained: "Once I realized I was surrounded I dropped to my knees and that's when I believe I was Tased in the head. I believe I was Tased in the head first, then I was kicked in the eye." (Docket No. 106-1 at 50:5-11).

Viewed as a whole, Plaintiff's testimony regarding the moment when he was tased is ambiguous, but his affidavit is consistent with his statement that he dropped to his knees "and that's when I believe I was Tased." (*Compare* Docket No. 100 at 3-4, *with* Docket No. 106-1 at 50:5-11). Moreover, the testimony Defendants cite is equivocal, and leaves open the possibility that Plaintiff was tased while on the ground. (Docket Nos. 102 at 10; 106-1 at 53:21-54:1). Thus, any contradiction is not "real, unequivocal, and inescapable." *See In re Fosamax Prod. Liab. Litig.*, 77 F.3d at 194 n.4; *see,*

*e.g., Brandon*, 938 F.3d at 33 n.9 (rejecting sham affidavit argument where plaintiff could not remember the exact number of times he was served pork at his deposition, but later "provided a specific number"); *Fleming v. Costco Wholesale Corp.*, 17-CV-2878 (AMD) (PK), 2020 WL 2404907, at \*5 (E.D.N.Y. May 12, 2020) (declining to apply sham affidavit rule where affidavit expressed "certainty" regarding "former ambivalen[t]" testimony). The inconsistencies here "go more to the reliability of plaintiff as a witness than to the genuineness of any material factual disputes." *See Buie v. City of New York*, No. 12 CV 4390(RJD)(CLP), 2015 WL 6620230, at \*4 (E.D.N.Y. Oct. 30, 2015) ("On balance, after reviewing plaintiff's deposition—during which she clearly struggled but nonetheless managed to set forth the basic facts of her surviving claims—the Court readily concludes that while the affidavit may undermine her credibility before the jury it is of no real consequence in the Court's determination of the motion."). Consequently, the Court will not preclude Plaintiff from relying on his affidavit at this stage.

### ii. Merits

It is well-established that under the Fourth Amendment, "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotations omitted). However, "law enforcement officers violate the Fourth Amendment if the amount of force they use is 'objectively unreasonable' in light of the facts and circumstances confronting them." *Id.* (quoting *Graham*, 490 U.S. at 397). Determining whether an officer's use of force is reasonable is a fact-intensive inquiry, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Because officers must often "make split-second judgments" about "the amount of force that is necessary," the reasonableness of the amount of force used "must be judged from the perspective of a reasonable officer on the scene." *See id.* at 396–97. Thus, "the factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

**\*8** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory

or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Officials are "entitled to qualified immunity ... [when] their decision was reasonable, even if mistaken." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Indeed, "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). To analyze a qualified immunity defense on summary judgment, courts ask "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "In the excessive force context, 'the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.' " *Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042(JPO), 2013 WL 3193413, at *7 (S.D.N.Y. June 25, 2013) (quoting *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995)).

Defendants assert that Lindsay's use of the taser once was reasonable because Plaintiff, who was eventually convicted of three counts of felony burglary, was running away from Lindsay in the direction of the Mountain Mall, and thus, posed a threat to other officers and the public. (*See* Docket No. 96 at 6-7). As a general matter, it is true that "the use of force may be reasonable against a suspect who is fleeing." *Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017). However, such force "may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight." *Id.* (citing *Tracy*, 623 F.3d at 96–98). Moreover, the only support for Defendants' contention that the fleeing suspect doctrine applies is Lindsay's self-serving affidavit – which is in direct conflict with Plaintiff's own affidavit and testimony. (Docket Nos. 100 at 3-4; 106-1 at 50:5-11; *see also* Docket No. 94-11). Plaintiff alleges that he was tased when he attempted to surrender by "dropp[ing]" to his "knees on the ground." (Docket No. 100 at 3-4; 106-1 at 50:5-11). Indeed, Plaintiff testified at his deposition that before he was tased, he "got down" because he realized he was "surrounded" by officers and "didn't want to appear threatening." (Docket No. 106-1 at 50:5-11, 51:14-19, 58:3-5). He further testified that he did not resist arrest, or punch or strike any officers. (*Id.* at 54:24-55:4). Furthermore, Plaintiff claims that he has "noticeable" scars from Lindsay's taser, which could constitute physical evidence that contrary

to Lindsay's assertions, the taser was deployed effectively in two places.[20] (Docket No. 106-1 at 89:16-90:3, 91:8-15).

[20]    Although the booking photograph that Plaintiff references in support of this allegation is not clear enough to show any scars, in light of Plaintiff's *pro se* status and the paucity of evidence in this record, the Court credits it for purposes of the Motion because Plaintiff attested to the scarring under oath and a jury could observe the scars in court. (*See* Docket Nos. 100 at 7; 37 at 9-10).

In light of the above evidence and the parties' contradictory accounts, a reasonable jury could conclude that Lindsay tased Plaintiff when he was no longer evading arrest and, therefore, this use of force was excessive and unreasonable. *See, e.g.*, *Tracy*, 623 F.3d at 96–98 (finding material issues of fact where plaintiff claimed officer used pepper spray after plaintiff told him he was not resisting); *Diaz v. City of Hartford Police Dep't*, 3:18-CV-01113 (KAD), 2021 WL 1222187, at *6 (D. Conn. Mar. 31, 2021) (finding dispute of material fact regarding excessive force claim where plaintiff testified that he "fully surrendered" before being beaten, punched, kicked and tased); *Zachary v. City of Newburgh*, 13 CV 5737 (VB), 2016 WL 4030925, at *9 (S.D.N.Y. July 25, 2016) (denying summary judgment "[e]ven though plaintiff was physically fighting officers just moment before" because "a jury could reasonably conclude plaintiff was subdued prior to being tased"); *Odom v. Matteo*, 772 F. Supp. 2d 377, 389 (D. Conn. 2011) (denying summary judgment where "[g]iven the competing affidavits submitted by the parties, the jury could construe Odom's conduct as ... attempting to comply subject to limitations caused by her brain injury"). Thus, there is a genuine dispute of material fact about when Lindsay deployed his taser that precludes the Court from finding his conduct objectively reasonable as a matter of law.

**\*9** Moreover, the Court cannot grant Lindsay summary judgment on qualified immunity grounds. As of the date of the incident, it was clearly established within this Circuit "that tasing and physically assaulting an individual who was not actively resisting arrest or posing an immediate threat to officers constitute[s] excessive force." *See Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *18 (D. Conn. July 2, 2019); *see also Tracy*, 623 F.3d at 98; *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 297 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015). In light of this precedent, and because there is a genuine issue of

material fact as to whether Lindsay tased Plaintiff after he had surrendered, qualified immunity does not apply. *Cf. Read*, 2013 WL 3193413, at *7–8. Accordingly, Defendants' motion for summary judgment with regard to Lindsay's use of the taser is denied.

## 2. Assault

Construing Plaintiff's arguments liberally, Plaintiff also asserts excessive force claims against Leon-Martinez for kicking him in the face, causing a broken eye socket, and all of the Defendants for participating in a "gang kind of assault" in which he was hit and kicked both before and after being handcuffed. (Docket Nos. 97 ¶¶ 11-13; 100 ¶¶ 3-4 at 1, 4; 106-1 at 51:19-20, 61:21-62:1; *cf.* Docket No. 37 at 5 ¶ 5, 6-7). Defendants dispute that these events occurred. (Docket Nos. 96 at 13 n.7; 97 ¶¶ 41-44). They further respond that Plaintiff cannot maintain an excessive force claim against Leon-Martinez because to the extent he used force, such force was necessary and Plaintiff had no observable injuries. (Docket No. 96 at 13-14 n.7; *see also* Docket No. 94-13 ¶ 4). Defendants also dispute that the Amended Complaint asserts an excessive force claim against the other officers, and in any event, they argue that such a claim must be dismissed because the evidence establishes that Solomon, Lindsay and Ottino were not present when Plaintiff was apprehended and handcuffed, and Davis was "not involved" in the process of handcuffing Plaintiff. (*See id.*).

Defendants' arguments with respect to Leon-Martinez fail for the same reasons as their contentions regarding Lindsay's use of the taser. Although Defendants claim that Leon-Martinez never hit or kicked Plaintiff, (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 96 at 13-14 n.7), Plaintiff disputes this and claims that Leon-Martinez kicked him in his left eye when he had already surrendered, (Docket No. 106-1 at 54:2-23, 55:5-10). Moreover, it is undisputed that Plaintiff was diagnosed with a broken left eye socket when he was transported to the hospital later that day. (Docket No. 101-1). Plaintiff further testified that after Leon-Martinez kicked him, he felt himself being hit and kicked again, but could not discern which officer did so because his head was facing the ground. (Docket No. 106-1 at 61:9-62:1).

In light of this evidence, there are clearly material issues of fact on whether Leon-Martinez used excessive force, which preclude the Court from granting summary judgment. *See Diaz*, 2021 WL 1222187, at *6; *supra* Section III.A.1.ii. Even by Defendants' account, Plaintiff and Leon-Martinez engaged in a "brief struggle" before Leon-Martinez handcuffed him.

(Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3). Accordingly, a jury could reasonably conclude that Leon-Martinez used excessive force against Plaintiff. *See Diaz*, 2021 WL 1222187, at *6. The Court therefore denies Defendants' motion for summary judgment with respect to Plaintiff's excessive force claim against Leon-Martinez.

The Court will now turn to whether Plaintiff makes out a claim of excessive force against Davis, Lindsay, Ottino and Solomon for the alleged "gang kind of assault." (Docket No. 96 at 13 n.7; *see also* Docket No. 106-1 at 61:21-62:1). "An individual defendant is not liable under § 1983 absent personal involvement." *See Walker v. Raja*, No. 17-CV-5202 (PKC) (LB), 2020 WL 606788, at *4 (E.D.N.Y. Feb. 7, 2020) (quoting *Morris v. Eversley*, 282 F. Supp. 2d 196, 202 (S.D.N.Y. 2003)) (internal quotations omitted). The Amended Complaint specifically identifies only Lindsay and Leon-Martinez as using unlawful force against Plaintiff, and only mentions the other Defendants in the context of Plaintiff's failure to intervene and deliberate indifference claims. (*See* Docket No. 37 at 5-6 ¶¶ 3-6). However, at his deposition, Plaintiff testified that in addition to being tased by Lindsay and kicked in the face by Leon-Martinez behind the Butcher Boys store, he was also "punched a few times" behind his head and kicked, and that he "believe[s]" Lindsay and the other Defendants may have done this. (Docket No. 106-1 at 48:10-16, 60:24-62:1). A review of the entire transcript reveals that the basis for this belief is that (1) Plaintiff saw them in the general area behind the Butcher Boys store when he arrived or regained consciousness; (2) the assault "felt like" it involved "more than one [officer];" (3) at the start of the pursuit, Solomon "said [he] w[as] gonna kick [his] ass;" and (4) when Plaintiff regained consciousness, Solomon was breathing heavily, Davis was sweating, and Davis said Plaintiff "shouldn't have made him run like that." (*Id.* at 33:24-34:22, 48:24-49:15, 59:10-22, 60:24-64:14, 65:2-10).

**\*10** The Court finds that the record fails to establish that Lindsay, Solomon, Davis and Ottino were directly involved in the alleged assault on Plaintiff. *See Djangmah v. Falcione*, No. 08 Civ. 4027(PAC)(FM), 2013 WL 208914, at *8 (S.D.N.Y. Jan. 18, 2013), *report and recommendation adopted*, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013). Plaintiff's argument that these Defendants directly participated constitutes speculation, which "is not a sufficient ground upon which to oppose summary judgment." *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 466 (N.D.N.Y. 2009); *see also Bermudez v. Edmonds*, 15-CV-3240 (KAM), 2017 WL 11507652, at *5 (E.D.N.Y. Dec. 19, 2017) (finding

that plaintiff's testimony that he was "kicked and punched all over" by unidentified officers "until losing consciousness" did not support a non-speculative inference that defendant hit him "at some point after losing consciousness") (internal quotations omitted); *Carey v. Maloney*, 480 F. Supp. 2d 548, 557 (D. Conn. 2007) (holding that officer's "mere presence at the scene where [plaintiff]'s rights were allegedly violated" was insufficient to sustain excessive force claim against him). Plaintiff does not proffer any facts beyond Defendants' presence that could provide the logical inferences needed to convince a rational jury that they actually participated in the alleged assault. *Cf. Goenaga*, 51 F.3d at 18.

Accordingly, Defendants' motion for summary judgment with respect to any excessive force claims against Ottino, Lindsay, Solomon and Davis *based on their direct participation in the alleged assault* is granted.

**3. Failure to Intervene**
On the other hand, "[a] police officer 'who does not personally inflict the injury at the core of an excessive use of force claim may still be liable under § 1983 if the officer was present at the assault, and fails to intervene to prevent the harm when the officer had a reasonable opportunity to do so.' " *See Walker*, 2020 WL 606788, at *4 (quoting *Raffaele v. City of New York*, 242 F. Supp. 3d 152, 156 (E.D.N.Y. 2017)). Defendants argue that Plaintiff's failure to intervene claim must be dismissed as to Ottino, Lindsay and Solomon because they were not present when Plaintiff was apprehended and handcuffed. (Docket No. 96 at 14). Defendants further assert that they are entitled to summary judgment because, even assuming they were present, there was no realistic opportunity for them to intervene in the tasing or alleged assault. (*Id.* at 14-15; *see also* Docket No. 102 at 8). Construed liberally, Plaintiff's opposition brief contends that there are issues of material fact regarding this claim because he testified that the Defendants were all present behind the Butcher Boys store while he was tased and assaulted, and therefore, had plenty of opportunity to intervene. (Docket No. 100 at 9-10).

"A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used ...; (2) that a citizen has been unjustifiably arrested ...; or (3) that any constitutional violation has been committed by a law

enforcement official ...." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citing *O'Neill*, 839 F.2d at 11–12; *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982)). Such liability attaches "only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill*, 839 F.2d at 11–12). "Whether [an] officer ha[s] a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.' " *See Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Anderson*, 17 F.3d at 557).

*11 As a general matter, "[a] defendant who is not in the vicinity of the alleged constitutional violation, especially an isolated violation that occurs within seconds, cannot be held liable because he lacked reasonable opportunity to intervene." *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *see also Sammarco v. Hoolan*, No. 12-CV-7857 (JMF), 2014 WL 3639161, at *2 (S.D.N.Y. July 23, 2014) (granting summary judgment in light of undisputed evidence that defendants "were not involved in Plaintiff's arrest and not even present at the scene"). However, genuine disputes of material fact as to an officer's presence during an alleged assault may preclude summary judgment by begging the question whether the officer had an opportunity to intervene. *See, e.g.*, *Walker*, 2020 WL 606788, at *5; *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016).

Here, Defendants concede that Davis was present behind the Butcher Boys store when Leon-Martinez apprehended Plaintiff. (*See* Docket Nos. 94-12 ¶ 2; 96 at 13 n.7). However, the parties dispute whether the rest of the Defendants were also present, and whether the tasing occurred in a wooded area at the beginning of the chase, with only Solomon present, or behind the Butcher Boys store as well. (*Compare* Docket Nos. 97 ¶¶ 26-29, 41-44; 94-12 ¶ 2; 96 at 13 n.7, *with* Docket No. 106-1 at 50:5-11, 52:20-22, 58:6-9, 62:12-24). Although his testimony is rife with inconsistencies, Plaintiff stated under oath that he saw Ottino and Davis follow him from the parking lot to the back of the Butcher Boys store, and that both Lindsay and Solomon arrived when he kneeled to the ground, after which he laid down and Leon-Martinez kicked him in the face. (Docket No. 106-1 at 50:5-11, 52:20-22, 54:7-17, 57:18-58:16, 62:12-24). Therefore, according to Plaintiff, all of the Defendants were present at least before Leon-Martinez

assaulted him behind the store. (*Id.* at 57:18-58:16). Plaintiff also offered testimony that he "could have been" tased while he was "on [his] knees." (*Id.* at 53:21-54:1); *see supra* n.9.

Construing Plaintiff's testimony in his favor, a reasonable jury could find that all of the Defendants except Ottino [21] arrived behind the store before both the tasing and assault began. This evidence, while thin, is sufficient to create a genuine dispute of material fact as to their presence during any alleged uses of excessive force. *See Randle*, 170 F. Supp. 3d at 591 (denying summary judgment where "[t]he parties ... genuinely dispute[d] a material fact, namely, whether C.O. Nelson was present at any point during the second fight"). Of course, the jury may also doubt the veracity of Plaintiff's proffered sequence of events in light of Defendants' assertions that both Solomon and Lindsay only arrived after being called to the location over the police radio. (Docket Nos. 94-5; 94-11 ¶¶ 3-4; 94-12 ¶¶ 3-4; 97 ¶¶ 42-43). Indeed, it is not the Court's role to make these credibility determinations.

[21]  In light of the robust objective evidence that Ottino was off duty at the time of the arrest, no reasonable juror could find that he was present behind the Butcher Boys store during the alleged excessive uses of force. (*See* Docket No. 94-5). Therefore, Plaintiff's failure to intervene claim against Ottino is dismissed. *See Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020) (summary order) (upholding summary judgment as to excessive force and failure to intervene claims where "a record of the line-up" during which alleged assault occurred "demonstrate[d] that [defendant] was not present when the line-up was conducted").

**\*12**  Nevertheless, an officer's "mere presence" at the scene of an arrest "cannot be considered a proximate cause of [the plaintiff]'s injuries without any evidence that she had an opportunity to prevent" the alleged excessive use of force. *See Howard v. Schoberle*, 907 F. Supp. 671, 682 (S.D.N.Y. 1995). Indeed, a failure to intervene claim requires that a defendant had a "*realistic opportunity* to intervene to prevent the harm from occurring." *Raffaele*, 242 F. Supp. 3d at 156 (quoting *Anderson*, 17 F.3d at 557) (internal quotations omitted) (emphasis added); *see also Jean-Laurent*, 540 F. Supp. 2d at 512. "Whether an officer had a realistic opportunity to intervene depends on several factors, including the number of officers present, their proximity to the situation, the environment in which they acted, the nature of the

assault, and, often most important, the assault's duration." *Burks v. City of New York*, No. 17-cv-00177 (ARR) (RLM), 2018 WL 6199550, at \*5 (E.D.N.Y. Nov. 28, 2018) (quoting *Merrill v. Schell*, 279 F. Supp. 3d 438, 444 (W.D.N.Y. 2017)). The Second Circuit has cautioned that whereas the duration of the assault is "always relevant" and may be of "great importance," there is no "hard-and-fast temporal cutoff" for satisfying this standard, and courts must be cognizant that other circumstances "might bear significantly on an officer's ability to stop [the assault] from happening" based on the unique facts in each case. *See Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016).

According to Defendants, assuming, *arguendo*, that Leon-Martinez kicked Plaintiff in the face, the rest of the Defendants lacked sufficient time to stop Leon-Martinez because by Plaintiff's account, Leon-Martinez was the first officer to reach him behind the Butcher Boys store and "the first thing [the officer] did" was kick Plaintiff. (Docket Nos. 96 at 14-15; 106-1 at 50:3-4, 91:24-92:4). They further argue that in light of the "quick nature of" the tasing and the kick, there is insufficient evidence as to the actions the officers could have taken to prevent the alleged harm. (Docket No. 102 at 8).

Plaintiff testified that the entire pursuit from East Broadway, where the Mountain Mall is located, to the moment of his arrest behind the store, lasted no longer than five minutes. (Docket No. 106-1 at 51:21-52:8; *see also* Docket No. 94-11 ¶ 3). Plaintiff further testified that he was tased before the assault, either when he was still running or when he was on his knees behind the store. (Docket No. 106-1 at 53:21-54:1). Plaintiff maintains that he dropped to his knees "like seconds" before Leon-Martinez reached him. (*Id.* at 52:9-12). He could not recall how much time passed between Leon-Martinez's alleged kick and the moment when he was placed in Leon-Martinez's vehicle. (*Id.* at 62:2-5). However, he testified that after the first kick, he was "punched a few times" and kicked again. (*Id.* at 48:10-16, 61:21-62:1). Moreover, he asserts he was "placed in handcuffs" as the beating continued. (*Id.* at 51:19-20).

Plaintiff was not specifically questioned about the Defendants' precise locations behind the store when he was allegedly tased and kicked, and there is little evidence of the area's size or topography. The most specific evidence on record of the officers' proximity to Plaintiff during the incident is Plaintiff's testimony that he saw Davis and Ottino behind the store "around the time [he] arrived," and before he

lost consciousness, he saw them standing ten or fifteen feet away from him. (*Id.* at 62:12-63:15). He was unsure whether they arrived before him, as "all the other officers came from the o[pposite] side" of the Butcher Boys building. (*Id.* at 63:20-64:9). However, the reason he dropped to his knees is that he was "surrounded" by the rest of the officers. (*Id.* at 50:8-9). When he regained consciousness, he saw Davis's "face" up-close as he was being placed into Leon-Martinez's vehicle. (*Id.* at 58:17-59:16).

In light of this testimony, there is a dispute as to whether Davis, Solomon and Lindsay had a realistic opportunity to intervene in the alleged beating *after* Leon-Martinez's first kick. As to the tasing and the alleged initial kick, the record indicates that these single, rapid events occurred spontaneously and without warning. By Plaintiff's own account, Leon-Martinez was the first officer to reach him, and mere "seconds" passed between the time when Plaintiff dropped to his knees and Leon-Martinez kicked him. (Docket No. 106-1 at 50:3-4, 52:9-12, 91:24-92:4). Thus, no reasonable juror could find that any officer present at the scene could have anticipated or stopped these alleged single uses of force. *See, e.g.*, *Raffaele*, 242 F. Supp. 3d at 158 (granting summary judgment on failure to intervene claim because "there was not enough time for any officer, from a distance of six to ten feet, to intervene between a push and a hit occurring in a two-second span"); *Elufe v. Aylward*, No. 09-CV-458(KAM)(LB), 2011 WL 477685, at *9 (E.D.N.Y. Feb. 4, 2011) ("Where the alleged force consists of a single push or a 'rapid succession' of blows, courts have found that the officer did not have a realistic opportunity to intervene.") (citing *O'Neill*, 839 F.2d at 11–12).

  **\*13**  However, drawing all reasonable inferences in Plaintiff's favor, there is sufficient evidence that the above three Defendants had a realistic opportunity to intervene in the further beating Plaintiff alleges he received after Leon-Martinez's kick. Although Plaintiff could not remember how long the beating lasted, he testified that after the initial kick, he was punched more than once and kicked at least once again in the presence of these officers, and for some of that period, he was handcuffed. (*Id.* at 48:10-16, 51:19-20, 61:21-62:1, 62:2-5). A reasonable juror could accept Plaintiff's version and find that the amount of time it took to punch Plaintiff multiple times before and after handcuffing him could have been sufficient for the Defendants to stop any further blows. This evidence raises a question of material fact whether the duration of the assault, and the officers' proximity to Plaintiff, gave them a realistic opportunity to intervene. *See*

*Buie*, 2015 WL 6620230, at *8 (holding that "while the initial use of force ... happened too quickly for intervention, a reasonable jury could conclude that ... defendants had time to intercede and were capable of preventing some of the harm caused" when detectives subsequently pushed plaintiff's arms upwards and pressed her face into the wall); *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 183 (D. Conn. 2003) (finding issue of material fact as to realistic opportunity to intervene where "[o]n the plaintiff's facts, the kneeing and process of unbuckling and pulling down [his] pants would have taken enough time to ... give[ ] the other officers, who ... could have seen what was occurring, a reasonable opportunity to intervene"). That said, the jury could also find that one or more of these officers was not present, or that the further blows were delivered too quickly for these officers to intervene. The task of weighing the parties' conflicting evidence will require a determination as to these Defendants' credibility, on the one hand, and Plaintiff's, on the other. Because it is not the Court's role to engage in this exercise, summary judgment on Plaintiff's failure to intervene claim against Davis, Lindsay and Solomon must be denied.

**B. Deliberate Indifference to Medical Needs**
Defendants contend that Plaintiff's deliberate indifference claims fail because he was never denied medical care, nor was his broken eye socket sufficiently serious to trigger such liability. (Docket No. 96 at 10-11). Defendants further argue that there is no evidence that Davis or Ottino acted with the requisite state of mind to sustain this claim, and they are otherwise entitled to qualified immunity. (*Id.* at 11-13 & n.6). Plaintiff maintains that (1) his broken eye socket was sufficiently serious because only surgery will correct it; (2) both officers had knowledge of his injury because they saw him being assaulted; and (3) they refused to take him to the hospital until after they interrogated him. (Docket No. 100 at 6-8; *see also* Docket No. 106-1 at 74:3-10). Moreover, according to Plaintiff, Davis intended to delay medical assistance as a "punish[ment]" in light of his statement: "You shouldn't have made me run like that, asshole." (Docket No. 100 at 7-8). In response, Defendants assert that even assuming Plaintiff's medical treatment was delayed, Davis and Ottino are entitled to judgment as a matter of law because (1) Plaintiff's broken eye socket was not a life-threatening or fast-degenerating condition, nor did any delay create any particular risk; and (2) there is no evidence that either Defendant was aware or should have been aware of any such risk. (*See* Docket No. 102 at 3-7).

A pre-trial detainee's claim for deliberate indifference to serious medical needs is evaluated under the Due Process Clause of the Fourteenth Amendment. *Davis v. McCready*, 283 F. Supp. 3d 108, 116 (S.D.N.Y. 2017) (citing *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)). "[W]hen a claim arises under the Fourteenth Amendment, 'the pre-trial detainee must prove that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care ... even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety.' " *Ryan v. Cty. of Nassau*, 12-CV-5343(JS)(SIL), 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) (quoting *Darnell*, 849 F.3d at 35). To establish a claim for deliberate indifference to serious medical needs under the Fourteenth Amendment, a plaintiff must satisfy both objective and *mens rea* components. *Davis*, 283 F. Supp. 3d at 116.

The objective standard has two prongs. "The first prong is whether the prisoner was actually denied adequate medical care." *James v. Correct Care Sols.*, No. 13-cv-0019(NSR), 2013 WL 5730176, at *4 (S.D.N.Y. Oct. 21, 2013) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)); *see Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. Oct. 18, 2018) (summary order) (noting that "[f]or Fourteenth Amendment claims, this Court applies the same standard as the Eighth Amendment to determine whether an alleged action is objectively serious enough to be a constitutional violation"). The second prong of the objective standard is "whether the 'medical condition is sufficiently serious.' " *Figueroa v. Cty. of Rockland*, 16-cv-6519 (NSR), 2018 WL 3315735, at *5 (S.D.N.Y. July 5, 2018) (quoting *Salahuddin*, 467 F.3d at 280). To establish that the medical condition was sufficiently serious, a plaintiff must show "the existence of 'a condition of urgency, one that may produce death, degeneration, or extreme pain[.]' " *Id.* at *4 (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)); *see also Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.") (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotations omitted).

**\*14** However, where, as here, "a detainee's deliberate indifference claim involves delay in treatment, not denial of treatment, the analysis of the medical need 'focus[es] on the challenged *delay* ... rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious.' " *Martinez v. City of New York*, 16-CV-79 (RPK) (CLP), 2021 WL 4502440, at *10 (E.D.N.Y. Sept. 30, 2021) (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (emphases in original). "The absence of adverse medical effects or demonstrable physical injury is one ... factor that may be used to gauge the severity of the medical need at issue." *Smith*, 316 F.3d at 187. Indeed, the "seriousness of a delay in medical treatment may be decided by reference to the effect of delay in treatment ... [c]onsequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *See Thurmond v. Thomas-Walsh*, No. 18-CV-409 (KMK), 2019 WL 1429559, at *6 (S.D.N.Y. Mar. 29, 2019) (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). Nevertheless, even without evidence that a delay in treatment worsened the condition, "allegations of a 'condition of urgency' that 'may produce ... extreme pain' satisfy the objective prong of the analysis." *See Martinez*, 2021 WL 4502440, at *10 (quoting *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (summary order)).

In *Darnell v. Pineiro*, the Second Circuit modified the *mens rea* component for deliberate indifference claims brought under the Fourteenth Amendment. *See* 849 F.3d at 35; *see also Lloyd v. City of New York*, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."). Since *Darnell*, courts must determine "whether an objectively reasonable person in Defendant's position would have known, or should have known, that Defendant's actions or omissions posed an excessive risk of harm to [Plaintiff]." *Davis*, 283 F. Supp. 3d at 120 (citing *Darnell*, 849 F.3d at 35; *Lloyd*, 246 F. Supp. 3d at 719). "In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a plaintiff is not required to 'show subjective awareness by the defendant that '[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm.' " *Ryan*, 2018 WL 354684, at *3 (quoting *Darnell*, 849 F.3d at 35) (alteration in original). Nevertheless, "[a] detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36. Whether a defendant acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Martinez*, 2021 WL 4502440, at *11 (quoting *Charles v. Orange Cty.*, 925 F.3d

73, 87 (2d Cir. 2019) (internal quotations omitted)); *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The record before the Court is insufficient to sustain either component of this exacting standard.[22] *Cf. Madera v. Ezekwe*, No. 10 CV 4459(RJD)(LB), 2013 WL 6231799, at *11 (E.D.N.Y. Dec. 2, 2013) ("Deliberate indifference is a very high standard."). As to the objective component, although Plaintiff required emergency treatment, Davis and Ottino's conduct does not rise to the level of egregiousness required to succeed on a deliberate indifference claim based on delayed treatment. Indeed, Plaintiff was not actually denied care; rather, he received care almost immediately after being arrested. Davis arranged for Mobile Medic to examine Plaintiff less than ten minutes after he arrived at the precinct, and to examine him again approximately twenty-four minutes after Plaintiff requested further treatment that evening. (Docket Nos. 94-6 at 4, 7; 97 ¶¶ 25, 46-47, 52-53; 94-8). Mobile Medic transported Plaintiff to the hospital approximately twelve minutes after they examined him a second time. (Docket No. 94-6 at 7). Courts within this Circuit generally limit finding deliberate indifference based on such delays in treatment to "cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." *See Freeman v. Strack*, No. 99 Civ. 9878(AJP), 2000 WL 1459782, at *7 (S.D.N.Y. Sept. 29, 2000) (quoting *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)) (internal quotations omitted); *see also Munoz v. Eliezer*, 16-cv-6049 (NSR), 2018 WL 1626170, at *6 (S.D.N.Y. Mar. 30, 2018).

[22]   As set forth *infra*, because the record is insufficient to support the objective or subjective components of Plaintiff's deliberate indifference claim, the Court does not reach the issue of qualified immunity. (*See* Docket No. 96 at 12-13 n.6).

**\*15** The facts here do not bear out any of these scenarios, nor do they support Plaintiff's assertion that "his body was racked with pain" to a point of severity that would otherwise trigger liability. (Docket No. 100 at 7); *cf. Martinez*, 2021 WL 4502440, at *10. The medical records do not classify Plaintiff's broken eye socket as "life-threatening" or "fast-degenerating," nor do they identify a concussion or any other severe issues that required immediate attention. Although Plaintiff testified that at some point, he was told that his broken eye socket required surgery, (Docket No. 106-1 at

85:24-87:19), Dr. Peace's notes from his visit to Albany on the evening of the incident state that there was no "urgent need to consult" the facial surgeon on call, (Docket No. 101-1). The record is clear that Mobile Medic treated him shortly after arrival at the precinct, and again less than five hours later. (Docket No. 94-6 at 7). There is no evidence that this delay exacerbated his condition or pain. Moreover, Plaintiff's first examination – which he initially refused – did not indicate any pain or medical conditions beyond scratches, "mild" blurred vision, and a broken blood vessel. (*Id.* at 4).

Courts have consistently rejected deliberate indifference claims under similar circumstances, involving relatively brief delays or interruptions in treatment and a dearth of evidence that the plaintiff's pain or medical condition worsened as a result. *See, e.g., Davis v. Furey*, No. 3:19-CV-1867 (JCH), 2021 WL 2827366, at *6 (D. Conn. July 6, 2021) ("Davis has not presented any evidence that he experienced any serious risk of harm as a result of the asserted two-hour delay in receiving treatment ...."); *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (granting summary judgment where plaintiff waited three hours for medical treatment but did "not allege[ ] that the delay in treatment caused his condition to worsen"); *Rodriguez v. Mercado*, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (dismissing deliberate indifference claim based on eight or nine-hour delay, and noting that patients "seeking care for a non-life-threatening injury generally experience[ ] some delay in receiving treatment"). In addition, although there is evidence that Plaintiff was in pain at some point while awaiting treatment, (Docket No. 106-1 at 66:9-13, 67:2-6), his sporadic complaints as well as ability to hold a conversation during the interview indicate that he was not in the type of "extreme pain" that may otherwise satisfy the objective prong of the analysis. *Compare Martinez*, 2021 WL 4502440, at *10 (finding objective prong satisfied on summary judgment in light of evidence that plaintiff was "screaming and crying" for hours and repeatedly told an officer that she was in too much pain to be fingerprinted), *with Benitez v. Pecenco*, No. 92 Civ. 7670 (DC), 1995 WL 444352, at *3 (S.D.N.Y. July 27, 1995) (granting summary judgment where "nothing in the record ... suggest[ed] that plaintiff's back pain was severe or excruciating[,]" no medical personnel noted he was in "acute distress or had any difficulty standing or walking[,]" and his complaints were "only sporadic[ ]"). Neither Mobile Medic nor any hospital staff noted any pain-related lapses in Plaintiff's functioning or complaints of excruciating pain at any of his examinations. *See Benitez*, 1995 WL 444352, at *3. Therefore, Plaintiff's "subjective claims of ... pain,

unaccompanied by substantial medical complications," are inadequate to create a genuine dispute of material fact as to whether his condition was sufficiently serious to warrant more immediate treatment. *See Brown v. White*, No. 9:08-cv-200 (GLS/ATB), 2010 WL 985184, at *10 (N.D.N.Y. Mar. 15, 2010) (internal quotations omitted).

Moreover, although Plaintiff alleges that Davis's comments demonstrate an "intent to punish" him "by making him wait unreasonably for medical assistance," (Docket No. 100 at 7-8), this conclusory assertion is not enough to withstand dismissal. According to Plaintiff, Davis told him that he "shouldn't have made [Plaintiff] run like that" when he was putting Plaintiff into Leon-Martinez's vehicle after the assault. (Docket No. 106-1 at 57:12-17). However, it is undisputed that Davis and Leon-Martinez arranged for Plaintiff's examination at the precinct shortly thereafter. (Docket Nos. 94-6 at 4; 97 ¶ 46; 100 at 3 ¶ 14). Therefore, no rational jury could conclude that Davis intended to delay Plaintiff's treatment when he made the subject comment. There is no indication that Davis made any similar comments upon Plaintiff's requests for further treatment. Absent any such evidence specifically connecting the alleged delay of Plaintiff's treatment to an improper motive, Plaintiff's claim cannot survive on this basis. *Compare Benitez v. Beneway*, No. 93 Civ. 3132 (DC), 1995 WL 489694, at *6 (S.D.N.Y. Aug. 15, 1995) (holding that "[n]o reasonable jury could conclude" that defendant ordered the filing of a misbehavior report in order "to terminate [plaintiff's] prescribed physical therapy treatment in retaliation" for plaintiff's complaint, based only on the "temporal proximity between the mailing of the complaint ... and the issuance of the misbehavior report") (internal quotations omitted), *with Cumberbatch v. Port Auth. of New York & New Jersey*, No. 03 Civ. 749(BSJ), 2006 WL 3543670, at *2, *9 (S.D.N.Y. Dec. 5, 2006) (finding genuine issues of material fact as to officers' intent to delay treatment as punishment due to evidence that "continued requests for medical attention were met with" an officer's reply that "they wanted him to 'marinate' ").

 **\*16** For similar reasons, the record is inadequate to support the subjective component of Plaintiff's deliberate indifference claims. Even if Plaintiff requested medical treatment as early as being placed in the holding cell after his initial examination, (*see* Docket No. 106-1 at 66:9-13, 67:2-6), there is no evidence upon which a reasonable jury could find that at that time, Ottino and Davis knew or should have been aware that Plaintiff had a serious medical condition that required timely treatment. *See Darnell*, 849 F.3d at 35. To the contrary,

Mobile Medic's initial examination did not reveal any serious medical issues that required immediate transportation to the emergency room. (Docket No. 94-6 at 4). Furthermore, there is no indication that Plaintiff's condition deteriorated until the middle of the interview when Plaintiff repeatedly complained about his eye and it began to bleed – which prompted Davis to obtain further care approximately twenty minutes later. (Docket Nos. 94-6 at 7; 94-8). None of these facts suggest that either officer knew or should have known of the seriousness of Plaintiff's condition earlier in this sequence of events, or specifically intended to delay care. *See Boyd v. Deasis*, 524 F. Supp. 3d 128, 148 (W.D.N.Y. 2021) (dismissing deliberate indifference claim on summary judgment where defendants "called medical shortly after Plaintiff sustained his injury"); *Vines v. McCrystal*, No. 3:18cv1432(MPS), 2020 WL 4818562, at *7–8 (D. Conn. Aug. 19, 2020) (granting summary judgment based on undisputed evidence that defendant knew that plaintiff's injury had been treated earlier that day and that plaintiff had been instructed to seek further treatment that evening).

Accordingly, Defendants' motion for summary judgment regarding Plaintiff's deliberate indifference claims is granted in its entirety.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's excessive force claim against Leon-Martinez, and his failure to intervene claims against Solomon, Lindsay and Davis, survive. The Court dismisses Plaintiff's failure to intervene claim against Ottino, and his deliberate indifference claims against Davis and Ottino. Finally, Plaintiff's claims that Davis, Solomon, Lindsay and Ottino also personally participated in excessive force are dismissed. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. The Clerk is respectfully requested to terminate the pending Motion (Docket No. 93), and mail a copy of this Opinion and Order to the *pro se* Plaintiff.

Attachment

Kennedy v. City of New York, 570 Fed.Appx. 83 (2014)

570 Fed.Appx. 83
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL,
United States Court of Appeals,
Second Circuit.

Michael KENNEDY, Plaintiff–Appellant,

v.

CITY OF NEW YORK, Anthony
Carreira, Police Officer Shield # 20333,
Kulka, P.O., Defendant–Appellees,
Dennis Lane, Sgt. Held, P.O. Shield # 2103,
Cordiner, P.O., P.O. Shield # 13774, Police
Officers John Does # 1–8, names and number
of whom are unknown at present, and other
unidentified members of the New York City
Police Department, Lantarita, Lt., Defendants.

The Clerk of Court is respectfully directed
to amend the official caption in this case to
conform with the caption above.

No. 13–2989–cv.

|

June 24, 2014.

Appeal from the United States District Court for the Eastern
District of New York (Edward R. Korman, Judge).

**Attorneys and Law Firms**

Stuart E. Jacobs, New York, NY, for appellant.

Zachary W. Carter, Corporation Counsel, Pamela Seider
Dolgow, Karl J. Ashanti, Elizabeth S. Natrella, of Counsel,
New York, NY, for appellees.

Present: GUIDO CALABRESI, GERARD E. LYNCH, and
RAYMOND J. LOHIER, JR., Circuit Judges.

**SUMMARY ORDER**

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the order
appealed at the district court is AFFIRMED.

Plaintiff–appellant Michael Kennedy appeals from the district
court's grant of summary judgment in favor of the defendants–
appellees the City of New York and Police Officers Anthony
Carreira and Thomas Kulka ("defendants") on Kennedy's
*84 claims of false arrest and malicious prosecution,
pursuant to 42 U.S.C. §§ 1983 and 1988 and New York State
common law, in connection with his 2008 arrest for alleged
violations of various New York State traffic laws—charges
later dismissed for failure to prosecute Kennedy with a speedy
trial. Kennedy withdrew his claims against the other parties
originally named as defendants, as well as other various state
law claims, and does not challenge the dismissal of those
claims with prejudice. Thus we review the district court's
grant of summary judgment with regard to his constitutional
claims against the above-captioned defendants for false arrest
and malicious prosecution and the pendent state law claim for
malicious prosecution. We assume the parties' familiarity with
the facts and the procedural history, which we describe only
as necessary to explain our decision.

"We review a district court's grant of summary judgment *de
novo,* resolving all ambiguities and drawing all reasonable
inferences against the moving party." *Nivolu Corp. Mgmt.
Servs. Ltd. v. Bloomberg L.P.,* 756 F.3d 73, 80, 2014 WL
2221162, at *4 (2d Cir.2014). We will affirm only if "there
is no genuine dispute as to any material fact and ... the
movant is entitled to judgment as a matter of law." *Id.* quoting
Fed.R.Civ.P. 56(a).

"When an officer observes a traffic offense—however minor
—he has probable cause to stop the driver of the vehicle"
and effect a subsequent arrest for that offense. *United States
v. Scopo,* 19 F.3d 777, 782 (2d Cir.1994). Where it exists,
probable cause "presents a total defense to [a plaintiff's]
actions for false arrest and malicious prosecution [and]

entitle[s the defendants] to judgment as a matter of law."
*Stansbury v. Wertman,* 721 F.3d 84, 89 (2d Cir.2013).

Carreira testified under oath that he initially detained
Kennedy for, among other traffic violations, driving through
a red light without stopping, and then, following the
stop, observed that Kennedy showed signs of intoxication.
At his own deposition, Kennedy testified, upon thorough
questioning by opposing counsel, that he was unable to
remember whether he committed any of the traffic infractions
being pulled over. Kennedy's deposition testimony, which
essentially claims a lack of recollection, is not sufficient to
contradict Carreira's testimony, or to raise a genuine dispute
of fact. Carreira's testimony that Kennedy drove through a red
light thus provides a basis for the initial stop, as well as the
subsequent arrest and prosecution.

On appeal, Kennedy argues that a factual dispute exists
because he submitted an affidavit with his Local Rule 56.1
counterstatement of material facts in which he denied that he
ran a red light, and asserted that he complied with all relevant
traffic laws. However it is well established in this circuit that

a party may not create an issue of fact by submitting an
affidavit in opposition to a summary judgment motion
that, by omission or addition, contradicts the affiant's
previous deposition testimony. "If a party who has been
examined at length on deposition could raise an issue of
fact simply by submitting an affidavit contradicting his own
prior testimony, this would greatly diminish the utility of
summary judgment as a procedure for screening out sham

issues of fact." Thus, factual issues created solely by an
affidavit crafted to oppose a summary judgment motion are
not "genuine" issues for trial.

*Hayes v. N.Y. Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996),
quoting *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d
572, 578 (2d Cir.1969) (internal citations omitted). We have
applied this principle to affirm a grant of summary judgment
*85 against a party who testified in his deposition that he was
unable to remember a particular fact, and then, in response to
a summary judgment motion submitted an affidavit claiming
a recollection of events that would have raised an issue for
trial. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 455 (2d Cir.
1999).

We thus conclude that Kennedy cannot rely on his affidavit
to raise a disputed issue of material fact, where that affidavit
contradicts his earlier deposition testimony. In the absence of
his affidavit there is no dispute that the arresting officer had
probable cause to perform the traffic stop and arrest Kennedy.
The existence of probable cause defeats Kennedy's claims for
false arrest and malicious prosecution.

For the reasons set forth above, the district court properly
granted the defendants' motion for summary judgment. We
have considered Kennedy's other arguments and found them
to be without merit. Accordingly, the judgment of the district
court is AFFIRMED.

**All Citations**

570 Fed.Appx. 83

---

Dotson v. Fischer, 613 Fed.Appx. 35 (2015)

613 Fed.Appx. 35
This case was not selected for
publication in the Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL,
United States Court of Appeals,
Second Circuit.

Tyrone DOTSON, Plaintiff–Appellant,

v.

Brian FISCHER, Commissioner, New York State
Department of Corrections and Community
Supervision, Dr. Carl J. Koenigsmann, Deputy
Commissioner and Chief Medical Officer, New York
State Department of Corrections and Community
Supervision, Dr. Elena Dionis, Regional
Medical Director, New York State Department
of Corrections and Community Supervision,
Dr. Beverly Frazer, Erie County Medical Center,
Dale Artus, Superintendent, Wende Correctional
Facility, New York State Department of Corrections
and Community Supervision, Rosalyn Killinger,
Deputy Superintendent for Health Services, Wende
Correctional Facility, New York State Department
of Corrections and Community Supervision,
Thomas Sticht, Deputy Superintendent for Security
Services, Wende Correctional Facility, New York
State Department of Corrections and Community
Supervision, Dr. Jacqueline Levitt, Facility
Health Services Director, Wende Correctional
Facility, New York State Department of Corrections
and Community Supervision, Defendants.

The Clerk of Court is respectfully
directed to amend the official caption in this case to
conform to the above.

No. 13–4428–pr.

|

June 2, 2015.

**Synopsis**

**Background:** State prisoner filed § 1983 action against
prison officials alleging violations of his First and Eighth
Amendment rights when he was allegedly denied adequate
medical treatment and then retaliated against for making the
complaints. The United States District Court for the Western
District of New York, Arcara, J., dismissed, sua sponte.
Prisoner appealed.

**Holdings:** The Court of Appeals held that:

[1] complaint sufficiently alleged Eighth Amendment
violation based on delay of ear surgery, and

[2] complaint sufficiently alleged Eighth Amendment
violation based on medical malpractice of surgeon.

Vacated and remanded.

Procedural Posture(s): On Appeal

West Headnotes (2)

[1] **Prison** ⬦ Particular Conditions and
Treatment

**Sentencing and Punishment** ⬦ Medical care
and treatment

State prisoner stated claim against prison
medical staff for violation of the Eighth
Amendment based on their deliberate
indifference to his serious medical needs;
complaint alleged that although medical staff
received an urgent recommendation, following
a CAT scan, that prisoner receive surgery to
remove a cyst in his left ear, they rejected it
without cause, knowingly delaying the surgery
for one year, and as a result prolonged his

severe symptoms of vertigo, blinding headaches,
extreme pain in his left ear, and increased hearing
loss. U.S.C.A. Const.Amend. 8.

26 Cases that cite this headnote

[2] **Prison** ⬦ Particular Conditions and
Treatment

**Sentencing and Punishment** ⬦ Medical care
and treatment

State prisoner stated claim against prison doctor
for violation of the Eighth Amendment, based
on deliberate indifference to his serious medical
needs, by alleging her culpable recklessness
in committing malpractice during ear surgery;
complaint alleged that doctor mismanaged
prisoner's first surgery by leaving gauze in his
ear, that after a second surgery by same doctor
he experienced months of vertigo, excessive
bleeding at the incision, and pain in the eyes,
and that when he saw doctor for a follow-up
appointment, she admitted that prisoner now had
a hole in his left ear drum and that she needed to
refer him to someone more qualified. U.S.C.A.
Const.Amend. 8.

12 Cases that cite this headnote

*36 Appeal from a Judgment of the United States District
Court for the Western District of New York (Arcara, J.).
UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
November 5, 2013 judgment of the District Court is
VACATED and the cause is REMANDED for further
proceedings consistent with this order.

**Attorneys and Law Firms**

Bryan J. Wegrzyn (Hent E. Morrison, on the brief),
Buckley/Sandler LLP, New York, N.Y., for Plaintiff–
Appellant.

Andrew Ayers and Kate H. Nepveu, Assistant Solicitors
General, and Barbara D. Underwood, Solicitor General, for
Eric T. Schneiderman, Attorney General of the State of New
York, Albany, N.Y., for the Attorney General of New York as
Amicus Curiae.

PRESENT: ROBERT D. SACK, BARRINGTON D.
PARKER and SUSAN L. CARNEY, Circuit Judges.

**SUMMARY ORDER**

Plaintiff Tyrone Dotson brings claims under 42 U.S.C. §
1983 for alleged violations *37 of his First and Eighth
Amendment rights during his incarceration at the state-run
Wende Correctional Facility in Alden, New York. He alleges
that he was deliberately denied adequate medical treatment by
prison officials and was retaliated against for making related
complaints. Acting *sua sponte,* the District Court dismissed
his *pro se* complaint and amended complaint pursuant to 28
U.S.C. §§ 1915(e)(2) and 1915A(b). We assume the parties'
familiarity with the underlying facts and the procedural
history of the case, to which we refer only as necessary to
explain our decision to vacate and remand. [1]

Because the District Court dismissed the action
before process was served, the defendants failed to
file complaints on ten parties to this appeal and filed
no brief as appellees. At our invitation, however,
the Office of the Attorney General of the State of
New York filed a brief as *amicus curiae* in support
of the position of the state defendants and of one
defendant, Dr. Prince, who was a state contractor.

Dotson challenges the District Court's dismissal of his Eighth
Amendment claims against Drs. Dionis, Koenigsmann, and
Prince, and of his First Amendment claim against Sticht.
Dotson alleges that Drs. Dionis and Koenigsmann, each
of whom had supervisory authority over inmates' medical
care, violated the Eighth Amendment by denying an urgent
recommendation that he receive surgery to remove a cyst in
his left ear delaying the surgery for one year and prolonging
his severe symptoms. He asserts that Dr. Prince provided
unconstitutionally inadequate medical care in connection with
the surgery that she performed on his left ear. Finally, he
claims that Sticht, the Deputy Superintendent for Security,
violated the First Amendment by imposing on Dotson
disciplinary confinement in retaliation for
Dotson's repeated filing of grievances. Sticht explained his
decision, saying, by charging in a "medical keeplock"
permit a "keeft-in-cell" permit that Dotson was issued for
medical reasons.

The District Court (Judge Larimer) reviewed Dotson's
initial complaint as required by 28 U.S.C. §§ 1915(e)(2)(B)

Dotson v. Fischer, 613 Fed.Appx. 35 (2015)

and 1915A, which apply to actions brought by prisoners proceeding *in forma pauperis* and provide for dismissal of a complaint that is frivolous, malicious, or fails to state a claim on which relief may be granted. *See Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). In May 2013, the court dismissed with prejudice the Eighth Amendment count against Dr. Prince for failure to state a claim. It further dismissed without prejudice the claims against Drs. Dionne and Koenigsmann under the Eighth Amendment and against Stickt under the First Amendment, permitting Dotson to file an amended complaint as to these defendants. Dotson did so, supplementing his original allegations.

On November 5, 2013, the District Court (by then, Judge Arcara) determined—also under §§ 1915(e)(2) and 1915A—that the amended complaint, too, failed to state a claim to relief as to the remaining defendants and entered judgment dismissing the action with prejudice. Dotson timely appealed, and our Court granted Dotson's motions for leave to proceed *in forma pauperis* on appeal and for appointment of counsel.[2]

2  Pro bono counsel Bryan J. Wegrzyn and Ross E. Morrison of Buckley Sandler have performed ably in this matter, and the Court appreciates their service, which it hopes can continue on remand. If counsel is disinclined, however, to continue its representation in further proceedings, the District Court should appoint new counsel.

**38** Now ably counseled, Dotson argues on appeal that the District Court erred in dismissing his constitutional claims against Stickt and Drs. Dionne, Koenigsmann, and Prince. We review *de novo* a District Court's *sua sponte* dismissal of a complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A. *See Giano v. Goord,* 250 F.3d 146, 149–150 (2d Cir.2001); *see also Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam). To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We afford a *pro se* litigant "special solicitude" by interpreting a complaint filed *pro se* "to raise the strongest claims that it suggests." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011) (internal alterations and quotation marks omitted).

[1]  Upon considered review, we conclude that the District Court erred by dismissing Dotson's Eighth Amendment claims that Drs. Dionne and Koenigsmann unconstitutionally denied him medical care. A prisoner pressing such a claim must cogently allege that the defendant acted with deliberate indifference to his serious medical needs. *See Hilton v. Wright,* 673 F.3d 120, 127 (2d Cir.2012) (per curiam). A "serious medical need" exists when, objectively, "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (internal quotation marks omitted). "Deliberate indifference" requires allegations of the defendants' subjective state of mind: that the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (internal quotation marks omitted).

The amended complaint plausibly alleges a serious medical need. Dotson alleges that a CAT scan revealed a cyst in his kidney, and that Nurse Practitioner Jennifer Wrest recommended surgery and requested an "urgent" level of attention. App. 41. Over the year following that "urgent" recommendation, while the recommended surgery was delayed, Dotson complained on numerous occasions of "vertigo, blinding headaches, extreme pain in his left ear, and increased hearing loss." *Id.* at 41–42. When the cyst was finally removed, one year later, it was of "significant size." *Id.* at 42. Such allegations of a "condition of urgency" that "may produce ... extreme pain" satisfy the objective prong of the analysis. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted).

The amended complaint also plausibly alleges that Drs. Dionne and Koenigsmann acted with sufficiently culpable states of mind to support liability. To satisfy this prong of the deliberate indifference test, a plaintiff must allege only that the defendant was "aware of facts" from which one could infer that "a substantial risk of serious harm" existed, and that the defendant actually drew the inference. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hilton,* 673 F.3d at 127. Here, Dotson asserts that Drs. Dionne and Koenigsmann reviewed Wrest's evaluation and recommendation that his condition demanded "urgent" care and rejected it, apparently without causing him to be examined again in person or taking any further step. As noted, their denials are alleged to have delayed Dotson's surgery for one year and **39** resulted in the continuation of severe symptoms. Allegations of delayed medical care may support a finding of deliberate indifference to a serious

medical need, *see, e.g., Hathaway v. Coughlin,* 841 F.2d 48, 50–51 (2d Cir.1988), and allegations that delayed treatment resulted in serious harm may bear on the reasonableness of an inference of a defendant's knowledge of the risks to which he or she subjected the plaintiff, *see Hilton,* 673 F.3d at 127. We believe Dotson's allegations suffice at this early stage of the litigation to state a plausible claim to relief.

[2]  We similarly conclude that the District Court erred by dismissing Dotson's Eighth Amendment claim against Dr. Prince for her affirmative acts. Although mere allegations of medical malpractice are generally insufficient to support liability, *see Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), allegations regarding the provision of medical care may be actionable under the Eighth Amendment when the alleged malpractice involves culpable recklessness, that is, "an act ... by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Hill,* 657 F.3d at 123 (internal alterations and quotation marks omitted). Here, Dotson alleges that Dr. Prince mismanaged his first surgery by leaving gauze in his ear, that after a second surgery by Dr. Prince, he experienced months of vertigo, "excessive bleeding at the incision, and pain in the eyes," App. 14; and that when he saw Dr. Prince for a follow-up appointment, she admitted that Dotson "now h[ad] a hole in his left ear drum" and that she needed to refer him to someone "more qualified," App. 15. Construing Dotson's *pro se* pleadings, as we must, to raise the strongest arguments they suggest, we rule that Dotson's allegations permit a reasonable inference that Dr. Prince's malpractice rose to a level of culpable recklessness and suffice to state an Eighth Amendment claim.

Finally, we conclude that the District Court improperly dismissed Dotson's First Amendment retaliation claim against Stickt. To state such a claim, an inmate must allege that he engaged in protected conduct and that his conduct was a "substantial or motivating factor" for an adverse action taken by a prison official. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir.2014) (internal quotation marks omitted). "[T]emporal proximity of an allegedly retaliatory medication report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)). Although Dotson's pleadings on this matter are not a model of clarity, they suggest sufficient temporal proximity between Dotson's complaints of inadequate medical care and Stickt's decision placing Dotson in keeplock to support Dotson's retaliation claim at this pleading stage. With the assistance of counsel, Dotson may replead this claim if he so chooses, and the District Court can then reassess its viability.

* * *

We therefore VACATE the judgment of the District Court and REMAND the cause for further proceedings consistent with this order.[3]

3  Our vacatur and remand are without prejudice to any motion to dismiss the complaint that defendants may file after they have been served with the amended complaint. We also leave open the possibility that, represented by counsel, Dotson may propose an additional amended complaint appending any relevant medical documents that he has procured.

**All Citations**

613 Fed.Appx. 35

Demosthene v. City of New York, 831 Fed.Appx. 530 (2020)

831 Fed.Appx. 530

This case was not selected for publication in West's Federal Appendix. RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL. United States Court of Appeals, Second Circuit.

Kreutcher DEMOSTHENE, Plaintiff-Appellant,
v.
CITY OF NEW YORK, Dora B. Schriro, Detective John Roberts, P.O.s John and Jane Does 1-10, Defendants-Appellees.

19-90002
|
October 9, 2020

**Synopsis**
**Background:** Arrestee brought action against municipality, police commissioner and police officer, alleging false arrest, false imprisonment, malicious prosecution, denial of his due process right to fair trial, fabrication of evidence, and excessive force. The United States District Court for the Eastern District of New York, Sterling Johnson, Senior District Judge, 2019 WL 1992868, granted summary judgment to municipality and its personnel after adopting the report and recommendation of Vera M. Scanlon, United States Magistrate Judge, 2018 WL 10072931. Arrestee appealed.

**Holdings:** The Court of Appeals held that:

[1]  police officer had probable cause to arrest arrestee for robbery;

[2]  arrestee's speculation that police officer who arrested him punched him twice while transporting him to police

department precinct was not sufficient to raise genuine issue of material fact on excessive force claim;

[3]  arrestee's speculation that police officer who arrested him clocked him when line-up was conducted was not sufficient to raise genuine issue of material fact on excessive force claim;

[4]  district court's decision to not grant requests for further extensions of time with respect to discovery deadline was well within range of permissible decisions and did not constitute abuse of discretion; and

[5]  arrestee waived further judicial review of findings contained in report and recommendation.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (7)

[1]  **Arrest**  ⟶  Identification or description of offender or vehicle
Police officer had probable cause to arrest arrestee for robbery, where telephone number provided by robber to victim in arranging sale of cell phone was linked to account associated with arrestee's date of birth and address, arrestee fit general physical description that was victim provided to police department immediately after robbery took place, and victim identified arrestee from photo array. U.S. Const. Amend. 4.

1 Cases that cite this headnote

[2]  **Federal Civil Procedure**  ⟶  Civil rights cases in general
Arrestee's speculation that police officer who arrested him punched him twice while transporting him to police department precinct was not sufficient to raise genuine issue of material fact on excessive force claim against him for robbery arising from transport, although only two officers were involved in arresting officer was in vehicle, U.S. Const. Amend. 4; Fed. R. Civ. P. 56(a).

[3]  **Federal Civil Procedure**  ⟶  Civil rights cases in general
Arrestee's speculation that police officer who arrested him clocked him when line-up was conducted was not sufficient to raise genuine issue of material fact on excessive force claim against city based on theory that he was present when the line-up was conducted and officer who allegedly clocked him was Black, and officer was Caucasian. U.S. Const. Amend. 4; Fed. R. Civ. P. 56.

1 Cases that cite this headnote

[4]  **Federal Civil Procedure**  ⟶  Time for motion
District court's decision to not grant requests for further extensions of time with respect to discovery deadline before allowing summary judgment motion to be filed was well within range of permissible decisions and did not constitute abuse of discretion, in arrestee's action against municipality, police commissioner, and police officer alleging false arrest, where arrestee received numerous extensions of that deadline over two-year period and still failed to complete such discovery.

1 Cases that cite this headnote

[5]  **United States Magistrate Judges**  ⟶  Time for objecting; extension
**United States Magistrate Judges**  ⟶  Waiver of right to review in general
Arrestee waived further judicial review of findings contained in report and recommendation by not objecting in timely fashion after receiving notice that failure to do so would constitute waiver, in arrestee's action against municipality, police commissioner, and police officer alleging false arrest. U.S. Const. Amend. 4.

**531**  Appeal from a judgment and various orders entered by the United States District Court for the Eastern District of New York, granting summary judgment to defendants on all claims, denying plaintiff's request to amend the complaint, and denying various requests for extensions of time and other relief (Johnson, Jr., J.).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment and orders of the district court are AFFIRMED.

**Attorneys and Law Firms**

For Plaintiff-Appellant: UGOCHUKWU UZOH, Upo Uzoh, P.C., Brooklyn, New York.

For Defendants-Appellees: TAHIRIH M. SADRIEH (Aaron M. Bloom, on the brief), for James E. Johnson, Corporation Counsel of the City of New York, New York, New York.

PRESENT: JON O. NEWMAN, RICHARD C. WESLEY, JOSEPH F. BIANCO, Circuit Judges.

**SUMMARY ORDER**

Plaintiff-Appellant Kreutcher Demosthene appeals from the judgment and decision by the district court granting summary judgment to defendants on all claims, denying his request to amend the complaint to include additional defendants, and denying various requests for extensions of time and other relief. In his complaint, Demosthene asserted claims for violation of his civil rights under 42 U.S.C. § 1983 against the City of New York (the "City"), Commissioner Dora Schriro, Detective John Roberts, and several other employees of the City (collectively, "defendants"), including claims for, among other things, false arrest/imprisonment, malicious prosecution, denial of his due process right to a fair trial, fabrication of evidence, and excessive force. Demosthene also asserted a conspiracy claim under 42 U.S.C. § 1985 and various state law claims. The underlying arrest and prosecution of Demosthene were for robbery of a cell phone. **532** At gunpoint, but the charges were ultimately dismissed.

This appeal centers primarily on two rulings by the district court. First, on August 28, 2015, the district court adopted the magistrate judge's Report and Recommendation, dated June 26, 2015 (the "2015 R&R"), granting in part and denying in part Demosthene's motion to amend. Second, on August 16, 2019, the district court adopted the Report and

Demosthene v. City of New York, 831 Fed.Appx. 530 (2020)

Reconsideration, dated July 20, 2018, granting summary judgment to defendants on all federal claims and declining to exercise supplemental jurisdiction over the remaining state law claims. In addition, Demosthene appeals various other orders issued by the district court relating to these motions, including: (1) the Order, dated August 26, 2015, denying his request for additional time to file objections to the 2015 R&R; (2) the Orders, dated September 9 and 11, 2015, denying his request for reconsideration of the partial denial of his motion to amend and denial of his extension of time to file objections; and (3) the Orders, dated September 19, 2017, denying his requests for reconsideration of the district court's decisions to deny a further extension of the discovery deadline and to allow defendants to move forward on their summary judgment motion.

We assume the parties' familiarity with the underlying facts and procedural history, which we reference only as necessary to explain our decision to affirm. We will address the summary judgment decision first and then analyze the various challenges to the other orders issued by the district court.

### I. Summary Judgment

This Court reviews a grant of summary judgment *de novo* ...

### A. False Arrest and Malicious Prosecution Claims

Demosthene argues that the district court erred in concluding that their was probable cause for his arrest and prosecution, and that his false arrest and malicious prosecution claims should have survived summary judgment. We disagree.

...

### B. Excessive Force Claims

...

### II. Other Rulings by the District Court

...

AFFIRMED.

**All Citations**

831 Fed.Appx. 530

Fleming v. Costco Wholesale Corporation, Slip Copy (2020)
2020 WL 2494907

2020 WL 2494907
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Cleera FLEMING, Plaintiff,
v.
COSTCO WHOLESALE
CORPORATION, Defendant.

17-CV-2856 (AMD) (PK)
|
Signed 05/12/2020

**Attorneys and Law Firms**

Steven Wildstein, Great Neck, NY, for Plaintiff.

Robert Joseph Walker, Brian B. Kenney, Gallagher, Walker, Bianco & Plastaras, LLP, Mineola, NY; Sena Michael Costigan, Brand, Glick & Brand, P.C., Garden City, NY, for Defendant.

**MEMORANDUM DECISION AND ORDER**

ANN M. DONNELLY, United States District Judge:

*1 On December 29, 2016, the plaintiff filed a complaint in the New York Supreme Court, alleging that the defendant's negligence caused her to slip and fall in a Brooklyn Costco store. (ECF No. 1 at 7-8.) The defendant removed the action to federal court on May 11, 2017 (ECF No. 1 at 1-4), and moved for summary judgment on December 18, 2019 (ECF No. 11). The plaintiff opposes the motion for summary judgment (ECF No. 36.). For the reasons that follow, the defendant's motion is granted in part and denied in part.

**BACKGROUND**[1]

In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the plaintiff, the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Sulaiman v. Our Lady of Victory Hosp.*, 814 F.3d 237, 226 (2d Cir. 2008).

On March 7, 2016, the plaintiff went to the Brooklyn Costco Warehouse with her niece, Miranda Richardson. (ECF No. 30, Def. Rule No. 1 Statement ("Def. 56.1") ¶¶ 1-3.)[2] Shortly after she entered the store, the plaintiff noticed a round piece of red cake, approximately four to five inches in diameter, on the floor near the bread and produce displays. (*Id.* ¶¶ 7, 8; ECF No. 37-8, Richardson Dep. 17:6-11.) The plaintiff told a Costco employee about the cake, and he replied that he or another employee would take care of it. (ECF No. 33-4, Pl. Dep. 37:23-38:5; Richardson Dep. 19:20-21:12.) The plaintiff and her niece continued shopping in other parts of the store. (Richardson Dep. 10:5-11:19.)

Unless otherwise noted, the factual background is based on my review of the entire record, including the parties' 56.1 statements, which are not especially detailed. On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible as evidence at trial. *Local Union 20 v. United Bhd. of Carpenters and Joiners of Am.*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003.) Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I disregard any arguments in the Rule 56.1 statements. *Pope v. Davidson & Sokolenow Inc.*, No. 16-CV-5777, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. May 31, 2019.)

Approximately ninety minutes later, the plaintiff and her niece returned to the bread and produce section so that the plaintiff could get some honey wheat bread. (*Id.* 11:18-24.) When she did not find the bread, she walked back to her niece, but slipped and fell on her side. (Pl. Dep. 43:8-12, 61-62; Def. 56.1 ¶ 9.) A shopper and a Costco employee froze the bakery section. Veronica Johnson, helped the plaintiff up; the shopper escorted the plaintiff downstairs to the manager's office, where the plaintiff filled out an incident report in which she described her accident as follows: "I slipped on something on the floor and fell on my side (right)." (ECF No. 33-9, Pl. Dep. 62:7-68:16, 75:5-22.)

*2 Pursuant to store policy, Costco employees conduct "floor walks" on an hourly basis. (ECF No. 33-5, Ramgulam Dep. 12:5-14, ECF No. 33-7, Johnson Dep. 27:13-28:21.) During a floor walk, a Costco employee walks throughout the store to clear debris from the aisles and monitor the freezer temperatures. (Johnson Dep. 27:16-23.) The employee records the results from the walk on a "Daily, Floorwalk/Safety Inspection" worksheet, which is then signed by a manager. (Ramgulam Dep. 19.) Alex Ramgulam did a floor walk from 7:06 p.m. to 7:46 p.m. on the night of the plaintiff's fall. (ECF No. 33-11; Ramgulam Dep. 24:16-26:6.) He did not note any dangerous conditions on the worksheet. (ECF No. 33-11.)

The parties dispute what caused the plaintiff's fall. According to Ms. Johnson, something that looked like the top of a strawberry or a partially eaten strawberry was on the floor near where the plaintiff was lying.

Q: So describe the strawberry top that you saw after the woman got up off of the floor.

A: It looked exactly like a bitten strawberry. Like if you take a bite out of the strawberry, what was left, is what was on the floor.

Q: Was the green little stem left intact on top of the strawberry?

A: Yes

(Johnson Dep. 17:15-24.)

Ms. Johnson photographed the strawberry after the plaintiff got up. (*Id.* 19:13-16; ECF No. 33-10.)

The plaintiff, on the other hand, attributes the fall to the piece of red cake. At her deposition, she conceded that she did not look at the floor after she slipped.

Q: [A]t any time before you left to go downstairs to the cashier, did you look at that area where you slipped?

A: No.

Q: Can you tell me anything about what it looked like in that area that day after your accident before you went downstairs?

A: I didn't look back there.

Q: So you have no observations?

A: No observations.

(Pl. Dep. 83:3-14.) Nevertheless, she saw bits of cake on her shoes and clothes after she fell.

Q: What was on your shoes after the accident?

A: The red cake.

Q: Was there any material in place else on your body other than your right shoe ... between your ankle and your knee?

A: Between my ankle and my knee.

Q: What did you see there?

A: It looked like pieces of cake.

(*Id.* 46:23-25, 83:14-84:14.) According to the plaintiff's niece, Miranda Richardson, the plaintiff fell on "something red ... I'm just assuming it probably was a cake, I don't know." (Richardson Dep. 16:5-13; *see also Id.* 45:8-11 ("It looks like red, so I just said, I just know' if it's cake or something, but it looks red, exactly the same thing that when we come in, what was on the floor.").)

The plaintiff and Ms. Richardson testified at her depositions that everal either their depositions, in support of the plaintiff's opposition to summary judgment. In the plaintiff's affidavit, she states that she slipped on "pieces of cake, possibly carrot cake or red velvet cake, and maybe some pieces of red frosting or cake decoration on wall." (ECF No. 36-1 ¶ 4.) In addition, she states that Johnson's photograph shows "at least 2 of the pieces of the red cake that were on the floor before and at the time of my accident" although "some of the substance could up on my clothing after I fell in it and was struggling to get off the floor." (*Id.* ¶¶ 10, 16.)

Although Ms. Richardson testified at her deposition that the plaintiff fell on "something red" which she "just assume[d] was a cake," she states in her affidavit that she is "certain" that her seat slipped on "the same substance that coated on the floor at the time [the plaintiff] complained to the store employee" about the red cake. (ECF No. 36-2 ¶ 6.) Ms. Richardson states further that her seat was on the floor and that no substance on the floor that looked like pieces of cake and a partial piece of strawberry." (*Id.* ¶ 4.)

---

*3 In addition to the affidavits, the plaintiff made substantive changes to her deposition transcript and submitted a "correction" sheet in connection with her brief. The plaintiff's

| Original (ECF No. 33-4) | Correction (ECF No. 37-2) |
|---|---|
| Q: Is this four to five inch piece of cake that you saw an hour and a half before what you claim you stepped on? | Q: Is this four to five inch piece of cake that you saw an hour and a half before what you claim you stepped on? |
| A: Apparently that's the same thing. | A: Apparently that's the same thing. |
| Q: When you say apparently, do you know for a fact? | Q: When you say apparently, do you know for a fact? |
| A: Well, it was in the same area I fell down. | A: Yes. |
| (41:9-17) | (41:9-17) |
| Q: At any time before you got up, did you look at that area three feet away from where you slipped? | Q: At any time before you got up, did you look at that area three feet away from where you slipped? |
| A: No. | A: Yes. |
| Q: At any time after you got up, did you look at that area that had been three feet away from where you slipped? | Q: At any time after you got up, did you look at that area that had been three feet away from where you slipped? |
| A: Did I look there? I only paid attention – I can't remember if I looked there. | A: Yes. |
| (80:13-22) | (80:13-22) |
| Q: I just want to know about the area where you slipped – at any time before you left to go downstairs to the cashier, did you look at that area where you slipped? | Q: I just want to know about the area where you slipped – at any time before you left to go downstairs to the cashier, did you look at that area where you slipped? |
| A: No. | A: Yes. |
| Q: Can you tell me anything about what it looked like in that area that day after your accident before you went downstairs? | Q: Can you tell me anything about what it looked like in that area that day after your accident before you went downstairs? |
| A: I didn't look back there. | A: Red Cake. |
| (81:2-12.) | (81:2-12.) |

**LEGAL STANDARD**

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits or other documentation show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted).

A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x. 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. * Sibbelsmith v. Choice Sec. Co.*, 91 F. Supp. 3d 539, 549 (E.D.N.Y 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

inadmissible hearsay because the plaintiff could not identify the Costco employee to whom she spoke. (ECF No. 37 at 3.) The defendant would not stipulate to facts the evidence from which it intends to challenge on summary judgment. In any event, the plaintiff's statements that she told an employee about the cake are not hearsay.

*4 The plaintiff's correction sheet is unusual, to say the least. She made substantive changes to her testimony that bear on central issues of the case, going so far as to change answers from "no" to "yes." For example, the plaintiff testified at least five separate times during her deposition that she did not look back at the spot on the floor where she slipped and fell. In the correction sheet, however, the plaintiff changes each response, and asserts that she did in fact look back at the floor where she fell. And she altered her response to this question: "Can you tell me anything about what it looked like in that area that day after your accident before you went downstairs?" from her original answer—"I didn't look back there"—to "Red Cake" in the correction sheet. The form correction sheet, which the plaintiff submitted with her corrections, includes a column entitled "Reason for change;" the plaintiff wrote "correction" as the reason for each change. (*See* ECF No. 37-2.)

Under Rule 30(e), a witness is permitted to review the transcript of her deposition and make changes "in form or substance" and must include the reason for making those changes. Fed. R. Civ. P. 30(e)(1)(B). A judge in another jurisdiction might very well consider striking the plaintiff's correction sheet and imposing sanctions. *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) ("The Rule cannot be interpreted to allow one to answer but was said under oath ... A deposition is not a take home examination.") In the Second Circuit, however, courts "construe Rule 30(e) broadly, permitting any changes to the deposition to be considered as part of the record, even where they contradict the original answers." *Samuel Brass, Inc. v. Beharie Rag Co., Inc.*, No. 09-CV-5844, 2012 WL 43633, at *8 (S.D.N.Y. Jan. 9, 2012) (collecting cases); *see also Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) ("A deponent involved in this privilege must sign a statement noting such changes and the reasons given for making them, but the language of the Rule places no limitations on the type of changes that may be made nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes, even if those reasons are concern-icing.") (citations, alterations and internal quotation marks omitted).

**DISCUSSION**

To establish a *prima facie* case of negligence under New York law, "a plaintiff must demonstrate: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Lerner v. Fleet Corp.*, 44 F. Supp. 3d 515, 518 (E.D.N.Y. 2014) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981) (citations omitted)). "In order to show a breach of a duty of care in a slip-and-fall case," *id.*, the plaintiff must demonstrate a genuine issue of material fact "that the defendant created the condition which caused the accident or that the defendant had actual or constructive notice of the condition." *Pinkey v. Waldbaum, Inc.*, 69 A.D.3d 502, 903 (2d Dep't 2010) (citations omitted). To establish constructive notice, "a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Id.* (citations omitted).

**I. Actual Notice**

It is undisputed that the defendant had actual notice that there was red cake on the floor. (Def. 56.1 ¶ 7.)[1] The plaintiff argues that she has raised a question of fact as to whether the red cake caused her fall. (ECF No. 36.) The defendant counters that there is no legitimate evidence that the red cake caused the plaintiff's fall, and moves to strike the plaintiff's deposition correction sheet and post deposition affidavits. (ECF No. 37.)

Certainly, the defendant included this fact in its stipulation of undisputed facts, but then argued in its brief that the evidence supporting the fact is

Fleming v. Costco Wholesale Corporation, Slip Copy (2020)
2020 WL 2494907

Bule v. City of New York, Not Reported in F.Supp.3d (2015)
2015 WL 6620230

**CONCLUSION**

**SO ORDERED**

All Citations

Slip Copy, 2020 WL 2494907

**MEMORANDUM & ORDER**

DEARIE, District Judge.

**II. Constructive Notice**

Rolle v. City of New York, Not Reported in F.Supp.3d (2015)
2015 WL 6620230.

holding her up and escorting her to the police van. *Pl.'s Aff.* Ex. 2 at ¶ 23.

This conflicts with plaintiff's testimony, in which she stated only that the white officer assisted Zambrano. *Seek Decl.* Ex. P at 89:18–20; *Pl.'s Aff.* Ex. 8 at 278:13–24.

Plaintiff denies that there were any drops or weapons in the residence at the time of her arrest. *Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1*, ECF No. 80–22, at ¶¶ 49, 50. She concedes that her doctor did not find any bruises but insists that she felt and still feels muscle pain in the areas strained by her arrest. *Id.* at ¶ 128; *Pl.'s Aff.* Ex. 2 at ¶¶ 44–45.

### PROCEDURAL HISTORY

The amended complaint pleads six claims against the City and the three detectives for constitutional violations arising out of plaintiff's arrest: (1) a federal and state false arrest claim; (2) a federal unlawful search claim; (3) a federal excessive force claim; (4) a federal failure to intervene claim; and (5) a federal denial of fair trial claim. [6] ECF No. 52. Despite the extensive factual disputes, defendants move for summary judgment on all of plaintiff's claims on the grounds that the detectives had probable cause to arrest her and did not use force. Alternatively, defendants argue that the detectives are entitled to qualified immunity. Defendants also assume plaintiff is submitting a "sham affidavit."

The amended complaint also pleads a *Monell* claim against the City, but plaintiff conceded in her opposition papers that she did not present sufficient evidence to support this claim.

### DISCUSSION

Summary judgment is appropriate where "the evidence, viewed in the light most favorable to the party against whom it was entered, demonstrates that there are no genuine issues of material fact and that the judgment is warranted as a matter of law." *Gibson v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir.2014) (internal quotation marks and citation omitted); *see also* Fed.R.Civ.P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is 'genuine' if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir.2012) (internal quotation marks, alteration, and citation omitted).

#### A. Sham Affidavit

As an initial matter, defendants accuse plaintiff of submitting a sham affidavit in order to survive their summary judgment motion. It is well settled in this Circuit "that '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his [or] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for resolving the sharp issues of fact.' " *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir.2000) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). However, this so-called "sham affidavit" principle does not apply where the affidavit (1) "addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition," or (2) is corroborated by other evidence. *Id.* (collecting cases).

*4 Many of the so-called "contradictions" between plaintiff's affidavit and her testimony go more to the reliability of plaintiff as a witness than to the genuineness of any material factual dispute. For example, while defendants are correct that plaintiff was previously unable to identify any of the officers involved in her arrest, she did provide affirmatives for the officers that match those of the defendants. Furthermore, although plaintiff's affidavit adds a fair amount of color to her claims, this detail was hardly necessary to create a genuine issue of material fact on plaintiff's surviving claims.

One of the inconsistencies between plaintiff's deposition testimony and her affidavit is more substantial. Plaintiff's affidavit states for the first time that McDowell physically participated in her arrest. This addition is notable, especially given the prior extent to which plaintiff was deposed on her arrest and the participant therein. But defendants, themselves, provided corroborating evidence admitting that McDowell was at least present for the arrest.

Both Crisco and McDowell testified that the two of them were in the hallway for at least part of plaintiff's arrest and that they saw plaintiff fall to the ground during her arrest.

On balance, after reviewing plaintiff's deposition—during which she clearly struggled but nonetheless managed to set forth the basic facts of her surviving claims—the Court readily concludes that while the affidavit may undermine her

credibility before the jury, it is of no real consequence to the Court's determination of the motion.

#### B. False Arrest

To prevail on her claims for false arrest under federal and state law, plaintiff must show, *inter alia*, that defendants intentionally arrested her without justification. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996). Defendants maintain that the arrest was justified.

First, defendants argue that seizure of the home and its occupants was reasonable. To determine the reasonableness of the seizure of a residence prior to obtaining a search warrant, courts must balance the following four factors: "(1) whether the police had probable cause to believe that the home contained evidence of crime or contraband; (2) whether the police had good reason to fear that, absent restraint, evidence would be destroyed before they could return with a warrant; (3) whether the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether the "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Cuesta v. New York City*, 25 F.Supp.3d 400, 411 (S.D.N.Y.2014) (quoting *Illinois v. McArthur*, 531 U.S. 326, 331–33, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)).

Defendants claim that the officers had probable cause to believe that plaintiff's home contained evidence of her crack drug sale, which may have been destroyed if the home's occupants had been permitted "to remain inside ... unobserved while aware of the law enforcement investigation." *See Id.* at 411–13 (finding reasonable the seizure of apartment of a suspect's girlfriend where suspect, who sold crack cocaine to undercover police officers, told officers he was staying at the apartment and officers suspected he may be keeping drugs there). This line of argument is developed from *Illinois v. McArthur* in which the Supreme Court held that the seizure of a suspect's entire home was not unreasonable where police officers had been told by the suspect's wife that he had hidden marijuana in his home. 531 U.S. at 331–32.

*5 However, though both *McArthur* and *Cuesta* justify the temporary seizure of plaintiff's home under the facts defendants describe, neither supports the forcible arrest and overnight jailing of a homeowner returning to the premises before the officers had obtained their search warrant. *See McArthur*, 531 U.S. at 332 (noting that "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy" by not entering the

suspect before obtaining a warrant and instead "imposs[ing] a significantly less restrictive restraint," of merely "preventing [the suspect] ... from entering [his] trailer unaccompanied") (emphasis added); *Cuesta*, 25 F.Supp.3d at 411 (reasoning that the court was not required to consider the personal privacy interests of the apartment's occupants because they were not parties to the action); *see also United States v. Watson*, 703 F.3d 684, 693–94 (6th Cir.2013) (finding unreasonable the three hour detention of criminal defendant in building open to the public while officers sought a search warrant, where officers had observed a drug transaction near the building but had no information linking defendant to the criminal activity).

*Brickell v. Clinton*, 206 F.Supp.2d 733, 736–38 (D.Md.2002) (finding reasonable the five hour seizure of a home owned by a drug suspect's mother while officers sought a warrant, but noting that the woman had been free to leave the house and use the phone). In fact, "each of the reasons justifying the police conduct in *McArthur* is either absent here or weighs against a conclusion that the officers reasonably seized and detained [plaintiff]." *Watson*, 703 F.3d at 692. The warrant in *McArthur* "was different in both character and duration" than the forcible arrest of the sixty-one-year-old mother of a drug suspect in this case and was based on a stronger "connection between the [plaintiff] and the contraband that was the subject of the search warrant application." *Id.*

As an alternative, defendants argue that they had probable cause to arrest plaintiff. "Probable cause is determined on the basis of facts 'known to the arresting officer at the time of the arrest.' " *Weaver v. City of New York*, — F.3d —, 2019 WL 6214708, at *4 (2d Cir.2019) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)), judged against the "totality of the circumstances," *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir.2015) (internal quotation marks and citation omitted). "Probable cause exists when law enforcement officials 'have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.' " *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir.2014) (internal quotation marks and citation omitted). The information required "need not reach the level of evidence necessary to support a conviction ... but it must constitute more than rumor, suspicion, or even a strong reason to suspect." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983) (internal quotation marks and citation omitted).

*6 Defendants argue that they had probable cause to arrest plaintiff for (1) constructive possession of the visible drugs

in the home, because plaintiff claimed ownership of the home when she asked the officers what they were doing in her house, or (2) obstructing governmental administration, because plaintiff restrained the home after being given clear instructions to stay outside. However, genuine issues of material fact preclude the Court from determining as a matter of law that probable cause existed.

Defendants argue plaintiff has no basis to deny that the officers found drugs in her home while she was out. However, plaintiff was arrested before the search warrant was procured and at the same time as the officers who had arrested her son and grandson returned from upstairs. Thus, the only drugs in the home known to her arresting officers by the time of plaintiff's arrest would have been openly visible to plaintiff, as well as the officers.

Nonetheless, plaintiff's state law false arrest claim against the City must be dismissed for plaintiff's failure to attend the hearing required by New York General Municipal Law § 50(h). [8] Plaintiff claims that she never received notice of the hearing because it went to her previous attorney. However, the record does not show any attempt by plaintiff's now attorney to arrange a 50(h) hearing. "Although the Second Circuit has not definitively decided the issue, courts have placed the burden on the plaintiff to resolve any discrepancies regarding the rescheduling of a [50(h) hearing] in accordance with the Second Circuit's directive to continue [state] [statute of [statute requirements 'strictly.' " *Gilliard v. N.Y.C. Health & Hosps. Corp.*, No. 10–CV–5347 (NGG) (CLP), 2013 WL 521929, at *15 n. 19 (E.D.N.Y.Feb. 11, 2013); *see also* N.Y. Gen. Mun. L. § 50(h).

Accordingly, the Court denies defendants' motion for summary judgment on plaintiff's federal and state false arrest

claims, except that the Court dismisses plaintiff's state law false arrest claim against the City for failure to attend the requisite 50(h) hearing.

#### C. Unlawful Search

Defendants argue that any search of plaintiff's person was proper as a search incident to her lawful arrest. Because there are disputes of fact as to whether defendants had probable cause to arrest plaintiff, this argument fails. Therefore, the Court denies defendants' summary judgment motion on plaintiff's unlawful search claim as to any search of plaintiff's person.

As for any search of plaintiff's house, plaintiff has provided no evidence—and cannot testify from personal knowledge—to refute defendants' claims that her elder son had engaged in a drug transaction with an undercover officer somewhere on her street and that the officers suspected there may be more drugs in the residence. [9] Even assuming, as plaintiff claims, that the officers could not see plaintiff's neighbor or any drugs through the front door, the nearby drug transaction involving plaintiff's son is could be sufficient under *McArthur* and *Cuesta* to justify a temporary seizure of the residence while the N.Y.P.D. sought a search warrant. 531 U.S. at 331-32; 25 F.Supp.3d at 411–13. And the record contains no evidence that defendants searched plaintiff's house before the warrant had been signed. But the issue of the warrant was unreasonably long, or that the warrant was unnecessarily deficient. *See Cuesta*, 25 F.Supp.3d at 411–13 (finding reasonable the five hour seizure of apartment of drug suspect's girlfriend). Furthermore, other than plaintiff's bold allegation to one sentence of her affidavit, the record contains no evidence that the search of plaintiff's home resulted in damage to her property.

Notably, the record contains no testimony from plaintiff's son or grandson. And plaintiff's elder son pled guilty to a misdemeanor drug possession charge.

*7 Accordingly, the Court grants defendants' motion for summary judgment on plaintiff's unlawful search claim as to the search of plaintiff's home.

#### D. Excessive Force

Excessive force claims stemming from an arrest invoke the Fourth Amendment's protection against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct.

1865, 104 L.Ed.2d 443 (1989). "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir.2004) (quoting *Graham*, 490 U.S. at 397). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake," including consideration of the following three factors: (1) the "severity of the crime," (2) "whether the suspect poses an immediate threat to the safety of the officer or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir.2015) (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396).

Because "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates ... the Fourth Amendment," courts are instructed to evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). However, "[d]efendants are liable as long as the force used exceeded the force needed for the factual circumstances and the fact that [a] [p]laintiff was not here sustained serious long lasting harm is not dispositive." *Usavage v. City of New York*, 932 F.Supp.2d 619, 618 (E.D.N.Y.2013) (collecting cases).

Defendants generally contend that plaintiff's injuries are *de minimis* and do not rise to the level of a constitutional violation. This Court disagrees.

First, as discussed further below, plaintiff provided sufficient descriptions of the arresting officers—combined with defendants' admissions that they were at or near the scene—to allow a reasonable jury to conclude that each individually named defendant either (1) directly participated in plaintiff's forcible arrest or (2) was present and had a reasonable opportunity to intervene after Zambrano slammed plaintiff into the wall. *See Curley v. Midul*, 89 F.Supp.3d 518, 523 (E.D.N.Y.2015) (discussing requirements for personal involvement in use of excessive force).

Second, the Court does not agree that plaintiff's alleged injuries are *de minimis* and do not rise to the level of a constitutional violation. Viewed in the light most favorable to plaintiff, the mass that defendants knew was that she

was the owner of a home being investigated in connection with a drug transaction. Nevertheless, according to plaintiff, Zambrano grabbed this sixty-one-year-old grandmother from behind (without first warning her that her house was under investigation or instructing her to leave) and slammed her into a wall. All three detectives then pushed plaintiff's arms up—ends and pressed her face into the wall, causing plaintiff to pass out.

*8 Considering the totality of circumstances, a reasonable jury crediting plaintiff's description of the arrest could find that the defendants' decision to use such aggressive tactics was objectively unreasonable and that some lesser degree of force would have been appropriate. *See Stile v. United States*, 474 F.Supp.2d 531, 539 (S.D.N.Y.2009) (finding that "[t]ackling an arrestee on the street and forcibly shoving him into a metal gate when he offer [sic] no resistance certainly could be actionable conduct"); (collecting cases). Moreover, even if plaintiff is required to show some threshold of injury, she has done so, at least sufficiently for nominal damages. *See id.* at 546 (upholding excessive force claim where plaintiff, who stated that he had pain in his neck and back, "tackle[d] [the] physical evidence, such as scraping or bruising, is greatly associated with the application of force") (collecting cases). Furthermore, while it is true that plaintiff's evidence is thin—consisting primarily of her own testimony—Crisco and McDowell both admitted to seeing plaintiff fall to the ground while she was being handcuffed, thereby corroborating at least a portion of plaintiff's account. *See id.* at 541 (declining to engage in credibility assessment on plaintiff and arresting officers' conflicting testimony).

Accordingly, the Court denies defendants' motion for summary judgment on plaintiff's excessive force claim.

#### E. Failure to Intervene

"An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know (1) that excessive force is being used ... (2) that a citizen has been unjustifiably arrested, ... or (3) that any constitutional violation has been committed by a law enforcement official...." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994) (citations omitted). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all

Rile v. City of New York, Not Reported in F.Supp.3d (2015)
2015 WL 6820230

*V. Denial of Fair Trial*

*G. Qualified Immunity*

*CONCLUSION*

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6820230

---

Read v. Town of Suffern Police Dept., Not Reported in F.Supp.2d (2013)
2013 WL 3193413

2013 WL 3193413
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David P. READ, Plaintiff,
v.
TOWN OF SUFFERN POLICE
DEPARTMENT, et al., Defendants.

No. 10 Civ. 9042(JPO).
|
June 25, 2013.

**MEMORANDUM AND ORDER**

J. PAUL OETKEN, District Judge.

**I. Background**

**A. Factual Background**

Read v. Town of Suffern Police Dept., Not Reported in F.Supp.2d (2013)
2013 WL 3193413

Shortly after Suzuki's departure from the station, Plaintiff had an anxiety attack and repeatedly asked for his medication (Read Dep. at 47.5.) The requested medication was in Plaintiff's black bag, which had been brought to the station by Lorenzano. (*Id.* at 52.11–13.) When the officers responded that they could not provide Plaintiff with the medication while he was detained, Plaintiff claimed to have suicidal thoughts and asked to be taken to the hospital. (*Id.* at 54.16.) Sergeant Glodic and Officer Giancotto complied with Plaintiff's request, calling the paramedics and accompanying Plaintiff to Good Samaritan Hospital. (*Id.* at 54.21–23.) At the hospital, Plaintiff briefly spoke to a doctor. (*Id.* at 55.14.) Plaintiff claims that, during this conversation, Glodic told the doctor not to prescribe any thing since Plaintiff was under arrest and could not receive medication while detained. (*Id.* at 59.19.) According to Plaintiff, Glodic then told the doctor "[t]o hurry up with his paperwork." (*Id.*) Plaintiff was signed out shortly thereafter, and returned to Suffern Police Station and his holding cell. (*Id.* at 50.15–18.)

### 2. The Events of April 28, 2009

At approximately 12 p.m. the next day, Plaintiff claims that he needed his medication due to another panic attack. (Read Dep. at 59.4.) Shortly thereafter, Plaintiff claims that his toilet clogged and his cell began to flood. (*Id.* at 59.14–15.)[3]

The officers tell a different story. According to them, Plaintiff tore up and tied his standard-issued blanket around the cell doors. (Dkt. No. 142 ("Tarrino Decl.") at ¶ 4.) Plaintiff then allegedly retrieved a green plastic knife from his cell, shredded it, and motioned as if he would put himself with the pieces. (*Id.* at ¶ 5.) The officers then claim that Plaintiff plugged up the toilet himself, purposely causing his cell to flood. (*Id.* at ¶ 7.)

After his cell flooded, Plaintiff was removed from his cell and handcuffed to a railing in a reversed-seated position. (Read Dep. at 60.22–24.) Apparently still panicking, Plaintiff attempted to remove his black bag from a nearby storage locker in order to obtain his medication. Plaintiff claims that he was used by Lorenzano before he could reach his bag. (*Id.* at 61.20–22.) Defendants claim that the tasing was done entirely by Officer Tarrino; indeed, they assert that Lorenzano was not even present when the tasing occurred. Moreover, according to Tarrino, Plaintiff was tased ten when he reached for his

While querying summary judgment demands that all facts be construed in the light most favorable to the non-movant, courts consider whether the officers made "reasonable inferences from the facts they possess[ed] at the time of [the alleged violation] based upon their own experiences." *Cerrone,* 246 F.3d at 293 (citing *Oromko v. United States,* 517 U.S. 690, 699 (1996)). If a genuine issue of material fact exists regarding the reasonableness of the officers' conduct, summary judgment must be denied. *See Astrulli v. Cohen Law Offices,* 21 F.3d 512, 516 (2d Cir.1994). Finally, "[q]ualified immunity is an affirmative defense." *Lee v. Sandberg,* 136 F.3d 94, 101 (2d Cir.1997). Accordingly, the burden rests on the officers "to raise the defense to their answer and to establish the defense on a motion for summary judgment." *Id.* (citing *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir.1996)).

### III. Discussion

#### A. Claims against the Suffern Police Department

At the outset, summary judgment must be granted in favor of Defendants with respect to all claims against the Suffern Police Department. In determining whether the arm of a municipality may be sued, courts look to state law. *Fed.R.Civ.P. 17(b)(3).* Under New York law, "departments which are merely administrative arms of a municipality," as is the case here, "do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y. January 25, 2003) (citations omitted). Thus, summary judgment is granted as to the claims against the Town of Suffern Police Department.[5]

Summary judgment must also be granted in favor of Detective Raymond Sheehan. Nowhere does Plaintiff allege that Sheehan was involved in any of the events that took place regarding this suit. Thus, all claims against Sheehan are dismissed. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" (citation omitted)).

#### C. False Arrest Claims

Plaintiff alleges that Officers Lorenzano and Giancotto violated his Fourth Amendment rights by falsely arresting and incarcerating him. To prevail on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier,* 316 F.3d 128, 134–35 (2d Cir.2003) (citation and quotation marks omitted). The presence of probable cause "is a complete defense to an action for false arrest." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.") To receive a qualified immunity, officers need only have a "'arguable' probable cause." *Cerrone,* 246 F.3d at 202. "Arguable' probable cause is met when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law.'" *Lee,* 136 F.3d at 102 (emphasis in original). Thus, an arresting officer is "entitled to summary judgment on qualified immunity grounds if [his] actions were not objectively unreasonable at the time they were taken," meaning either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 102.

*5 Probable cause "is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information or facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'

Here, it is beyond genuine dispute that the officers had probable cause to arrest Plaintiff. Suzuki informed the police that Plaintiff was threatening her and that he had violated an order of protection. Nor does Plaintiff dispute that he continued to threaten Suzuki in the officers' presence. Finally, dispatch confirmed that there was a valid order of protection against Plaintiff. Given this confluence of circumstances, the arresting officers reasonably believed that they possessed probable cause to detain Plaintiff.

Plaintiff argues that the order of protection was no longer valid. Yet even if the order of protection had been nullified, the officers acted reasonably in arresting a man alleged to have threatened his wife in a domestic dispute. Moreover, the officers had "reasonably trustworthy information" regarding the restraining order—it had been confirmed by police dispatch. Most importantly, Plaintiff was eventually convicted for violating the protective order, and his conviction was affirmed on appeal. *See Wayne v. Jarvis,* 197 F.3d 845, 852 (2d Cir.1996) ("If, following the arrest, the prosecutor took advantage of the charges against him, that conviction normally would be conclusive evidence of probable cause ... if the conviction survives appeal.' (internal quotation marks and citations omitted)); *see also Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.1986) ("[E]ven if no probable cause existed at the time of arrest ... a suit for false arrest may not normally be maintained if the arrest was followed by conviction, regardless of the validity of the arrest at the time it was made." (internal quotation marks and citations omitted)). Given Plaintiff's threats to his wife, police dispatch's confirmation of the warrant's validity, and the upholding of Plaintiff's conviction on appeal, probable cause existed as a matter of law. *See Lee,* 136 F.3d at 102.

Accordingly, Plaintiff's false arrest claim is dismissed.

#### D. Failure to Treat Claims

Plaintiff alleges that Officers Giancotto and Glodic violated his rights by failing to supply him with anxiety medication and refusing his request for treatment after he was tased. If Plaintiff was an inmate, his deliberate indifference claims would be rooted in the Eighth Amendment. *see City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983), but since Plaintiff was a pre-trial detainee, his claim is governed by the Fourteenth Amendment. *Id.* This distinction, however, is academic: "While the Eighth Amendment may

**Read v. Town of Suffern Police Dept., Not Reported in F.Supp.2d (2013)**
2013 WL 3198413

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," so as to allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97 (citation omitted).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Mesa v. City of New York*, No. 09 Civ. 10464(JPO), 2013 WL 31092 (S.D.N.Y. Jan. 3, 2013) (citing *Finnigan v. Finnigan*, 915 F.2d 817, 822–23 (2d Cir.1987)). At the same time, "[i]t is beyond dispute that the right to be free from excessive force has long been clearly established." *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir.2000) (citation omitted). Thus, in the excessive force context, "the question for the purposes of qualified immunity is 'whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.' " *Lennon*, 66 F.3d at 425 (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir.1994)).

### 1. Officer Lorenzo

*8   Officer Lorenzo denies that he was present when Plaintiff was tased. Yet even if Plaintiff's version of the story is true and Loerenzo conducted the initial tasing, Plaintiff's claim of excessive force falls short. Given Plaintiff's behavior, it was reasonable for Loerenzo to believe that he might harm himself or others. Immediately prior to being tased, Plaintiff was both acting manically and reaching inside a controlled item only a few feet away. It was entirely reasonable for the officers to believe that Plaintiff might pull something more dangerous from the bag than his cell phone. Even if Plaintiff only grabbed his pills, his prior suicidal threats gave the officers reason to restrain him as quickly as possible.

Plaintiff argues that Defendants could have less aggressively restrained him or removed the bag from his possession. Perhaps so. But courts must be hesitant in judging such split-second decisions, especially in such a tense and uncertain situation. *See Graham*, 490 U.S. at 396–97. Given Plaintiff's potential harm to himself and the officers, the undisputed evidence establishes that the initial decision to tase Plaintiff does not constitute excessive force.

### 2. Officer Territino

The second tasing is another matter. Plaintiff states that after the initial tasing, Officer Territino grabbed the taser from

**Read v. Town of Suffern Police Dept., Not Reported in F.Supp.2d (2013)**
2013 WL 3198413

### IV. Conclusion

*9   For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The excessive force claim against Officer Territino survives summary judgment. Plaintiff's other claims are dismissed.

Loerenzo and continued to shock Plaintiff, remarking that he was going to "roast" him. Construing the facts in light most favorable to Plaintiff, this second tasing constitutes a viable claim of excessive force. In his declaration, Territino curtly testifies that he acted to prevent Plaintiff from causing further harm to himself or others. According to Plaintiff, however, the initial tasing rendered him immobile. It is hard to image how a man tied to a railing and temporarily paralyzed could continue to pose a danger to himself or the officers. Again, the Court recognizes, and expects, that police officers are forced to make quick judgments in difficult situations. *Graham*, 490 U.S. at 396–97. Nonetheless, the present record fails to demonstrate how it was objectively reasonable to continue shocking Plaintiff after he had collapsed. *Accord Tewksbury v. Frank*, No. 09 Civ. 23, 2010 WL 5394837, at *7–10 (D.Vt. Dec. 28, 2010) (officer was justified as a matter of law in tasing plaintiff initially, but material facts precluded summary judgment on the second tasing while plaintiff was lying on the sidewalk).

According to Defendants, Plaintiff's inability to prove that he sustained any injuries disqualifies his excessive force claim. *See Santiago v. C.O. Campisi Shield No. 4592*, 91 F.Supp.2d 665, 674 (S.D.N.Y.2000) (noting that de minimus physical contact is not cognizable under the Eighth Amendment). In the Fourth Amendment context, however, it is the officer's unreasonable conduct, and not the injuries that result, which is of critical importance. Of course, " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' ... violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). Needless to say, however, a taser to the back is not a "non-serious or trivial use of force" akin to a shove; rather, it is a "serious intrusion into the core of the interests protected." *Beasley*, 2010 WL 5394837, at *8 (quoting *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir.2010)); *see also Bryan v. MacPherson*, 630 F .3d 805, 810 (9th Cir.2010) (describing use of a taser as an "intermediate, significant level of force that must be justified by the governmental interest involved" (citation omitted), *cf. Alex v. 2013 WL 31092*, at *26 (S.D.N.Y. Jan. 3, 2013) (noting that "bruises or even fleeting pain, such as that which [the defendant] [ ] claims she experienced during her arrest, *may* give rise to an excessive force claim"). Since it remains unclear whether Officer Territino's use of force was objectively reasonable and serious injury need not be shown here, summary judgment on Plaintiff's excessive force claim as to the second tasing is denied.

The Clerk of the Court is directed to close the motions at Docket Numbers 131 and 154.

SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2013 WL 3197413

---

**Diaz v. City of Hartford Police Department, Slip Copy (2021)**
2021 WL 1222187

2021 WL 1222187
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

DIAZ, et al., Plaintiffs,
v.
CITY OF HARTFORD POLICE
DEPARTMENT, et al., Defendants.

3:18-CV-01115 (KAD)
|
Signed 03/31/2021

**Attorneys and Law Firms**

Matthew D. Paradisi, Emanuele Robert Cicchiello, Michael John Reilly, Cicchiello & Cicchiello, LLP, Hartford, CT, for Plaintiffs.

Rebecca M. Harris, Crumbie Law Group, LLC, Hartford, CT, for Defendants Stephen Barone, Sean Spell.

Joseph W. McQuade, Kainen, Escalera & McHale, PC, Hartford, CT, for Defendants Christopher Mastroianni, Samuel Cruz, Ricardo Colon, Luan Bejka, William Cote, Carlo Faienza, Luis Franco, Robert Fogg, Carlos Torres, Luis Ruiz.

Kimberne E. Rule, Thomas E. Gerarde, Howd & Ludorf, LLC, Hartford, CT, for Defendant Jeremy Allen.

| Count | Cause of Action | Plaintiff | Defendants Named |
|---|---|---|---|
| 1 | Section 1983/Connecticut Constitution | Diaz | All Defendants |
| 2 | Section 1983/Connecticut Constitution | Perez | All Defendants |
| 3 | Negligence | Diaz | All Defendants |
| 4 | Negligence | Perez | All Defendants |
| 5 | Recklessness | Diaz | All Defendants |
| 6 | Recklessness | Perez | All Defendants |
| 7 | Negligent Infliction of Emotional Distress | Diaz | All Defendants |
| 8 | Negligent Infliction of Emotional Distress | Perez | All Defendants |
| 9 | Intentional Infliction of Emotional Distress | Diaz | All Defendants |
| 10 | Intentional Infliction of Emotional Distress | Perez | All Defendants |

Pending before the Court are three separate motions for summary judgment. Officer Allen moves for summary judgment on all Counts. (ECF No. 74). Detective Mastroianni, Officer Cruz, Officer Colon, Officer Bejka, Officer Cote, Officer Faienza, Officer Franco, Officer Fogg, Officer Torres, and Sergeant Ruiz move for summary judgment on all Counts (ECF No. 77). Officer Barone moves for summary judgment on all Counts and Sergeant Spell moves for summary judgment on Counts Two through Ten (ECF No. 80).[1] The Court heard oral argument on the motions on November 24, 2020.

[1] Defendant Spell did not move for summary judgment as to Count One. (*See* ECF No. 94 at 7).

**Facts**

The following facts are undisputed unless otherwise indicated.

*Prior to the Pursuit*

On June 4, 2016, Perez consumed 3-4 blunts of PCP in addition to 2-3 blunts of marijuana while Diaz consumed a six-pack of beer, two blunts of marijuana laced with PCP, 4-5 bags of heroin and $10 worth of cocaine. (Mastroianni, et al., Local Rule 56(a)(1) Statement ("Mastroianni SMF"), ECF No. 79 ¶¶ 31, 35). After consuming the drugs, Perez picked up Diaz at Perez's brother's apartment in a Toyota Camry. (*Id.* ¶ 33). The Toyota Camry was a rental, but had been reported stolen by the rental agency when Perez kept the car after the rental period expired. (*Id.* ¶¶ 38–40).

**The Pursuit**

The pursuit began after Perez beeped his horn while passing a marked police car driven by Officer Barone on Zion Street in Hartford, Connecticut. (Mastroianni SMF, ECF No. 79 ¶ 41; Barone and Spell Local Rule 56(a)(1) Statement ("Barone SMF"), ECF No. 80-2 ¶¶ 25-26). Officer Barone attempted to pull Perez over, but Perez sped away, failing to stop for stop signs or stop lights, because he knew that he was driving a stolen car. (Mastroianni SMF, ECF No. 79 ¶¶ 41–42; Barone SMF, ECF No. 80-2 ¶¶ 26–27).

### MEMORANDUM OF DECISION RE: DEFENDANT JEREMY ALLEN'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 74); DEFENDANTS LUAN BEJKA, RICARDO COLON, WILLIAM COTE, SAMUEL CRUZ, CARLO FAIENZA, ROBERT FOGG, LUIS FRANCO, CHRISTOPHER MASTROIANNI, LUIS RUIZ, AND CARLOS TORRES' MOTION FOR SUMMARY JUDGMENT (ECF NO. 77); DEFENDANTS STEPHEN BARONE AND SEAN SPELL'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 80)

Kari A. Dooley, United States District Judge

*1   This civil rights action arises out of the aftermath of a car-chase during which plaintiffs Emilio Diaz ("Diaz") and Ricardo Leon Perez ("Perez") allege that they were subjected to unnecessary and excessive force by defendant police officers who effectuated their arrest. Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 ("Section 1983") and state law against Officer Stephen Barone, Detective Christopher Mastroianni, Officer Samuel Cruz, Officer Ricardo Colon, Officer Luan Bejka, Officer William Cote, Officer Carlo Faienza, Officer Luis Franco, Sergeant Sean Spell, Officer Jeremy Allen, Officer Robert Fogg, Officer Carlos Torres, and Sergeant Luis Ruiz as follows:

When the car reached Affleck Street, it stopped. Officer Cote approached the car, opened the driver's side door, and attempted to pull Perez out of the car. (Mastroianni SMF, ECF No. 79 ¶ 43). Officer Cruz then opened the rear driver's side door to assist in Perez's removal. (*Id.* ¶ 44). Instead of exiting the car, Perez shifted the car into reverse and stepped on the gas. (*Id.* ¶ 45). Officer Cruz was hit by an open door and sustained a left knee injury. (*Id.* ¶ 46). Perez, accompanied by Diaz, left the scene of the attempted stop, again, at a high rate of speed. (Barone SMF, ECF No. 80-2 ¶ 44).

*2   As the pursuit continued, Perez drove recklessly despite there being traffic, pedestrians, and children on bicycles. (Mastroianni SMF, ECF No. 79 ¶¶ 49–50; Barone SMF, ECF No. 80-2 ¶ 49). Diaz did not ask Perez to slow down, to stop the vehicle, or to be let out of the vehicle. (Mastroianni SMF, ECF No. 79 ¶ 60). Eventually, West Hartford police deployed stop sticks to deflate the car's tires though Perez continued to drive on the tire rims. (Mastroianni SMF, ECF No. 79 ¶¶ 56–57; Barone SMF, ECF No. 80-2 ¶¶ 56–57). Soon thereafter, the pursuit ended in the vicinity of 809 Flatbush Avenue in West Hartford. (Mastroianni SMF, ECF No. 79 ¶ 59; Barone SMF, ECF No. 80-2 ¶ 61). In his last effort to evade apprehension, Perez struck multiple police cruisers. (Barone SMF, ECF No. 80-2 ¶ 61).

*After the Pursuit*

After the Camry was stopped and boxed in by police vehicles, the parties' versions of events diverge. Specifically, the parties disagree as to whether Perez and Diaz actively resisted arrest following the stop thereby rendering the use of force necessary, or whether they surrendered themselves to the police, obviating the need for force. The following facts, however, are undisputed unless otherwise indicated.

*Arrest of Diaz*

After the pursuit, Officer Bejka broke open the passenger side window with his baton. (Mastroianni SMF, ECF No. 79 ¶ 136). Before Diaz exited the car, Officer Bejka struck Diaz multiple times with the baton, one strike of which may have connected with Diaz's forehead. (*Id.* ¶ 137).

2022 WL 357020

Diaz v. City of Hartford Police Department, Slip Copy (2021)
2021 WL 1222187

After Diaz exited the car, Officer Colon struck Diaz in the head with closed fists, (id. ¶ 147), and Officer Allen deployed his taser on Diaz, (Alloc Local Rule 56(a)(1) Statement ("Alloc SMF"), ECF No. 71-2 ¶ 12). According to Diaz, Officer Allen tased him in the back while he was flat on the ground facedown, (id. ¶¶ 47-48). Thereafter, Officer Colon kicked Diaz, (Maisonaisin SMF, ECF No. 79 ¶ 146), and Officer Fenzi struck Diaz's right shoulder with his right foot and used his knee to pin Diaz's shoulder to the ground, (id. ¶ 102). While Diaz was on the ground, Detective Maisonaisin applied foot strikes to Diaz's back/torso area until other officers were able to handcuff him. (id. ¶ 130)

After Diaz was handcuffed and kneeling in the grass, Sergeant Spell "used his foot onto the lower back side of Diaz's head or shoulder area to force him onto the ground." (Barone SMF, ECF No. 80-2 ¶¶ 95.) [2] Eventually, Diaz was taken by ambulance to the hospital. (id. ¶ 97)

[2]    According to plaintiffs, "Defendant Spell gratuitously, intentionally, and willfully stomped Plaintiff Diaz's head into the ground as he lay face down, prone, with his hands cuffed behind his back." (Plaintiffs' Local Rule 56(a)(2) Statement ("Plfs' SMF"), ECF No. 84-11 at 88). Having viewed the dashcam video from this event, the plaintiffs' description appears more apt. In Defendant Spell's reply in support of his motion for summary judgment, Spell argues that the dashcam video is not authenticated and that plaintiffs have not presented any affidavits or other admissible evidence to identify the people depicted in the video. (ECF No. 94 at 6). The Court's decision does not turn on the content of the video and the Court does see therefore resolve this evidentiary claim.

**Arrest of Perez**

While still in the car, Perez testified that he was hit in the forehead with a baton (Perez Dep., ECF No. 84-4 id. ¶¶ 177) After officers removed [3] Perez from the car, non-party Detective Abbatiello Pillai, Officer Cote, and Officer Barone placed Perez on the ground. (Barone SMF, ECF No. 80-2 ¶¶ 69, 71). Officer Fenton then tased Perez, while enabled Detective Pillai and Officer Barone to handcuff him. (Maisonaisin SMF, ECF No. 79 ¶¶ 95-96; Barone SMF, ECF No. 80-2 ¶ 79). Before Perez was handcuffed, Officer Cote

kicked Perez in the shoulder twice and on the right side of his face once and Officer Barone struck his torso multiple times with closed fist strikes. (Maisonaisin SMF, ECF No. 79 ¶ 123; Barone SMF, ECF No. 80-2 ¶ 77).

[3]    The record is silent as to whether Perez was physically removed from the car or whether he exited the car on his own or in response to officer commands.

[*3]   After Perez was apprehended, Officer Franco escorted Perez to the hospital in an ambulance. (Maisonaisin SMF, ECF No. 79 ¶ 113). On the ride to the hospital, Officer Franco claims that he used the heel of his hand to turn Perez's face away from him to prevent Perez from spitting at him, (id. ¶ 114). [4] At the hospital, Perez claims that Officer Franco punched him while he was handcuffed to the hospital bed. (ECF No. 84 at 6-7)

[4]    Perez argues that he did not spit at Officer Franco in the ambulance. (ECF No. 84 at 6 (citing Perez Dep., ECF No. 84-4 at 142))

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*.

Significantly, the inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *id.* at 250. As a result, the moving party entitles his burden under Rule 56, "by showing ... that there is an absence of evidence to support the nonmoving party's case," or trial. *Pepsi Co. Inc. v. Does-Vida Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted)*. Once the non-movant meets its burden, "[t]he nonmoving party need set forth specific facts showing that there is a genuine issue for trial[.]" *Amaury v. Curtainside, 722 F.3d 99, 103 n.3 (2d Cir. 2013) (quoting*

*Rohrers v. Mosson, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009); accord Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted, internal quotation marks omitted). Nor will a belly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenti, 923 F.2d 18, 21 (2d Cir. 1991); argus Inc. v. Eastman Kodak Co., 809 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *Anderson, 477 U.S. at 249-50 (citations omitted)*.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)). Importantly, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Morrison v. Miller, 808 F. App'x 14, 16 (2d Cir. 2020) (summary order) (internal quotation marks omitted). "Corroboration, though helpful, is not essential," a § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." *Id. (quoting Bellamy v. City of New York, 914 F.3d 727, 746 (2d Cir. 2019)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact, it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente's Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002)*.

**Discussion**

**Preliminary Matters**

[*4]   Through the briefing and argument on the motions for summary judgment, the scope and nature of the plaintiffs' claims narrowed significantly. The Court has been, and is therefore, able to resolve many of the issues raised in summary fashion. First, the Court granted summary judgment in favor of Defendants Luis Ruiz, Carlos Torres, and Samuel Cruz on all Counts because plaintiffs did not contest entry of judgment in their favor. (ECF No. 98). Next, as confirmed

at oral argument, each defendant only interacted with one of the plaintiffs even though each defendant was named by both plaintiffs on a failure to intervene theory of liability that plaintiffs acknowledged that they did not brief and therefore abandoned (See Section 1983 failure to intervene theory of liability, *Lunt v. Hold, 514 F.3d 154-16 (MRIG) 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."). Accordingly, absent objection, the Court granted summary judgment in favor of each defendant on each count asserted against that defendant by the plaintiff with whom that defendant did not interact. [5] Specifically, the Court granted summary judgment in favor of Defendants Laura Bojka, Christopher Mastroianni, Robert Fogg, and Ricardo Colon as to Counts 2, 4, 6, 8, and 10 (claims brought by Perez), in favor of Defendants Carlo Fittenza, William Cote, and Luis Franco as to Counts 1, 3, 5, 7, and 9 (claims brought by Diaz), in favor of Defendant Jesus Alifan as to Counts 2, 4, 6, 8, and 10, in favor of Defendant Sean Spell as to Counts 2, 4, 6, 8, and 10, and in favor of Defendant Stephen Barone as to Counts 1, 3, 5, 7, and 9. (ECF No. 98).

[5]    To the extent plaintiffs bring a Section 1983 failure to intervene theory of liability against those defendants with whom they interacted, plaintiffs have also failed to brief and, therefore, abandoned this theory of liability.

In addition, at oral argument, plaintiffs confirmed that they have abandoned their claims brought pursuant to the Connecticut State Constitution.

**Plaintiffs' Deposition Testimony**

The Court also addresses, as a preliminary matter, the question of whether the plaintiffs should be permitted to rely upon their own deposition testimony in opposing these motions for summary judgment. In the analysis below, plaintiffs' deposition testimony is central to determining if a genuine issue of material fact exists as to whether plaintiffs actively resisted arrest, thus necessitating the force used. Some defendants argue that the Court should not consider plaintiffs' deposition testimony because it is so inherently unreliable as to render it inadmissible given plaintiffs' admitted inability to recall much of the events surrounding the pursuit and the arrest. While there may be extraordinary circumstances under which such testimony might be properly challenged, this is not

that case. Whether the plaintiffs were under the influence at the time of the arrest, or whether their recollections are imperfect, are considerations which go to the weight of their testimony. And the Court must consider plaintiffs' deposition testimony, not to weigh its credibility but to determine whether, if credited, it creates a genuine issue of material fact in dispute. To do otherwise would be to improperly engage in credibility determinations forbidden when deciding motions for summary judgment. *Rogoz v. City of Hartford, 796 F.3d 236, 245 (2d Cir. 2015) ("In reviewing the evidence and the inferences that may reasonably be drawn, the court may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (internal quotation marks, citations, alterations and emphasis omitted)). In fact, the Court must resolve questions of credibility in the plaintiff's favor. *Id.* at 246.

As to these claims, all defendants argue that they are entitled to qualified immunity. "[Q]ualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The shield of qualified immunity insulates law enforcement officials from liability in their individual capacities unless the plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Gandi v. Lahman, 874 F.3d 73, 80 (2d Cir. 2017) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow, 457 U.S. at 818). However, "[a]s this Court, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Southerland v. City of New York, 680 F.3d 127, 141 (2d Cir. 2012) (quoting *Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (brackets omitted)). Thus, "a defendant is entitled to summary judgment on qualified immunity grounds when no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected

**Section 1983 – Excessive Force**

Plaintiffs allege that defendants violated their Fourth Amendment rights, as incorporated against the states by the Fourteenth Amendment, *see Tennelman v. Williams, 193 F.3d 581, 592 n.13 (2d Cir. 1999), by their excessive use of force during plaintiffs' arrest on June 4, 2016. "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Jamison v. Metz, 541 F. App'x 15, 17 (2d Cir. 2013) (internal quotation marks omitted). "A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is objectively unreasonable in light of the facts and circumstances confronting the officer." *Lennox v. Miller, 968 F.3d 150, 155 (2d Cir. 2020) (internal quotation marks and alterations omitted).

[*5]   "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). More specifically, "[a] determination of whether the force used was reasonable requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Miller, 968 F.3d at 155. (internal quotation

right," *Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999) (internal quotation marks, citations, and alterations omitted) Accordingly, "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Id.*

Given these applicable legal principles, it is clear that in an excessive force case, the issue of qualified immunity necessarily overlaps considerably with the question of liability on the underlying claim, as both require an assessment of the objective reasonableness of the arresting officer's conduct. *See Cowan ex rel. Est. of Cooper v. Breen, 352 F.3d 756, 764 n.7 (2d Cir. 2003) (noting that, in most excessive force cases, the qualified immunity and Fourth Amendment issues converge on one question: "Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful.").

**The Arrest at Flatbush Avenue**

Courts have held that the use of force after a suspect has surrendered is excessive and, therefore, violates the Fourth Amendment. For example, in *Amnion, plaintiff alleged that defendant-police officers used excessive force "when they shot at him multiple times, causing injury, as he fled following a high-speed car chase." 541 F. App'x at 17. According to the officers, plaintiff struck an officer with his car, "fled on the officers, and refused to comply with the officers' orders to drop his gun and stop running." *Id.* Nevertheless, the Second Circuit found that plaintiff's verified complaint and a witness affidavit were sufficient to raise "a genuine dispute ... as to whether [plaintiff] had surrendered and was no longer a threat when [the defendants] employed deadly force." *Id.* at *19. Significantly, the court found that under plaintiff's version of events, in which he surrendered before the officers' application of force, "the officers lacked probable cause to believe that [plaintiff] posed a serious threat to the officers or to others, and the decision to use force was not objectively reasonable." *Id. Thus, even though "other evidence in the record support[ed] the officers' account, and a reasonably jury may well accept their version of events," the court concluded that "the district court cannot, on summary judgment, weigh the evidence or credit one account over the other," and thus summary judgment in favor of the officer "[b]ecause summary judgment turned either on the merits or on qualified immunity requires that no dispute about material issues remain[.]" *Id.* at *18.

[*6]   Similarly, in *Hemphill v. Schott, the plaintiff brought an excessive force claim against, among others, a police officer who shot him prior to his arrest for armed robbery. 141 F.3d 412, 414 (2d Cir. 1998). There, the police officer claimed that plaintiff led the police on a chase and "made furtive motions at his waist, as if to draw a weapon, immediately before the shooting," *Id.* at 416. The police officer also claimed that he gave advance warning at the plaintiff of his intention to use deadly force. *Id.* In contrast, plaintiff claimed that he did not resist arrest and raised his hands in the air when confronted, and that he was not provided advance warning by the police officer before the shooting. *Id.* at *17. Accepting plaintiff's version of events "immediately preceding the shooting," the Second Circuit found that the officer's "alleged decision to use potentially deadly force upon a suspect who stopped and raised his arms in surrender constituted the use of excessive force and that he was entitled to summary judgment on the merits or on qualified immunity." *Id.* at 418.

Accordingly, the court held that the district court erred in entering summary judgment in favor of the officer "[b]ecause summary judgment turned either on the merits or on qualified immunity requires that no dispute about material factual issues remain.[" *Id.* at 418.

*Diaz (Count One as against Defendants Allen, Bojka, Mastroianni, Fogg, and Colon)*

Here, viewing the evidence in a light most favorable to Diaz, Diaz fully surrendered when the car stopped on Flatbush Avenue. Indeed, in his deposition, Diaz repeatedly testified that he put his hands up when the car stopped. (Diaz Dep., ECF No. 84-3 at 160 ("Well, after the car went over the Stop Sticks, we was on Flatbush. The car came to a stop. In the heat of my knowledge I put my hands up so the officers could see my hands."); 162-63 (same); 163-64 (Q: "Do you recall police officers coming to your side of the vehicle and issuing commands to get out of the car?" A: "the didn't say nothing. I was willing to comply with the officer. I was ready to do anything. So didn't say nothing. I had my hands up. He tried opening the door; he didn't say -- Unlock the door; he told [d]oor,' nothing. He busted the window out."); 198 ("[W]hen the car came to a stop, I put my hands up and was waiting for directions. I didn't hear anything."); *see also id.* at 205-236). Diaz also repeatedly testified that he did not otherwise resist arrest while being approached by the defendants. (Id. at 292-93 (testifying that he led facedown on the ground with his hands up after being yanked out of the car); 305 (testifying that he did not do anything to resist arrest while on the ground); 262 (testifying that he did nothing to threaten

officers on the scene after he had his hands up, 267 (testifying that he did not resist the officers' efforts to place him into handcuffs).)

By Diaz's account, it was therefore after he surrendered that Officers Bojka, Allen, Fogg, Colon, and Detective Mastroianni used the force described above, i.e., baton strikes, a taser deployment, punches and kicks, while effectuating his arrest. Although defendants offer evidence that Diaz was actively resisting arrest and that the force was therefore necessary, the Court must view the above facts in a light most favorable to Diaz. Thus, given Diaz's testimony that he fully surrendered after the car stopped at Flatbush Avenue, the Court finds that there is a genuine issue of material fact as to whether the defendants' use of force against Diaz was reasonable under the circumstances. *See Jamison*, 544 F. App'x at 19; *Hemphill*, 141 F.3d at 416. He *see also Cuhn v. Deft*, 307 F. Supp. 2d 369, 378-79 (E.D.N.Y. 2010) (finding that defendant police officer was not entitled to summary judgment or qualified immunity on an excessive force claim because he did not have probable cause to believe that the plaintiff posed a significant threat after the plaintiff stopped his car and put his hands in the air and because it was unreasonable for the officers to drag the non-resisting plaintiff's body through the window and to kick and punch him); *compare MacLeod v. Town of Brattleboro*, 548 F. App'x 6-8 (2d Cir. 2013) (summary order) (finding that the officer's use of a taser was not excessive force where plaintiff overturned "clear repeated instructions that he acknowledge[d] he understood"). Therefore, Officers Bojka, Allen, Fogg, Colon, and Detective Mastroianni are not entitled to summary judgment with respect to Diaz's Section 1983 claim for excessive force.

### *Perez (Count Two as to Defendants Barone, Faienza, Cote and Franco)*

*7  Viewing the evidence in a light most favorable to Perez, Perez initially signaled his intent to surrender when the car stopped at Flatbush Avenue by raising his hands in the air. But there is an evidence to suggest that Perez continued in that vein or that he did not thereafter resist arrest when he exited the vehicle. After the car stopped, Perez testified that he put his hands up. (Perez Dep., ECF No. 84-4 at 178 ("I remember putting my hands up in the air when I went to completely stopped"), 135 (When the car stopped, "I just put my hands up in the air")). Though, after putting his hands up, Perez does not remember much else. (*Id.* at 135-36

Barone struck Perez with his fist while Perez was already out of the car. (ECF No. 84-1 at 23.)

And the uncontradicted evidence is that Officers Faienza, Cote, and Barone used force to effectuate Perez's arrest at Flatbush Avenue only after Perez exited the car and was actively resisting arrest. Specifically, Officer Faienza deployed a taser on Perez after he exited the car because he failed to follow verbal commands. (Faienza Incident Report, ECF No. 79-3 at 58-60). Officer Cote applied four strikes to Perez after Perez fell to the ground because he continued to thrash about and did not follow commands to stop resisting. (Cote Aff., ECF No. 93 at 25-26, ¶¶ 8, 12), and Officer Barone tossed closed fist strikes to Perez's right torso while Perez was on the ground because Perez would not show his hands to the officers. (Barone Aff., ECF No. 89-3 ¶¶ 43-45). Therefore, because there is no evidence that Officers Faienza, Barone, or Cote used any force on Perez while he was in the car, and Perez does not offer any evidence which counters the defendants' sworn statements that the force was necessary to effectuate his arrest given his active resistance after he exited the car, Perez has not raised a genuine issue of material fact as to whether these defendants acted reasonably under the circumstances.[7] *See Jungjar*, 796 F.3d at 216 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (internal quotation marks and citation omitted)); *see e.g., Crowell v. Kirkpatrick*, 400 F. App'x 592, 594-95 (2d Cir. 2010) (summary order) (finding application of taser objectively reasonable where arrestees were actively resisting arrest. Accordingly, Officers Barone, Faienza, and Cote are entitled to summary judgment with respect to Count Two, the Section 1983 claim alleging excessive force.

[7]  The Court notes that Perez does not assert that, even under the defendants' version of events, a genuine issue of material fact exists as to whether the force used was reasonable.

### *Defendant Franco*

Perez also claims that Officer Franco punched him while he was being transported to Hartford Hospital in an ambulance. However, Perez offers no evidence to support this claim either; Perez's claim appears to be based on his interpretation of Officer Franco's statement of material facts, which indicates that Officer Franco used the fact of his hand to turn Perez's face in the other direction after Perez attempted to

(Q: "All right. What do you remember about what happened when the car finally stopped?" A: "I just put my hands up to the air. All of a sudden, I just don't remember nothing from then." Q: "Okay. So you—when the car stopped you remember putting your hands up in the air?" A: "From then I just don't remember nothing, what happened all from there."). 136 (Q: "Okay. What do you recall about police officers approaching the car?" A: "I guess it was like, 'Freeze. Don't move.' After that I don't remember even [time else." Q: "Do you have any recollection of how you got out of the car?" A: "I don't remember No."), 137 (Q: "Do you have a recollection of anything before when the car stopped and when you woke up in Hartford Hospital?" A: "Just woke up at Hartford Hospital being tased, like wow."). More specifically, Perez testified that he does not remember anything after officers broke the driver's side window and hit him with a baton. (*Id.* at 178, 176 (Officers "broke the window, hit me with a baton, and after that I don't remember nothing else.")). 177 (A: "I got hit with the baton stick, and after that I don't remember nothing else." Q: "You got hit with a baton stick while you were seated in the driver's seat?" A: "yes."). Perez inability to recall the remainder of the events of his arrest notwithstanding, the defendants have submitted substantial evidence, unanswered by Perez, that Perez continued his efforts to avoid apprehension and resisted arrest after he exited the car. (*See, e.g.*, Barone Aff., ECF No. 86-3 ¶¶ 38, 40, 44; Faienza Incident Report, ECF No. 79-3 at 60 ("[Perez] was actively resisting officers by flailing his arms and pushing off the ground." ); Cote Incident Report, ECF No. 79-3 at 69 ("[Perez] evaded the vehicle ignoring numerous verbal commands given by officers to stay in the vehicle. [Perez] took a fighting stance and appeared to be looking for an avenue of escape.").) Therefore, viewing the evidence in a light most favorable to Perez, the use of excessive force claim would be limited to force used while Perez was still in the car having signaled an intention to surrender. But Perez offers no evidence identifying the officer who allegedly struck him with a baton while he was inside the car.[8]

[8]  Although plaintiffs appear to argue that Officer Barone struck Perez in the head with a baton while Perez was still in the car with his hands up, there is no evidence that suggests this happened. Perez testified that he was struck in the head with a baton while in the car, but he also testified that he did not know whom he was struck him. (Perez Dep., ECF No. 84-4 at 177). Further, the Internal Affairs investigation report cited by plaintiffs only indicates that Officer

summary judgment as to Perez's Section 1983 claim based on the purported punch at the hospital.

[8]  Officer Franco argues that the picture is not properly before the Court because Perez did not authenticate it. Whether the picture is properly before the Court does not affect the Court's analysis.

### State Law Claims

In the Third Amended Complaint, in Counts Three through Ten, plaintiffs, in conclusory fashion, assert that their allegations also give rise to liability under the various state law claims specified. Although the defendants addressed each additional count in the motions for summary judgment, plaintiffs' response to these arguments was conclusory absent to the point of being deemed abandonment. *See Zukowski v. Town of Plainville*, No. 3:09-CV-1367 (JHS), 2011 WL 5415491, at *8 (D. Conn. Sept. 30, 2013) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks and citation omitted)). When asked whether abandonment was in fact the basis for plaintiffs' intent, counsel advised the Court, in essence, that he viewed the state law claims as rising or falling with the Section 1983 claims. Even though these additional counts of action have different elements or might be subject to different defenses, in the absence of meaningful briefing, the Court takes counsel at his word. Accordingly, because Perez has failed to raise a genuine issue of material fact as to his Section 1983 claims against Defendants Cote, Barone and Faienza, these defendants' motions for summary judgment are granted as to Counts Four, Six, Eight and Ten as well

As to Defendants Allen, Bojka, Mastroianni, Fogg, Colon, and Franco, the Court must address their arguments that irrespective of the outcome on the Section 1983 claims, which have survived summary judgment as discussed above, they are entitled to summary judgment on the state law claims. The Court must also take up Defendant Spell's motion for summary judgment as to the state law claims.

### Intentional Infliction of Emotional Distress (Counts Nine, Ten)

To establish liability for intentional infliction of emotional distress, plaintiffs must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have

that Defendant Spell gratuitously kicked him in the head after he was fully apprehended. (*See, e.g.*, Diaz Dep., ECF No. 84-3 at 170 ("Once they finished on the side of the car, I got handcuffed and two of ever from the car.... Now that I'm not next to the car, this is when the other officer kicked me to the head. I'm thinking I'm gonna die. I'm crying for my life. I'm thinking I'm gonna die. He tells me all I don't stop crying, he gonna kick me again in the head."), *see also id.* at 171 (identifying Defendant Spell as the person who kicked him in the head)).

### Recklessness (Counts Five, Six)

All remaining defendants also seek summary judgment as to plaintiffs' recklessness claims. "Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man[.]" *Doe v. Hartford Roman Cath. Diocesan Corp.*, 317 Conn. 357, 382 (2015) (internal quotation marks omitted). Although recklessness is a "state of consciousness with reference to the consequences of one's acts" it "may be inferred from conduct." *Id.* "[Recklessness] is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." *Id.* (internal quotation marks omitted).

Here, as discussed above, there is a genuine dispute as to the nature of defendants' use of force at Flatbush Avenue and Defendant Franco's purported unjustified punch of Perez at the hospital and therefore a genuine dispute as to whether the remaining defendants acted recklessly. *See Armstead*, No. 3:09-CV-1367 (JHS), 2011 WL 5415491, at *2, *9 (finding that it is a question for the jury to determine whether the officer's conduct was reckless where the officer slammed plaintiff against a car and clubbed him).[9] Accordingly, Defendants Allen, Bojka, Mastroianni, Fogg, Colon, Franco, and Spell are not entitled to summary judgment on Count Five or Count Six, plaintiffs' respective claims for recklessness.

[9]  Defendant Spell argues that his conduct did not summary judgment as to plaintiff's recklessness claim; he states nothing about having struck plaintiff in the head, viewing the record in a light most favorable to Diaz, Diaz did not spit at Defendant Spell. (Diaz Dep., ECF No. 84-3 at 172 (Q: "Were you spitting at the base?" A: "No. I didn't raise my head. I didn't raise my head. I didn't do

nothing. I kept my head down." Q: "Did you spit at any officer, any officer that night on June 4, 2016?" A: "For what? To get beat up? I ain't stupid." Q: "Were you spitting on the ground?" A: "I wasn't spitting nowhere. How am I spitting and the blood is coming straight out of my forehead dripping onto the ground?").

### Negligence/Negligent Infliction of Emotional Distress (Counts Three, Four, Seven, Eight)

*10  All remaining defendants argue that they are entitled to summary judgment as to plaintiffs' negligence-based claims. Specifically, defendants argue that plaintiffs' negligence claims fail as a matter of law because their allegations involve only allegedly intentional conduct. *See Frappier*, No. 3:07-CV-1457 (WWE), 2008 WL 4980362, at *3 ("Because defendants have not prevailed on a negligence claim when they have brought claims of intentional use of excessive force and intentional infliction of emotional distress."). However, "[t]he majority of courts in this District have recognized that plaintiffs may simultaneously plead negligence-based and intent-based claims arising from the same conduct." *Wilson v. Sonday*, No. 3:17-CV-00811 (JCH), 2018 WL 3596750, at *4 (D. Conn. July 25, 2018) (collecting cases). As Judge Meyer explained, "[t]he case that is most often cited by Connecticut federal courts for the proposition that § 1983 and negligence claims are incompatible is based on a misapprehension of New York law that finds no cause of action for negligence on the part of a police officer's when making an arrest." *Barashed*, No. 3:14-CV-00149 (JAM), 2016 WL 4272419, at *3 (internal citation omitted). In contrast, for example, "Connecticut courts have allowed for recovery under Connecticut's negligence-based municipal liability statute, Conn. Gen. Stat. § 52-557n, in cases involving allegations of excessive force by police officers." *Id.* Thus, defendants' purely legal argument fails on this point and plaintiffs may pursue negligence-based claims arising out of the remaining defendants' alleged excessive force.

Defendants further argue that they are entitled to governmental immunity pursuant to Conn. Gen. Stat. § 52-557n. The Court construes defendants' argument as seeking common law governmental immunity for municipal employees.[10] "Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts." *Mulligan v. Rioux*, 229 Conn. 716, 727 (1994) Because "[a]

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

Diaz v. City of Hartford Police Department, Slip Copy (2021)
2021 WL 1222187

**Conclusion**

*11 For the foregoing reasons, summary judgment is GRANTED in favor of Defendants Barone, Faiceta and Cole as to Counts 2, 4, 6, 8, and 10. Defendant France's motion for summary judgment is DENIED as to Counts 2, 4, 6, 8, and 10. Defendant Allen's motion for summary judgment is DENIED as to Counts 1, 3, 5, 7, and 9. Defendants Bojka, Mastroianni, Fogg, and Colon's motion for summary judgment is DENIED as to Counts 1, 3, 5, 7, and 9. Defendant Spell's motion for summary judgment is DENIED as to Counts 1, 3, 5, 7, and 9. Accordingly, the only claims remaining in this action are as follows: (1) Diaz's Section 1983 claim for excessive force against Defendants Allen, Bojka, Mastroianni, Fogg, Colon, and Spell; (2) Diaz's state law claims against Defendants Allen, Bojka, Mastroianni, Fogg, Colon, and Spell for the same; (3) Perez's Section 1983 claim for excessive force against Defendant France based on his purported punch to the hospital; and (4) Perez's state law claims against Defendant France for the same.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March 2021.

**All Citations**

Slip Copy, 2021 WL 1222187

End of Document

---

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

2016 WL 4030625
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chaz ZACHARY, Plaintiff,
v.
CITY OF NEWBURGH, Officer Rosean Scoudroni, Carlos Mendez, Andres Arrestin, Daniel Volpe, William Hempeter, William Labar, Sgt. Anderson, Kevin Labar, John Kirby, Howard Zadler, Defendants.

13 CV 5737 (VB)
|
Signed 07/25/2016

**Attorneys and Law Firms**

Chaz Zachary, Ottisville, NY, pro se.

David Lewis Posner, McCabe & Mack LLP, Poughkeepsie, NY, Kellie Elizabeth Lupinik, Shawn Kay Worthy-Spiegl, Goshen, NY, for Defendants.

**OPINION AND ORDER**

Briccetti, United States District Judge

*1 Plaintiff Chaz Zachary, who is proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983 arising from events during and after his arrest on May 9, 2013, in the City of Newburgh. Plaintiff brings an excessive force claim under the Fourth Amendment and a procedural due process claim under the Fourteenth Amendment against two Orange County Sheriff's Office ("OCSO") deputy sheriffs and eight Newburgh Police Department ("NPD") officers.

Defendants Deputy Sheriff Daniel Volpe and Deputy Sheriff Jake Kirby ("County Defendants") move for summary judgment as to both claims. Defendants Officer Rosean Scoudroni, Officer Carlos Mendez, Officer Andres Arrestin, Officer William Hempeter, Officer William Labar, Sergeant Anderson, Officer Kevin Labar, and Officer Howard Zadler ("Newburgh Defendants") move for summary judgment as to the procedural due process claim and as to the excessive force claim arising from an altercation in the NPD booking room.

**BACKGROUND**

The parties have submitted briefs, statements of facts, declarations with supporting exhibits, and video evidence, which reflect the following factual background.

On May 9, 2013, County Defendants were assigned to work on an "Operation Impact" patrol, which was a joint operation between the OCSO and the NPD targeting quality-of-life crimes. NPD Officers Rosean Scoudroni, William Hempeter, Carlos Mendez, William Labar, and Kevin Labar were also assigned to Operation Impact.

**1. Plaintiff's Arrest**

At approximately 6:25 p.m. on May 9, 2013, Officer Scoudroni received a radio transmission identifying an individual with an open container. Officer Scoudroni drove to the reported location, exited his vehicle, and approached plaintiff. Plaintiff fled. Officer Scoudroni pursued plaintiff on foot and sent a radio transmission informing other officers of the pursuit. County Defendants and Officers Mendez and Hempeter received Officer Scoudroni's radio transmission and drove to his location. Upon their arrival, County Defendants witnessed Officer Scoudroni struggling to handcuff plaintiff.

---

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

Plaintiff's excessive force claim arises from two separate incidents – his arrest and later in the NPD booking room. The Newburgh defendants do not seek summary judgment dismissing plaintiff's excessive force claim as it relates to the arrest itself, but only as it relates to the incidents in the booking room.

For the following reasons, defendants' motions are DENIED as to plaintiff's excessive force claim and GRANTED as to plaintiff's procedural due process claim.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

The parties dispute what happened during the arrest and which officers were involved in subduing plaintiff. Plaintiff contends "numerous officer[s] arrived and began to assault" him and further contends "officers kicked [him] while [he] was down and handcuffed." (Zachary Aff. ¶ 5.) Plaintiff states he was on his chest when he was kicked in his ribs and legs. Plaintiff does not know who kicked him, but asserts Officer Mendez stepped on the back of his head. It took between thirty seconds and one minute for Deputy Volpe and Officer Mendez to gain control of plaintiff and place him in handcuffs. Deputy Kirby contends he did not help subdue or handcuff plaintiff, but did search plaintiff after he was handcuffed. Deputy Kirby maintains he "never observed anyone kick plaintiff or put their feet on his head or back in the claims." (Kirby Aff. ¶ 9.) Plaintiff admits Deputy Volpe did not punch, kick, or knee him during his arrest.

Plaintiff submitted an affidavit as a part of his opposition to defendants' motions. (Doc. #187 at 14–18).

**II. NPD Booking Room Incident**

*2 NPD officers arrived at the NPD headquarters with plaintiff at approximately 6:30 p.m. County Defendants arrived shortly thereafter. Non-defendant officers escorted plaintiff into the booking room. Deputy Volpe then escorted plaintiff, who was handcuffed, to the strip search room to conduct a "pat frisk." [1] (Volpe Aff. ¶ 11.) During the pat frisk, plaintiff asked Deputy Volpe if the strip search room was available. Deputy Volpe responded he was not. Upon completing the pat frisk, Deputy Volpe escorted plaintiff out of the strip search room to a bench in the booking room.

The strip search room is located within the booking room. It has one entrance and does not have a door. Two of the six surveillance cameras in the booking room have sightlines into the strip search room, but the space to the left of the entrance in the strip search room is almost entirely out of view of the cameras. Officer Hempeter explained in his affidavit that the visual obstruction is an intentional measure to provide privacy to those undergoing strip searches.

A. Altercation with Officer Scoudroni

At approximately 6:36 p.m., Officer Scoudroni escorted plaintiff back to the strip search room to conduct a full

---

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

*3 The parties also dispute what happened next. Plaintiff contends Deputy Volpe swung at him from behind, hit the wrong back of Deputy Volpe. Deputy Volpe prepares to assault plaintiff in self-defense after plaintiff swung at him unprovoked. The parties agree Deputy Volpe struck plaintiff twice.

The surveillance video shows that approximately one second after Deputy Volpe positioned himself behind Officer Scoudroni, Officer Scoudroni quickly bent down to his right. (Ex. E, Booking 1, at 6:39:33). Deputy Volpe, facing towards plaintiff, lifted his arms up as if to cover his face and stepped backwards, away from plaintiff. Less than one second later, plaintiff, no longer handcuffed, moved around to face Deputy Volpe with his fists clenched and his arms extended towards them. (Id. at 6:39:04). Within the same second, Deputy Volpe swung his closed left fist towards plaintiff's upper chest, and plaintiff swung his closed left fist towards Deputy Volpe's head. Plaintiff then swung his right arm towards Deputy Volpe's head. These Officer Scoudroni grabbed plaintiff's torso and pushed him against the back wall of the strip search room as Deputy Volpe swung his right arm at plaintiff's head, hitting him with his closed fist. (Id. at 6:39:04).

Seconds later, Officer Mendez, Officer Arrestin, Officer Hempeter, Deputy Kirby, and a non-defendant officer rushed towards the strip search room. Plaintiff contends Officer "Mendez tried to knee [him] against a wall" (Zachary Dep. Tr. at 84), and one officer "was swinging a knife", or "something silver" at him (Id. at 85), but truth is visible in the surveillance video. Defendants contend the officers were merely attempting to secure plaintiff and gain his compliance after he had struck Officer Scoudroni.

The surveillance video shows that Officer Mendez and the officer not named as a defendant entered the strip search room, while Officer Hempeter discharged pepper spray towards plaintiff's face from outside the room's entrance. (Ex. E, Booking 1, at 6:39:06). For about five seconds, plaintiff was obscured from the surveillance video both by the wall of the strip search room and the presence of officers in and around the entrance to the room.

B. Subduing Plaintiff

After the five seconds in which plaintiff was not visible in the surveillance video, plaintiff crawled underneath the officers to exit the strip search room into the booking room. (Ex. E, Booking 1, at 6:39:11). Officer Hempeter pointed his pepper spray in plaintiff's direction, but did not continue to spray

---

strip search because officers recovered drugs from plaintiff during his arrest. Plaintiff contends while plaintiff sat handcuffed, without being escorted to the strip search room, plaintiff asked Officer Scoudroni if he was the officer that pursued him on foot prior to his arrest. Officer Scoudroni responded he was.

Once inside the strip search room, Officer Scoudroni faced plaintiff towards the wall to the left of the room's entrance. (Ex. E, Booking 1, at 6:38:43). [2] Officer Scoudroni stood just behind plaintiff, facing his back. Officer Scoudroni then removed plaintiff's handcuffs. About ten seconds after Officer Scoudroni positioned plaintiff in the strip search room, Deputy Volpe entered the strip search room and stood behind Officer Scoudroni.

The Court adopts the nomenclature supplied in Exhibit E to identify each concern.

The parties dispute what happened immediately after Officer Scoudroni removed plaintiff's handcuffs. Plaintiff contends Officer Scoudroni bent plaintiff's arm and grabbed plaintiff's throat. Plaintiff asserts he then pushed Officer Scoudroni away, and Officer Scoudroni swung at plaintiff. Defendants contend plaintiff swung at Officer Scoudroni.

Officer Scoudroni contends he simply removed plaintiff's handcuffs and did not hit plaintiff's arm or grab plaintiff's throat. Officer Scoudroni maintains plaintiff turned and struck him as soon as plaintiff's handcuffs were removed, opening a laceration on Officer Scoudroni's scalp. Although plaintiff says he did not strike Officer Scoudroni, Officer Scoudroni was taken to the hospital and received three staples to close a wound to his head.

The surveillance video does not conclusively show what happened after Officer Scoudroni removed plaintiff's handcuffs because plaintiff was standing in the area of the strip search room that is obstructed from the cameras' sightlines. During the fourteen seconds between Officer Scoudroni positioning plaintiff in the strip search room and plaintiff striking Officer Scoudroni, the surveillance video does not clearly show Officer Scoudroni's arms for approximately seven seconds, including the four seconds immediately preceding the altercation. However, it shows Officer Scoudroni's legs and upper body remained stationary during that time. (Ex. E, Booking 1, at Booking 2, at 6:38:54-6:38:57, 6:38:59-6:39:02).

B. The Melee While Plaintiff was Unrestrained

After plaintiff had crawled for approximately four seconds, Deputy Kirby stepped on plaintiff's right hand or wrist, and Officer Mendez stepped on plaintiff's left hand or wrist. (Ex. E, Booking 2, at 6:39:16). Plaintiff contends Deputy Kirby and Officer Mendez stepped for his wrists "without cause," (Zachary Aff. ¶ 5), while they contend they placed their feet on plaintiff's wrists to regain control of plaintiff. Both Deputy Kirby and Officer Mendez removed their feet from three seconds later when Officer Arrestin eased plaintiff to the back. (Ex. E, Booking 1, at 6:39:19).

After the five-second tussle under was complete, plaintiff lay face-down on the ground and placed his hands behind his hand. (Ex. E, Booking 1, at 6:39:23). Deputy Volpe took plaintiff's right hand and placed it behind plaintiff's back. (Id. at 6:39:31). Officer Mendez placed handcuffs on plaintiff's left hand and pulled his left arm backwards before placing it behind plaintiff's back. (Id. at 6:39:33). Officer Hempeter then removed his knee from plaintiff's shoulder, and Officers Mendez and Hempeter lifted plaintiff onto his feet and took him back into the strip search room. (Id. at 6:39:46-6:39:57). Approximately three minutes later, Officer Labar placed plaintiff in shackles while plaintiff lay on the floor. (Ex. E, Booking 2, at 6:43:04).

C. After Plaintiff was Subdued

*4 The parties also dispute what occurred after plaintiff was shackled in the strip search room for approximately twenty-one minutes.

Plaintiff claims (i) Officer Arrestin grasped plaintiff's throat and held, and placed a taser under his chin, (ii) he lost consciousness, (iii) an officer whose identity plaintiff cannot recall placed a knife under his throat and threatened to stab him, (iv) Sergeant Anderson stomped on his legs and shackles, and (v) Officer William Labar yanked the taser prongs from his back.

Defendants dispute plaintiff's account. Officer Arrestin admits he had a taser in his hand, but did not use it while in the strip search room with plaintiff. Sergeant Anderson denies having any physical contact with plaintiff. Officer William Labar denies removing taser prongs from plaintiff's back, and asserts that taser prongs were already out of plaintiff's back when he entered the strip search room. Officer Arrestin admits that the taser prongs fell out of plaintiff's back prior

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

to his return to the strip search room because someone had stepped on the taser wires.

The surveillance video is inconclusive. It shows that Officers Mendez and Hauspurg placed plaintiff on the ground to the left of the room's entrance, where he lay down with his head facing away from the entrance. (See Ex. E, Booking 2, at 6:42:44-6:43:45, 6:48:38-6:52:30). However, the surveillance video does not clearly capture plaintiff for approximately twenty-one minutes while he was in the strip search room. During that time, Officer Arensin, Sergeant Anderson, Officer William Lahar, and Officer Hinspeter entered the strip search room, but the surveillance video does not depict what defendants were doing in the strip search room.

**III. Plaintiff's Hospital Visit**

Later that evening, Officer Mendez transported plaintiff to St. Luke's Hospital in Newburgh. Plaintiff arrived at the emergency room at approximately 9:17 p.m.

The hospital medical records show plaintiff complained of pain in his left elbow, left wrist, chest, and ribs. Plaintiff's medical report indicates he had mild swelling of his left wrist at the hand cuff site and redness on his left elbow, but reports his left elbow was "atraumatic with slightly red," meaning the elbow did not show signs of serious injury. (Ex. G at 19). The medical report also indicates plaintiff's head was "normocephalic" and "atraumatic." (Id.). Plaintiff's X-ray of his wrist and elbow was negative for injuries. Plaintiff was instructed to take Tylenol or ibuprofen for his pain.

> Plaintiff's medical records from St. Luke's Cornwall Hospital are Exhibit G to the Declaration of Kellie E. Lagitch, Esq., hereinafter referred to as "Ex. G." (Doc. #172).

**IV. Criminal Conviction**

[column continues]

As a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1996).

A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the non-moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits evidence that is "merely colorable," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

\*6  On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011). If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

While "it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage," Jeffreys v. City of New York, 426 F.3d 549, 554 (2d

[column continues]

Cir. 2005), the Supreme Court has instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Therefore, district courts may make credibility assessments at the summary judgment stage "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, [because] it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." Jeffreys v. City of New York, 426 F.3d at 554 (internal citation omitted).

**II. Excessive Force Claim**

The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010). The incidence of the excessive force analysis is whether the force used by a police officer was "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). The analysis looks to the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. at 396. Also relevant is whether officers "continued to use force against a suspect who, although previously resistant, has been subdued." Whitfield v. City of Newburgh, 2015 WL 9275695, at \*18 (S.D.N.Y. Dec. 17, 2015).

> Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

The "force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396.

Because police officers often must use some degree of force when arresting or otherwise lawfully "seizing" an individual, the Supreme Court has recognized that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham v. Connor, 490 U.S. at 396 (internal citation omitted). Thus, a plaintiff generally must prove he sustained some injury to prevail on an excessive force claim. McAllister v. N.Y.C. Police Dep't, 49 F. Supp. 2d 688, 693 (S.D.N.Y. 1999); see Landy v. Irizarry, 884 F. Supp. 788, 799 n.14 (S.D.N.Y. 1995) ("An excessive force claim requires some injury, even if insignificant, to prevail in an excessive force claim.").

**A. County Defendants' Involvement in Plaintiff's Arrest**

County Defendants and Newburgh Defendants submitted statements of undisputed facts pursuant to Local Rule 56.1, but plaintiff submitted a counterstatement of facts only in response to Newburgh Defendants' statement. County Defendants argue the Court should deem admitted the facts contained in their Rule 56.1 Statement. However, the Court recognizes "the various procedural rules attendant to opposing summary judgment may be challenging or confusing for a pro se litigant." Cayetano v. City of New York, Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013), aff'd, 2016 WL 860063 (2d Cir. Mar. 7, 2016). Therefore, the Court will "in its discretion opt to conduct an assiduous review of the record." Alexander v. The Bd. of Educ. of City of New York, 2016 WL 2610809, at \*2 (2d Cir. May 6, 2016) (summary order).

\*7  County Defendants argue they are entitled to summary judgment for plaintiff's claim of excessive force arising from his arrest because they were not personally involved insofar as they did not kick or personally harm plaintiff.

The Court disagrees.

A reasonable juror could conclude County Defendants were personally involved in the use of excessive force during plaintiff's arrest by failing to intervene.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1981." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation omitted). "To survive a motion for summary judgment, there

must be some evidence of the personal involvement of each defendant in the alleged constitutional deprivation." Ricks v. O'Hanlon, 2010 WL 245550, at \*4 (S.D.N.Y. Jan. 19, 2010) (citing Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)).

"A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault, or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." Jeffreys v. Rossi, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), aff'd sub nom. Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). At the summary judgment stage, "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Id. at 474. "This is especially true where the acts complained of by the plaintiff, if true ... are likely to have prevented plaintiff from identifying which ... defendant officers specifically engaged in the bad acts." Skinkle v. Anderson, 2009 WL 311761, at \*5 (E.D.N.Y. Sept. 25, 2009) (internal citation omitted). A plaintiff need only show there was "a realistic opportunity to intervene to prevent the harm from occurring." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

"[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." Figueroa v. Mazza, 2016 WL 3126772, at \*13 (2d Cir. June 3, 2016). Because no single factor is dispositive, "[t]he essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." Id. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d at 557.

Here, plaintiff contends he was on the ground on his chest and is unable to identify which officers kicked him in his ribs and legs while County Defendants were present. Even assuming County Defendants did not kick plaintiff, a reasonable jury could credit plaintiff's account that he was kicked after he was on the ground and compliant, and therefore conclude County Defendants failed to intervene in other defendants' use of excessive force.

[footnote column, second page right]

9   County Defendants do not argue that any kicking occurred too quickly for them to intercede. Even if they had made such an argument, viewing the facts favorable to plaintiff, the Court would not be able conclude that this "assault occurred so quickly that defendant officers lacked time to intercede as a matter of law." Figueroa v. Mazza, 2016 WL 3126772, at \*10 (denying summary judgment on personal involvement grounds when defendant officers were present for an alleged assault of an arrestee that lasted approximately twenty seconds).

\*8  Accordingly, County Defendants' motion for summary judgment on plaintiff's excessive force claim with respect to plaintiff's arrest is denied.[10]

> 10   As noted above, Newburgh Defendants do not seek summary judgment as it relates to the arrest itself.

**B. Officer Scudošvoi's Use of Force While Un-Handcuffing Plaintiff**

Summary judgment is not appropriate as to Officer Scudošvoi because there are issues of material fact as to whether, as plaintiff claims, Officer Scudošvoi beat plaintiff's arm and grabbed plaintiff's throat during, or immediately following, his removal of plaintiff's handcuffs.

Although the video evidence casts significant doubt on plaintiff's version of the events in the strip search room, a reasonable juror could credit plaintiff's account that Officer Scudošvoi twisted his arm and grabbed his throat, unprovoked. Summary judgment is inappropriate when "an excessive force claim turns on which of two conflicting stories best captures what happened." Whitfield v. City of Newburgh, 2015 WL 9275695, at \*18 (S.D.N.Y. Dec. 17, 2015) (quoting Sawyer v. Asbury, 537 U.S. 894, 210 (2003) (Ginsburg, J., concurring)), and "video evidence is ambiguous as to how much force, if any, the officers used." Ricks v. Vill. of Ossining, 2016 WL 145582, at \*5 (S.D.N.Y. Jan. 27, 2016) (denying summary judgment for defendant officers when surveillance video did not clearly capture the amount of force used to apprehend plaintiff). Here, surveillance video shows that Officer Scudošvoi's legs and back were relatively stationary when he removed plaintiff's handcuffs, consistent with Officer Scudošvoi's account that he did not twist plaintiff's arm or grab plaintiff's throat. (Ex. E, Booking 1 d, Booking 2, at 6:38:49-6:38:59). However, Officer Scudošvoi's arms are not visible during the four seconds just before plaintiff turns to strike Officer Scudošvoi

[page 28 second column right, footnote]

(Id. at 6:38:59-6:39:03). Viewing the record in the light most favorable to plaintiff, as the Court must at the summary judgment stage, a jury could credit plaintiff's account that Officer Scudošvoi—unprovoked by any of plaintiff's actions—twisted plaintiff's arm and grabbed his throat while removing the handcuffs.

Therefore, Newburgh Defendants' motion for summary judgment on plaintiff's excessive force claim is denied as to Officer Scudošvoi.

**C. The Melee While Plaintiff was Unrestrained**

After Officer Scudošvoi removed plaintiff's handcuffs it is uncontroverted that plaintiff struck Officer Scudošvoi[11] and a melee ensued for approximately thirty seconds.

> 11   Although plaintiff denies striking Officer Scudošvoi in the head, he is estopped from doing so. "Collateral estoppel operates only to prevent [plaintiff] from asserting facts that were necessarily decided in his previous trial." Hemphill v. Schott, 141 F.3d 412, 417 (2d Cir. 1998). Plaintiff was charged with second degree assault in violation of New York Penal Law § 120.05 for striking Officer Scudošvoi in the head. A jury found plaintiff guilty, necessarily deciding that plaintiff struck Officer Scudošvoi in the head. Under New York law, "unless and until the state court judgments are reversed" on appeal, "they constitute a conclusive final and binding adjudication." Santiago v. Muhammad, 873 F. Supp. 817, 824 (S.D.N.Y. 1995), aff'd, 8 Fed.Appx. 78 (2d Cir. 2001). Therefore, plaintiff is estopped from denying he struck Officer Scudošvoi.

\*9  During the fracas, County Defendants, Officer Mendez, and Officer Hinspeter each used force that appears to have been reasonable in light of plaintiff's efforts to fight the officers and to resist their efforts to restrain him. See Graham v. Connor, 490 U.S. at 396 (the reasonableness of an officer's use of force depends in part on whether the suspect poses an immediate threat to the safety of the officers and whether he is actively resisting arrest). Here, after plaintiff was reasonable when he struck plaintiff with his flashlight after plaintiff "made a quick and sudden movement in [the officer's] attempt to effect an arrest"). County Defendants, Officer Mendez, and Officer Hinspeter attempted to restrain

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

plaintiff[17] while he was physically fighting with or resisting the defendant police officers. Defendants argue "[e]ach had every right to take reasonable measures, including the use of force, to end the threat to their safety." (Newburgh Defs.' Br. at 5.)

[17]   Deputy Volpe punched plaintiff after plaintiff mustered a fighting stance and reached toward him. Officer Mendez entered the strip search room and attempted to knee plaintiff against the wall. Officer Hunpeter sprayed plaintiff with pepper spray. Deputy Kirby and Officer Mendez stepped on plaintiff's wrists.

Although it appears these defendants' use of force was reasonable while plaintiff was fighting and resisting the officers' efforts to restrain him, the Court declines to grant summary judgment and conclude as a matter of law that their use of force was reasonable during this thirty second period of time. As discussed below, issues of material fact preclude summary judgment for each of these four defendants' use of force; while plaintiff was no longer fighting or resisting. Thus, there would be little benefit of finding these four defendants' use of force – for an approximately thirty-second period of time – reasonable as a matter of law, given that the Court must defer to the jury's view of the jury as to other aspects of plaintiff's excessive force claim.

D. Subduing Plaintiff

Defendants argue summary judgment should be granted in favor of Deputy Volpe and Officers Mendez, Hunpeter, and Amestin with respect to their efforts to subdue plaintiff outside the strip search room because their actions were objectively reasonable.

Although it is a close call, the court disagrees.

When officers continue to apply force to an arrestee who is already subdued, it may be sufficient for a jury to find such force to be excessive. See, e.g., Alberghy v. Ryan, 658 F. Supp. 2d 526, 538 (S.D.N.Y. 2009), aff'd sub nom. Alberghy v. Paul, 406 Fed. App'x. 515 (2d Cir. 2011) (denying summary judgment for defendant officers when they slammed an arrestee's head into a glass window after he had been handcuffed). Specifically, the use of a taser on a suspect who has already been subdued is some indication of excessive force. See Garcia v. Dutchess Cty., 43 F. Supp. 3d 281, 293 (S.D.N.Y. 2014), aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik, 603 Fed.Appx. 61 (2d Cir 2015)

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

the medical report reflects swelling of plaintiff's wrist at the handcuff site. Thus, regardless of exactly when plaintiff was subdued, a reasonable jury could find the force with which these officers handcuffed plaintiff constituted excessive force.

E. After Plaintiff was Subdued

Because material facts are disputed and the record is inconclusive regarding the events that transpired in the strip search room after plaintiff was placed there in shackles, summary judgment is denied as to plaintiff's excessive force claim arising from this period of time.

Plaintiff contends Officer Amestin stomped on his head and throat, and Sergeant Anderson stamped on his shackled ankles and kicked him in his back. Plaintiff also states Officer William Lahar yanked the taser prongs from his back.

Defendants argue plaintiff's medical records reflect only minor injuries and do not support his claims of being assaulted while shackled in the strip search room. Defendants do contend that a mere de minimis injury is evidence that de minimis force was used. See, e.g., Carmillay v. City of New York, 2016 WL 1274575, at *12 (S.D.N.Y. Mar. 31, 2016) (holding the force used in applying flex cuffs to be a reasonable as a matter of law because the numbness and tingling plaintiff experienced were de minimis). However, the absence of long-term injury is not dispositive of an excessive force claim. See Franks v. New Rochelle Police Dep't, 2015 WL 4922996, at *14 (internal quotation omitted) (collecting cases and concluding, despite the plaintiff's lack of major injury, that the reasonableness of the defendant officers' use of force should be left to the jury). "[T]o focus on the severity of an arrestee's injury as opposed to the reasonableness of an officer's use of force is to focus on the wrong question." Id.

To the extent defendants invite the Court to discredit plaintiff's version of events based on the minor injuries reflected in his medical records, the Court declines to do so. Although plaintiff's medical records are inconsistent with his version of events, plaintiff's account is not "blatantly contradicted" by the video and documentary evidence such that the Court should discredit plaintiff's account at this stage; it is matter of law. Cf. Scott v. Harris, 550 U.S. at 380. In short, it is the province of the jury to weigh credibility.

*11.  Accordingly, summary judgment is denied with respect to plaintiff's excessive force claim after he was subdued and back in the strip search room.[18]

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

(denying summary judgment when an officer tased an arrestee twice after officers stood on top of the arrestee and pulled his arms behind his back to handcuff him). Therefore, the reasonableness of force used by (i) Officer Amestin when he tased plaintiff, (ii) Deputy Volpe and Officer Mendez when they grabbed plaintiff's arms to reapply his handcuffs, and (iii) Officer Hunpeter when he placed his knee on plaintiff's neck and upper back depends in part on exactly when plaintiff was subdued and no longer a threat to the officers' safety.

Based on the video and other evidence, the Court is simply not able to say as a matter of law precisely when plaintiff was restrained to the point that he no longer posed a threat to the officers' safety. On the one hand, Newburgh Defendants argue "[a]ctions and until [plaintiff] was fully restrained in cuffs he posed a threat." (Newburgh Defs.' Br. at 12). However, Deputy Kirby and Officer Mendez stepped on plaintiff's wrists as he lay face-down on the ground, and then Officer Amestin deployed his taser. Even though plaintiff was physically fighting officers just moments before, a jury could reasonably conclude plaintiff was subdued prior to being tased, grabbed, or kneed.

*10  Of course, the jury is not compelled to find plaintiff was already subdued prior to being tased, grabbed, or kneed. These are issues that remain in dispute. A jury may conclude plaintiff was subdued only after he was tased, or, as defendants contend, only after Volpe, Hunpeter, and Mendez reapplied plaintiff's handcuffs. But if plaintiff was no longer resisting, and if defendants gratuitously tased, grabbed, or kneed plaintiff, causing injuries, a reasonable jury could find the force used was excessive.[19]

[19]   Even assuming the Court could conclude as a matter of law the exact moment plaintiff was subdued; whether plaintiff was still resisting officers' commands is not necessarily dispositive of whether the force used against him was unconstitutionally excessive. A law enforcement officer's use of force may be unreasonable, even if the arrestee is not yet subdued, if the officer "uses overwhelming and disproportionate force in subduing" the arrestee. McCrory v. Belden, 2003 WL 22371192, at *4 (S.D.N.Y. Sept. 30, 2003). The surveillance video does not conclusively convey the degree of force Deputy Volpe, Officer Mendez, and Officer Hunpeter used as they reapplied plaintiff's handcuffs. When plaintiff arrived at the hospital, he complained of pain to his left wrist, and

[18]   Newburgh Defendants argue there is no evidence Officer Kevin Lahar, Officer William Lahar, and Officer Luftex personally used force against plaintiff during the altercation in the booking room. (Newburgh Defs.' Reply at 5-6). This argument may well have merit. However, these defendants' were present during their colleagues' use of force and would have had an opportunity to intervene if their colleagues' use of force was excessive. See supra Discussion Section II.A (discussing failure to intervene theory of personal involvement as to the County Defendants during plaintiff's arrest). Because issues of material fact preclude summary judgment as to plaintiff's excessive force claim, summary judgment is also denied as to Officer Kevin Lahar's, Officer William Lahar's, and Officer Luftex's failure to intervene.

III. Qualified Immunity

The Court must next address whether defendants' actions are protected by qualified immunity. Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). A qualified immunity defense is established when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir 1998)

The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct." Saucier v. Katz, 533 U.S. 194, 205 (2001). Qualified immunity applies if the officer's mistake as to what the law requires is reasonable. Id. It does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. Malley v. Briggs, 475 U.S. at 341.

Defendants argue the force they used was objectively reasonable as a matter of law.

Defendants are incorrect.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Zachary v. City of Newburgh, Not Reported in Fed. Supp. (2016)
2016 WL 4030625

issues of fact exist as to whether (i) County Defendants had an opportunity to intervene while plaintiff contends he was being kicked during his arrest; (ii) Officer Scandoson grabbed plaintiff's throat and bent his arm while un-handcuffing later, and (iii) whether the defendants' use of force was excessive after plaintiff was re-restrained. Were a jury to credit plaintiff's account, it could reasonably conclude defendants violated plaintiff's Fourth Amendment right to be free from excessive force, and it was not objectively reasonable for defendants to have done so.

Accordingly, summary judgment on the issue of qualified immunity is not appropriate.

IV. Procedural Due Process Claim

To prevail on a procedural due process claim, a plaintiff must show he possessed a protected liberty or property interest and was deprived of that interest without due process. McKnnomy v. City of Rochester, 241 F.3d 279, 285-86 (2d Cir 2001). The Due Process Clause protects "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir 2000); see Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir 1997) ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.").

*12  The Supreme Court has held, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). If a Section 1983 claim "would necessarily imply the invalidity of the punishment imposed, ... the claim [is] not cognizable under [Section] 1983." Jackson v. Johnson, 15 F. Supp. 2d 341, 348 (S.D.N.Y. 1998) (quoting Edwards v. Balisok, 520 U.S. 641, 648 (1997)).

Plaintiff contends he was deprived of a full and fair opportunity to litigate his criminal conviction in violation of his Fourteenth Amendment Due Process rights because a suppression hearing was held on December 11, 2013, but

"was never ruled on." (Zachary Aff. ¶¶ 14-15). Defendants argue summary judgment must be granted in light of plaintiff's criminal conviction.

Defendants are correct.

Plaintiff's due process claim necessarily challenges the validity of his criminal conviction. A plaintiff is barred from bringing such a claim in civil court if his conviction has not been invalidated. See Barnes v. City of New York, 2015 WL 5692308, at *6 (S.D.N.Y. Aug. 26, 2015) (granting summary judgment on plaintiff's claim brought after his conviction premised on the allegation that defendant officers fabricated evidence; see also Edwards v. Balisok, 520 U.S. at 644-45 (holding plaintiff's due process claim under Section 1983 was not cognizable, as his allegation that the hearing officer at his prison disciplinary proceeding " 'intentionally denied' him the right to present evidence in his defense" would have necessarily invalidated the results of his hearing).

Here, an appeal of plaintiff's conviction is pending in the Appellate Division, Second Department. As long as plaintiff's case has not been "reversed on direct appeal" or otherwise invalidated, Heck v. Humphrey, 512 U.S. at 487, plaintiff's procedural due process claim is not cognizable under Section 1983. As such, summary judgment for defendants is granted as to plaintiff's due process claim.

CONCLUSION

Defendants' motions for summary judgment are DENIED as to plaintiff's excessive force claim and GRANTED as to plaintiff's procedural due process claim.

Counsel for all parties, as well as plaintiff, are directed to attend a case management conference on August 22, 2016, at 2:30 p.m. Defense counsel shall arrange for plaintiff's appearance by telephone.

The Clerk is instructed to terminate the motions. (Docs 60, 66, 171).

SO ORDERED.

All Citations

Not Reported in Fed. Supp., 2016 WL 4030625

End of Document       © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2785594
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Wilson RAMOS, as Administrator of The Estate of Jose A. Maldonado, and Individually, Plaintiff,
v.
TOWN OF EAST HARTFORD et al., Defendants.

No. 3:16-CV-166 (VLB)

Signed 07/02/2019

**Attorneys and Law Firms**

David M. Cohen, Leonard Braman, Zachary John Phillipps, Wofsey, Rosen, Kweskin & Kuriansky, Stamford, CT, for Plaintiff.

Michael Brave, Pro Hac Vice, Taser International, Inc., Scottsdale, AZ, Alan Raymond Dembiczak, Beatrice S. Jordan, Thomas R. Gerarde, Howd & Ludorf, LLC, Hartford, CT, Sarah Murphy, Durham, CT, Winifred B. Gibbons, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Defendants Town of East Hartford, James Lis, Jason Cohen, Scott Sansom.

Dennis M. Durao, James Newhall Tallberg, Karsten & Tallberg LLC, Rocky Hill, CT, Kristan M. Maccini, Thomas R. Gerarde, Howd & Ludorf, LLC, Hartford, CT, for Defendant Jason Kaplan.

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [DKTS. 125, 126]

Hon. Vanessa L. Bryant, United States District Judge

*1 Plaintiff Wilson Ramos ("Ramos"), as administrator of the Estate of his deceased brother Jose A. Maldonado (the "Estate" or "Maldonado"), and individually, brings this action against the Town of East Hartford and Officers Jason Kaplan, James Lis, Jason Cohen, and Chief Scott Sansom (collectively, "Defendants"). Plaintiff brings various state and federal claims stemming from the fatal altercation he observed between Maldonado and Defendants Kaplan, Lis, and Cohen on April 13, 2014.

Before the Court are two motions for summary judgment. Defendants Town of East Hartford, Lis, Cohen, and Sansom filed a Motion for Summary Judgment ("Defendants' Motion for Summary Judgment"). *See* [Dkt. 126 (Mot. for Summ. J.)]. Defendant Kaplan filed a separate Motion for Summary Judgment ("Defendant Kaplan's Motion for Summary Judgment"). *See* [Dkt. 125 (Def. Jason Kaplan's Mot. for Summ. J.)]. For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment and Defendant Kaplan's Motion for Summary Judgment.

I. Factual Background[1]

1 The facts are taken from the parties' Local Rule 56(a) Statements and the exhibits submitted in support of and in opposition to Defendants' Motion for Summary Judgment and Defendant Kaplan's Motion for Summary Judgment.

On April 12, 2014, Ramos and Maldonado attended a party and Maldonado drank beer and cognac to the point of intoxication. They left early because Maldonado was so intoxicated. [Dkt. 126-5 (Ramos Dep.) at 44:21-25, 49:16-52:6]. Ramos and Maldonado were half-siblings. *Id.* at 10:2-8. Ramos had never seen Maldonado as drunk as he was that night. *Id.* at 43:24-44:1.

While Ramos and Maldonado were walking towards Ramos's car, a vehicle occupied by Angel Arroyo, Liz Bigio, and three children stopped, and an argument ensued during which Maldonado punched and shattered the glass of the driver's side window. *Id.* at 62:19-64:23; *see also* [Dkt. 126-6 (Bigio Dep.) at 18:8-13]; [Dkt. 126-7 (Arroyo Dep.) at 16:23-25]. Ms. Bigio called the police and Sergeant Lis was the first to arrive on the scene alone. [Dkts. 126-5 at 69:22-70:6; 126-6 at 38:16-26; 126-8 (Lis Dep.) at 54:7-19]. Sergeant Lis spoke with Ms. Bigio and observed damage to her vehicle. [Dkt. 126-8 at 54:7-23]. Ms. Bigio pointed to Ramos and Maldonado and stated that one of them broke her window. *Id.*

Sergeant Lis approached Ramos and Maldonado and observed Ramos pushing Maldonado into the passenger seat of a motor vehicle. [Dkt. 126-5 at 70:18-71:14]. Sergeant Lis instructed Ramos to move away from the vehicle, so he could speak to Maldonado, but Ramos refused. [Dkt. 126-8 at 57:8-16]. At his deposition, Ramos admitted he heard Sergeant Lis's command, but could no longer recall what

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

| Time on Camera[2] | Event |
|---|---|
| 2:04:43 | Maldonado struggles with the officers who are crowded in the entrance of the cell. Maldonado punches forward towards the officers with his right arm. |
| 2:04:44 | Maldonado continued to struggle with the officers. |
| 2:04:46 | While struggling with the officers, Maldonado extends his left arm and tries to keep Sergeant Lis at bay. Officer Kaplan takes out his taser and aims it at Maldonado. |
| 2:04:46 | Officer Kaplan takes a step forward still aiming the taser at Maldonado. Maldonado's arms are bent at a ninety-degree angle. Maldonado takes a step to the side with his left leg. He does not appear to be advancing. |
| 2:04:48 | Sergeant Lis punches Maldonado in the face with his left arm. Maldonado doubles over, spins approximately 180° and is facing the back of the holding cell. |
| 2:04:49 | Sergeant Lis pushes Maldonado from behind towards the holding cell wall directly opposite from the door. Maldonado extends his arms to catch himself. He falls forward and his head makes contact with the wall. |
| 2:04:50 | Sergeant Lis turns towards Maldonado and hovers over him. |
| 2:04:51 | Sergeant Lis stays near Maldonado leaning over him. |
| 2:04:52 | Officer Kaplan continues to hold the taser aimed at Maldonado. With his other hand, he holds Ramos against the side of the holding cell against the cell wall. |
| 2:04:53 | Maldonado braces his right arm on the floor and lifts his upper body off the floor. |
| 2:04:54 | Maldonado sits on the floor with his upper body slumped forward over his legs. |

| Time on Camera[2] | Event |
|---|---|
| 2:04:55 | Sergeant Lis steps back from Maldonado. Officer Kaplan holds Ramos in the corner of the holding cell against the wall. He continues to hold the taser in his other hand. |
| 2:04:56—2:04:59 | Maldonado remains seated leaning forward as his torso rocks slightly from side-to-side. |
| 2:05:00 | The officers stand back from Maldonado who is still seated and leaning very far forward. |
| 2:05:01—2:05:03 | Sergeant Lis takes out his handcuffs and moves towards Maldonado. |
| 2:05:04 | Sergeant Lis and Officer Cohen continue to move towards Maldonado. |
| 2:05:05—2:05:08 | Sergeant Lis and Officer Cohen move Maldonado in preparation for handcuffing him. |
| 2:05:09 | Sergeant Lis moves away from Maldonado towards Officer Kaplan and Ramos in the corner of the holding cell. |
| 2:05:09—2:05:14 | Officer Cohen moves Maldonado to his side and begins handcuffing his wrists. |
| 2:05:17 | Officer Kaplan joins Officer Cohen to assist in handcuffing Maldonado. |
| 2:05:17—2:05:32 | Officers Kaplan and Cohen pull Maldonado's arms behind his back and cuff him. |
| 2:05:33—2:05:41 | Officers Kaplan and Cohen stand up behind Maldonado. |
| 2:05:42—2:05:46 | Officer Cohen moves away from Maldonado towards the door of the holding cell. |
| 2:05:47—2:05:57 | All three officers are stand in a circle around Maldonado. Ramos remains in the corner of the holding cell. |
| 2:05:57—2:06:07 | Sergeant Lis moves towards the door of the holding cell, but all three officers remain in the holding cell with Maldonado. Ramos remains in the corner of the holding cell. |
| 2:06:08 | Sergeant Lis, looking at Ramos, waves his hand towards the door of the holding cell. |

| Time on Camera | Event |
|---|---|

| Time on Camera[2] | Event |
|---|---|
| 2:06:09—2:06:11 | Ramos exits the holding cell followed by Sergeant Lis. Officers Cohen and Kaplan move towards the door of the holding cell. |
| 2:06:12—16 | Officer Kaplan exits the holding cell followed by Officer Cohen. |
| 2:06:16—2:06:22 | All three officers leave the holding cell and remain in the area outside the open door of the holding cell. |
| 2:06:23—2:06:29 | One of the officers slides the door of the holding cell closed. |
| 2:06:30 | The door of the holding cell is fully closed. Maldonado is left alone inside the holding cell lying on his side with his hands cuffed behind him. |

[Editor's Note: The preceding image contains the reference for footnote[2]]

2 Two timestamps are visible on the video. The Court uses the timestamp in the upper left corner of the video in large white text. [Dkt. 126-17].

During the altercation with Maldonado, Defendant Kaplan deployed the taser for twenty seconds. [Dkt. 132-2 (Taser Deployment Report)]. The maximum recommended deployment time for a taser is fifteen seconds. [Dkts. 132-40 (ECW Guidelines) at 18; 132-41 (Taser Training) at 5]. Tasing for longer than fifteen seconds may increase the risk of serious injury or death and should be avoided. [Dkt. 132-25 (Minor Dep.) at 110:17-25]. The taser prongs struck Maldonado in the chest. [Dkt. 132-7 (Postmortem Examination) at 2]. Taser training warns against targeting a person's chest. [Dkts. 132-40 at 37; 132-41 at 4; 132-25 at 119; 132-24 at 88:3-7, 91:6-21; 132-18 at 36:6-23; 132-23 at 32:17-33:9].

*3 Ramos washed his eyes again and afterwards he sat unhandcuffed on the floor outside of the holding cell, approximately eight feet away from Maldonado. [Dkts. 126-5 at 99:18-100:10, 102:21-103:5, 102:21-23; 126-8 at 113:14-19; 126-17 at 2:09:40]. Officer Parlapiano arrived and observed Maldonado lying on the floor in the holding cell. [Dkt. 126-9 at 37:20-22]. The officers did not reenter the cell to check on Maldonado until 2:10:34 AM–after approximately four minutes passed. [Dkt. 126-17 at 2:10:34]. During that four-minute period, Maldonado remained lying on the floor of the cell on his side with his hands cuffed behind his back moving slightly every couple of seconds. The holding cell camera depicts his movements:

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

Lis said. [Dkt. 126-5 at 71:5-8]. Ramos admitted he did not comply with Sergeant Lis's command and told Lis to wait until he got Maldonado fully into the vehicle. [Dkts. 126-5 at 116; 132-6 (Ramos Aff.) at ¶ 4; 126-8 at 57:3-58:25, 71:1-20]. After Ramos got Maldonado into the vehicle, he turned around and Sergeant Lis sprayed him with pepper spray. [Dkts. 126-5 at 71:1-4; 132-6 at ¶ 4; 126-8 at 56:21-57:23]. Ramos claims he did not have a chance to acknowledge Sergeant Lis's command voluntarily because he was pepper sprayed almost immediately after the command. [Dkts. 132-3 (Ramos Dep.) at 72:13-18; 132-6 at * 4]. Sergeant Lis, with the help of Officer Miller who arrived on the scene, handcuffed Ramos and brought him to the ground. [Dkts. 126-8 at 59:3-10; 132-3 at 72:24-73:6].

*2 Next, Sergeant Lis turned to Maldonado who was walking towards him with clenched fists and saying, "Fuck you, motherfucker." [Dkt. 126-8 at 59:22-60:11]. Sergeant Lis struck him in the face. *Id.* Then, Officer Parlapiano arrived, sprayed Maldonado with pepper spray, and both officers brought Maldonado into custody. *Id.* at 60:12-13. Once Maldonado was handcuffed, he continued to resist and try to pull away. [Dkt. 126-10 (Cohen Dep.) at 65:21-24, 66:16-22]. Ramos did not see this interaction between Maldonado and the officers because he was handcuffed and face down on the ground. [Dkt. 132-3 at 74:15-75:11]. Officers Parlapiano and Cohen observed Sergeant Lis struggling to take Maldonado into custody. [Dkts. 126-9 (Parlapiano Dep.) at 16:5-19; 126-10 at 62:24-63:2]. Mr. Arroyo and Ms. Bigio also observed that the officers had a hard time controlling Maldonado. [Dkts. 126-6 at 37:2-23; 126-7 at 22:12-21]. Mr. Arroyo described Maldonado like "a bullet going everywhere" and Ms. Bigio described him as "The Hulk." [Dkts. 126-6 at 37:2-23; 126-7 at 25:1-20].

After he was handcuffed, the officers observed that Maldonado was intoxicated and continued to be uncooperative. [Dkts. 126-8 at 71:18-24; 126-10 at 65:12-66:22; 126-11 (Kaplan Dep.) at 133:21-134:12]. He struggled during the pat down and refused to get into the police cruiser. [Dkts. 126-8 at 75:8-12; 126-11 at 133:24-134:6]. Ramos was compliant with the officers for the remainder of the night and no additional force was used. [Dkt. 126-8 at 66:9-21]. Maldonado and Ramos were put in separate police cruisers and transported to the East Hartford Police Department headquarters by Officers Kaplan and Cohen, respectively. [Dkts. 126-10 at 70:5-8; 126-11 at 145:9-19]. Maldonado was spitting at Officer Kaplan during the transport, but Ramos was transported without incident. [Dkt. 126-11 at 145:12-17].

Upon arrival at the headquarters, Officers Kaplan and Cohen brought Maldonado to the eyewash decontamination area in the booking room to let him rinse his eyes, but he refused. [Dkt. 126-10 at 72:2-12; 126-11 at 145:20-147:6]. Plaintiff disputes that Maldonado refused, but he cites no evidence in support of his assertion. Officers Kaplan and Cohen then escorted Maldonado into the holding cell inside the booking area, uncuffed him, and locked him inside the cell. [Dkts. 126-17 (Holding Cell Video); 126-10 at 77:3-5; 126-11 at 146:17-147:6]. After he was alone in the cell, Maldonado began pacing and disrobing. [Dkt. 126-17 at 2:00:49-2:04:35].

Next, Officers Cohen and Kaplan escorted Ramos into the booking area and allowed him to rinse his face in the eye decontamination area. [Dkts. 126-10 at 73:15-74:2; 126-11 at 147:11-148:10]. By this time, Sergeant Lis arrived in the booking room. [Dkt. 126-8 at 77:21-78:5]. Maldonado had removed all of his clothing except for his underwear and his right pant leg which was stuck around his ankle over his shoe. [Dkt. 126-17 at 2:00:49-2:04:35]. The officers asked Ramos if he was comfortable going into the holding cell with Maldonado and Ramos said yes. [Dkt. 126-5 at 84:24-85:3]. Officers Kaplan and Cohen escorted Ramos to the holding cell door and told Maldonado, who was inside the cell, to step away from the door. *Id.* at 90:1-6. The officers removed Ramos's handcuffs. *Id.* at 89:12-14. One of the officers unlocked the holding cell door.

What happened during the next two minutes was captured by two cameras, neither of which recorded audio:

| Time on Camera | Event |
|---|---|
| 2:04:36 | Maldonado begins moving towards the door of the holding cell. |
| 2:04:38 | Maldonado grabs the sliding door of the holding cell. |
| 2:04:39 | Maldonado pushes the sliding door of the holding cell open and steps into the threshold of the door. |
| 2:04:40 | Maldonado reaches the officers standing immediately outside of the sliding door of the holding cell. |
| 2:04:41 | Maldonado is launched and pushed backwards towards the holding cell. |
| 2:04:42 | Maldonado is pushed backwards and re-enters the holding cell. |

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

| | |
|---|---|
| 2:06:26—2:06:31 | Maldonado seen moving slightly |
| 2:06:46—2:06:50 | Maldonado seen moving slightly |
| 2:07:05—2:07:08 | Maldonado seen moving slightly |
| 2:07:10 | Maldonado seen moving slightly |
| 2:07:22—2:07:25 | Maldonado seen moving slightly |
| 2:07:27—2:07:29[3] | Maldonado seen moving slightly |
| 2:07:46—2:07:50 | Maldonado seen moving slightly |
| 2:07:53 | Maldonado seen moving slightly |
| 2:07:56—2:07:57 | Maldonado seen moving slightly |
| 2:08:02 | Maldonado seen moving slightly |
| 2:08:06—2:08:08 | Maldonado seen moving slightly |
| 2:08:12 | Maldonado seen moving slightly |
| 2:08:35 | Maldonado seen moving slightly |
| 2:09:03 | Maldonado seen moving slightly |
| 2:09:15 | Maldonado seen moving slightly |
| 2:09:25 | Maldonado seen moving slightly |
| 2:10:04—2:10:05 | Maldonado seen moving slightly |

3 There is a gap in the video from 2:07:31 to 2:07:45. [Dkt. 126-17].

Plaintiff's expert Dr. Robert Myerburg described these slight movements as "gasping respirations," which, to a trained eye, indicate that Maldonado suffered potentially lethal brain trauma. [Dkt. 126-14 (Myerburg Dep.) at 114:12-115:9]. Dr. Myerburg also testified that it is unlikely a police officer would not appreciate the significance of the movements. *Id.* at 115:10-116:1. Dr. Myerburg testified that while awareness that while gasping respiration was not something he was sure he would hold a police officer to appreciate, "it does not matter because what they didn't do was respond to an unconscious patient." *Id.* at 115:21-116:1. Defendant Kaplan's expert, Sergeant Henry Minor, testified that police officers are trained to know the difference between normal breathing and agonal respiration. [Dkt. 132-25 at 56:19-25].

Defendants Kaplan, Lis, and Cohen were near the holding cell throughout the four-minute period. The holding cell is surrounded by a chain link enclosure. The officers observed Maldonado without entering the cell several times. [Dkts. 126-16 (Booking Room Video) at 2:07:41, 2:07:49, 2:07:58-2:08:03, 2:08:37, 2:10:14]. Ramos also observed Maldonado from the outside of the holding cell door. *Id.* at 2:09:26. Ramos initially thought Maldonado was sleeping but became concerned and asked the officers to check on him. [Dkt. 126-5 at 100:21-101:17].

The officers entered the cell at 2:10:34 AM. That was 29 seconds after the last time the video depicted Maldonado moving. [Dkt. 126-17 at 2:10:34]. Prior to that, the longest period Maldonado was still was 28 seconds between 2:08:35 and 2:09:03. [Dkt. 126-17 at 2:08:35-2:09:03].

The officers tried to rouse Maldonado, but they were unable to do so. [Dkt. 126-17 at 2:10:37-55]. Officer Cohen grabbed

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

## II Legal Standard

## III. Abandoned Claim

## IV. Federal Claims

### A. Section § 1983 Claims

### 1. Count 1 – Unreasonable Search and Seizure

#### i. By Ramos Against Lis

### 2. Count 1 – Excessive Force

#### i. By Ramos Against Lis

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

## II. By the Estate Against Kaplan, Lis, and Cohen

### a. Taser by Defendant Kaplan

### b. Punch and Shove by Defendant Lis

### c. Pepper Spray by Defendant Cohen

## 1. Count 1 — Failure to Intervene

### i. By the Estate Against Kaplan, Lis, and Cohen

## 4. Count 1 — Deliberate Indifference to Medical Needs

### i. By the Estate Against Kaplan, Lis, and Cohen

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

[Dense multi-column legal text — body paragraphs discussing Monell claims, qualified immunity, and deliberate indifference standards.]

## 5 Count 2 – *Monell* Claim

### i. By Ramos and the Estate Against Town of East Hartford and Sansone

### B. Qualified Immunity

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2788594

light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Lewis v. Idaonv*, 237 F.3d 156, 162 (2d Cir. 2001). "[A] court may grant [summary] judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law." *Orga v. Elliot*, 150 F. Supp. 3d 178, 189 (D. Conn. 2015).

**1. Qualified Immunity as to Ramos's Claim**

Even if Sergeant Lis's use of force against Ramos was unreasonable, Ramos's claim would still fail because Sergeant Lis is entitled to qualified immunity. Here, no reasonable jury could conclude that the force used by Defendant Lis under these circumstances was objectively unreasonable in violation of the Fourth Amendment. In fact, in *Brown v. City of New York*, the Second Circuit records affirmed the district court's grant of qualified immunity on similar facts. 862 F.3d 182, 189-92 (2d Cir. 2017). In *Brown*, the plaintiff repeatedly refused to follow instructions of the officers who were attempting to handcuff and arrest her. *Id.* at 190. The officers used pepper spray with prior warning to plaintiff, kicked the plaintiff's legs out from under her to bring her to the ground, and pushed her face into the pavement. *Id.* The Court found that "[n]o precedential decision of the Supreme Court or this Court 'clearly establishes' that the actions of [the officers], viewed in the circumstances to which they were taken, were in violation of the Fourth Amendment." *Id.*

Similarly, in *McKnight v. Vasile*, the plaintiff challenged an officer's use of pepper spray against her while she was resisting arrest by a different officer. 2017 WL 1176051 at *26. The officer observed plaintiff resisting arrest and trying to enter her home. *Id.* at *27. His attempts to physically restrain her failed and he deployed his pepper spray without warning. *Id.* The officer testified that he deployed the spray "after he failed to gain control of her and in the moment that she turned toward him he felt vulnerable to a physical threat, such as a punch." *Id.* The court printed qualified immunity and found that "a reasonable officer in [this] position would not have clearly understood that resort to one burst of pepper spray was unlawful." *Id.* at *28.

Although Ramos did not physically resist arrest, he refused to comply with Defendant Lis's commands and obstructed his investigation of a violent altercation. Defendant Lis was the only officer at the scene and he wanted to ensure that Ramos and Maldonado did not drive away. [Dkt. 126-8 at 56:14-19]. At this time, Maldonado was screaming and trying to get out of the car. *Id.* at 57:1-3. Defendant Lis perceived that Maldonado was the aggressor. *Id.* at 57:4-7. Ramos refused to comply and clenched his fists. Defendant Lis testified that he was fearful because Ramos clenched his fists and was not obeying commands, so he pepper spray of him in "gain control of him." *Id.* at 57:18-23. The Court finds that under these circumstances a reasonable officer would not have understood that his acts were unlawful and gaan Defendant Lis qualified immunity on Ramos's excessive force claim. Therefore, Defendants' Motion for Summary Judgment based on qualified immunity is GRANTED.

**2. Qualified Immunity as to the Estate's Claim**

**a. Failure to Intervene**

**\*18** A police officer is entitled to qualified immunity unless his failure to intervene was under "circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct that are violate [the plaintiff's] rights." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 123, 129 (2d Cir. 1997); *see also Sterg v. Kelly*, 897 F.3d 99, 113 (2d Cir. 2018). As explained above, the Court finds as a matter of law that no reasonable jury could find that Defendants had any opportunity to prevent or stop the use of force by their fellow officers. Under these circumstances, it was not objectively unreasonable for Defendants to believe that their fellow officers' conduct did not violate Maldonado's rights. Therefore, Defendants' Motions for Summary Judgment based on qualified immunity are GRANTED.

**b. Deliberate Indifference to Medical Need**

Maldonado's right to be free from deliberate indifference to his medical needs was clearly established on the night of his arrest. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Weyant v. Fenpor*, 101 F.3d 845, 856 (2d Cir. 2006) (citing *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990)). Defendants summary judgment against pretrial detainee and further finding that "defendants are not entitled to qualified immunity because a pretrial detainee's right not to be recklessly denied treatment for a serious medical condition was 'clearly established' at the time these events transpired"). *Lewis v.* Clarkstown Police Dept., 11-CV-2487, 2014 WL 1364034, at *10 (S.D.N.Y. Mar. 31, 2014) (finding that "rights of pretrial detainees to be free from ... deliberate indifference to their serious medical needs are well established" and deny ing summary judgment based on qualified immunity). Here, there is a genuine issue of material fact regarding whether Defendants recklessly denied Maldonado sufficient medical care. Given these factual disputes, the Court cannot determine that Defendants' actions were objectively reasonable as a matter of law. Therefore, Defendants' Motions for Summary Judgment based on qualified immunity are DENIED.

**c. Excessive Force**

**i. Taser by Defendant Kaplan and Punch and Shove by Defendant Lis**

As of the date of this incident, it was clearly established within the Second Circuit that tasing and physically assaulting an individual who was not actively resisting arrest or posing an immediate threat to officers constituted excessive force. *See Hickfield*, 2015 WL 9275055, at *18; *see also Jackson v. City of Newburgh*, No. 13-CV-5777, 2016 WL 4030028, at *9 (S.D.N.Y. July 25, 2016) ("When officers continue to apply force to an inmate who is already subdued, it may be sufficient for a jury to find such force to be excessive") (collecting cases). Here, there is a genuine issue of material fact regarding whether Maldonado was resisting during the entire time the taser was deployed and when Defendant Lis punched him and shoved him towards the holding cell wall. This fact dispute precludes the Court from granting summary judgment on qualified immunity grounds. *See Hickfield*, No. 11-CV-97, 2012 WL 327013, at *5 [D. Conn. Aug. 6, 2012) (denying summary judgment on qualified immunity grounds where a reasonable juror could find officer used unreasonable force in deploying taser; *see also Jackson*, 2016 WL 4030028, at *9 (S.D.N.Y. July 25, 2016) (denying summary judgment on qualified immunity grounds where "the Court is simply not able to say as a matter of law precisely when plaintiff was restrained to the point that he no longer posed a threat to officers' safety"). Therefore, Defendants' and Defendant Kaplan's Motions for Summary Judgment on Maldonado's excessive force claim based qualified immunity is DENIED.

**ii. Pepper Spray by Defendant Cohen**

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2788594

**\*19** At the time of Maldonado's arrest, the Second Circuit had clearly established that "an reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and nonresisting arrestee." *Tracy*, 623 F.3d 90, 99 n.5 (2d Cir 2010). Since then, many courts have denied qualified immunity to officers for using pepper spray on individuals who were not actively resisting arrest or who had already been restrained. *See, e.g., Knight v. City of New York*, No. 16-CV-7888, 2019 WL 95480, at *5 (S.D.N.Y. Jan. 2, 2019) ("[A]t least since Tracy, deploying pepper spray in the face of [an individual] 'already in handcuffs and offering no further active resistance' constitutes a clearly established unreasonable use of force."); (citing *Tracy*, 623 F.3d at 98); *Jackson v. DiNapoli*, 236 F. Supp. 3d 616, 669 (E.D.N.Y. 2017) ("It is clearly established that the use of pepper spray against a restrained and cooperative person constitutes excessive force. Once Plaintiff was handcuffed and restrained, any additional use of force was plainly unnecessary and thus violated clearly established law.") (collecting cases); *Drews*, 2017 WL 1213990, at *15 ("Like other courts before me, I hold as a matter of law that it was clearly established in March 2011 that officers could not employ a significant degree of force, such as a taser, against a suspect who was handcuffed, surrounded by multiple officers in a police station holding cell, and who did not pose either a threat to the officers or a threat of escape.").

Here, as explained above, the parties dispute whether Defendant Cohen discharged his pepper spray at Maldonado. Because there are disputed facts as to Defendant Cohen's actions, the Court cannot determine if Defendant Cohen acted reasonably and cannot find as a matter of law that he is entitled to qualified immunity. For the foregoing reasons, Defendants' Motion for Summary Judgment based on qualified immunity is DENIED.

**V. State Claims**

**A. Count 3 – Connecticut Constitutional Claims, Art. 1, §§ 7, 9**

Ramos and the Estate bring claims against all Defendants under two sections of the Connecticut Constitution.[5] Article First, § 7 provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures ..." CONN. CONST. art. 1, § 7. Article First, § 9 provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." *Id.* at § 9. In *Binette v. Sabo*, the Connecticut Supreme Court recognized "a common-law cause of action under article first, §§ 7 and 9, of the state constitution for the police reasons articulated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388." 244 Conn. 23, 32 (1998); *see also Lopez v. Smiley*, 375 F. Supp. 2d 19, 23 (D. Conn. 2005) ("*Binette* created a narrow cause of action for money damages under the Article First, §§ 7 and 9 of the Connecticut Constitution for illegal searches and seizures of private homes by police officers, a cause of action that is equivalent to the federal *Bivens* action under the Fourth Amendment to the United States Constitution.").

[5] Plaintiffs' claims against Defendant Town of East Hartford fail as a matter of law because "damages claims based on violations of the Connecticut constitution cannot be maintained directly against a municipal entity." *McCullough v. Town of Rocky Hill*, No. CV13501402115, 2018 WL 1278220, at *3 (Conn. Super. Ct. Jan. 31, 2018) (internal citation omitted).

Following *Binette*, the Connecticut Appellate Court, in *Martin v. Brady*, affirmed the dismissal of the plaintiff's complaint finding that it was distinguishable from *Binette* because the alleged conduct was not sufficiently egregious. 64 Conn. App. 433, 441 (2001). The court noted that the *Binette* complaint "was sustained because of its specific allegations of an unreasonable, egregious search and seizure." *Id.* at 440. In *Martin*, plaintiff alleged two improper intrusions into his home, property damage, and physical harm. *Id.* The court found that those allegations were "a far remove from the allegations of misconduct that underlay *Binette*." *Id.*

Despite *Martin*, "[c]ourts in this District have diverged on the issue of whether *Binette* created a cause of action for every violation of §§ 7 and 9 or only for those violations that are sufficiently egregious." *Gilbert v. Newton*, No. 13-CV-1715-RCR, 2017 WL 3755955, at *3 (D. Conn. June 15, 2017). Judges Hall and Haight have found that, based on a close reading of *Binette* and its underlying rationale, "a violation of sections 7 and 9 gives rise to a cause of action even if it is not the result of egregious conduct." *Id.*; *see also Walker v. City of Middletown*, 50 F. Supp. 3d 171, 191-92 (D. Conn. 2014), order vacated in part on other grounds on reconsideration, 89 F. Supp. 3d 279 (D. Conn. 2015)

**\*20** In the majority of cases, this Court has recognized *Binette* claims where officers have created a plaintiff's persons illegally and seriously injured the plaintiff. *See, e.g., Orabona v. City of Hartford*, No. 3-CV-4703, 2015 WL 1338230, *11 (D. Conn. April 6, 2015) (denying summary judgment where officers created without a warrant and seriously injured plaintiff who was not resisting or attempting to flee); *Fagars v. Davila*, No. 3:04-CV-14658955, 2015 WL 5135949, at *3 (Conn. Super. Ct. July 11, 2015) (granting motion to strike because allegations that one officer was aggressive and slammed plaintiff against a car and another exceed witnesses for evidence necessary for plaintiff's arrest did not rise to the level of egregious misconduct necessary to state a cause of action), *Faulks v. City of Hartford*, No. 8-CV-270, 2010 WL 259076, at *10 (D. Conn. Jan. 19, 2010) (granting summary judgment where plaintiff was struck with a baton until he fell and could be handcuffed on the grounds that this conduct did not rise to the level of egregious); *Cotto v. Carrow*, 273 F. Supp. 3d 128, 352 (D. Conn. 2017) (denying summary judgment where officers unlawfully entered and searched a family's home, used excessive force on a teenager who was verbally objecting to their presence and arrested multiple family members without probable cause).

Here, the Court finds that Ramos and the Estate fail to state claims based on the Connecticut Constitution as a matter of law. First, there was no illegal entry onto their private home. Ramos and Maldonado were on a public street when they were arrested and placed in police custody in the booking room. Second, although the result of Ramos and Maldonado's contact with police—Maldonado's death—was the most egregious imaginable, the Court cannot find that the police conduct rises to the level and type of egregiousness required by *Binette*. The undisputed facts demonstrate that Maldonado was attempting to exit the holding cell and punched one of the officers. His conduct is wholly unlike that of other plaintiffs who were compliant with the officers' requests. In contrast, the record also reflects that Ramos cooperated with the officers after his arrest, but he was not tased in the holding cell. Because he did not use force against the officers or resist arrest, there is no warrant the creation of a private cause of action *See, e.g., Nelson v. City of Stamford*, No. 09-CV-1698, 2012 WL 251994, at *12 (D. Conn. Jan. 25, 2012) (granting summary judgment where one plaintiff admitted to resisting arrest and the other did not sustain an injury because the conduct did rise to the level of egregiousness); *see also Edwards v. City of Hartford*, No. 13-CV-478, 2015 WL 7458501, at *2, 5 (D. Conn. Nov. 23, 2015) (granting summary judgment where the same conduct to proceed to trial, which is consistent with federal pleading rules.").

**\*21** In *Bisciari*, Judge Meyer questioned the rationale behind cases that refused to allow alternative theories of liability:

> These decisions cited above that have disallowed simultaneous intentional/ negligent tort claims in this context have not elaborated on their reasoning other than to cite the fact of prior court rulings. They rely in part on cases applying New York law that appears to be different from Connecticut law ... By contrast, it appears that Connecticut law allows for claims of negligence against police officers, including for negligent arrest and use of force ... Similarly, Connecticut courts have allowed for recovery under Connecticut's negligence-based municipal liability statute, Conn. Gen. Stat. § 52-557n, in cases involving allegations of excessive force by police officers.

For the foregoing reasons, Defendants' Motions for Summary Judgment on Plaintiff's Claims for violations of Articles 7 and 9 of the Connecticut Constitution are GRANTED.

**B. Count 4 – Negligence Claim**

**By Ramos Against All Defendants**

Ramos alleges that Defendants breached their duty to act with reasonable care because, among other things, the Defendant officers acted with excessive force and the Defendant Town of East Hartford and Chief Sansom failed to properly supervise the Defendant Officers. Defendants first argue that Ramos's claim fails as a matter of law because a plaintiff cannot prevail on a negligence claim where he also claims intentional use of excessive force. *See, e.g., Frazier v. City of Waterbury*, No. 7-CV-1457, 2008 WL 4980362, at *5 (D. Conn. Nov. 20, 2008) ("Plaintiff may not prevail on a negligence claim when she has brought claims of intentional use of excessive force against the police officers"). Second, Ramos cannot recover, under legal theories of Connecticut have dispuved. *See e.g., Bisociari v City of Maryland*, No. 14-CV-00149, 2016 WL 4273419, at *4 (D. Conn. Aug. 12, 2016) ("I do not see why a special exception to this general rule [allowing alternative theories of liability] should or must exist for claims of intentional and negligent police misconduct in the excessive force context."); *Ohnilyadjai*, 2017 WL 4286374, at *7 ("[O]ther courts in this District have allowed negligence-based and intent-based claims regarding the same conduct to proceed to trial, which is consistent with federal pleading rules."). 

2016 WL 4273419, at *3-4 (internal citations and quotation marks omitted); *see also Ohnilyadjai*, 2017 WL 4286374, at *7. Judge Meyer concluded that "genuine fact issues remain to allow a jury to consider whether the defendant officers are liable for intentional torts or negligent torts ... there are genuine issues of material fact that can properly left to a jury regarding how defendants—and plaintiff—acted during the arrest." *Bisociari*, 2016 WL 4273419, at *3-4. As the Court has stated repeatedly, the nature of the Defendants' conduct is far from clear. Therefore, the Court will allow the jury to decide whether Ramos can prove intentional or negligent conduct. As Ramos cannot recover under multiple claims based on the same conduct and Jason, Defendants are not prejudiced.

Defendants next claim that Ramos's claim must fail because they are immune. The Court will first consider immunity as applied to the officers involved at the scene, Defendants Lis, Kaplan, and Cohen. The Court will next consider the immunity as to the Town of East Hartford and Defendant

Ramos v. Town of East Hartford, Not Reported in Fed. Supp. (2019)
2019 WL 2785594

Sansato. Connecticut employers may claim governmental immunity under common law for negligence claims arising from their official acts that are discretionary rather than ministerial in nature. *See, e.g., Spears v. Garcia,* 263 Conn. 22, 36 (2003); *Belanger v. City of Hartford,* 578 F. Supp. 2d 360, 366 (D. Conn. 2008). "The manner in which a police officer makes an arrest, including when to use force, is a discretionary act." *See, e.g., Edwards,* 2015 WL 7458301, at *4; *Valentin v. Miller,* 285 F. Supp. 2d 199, 195 (D. Conn. 2003). Therefore, Defendants Kaplan, Lis, and Cohen are entitled to claim governmental immunity. The Court also finds that Defendants Town of East Hartford and Sansom are entitled to claim governmental immunity.[7]

[7] The Court discusses the application of governmental immunity to Defendant Town of East Hartford in more detail in Section V.F.

There are three exceptions to the governmental immunity for discretionary acts: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm[;] second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws[;] and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Spears,* 263 Conn. at 36, 818 A.2d 37.

*22 "Courts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create just such a duty of care." *Belanger,* 578 F. Supp. 2d at 367 (collecting cases). The Connecticut Supreme Court has laid out a three-part test for the identifiable person-imminent harm exception to apply: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Doe v. Peterson,* 279 Conn. 607, 616 (2006); *Brooks v. Powers,* 165 Conn. App. 44, 54 (2016) (same). For the exception to apply, all three elements must be present. *Doe,* 279 Conn. at 620.

Ramos alleges that Defendants Kaplan, Lis, and Cohen used excessive force by causing trauma to his head, increased his risk of harm, failed to use generally-accepted law enforcement tactics, and failed to take measures to protect his health. He also alleges that Defendants Town of East Hartford and Sansom failed to properly hire, train, and supervise employees, failed to enforce lawful policies, and instituted

wrongful policies. Defendants move for summary judgment on Ramos's claim in its entirety. In his opposition briefing, however, Ramos fails to address the full claim and argues only the following: (1) Ramos was an identifiable victim because he was the person against whom Defendant Lis used force; (2) Ramos was subjected to an imminent harm while in police custody; and (3) it was apparent to Defendant Lis that his conduct was likely to cause Ramos that harm because he is the one who deployed the pepper spray. To the extent that Ramos objects to negligence claims, other than the negligence claim against Defendant Lis for spraying him with pepper spray prior to his arrest, the Court deems it abandoned and grants Defendants' Motions for Summary Judgment on that claim.

As to the claim against Defendant Lis, Ramos could continue an identifiable victim of the alleged harm, pepper spray, caused by the Defendant Lis's force if such force was shown to be excessive. See, e.g. *Jefferson v. Reddish,* No. 12-CV-1541, 2017 WL 625391, at *5 (D. Conn. Jan. 4, 2017) "[A plaintiff] could constitute an identifiable victim of the alleged harms caused by the force applied if such force is shown to be unauthorized or excessive."). As explained above, however, the Court finds that the undisputed facts show that Defendant Lis did not use excessive force against Ramos at any point on the night of April 13, 2014. Therefore, because the Court finds that Defendant Lis did not use excessive force against Ramos or arrest him as an unreasonable manner as a matter of law, Defendant Lis is entitled to governmental immunity and the identifiable person-imminent harm exception does not apply. For the foregoing reasons, Defendants' Motions for Summary Judgment on Ramos's negligence claim is GRANTED.

### C. Count 5 – Wrongful Death Claim

#### i. By the Estate Against All Defendants

The Estate brings a wrongful death claim against all Defendants. In Connecticut, a decedent's estate may recover "from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, including funeral expenses." CONN. GEN. STAT. § 52-555(a). As explained above in Section V.B., state governmental actors may claim immunity for governmental acts that were discretionary and not ministerial. Governmental acts are "inspirationary or discretionary in nature" and ministerial acts are those "to be performed in a prescribed manner without the exercise of judgment or discretion." *Baralou v. Town of East Hartford*

*et al.,* No. 16-CV-1642, 2019 WL 2491657, at *10 (D. Conn. June 14, 2019) (quoting *Milligan v. Rioux,* 229 Conn. 716, 727 (Conn. 1994)) (internal citations and quotation marks omitted).

*23 To determine the nature of Defendants' actions, the Court must consider the Estate's claim against each Defendant. The Estate alleges that Defendant Kaplan used excessive force against Maldonado and Defendants Kaplan, Lis, and Cohen failed to provide him such proper medical attention. The decision as to the appropriate type and amount of force is discretionary and the Court finds Defendants may be immune unless an exception applies.

The Estate alleges that Defendants Town of East Hartford and Sansom failed to properly train officers, condoned improper practices, and discouraged officers from using life-saving medical treatment to save detainees' lives. These acts are discretionary in nature and Defendants Town of East Hartford and Sansom may claim governmental immunity unless an exception applies.

Defendants argue that they are immune, and the parties dispute whether the identifiable person-imminent harm exception applies. Defendants Kaplan, Lis, and Cohen argue that Maldonado was not an identifiable victim and it was not apparent that their conduct was going to cause him imminent harm. As the Estate correctly argues, however, "[c]ourts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create just such a duty of care." *Belanger v. City of Hartford,* 578 F. Supp. 2d 360, 367 (D. Conn. 2008) (collecting cases); *see also, Keeney v. City of New London,* 196 F. Supp. 2d 190, 202 (D. Conn. 2002) (denying summary judgment on wrongful death claim on the grounds that "officers' alleged use of force after the plaintiff was handcuffed posed an apparent and imminent harm to [arrestee]"); *see also Jefferson,* 2017 WL 625391, at *4 (denying summary judgment on negligence claim when "plaintiff could constitute an identifiable victim of the alleged harms caused by the force applied if such force is shown to be unauthorized or excessive"); *see also Reoye v. Walsh,* No. 3:- CV-1052, 2012 WL 6049580, at *9 (D. Conn. Dec. 5, 2012) (denying summary judgment on governmental immunity and applying imminent harm exception where "plaintiff was a clearly identifiable victim to Walsh, and it is undisputed that Walsh purposefully hit and swung his baton at plaintiff. Plaintiff was put at risk of imminent harm from Walsh's fists

and baton swings"). Here, Maldonado was an identifiable victim when Defendant Kaplan tased him, when Defendant Lis punched him and when Defendant Cohen allegedly pepper sprayed him. There is sufficient evidence for a jury to conclude that Maldonado was subject to the possibility of imminent harm and the Defendants were aware that their conduct was likely to subject Maldonado to that harm. *See Garcia v. Town of East Hartford,* No. 16-CV-928, 2017 WL 3038305, at *8 (D. Conn. July 18, 2017) (denying summary judgment on governmental immunity where "there [was] sufficient evidence for a jury to conclude that Marsh was an identifiable victim who was subject to possibility of imminent harm during the course of the arrest"). Accordingly, as to Defendants Kaplan, Lis, and Cohen, summary judgment on the Estate's wrongful death claim is DENIED.

Defendants Lis and Cohen also argue that the Estate's wrongful death claim fails because there is no evidence of proximate cause. They cite Dr. Myerburg's testimony that there was no evidence that Maldonado's head hitting the wall led to cardiac arrest and ultimately, Maldonado's death. [Dkt. 126-7 at 77:18-78:11; 104:20-105:7]. In response, Plaintiff argues that Maldonado's cause of death is disputed and cites the medical report which lists "blunt injury of head" as a contributing cause of Maldonado's death. [Dkt. 132-7 at 6; *see also* 132-35 (Gill Dep.) at 50:5-17 ("I think the proximal and electric shock and the blunt injury of the head are both kind of the processes that resulted in the death and the cardiac arrhythmia")]. A reasonable jury could conclude that Defendants' actions were a proximate cause of Maldonado's death. For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiff's wrongful death claim as to Defendants Kaplan, Lis, and Cohen is DENIED. *See Keeney,* 196 F. Supp. 2d at 202.

*24 The Court finds, however, that the identifiable victim-imminent harm exception does not apply to Defendants Town of East Hartford and Sansom.[8] Under the exception, "[i]mminent does not simply mean a foreseeable event at some unspecific point in the not too distant future. Rather, we have required plaintiffs to identify a discrete place and time period at which the harm will occur." *Haynes v. City of Middletown,* 314 Conn. 303, 318 (Conn. 2014) (quoting *Jacasum v. Rhymers,* 297 Conn. 297, 314 (2010)) (collecting cases). The Estate argues that Defendants condoned improper force use, discouraged officers from performing lifesaving medical treatment, failed to train officers to perform medical treatment, and carried out excessive force. The Estate presents no evidence to establish

an imminent and specific harm and thereby fails to meet its burden to establish the exception to governmental immunity as a matter of law. *See Sev.* 573 F. Supp. 2d at 676 (granting summary judgment for town defendant where plaintiff did not allege that it "acting through a specifically identified public official, was on notice that [plaintiff] was individually subject to a specific and imminent harm so that it was in a position to make a decision that specifically required [plaintiff] and caused the resulting harm."); *see also Allen v. Darnell,* 9-CV-06948, 2014 WL 4395663, at *8 (D. Conn. Aug. 22, 2014). Because the exception does not apply to Defendants Town of East Hartford and Sansom, they are entitled to immunity. Therefore, Defendants' Motion for Summary Judgment on the Estate's wrongful death claim as to Defendants Town of East Hartford and Sansom is GRANTED.

[8] Since the Connecticut Supreme Court's decision in *Doe v. Peterson,* "the prevailing opinion of the lower courts in Connecticut appears to be in favor of applying the identifiable victim/imminent harm exception to municipal immunity, too." *Sev v. Town of Newington,* 5 F. Supp. 2d 661, 673 (D. Conn. 2008); *see also Cooper v. City of Hartford,* No. 7-CV-833, 2009 WL 2163127, at *17 (D. Conn. July 21, 2009) (adopting the "prevailing opinion"); *Goldberg v. Town of Plainville,* 148 F. Supp. 3d 108, 103 n.10 (D. Conn. 2015).

### D. Count 6 – Bystander Emotional Distress Claim

#### i. By Ramos Against Kaplan, Lis and Cohen

Ramos brings a claim for bystander emotional distress against Officers Kaplan, Lis, and Cohen. To recover on a claim for bystander emotional distress under Connecticut law, Ramos must show "(1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an

abnormal response." *Clohessy v. Bachelor,* 237 Conn. 31, 56 (1996).

Defendants argue that Ramos's bystander emotional distress claim fails as a matter of law because the undisputed evidence shows he cannot meet the third prong, serious emotional injury. This prong requires injuries so severe such as to "warrant a psychiatric diagnosis or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands." *Squeo v. Norwalk Hosp. Ass'n,* 316 Conn. 558, 585 (2015). Defendants argue that Ramos cannot show a serious emotional injury under either of these methods. First, Defendants note that Ramos attended to no psychiatric sessions. Second, Defendants argue that Ramos's full-time employment and pursuit of his master's degree evidence that he is fully capable of coping with life's demands.

In response, Ramos points to evidence which shows a genuine dispute of material fact. With regard to a psychiatric diagnosis, Ramos cites LCSW Toper who diagnosed him with major depression, recurrent, LCSW Toper also noted symptoms which may interfere with Ramos's ability to cope with activities of daily life such as depressed mood, diminished interest and pleasure, insomnia, worthlessness, irritated mood, excessive anxiety, and irritability. Ramos testified that he is triggered by police officers and celebrating family events. He also testified that he has taken time off work because of his symptoms. The Court finds that a reasonable jury could conclude that Ramos has established a claim for bystander emotional distress. Therefore, Defendants' Motion for Summary Judgment on this claim is DENIED.

### E. Count 7 – False Arrest Claim

#### i. By Ramos Against Lis and Cohen

*25 Ramos brings a state law claim for false arrest against Officers Lis and Cohen. These claims must be dismissed for the same reason that they were dismissed under § 1983. *See Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir. 2003) ("Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the

same' in claims for false arrest or malicious prosecution under state law."). As explained above in Section IV.A.1, the Court found that the undisputed facts show that there was probable cause for Officer Lis to arrest Ramos. "It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest." *Jolaemith v. Frett,* 98 F. Supp. 2d 599, 213 (D. Conn. 2007); *see also David v. Rodriguez,* 364 F.3d 424, 433 (2d Cir. 2004). Because Officer Lis has established a complete defense, Ramos's false arrest claims fail as a matter of law. Therefore, Defendants' Motions for Summary Judgment on the false arrest claim are GRANTED.

### F. Count 8 – Conn. Gen. Stat. § 52-557n Claim

#### i. By Ramos and the Estate Against Town of East Hartford

Conn. Gen. Stat. § 52-557n provides that a municipality shall be liable for damages to person or property caused by the negligent acts or omissions of its employees acting within the scope of their employment, provided that such acts or omissions do not constitute "created conduct, fraud, actual malice or willful misconduct." *See* CONN. GEN. STAT. § 52-557n. Defendant Town of East Hartford argues that it is entitled to governmental immunity to the same extent that the individual defendants are entitled to such immunity on Ramos's negligence claim. The Court agrees. *See* CONN. GEN. STAT. § 52-557n(a)(2)(A); *Cooper,* 2009 WL 2163127, at *27. As noted above, the Defendant officers are discretionary governmental acts, thus Defendant Town of East Hartford is immune for the acts or omissions of its officers unless an exception applies. The Court previously found that the identifiable person-imminent harm exception does not apply and the Defendants are immune from claims based on discretionary actions. Therefore, Defendant Town of East Hartford's Motion for Summary Judgment on Plaintiff's § 52-557n claim is GRANTED.

### G. Count 9 – Conn. Gen. Stat. § 7-465 Claim

#### i. By Ramos and the Estate Against Town of East Hartford

Conn. Gen. Stat. § 7-465 provides that a municipality shall indemnify its employees acting within the scope of their employment for all infringement of civil rights or damages to person or property unless the damage was the result of a willful or wanton act. *See* CONN. GEN. STAT. § 7-465. Defendant Town of East Hartford is only liable to indemnify Defendants against Ramos's negligence claim. Because the negligence claim fails and there is no other claim for which Defendant Town of East Hartford can indemnify Defendants, Defendant Town of East Hartford's Motion for Summary Judgment on Plaintiff's § 7-465 claim is GRANTED.

### VI. Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART. Defendants' Motions for Summary Judgment are GRANTED as to the following claims: (1) unreasonable search and seizure by Ramos against Defendant Town of East Hartford (Count 1); (2) excessive force by Ramos against Defendant Lis (3) failure to intervene by the Estate against Defendants Kaplan, Lis, and Cohen; (4) *Monell* by Ramos and the Estate against Defendants Town of East Hartford and Sansom; (5) Connecticut Constitution Articles 7 and 9 by Ramos and the Estate against all Defendants; (6) negligence by Ramos and the Estate against all Defendants; (7) wrongful death by the Estate against Defendants Town of East Hartford and Sansom; (8) false arrest by Ramos against Defendants Lis and Cohen (9) Conn. Gen. Stat. § 52-557n by Ramos and the Estate against Defendant Town of East Hartford; and (10) Conn. Gen. Stat. § 7-465 by Ramos and the Estate against Defendant Town of East Hartford. The claims that remain for trial: (1) excessive force by the Estate against Defendants Kaplan, Lis, and Cohen; (2) deliberate indifference by the Estate against Defendants Kaplan, Lis, and Cohen; (3) wrongful death by the Estate against Defendants Kaplan, Lis, and Cohen; and (4) bystander emotional distress by Ramos against Defendants Kaplan, Lis, and Cohen.

*26 IT IS SO ORDERED

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2785594

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**2020 WL 606788**
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Michael Tracy WALKER, Plaintiff,

v.

Police Officer Taimur RAJA, Police Officer David Vasquez, Police Officer Eatharlin Lopez, Police Officer Kyle Brown, Police Officer William Chow, Police Officer Elisa Battista, Sergeant Saurabe Rahman, and the City of New York, Defendants.

17-CV-5202 (PKC) (LB)

Signed 02/07/2020

**Attorneys and Law Firms**

Michael Tracy Walker, Napanoch, NY, pro se.

Allyson Nicole Brown, Christopher Dominick DeLuca, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge.

*1 Plaintiff Michael Tracy Walker brings this pro se action against Defendants Police Officer Taimur Raja, Police Officer David Vasquez, Police Officer Eatharlin Lopez, Police Officer Kyle Brown, Police Officer William Chow, Police Officer Elisa Battista, Sergeant Saurabe Rahman, and the City of New York, advancing multiple claims under 42 U.S.C. § 1983 and related claims under New York law, in connection with Plaintiff's January 2017 apprehension and arrest. Currently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, Plaintiff's motion for summary judgment is denied in its entirety, and Defendants' motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

**I. Facts**

On January 8, 2017, Plaintiff entered Kangtai Jewelry, located at 1058 Coney Avenue, Brooklyn, New York, on the corner of Foster Avenue and Avenue H. (Defendants' Rule

56.1 Statement[1] of Material Facts ("Defs.' 56.1"), Dkt. 112, ¶ 1.) Plaintiff was carrying a firearm and intended to steal jewelry from the store at gunpoint. (Id.; see also Deposition of Michael Tracy Walker ("Dep. Walker"), Dkt. 114-1, at 43:5–17, 44:16–24.) After entering the store, Plaintiff took jewelry while threatening the store owner, Mr. Iqbal and the store employee, Ms. Parveen, with the gun. (Defs.' 56.1, Dkt. 112, ¶ 2.) In an attempt to restrain Plaintiff, Mr. Iqbal grabbed Plaintiff's upper body. (Id. ¶ 3.) Plaintiff then used his firearm to strike Mr. Iqbal in the head. (Id. ¶ 4.) Plaintiff fled the store by kicking and slamming his body against the locked glass door, causing it to shatter onto his body. (Id. ¶¶ 6–7.) Plaintiff exited the store with the jewelry and his firearm. (Id. ¶ 8, but Mr. Iqbal followed Plaintiff and wrestled him to the ground on the sidewalk outside. (Id. ¶ 9.) Plaintiff and Mr. Iqbal struggled and exchanged blows until several civilian bystanders intervened, grabbed Plaintiff, hit him, and positioned him face-down on the pavement, as he restrained their efforts to restrain him. (Id. ¶¶ 10–12; Dep. Walker, Dkt. 114-1, at 62:1–25.) In the meantime, Ms. Parveen and other civilians had called 911 to report both the robbery and Mr. Iqbal's injuries. (Defs.' 56.1, Dkt. 112, ¶ 5, 16.) At about 8:26 p.m., several police officers from the New York City Police Department ("NYPD") arrived at the scene. (Id. ¶ 17.) NYPD officers, including Defendants Vasquez and Raja, held Plaintiff down and attempted to pull his hands behind his back in order to handcuff him. (Id. ¶¶ 18–20.) In an effort to subdue Plaintiff, an officer struck Plaintiff several times. (Id. ¶¶ 19–20.) Plaintiff testified that the first officer to approach him was a female officer[2] with a "ponytail [o]n the back of her head," who "began repeatedly punching" him in the face. (Dep. Walker, Dkt. 114-1, at 65:18–20, 66:19–22, 67:2–4.) According to Plaintiff, "multiple people [were] striking [him] at one time." (Id. at 69:3–7.)

Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the document cited therein; where relevant, however, the Court may cite directly to an underlying document. The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. See Ceramatec, Inc. v. Dassow, No. 16-CV-3881 (TCP), 2017 WL 4999027, at *2, n.2 (E.D.N.Y. Sept. 12, 2012)

state law claims arising from his January 2017 arrest. (Id. ¶ 30.) The Comptroller's Office informed Plaintiff on or about May 24, 2017 that his claim was disallowed in summary because it was not filed within 90 days from the date of his January 8, 2017 arrest. (Id. ¶ 31.)

**II. Procedural History**

Plaintiff commenced this action on or about August 22, 2017 in the Southern District of New York. (Dkt. 1.) Plaintiff's initial complaint alleged, inter alia, claims of excessive force under § 1983 and related state law claims against Defendants Raja, Vasquez, Lopez, Brown, and the City of New York. (Complaint, Dkt. 2.) On September 5, 2017, the case was transferred to the Eastern District of New York. (Dkt. 3.) The case was stayed by Order dated November 6, 2017, pending resolution of the Civilian Complaint Review Board's ("CCRB") investigation into the underlying incident. (Dkt. 21.) Plaintiff amended his initial complaint on November 13, 2017 to include claims of deprivation of federal civil rights, municipal liability, and failure to intervene. (Amended Complaint, Dkt. 22.) On August 7, 2018, the stay was lifted (Dkt. 51), and, as discovery progressed, Plaintiff filed a "proposed amended complaint" on October 31, 2018, adding Sergeant Rahman and Police Officers Chow and Battista as Defendants (Dkt. 61, 62.) Plaintiff re-filed his proposed amended complaint as an amended complaint—effectively his Second Amended Complaint—on November 26, 2018. (Second Amended Complaint ("SAC"), Dkt. 66.) Plaintiff was deposed on December 1, 2018. (Dep. Walker, Dkt. 114-1.)

On January 3, 2019, Plaintiff filed his motion for summary judgment. (Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), Dkt. 71.) By Order dated January 4, 2019, the Court construed his motion as a request for a pre-motion conference. Defendants, in turn, requested a pre-motion conference for their anticipated summary judgment motion on February 1, 2019. (Dkt. 83.) A pre-motion conference was held on March 8, 2019, at which the Court set a briefing schedule for both parties' proposed motions for summary judgment, which were fully briefed on July 8, 2019. (Dkt. 110, 117.)

**STANDARD OF REVIEW**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986) (noting that summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

*3 The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. Spinelli v. City of New York, 579 F.3d 160, 166–67 (2d Cir. 2009); see also Cabrera Corp. v. Corretti, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." Hayes v. New York City H.A., 332 F.3d 733, 743 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." California v. Caidevese, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotations and citations omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes are disputed facts in the light most favorable to the non-moving party. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247–48. "The mere scintilla of review applies when the court is faced with [a] cross-motion[ ] for summary judgment." Jantarakis v. Heffernan, 607 F. Supp. 2d 493, 497 (E.D.N.Y. 2009) (internal quotation omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

In considering a dispositive motion brought or defended by a pro se litigant, the Court must "liberally construe" the

**DISCUSSION**

Both parties move for summary judgment on the following claims[3]: (1) excessive force (as to Defendants Raja, Vasquez, Lopez, Brown, Chow, and Battista[4]); (2) failure to intervene (as to all individual Defendants); (3) denial of the right to a fair trial (as to Defendants Raja and Vasquez); (4) failure to supervise (as to Defendant Rahman); (5) violation of due process and equal protection (as to all individual Defendants); (6) qualified immunity (as to all individual Defendants); (7) municipal liability (as to the City of New York); and (8) state law claims (as to all individual Defendants). (See Pl.'s Mot., Dkt. 73, at 5–12; Defs.' Mot., Dkt. 113, at 9–13.)

Because of Plaintiff's pro se status, the Court allowed Plaintiff's right to his trial claim, alleged for the first time in Plaintiff's motion for summary judgment (Dkt. 71), to be added, in effect, to his Second Amended Complaint. (See Minute Entry March 6, 2019.)

Plaintiff's Second Amended Complaint did not explicitly allege excessive force as to Defendant Battista, which Plaintiff explained was because he had not yet viewed the video of the underlying incident. (SAC, Dkt. 66, ¶¶ 5, 13.) However, because Plaintiff's Second Amended Complaint alleged that Battista "was present during plaintiff['s] assault and arrest" (id.), and because Plaintiff now asserts his excessive force claim as to Defendant Battista in his motion for summary

judgment (Pl.'s Mot., Dkt. 73, ¶ 7), the Court allows this claim to proceed as to Defendant Battista.

In both his Second Set of Supporting Facts (Dkt. 96) and his opposition to Defendants' motion for summary judgment (Dkt. 102), as well as unfinished or duplicate copies thereof (Dkts. 101, 106), Plaintiff raises, for the first time, allegations that (1) Defendants "deceased" the video evidence showing his January 8, 2017 apprehension and arrest; (2) Defendants and various non-parties to the case engaged in spoliation of evidence and Brady violations; (3) Plaintiff's public defender provided ineffective assistance of counsel in his state criminal case; and (4) the Court prejudiced Plaintiff by granting Defendants a stay in this case for nine months during the CCRB review. (Plaintiff's Brief in Opposition of the Defendants Motion ("Pl.'s Opp."), Dkt. 102, ¶¶ 2, 7–10, 13–16.) Except as precisely noted, the Court overlooks its discretion not to consider allegations newly made in Plaintiff's various reply submissions. See DeFilippo v. N. Y. State Unified Court Sys., 223 F. App'x. 45, 46 (2d Cir. 2007) (summary order) (holding that pro se plaintiff could not raise a due process claim for the first time in his opposition to defendants' summary judgment motion); Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.").

Even allowing brief consideration of these claims in light of Plaintiff's pro se status, the Court finds that they are not cognizable. First, Plaintiff offers no record evidence to suggest that the video evidence was deceased. Second, Plaintiff's claims against non-parties to this case (e.g., the Court, his public defender, Assistant District Attorney Michael Jaffe, the CCRB) are not cognizable for their failure to meet fundamental pleading standards. Furthermore, Plaintiff's remaining claims for ineffective assistance of counsel and prejudice due to the earlier stay in this case are challenges to the validity and propriety of his criminal proceeding, which were previously and properly resolved in this court pursuant to the federal habeas corpus statute, 28 U.S.C. § 2254. See McEachin v. Brown, 681 F.3d 89, 100–01 (2d Cir. 2007) (" '[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of

pro se party's pleadings in his favor and hold him to "less stringent standards than formal pleadings drafted by lawyers." Hughes v. Rowe, 449 U.S. 5, 9–10 (1980) (internal quotation and ellipsis omitted); see also Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) ("[T]he Second Circuit [directly] construe[s] pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." (internal quotation and citation omitted)). Nonetheless, "[p]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." Rodriguez v. Hahn, 209 F. Supp. 2d 344, 348 (S.D.N.Y 2002) (internal quotations and citation omitted).

his confinement and seeks immediate or speedier release.' " (quoting Heck v. Humphrey, 512 U.S. 477, 481 (1994))) (ellipsis) Plaintiff has asserted the same claims in a separate habeas petition, filed on December 18, 2018, in this district. See Walker v. Keyser, No. 18-CV-7227 (KAM) (LB).

**I. Excessive Force**

*4 "When the parties disagree as to the existence of a genuine dispute of a material fact, the Court must consult inconvertible video evidence to determine whether summary judgment is nevertheless appropriate." Wiles v. City of New York, No. 13-CV-2898 (TPG), 2016 WL 6238069, at *3 (S.D.N.Y. Oct. 25, 2016) (citing Scott v. Harris, 550 U.S. 372, 379–80 (2007)). Here, Defendants have supplied video footage (the "Video") of Plaintiff's January 8, 2017 apprehension and arrest, recorded by a surveillance camera located outside Kangtai Jewelers. (Defendants' Exhibit B ("Video"), Dkt. 114-2.) The Video shows that, shortly after civilians had subdued Plaintiff, six police officers arrived at the scene and took control of Plaintiff "by holding him down and attempting to pull his hands behind his back." (Defs.' 56.1, Dkt. 112, ¶ 18; Video, Dkt. 114-2, at 20:21:27–24:31.) One of these officers seems to match Plaintiff's description of a female officer wearing her hair in a ponytail. (Dep. Walker, Dkt. 114-1, at 66:19–67:4; Video, Dkt. 114-2 at 20:21:37–30.) The Video also shows one police officer, who appears to be male, repeatedly administering blows to Plaintiff, although it is not clear which part of Plaintiff's body is being struck. (Video, Dkt. 114-2, at 20:21:48–22:05.) Although Plaintiff testified that "there were multiple people striking [me] at one time." (Dep. Walker, Dkt. 114-1, 69:3–7.) Due to the presence of other bystanders and the angle of the camera, the Video does not clearly show either the other officers' actions, including those of the female officer (who Plaintiff claims struck him) or Plaintiff's own counts, if any, while he was on the pavement. (See id. at 20:21:20–24:31.)

**A. Personal Involvement of Defendants Raja, Vasquez, Brown, Lopez, and Chow**

Defendants argue that Plaintiff cannot demonstrate the personal involvement of Officers Raja, Vasquez, Brown, Lopez, and Chow[5] in any alleged use of excessive force against him. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Mot."), Dkt. 113, at 9–10.) The Court disagrees, except as to Defendant Lopez.

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

Walter v. Raja, Slip Copy (2020)
2020 WL 606768

### III. Denial of Right to a Fair Trial

### IV. Failure to Supervise

### V. Violations of Due Process and Equal Protection

### VI. Qualified Immunity

### VII. Municipal Liability (*Monell* Claim)

### VIII. Equitable Tolling for State Law Claims

Walker v. Raja, Slip Copy (2020)
2020 WL 606768

## CONCLUSION

SO ORDERED.

All Citations

Slip Copy, 2020 WL 606768

---

Djangmah v. Falcione, Not Reported in F.Supp.2d (2013)
2013 WL 209914

2013 WL 209914
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Victor T.R. DJANGMAH, Plaintiff,
v.
Officer FALCIONE, et al., Defendants.

No. 08 Civ. 4027(PAC)(FM).
|
Jan. 18, 2013.

*REPORT AND RECOMMENDATION TO
THE HONORABLE PAUL A. CROTTY*

FRANK MAAS, United States Magistrate Judge.

**Ridge v. Davis, Slip Copy (2022)**

2022 WL 357020

Djangmah v. Falcione, Not Reported in F.Supp.2d (2013)

2013 WL 209614

---

### B. Motion for Summary Judgment

#### 1. Standard of Review

#### 2. Section 1983

#### 3. Monell Claim

#### 4. Negligent Infliction of Emotional Distress

#### 5. Fourth Amendment Claim

Djangmah v. Falcone, Not Reported in F.Supp.2d (2013)
2013 WL 208914

omitted). Djangmah therefore arguably has pleaded a Fourth Amendment claim.

[7]   In his deposition, Djangmah referred to an unlawful search of the vehicle he was driving during the traffic stop. (see Dept. 221–22), but the SAC does not contain any facts supporting a claim for unlawful search. Assuming that the vehicle was damaged when the officers attempted to open the trunk with a screwdriver, Djangmah presumably lacks standing to seek to recover damages since he is not the owner of the vehicle.

To comport with the Fourth Amendment, an officer making a traffic stop must have probable cause, or, at minimum, reasonable suspicion "that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir.2005) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)); *see also United States v. Stewart*, 551 F.3d 187, 191 (2d Cir.2009) (noting that the Second Circuit has "held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment").

Djangmah's SAC appears to concede that there was probable cause for the police to stop his vehicle and arrest him. (*See* SAC ¶ 24) ("Officer Falcone observed that the windows of [Djangmah's] car appeared to be tinted beyond the legal limit, and further that the car had an excessively loud muffler and exhaust system."). Even if this concession had not been made, a police officer's direct observation of a violation of traffic laws, however minor, supplies the requisite cause to effectuate a traffic stop. *Nogas*, 19 F.3d at 782; *accord United States v. Garcia*, 279 F.Supp.2d 294, 298 (S.D.N.Y.2003) ("[T]he observation by a police officer of even minor traffic violations is sufficient reason to stop a car"). The Supreme Court has held "[i]n a long line of cases ... that when an officer has probable cause to believe a person committed even a minor crime in his presence ... [t]he arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (citing, e.g., *Devenv v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Similarly, "under New York law, police officers may arrest a person for a traffic violation committed in the officers' presence." *United States v. Ferguson*, 130 F.Supp.2d 560, 565 (S.D.N.Y.2001) (citing *Nogas*, 19 F.3d at 781); *see Stuart v. City of V.T*, Sec. 140 (2d Cir. 220 U.ID), 3009 WL 862281, at *4 (S.D.N.Y. April 1, 2009) ("Even though [a traffic] violation may be reasonably characterized as a 'minor' offense, it is well-established that an officer's direct observation of even a

minor traffic violation is sufficient probable cause to arrest the violator."); *see also* N.Y. Veh. & Traf. Law ("VTL") § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); N.Y.Crim. Proc. Law § 140.10(1)(a) (an officer may arrest a person for "[a]ny offense when [the officer] has reasonable cause to believe that such person has committed such offense in [the officer's] presence").

**[*11]** Section 375(12–a) (b) of New York's VTL provides that a driver may not operate a car with excessively-tinted windows. [8] An officer's reasonable conclusion that a car is in violation of Section 375(12–a) (b) therefore provides probable cause to arrest the driver of the car. *See Woods v. Candela*, 921 F.Supp. 1140, 1144–45 (S.D.N.Y.1996) (officer who stopped driver for excessively tinted windows authorized to effectuate an arrest on that ground), *Holeman*, 425 F.3d at 191 n. 2 (Tinted windows alone would justify the stop if they were so dark that an officer, acting reasonably, would have suspected that there were a traffic violation"); *Harrell*, 268 F.3d at 148–49 (officers' observation that car had tinted windows and a defective brake light supplied sufficient cause for stop). In this case, Falcone observed that the Oldsmobile had windows that appeared to be tinted beyond the legal limit. (Falcone Decl. ¶¶ 5–6). Although there is no indication that Falcone tested the windows with a "tint meter" to determine if they were, in fact, in violation of the law, this failure is "immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required." *Garcia*, 279 F.Supp.2d at 299 (citing *Harrell*, 268 F.3d at 149). In his deposition, Falcone explains that, in his experience, a vehicle is unlikely to be in compliance with the law when the window tint is visible from a distance. There is nothing in the record to suggest that Falcone's belief that the tint on the Oldsmobile's windows violated New York's VTL was objectively unreasonable. Falcone therefore had probable cause to arrest Djangmah for this VTL violation.

[8]   VTL § 375(12–a) (b) provides:
(b) No person shall operate any motor vehicle upon any public highway, road or street;
(1) the front windshield of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent unless such materials are limited to the uppermost six inches of the windshield; or

(2) the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent, or
(3) if it is classified as a station wagon, sedan, hardtop, coupe, hatchback or convertible and any rear side window has a light transmittance of less than seventy percent; or
(4) the rear window of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. A rear window may have a light transmittance of less than seventy percent if the vehicle is equipped with side mirrors on both sides of the vehicle so adjusted that the driver thereof shall have a clear and full view of the road and condition of traffic behind such vehicle.

Even if the degree of window tint was not a sufficient basis for the arrest, VTL § 375(31) prohibits modifying a vehicle's muffler or exhaust system to amplify the noise emitted. [9] In his declaration, Falcone notes that the Oldsmobile's muffler and exhaust system had been modified and "amplified the noise coming from the car such that it was excessive and unusual." (Falcone Decl. ¶ 5). Moreover, in his testimony, Djangmah affirmed the accuracy of Falcone's observations. As Djangmah explained, the vehicle owner's son had modified "an exhaust" that was "very heavy sounding" even "without [ ] pressing the accelerator." (Dep.218). Djangmah further described the vehicle as containing a "loud [ ] intake noise" that is "a little obvious" when it passes by. (*Id.*). Since Falcone therefore clearly had probable cause to believe that the muffler and exhaust system on the vehicle that Djangmah was driving gave rise to a VTL violation, he also had probable cause to effect an arrest on that ground.

[9]   VTL § 375(31) provides that:
Every motor vehicle operated or driven upon the highways of the state, shall at all times be equipped with an adequate muffler and exhaust system in constant operation and properly maintained to prevent excessive or unusual noise and no such muffler or exhaust system shall be equipped with a cut-out, bypass, or similar device. No person shall modify the muffler or exhaust system of a motor vehicle in a manner which will amplify

or increase the noise emitted by the motor or exhaust system of such vehicle above that emitted by the muffler or exhaust system originally installed on the vehicle and such original muffler and exhaust system shall comply with all the requirements of this section.

Djangmah's Section 1983 claim seeking damages for a violation of his Fourth Amendment rights consequently cannot survive summary judgment.

**c.   Respondeat Superior**

Finally, in Count 5 of the SAC, Djangmah seeks to assert "pendent claims of *respondeat superior* " against the NYPD in connection with the "torts committed by its employees." (SAC at 13). As noted previously, the NYPD is not a suable entity. Furthermore, even if this were deemed to be a claim against the City of New York, it is settled law that "[u]nder [Section] 1983, a municipal corporation cannot be held liable solely on a theory of *respondeat superior*." *Dwyer v. Oswego Cnty. Cmty. Coll.*, 472 F.Supp.2d 469, 471 (S.D.N.Y.2006) (citing *Monell*, 436 U.S. at 694–95). Instead, to establish the liability of a municipal corporation, a plaintiff "must demonstrate 'a direct causal link between a municipal policy or custom ... and the alleged constitutional deprivation.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). In his papers, Djangmah has not shown that any of the conduct about which he complains is attributable to any municipal policy or custom, much less that it gave rise to a violation of his constitutional rights. Summary judgment therefore must be granted with respect to Count 5 of the SAC.

**III.   Conclusion**

**[*12]** For the reasons set forth above, the motion for summary judgment should be granted with respect to all of Djangmah's claims other than his excessive use of force claim against Falcone.

[10]   In his declaration, but not in the SAC, Djangmah alleges that he was "racially profiled" by the Defendants (Djangmah Decl. ¶ 4). Construing this potential claim liberally, Djangmah apparently seeks to assert a violation of either his Fourth Amendment right against unreasonable seizure or the Fourteenth Amendment Equal Protection Clause. This claim fails for at least two reasons. First, Djangmah fails to allege any facts supporting

an inference that the Defendants stopped and arrested him based on his race, instead, he relies on "bald assertions" that, as a matter of law, are insufficient to overcome a motion for summary judgment. *See Oshun*, 1997 WL 576088, at *7 (quoting *Carey v. Crescenzi*, 923 F. 3d 18, 21 (2d Cir.1991)). Second, as discussed above, Falcone had probable cause to stop and arrest Djangmah, and "the existence of probable cause ... is a complete defense to an action for false arrest ... under [Section] 1983." *Bryant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (internal citations and quotations omitted); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118–19 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."); *see also Holeman*, 425 F.3d at 190 ("Whether probable cause or reasonable suspicion [to stop a vehicle] exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis.") (quoting *Whren*, 517 U.S. at 812).

**IV.** *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 208914

End of Document

Bermudez v. Edmonds, Slip Copy (2017)
2017 WL 11507652

2017 WL 11507652
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Robinson BERMUDEZ, Plaintiff,
v.
Michael EDMONDS, et al., Defendants.

16-CV-5240 (KAM)
|
Signed 12/19/2017

**Attorneys and Law Firms**

John P. Tunnelly, David Alann Glenn, Tunnelly & Spier LLP, New York, NY, for Plaintiff.

Brachah Geesdesik, Kiran Hans Rosenkilde, Kathryn M. Sprowici, Melanie Mary Speight, New York City Law Department, New York, NY, for Defendant P.O. Christopher DiStefano.

Brachah Geesdesik, Kiran Hans Rosenkilde, Melanie Mary Speight, New York City Law Department, New York, NY, for Defendant P.O. Nicholas Ruiz.

**REPORT AND RECOMMENDATION**

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE

**[*1]**   Plaintiff Robinson Bermudez ("plaintiff" or "Bermudez") brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights, specifically, with respect to the use of excessive force during his arrest. *See* Complaint ("Compl") (June 1, 2015), Electronic Case Filing Document Entry ("DE") #1. On June 1, 2015, plaintiff, initially proceeding *pro se*, filed this suit against "NYPD 102 Pct." (the "NYPD"), Lieutenant Michael Edmonds ("Edmonds"), Sergeant Jonathan Peyer ("Peyer"), [1] Police Officer ("PO") Matthew Hynes ("Hynes"), and PO Christopher DiStefano ("DiStefano"). See id. After returning counsel, plaintiff filed an amended complaint on October 19, 2016, in which he withdrew his claims against defendant NYPD and added as defendants PO. Nicholas Ruiz ("Ruiz") and the City of New York ("City"). See id.; Notice of Appearance (Sept. 6, 2016), DE #37; Am. Compl. On May 12, 2017, plaintiff voluntarily withdrew all claims against

defendant Peyer. See Stipulation of Voluntary Dismissal with Prejudice (May 12, 2017), DE #61.

[1]   Although the initial complaint spells this name as "Peter," *see generally* Compl., subsequent filings spell it as "Peyer," *see generally* Amended Complaint ("Am. Compl.") (Oct. 19, 2016), DE #36.

Defendants Hynes, Edmonds, and the City (together, "defendants") have since moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure with respect to all claims against these three defendants. *See* Motion for Partial Summary Judgment (Aug. 3, 2017), DE #69; *see also* Memorandum in Support of ("Def. Mem.") (Aug. 3, 2017), DE #72. On October 3, 2017, the Honorable Kiyo A. Matsumoto referred defendants' motion to the undersigned magistrate judge for a report and recommendation. *See* Order Referring Motion (Oct. 3, 2017). For the reasons set forth below, this Court recommends that defendants' motion be granted, leaving only plaintiff's section 1983 claim for excessive force against defendants Ruiz and DiStefano. [2]

[2]   Despite contrary language in the Amended Complaint, *see* Am. Compl. ¶ 60, plaintiff now represents that he "does not allege any state law claims against the Defendants in this action[.]" *see* Memorandum in Opposition (Aug. 3, 2017) ("Pl. Opp."), DE #75.

**THE UNDERLYING FACTS** [3]

[3]   Consistent with Local Civil Rule 56.1(c), defendants' motion is accompanied by a Statement of Undisputed Facts ("R. 56.1 Statement"), DE #75, wherein each of defendants' factual assertions is supported by citations to admissible evidence in the record. Contrary to his obligations under Local Civil Rule 56.1(b), plaintiff's opposing papers contain no responsive statement. Consequently, defendants' statement of material facts "will be deemed to be admitted for purposes of the motion..." S.D.N.Y./E.D.N.Y. Local Civ. R. 56.1(c); *see* E.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

Plaintiff's claims arise out of his March 1, 2015 arrest following a 911 call regarding a man beating his wife

See, R. 36-1 Statement ¶¶ 1-2; Hynes and P.O. Micheal responded to the call. See id. ¶ 2. Together, they went to plaintiff's apartment and questioned him and his wife. See Leiter Additional to the Honorable Kiyo A. Matsumoto, Attachment #1, Joint Deposition Transcript Appendix, DE 479-1 ("JDTA"), Transcript 2 ("Hynes Dep.") at 15:6-11. After Micheaal spoke with plaintiff's wife, Micheaal told Hynes that plaintiff was "under," which is police code for "under arrest." See id. at 18:18 to 15:22. Wearing only his boxer shorts—in the middle of winter—plaintiff then left the apartment and, when the officers told him to stop, he fled. See R. 36-1 Statement ¶¶ 3-6; see also JDTA, Transcript 1 ("Bermudez Dep.") at 111:19-112:25.

Hynes and Micheaal chased after plaintiff and reported over their police radio that he had fled. See Hynes Dep. at 22:9-21. Other officers responded to the bulletin and began to canvass the area. See, e.g., JDTA, Transcript 4 ("LaSala Dep.") at 9:5-23. Hynes and Micheaal stopped running after plaintiff and reported their location. See Hynes Dep. at 23:5-10. Officers Mann and Ruiz were driving in the area and picked up Hynes and Micheaal, who entered the police vehicle through the back door. See id. at 25:14 to 27:13.

P.O. LaSala eventually found plaintiff at the mouth of an underpass, attempted to restrain him, and radioed for assistance. See LaSala Dep. at 17:5-22, 32:15-25. Mann and Ruiz—with Hynes and Micheaal still in the back seat—drove to the opposite opening of the underpass, exited, and assisted in plaintiff's arrest. See Hynes Dep. at 19:2-11. Other officers, including DiStefino, also assisted. See LaSala Dep. at 29:6 to 57:25. JDTA, Transcript 3 ("DiStefino Dep.") at 29:2 to 30:23. These officers used force to restrain plaintiff. See Affidavit/Declaration in Opposition, Exhibit F, DE #87-1 ("Arrest Report") at 3 (noting that "PHYSICAL FORCE" was used to restrain plaintiff). Ruiz used his baton. [*] See CCRB Report at 10. Although contested, plaintiff claims that he was also punched and kicked until he lost consciousness. Compare Ann. Compl. [*] 56 (alleging that the defendant officers punched and kicked plaintiff), with Answer ¶ 50, DE #47 (denying these allegations); see also Bermudez Dep. at 128:16-24. The officers eventually placed plaintiff in handcuffs. [*] See R. 36-1 Statement ¶ 6.

[*] For clarity, the Court refers to the device that Ruiz used as a "baton." The record also describes the "baton" as an "ASP." See generally, e.g., Sealed Affidavit/Declaration (Oct. 17, 2017), Exhibit

G, DE 480-2 ("CCRB Report"), a brand name; that is an acronym for Armament Systems and Procedures, see Products - Batons, ASP, https://www.asp-usa.com/collections/batons (last visited Dec. 19, 2017).

A jury subsequently convicted plaintiff for resisting arrest, endangering the welfare of a child, criminal obstruction, and assault in the third degree. See R. 36-1 Statement ¶ 7; see Affidavit/Declaration in Support, Exhibit C, DE 479-3 at 2.

*2 Meanwhile, when P.O. Mann drove to the underpass (before plaintiff was apprehended), Officers Hynes and Micheaal emerged to exit the back of the police car. See Hynes Dep. at 55:2-24. The police car was, however, locked from the outside; as a result, Hynes and Micheaal were locked inside and could not assist in plaintiff's apprehension. See R. 36-1 Statement ¶ 6. Further, because the underpass shaped downward, and the police car was positioned toward the top of the shape, Hynes and Micheaal could not observe plaintiff's arrest. See Hynes Dep. at 37:5-9. It was not until after plaintiff was handcuffed that someone released Hynes and Micheaal from the locked car. See id. at 37:25 to 39:23. Similarly, Edmonds—who was the ranking supervisor of the police officers the night that Bermudez was arrested, see JDTA, Transcript 3 ("Edmonds Dep.") at 10:9-11—was not "involved in [plaintiff]'s physical apprehension" because "he was at the precinct" during the arrest, see R. 36-1 Statement ¶ 2.

Following his arrest, plaintiff "was transported to and treated at Jamaica Hospital" for injuries he sustained during the arrest. See id. ¶ 8. A torn meniscus Edmonds went to the hospital to question plaintiff about his injuries. See Edmonds Dep. at 20:5-16, 25:2-13. Plaintiff did not respond to any of Edmonds' questions. See id. at 23:14-17. Edmonds left the hospital and reported the incident to the NYPD's Internal Affairs Bureau ("IAB"). See id. at 23:18-21, 26:5-12. Edmonds also subsequently questioned Ruiz about plaintiff's arrest. See id. at 32:4-19.

After IAB investigated plaintiff's arrest, it referred the incident to the Civilian Complaint Review Board ("CCRB"). See CCRB Report at 2. Upon its own investigation, the CCRB substantiated the allegation that Ruiz had used excessive force. See id. at 10. As a result, Ruiz underwent subsequent training "on theories of law and reasons to stop people." Ruiz Dep. at 114:14-18.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Minnesota Elec. Indus. Co. v. Acuity Radio Corp., 475 U.S. 574, 585–87 (1986). The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [factual dispute] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all logical inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A factual dispute is genuine if it "may reasonably be resolved in favor of either party." Id. at 250. A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248.

Further, a "defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial." Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001). A defendant "need only point to an absence of proof on plaintiff's part[.]" Id. The nonmoving plaintiff must then "designate specific facts showing that there is a genuine [dispute] for trial." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)) (internal quotation marks omitted). To defeat a motion for summary judgment, the nonmoving plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Rather, the nonmoving plaintiff "must present concrete particulars and cannot succeed with purely conclusory allegations." Fitch v. R.J. Reynolds Tobacco Co., 675 F.Supp. 133, 136 (S.D.N.Y. 1987) (internal quotations omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). A plaintiff must thus proffer some evidentiary basis on which to believe that his "version of relevant events is not fanciful." Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 38 (2d Cir. 1986) (internal quotations omitted).

### II. Defendant Hynes' Lack of Participation in Plaintiff's Apprehension

*3 Defendants move for summary judgment with respect to the allegations against defendant Hynes. See Def. Mem. at 17-21; the individual designated as plaintiff's arresting officer, see Arrest Report at 2. Defendants argue that there is no evidence in the record to support Hynes' personal involvement in the alleged use of excessive force. See Def. Mem. at 17-14. Plaintiff responds that there is sufficient evidence to support an inference that Hynes kicked and punched plaintiff or failed to intervene when another police officer kicked and punched him. See Pl. Opp. at 8-9. [*] Plaintiff's theory is predicated to record evidence:

a. In their initial moving papers, defendants raise and refute a series of theories of potential liability, see generally Def. Mem., only a subset of which plaintiff thereafter addresses, see generally Pl. Opp. Plaintiff is deemed to have abandoned any and all undefended theories of liability. See Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that issues not defended have been abandoned."); "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (collecting cases). "In cases of excessive force, '[a] police officer is personally involved [sufficient to establish section 1983 liability]... if the officer either: (1) directly participates in an assault; (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so.' " Frederique v. Cty. of Nassau, 168 F.Supp.3d 455, 471 (E.D.N.Y. 2016) (collecting cases).

Here, plaintiff fails to "designate specific facts showing that there is a genuine issue for trial" regarding Hynes' personal involvement in the alleged violation of plaintiff's civil rights. See Parker, 260 F.3d at 111 (quoting Celotex Corp., 477 U.S. at 324) (internal quotation marks omitted). Plaintiff rests his evidence from which a reasonable jury could infer that Hynes either hit plaintiff or could have prevented another officer from hitting him. It is undisputed that Hynes was not involved in plaintiff's physical apprehension; as he was locked in the back seat of Ruiz's police car, see R. 36-1 Statement ¶ 6, and could not even observe plaintiff's arrest, see Hynes Dep. at 35:5-39:10. It was not until after plaintiff

*4 Plaintiff's argument is unavailing for two reasons. First, it rests on a fundamental misunderstanding of summary judgment jurisprudence. Unlike the cases on which he relies, plaintiff does not contend that there are multiple versions of the facts that a jury could reasonably infer from the admissible evidence. Instead, plaintiff's argument assumes, as it must, that there are no facts in the record that affirmatively support Hynes' personal involvement in the challenged conduct. See id. at 9 (referring to the record as being "silent" and "unclear" as to defendant Hynes' personal involvement). For example, plaintiff argues that the "record is silent" as to whether defendant Hynes, "after being let out of the squad car[,] was in a position to reasonably prevent further harm to" plaintiff. See id. According to plaintiff, such a lack of evidence warrants presentation of the issue to a jury. See id.

Contrary to the premise of plaintiff's argument, it is not the role of the jury to engage in fact discovery. See Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir. 1976) ("The jury's role as the finder of fact does not enable it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial."). Rather, the jury's role is to resolve factual disputes, that is, to assess multiple versions of the facts, which the parties presumably developed during pretrial discovery. See id. Moreover, at trial, it would fall to plaintiff to prove Hynes' liability. As such, it is plaintiff's burden on summary judgment to direct the Court's attention to sufficient admissible evidence—be it through affidavits, deposition testimony, interrogatories, or admissions—that reasonably supports a competing version of facts that is probative of Hynes' liability. See Fed. R. Civ. P. 56(e)(1). Absent such a showing, there can be no genuine dispute as to a material fact, and the Court is entitled to decide the case as a matter of law. See Fed. R. Civ. P. 56(a); Plaintiff's response to Hynes' motion for summary judgment, and his acknowledgment that he developed no facts to support Hynes' alleged use of force or failure to intervene, see Pl. Opp. at 9, effectively concede that summary judgment should be granted in Hynes' favor.

Plaintiff's argument with respect to Hynes' alleged involvement is unavailing for a second reason: it rests on a fundamental misunderstanding of section 1983 jurisprudence. Specifically, plaintiff overlooks a factual prerequisite in arguing that plaintiffs in such cases "need not establish who, among a group of officers, directly participated in [an] attack and who failed to intervene." See Pl. Opp. at 8. As noted above, plaintiff cites various cases to support this proposition.

Skarupski, 652 F.Supp. at 694; Fischl v. Armitage, 128 F.3d 50, 57 (2d Cir. 1997); Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000); Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002); and Jeffreys v. Rossi, 275 F.Supp.2d 463, 474 (S.D.N.Y. 2003), aff'd sub nom. Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). See Pl. Opp. at 8. Although the plaintiffs in those cases were unable to identify the specific officers who/hey claim hit them, they did cite sufficient (often undisputed) evidence that a defendant officer could, at the very least, have intervened to prevent the alleged civil rights violations, which is an independent duty that officers owe to arrestees. See Skarupski, 652 F.Supp. at 694 ("All the named defendants, with the exception of Detective Denning, have admitted being present during the arrest, and even Kiernan and Watson, admit physical contact with plaintiff...") (emphasis added); Fischl, 128 F.3d at 57 ("Assuming the accuracy of Fischl's estimates that the attack occurred between 9:00 and 9:30 and lasted some 10 minutes, the record suggests that Marshall either was in the control area at the time Fischl's cell door was already open or that he was in the vicinity of the original attack and deputy Fischl's absence from his cell was ongoing. On the record would thus have permit a reasonable juror to find either than Marshall opened the cell door for the inmates himself or that he was in the vicinity of the ongoing attack and deputy Fischl's absence, knowingly did nothing to stop it. Either would suffice to show Marshall's personal involvement.") (emphasis added); Miller, 220 F.3d at 495 ("Miller contends that either Smith or Brewer (with Evon nearby) smacked him around while he lay cuffed on the ground. If, as we are required to do at this point in the case, Miller's allegations are taken as true, whichever officer was not directly responsible for the beating was idly standing by. If Miller can show at trial that an officer attacked him while another officer ignored a realistic opportunity to intervene, he can recover. Since he alleges facts to support either theory of excessive force, the defendants' motion for summary judgment was properly denied."); Smith, 293 F.3d at 652 ("Smith further testified that the door of the office contained open throughout the incident and that Pontalatis saw the beating, a fact finder could conclude that Pontalatis knew that his fellow officers were using excessive force against Smith and an opportunity to intervene but refused to do so. Accordingly, the district court erred in dismissing Smith's Eighth Amendment claim against Pantalatos.") (emphasis added); Jeffreys, 275 F.Supp.2d at 474–75 ("There is undisputed evidence here that the defendants were either located within the classroom 112 or in the doorway or hallway outside of the classroom. Thus, Jeffreys' inability to identify which officers did what to him is not dispositive.") (internal citations omitted).

*5 Indeed, in Skarupski, the primary case cited by plaintiff, the court held that there was no triable issue as to one of the defendants, Detective Denning, because he was not in the vicinity of the arrest at the time that the alleged excessive force took place. See 652 F.Supp. at 694. By the same, the detective did reach the scene of the arrest, the plaintiff had already been handcuffed. See id. In other words, the holding in Skarupski turned on whether there was sufficient evidence supporting a logical inference that a specific defendant at least had an ability to intervene, and, as to the detective, such proof was lacking. See id. So too here, it is undisputed that Hynes was locked in a police car without the ability to observe plaintiff during his apprehension, and thus was not released from the vehicle until after plaintiff was handcuffed. See Hynes Dep. at 35:9-39:10, 38:11-21. As discussed below, plaintiff offers no evidence or argument that, from the confines of the police car, Hynes was, at a minimum, able to intervene.

Plaintiff additionally suggests that, once Hynes exited the police car and was in plaintiff's vicinity, he may have either hit plaintiff or been in a position to prevent another officer from doing so. See Pl. Opp. at 8-9. This argument assumes that plaintiff was hit after he allegedly became unconscious and while defendant Hynes was in plaintiff's presence. See id. (noting that plaintiff "remained multiple other injuries" apart from those related to the use of a baton and asserting that "it also a question of fact[ ] whether Defendant Hynes, after being let out of the squad car[,] was in a position to reasonably prevent further harm to Plaintiff"). The only evidence that plaintiff seems to proffer in support of this factual assumption is plaintiff's deposition testimony that, as plaintiff blacked out, "he was kicked and punched lot of over [his] body by different members of [the] NYPD ... until losing consciousness[.]" See id. at 9 (citing Bermudez Dep. at 174:15-21); see also Edmonds Dep. at 19:18-21; Hynes Dep. at 38:11-21.

Plaintiff does allege, in the Amended Complaint that "the unlawful assault took place before[,] during[,] and after Plaintiff was handcuffed." Am. Compl. ¶ 51 (emphasis added). As this pleading is not verified, it does not constitute admissible evidence. See Patterson v. People's United Bank, No. 2:14cv-599 (ADS)(GRB), 2017 WL 2334631, at *11 (E.D.N.Y. Aug. 7, 2017) ("[A]n unverified complaint is not admissible evidence") (collecting cases). And while the defendants were either located inside classroom 112 or in the doorway or hallway outside of the classroom. Thus, Jeffreys' inability to identify which officers did what to him is not dispositive on reconsideration, No. 2:14cv599 (ADS)(GRB),

urge, *res ipsa loquitur* does not apply in a § 1983 municipal liability action: the fact that plaintiff may have been injured does not necessarily result from the municipality's failure to train. To prevail on these claims at trial, plaintiff must prove actual causation.").

\*6 Accordingly, the Court recommends that summary judgment be granted in favor of defendant Hynes.

## III. Defendant Edmonds' Lack of Supervisory Liability

Defendants also move for summary judgment with respect to the allegations against defendant Edmonds, see Def. Mem. at 9-11, who was the ranking supervisor of the 102nd Precinct at the time of plaintiff's arrest, see Edmonds Dep. at 10:9-11. It is undisputed that Edmonds was at the precinct when plaintiff was apprehended, see R. 56.1 Statement ¶ 7, and thus was not present during and did not participate in the use of force against plaintiff, see Edmonds Dep. at 10:12-22. Defendants contend that there thus is no evidence of record to support any cognizable theory of supervisory liability, even assuming that Edmonds was the supervisor of officers who deprived plaintiff of his civil rights. See Def. Mem. at 10-11. Plaintiff disagrees, invoking theories of supervisory liability predicated on alleged gross negligence or deliberate indifference. See Pl. Opp. at 6. Plaintiff's argument is legally and factually unfounded.

As noted above, to succeed on a section 1983 claim, the plaintiff must establish a defendant's personal involvement. See Wright, 21 F.3d at 501. The Second Circuit has identified five theories of personal involvement for supervisory liability: plaintiff relies on the final two: [10]

(4) the defendant was *grossly negligent* in supervising subordinates who committed the wrongful acts, or

(5) the defendant exhibited *deliberate indifference* to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (emphasis added) (citing Wright, 21 F.3d at 501). [11] The Second Circuit has recognized that for a plaintiff to survive summary judgment on a section 1983 claim regarding a supervisor's gross negligence or deliberate indifference, the plaintiff "must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor-defendant] *knew or should have known* that there was a high degree of risk that [his or her subordinate] would" engage in a

*7 Here, plaintiff, who bears the burden of proof on this issue, fails to "designate specific facts showing that there is a genuine issue for trial" as to Edmonds' gross negligence or deliberate indifference with respect to his subordinates' alleged misconduct. See Rucci, 260 F.3d at 111 (quoting Celotex Corp., 477 U.S. at 324) (internal quotation marks omitted). Plaintiff proffers no evidence that is actually probative of whether Edmonds knew or should have known that there was a high degree of risk that the officers in this case would use excessive force against plaintiff.

As an initial matter, in arguing defendant Edmonds' liability, plaintiff does not discuss or cite any evidence suggestive of a problematic history or pattern of related misconduct on the part of any of the subordinate officers involved in this case. As noted above, such evidence is often necessary for a plaintiff to survive summary judgment on a gross negligence or deliberate indifference theory of supervisory liability. See Raspardo, 770 F.3d at 117; see also Swanson, 2017 WL 3130322, at \*10. To be sure, plaintiff's argument on his *Monell* claim does cite defendant Raiz's deposition testimony as to his involvement (or, rather, lack thereof) in prior excessive force allegations. See Pl. Opp. at 11 (citing Raiz Dep. at 149:13-152:24). But nowhere in plaintiff's opposition papers does he cite, discuss, or proffer any proof of prior complaints of misconduct on the part of any of Edmonds' subordinates. [12] Accordingly, Edmonds' liability cannot be predicated on prior complaints of misconduct that are not before the Court.

[10]  On March 7, 2017, the Court held a telephonic conference to address a discovery dispute that arose during defendant DiStefano's deposition. See Minute Entry for Discovery Hearing (Mar. 7, 2017), DE #32. There, defendants mentioned that they had produced reports of the CCRB concerning allegedly similar incidents involving the officers in this case. Plaintiff does not now argue that these CCRB reports raise a triable issue as to whether Edmonds knew or should have known of a high degree of risk that his subordinates would use excessive force. See generally Pre. 282 F.3d at 141 (holding that there was no genuine dispute as to the defendant supervisor's gross negligence or deliberate indifference because the supervisor did not actually know of his subordinate's "troubled past" and the evidence presented did not implicate an affirmative duty on the supervisor's part to learn about such past); Wilson v. City of Norwich, 507

F.Supp.2d 199, 206-10 (D. Conn. 2007) (collecting cases) (holding that, although the defendant-supervisor actually knew that his subordinate had previously taken photographs of a "consenting female colleague[,]" such prior conduct "was not enough to make it sharply obvious" that the subordinate "might abuse his position of authority ... in fabricating a child pornography 'investigation' to cause young women to pose for nude and semi-nude photographs").

Further, the evidence upon which plaintiff relies does not support his theory of liability. Citing excerpts from defendants Raiz's and Edmonds' depositions, as well as Hynes' arrest report, see Pl. Opp. at 5-7, plaintiff contends that (1) there was a "complete lack of inquiry or review" regarding plaintiff's injuries, and (2) defendant Raiz "received no discipline resulting from his conduct towards [plaintiff] other than training conducted by 'Legal Bureau' ... on impartiality-related topics, see id. at 4-6. According to plaintiff, such a lack of inquiry and discipline indicates that the officers under Edmonds' command knew "that there would be no consequences to their unlawful conduct[.]" Id. at 4-7.

\*8 Such evidence is insufficient to defeat summary judgment. First, plaintiff mischaracterizes the record in asserting that Edmonds initiated a "complete lack of inquiry or review." For example, plaintiff labels out of context Edmonds' deposition testimony that he did not speak with plaintiff's physicians—specifically, those who treated plaintiff for the injuries that he sustained during his arrest. See Pl. Opp. at 4-5; Edmonds Dep. at 23:22-24. Plaintiff ignores Edmonds' testimony that, per his protocol, he visited plaintiff in Jamaica Hospital, attempted to interview plaintiff, and left after plaintiff did not respond to his questions. See Edmonds Dep. at 10:4-8, 23:2-21. Edmonds also testified that he questioned defendant Raiz about plaintiff's arrest and referred the incident to IAB to conduct a further investigation. See id. at 26:5-12, 32:4-19. Plaintiff does not dispute any of this testimony. As such, even in the light most favorable to plaintiff, the deposition testimony does not support the assertion that there was a "complete lack of inquiry of review."

Moreover, to the extent that plaintiff's "complete lack of inquiry" assertion is construed to be a hyperbolic "incipient inquiry" argument based on Edmonds' failure to question plaintiff's doctors, plaintiff's argument is legally as well as factually flawed. Plaintiff proffers no evidence or cogent argument that Edmonds must should, or even could [13]

[13]  See generally 45 C.F.R. § 164.512(f) (describing the limited circumstances in which a healthcare provider may disclose protected health-information to law enforcement); see also Edmonds Dep. at 23:2-17 (testifying that plaintiff would not respond to Edmonds' questions).

Further, plaintiff does not address, let alone distinguish, case law to the effect that a supervisor's duty to inquire with respect to a subordinate's involvement in alleged civil rights violations is satisfied when the supervisor requests that an investigatory entity independently review the incident. See Fino v. Conghlin, 684 F.Supp. No. 66 (S.D.N.Y. 1988) (holding that defendant-supervisor did not exhibit deliberate indifference under a "failure to act" theory where defendant-supervisor "directed the Inspector General's office to take appropriate action with respect to plaintiff's alleged civil rights violations); see also Tafoya v. City of New York, No. 04cv3862 (LTS), 2012 WL 6013998, at \*6 (S.D.N.Y. Dec. 1, 2012) (inmate's allegations were relieved to appropriate authorities within the prison system) (citing Maniz v. Fernsley, 282 F.Supp.3d 196, 208 (S.D.N.Y. 2007)). Here, it is undisputed that Edmonds requested that IAB conduct a further investigation, and that a separate CCRB investigation also ensued. See Edmonds Dep. at 26:9-12; see generally CCRB Report.

Second, plaintiff's conclusory assertion that Edmonds "ratified the abuse" that plaintiff claims to have suffered by taking an inquiry mischaracterizes the record. See Pl. Opp. at 6. Plaintiff presents no legal authority or analysis as to why the failure to reprimand raises a triable issue of gross negligence or deliberate indifference as to an alleged violation that had already occurred. Plaintiff seems to suggest that, regardless of an external investigation's findings and disciplinary actions, a police supervisor's failure to directly reprimand a subordinate for a single disputed act of alleged misconduct constitutes [14]

sufficient evidence from which a jury may infer that the police supervisor (1) knew or should have known that there was a high degree of risk that his subordinate officer would violate a person's civil rights, and (2) deliberately or recklessly ignored that risk, thereby (3) causing the subordinate officer to deprive the plaintiff of his or her civil rights. See Pre, 282 F.3d at 142. Courts have rejected this kind of argument on account of its bilateral tenuous probativeness with respect to breach of duty as well as causation. See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 93-94 (1st Cir. 1994) (finding that defendant-supervisor's failure to sanction an officer for a prior unsustained complaint "did not show ... a gross-deficient complaint program"); Noscariglia v. Conston, No. 03cv10878 (IT), 2015 WL 1410164, at \*11 (D. Mass. Mar. 27, 2015) ("A single incident of misconduct, even if egregious, is generally insufficient to find supervisory liable for their failure to supervise or discipline subordinates.") (collecting cases); Fowler v. California Highway Patrol, No. 13cv1026 (THE), 2013 WL 3945260, at \*4 (N.D. Cal. July 29, 2013) ("[I]t is not possible for failure to discipline an officer after a single incident to cause any constitutional injury that occurred during the incident."); (citing Hansen v. Black, No. 14-06cv01882 (LJO), 2010 WL 2791386, at \*6 (E.D. Cal. July 14, 2010), adopted, 2010 WL 3410412 (E.D. Cal. Aug. 30, 2010)); cf. Turpin v. Mailet, 619 F.2d 196, 201-02 (2d Cir. 1980) ("Appellant next contends that, even if a single incident of misconduct, even if egregious, ...).

\*9 Accordingly, the Court recommends that summary judgment be granted in defendant Edmonds' favor.

## IV. Defendant City of New York's Lack of Municipal Liability [15]

have questioned plaintiff's doctors. This failure is fatal to plaintiff's "lack of inquiry" argument. See, e.g., Phelan ex rel. Phelan v. Torres, No. 1:04cv03545 (ERK), 2013 WL 3053354, at \*18 (E.D.N.Y. Dec. 30, 2011) (holding that defendant encountered's failure to "meet an interview" a third-party caretaker was insufficient to defeat summary judgment on gross-negligence theory of supervisory liability because plaintiff's did not "provide any evidence that it was within [defendant-supervisor's] scope of responsibility to conduct [such] inquiries").

[15]  At the District Court agrees that plaintiff has failed to identify sufficient admissible evidence to establish municipal liability, it need not address defendants' arguments regarding the adequacy of the pleading of the *Monell* claim. See Def. Mem. at 22-24.

Finally, defendants move for summary judgment with respect to the allegations against the City, the employer of the NYPD police officers. See Def. Mem. at 24-27. Defendants argue that the record does not support municipal liability because there is no evidence of a municipal policy, custom, or practice that caused the alleged civil rights violation and plaintiff's injuries. See Def. Mem. at 25; Def. Reply at 10. Plaintiff disagrees, directing the Court's attention to defendant Raiz's purported one of excessive force during plaintiff's arrest, Edmonds' purported failure to supervise and discipline defendant Raiz, and a 2016 Claim Report containing statistics regarding lawsuits brought against, and settled by, the City. See Pl. Opp. at 12-18, 20 (citing Affidavit/Declaration in Opposition, Exhibit C ("Claims Report"), DE #74-3; CCRB Report; Affidavit/Declaration in Opposition, Exhibit E ("Judicial Expert Report"), DE #74-5; Edmonds Dep. at 52:7 to 53:11; Raiz Dep. at 144:5-18, 149:12-152:24; Hynes Dep. at 14:18 to 17:4; Bermudez Dep.). This Court concludes that plaintiff's cited evidence is insufficient to raise a genuine dispute as to any unlawful municipal policy, custom, or practice.

As with any defendant in a section 1983 claim, a municipality is liable only for its own involvement in a civil rights violation. See Connick v. Thompson, 563 U.S. 51, 60 (2011) (noting that municipalities are not "vicariously liable under § 1983 for their employees' actions"). Accordingly, a plaintiff must present evidence of a municipal policy, custom, or practice that caused the claimed civil rights violation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94 (1978). This causal link must be sufficiently strong such that the municipal policy, custom, or practice can be considered a "moving force" behind the municipal employee's misconduct. See id. at 694.

Further, a plaintiff may establish a municipal policy, custom, or practice with evidence of either: (1) a formal, express policy, see id. at 690, (2) a practice of similar constitutional violations that is so widespread and persistent as to constitute a custom or usage of the state (or municipality), see Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970), (3) a decision to follow a particular course of action made by an officer or officials responsible for establishing final policy with respect

2022 WL 357020

to the subject matter in question, see *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to properly train municipal employees, amounting to deliberate indifference to the rights of persons with whom the police come in contact, see *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989). Here, plaintiff does not argue that there was any express, unlawful policy. See Pl. Opp. at 10-21. Instead, plaintiff relies on the final three theories of municipal liability. See *id.*

**A. Widespread Practice**

**\*10** To support a custom-and-usage theory of municipal liability, plaintiff must identify sufficient admissible evidence that is probative of similar constitutional harms that are "persistent and widespread[.]" See *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992). That is, plaintiff must identify relevant practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes*, 398 U.S. at 168.

Evidence of the single dispute at hand is insufficient to show a widespread practice. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-24 (1985) (holding that it was reversible error to allow jury to infer an implicit municipal policy of inadequate training, and thus to find municipal liability, based on a single incident of unjustified police shooting); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (reversing verdict for plaintiff and ordering entry of judgment in favor of municipal defendant "[b]ecause the absence of evidence for any municipality-wide constitutional conduct by municipal employees can prevent plaintiff from meeting the threshold ... Instead, ... [L]ow evidence that would justify municipal liability" citing *Vilante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986)). Further, "[r]esearch reports may be used to bolster [Myself] claims, but only if these reports are sufficiently connected to the specific facts of the case." *Gaines v. City of New York*, No. 1(cin 1374 (NGG)(A), 2017 WL 1054690, at *11 (E.D.N.Y. Mar 16, 2017)

Here, plaintiff fails to "designate specific facts showing that there is a genuine issue for trial" regarding a widespread, unconstitutional practice. See generally Parker, 260 F.3d at 113 (quoting *Celotex Corp.*, 477 U.S. at 324) (internal quotation marks omitted). Plaintiff appears to rely on a New York City Comptroller Claims Report in support of this theory. See Pl. Opp. at 12. Plaintiff asserts that, according to the statistical report, in fiscal year 2016, "there were 7,562 claims filed against [the] NYPD." See *id.* at 15. Claims Report at 14, 36. However, this number includes "personal"

was insufficient to defeat summary judgment where plaintiff failed "to explain whether the misconduct analyzed in the report [here] any resemblance to the violations allegedly committed by the Officer Defendants"); see also Pludea at rel. Pludea v. Mullane, 312 F.App'x 95, 95 (3d Cir. 2013) ("[P]laintiffs' citation to various City Comptroller reports critical of the City's foster care system ... would hardly support a finding of an unconstitutional policy[.]"). Indeed, the purported excessive force claims included in the Claims Report date may deal with allegations of, for example, police using firearms—alleged misconduct not implicated by the case at hand. Thus, a jury would have to speculate how many of the purportedly thousands of complaints against the NYPD—including claims of false arrest and imprisonment, see Claims Report at 26 (defining "police action" personal injury claims)—were in fact instances of excessive force, and, in particular, claims of punching, kicking, and using batons against fleeing arrestees. See Michelman, 534 F.2d at 1042 ("The jury's role as the finder of fact does not entitle it to return a verdict based only on ... speculation[.]").

Even if the Claims Report were arguably probative of a widespread practice of excessive force, such evidence is, without more, insufficient as a matter of law. As noted above, statistical reports may only *bolster* a claim of widespread, unconstitutional practices. *Gomez*, 2017 WL 1034690, at *11. In other words, plaintiffs ordinarily may rely on statistical reports only in *conjunction* with primary sources of evidence that are probative of similar misconduct.[19] See *id.* The only evidence in the record that is even arguably suggestive of similar misconduct is defendant Rais's testimony that his partner was the subject of a prior complaint of excessive force, which defendant Rais testified was brought in error. See Rais Dep. at 149:12-152:24. This sole, unsubstantiated allegation of excessive force in combination with the Claims Report is insufficient to establish the existence of an ongoing and well-settled practice. See Vasquez v. City of New York, No. 11cv5024 (SLT)(VVP), 2013 WL 5519981, at *11 (E.D.N.Y. Sept. 30, 2013) (holding that evidence of five prior CCRB complaints of excessive force and two settled lawsuits was insufficient to defeat summary judgment on municipal liability claim because, in part, such "allegations were not sustained").

[19] The unique facts in the *Sorlucco* case present the exception that proves the general rule. See *Sorlucco*, 971 F.2d at 873 ("[T]he relatively harsh disciplinary treatment [the plaintiff experienced after] received from the NYPD when

injury or property damage arising out of motor vehicle[] accidents involving police vehicles[.]" Claims Report at 14, and represents a ten percent decrease in the number of claims filed against the NYPD over the prior year, see *id.* While the City spent $279,799,000 in settlements over such claims, the City Comptroller determined that this sum was attributable to the resolution of long-pending litigation challenging outdated policies. See *id.* at 15.

Such evidence is, in and of itself, insufficient to raise a genuine dispute as to an unlawful municipal policy, custom, or practice. First, plaintiff's cited Claims Report presents inferential hurdles that, collectively, are insurmountable. As an initial matter, the Claims Report does not provide any citation or reference material to support its factual data. The Court is thus unable to assess the accuracy of the Claims Report.

Even assuming *arguendo* the accuracy of the Claims Report, the data contained therein are not sufficiently probative of relevant prior misconduct. First of all, the report relies on "claims" and "settlements" as data points. See generally Claims Report. But claims are merely unsubstantiated allegations of misconduct, as opposed to actual findings of civil wrongs, and settlements are not admissions of liability. Courts in this district have accordingly been highly skeptical of such evidence, considering it too attenuated and misleading to properly support an inference probing rise to municipal liability. See, e.g., *Reape v. City of New York*, No. 09cv5163 (BMC)(LB), 2010 WL 4702285, at *4 (E.D.N.Y. Nov. 15, 2010) (granting the City's motion for summary judgment and observing that if statistical proof as to unsubstantiated excessive force claims were sufficient to establish municipal liability, "then local governments would be liable in every § 1983 case" (internal citation omitted)); Strauss v. City of New York, 2008 WL 2977145, at *11 (4 (E.D.N.Y. July 12, 2017) (collecting cases and declining to decide whether evidence of unsubstantiated complaints is sufficient to show deliberate indifference in connection with a failure-to-train theory of municipal liability).

**\*11** Most problematically, however, is that plaintiff's cited Claims Report does not, as plaintiff concedes, even "break down the exact number of excessive force complaints[.]" See Pl. Opp. at 15. Nor does plaintiff explain how any of these claims are sufficiently similar to the case at hand so as to imply the occurrence of similar constitutional harms. See *Gomez*, 2017 WL 1034690, at *11 (holding that plaintiff's cited report regarding civil action alleging police misconduct

compared with the total absence of any meaningful investigation into [her police-officer attacker's] conduct, seems to us sufficiently egregious to warrant an inference that could, when coupled with the statistical proof [of disparate] disciplinary treatment of male and female officers], justify a jury's finding of an unconstitutional departmental practice of sex discrimination.").

Accordingly, this Court concludes that plaintiff has failed to identify sufficient admissible evidence probative of a persistent, widespread practice of NYPD officers using excessive force, let alone a practice of excessively kicking, punching, and using batons against fleeing arrestees.

**B. Final Policymaker's Ratification**

Alternatively, an unlawful municipal policy, custom, or practice may be established by proof of a final policy-maker's ratification. See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.") (emphasis added). To support this theory of municipal liability, plaintiff must establish both final policymaking authority and ratification. See *Praprotnik*, 475 U.S. at 483. Specifically, plaintiff must show that (1) "the official or officials responsible for establishing final policy with respect to the subject matter in question" (2) made "a deliberate choice to follow a course of action ... from among various alternatives[.]" *Id.*

**\*12** Whether an official has final policymaking authority is a legal question, determined on the basis of state law. See Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (collecting cases); see also Praprotnik, 485 U.S. at 123-26. The official need not have final policymaking authority "in some categorical," "all or nothing" manner." McMillian v. Monroe County, 520 U.S. 781, 785 (1997). Instead, the official need only be a "final policymaker[] for the local government in [that] particular area, or in [the] particular issue[.]" See *id.* at 63 n.7 (internal citation omitted). To bear the burden of establishing that the official had final policymaking authority, plaintiff must point to Jeffes, 208 F.3d at 57-58.

In contrast to a widespread-practice theory of municipal liability, a single decision to take unlawful action, made by municipal policymakers, may be sufficient to raise a triable issue of municipal liability, particularly where that decision is embodied in an express instruction to subordinates. See

Pembaur, 475 U.S. at 480-84. A policymaker's ratification need not be evidenced by an express act, but may be inferred from omission, such as a policymaker's persistent failure to discipline subordinates for particular misconduct. See Turpin, 619 F.2d at 200-01. Nevertheless, where, as here, the purported ratification is based on alleged inaction by policymakers, the municipal policy, custom, or practice "cannot be inferred from the failure of those in charge to discipline a *single* police officer for a single incident of illegality." *Id.* at 202 (emphasis added). In other words, "absent mere evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not rationally be inferred from a single incident of illegality[,] such as a first arrest ... with excessive use of force." *Id.*

In this case, plaintiff fails to "designate specific facts showing that there is a genuine issue for trial" regarding ratification by any final policymaker. See Parker, 260 F.3d at 113 (quoting *Celotex Corp.*, 477 U.S. at 324) (internal quotation marks omitted). As an initial matter, plaintiff's ratification theory appears to be predicated on comments on the part of defendant Edmonds. See Pl. Opp. at 12 (incorporating plaintiff's supervisory liability arguments by reference, as well as citing the Claims Report generally). Any such evidence is, however, insufficient. First, plaintiff offers no evidence or argument that Edmonds is a final policymaker. The only proof in the record that remotely suggests any sort of authority on Edmonds' part is his deposition testimony in which he stated that, as a lieutenant, he was the ranking supervisor the night that plaintiff was arrested. See Edmonds Dep. at 10-9-11. Contrary to this theory, the Court found that such bare facts of supervisory authority cannot defeat a motion to dismiss, let alone summary judgment. See Joseph v Doe, No. 16cv2004 (PKC)(LB), 2017 WL 4373024, at *3-4 (E.D.N.Y. Sept. 22, 2017) ("[A] mere assertion that [a defendant] was responsible for supervising the other Defendants is insufficient" to survive a Rule 12(b)(6) motion to dismiss) (collecting cases); see also Vasquez, 2013 WL 5519981, at *12 (rejecting plaintiff's final-policy-maker argument and dismissing *Monell* claim on summary judgment where plaintiff offered "no support for the contention that Sergeant Hanranan qualifies as a policy-making official simply because he [had] authority to verify arrests") (collecting cases).

Second, even if Edmonds were a final policymaker, plaintiff points to no proof of ratification of any misconduct. Plaintiff seems to suggest that a jury could infer a policy of acquiescing to such misconduct based on Edmonds' failure to discipline Rais after his alleged use of excessive force

as well as Edmonds' failure to inquire as to plaintiff's injuries. See Pl. Opp. at 12 (noting that "[t]he Defendant Edmonds argument is incorporated here by reference"). Even overlooking the uncontested evidence of Edmonds' actions refuting this theory—such as his referral of Rais's use of force to IAB for investigation, see Edmonds Dep. at 10:3-8, 23:2-21, 26:5-12, 32:4-22—plaintiff's argument is unavailing. Edmonds' failure to personally discipline defendant Rais after this single incident of alleged excessive force is insufficient to support an inference of a municipal policy, custom, or practice. See Turpin, 619 F.2d at 202.

**\*13** Accordingly, this Court concludes that plaintiff has failed to identify sufficient admissible evidence probative of a final policymaker's ratification.[17]

[17]
It is unclear whether plaintiff is also arguing that the City should be held liable based on Edmonds' alleged failure to supervise and failure to discipline his subordinates. See Pl. Opp. at 11-21 (referring to issues of failure to supervise/ or discipline, without subsequently developing a cogent argument in support of such allegations). If so, such theories fail for the same reason previously articulated. "Where plaintiffs seek to hold a municipality liable under a theory of failure to supervise or discipline, ... they must also show that the *municipal policymaker* acted with deliberate indifference." Pipitone v. City of New York, 57 F.Supp.3d 173, 191 (E.D.N.Y. 2014) (citing City of Canton, 489 U.S. at 388-89) (emphasis added). As discussed above, plaintiff has failed to identify sufficient evidence that (a) Edmonds is a municipal policy-maker for purposes of imputing liability onto the City of New York, see supra pp. 28-29, or (b) that Edmonds' supervision or disciplining of his subordinates was legally inadequate, see supra pp. 14-23.

**C. Failure to Train**

Finally, a plaintiff may establish an unlawful policy, custom, or practice under a failure-to-train theory, which requires (in act, a mental state, and causation. See City of Canton, 489 U.S. at 388-92. Specifically, first, plaintiff must show that the municipality failed to adequately train its employees. See *id.* Second, plaintiff must show that such inadequate training was the product of the municipality's deliberate indifference. See *id.* Finally, "for liability to attach[,] ... the identified deficiency

in a city's training program must be closely related to the ultimate injury." *Id.* at 391

In this connection, plaintiff must proffer some evidence indicating what the municipality did or did not do in its training program as well as in what it could have done to avoid the violations of plaintiff's civil rights. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130-31 (2d Cir 2004). Without such evidence, a jury cannot reasonably infer that the municipality's training program was inadequate, or that that deficiency actually caused the constitutional violation. See *id.* Nor could a jury reasonably infer that the municipality acted with deliberate indifference.[18] See Connick, 563 U.S. at 61 (noting that, to establish deliberate indifference, a plaintiff must show that "a municipal actor disregarded a known or obvious consequence of his action[.]"—that is, a city policy-maker must have had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights") (internal quotation and quotation marks omitted).

[18] The Second Circuit specifically requires that a plaintiff establish three distinct factors to prove deliberate indifference. See Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation[.]" *Id.* at 297. "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298.

[14] Further, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing Turtle, 471 U.S. at 822-23). Accordingly, inadequate training proposes recovering *after* plaintiff's constitutional injury are not "closely related" to the alleged civil rights violation. See *id.* at 63 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the city[] and the opportunity to conform to constitutional dictates' ..." (quoting City of Canton, 489 U.S. at 395 (O'Connor, J. concurring in part and dissenting in part)); see also Kogut v. City of Nassau, No. 06cv6695 (JS)(WDW), 2013

WL 3740710, at *3 (E.D.N.Y. Aug. 27, 2013) ("[E]vidence of subsequent violations is irrelevant to a failure-to-train analysis.") (collecting cases).

Here, plaintiff fails to "designate specific facts showing that there is a genuine issue for trial" regarding the City's failure to train. See Parker, 260 F.3d at 114 (quoting Celotex Corp., 477 U.S. at 324) (internal quotation marks omitted). Specifically, plaintiff has "proffered no evidence of the [City's] training programs or advanced any theory as to how a training deficiency caused the police-officers to use excessive force [to deprive plaintiff of [his] constitutional rights." Amnesty Am., 361 F.3d at 130. More particularly, plaintiff has "provided no evidence concerning subsequent training efforts, see Pl. Opp. at 6, 13 (citing Rais Dep. at 144:5-18); see also Connick, 563 U.S. at 63 n.7, plaintiff's "failure to train theory is based solely on [] evidence that the police used excessive force" during his arrest, see Amnesty Am., 361 F.3d at 130. The Supreme Court "unequivocally requires, however, that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place." *Id.*

Indeed, "[it] is impossible to prevail on a claim that the [City's] training program was inadequate without any evidence as to whether the [City] trained its officers [before plaintiff's arrest], how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted *under the circumstances*' to [prevent plaintiff] during his arrest." *Id.* (quoting City of Canton, 489 U.S. at 391). Similarly, having failed to show an inadequacy in the City's training program, plaintiff cannot show that the City had notice—be it actual or constructive—that such inadequacy was causing civil rights violations See Connick, 563 U.S. at 61. Moreover, plaintiff has "provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training, and therefore no reasonable factfinder could conclude that the excessive force occurred as a result of training deficiencies." Amnesty Am., 361 F.3d at 130.

Accordingly, in the absence of a proffer of sufficient admissible evidence probative of a failure to train, plaintiff has "failed to raise an inference that the police were improperly trained and that this training caused them to use excessive force ..." See *id.* at 131; see also Walker, 974

Bermudez v. Edmonds, Slip Copy (2017)
2017 WL 11507652

Sammarco v. Hoolan, Not Reported in F.Supp.2d (2014)
2014 WL 3639161

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the District Court grant defendants' motion for partial summary judgment, dismissing plaintiff's claims against defendants Hynes, Edmonds, and the City of New York.

Any objections to this Report and Recommendation must be filed with the Honorable Kiyo A. Matsumoto on or before **January 2, 2018**. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72.

SO-ORDERED.

All Citations

Slip Copy, 2017 WL 11507652

---

Sammarco v. Hoolan, Not Reported in F.Supp.2d (2014)
2014 WL 3639161

2014 WL 3639161
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert Anthony SAMMARCO, Plaintiff,
v.
NY State Trooper HOOLAN et al., Defendants.

No. 12–CV–7857 (JMF).

Signed July 23, 2014.

MEMORANDUM OPINION AND ORDER

JESSE M. FURMAN, District Judge.

SO-ORDERED.

All Citations

Not Reported in F.Supp.2d, 2014 WL 3639161

---

Burks v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 6199550

2018 WL 6199550
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Timothy BURKS, Plaintiff,
v.
The CITY of NEW YORK, et al., Defendants.

17-cv-00177 (ARR) (RLM)

Signed 11/28/2018

Attorneys and Law Firms

Baree H. Klein, Baree H. Klein, Esq. PLLC, New York, NY, for Plaintiff.

Daniel G. Saavedra, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

Allyne R. Ross, United States District Judge

**FACTUAL AND PROCEDURAL BACKGROUND**

Unless otherwise noted, all material facts are undisputed.

**I. Plaintiff's Arrest**

## II. Rikers Island Medical Treatment

## STANDARD OF REVIEW

## DISCUSSION

### I. Defendant's motion for summary judgment on the supervisory liability claim is granted.

### II. Defendant's motion for summary judgment on the failure to intervene claim is granted.

Burks v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 6659550

*7 The facts of plaintiff's arrest are not exactly like those in *Parks*, for one thing, Detective McBurnie—who had placed plaintiff in handcuffs, never seconds before plaintiff was pushed to the ground—appears to have been very close to both plaintiff and Detective Thompson at the time that the force occurred, and not, as in *Parks*, two feet away. *id.* at *4. However, *Parks* demonstrates that an officer does not become liable for failing to intervene just because he has *some* initial —verbal or otherwise—then another officer intends to use force against the plaintiff. Indeed, even where a defendant uses force multiple times—as in *O'Neill*, where the defendant struck the plaintiff "three times in rapid succession"—an observer is not liable unless there is evidence that he could have intervened. 839 F.3d at 10, 11–12.

III. Because plaintiff's negligence claim does not share a "common nucleus of operative fact" with the other federal claims, it is dismissed for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on plaintiff's failure to intervene claim, and plaintiff's negligence claim is dismissed for lack of supplemental jurisdiction. Additionally, because defendants' motion for summary judgment on the negligence liability claim is unconnected to plaintiff, that claim is also dismissed...

So ordered.

All Citations

Not Reported in Fed. Supp., 2018 WL 6199550

Elufe v. Aylward, Not Reported in F.Supp.2d (2011)
2011 WL 477868

KeyCite Yellow Flag - Negative Treatment
Distinguished by *Aktağ v. Erdin,* E.D.N.Y., March 27, 2013

2011 WL 477868(.)
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Eleggua Osun ELUFE, Plaintiff,
v.

Lieutenant John AYLWARD; Lieutenant Bernardo
Colon; Sergeant Ayanna Harrison; Detective
Jason Palamara; Police Officer Richard Reilly;
Police Officer Slinley, Sergeant Thomas Brogan;
Police Officer McCauley; and Unknown Police
Officers, 84th Precinct Brooklyn, Defendants.

No. 09–CV–458 (KAM)(LB).
|
Feb. 4, 2011.

**Attorneys and Law Firms**

Elegguo Osun Elufe, Ossining, NY, pro se.

Diep Nguyen, New York City Law Department, New York,
NY, for Defendants.

**MEMORANDUM AND ORDER**

MATSUMOTO, District Judge:

*1 On January 29, 2009, plaintiff Elegguo Osun Elufe ("plaintiff")
commenced this *pro se* action against defendants Lieutenant
Aylward, Lieutenant Colon, Sergeant Brogan, Sergeant
Harrison, Detective Palamara, Police Officer Reilly, Police
Officer Slinley, and Police Officer McCauley ("defendants"),
alleging violations of his civil rights pursuant to 42 U.S.C. §
1983 and state law claims of assault and battery. Defendants
now move for summary judgment pursuant to Fed.R.Civ.P.
56. For the reasons set forth below, defendants' motion is
granted.

**BACKGROUND**

*I. Procedural History*

by the jury moving for summary judgment.
Here, defendants served both Rule 56.1 and 56.2
statements on plaintiff. Plaintiff did not submit
a correspondingly numbered counter-statement
controverting defendants' moving papers. Thus,
although the assertions in defendants' Rule 56.1
statement are deemed admitted for the purposes
of this motion, the court has literally construed
plaintiff's opposition papers and has determined
that he has failed to raise a disputed issue of
material fact.

The undisputed material facts, as set forth in the current
record and the defendants' Rule 56.1 statement and exhibits
referenced therein, are as follows. On August 28, 2008,
plaintiff was involved in a knife fight with another individual,
Mr. Williams, in Brooklyn, New York. (R. 56.1 Stmt. * 1.)
New York City police officers arrived at the scene and arrested
plaintiff. (R. 56.1 Stmt. * 3.) Subsequent to plaintiff's arrest,
the officers took photographs of plaintiff's face and body,
which showed no visible injuries to plaintiff. (R. 56.1 Stmt.
* 4.) Plaintiff was examined by a medical professional prior
to his arraignment on August 28, 2008 (R. 56.1 Stmt. * 5),
and two days later when he was admitted to Rikers Island (R.
56.1 Stmt. * 6), during which examinations physical injuries
were neither reported by plaintiff nor noted by the examining
medical provider. Two months later, on August 28, 2008,
plaintiff was again examined by a medical professional and
again denied any health problems or complaints. (R. 56.1
Stmt. * 8.) On December 26, 2008, four months after his
arrest, plaintiff was given another health screening and, for
the first time, complained of shoulder pain. (R. 56.1 Stmt.
* 9.) Plaintiff offered alternate theories for the cause of his
shoulder injury that did not relate to his arrest four months
earlier: that it was caused by an "accident on the street" and
that his shoulder "snapped." (R. 56.1 Stmt. * 10.) The New
York State Department of Correctional Services diagnosed
plaintiff with a possible joint disease, but found no fractures
or dislocations in plaintiff's shoulder. (R. 56.1 Stmt. * 11.)
Plaintiff received physical therapy for several months, which
ended in May 2009. (R. 56.1 Stmt. * 12.) The record does not
indicate that plaintiff has received any other treatment for his
shoulder injury since that time. (*Id.*)

*2 Plaintiff pled guilty to Robbery in the Third Degree and
Criminal Possession of a Weapon in the Third Degree on
September 4, 2008. (R. 56.1 Stmt. * 13.) Plaintiff is currently
incarcerated at Sing Sing Correctional Facility. (R. 56.1 Stmt.
* 15.)

On January 29, 2009, plaintiff commenced this *pro se* action
pursuant to 42 U.S.C. § 1983 against Police Officer Reilly
and unnamed police officers, alleging claims of false arrest,
malicious prosecution, excessive force, and denial of medical
attention under the Fourth and Eighth Amendments to the
United States Constitution, and assault and battery under
New York state law. Plaintiff filed an amended complaint on
August 17, 2009, adding as defendants Lieutenant Aylward,
Lieutenant Colon, Sergeant Brogan, Sergeant Harrison,
Detective Palamara, Police Officer Slinley, and Police Officer
McCauley. Discovery followed.

Defendants filed the pending motion on August 13, 2010.
Defendants move for summary judgment pursuant to
Fed.R.Civ.P. 56 on the grounds that: (1) plaintiff's false arrest
and malicious prosecution claims are barred pursuant to the
United States Supreme Court's decision in *Heck v. Humphrey,*
512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); (2)
the amount of force used was *de minimis* and reasonable and
insufficient to sustain a claim for excessive force under §
1983; (3) the undisputed record establishes that plaintiff did
not sustain an objectively serious or urgent injury, and neither
sought nor was denied medical attention; (4) plaintiff fails to
allege that defendants were personally involved in the alleged
excessive force used against him and the undisputed record
establishes that defendants were not personally involved; (5)
plaintiff fails to state a claim for supervisory liability; (6)
defendants are entitled to qualified immunity; and (7) to the
extent that plaintiff alleges state law claims, they should be
dismissed because plaintiff failed to comply with the New
York General Municipal Law § 50-e pre-requisite to file a
notice of claim. As required by the Local Civil Rules of this
district, defendants served and filed a Rule 56.1 statement of
undisputed facts ("R. 56.1 Stmt.") a Rule 56.2 notice to a pro
se litigant. Plaintiff opposes defendants' motion for summary
judgment.

*II. Undisputed Material Facts[1]*

As set forth in Local Civil Rule 56.1(c), "[e]ach
numbered paragraph in the statement of material
facts set forth in the statement required to be
served by the moving party will be deemed
admitted for purposes of the motion unless
specifically controverted by a correspondingly
numbered paragraph in the opposition required
to be served by the opposing party." L. Civ.
R. 56.1(c). In addition, Local Civil Rule 56.2
requires that notice be sent to *pro se* parties

**DISCUSSION**

*I. Summary Judgment Standard*

A court may grant summary judgment only "if the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to a judgment
as a matter of law." Fed.R.Civ.P. 56(c). The moving party
carries the burden of demonstrating the absence of a genuine
issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317,
323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a
motion for summary judgment, the court's function is not to
resolve disputed issues of fact, but only to determine whether
there is a genuine issue to be tried. *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986). The court must construe the facts in the light
most favorable to the nonmoving party and all reasonable
inferences and ambiguities must be resolved against the
moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2d
Cir.2001).

Nevertheless, the nonmoving party cannot rely "merely on
allegations or denials" but must instead "set out specific facts
showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *see
also Nat'l Westminster Bank USA v. Ross,* 676 F.Supp. 48,
51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and
mere denials are not enough to raise genuine issues of fact.");
*Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499
(2d Cir.2001) ("[M]ere speculation and conjecture is [sic]
insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest only on the pleadings.
*Celotex,* 477 U.S. at 324 (Rule 56(e) "requires the nonmoving
party to go beyond the pleadings"); *Davis v. New York,* 316
F.3d 93, 100 (2d Cir.2002). Instead, each statement of material
fact by the movant or opponent must be followed by citation
to evidence which would be admissible, as required by
Fed.R.Civ.P. 56(e) and Local Civil Rule 56.1(d). Moreover,
"the mere existence of some alleged factual dispute between
the parties will not defeat an otherwise properly supported
motion for summary judgment; the requirement is that there
be *no genuine issue of material fact." Anderson,* 477 U.S. at
247–48 (emphasis in original). No genuine issue of material
fact exists "unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party.
If the evidence is merely colorable ... or is not significantly
probative ... summary judgment may be granted." *Id.* at 249–
50 (internal citations omitted).

*II. Application*

*a. Malicious Prosecution Claim*

Defendants first argue that plaintiff's malicious prosecution
claim is barred as a matter of law under *Heck v. Humphrey,*
512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994),
because his conviction has not been invalidated by an
administrative board, state court, or in a federal habeas
corpus proceeding. (ECF No. 67, Defendants' Memorandum
of Law in Support of Their Motion for Summary Judgment
("Defs.Mem."), at 3–6.) Plaintiff does not address this
procedural argument in his opposition, rather, he argues on the
merits that the malicious prosecution claim "does not require
a plaintiff to prove that the defendant was motivated by spite
or hatred, but that he sustained the criminal proceeding due
to a wrong or improper motive." (ECF No. 68, Plaintiff's
Motion for Opposition of Defendants' Motion for Summary
Judgment, ("Pl.Mem."), at 6.) The court finds that plaintiff's
claim for malicious prosecution is barred by the doctrine set
forth in *Heck v. Humphrey.*

*3 In *Heck v. Humphrey,* the Supreme Court held that
"a § 1983 cause of action for damages attributable to an
unconstitutional conviction or sentence does not accrue until
the conviction or sentence has been invalidated." 512 U.S.
at 489–90. Thus, a plaintiff who seeks to "recover damages
for allegedly unconstitutional conviction or imprisonment,
or for other harm caused by actions whose unlawfulness
would render a conviction or sentence invalid ... must prove
that the conviction or sentence has been reversed on direct
appeal, expunged by executive order, declared invalid by
a state tribunal authorized to make such determination, or
called into question by a federal court's issuance of a writ of
habeas corpus." *Id.* at 486–87. Accordingly, "the district court
must consider whether a judgment in favor of the plaintiff
would necessarily imply the invalidity of his conviction or
sentence; if it would, the complaint must be dismissed unless
the plaintiff can demonstrate that the conviction or sentence
has already been invalidated." *Id.* at 487.

The Second Circuit has consistently held that claims for
malicious prosecution are barred by *Heck v. Humphrey* if the
conviction or sentence has not been invalidated. *See, e.g.,
Lynch v. Suffolk Cty. Police Dep't, Inc.,* 348 F. App'x 672,
674 (2d Cir.2009) (affirming dismissal of plaintiff's claim for
malicious prosecution because plaintiff "conced[ed] that his
felony convictions have never been 'invalidated' by a court or
other proper authority"); *Murphy v. Lynn,* 118 F.3d 938, 947

(3d Cir.1997) (holding that in order to establish a claim for
malicious prosecution under § 1983, a plaintiff must show that
the prosecution ended in his favor). Here, plaintiff pled guilty
to Robbery in the Third Degree and Criminal Possession of a
Weapon in the Third Degree. (R. 56.1 Stmt. * 13.) Plaintiff has
not alleged nor presented any evidence that his conviction has
been invalidated. Accordingly, summary judgment is granted
as to plaintiff's claim for malicious prosecution pursuant to
*Heck v. Humphrey.*

*b. False Arrest Claim*

Defendants similarly move for summary judgment on
plaintiff's false arrest claim on the ground that it, too, is barred
by *Heck v. Humphrey.* (ECF No. 67, Defs. Mem., at 4–6.)
The court agrees. In addition to *Heck v. Humphrey,* the court
grants summary judgment as to plaintiff's false arrest claim on
the ground that there was probable cause for plaintiff's arrest,
based on the undisputed record.

To analyze a § 1983 false arrest claim, the court looks to the
law of the state in which the arrest occurred. *See, e.g., Davis
v. Rodriguez,* 364 F.3d 424, 433 (2d Cir.2004) (gathering
cases). In New York, "a plaintiff claiming false arrest must
show, *inter alia,* that the defendant intentionally confined him
without his consent and without justification." *Covington v.
City of New York,* 171 F.3d 117, 122 (2d Cir.1999) (quoting
*Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)).

*4 However, the Second Circuit has held that "[t]he
existence of probable cause to arrest constitutes justification
and is a complete defense to an action for false arrest."
*Bayne,* 101 F.3d at 852 (internal quotation marks and citation
omitted); *see also Singer v. Fulton Cty. Sheriff,* 63 F.3d
110, 118 (2d Cir.1995) ("There can be no federal civil
rights claim for false arrest where the arresting officer had
probable cause."). "The requirement of probable cause does
not create a high bar for law enforcement." *Morris v. City of
New York,* No. 07–CV–6122, 2009 U.S. Dist. LEXIS 27358,
at *40, 2009 WL 857486 (S.D.N.Y. Mar. 31, 2009). "In
general, probable cause to arrest exists when the officers have
knowledge or reasonably trustworthy information of facts
and circumstances that are sufficient to warrant a person of
reasonable caution in the belief that the person to be arrested
has committed or is committing a crime." *Bayne,* 101 F.3d
at 852 (citations omitted). Significantly, the "validity of an
arrest does not depend upon an ultimate finding of guilt or
innocence." *Peterson v. County of Nassau,* 995 F.Supp. 305,
313 (E.D.N.Y.1998) (citing *Pierson v. Ray,* 386 U.S. 547, 555,
87 S.Ct. 1213, 18 L.Ed.2d 288, (1967)). "Rather, the court

looks only to the information that the arresting officer had
at the time of the arrest." *Id.* (citing *Anderson v. Creighton,*
483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).
The question of whether or not probable cause existed may be
determinable as a matter of law where there is no dispute as
to the pertinent events and the knowledge of the officers. *See
Weyant,* 101 F.3d at 852 (citation omitted).

Where the police arrest a suspect based on eyewitness
identification, there is probable cause for the arrest. *See,
e.g., Wahhab v. City of New York,* 386 F.Supp.2d 277, 287
(S.D.N.Y.2005) (finding that the police had probable cause to
arrest a suspect in response to a 911 call from an eyewitness).
*Bustelli v. Tuohy Family Pretzels,* No. 03–CV–6719, 2004
U.S. Dist. LEXIS 22546, at *7–9, 2004 WL 2594646
(E.D.N.Y. Nov. 8, 2004) (finding that police had probable
cause to arrest a suspect based on eyewitness identification).
Here, it is undisputed that plaintiff was involved in a knife
fight prior to his arrest. (R. 56.1 Stmt. * 1; ECF No. 66,
Ex. B, Excerpts from Deposition of Plaintiff ("Pl.Dep.")
at 123–24.) Plaintiff testified at his deposition that there
were eyewitnesses at the scene of the knife fight involving
plaintiff and that someone called 911. (Pl. Dep. at 123) ("A
school guard was there; a black man; chubby. I think he's
the one that called the police. Somebody called 911.") Thus,
because the undisputed evidence in the record suggests that
the officers were relying on the identification of a suspect by
an eyewitness, the police officers had probable cause to arrest
plaintiff. Having established that the officers had probable
cause for the arrest, plaintiff's claim for false arrest must be
dismissed.

Accordingly, the court grants defendants' motion for summary
judgment on plaintiff's false arrest claim because, as a matter
of law, it is barred by *Heck v. Humphrey* and because there
was probable cause to arrest plaintiff.

*c. Excessive Force Claim*

*5 In support of their summary judgment motion on
plaintiff's excessive force claim, defendants argue that "even
if plaintiff could prove that the police pushed his face against
the storefront window on August 28, 2008, the push was a
*de minimis* use of force." (ECF No. 67, Defs. Mem., at
8.) Defendants further argue that pending plaintiff's face was
"reasonable under the circumstances." (*Id.*) In the alternative,
defendants argue that plaintiff's excessive force claim must
be dismissed against each defendant for their lack of personal
involvement in plaintiff's arrest and because they are entitled
to qualified immunity. (*Id.* at 12–17.) In response, plaintiff

argues that "under Eighth Amendment claims, plaintiff herein
did not have to show that the injuries was [sic] serious, only
that it was more than minor and the other circumstances
of the assault were unjustifiable." (ECF No. 68, Pl. Mem.,
at 5.) Plaintiff further argues, but offers no evidence, that
each of the defendants was involved in the alleged use
of excessive force, and that defendants are not entitled
to qualified immunity because reasonable officers would
disagree over the constitutionality of the force used during
his arrest. (*Id.* at 6, 7.) The court considers the record in the
light most favorable to plaintiff and, as set forth below, grants
summary judgment to the defendants on plaintiff's excessive
force claim.

*i. Reasonableness of Amount of Force Used*

Plaintiff's complaint alleges that at the time of his arrest,
a police officer pushed him against a glass window and he
"received lacerations to head, a cut on my nose and injury
to my right shoulder and arm." (ECF No. 1, Compl., at 4.)
Although more allegations are insufficient to defeat summary
judgment, *Nat'l Westminster Bank USA,* 676 F.Supp. at
51, plaintiff testified at his deposition that he sustained an
indentation on his nose from his glasses, a bruise losing a
few days on his forehead and a shoulder injury. (Pl. Dep. at
134–36.) Defendants do not dispute that plaintiff was pushed
into a window, but assert that the single "push was a *de
minimis* use of force" and "the force used by the police was
reasonable." (ECF No. 67, Defs. Mem. at 8.) As set forth
below, the court agrees that, based on the undisputed record,
the force used by the police was not objectively unreasonable.

Claims for excessive force used by police officers "in the
course of an arrest, investigatory stop, or other 'seizure' of a
free citizen should be analyzed under the Fourth Amendment
and its 'reasonableness' standard." *Graham v. Connor,* 490
U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989);
*see also Papineau v. Parmley,* 465 F.3d 273, 282 (2d Cir.2006)
("To succeed on a Fourth Amendment excessive force claim,
a plaintiff must show that the amount of force used was
'objectively unreasonable.' *Lowth v. Town of Cheektowaga,*
82 F.3d 563, 573 (2d Cir.1996) (citation omitted). Moreover,
not "every push or shove" violates the Fourth Amendment.
*Graham,* 490 U.S. at 396. Whether the force used to
effect a particular arrest is reasonable depends on a careful
weighing of the facts of each particular case, including
whether the suspect poses a threat, resists, or attempts to
evade arrest, and the severity of the crime at issue. *Id.*

Elufe v. Aylward, Not Reported in F.Supp.2d (2011)
2011 WL 477868

his legs to the point that a law enforcement officer asked if plaintiff was trying to escape (*id.* at 146), the court finds that no reasonable jury would conclude that the force used was excessive and rises to the level of a constitutional violation. *See, e.g., Garcia v. Greco,* No. 05 Civ. 9587, 2010 U.S. Dist. LEXIS 11166, at *18, 2010 WL 446446 (S.D.N.Y. Feb. 9, 2010) ("Considering the danger Plaintiff posed to Defendant, and the very limited nature of Plaintiff's injuries, the Court concludes that no reasonable jury could find that Defendant's use of force rose to the level of a constitutional violation."). Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's claims for excessive force.

**ii. Defendants' Personal Involvement in Use of Excessive Force**

*\*7* Defendants argue, in the alternative, that even if the court finds that the force used was excessive, plaintiff's excessive force claim must be dismissed because the defendants were not personally involved in the alleged constitutional violation. (ECF No. 67, Defs. Mem., at 12–14.) In response, plaintiff argues, without evidentiary support, that "defendants participated directly in the alleged constitutional violations ... by committing perjury, by signing [documents], fabricating criminal charges, fabricating witnesses, events, that never transpired...." (ECF No. 68, Pl. Mem., at 7.) Plaintiff further argues that "Defendants have all failed to remedy wrongs which occurred on 28 August, 2008 ... [and] were directly involved and or knew of the wrongdoings, misconduct and violations towards herein plaintiff." (*Id.* at 9.) As set forth below, the court finds that even if the alleged use of force had been excessive, plaintiff has failed to present evidence that any of the defendants were personally involved in the alleged constitutional violation.

It is well-established in the Second Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." *Michael v. Kirby, Forensic Psychiatric Ctr.,* No. 09 Civ. 6660, 2010 U.S. Dist. LEXIS 118156, at *22, 2010 WL 3446772 (S.D.N.Y. Nov. 5, 2010). Prior to *2009,* the Second Circuit had held that a supervisory official was personally involved when that official: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the violation after being informed of the violation through a report or appeal; (3) created or allowed the continuation of a policy or custom under

which constitutional practices occurred, (4) acted with gross negligence in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in 2009, the Supreme Court held in *Ashcroft v. Iqbal* that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). The Supreme Court explicitly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949. Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

Here, plaintiff does not present evidence to raise a genuine factual dispute that Lieutenant Aylward, Lieutenant Colon, Sergeant Horgan, Detective Palamara and Police Officer Stanley were one person at the time of his arrest and did not personally use excessive force in effecting the arrest. (*See generally* ECF No. 68, Pl. Mem.) Rather, plaintiff testified only that a "Hispanic" officer pushed him into the window, and that Officer Reilly and one other officer, possibly Officer McCauley, were on the scene. (Pl. Dep. at 144–46.) Plaintiff presents conclusory allegations that defendants "participated in" the use of force. (ECF No. 37, Amend. Compl., at 3), and were "aware of what took place," (*id.*), but does not present specific evidence regarding each defendant's role in the alleged constitutional violation. Plaintiff's conclusory accusations are not sufficient to sustain a claim for supervisory liability. *See, e.g., Smith v. P.O. Canine Dog Chase,* No. 02 Civ. 6240, 2004 U.S. Dist. LEXIS 19623, at *13–56, 2004 WL 2202564 (S.D.N.Y. Sept. 29, 2004) (holding that individual allegations of supervisory liability without allegations of personal involvement of the alleged violations, are insufficient to establish supervisory liability).

*\*8* Defendants correctly note that to the aftermath of *Iqbal,* "courts in this Circuit have summarily dismissed supervisory liability claims similar to the claim plaintiff is pursuing in the instant action." (ECF No. 67, Defs. Mem., at 15.) *See also Maniscalco v. Int'l, UB of Stag Harbor,* 07 Civ. 1149, 2010 U.S. Dist. LEXIS 21109, at *38–39 (E.D.N.Y. Feb. 17, 2010) ("*Iqbal's* 'active conduct' standard only imposes liability on a supervisor through section 1983 if that

supervisor actively had a hand in the alleged constitutional violation."); *Gordon v. City of New York,* 05–CV–7699, 2009 U.S. Dist. LEXIS 108179, at *6, 2010 WL 3878741 (E.D.N.Y. Nov. 18, 2009) (dismissing claims against Commissioner of the Department of Corrections and the Warden of the correctional facility based on plaintiff's failure to allege facts demonstrating that they had "any direct involvement with, knowledge of, or responsibility for the alleged deprivation of plaintiff's civil rights"). Accordingly, even if the use of force against plaintiff had been excessive, which it was not, the court grants summary judgment as to plaintiff's excessive force claims against Lieutenant Aylward, Lieutenant Colon, Sergeant Horgan, Detective Palamara and Police Officer Stanley based on the lack of any evidence that they were personally involved in the use of force.

On the other hand, plaintiff testified that Officer Reilly, Officer McCauley, a female officer and another "Hispanic" officer were present during the alleged constitutional violation, although plaintiff specifically testified that it was the male Hispanic officer who pushed him into the window:

A. I think Reilley was there... Reilley was there and two other police.

Q. Reilly and who?

A. I don't know the names. It might have been McCauley...

Q. Which officer pushed you into the window?

A. The Spanish guy.

Q. Only the Hispanic officer?

A. Yes.

(Pl. Dep. at 144.)

Defendants Reilly and McCauley argue that "it is clear from plaintiff's deposition that they did not participate in the alleged use of force against plaintiff," and moreover, "neither Police Officer McCauley nor Police Officer Reilly are of Hispanic origin." (ECF No. 67, Def. Mem., at 17.) The court does not rely on defendants' argument that neither Officer McCauley nor Officer Reilly is of Hispanic origin. Rather, based on plaintiff's testimony distinguishing the "Hispanic" officer from Officers McCauley and Reilly, and the defendants' submissions, the court finds that Officers Reilly and McCauley were not personally involved in a violation of plaintiff's rights, and that even if the alleged use of force used against plaintiff had been excessive, which

---

Elufe v. Aylward, Not Reported in F.Supp.2d (2011)
2011 WL 477868

it was not, Officers Reilly and McCauley are entitled to summary judgment because the undisputed record establishes that they did not use force about which the plaintiff complains. Similarly, the court finds that Sergeant Harmon was not involved in a violation of plaintiff's rights because plaintiff testified that the "Hispanic" officer who pushed him was male, and Sergeant Harrison is a woman. (Pl. Dep. at 132 (referring to the Hispanic officer as "he").)

*\*9* Furthermore, where an officer does not personally use excessive force, but witnesses the use of excessive force by other officers, he may be liable for failing to intercede to prevent the constitutional violation. Liability attaches if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988)). Where the alleged force consists of a single push or a "rapid succession" of blows, courts have found that the officer did not have a realistic opportunity to intervene. *See, e.g., O'Neill,* 839 F.2d at 11–12.

Based on plaintiff's sworn testimony that it was the Hispanic officer who pushed him once into a window, the court finds that Officer Reilly, Officer McCauley, and Sergeant Harrison did not have a realistic opportunity to intervene in the alleged violation. *See, e.g., Sloane v. Sivana,* No. 02–CV–4257, 2004 U.S. Dist. LEXIS 28225, at *12, 2004 WL 2202645 (W.D.N.Y. Sept. 30, 2004) (where alleged use of force was a "single kick to the head," a reasonable jury could not conclude that defendant had a realistic opportunity to intervene). Accordingly, the court grants summary judgment as to plaintiff's excessive force claims against Officers Reilly and McCauley and Sergeant Harrison.

**iii. Qualified Immunity**

Finally, defendants argue that they are entitled to qualified immunity on plaintiff's excessive force claims because they are "officials who act in ways they reasonably believe to be lawful." (ECF No. 67, Defs. Mem., at 16–17.) In response, plaintiff argues that "defendants are not entitled to qualified immunity ... [because] reasonable officers would not have disagreed on the constitutionality of such conduct." (ECF No. 68, Pl. Mem., at 6.)

Pursuant to the doctrine of qualified immunity, "a government official performing discretionary functions is shielded from

liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cty. of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). Prior to 2009, the United States Supreme Court had prescribed a formal two-step process for resolving qualified immunity claims: first, a court would decide whether the facts that plaintiff presented made out a constitutional violation, and second, if the plaintiff satisfied the first step, the court would decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In 2009, the Supreme Court revisited this two-step analysis and held that a federal court no longer has to adhere to a rigid order of analysis and could continue to do so if deemed appropriate. *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Supreme Court's decision in *Pearson* did not alter the substantive law that, in order to deny qualified immunity, a court must find both that the defendant violated a constitutional right and that the law was clearly established. *US v. Mahamoud,* No. 07–CV–211, 2009 U.S. Dist. LEXIS 28159, at *7 n. 3, 2009 WL 930711 (E.D.N.Y. Apr. 7, 2009).

*\*10* Here, as discussed *supra,* plaintiff admits that he was "kick[ing]" at the officer tried to arrest him. *(see* Pl. Dep. at 146), and that the alleged force consisted of a single shove against a window. *(see id.* at 117) (referring to "the push"). Because, under these circumstances, plaintiff cannot establish that the alleged use of force constituted a Fourth Amendment violation, Officer McCauley, Officer Reilly, Sergeant Harrison and the "other [Hispanic] officer" who allegedly pushed plaintiff are entitled to qualified immunity with respect to plaintiff's excessive force claims against him. *See, e.g., Biggs v. City of New York,* 08 Civ. 8123, 2010 U.S. Dist. LEXIS 121332, at *28, 2010 WL 4628369 (S.D.N.Y. Nov. 15, 2010) ("Because [defendant's] action were objectively reasonable under the Fourth Amendment excessive force standard, it follows that Defendants are also entitled to summary judgment on qualified immunity grounds."). As such, the court need not reach the second step of the *Saucier/Pearson* analysis, whether the law was "clearly established." Accordingly, the court grants summary judgment as to plaintiff's excessive force claims against all defendants.

**c. Denial of Medical Attention Claims**

Defendants next argue that summary judgment is appropriate on plaintiff's claim for denial of medical attention because

"the bruise on plaintiff's arm and the cut on her thumb were not sufficiently serious to elevate his claim of denial of prompt medical attention to a constitutional violation," and because plaintiff "has failed to show that, subjectively, any police officer 'knew of and disregard[ed] an excessive risk to [his] health or safety.'" (ECF No. 67, Defs. Mem., at 11, 12.) Plaintiff does not directly address this argument in his opposition. (*See generally* ECF No. 68, Pl. Mem.) For the reasons discussed below, the court grants defendants' motion for summary judgment on plaintiff's denial of medical attention claim.

An Eighth Amendment claim against prison officials arising out of allegedly inadequate medical treatment requires proof of "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish deliberate indifference constituting "a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and a subjective requirement." *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999).

Under the objective prong, the plaintiff must establish that an "official denied [the patient] treatment needed to remedy a serious medical condition...." *Vincent v. Okst,* 691 F.3d 845, 856 (2d Cir.1996). Under this prong, "the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Johnson v. Wright,* 412 F.3d 349, 403 (2d Cir.2005) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)).

Under the subjective prong of the analysis, the plaintiff must prove that the the official denied treatment with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). This requires that the prison official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference.'" *Id.* at 66 (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Under the subjective prong of the deliberate indifference standard, officials must "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed." *Demata v. N.Y.S. Corr. Dept. of Health Servs.,* No. 99–0060, 1999 U.S.App. LEXIS 22955, at *9, 1999 WL 753142 (2d Cir. Sept. 17, 1999) (quoting *Estelle,* 429 U.S. at 104–05). The Second Circuit has viewed of classifying delays in providing necessary medical care as "deliberately indifferent" for "cases

in which, for example, officials deliberately delayed care in a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Id.* at *5 (citations omitted).

*\*11* Here, plaintiff claims that he was denied medical attention after sustaining a "gash" on his thumb and a "bruise" on his arm during the knife fight that preceded his arrest. (Pl. Dep. at 130–31.) Plaintiff also testified that he bruised his forehead and injured his shoulder and neck during the arrest, but he does not allege that he sought or was denied proper medical treatment for these injuries. (*See generally id.*)

Accepting for the purposes of this motion plaintiff's account of his injuries, plaintiff has not presented evidence from which a reasonable juror could conclude that the defendants provided inadequate medical care. First, plaintiff fails to satisfy the objective prong of the analysis under *Griffin.* Plaintiff's injuries to his thumb and arm were not "serious medical conditions" of the type that "may produce death, degeneration, or extreme pain." *See, e.g., Rodriguez v. Mercado,* No. 00 Civ. 8588, 2002 U.S. Dist. LEXIS 16057, at *24, 2002 WL 1997885 (S.D.N.Y. Aug. 28, 2002) (holding that plaintiff's bruises to his head, face and wrist did not constitute a serious medical need); *Smith v. M Barnabas Hosp. Com. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("A bleeding finger does not pose a substantial risk of serious harm.").

Second, plaintiff fails to satisfy the subjective prong under *Griffin.* Defendants did not possess a "sufficiently culpable state of mind" nor ignore a "'life-threatening and fast-degenerating' condition for three days." *See, e.g., Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20, at *9, 2002 WL 10450 (S.D.N.Y. Jan.2, 2002) (holding that a delay in treatment for a knee injury "was neither 'life threatening' nor 'fast-degenerating,' "). Indeed, the claims here of plaintiff's face and body, in the police station show no visible signs of injury. (R. 56–1 Stmt. ¶ 4, ECF No. 66, Ex. D.) Moreover, during a pre-arraignment medical examination on the same day of his arrest, plaintiff denied any injury or illness. (R. 56–1 Stmt. ¶ 5, ECF No. 66, Ex. D.) As discussed above, the evidence does not suggest that the defendants acted with a sufficiently culpable state of mind and there is, therefore, no genuine issue of material fact to support plaintiff's assertion that he was denied medical care. The court finds that the defendants were not deliberately indifferent to plaintiff's medical needs within the meaning of the Eighth Amendment, and summary judgment on this claim is granted.

Elofe v. Aylward, Not Reported in F.Supp.2d (2011)
2011 WL 477685

#### c. State Law Claims

Finally, defendants argue that to the extent plaintiff's complaint can be liberally construed to allege state law tort claims, they should be dismissed under New York General Municipal Law ("GML") § 50-e. (ECF No. 67, Defs. Mem. at 17–18.) The court agrees.

Under GML § 50-e, "notice of claim shall ... be served ... within ninety days after the claim arises." GML § 50-e(1)(a); *see Niner v. New York City Police Dep't*, No. 08-CV-5104 2009 U.S. Dist. LEXIS 78821, at *8, 2009 WL 2915211 (E.D.N.Y. Sept. 1, 2009) ("Pursuant to New York General Municipal Law § 50-e, a plaintiff who asserts a state law tort claim against a municipal entity or its employees for acts that occurred within the scope of their employment must file a notice of claim within ninety days after the incident giving rise to the claim."). Failure to timely comply with the notice requirements of GML § 50-e requires dismissal of state law tort claims against a municipal entity and its employees. *Id.* at *12. As GML § 50-e provides, the 90-day period by which a notice of claim must be filed commences "after the claim arises..." GML § 50-e(1)(a).

[*12] Here, plaintiff's claims arose on the date of his arrest, August 28, 2008. Plaintiff fails to allege that he filed a notice

of claim within 90 days of his arrest, nor does he offer any documentation of such notice. Moreover, defendants have presented uncontroverted evidence that a § 50-e claim relating to this incident from the plaintiff was not found in the city's records. (ECF 66-4, Declaration of Diep Nyun cis in Support of Defendants' Motion for Summary Judgment, at ¶ 20.) Thus, any potential state law tort claims arising out of this incident are dismissed.

#### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. Defendants shall serve a copy of this Memorandum and Order on plaintiff and file a declaration of service by ECF no later than February 7, 2011. The Clerk of Court is respectfully requested to enter judgment in favor of defendants, to dismiss plaintiff's complaint in its entirety, and to close the case. Any notice of appeal to the Second Circuit must be filed with the district court within 30 days after the judgment is entered. Fed. R. App. P. 4(a)(1)(B).

#### SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2011 WL 477685

End of Document

---

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2018)
2018 WL 354684

2018 WL 354684
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Lilyann RYAN, Individually and as Administrator of the Estate of Bartholomew Ryan, deceased, Plaintiff,
v.
COUNTY OF NASSAU, County of Nassau Correctional Center, Nassau County Sheriff's Department, Armor Correctional Health Services, Inc, and Does, Defendants.

12-CV-5343(JS)(SIL)
|
Signed 01/10/2018

Attorneys and Law Firms

For Plaintiff: Nicholas E. Warywoda, Esq., Parker Waichman, 6 Harbor Park Drive, Port Washington, NY 11050.

For the County Defendants: James R. Scott, Esq., Nassau County Attorney's Office, 1 West Street, Mineola, NY 11501.

For the Armor Defendants: John J. Doody, Esq., Sano Seibial, Esq., Lewin Drinkon Biegard & Smith, LLP, 199 Water Street, 25th Floor, New York, NY 10038.

MEMORANDUM & ORDER

*Joanne Seybert, U.S.D.J.*

*1 Plaintiff Lilyann Ryan ("Plaintiff"), individually and as administrator of the Estate of Bartholomew Ryan ("Ryan"), commenced this action against the County of Nassau, the Nassau County Correctional Center, the Nassau County Sheriff's Department (together, the "County Defendants"), Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York, Inc. (together, the "Armor Defendants" or "Armor," and collectively, "Defendants") on October 22, 2012. (Compl., Docket Entry 1.) On November 14, 2012, Plaintiff filed an Amended Complaint asserting claims under 42 U.S.C. §§ 1981, 1983, and 1985 and state law claims for negligence and wrongful death. (Am. Compl., Docket Entry 7, ¶¶ 106-130.)

After the Court dismissed the claims under Section 1981 and 1985, and the Section 1983 claim against the County Defendants, the remaining claims proceeded to trial. (*See* March 2016 Order, Docket Entry 62, at 25.) The case was tried from April 3, 2017 to April 12, 2017, and the following claims were submitted to the jury: (1) a Section 1983 claim for deliberate indifference to medical needs against the Armor Defendants, and (2) negligence and wrongful death claims against the Armor Defendants and the County Defendants (Verdict Sheet, Court Ex. 3, Docket Entry 108, at 2-9.) On April 12, 2017, the jury reached a verdict in Plaintiff's favor on both claims and awarded $370,000 for pain and suffering on the negligence claim, and $520,000 for pain and suffering and $7,000,000 in punitive damages on the Section 1983 claim. (Verdict Sheet 6(A)-(G).) As to the negligence pain and suffering award, the jury apportioned the fault as follows: twenty-five percent (25%) to the County of Nassau, fifty-five percent (55%) to Armor, and twenty percent (20%) to Ryan. (Verdict Sheet 6(D).)

Currently pending before the Court is the Armor Defendants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or alternatively, for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(A). (Armor Mot., Docket Entry 115.) The County Defendants have not moved for any post-trial relief. For the reasons that follow, the Armor Defendants' motion is GRANTED.

#### DISCUSSION

The Court assumes familiarity with its March 2016 Order resolving the parties' motions for summary judgment and will discuss the evidence presented at trial as necessary in its analysis. (*See generally* March 2016 Order.) Briefly, Ryan was remanded to the Nassau County Correctional Center ("NCCC") on February 17, 2012. (March 2016 Order at 4.) After his arrival, he was assessed by a corrections officer, two nurses employed by Armor, and Dr. Vincent Maneti ("Dr. Maneti"), a psychiatrist employed by Armor. (March 2016 Order at 5-8.) While Ryan relayed that he had a history of drug abuse and psychological disorders, he did not indicate that he was experiencing suicidal ideations or that he had previously attempted suicide. (March 2016 Order at 5-7.) However, he did indicate to Dr. Maneti that he had used heroin immediately prior to his arrest at NCCC. (March 2016 Order at 7-8.) As a result, Dr. Maneti referred Ryan to the medical department for monitoring on an urgent basis, which according to Armor's guidelines, meant that Ryan would be

---

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2018)
2018 WL 354684

seen within twenty-four hours. (March 2016 Order at 8, 21.) Unfortunately, just hours after his visit with Dr. Maneti, Ryan committed suicide. (March 2016 Order at 2, 9.)

#### 1. The Armor Defendants' Motion for Judgment as a Matter of Law

**A. Rule 50(b) Standard**

*2 If a party believes that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for its adversary on a particular issue, it may move for judgment as a matter of law during trial under Federal Rule of Civil Procedure 50(a), and renew the motion after trial under Rule 50(b). FED. R. CIV. P. 50(a)-(b). In an order determining a Rule 50(b) motion, the district court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." FED. R. CIV. P. 50(b).

The district court may only grant a Rule 50(b) motion where "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture; or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [it]." *Pensburger, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-0910, 2015 WL 3605143, at *2 (E.D.N.Y. June 5, 2015) (quoting *Kinsey v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010)) (alteration in original). In other words, judgment as a matter of law is appropriate only when " 'a reasonable juror would have been compelled to accept the view of the moving party.' " *Id.* at *2 (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998)). "When considering the evidence associated with a Rule 50(b) motion, the trial court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury." *Restrepino v. City of N.Y.*, 526 Fed.Appx. 118, 119 (2d Cir. 2013) (internal quotation marks and citation omitted), and must view the evidence "in the light most favorable to the nonmoving party." *Brunson v. Conjer*, No. 97-CV-3756, 2016 WL 1253189, at *1 (E.D.N.Y. Mar. 30, 2016) (internal quotation marks and citation omitted).

**B. Section 1983 Deliberate Indifference to Medical Needs**

To establish a Section 1983 claim, a plaintiff must demonstrate that the defendant violated a "right, privilege, or immunity secured by the Constitution or laws of the United States ... by a person acting under the color of state law."

a claim arises under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care ... even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety." *Id.* at *15; *see also Charles*, 2017 WL 4402576, at *10. In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment "is defined objectively," and a plaintiff is not required to show subjective awareness by the defendant that "[his] acts (or omissions) have subjected the pre-trial detainee

to a substantial risk of harm." " *Darnell*, 849 F.3d at 35. Despite the slightly lower standard articulated in *Darnell*, which is akin to objective recklessness, " 'any § 1983 claim or a violation of that process requires proof of a mens rea greater than mere negligence." " *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36); *see also Grimmett*, 2017 WL 2274485, at *4.

**C. Analysis**

The Armor Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's Section 1983 claim because the evidence at trial did not establish either element of a deliberate indifference claim. (Armor Br., Docket Entry 117, at 4-5.)

##### 1. The Objective Prong

As to the first element, the Armor Defendants maintain that Plaintiff failed to show that Ryan received inadequate medical care. (Armor Br. at 6-9.) Specifically, they contend that "Armor and its staff followed protocol in processing and evaluating the plaintiff upon his arrival at NCCC and there was simply no notice of Ryan's purported suicidal tendencies prior to and at the time of his detention." (Armor Br. at 6.) They point out that there were no signs that Ryan was experiencing symptoms of withdrawal or mental illness when he arrived at NCCC. (Armor Br. at 6; *see also* NCCC Records, Doody Decl., Ex. B, Docket Entry 116-3, at 2.) However, because Ryan indicated that he had taken medication for a psychological condition, he was placed on constant observation until he could be assessed by the mental health department.[3] (Armor Br. at 6.)

---

<small>
[3] The suicide prevention screening form (the "Screening Form"), completed by Officer Michael Archer ("Officer Archer"), indicates that Ryan failed the suicide screening because he indicated that he had previously taken medication for a psychological condition. (Screening Form, Doody Decl., Ex. C, Docket Entry 116-3, at 6-7.) The Screening Form indicated that he answered "no" to questions regarding suicidal thoughts and prior suicide attempts. (Screening Form at 6.)
</small>

*4 Afterward, he was seen by a Licensed Practical Nurse, Sue Mathews ("Nurse Mathews"), and a Registered Nurse,

---

<div align="right">

of claims within 90 days of his arrest, nor does he offer
</div>

Clarke v. Cty. of Orange, N.Y., No. 16-CV-5537, 2017 WL 4402576, at *6 (S.D.N.Y. Sept. 29, 2017); 42 U.S.C. § 1983. To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements. (1) that the "deprivation of medical care ... [was] sufficiently serious," and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.' " *See Smith v. Outlaw*, No. 15-CV-0961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Saltzbaddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994)); *see also Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017).

The first element requires that the Court assess the seriousness of the deprivation of medical care objectively, including whether "the medical care was inadequate, and if so, ... how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Smith*, 2017 WL 4417699 (internal quotation marks and citation omitted). Further, with courts should tailor the analysis "to the specific circumstances of each case[,] ... the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* (internal quotation marks and citation omitted). Generally, the condition must be " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Grimmett*, 2017 WL 2274485, at *3 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). If the plaintiff alleges that medical care was delayed or interrupted, the appropriate inquiry is whether "the challenged delay or interruption in treatment ... is, in objective terms, sufficiently serious," to support a claim. *Id.* (internal quotation marks, citation, and emphasis omitted).

*3 Prior to the Second Circuit's decision in *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the second element —whether the defendant acted with a sufficiently culpable state of mind—was evaluated subjectively. *See Grimmett*, 2017 WL 2274485, at *4. However, in *Darnell*, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, — U.S. —, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), the Second Circuit held that the standard for deliberate indifference depends on whether the plaintiff is a pre-trial detainee, in which case the claim arises under the Fourteenth Amendment, or a convicted prisoner, in which case the claim arises under the Eighth Amendment. *Darnell*, 849 F.3d at 32-36. The Second Circuit further held that when

---

be "no permanent and well settled as to constitute a custom or usage with the force of law, '' and lead to the imposition of liability. *Hawton*, 2016 WL 1253189, at *7 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)).

*5 The Court previously found that Armor was a state actor for purposes of Section 1983. (March 2016 Order at 19.)

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2019)
2016 WL 264884

*6 Additionally, relying on Dr. Maietti's own testimony, Plaintiff contends that Dr. Maietti acted recklessly by (1) failing to consult other physicians or family members regarding Ryan's prior treatment and diagnoses, (Trial Tr. (Maietti) 310:4-9 (testifying that it would be good practice to contact family or treating physicians if patient was in a poor historian)); (2) failing to tell correction officers that Ryan was at risk for withdrawal symptoms, (Trial Tr. (Maietti) 302:11-24 (agreeing that it was good psychiatric practice to notify corrections officers of imminent withdrawal), 355:23-356:3 (testifying just he did not tell any corrections officer about Ryan's possible withdrawal)); and (3) despite his concerns, referring Ryan to the medical department for monitoring knowing that he could wait twenty-four hours to be seen, (Trial Tr. (Maietti) 346:17-348:16 (testifying regarding his concerns and agreeing that Ryan could wait up to twenty-four hours before he was monitored for withdrawal symptoms)). (See Pl.'s Opp. at 16-17.) Moreover, Plaintiff maintains that Maietti's argument that it reasonably relied on the corrections officers, even if it was believed by the jury, is irrelevant in light of Dr. Maietti's admission that he never told the officers about his concerns. (Pl.'s Opp. at 17.) In light of this evidence, Plaintiff maintains that there was sufficient evidence to conclude that Dr. Maietti "knew or should have known" that his conduct "posed an excessive risk" to Ryan's health and safety. (Pl.'s Opp. at 18 (internal quotation marks omitted).)

The Court finds that no reasonable juror could conclude that Dr. Maietti acted with a state of mind sufficient to support a deliberate indifference claim. Focusing on the Dowell standard, there is no evidence that Dr. Maietti intentionally deprived Ryan of adequate medical care. See Dowell, 849 F.3d at 35 (holding that "the pre-trial detainment prove that the defendant-official acted intentionally– or recklessly failed to act with reasonable care – even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety"). Further, the evidence does not support a finding that Dr. Maietti "knew or should have known" that his actions or omissions ... "posed an excessive risk to [Ryan's] health or safety." Lloyd v. City of N.Y., 246 F.Supp.3d 704, 720 (S.D.N.Y. 2017) (quoting Darnell, 849 F.3d to 35). Dr. Maietti's referral would not have prevented Ryan from receiving treatment if he needed it. Dr. Maietti testified that if an inmate needed medical attention for an acute condition, the medical department would see the inmate on an expedited basis. (Trial Tr. (Maietti) 343:2-10; in other words, he recognized the

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2019)
2016 WL 264884

### 4. Punitive Damages Award

### A. Legal Standard

### B. Analysis

#### 1. Compensatory Damages Award

#### II. The Armor Defendants' Motion for a New Trial

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2019)
2018 WL 354684

at 794 (ordering a new trial or remittitur, in part because there was no indication that "the jury intended to award the aggregate sum"). Here, the two awards total $890,000 if the jury intended to award $890,000 and divided the award between the two claims, presumably they would have awarded $445,000 for the negligence claim and $445,000 for the Section 1983 claim. In light of this ambiguity, and the lack of clarity regarding the jury's intent, the Court will not assume that they intended to award the aggregate amount of $890,000.

Because the Armor Defendants sought a new trial in the alternative, the Court conditionally finds that, if its determination on the Rule 50 motion is reversed, a new trial is warranted. See FED. R. CIV. P. 50(c). The parties have not provided a reasonable explanation for the two awards, and the Court struggles to formulate one. Additionally, regardless of the outcome of our future appeal, the Court exercises its discretion and orders a new trial on the negligence claim only. Because the Court granted the Armor Defendants judgment as a matter of law on the Section 1983 claim, only the $370,000 award for negligence against the County and the Armor Defendants remains. However, as discussed, it is unclear how or if the jury allocated damages for pain and suffering between the two counts of action or if they intended to award the aggregate amount. For these reasons, the Court cannot allow the $370,000 award to stand, and the award is hereby VACATED.

#### 2. Punitive Damages Award

Having found that a new trial is necessary due to the duplicative pain and suffering awards, the Court will briefly address the remaining ground for a new trial.

The Armor Defendants argue that if the Court finds that the evidence supports an award of punitive damages, the Court should reduce the award because the $7,000,000 punitive damages award "clearly shocks the conscience." (Armor Br. at 22.) Based on a collection of cases from this Circuit and others, the Armor Defendants contend that a punitive damages award of, at most, between $100,000 and $200,000 would be appropriate in this case (Armor Br. at 24.)

Plaintiff responds that the Court should not disturb the jury's punitive damages award because the award does not run afoul of due process and the conduct constituted "a callous prioritizing of self-interest and profit over the responsibility

Ryan v. County of Nassau, Not Reported in Fed. Supp. (2019)
2018 WL 354684

v. Verrone, No. 97-CV-1487, 1999 WL 33432177, at *4-5 (D. Conn. Sept. 30, 1999) (reducing $2,000,000 punitive damages award to $300,000 in excessive force case in which defendants acted violently and "with intentional malice"). The Court recognizes that the conduct at issue in Mathie and King likely resulted in physical and psychological injuries, and not death, but even cases where deliberate indifference led to the death of an inmate have resulted in substantially lower punitive damages awards. See Morris v. Blaul, 000 Fed.Appx. 233, 237, 240-41 (4th Cir 2016) (declining to reduce $2,450,000 punitive damages award in case where inmate was denied medical care and died). Therefore, the punitive damages award is excessive, and assuming this verdict was warranted on these facts, a new trial is necessary.

#### CONCLUSION

*13 For the foregoing reasons, the Armor Defendants' motion for judgment as a matter of law, or in the alternative, for a new trial (Docket Entry 115) is GRANTED. The Court GRANTS the Armor Defendants judgment as a matter of law on the Section 1983 deliberate indifference claim and VACATES the jury's compensatory damages award of $520,000 and punitive damages award of $7,000,000 on that claim. Additionally, the Court finds that a new trial is required on the negligence claim and VACATES the jury's award of $370,000 in compensatory damages for negligence. The parties will be contacted regarding the scheduling of a new trial.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 354684

---

James v. Correct Care Solutions, Not Reported in F.Supp.2d (2013)
2013 WL 6730178

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Hull v. Janssen, S.D.N.Y., September 24, 2021

2013 WL 6730178
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Alvern JAMES, Plaintiff,
v.

CORRECT CARE SOLUTIONS, Aramark
Corporation and Westchester County, Defendants.

No. 13-cv-0019 (NSR).
|
Oct. 21, 2013.

#### OPINION AND ORDER

NELSON S. ROMAN, District Judge.

*1 Plaintiff Alvern James ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 alleging that Defendants Correct Care Solutions, LLC ("CCS") and Aramark Correctional Services, LLC[1] ("Aramark") violated his constitutional rights while he was confined at Westchester County Jail ("WCJ"). Before this Court are the Motions to Dismiss of Defendant Aramark and Defendant CCS pursuant to Federal Rule of Civil Procedure 12(b)(6).

Aramark was erroneously sued under the name Aramark Corporation. Def. Aramark Mem. 1.

#### I. Background

For purposes of this motion, this Court accepts as true the facts as stated in Plaintiff's Second Amended Complaint. Defendant CCS administers medical services at WCJ. Def. CCS Mem. 2-3 Defendant Aramark is employed by Westchester County to provide food services at WCJ. Def. Aramark Mem. 3-4. Plaintiff alleges that on October 29, 2012 at approximately 5 a.m., while he was working in the kitchen at WCJ, an Aramark employee told him to move a cart containing several stainless steel pots of hot grits. Second Am. Compl. 3. While pushing the cart, a wheel of the cart became jammed because of a loose "diamond plated manmade saddle" in the floor and caused the container of hot grits to spill onto Plaintiff's body. Id. Some of the hot grits

James v. Correct Care Solutions, Not Reported in F.Supp.2d (2013)
2013 WL 6730178

It is undisputed from Plaintiff's complaint whether the named kitchen worker was an Aramark employee.

#### II. Legal Standard

On a motion to dismiss for "failure to state a claim upon which relief can be granted," Fed.R.Civ.P. 12(b)(6), discussed in proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); accord Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir.2010). "Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation,' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted must be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

"'Pro se complaints are held to less stringent standards than those drafted by lawyers, even following Twombly and Iqbal." Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009). See also Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) ("even after Twombly, though, we remain obligated to construe a pro se complaint liberally"). "However, even a pro se plaintiff's asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." Jackson v. N.Y.S. Dep't of Labor, 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (quoting Twombly, 550 U.S. at 555) (internal quotation marks omitted). Dismissal is justified, therefore, where "the complaint lacks an allegation regarding an element necessary to obtain relief," and therefore, the "duty to liberally construe a plaintiff's

James v. Correct Care Solutions, Not Reported in F.Supp.2d (2013)
2013 WL 6730178

spilled onto Plaintiff's exposed left forearm, which caused Plaintiff's skin to burn. Id. Plaintiff alleges that after the grits spilled, his burns went untreated for 5 to 6 hours. [2] Id at 3-4.

In Plaintiff's handwritten portion of the complaint, it appears that he states that five hours passed between injury and treatment. Second Am Compl. 3. However, on the typewritten page of the complaint, Plaintiff states that six hours passed between injury and treatment. Id at 4.

According to Plaintiff, he was not seen by medical personnel until 6 hours after the accident, and he was never taken to the hospital. Plaintiff received treatment for his burns at WCJ from CCS employees. Def. CCS Mem. 2. Plaintiff alleges that in the weeks that followed the accident, his bandages were not changed on 6 days: October 30 and 31, and November 1, 15, 16, and 17. He further claims that he was given inadequate medical attention, including being asked to wait while a nurse practitioner ate her lunch before seeing Plaintiff and that medical personnel failed to wear gloves when treating him.

Plaintiff filed a grievance against CCS with the jail on October 31, 2012 in which he claimed that 8 hours passed between his accident and the administration of treatment. CCS Mot. to Dismiss Ex. D. The grievance includes a written statement signed by Plaintiff at 8:25 a.m. on October 28, 2012—less than 4 hours after the accident—in which he states that he had already seen a nurse who "didn't do anything" but told him to "put ice on [the burn]." Id at 9. The Grievance report provides that Plaintiff was taken to the nurse again at 9:15 a.m., where the nurse practitioner applied silvadene cream (an antimicrobial cream), cleaned Plaintiff's wound, and ordered daily follow-up consultations until the burned healed. Also included in the grievance is an officer's report, which recounts Plaintiff as saying that the "injury occurred approx. 0500" and that Plaintiff was "advised to apply ice to affected area" after being escorted to the nurse by another officer.

*2 Plaintiff alleges that a kitchen worker[3] informed him that Aramark was aware that the floor plate was loose prior to the accident. Plaintiff also states that he was not trained to move the equipment he handled, and that Aramark's equipment was improperly maintained. No internal grievance was filed by Plaintiff at the WCJ with respect to Aramark or the loose floor saddle.

complaint [is not] the equivalent of a duty to re-write it." Geldzahler v. New York Medical College, 663 F.Supp.2d 379, 387 (S.D.N.Y.2009) (internal citations and alterations omitted).

*3 The materials that may be considered on a motion to dismiss are those "annexed within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp. 482 F.3d 184, 191 (2d Cir.2007). One way a document may be deemed incorporated by reference is where the complaint "refers to" the document. EQT Infrastructure Ltd. v. Smith, 861 F.Supp.2d 220, 224 n. 2 (S.D.N.Y.2012). Especially important to the inquiry of whether to consider a document outside the complaint is whether plaintiff has notice of the documents outside the complaint. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991). ("[T]he district court ... could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim.") Conversely, when the defendant includes documents that do not fall into these categories, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." Friedl v. City of N. Y., 210 F.3d 79, 83 (2d Cir.2000) (internal quotation marks omitted). "In addition, because a pro se plaintiff's allegations must be construed liberally, it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." Brooks v. Jackson, No. 11 Civ. 6627(JMF), 2013 WL 5339161, at *3 (S.D.N.Y. Sept.23, 2013).

Here, Defendant CCS included Plaintiff's grievance report ("Grievance") as an exhibit to its motion to dismiss. The Grievance was submitted to the warden of the WCJ as part of internal complaint procedure as required from the Prison Litigation Reform Act ("PLRA") before a plaintiff may bring certain actions in court.[4] Plaintiff filed the grievance on October 31, 2012 and was denied on November 01, 2012. CCS Mot. to Dismiss Ex. D. The Grievance includes a Grievance Investigation Form, a Special Report, including officers' reports, and a Report of Inmate Injury completed by Plaintiff. Id. In his complaint, Plaintiff specifically refers to the grievance by noting that the attempted administrative channels before filing this suit. Although Plaintiff did not include the grievance as an exhibit, Plaintiff nonetheless

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

### III. Defendant CCS's Motion to Dismiss

The Cruel and Unusual Punishments clause of the Eighth Amendment forbids the basis of a convicted prisoner's claim that he or she is not being provided adequate medical

#### a. Objective Test

#### i. Subjective Test

#### a. Objective Test

#### b. Defendant Aramark's Motion to Dismiss

#### i. State Actor

James v. Correct Care Solutions, Not Reported in F.Supp.2d (2013)
2013 WL 5730178

Figueroa v. County of Rockland, Not Reported in Fed. Supp. (2018)
2018 WL 3315735

---

**IV. State Law Claims**

**V. Conclusion**

SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2013 WL 5730178

---

**2018 WL 3315735**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David Christopher FIGUEROA, Plaintiff,
v.
The COUNTY OF ROCKLAND, Doctor Dominiek Piacente of the Rockland County Jail, Lt. John Byron of the Rockland County Jail, Sergeant Louis Falco of the Rockland County Jail, Sergeant John Hickey of the Rockland County Jail, Correctional Officer Bill McLaughlin of the Rockland County Jail, Nurse Mariannma Jacob of the Rockland County Jail, Defendants.

16-cv-6529 (NSR)
|
Signed 07/05/2018

**Attorneys and Law Firms**

David Christopher Figueroa, New City, NY, pro se.

Eric Dranoff, Saretsky Katz Dranoff & Glass L.L.P, New York, NY, James Christopher Freeman, Kent Hazzard, LLP, White Plains, NY, for Defendants.

**OPINION AND ORDER**

NELSON S. ROMAN, United States District Judge

---

**FACTUAL BACKGROUND**

**DISCUSSION**

**I. Legal Standard**

**A. Rule 12(b)(6)**

**II. Deliberate Indifference**

Figueroa v. County of Rockland, Not Reported in Fed. Supp. (2018)
2018 WL 3315735

Like under the Eighth Amendment, deliberate indifference pursuant to the Fourteenth Amendment has both an objective and a subjective prong. Consequently, "the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Bryant*, 101 F.3d at 856.

The objective prong under either Amendment remains the same. *Darnell*, 849 F.3d at 30, mandating that the deprivation be, "in objective terms, sufficiently serious," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations omitted). The second prong requires that the official act with "a sufficiently culpable state of mind," *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991), but this standard differs between the Eighth and Fourteenth Amendments, as the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), "altered the standard for deliberate indifference claims under the Due Process Clause," *Darnell*, 849 F.3d at 30. It is now more properly considered a *mens rea* prong that requires a showing of recklessness, which is defined objectively, *id.* at 72, 35. A pretrial detainee must therefore prove "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety," *id.* at 35.

The bulk of Plaintiff's Second Amended Complaint sounds in an assortment of claims regarding conditions-of-confinement in violation of the Fourteenth Amendment. Such claims fall into two categories—housing and medical care—and are analyzed under variations of the same standard.

### A. Medical Care

Plaintiff claims deliberate indifference to his medical needs against Dr. Piraino, and of the County Defendants, McLaughlin and Jacob. (*See* SAC at 4-5, 8.)

#### i. Objective Prong

The objective prong is a two part inquiry. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006), requiring an actual "depriv ation of adequate medical care," *id.* at 279; *see Farmer*

v. *Brennan*, 511 U.S. 825, 844-47 (1994) (reasonable care is not deprivation, and a determination that the deprivation is sufficiently serious, shown by the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain," *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("*Hathaway III*") ).

*5 To the extent that Plaintiff is claiming a categorical denial of treatment, his claims against all Defendants do not pass muster. In such instances, the Court must examine whether the "medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Here, Plaintiff's injury of a half-inch nail cut in his left pinky, (*see* SAC at 4), is not sufficiently serious for the objective prong. *Davis v. Coughlin*, 159 F.3d 1346, 1346 (2d Cir 1998) (noting that "a one-and-a-half-inch laceration on [plaintiff's] elbow" not sufficiently serious); *Sonds v. St. Barnabas Hosp. Corr. Health Svcs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("a cut finger, even where skin is 'ripped off' " insufficient for objective prong); *see also Dead-Sky v. Smith*, No. 04-CV-0910(LEK/DRH), 2007 WL 274793, at *6 (N.D.N.Y. Jan. 26, 2007) (3 ⁄ inch laceration insufficient). Nevertheless, the Court cannot consider the severity of the injury in a vacuum. *See Chance*, 143 F.3d at 702 (noting that while the injury itself may not be serious, ignoring a five-inch gash "that is becoming infected" may give rise to an Eighth Amendment violation); *Salahuddin*, 467 F.3d at 280 ("[A]lthough we sometimes speak of a 'serious medical condition' as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability").

With respect to alleged inadequate treatment, the inquiry focuses on the alleged inadequacy "rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280. Plaintiff alleges that he should have been sent to the hospital immediately and been given stitches. (*See* SAC at 4-10.) Plaintiff was seen by Jacob and Dr. Piraino. While a cut on the hand is not typically a sufficiently serious injury, Plaintiff has nevertheless met the objective, because of his resulting staph infection that developed because his wound was not closed before he was returned to intake housing. *See Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) ("[T]he failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury as the absence of medical treatment"); *see also Vassalle v. City of New York*, No. 13-cv-7125(KPF),

#### A. Subjective Prong

Though analysis of the second prong under the Fourteenth Amendment has been modified, what remains the same is that negligence, and thus medical malpractice, will not rise to the level of a constitutional violation unless the medical malpractice contains an element of intent or recklessness. *Darnell*, 849 F.3d at 36 (noting that "any § 1983 claim for a violation of due process requires proof of *mens rea* greater than mere negligence"); and it must be shown that an official "acted intentionally or recklessly").

*6 Plaintiff's allegations against Jacob are insufficient to meet the *mens rea* prong of the Fourteenth Amendment analysis. Medical malpractice, "misdiagnosis and" the decision not to treat based on an erroneous view that the condition is benign or trivial " does not rise to the level of deliberate indifference. *Williams v. Williams*, No. 17-CV-1314(RA), 2015 WL 568842, at *6 (S.D.N.Y. Feb. 11,

the estate. Plaintiff's claims against Dr. Piraino[ ] are properly pled.

9      In *Chaise*, the Court was considering an inmate's Eighth Amendment claim, which imparts a higher standard for *mens rea*; consequently, conduct that meets the higher standard certainly suffices for the lower, Fourteenth Amendment objective *mens rea* standard of deliberate indifference.

### III. Housing

#### A. Unsanitary Conditions

Plaintiff also appears to assert a deliberate indifference claim against Byron, Hickey, and Falco regarding the alleged unsanitary conditions in intake housing.

*7 Claims challenging a detainee's housing conditions likewise have two prongs. "To establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," " and those conditions should be "evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Though the Constitution "does not mandate comfortable prisons", *see Farmer*, 511 U.S. at 832, it requires that prison officials "provide humane conditions of confinement" and "must ensure that inmates receive adequate food, clothing, shelter, and medical care ...." *Id.* Consequently, a Plaintiff properly alleges a claim when he articulates an "objectively, sufficiently, serious ... denial of the minimal civilized measure of life's necessities." *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015). Where unsanitary conditions are concerned, courts look at "both the duration and the severity of the exposure." *Id.* at 68; *see also Darnell*, 849 F.3d at 70. Moreover, a pretrial detainee need not "show that [he] actually suffered from serious injuries." *Darnell*, 849 F.3d at 31. As to the second prong, a Plaintiff must demonstrate that prison officials acted "with more than mere negligence." *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835) (internal quotations omitted).

Plaintiff's claims fail to meet the requisite burden. Preliminarily, Plaintiff lists a number of unsanitary conditions of confinement, including "no ventilation at all in intake housing", (SAC at 6), that he had "lice marks up and down" his leg, (*id.*), a panty suit was "growing to the shower", (*id.*), there "was mold seeping on the walls", (*id.*), a fellow detainee, Brad Smith, was "throwing around" his feces, (*id.*), and the

indifference claims against these Defendants suffers from a facial malady, he will be granted leave to re-plead.

#### B. Insufficient Mirror

*8 To the extent Plaintiff alleges that his constitutional rights were violated because the mirror provided to him was not clear, such allegations do not give rise to a cognizable federal claim. While "the failure to regularly provide prisoners with[ *inter alia,*] access to a mirror ... constitutes a denial of personal hygiene and sanitary living conditions," *see Myers v. City of New York*, No. 11-CV-8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012), Plaintiff fails to allege an actual deprivation, nor one that rises to the level of a "denial of the minimal civilized measure of life's necessities." *Willey v. Kirkpatrick*, 801 F.3d at 66. Such a claim is dismissed.

### IV. Access to the Courts

10      Plaintiff also alleges that his Sixth Amendment rights were violated. "[A] pre-trial detainee's Sixth Amendment rights are infringed when prison regulations 'unjustifiably obstruct,' 'infringe,' 'unreasonably burden,' or 'significantly interfere' with the detainee's access to counsel." *Perri v. Ponte*, 236 F. Supp. 3d 590, 617 (E.D.N.Y. 2017). Plaintiff's complaint contains no allegations that his access to counsel was interfered with whatsoever. Any Sixth Amendment claims must be dismissed with prejudice.

Plaintiff also appears to raise two claims that sound in principals of access to the courts. Specifically, Plaintiff alleges that Byron interfered with the grievance procedure, (*see* SAC at 6-7), and that Falco and Hickey interfered with his ability to allege a Section 1983 claim by failing to photograph his injury, (*id.* at 7.) Neither claim survives a motion to dismiss.

To state a First Amendment access to the courts claim, a plaintiff must demonstrate "that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.'" *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (alterations in original).

#### A. Interference With the Grievance Procedure

Any claim against Byron that he violated Plaintiff's constitutional rights by interfering with the grievance process cannot stand. "[I]nmate grievance programs created by state

law are not required by the Constitution"; thus, a claim alleging interference with the grievance procedures is not cognizable under Section 1983. *Swift v. Westchester Cnty. Dep't of Corr.*, No. 04-CV-0011(RJS), 2008 WL 953616, at *13 (S.D.N.Y. Apr. 1, 2008); *see also Riddick v Semple*, No. 16-CV-535(JCS)(PED), 2013 WL 1176699, at *20 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted by*, 2013 WL 1153354 (Mar. 21, 2013); *Mamon v. Carr*, No. 09-CV-5748(VGG)(LB), 2011 WL 2360591, at *10 (E.D.N.Y. Jun. 9, 2011); "absent a showing that the defendant' actions in that regard result in actual prejudice to the inmate's pursuit of a legal action," *Amos v. Jopp*, 635 F. Supp. 2d 214, 234 (W.D.N.Y. 2009); *see also Banks v. Cnty. of Westchester*, 168 F. Supp. 3d 682, 692 (S.D.N.Y. 2016) (noting that plaintiff must demonstrate that "defendant's actions resulted in an actual injury"). Plaintiff's conclusory allegations fail to demonstrate that he was actually prejudiced in the pursuit of any legal action. He has successfully pursued this Section 1983 action in federal court, as this Court is permitting Plaintiff to re-allege his claims against Byron as they concern alleged interference with his grievances. An access to the courts claim cannot stand.

#### B. Refusal to Take Photographs

Plaintiff's attempt to allege that Hickey and Falco violated his constitutional rights by failing to take photographs of his injuries likewise fails. A refusal to take a photograph requested by a plaintiff does not rise to the level of a constitutional violation. *See Thomas v. Chapjian*, No. 06-CV-5435, 2015 WL 1472517, at *15 (W.D.N.Y. Mar. 11, 2015). Moreover, even if Plaintiff could assert it as the basis of an access to the courts claim, it fails his hindered his pursuit of a lawsuit. Despite not having a photograph of his injury, Plaintiff brought this civil rights lawsuit, alleging, *inter alia*, inadequate medical care. This Court construed all of these claims against the County Defendants lead nothing to do with Plaintiff's lack of photographic evidence, which the detailed did not rise to the level of a constitutional violation. Moreover, Plaintiff's allegations suffered to move his case forward on a deliberate indifference claim against Dr. Piraino; the merits of this claim will not rise and fall on the existence of a photograph of Plaintiff's injury. Plaintiff's claims against Hickey and Falco must be dismissed.

### V. Monell Liability

*9 Defendants also argue that Rockland County is not a proper party or this lawsuit because Plaintiff has failed to properly allege *Monell* liability. This Court agrees.

Figueroa v. County of Rockland, Not Reported in Fed. Supp. (2018)
2018 WL 3315735

A Plaintiff can only recover from a municipality if he demonstrates a claim pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) (a "*Monell*" claim). To state such a claim, plaintiff "must allege that 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers.' " *Cipriano v. Suffolk Cnty. Dep't of Health*, 485 F. App'x 505, 508 (2d Cir. 2012) (quoting *Monell*, 436 U.S. at 690) (alterations in original). Critically, a Plaintiff must prove both that there was a constitutional violation *and* that the constitutional violation "was a result of a municipal policy or custom." *Brown v. City of New York*, No. 13-CV-6912 (TPG), 2016 WL 616396, at *2 (S.D.N.Y. Feb. 16, 2016) (emphasis added). A municipality will not be held liable under the doctrine of respondeat superior. *Monell*, 436 U.S. at 691.

Where, as here, the complaint contains allegations of a "single incident, especially one involving only actors below the policy-making level" *Monell* liability cannot be sustained. *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 439 (S.D.N.Y. 2016) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)); *Tobver v. Office-Dep't of Corr.*, No. 10-CV-5354(DAB), 2013 WL 3781727, at *5 (S.D.N.Y. July 9, 2013). Plaintiff's SAC contains no allegations from which this Court could infer the existence of a *Monell* claim. None of the Defendants appear to be in a policy-making position. Moreover, the SAC does not contain a single allegation tying any of the alleged unlawful conduct to an overarching policy or custom. *See Simpson*, 159 F. Supp. 3d at 439 (dismissing *Monell* claim where "SAC does not contain a single allegation—even a conclusory one—that a policy or custom" caused plaintiff's injury); *see also Motton v. City of New York*, No. 13-CV-6485(GHD)(LC), 2016 WL 1729646, at *4 (S.D.N.Y. Apr. 26, 2016) (no *Monell* liability in absence of allegations "that the harm was brought about by any municipal policy"); *report and recommendation adopted by*, 2016 WL 3551953 (Jun 24, 2016). Plaintiff's claim against Rockland County must be dismissed.

**VI. State Law Claims**

The Court need not linger on whether to assert supplemental jurisdiction over Plaintiff's state law claims against Defendants McLaughlin, Jacob, Hickey, Falco, Byron, and Rockland County. These claims must fail as the Court has already determined that the Section 1983 claims are ripe for dismissal. *See Skladowska-Cieslak v. Stein*, 256 F. Supp. 3d 805, 810 (S.D.N.Y. 2017) (declining to exercise

supplemental jurisdiction over state law claims where federal claims dismissed); *Klachevtz v. Eaton*, 375 F. Supp. 2d 332, 339 (S.D.N.Y. 2005). Such claims are dismissed without prejudice, and to the extent Plaintiff can reasonably plead same, he can do so in state court.

**VII. Leave to Amend**

Though "[l]eave to amend should be freely granted", this Court declines to allow Plaintiff leave to amend his claims against Defendants Jacob, McLaughlin, and Rockland County, as an amendment would be futile. *See Nisjana v. Mcaunman*, 930 F. App'x 617, 620 (2d Cir. 2019) (summary order) (quoting *Jews Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)). The conduct of Jacob and McLaughlin do not rise above the level of negligence and medical malpractice; thus, it is not actionable and no amendment would render it otherwise. *See id.* (affirming denial of leave to amend on ground that "negligence and medical malpractice" not recoverable under Section 1983). Further, as noted, *supra*, Plaintiff is not permitted to re-plead his claims against Hickey and Falco as they pertain to the refusal to take a photograph of his injury, as such conduct is not actionable under the Constitution.

*10 Nevertheless, "a *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotations and alterations omitted). With respect to Plaintiff's claims against Byron, Hickey, and Falco for deliberate indifference to the conditions of his confinement, Plaintiff may re-plead with additional facts regarding the severity and duration of the unsanitary conditions, as well as interactions that Plaintiff had with these Defendants that would demonstrate the requisite *mens rea*.

**CONCLUSION**

In line with the foregoing, Dr. Piccotte's Motion is **DENIED**, as the claims against Dr. Piccotte for inadequate medical care is properly pled. Dr. Piccotte is hereby directed to Answer Plaintiff's SAC on or before August 21, 2018.

The County Defendants' Motion, however, is **GRANTED** in accordance with the following:

1. The Second Amended Complaint is dismissed *with prejudice* against Defendants Jacob, McLaughlin, and Rockland County;

2. The claims against Hickey and Falco based on a refusal to take a photograph of Plaintiff's injury are dismissed *with prejudice*;

3. The claim against Byron alleging an interference with Plaintiff's access to the courts is dismissed *with prejudice*;

4. The claims against Byron, Hickey, and Falco alleging a deliberate indifference to Plaintiff's conditions of confinement are dismissed *without prejudice* and Plaintiff is granted 30 days to re-plead these claims.

Should Plaintiff choose to file a Third Amended Complaint against Byron, Hickey, and Falco for deliberate indifference to his conditions of confinement, he must do so on or before August 7, 2018 and in conformity with this Opinion. Failure

to do so will result in a dismissal of the claims against Byron, Hickey, and Falco with prejudice.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 16 and 19. The Clerk of Court is further respectfully directed to terminate Defendants Bill McLaughlin, Mariananne Jacob, and Rockland County, as all claims against them are dismissed with prejudice. The Clerk of the Court is also directed to mail a copy of this Opinion and Order to Plaintiff at David Christopher Figueroa, Rockland County Correctional Center, 55 New Hempstead Road, New City, New York 10956 and change Plaintiff's address on ECF to reflect same. Plaintiff is reminded that it is his obligation to inform the Court when his address changes.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3315735

---

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4502440

2021 WL 4502440
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Rosie MARTINEZ, Plaintiff,
v.
CITY OF NEW YORK, Police Officer Eric Ryan, Lieutenant David Carchi, Sergeant Joseph DiGennaro, Sergeant Keith Laliberte, Sergeant Albert Trotter, Sergeant Joseph Pontecervo, and John and Jane Doe 1 through 10 individually and in their official capacities (the names John and Jane Doe being fictitious, as the true names are presently unknown), Defendants.

16-CV-70 (RPK) (CLP)
|
Signed 09/30/2021

**Synopsis**
**Background:** Arrestee brought civil rights action against city and police officers, asserting claims for, among other things, deprivation of due process, illegal search, denial of access, deliberate indifference, and supervisory liability. Defendants moved for summary judgment and judgment on pleadings.

**Holdings:** The District Court, Rachel P. Kovner, J., held that

[1] existence of adequate state post-deprivation remedies precluded arrestee's claims for deprivation of due process;

[2] probable cause existed to search arrestee's automobile;

[3] arrestee failed to establish denial of access claim;

[4] purported deficiencies in arrestee's notice of claim did not prejudice municipal defendants;

[5] fact issues precluded summary judgment on arrestee's due process claims for deliberate indifference to serious medical needs; and

[6] arrestee failed to establish supervisory liability claims.

Motions granted in part and denied in part.

Procedural Posture(s): Motion for Summary Judgment; Motion for Judgment on the Pleadings.

West Headnotes (19)

[1] **Federal Civil Procedure** ← Judgment on the Pleadings
Motion for judgment on the pleadings and motions to dismiss for failure to state a claim are evaluated under the same standard. Fed. R. Civ. P. 12(b)(6), 12(c).

[2] **Constitutional Law** ← Other particular conditions
**Municipal Corporations** ← Police and fire
**Prisons** ← Search, seizure, and confiscation
Existence of adequate state post-deprivation remedies under New York state law, such as causes of action for negligence, replevin, or conversion under New York state law, precluded arrestee's claims for deprivation of due process arising from arrestee's allegations that individual police officers stole money and gift cards from her purse when they processed her, and then neither vouchered nor returned those items. U.S. Const. Amend. 14.

[3] **Constitutional Law** ← Protections Provided and Deprivations Prohibited in General
Claims arising from a deprivation of property without due process of law come in two forms: deprivations deriving from (1) established state procedures, and (2) random, unauthorized acts by state employees. U.S. Const. Amend. 14.

[4] **Constitutional Law** ← Procedural due process in general
States have affirmative duty not to violate Fourteenth Amendment by creating procedures lacking in due process. U.S. Const. Amend. 14.

[5] **Constitutional Law** ← Duration and timing of deprivation; pre- or post-deprivation remedies
When someone is deprived of property by deficient established state procedure, due process claim accrues automatically. U.S. Const. Amend. 14.

[6] **Constitutional Law** ← Duration and timing of deprivation; pre- or post-deprivation remedies
Government's provision of adequate state post-deprivation remedies satisfies due process with respect to deprivation of property, either through deficient established state procedure, or through random and unauthorized property deprivations by government employees. U.S. Const. Amend. 14.

[7] **Searches and Seizures** ← Probable or reasonable cause
Under the "automobile exception" to Fourth Amendment warrant requirement, officers may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime. U.S. Const. Amend. 4.

[8] **Searches and Seizures** ← Presumptions and Burden of Proof
The government has the burden of establishing probable cause to conduct a warrantless search. U.S. Const. Amend. 4.

[9] **Searches and Seizures** ← Probable or reasonable cause
Probable cause for a vehicle search exists where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place. U.S. Const. Amend. 4.

[10] **Federal Civil Procedure** ← Admissibility
**Searches and Seizures** ← Hearsay; informers; collective knowledge
To establish probable cause to conduct a vehicle search, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment. U.S. Const. Amend. 4.

[11] **Controlled Substances** ← Probable or reasonable cause
Probable cause existed to search arrestee's automobile, which arrestee's boyfriend allegedly used to pick up and transport drug; police informant reported that arrestee's boyfriend transported drugs in automobile and sold them from arrestee's apartment, police surveillance confirmed arrestee's boyfriend driving the automobile, and prior to search of automobile, arrestee's boyfriend possessed 280 bags of cocaine when he was arrested in arrestee's apartment. U.S. Const. Amend. 4.

[12] **Searches and Seizures** ← Probable or reasonable cause
Even if the information on which a police officer relies to establish probable cause to search later turns out to be mistaken, probable cause still exists as long as the arresting officer acted reasonably in relying on that information. U.S. Const. Amend. 4.

[13] **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies
**Federal Civil Procedure** ← Failure to respond; sanctions
Fact that city and police officers violated their obligations during discovery in civil rights action did not establish plaintiff's denial of access in courts claim, in civil rights action arising from plaintiff's arrest and detention; plaintiff failed to identify any specific claims that such actions prevented her from bringing, and city and police

Martinez v. City of New York, --- F.Supp.3d --- (2021)
2021 WL 4522440

officers agreed not to press statute of limitations defense regarding claims lost due to discovery misconduct.

**[14]** Constitutional Law ⟵ Conditions; Limitations, and Other Restrictions on Access and Remedies

Backward-looking denial of access to courts claim is available only if governmental action caused a plaintiff's suit to be dismissed as untimely, or if a judicial remedy was completely foreclosed by public official's false statement or nondisclosure.

**[15]** Municipal Corporations ⟵ Requirement as mandatory or condition precedent

Under New York law, failure to comply with notice-of-claim requirements ordinarily requires a dismissal for failure to state a cause of action. N.Y. General Municipal Law § 50-e.

**[16]** Municipal Corporations ⟵ Form and sufficiency

Under New York law, standard for determining whether notice of claim against city is sufficient is merely whether notice includes information sufficient to enable city to investigate. N.Y. General Municipal Law § 50-e.

**[17]** Municipal Corporations ⟵ Form and sufficiency

Under New York law, whether notice of claim against city substantially complies with requirements of notice statute depends on circumstances of each case N.Y. General Municipal Law § 50-e.

**[18]** Municipal Corporations ⟵ Form and sufficiency

Under New York law, purported deficiencies in arrestee's notice of claim, namely, listing wrong time of incident and naming city and

not individual defendants, did not prejudice municipal defendants, and thus any deficiencies did not warrant dismissal of arrestee's assault and battery claims against police officers. N.Y. General Municipal Law § 50-e.

**[19]** Constitutional Law ⟵ Medical treatment

Fourteenth Amendment's due process clause bars officials from acting with deliberate indifference to serious medical needs of pretrial detainee. U.S. Const. Amend. 14.

**[20]** Constitutional Law ⟵ Medical treatment

To prevail on a claim of deliberate indifference to serious medical needs in violation of due process, a pretrial detainee must offer evidence that (1) her medical need was a condition of urgency, and (2) that the defendants treated that need with deliberate indifference. U.S. Const. Amend. 14.

**[21]** Constitutional Law ⟵ Medical treatment

When a pretrial detainee's due process claim for deliberate indifference to serious medical needs involves delay in treatment and not denial of treatment, the analysis of the medical need focuses on the challenged delay, rather than the detainee's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious. U.S. Const. Amend. 14.

**[22]** Constitutional Law ⟵ Medical treatment

For purpose of a pretrial detainee's due process claim for deliberate indifference to medical needs, a "serious medical condition" exists where the failure to treat detainee's condition could result in further significant injury or the unnecessary and wanton infliction of pain. U.S. Const. Amend. 14.

**[23]** Federal Civil Procedure ⟵ Civil rights cases in general

Genuine issue of material fact as to whether pretrial detainee's hand and wrist pain was sufficiently severe that its treatment qualified as serious medical need, precluding summary judgment on detainee's due process claim for deliberate indifference to serious medical needs. U.S. Const. Amend. 14.

**[24]** Federal Civil Procedure ⟵ Civil rights cases in general

Genuine issue of material fact as to whether jail personnel recklessly failed to act with reasonable care regarding pretrial detainee's hand and wrist injury, precluding summary judgment on detainee's due process claim for deliberate indifference to serious medical needs. U.S. Const. Amend. 14.

**[25]** Constitutional Law ⟵ Medical treatment

A pretrial detainee can prove deliberate indifference to a serious medical need in violation of due process by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee. U.S. Const. Amend. 14.

**[26]** Civil Rights ⟵ Liability of Public Employees and Officials

Civil Rights ⟵ Vicarious liability and respondeat superior in general; supervisory liability in general

Civil Rights ⟵ Complaint in general

To state a claim against a supervisory official under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official; a plaintiff may not instead establish liability by reason of the official's supervision of others who committed the violation. 42 U.S.C.A. § 1983.

**[27]** Civil Rights ⟵ Criminal law enforcement; prisons

**[28]** Civil Rights ⟵ Vicarious liability and respondeat superior in general; supervisory liability in general

Where there is no underlying constitutional violation, there is also no supervisory liability under § 1983. 42 U.S.C.A. § 1983.

**[29]** Civil Rights ⟵ Criminal law enforcement; prisons

Arrestee failed to establish supervisory liability claims under § 1983 against police officials, arising from claims of excessive force, arrestee's claims were duplicative of identical claims against same officials in non-supervisory capacity. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[30]** Civil Rights ⟵ Liability of Public Employees and Officials

A plaintiff suing a government official in her individual capacity under § 1983 may not assert a second set of identical claims against the officials premised on the same conduct under the label supervisory liability. 42 U.S.C.A. § 1983.

**[31]** Civil Rights ⟵ Police, Investigative, or Law Enforcement Activities

Police officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

**[32]** Civil Rights ⟵ Police, Investigative, or Law Enforcement Activities

To hold an officer liable on failure-to-intervene claim, a plaintiff must demonstrate that the officer's failure to intervene permitted fellow officers to violate the plaintiff's clearly established statutory or constitutional rights, and that it was objectively unreasonable to believe that his fellow officers' conduct did not violate those rights.

**[33]** Civil Rights ⟵ Police, Investigative, or Law Enforcement Activities

On a claim for failure to intervene, the officer faulted for failing to intervene must have had a realistic opportunity to intervene to prevent the harm from occurring.

**[34]** Civil Rights ⟵ Failure to act or protect or to enforce law

Arrestee could not maintain failure-to-intervene claims linked to allegations of denial of access to courts, illegal search, due process violation, and supervisory liability, where arrestee failed to establish the underlying constitutional violation.

**[35]** Civil Rights ⟵ Failure to act or protect or to enforce law

Because a plaintiff may recover on a failure-to-intervene theory only by showing that the purported failure led to the denial of clearly established statutory or constitutional rights, a failure-to-intervene claim is contingent upon the disposition of the underlying primary claim.

**[36]** Federal Civil Procedure ⟵ Civil rights cases in general

Genuine issues of material fact existed as to whether police officers injured or turned blind eye to arrestee's serious medical need following injury, precluding summary judgment on arrestee's claim that officers failed to

**[37]** Federal Civil Procedure ⟵ Matters considered

A plaintiff may not assert a claim for the first time in opposition to a motion for summary judgment.

**[38]** Statutes ⟵ Language and Intent; Express Provisions

Absent a clear statement, New York's statutes lack retroactive effect.

**[39]** Courts ⟵ Previous Decisions in Same Case as Law of the Case

Courts generally adhere to prior decisions in subsequent stages of the same case unless cogent and compelling reasons militate otherwise.

**Attorneys and Law Firms**

Fred Brian Lichtmacher, The Law Office of Fred Lichtmacher P.C., Gabriel Paul Harvis, Baree N. Fett, Elefterakis Elefterakis & Panek, New York, NY, for Plaintiff.

Kavin Suresh Thadani, Paul Hasani Johnson, Morgan Chuniel McKinney, New York City Law Department, New York, NY, for Defendants City of New York, Lieutenant Jason Weitzman, Sergeant Jason Fonjisoz.

Kavin Suresh Thadani, Morgan Chuniel McKinney, New York City Law Department, New York, NY, for Defendants Police Officer Eric Ryan, Lieutenant David Coridi, Sergeant Joseph DiGennaro, Captain Paul Valerga, Sergeant Keith Laliberte, Sergeant Joseph Franciscone, Police Officer Blake Ficken, Albert Police Officer Trainer, Police Officer Vince Kandilean, Police Officer Matthew Rippel, Detective James Davanino, Police Officer Bryan Post, Police Officer Tiffany Wolff, Police Officer Casey Wolff, Sergeant Richard Lavalle, Police Officer James Seddlo, Police Officer Daniel Mendier, Police Officer Richard Russo.

---

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

*1 Plaintiff Rosie Martinez brings eleven federal and state law claims against the City of New York ("City"), six named officers of the New York Police Department ("NYPD"), and officers John and Jane Doe, 1 through 10. The City and the named officers have agreed that Ms. Martinez can proceed to trial on her claims of excessive force in violation of the Fourth Amendment. They have sought summary judgment or dismissal of all other claims. For the reasons that follow, I grant defendants' motion with respect to all claims except for Ms. Martinez's assault-and-battery and deliberate-indifference claims, and Ms. Martinez's failure to intervene claims against defendants David Coridi, Keith Laliberte, Eric Ryan, and Joseph DiGennaro pertaining to excessive force and deliberate indifference. Those claims, along with Ms. Martinez's excessive force claim, may proceed to trial.

**BACKGROUND**

**A. Factual Background**

On January 22, 2015, the NYPD arrested Diany Rivera inside Ms. Martinez's apartment, seizing thousands of dollars and 280 bags of cocaine. Diany Rivera Dep. I, Defs.' Ex. B, at 189:6 (Dkt. #184-2) ("Rivera Dep. I"); Pl.s' Local Rule So 1 Counter Statement of Facts ¶ 6 (Dkt. #191) ("Pl.'s Statement") When Ms. Martinez arrived home, Officer Ryan placed her under arrest, bringing her to the 107th Precinct. Id. at ¶ 8; Pl. Counterstand Counsel Call Tr., Pl.'s Ex. 24, at 5:6-9 (Dkt. #194-24) ("Command Center Call Tr."). By all accounts, Ms. Martinez entered the process unsigned. See Pl.'s Statement ¶ 8 A; see also Keith Laliberte Dep., Pl.'s Ex. 23, at 145:9-10 (Dkt. #194-23) ("Laliberte Dep."). When she left five hours later, her right wrist was so severely swollen that officers could not fit it on a handcuff. Pl.'s Statement ¶ 8 C. What happened inside the precinct that night forms the crux of this suit.

In late 2014, Ms. Martinez, a housecleaner, began dating Ms. Rivera. Id. at 8:6 n.1. Ms. Rivera began selling heroin out of Ms. Martinez's apartment. Ibid. Ms. Martinez asserts that he did so without her knowledge. Rosie Martinez Dep., Pl.'s Ex. 2, at 32:2-6 (Dkt. #194-2) ("Martinez Dep.").

Just how the NYPD learned Mr. Rivera was dealing drugs from Ms. Martinez's apartment is disputed. Pl.'s Statement ¶ 4. According to the defendants, in early January 2015, Officer Ryan arrested an individual who claimed knowledge of Mr. Rivera's criminal conduct. Eric Ryan Dep. I, Pl.'s Ex. 28, 33:17-34:25 (Dkt. #194-28) ("Ryan Dep. I"). Officer Ryan informed Sergeant DiGennaro. Ibid. Sergeant DiGennaro, in turn, relates that the informant claimed to have purchased drugs from Mr. Rivera in Ms. Martinez's apartment. Sergeant Joseph DiGennaro Dep. II, Pl.'s Ex. 6, at 206:24-207:8 (Dkt. #194-6) ("DiGennaro Dep. II")

According to Sergeant DiGennaro, the informant told him that Mr. Rivera used a car, a 1999 Ford Explorer, to "re-up" his supply on Thursdays or Fridays. Joseph DiGennaro Dep. I, at 277:1-278:12 (Dkt. #194-4) ("DiGennaro Dep. I"). The police began surveilling this car on January 16. See Complaint Follow-Up Informational PD113-0810, Defs.' Ex. 3 (Dkt. #184-3) ("Follow-Up Informational"). This Ford Explorer was legally titled in Ms. Martinez's name, Pl.'s Statement ¶ 1, and while the parties dispute whether she had given legal ownership of it to Mr. Rivera, ibid. he "was in the process of transferring the insurance over to [his] name and ... driving that car" Danny Rivera Dep. II, Pl.'s Ex. 3, at 187:3-12 (Dkt. #194-3) ("Rivera Dep. II") Shortly before January 22, the informant told Sergeant DiGennaro that Mr. Rivera would be driving the Ford Explorer that night to refill his supply in Brooklyn. DiGennaro Dep. I, at 277:1-278:12. Mr. Rivera contends that he could not have used the Ford to make that trip, because the Ford's timing belt had snapped about nine days earlier. Rivera Dep. II, at 187:17-188:5

*2 Either way, on January 22, NYPD officers arrested Mr. Rivera as Ms. Martinez's apartment while Ms. Martinez was at work. Rivera Dep. I, at 189:6; Pl.'s Statement ¶ 6. On Mr. Rivera, they found 280 bags of cocaine. Rivera Dep. I, at 189:6; Pl.'s Statement ¶ 6. When Ms. Martinez came home, Officer Ryan arrested her. Id. at ¶ 8; Command Center Call Tr., at 5:6-9; and Sergeant DiGennaro impounded the Ford Explorer, which was parked in front of the apartment complex. DiGennaro Dep. I, 292:9-23. Officers later searched the vehicle at Sergeant DiGennaro's direction. Ryan Dep. I, at 118:20-21; Defs.' Statement ¶ 7. Ms. Martinez testifies that police took about $390, one or two gift cards, and a phone charger from her purse when they processed her. According to Ms. Martinez, they failed to return that property. Martinez Decl. 81:7-21; CCRB Summary, Pl.'s Ex. 11 (Dkt. #194-11)

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4522440

Ms. Martinez arrived at the station in "apparently normal" physical condition, Pl.'s Statement ¶ 8.A, 107th Command Log, Pl.'s Ex. 40, at 53 (Dkt. #194-40) ("Command Log"). She was then taken to the Juvenile Room and handcuffed by one hand to a bench. Pl.'s Statement ¶¶ 8.A, 8.B. As the desk officer that night, Sergeant Lahbere was stationed near the room with a partial view into it, Lahbere Dep. 14:6-15, 147, 2-8, 151:4-7. What happened next is disputed.

The officers claim that Ms. Martinez began punching a wall so fiercely that she injured her right hand. Command Center Call Tr., at 1:6-13; Pl.'s Statement ¶ 8.B. Lieutenant Camila says he entered the room to restrain her. Command Center Call Tr., at 3:6-15; David Camila Dep., Pl.'s Ex. 27, at 95:20-23 (Dkt. #194-27) ("Camila Dep."). Officer Ryan reports checking on Ms. Martinez seventeen times that night, including nine times after the alleged incident occurred. Erie Ryan Dep. II, Pl.'s Ex. 28, at 301,19-302,16 (Dkt. #194-28) ("Ryan Dep. II"). Save for two accounts, Sergeant DiGennaro, Lieutenant Camila, and Officer Ryan each questioned her, restrained her, or checked on her that night. DiGennaro Dep. II, at 485.8-24, 487,2-25; Ryan Dep. II, at 301;10-302,16; Camila Dep., at 95;20-23.

Ms. Martinez offers a different account. According to her, two officers entered the room to interrogate her. When she told them that she did not know who Mr. Rivera's drug distributor was, they smacked her, pulled her hair, choked her, stomped on her feet, and bent her right thumb back. Martinez Dep. 57,1-59,24; Pl.'s Statement ¶ 8.A. Her right hand swelled, and she spent the next five hours in pain. Martinez Dep. 61:11-22; Pl.'s Statement ¶ 6. When she requested medical care, the officers refused, hoping that her swelling would decrease. Rosa Martinez 1AB Interview, Pl.'s Ex. 13, at 59:20-40:23 (Dkt. #194-13) ("Martinez 1AB Interview"); Pl.'s Statement ¶ 8.C. Ms. Martinez's description of one of her assailants matches Sergeant Lahbere. Id. at ¶ 8.D.

From here on, the parties agree. Ms. Martinez suffered lacerations around 1:37-40 AM. Pl.'s Statement ¶ 8.B. Command Center Call Tr. 5:17-19; DiGennaro Dep. II, at 292,15-17. No officer gave medical care, and the officers did not record the incident. Report & Recommendation 31 (Dkt. #188) ("P. & R."); Pl.'s Statement ¶ 8.C. By the time officers sent Ms. Martinez to Central Booking, her right wrist was so swollen it took two handcuffs to secure it. Martinez Dep. 73:14-21.

At Central Booking, medical screeners immediately redirected Ms. Martinez and the two officers with her, Officer

Trotter and Sergeant Pontecorvo, to the emergency room. Id. at 73:22-74:2. Ms. Martinez's and the officers' conflicting accounts of how she sustained her injuries are memorialized in a medical report. Unredacted ED Physician Progress Note, Pl.'s Ex. 39 (Dkt. #195-39) ("Progress Note"). An X-ray showed no broken bones. Queens Hospital Center Note, Pl.'s Ex. 51 (Dkt. #193-51) ("QHC Note"). The doctor gave Ms. Martinez a splint, prescribed Motrin and Maalox, and advised her to follow up with a hand specialist. Progress Note; Pl.'s Statement at ¶ 16. At 5:19 AM, Lieutenant Camila was dispatched to call in the Internal Affairs Bureau (IAB) Command Center, in which he stated that Ms. Martinez had injured herself punching a wall. Command Center Call Tr. 8:6-17.

[3] Afterward, medical records indicate Ms. Martinez continued to experience chronic pain in her hand. Rosa Martinez Medical Records, Pl.'s Ex. at 5:1 (Dkt. #194-51). This pain resulted in multiple medical visits and ultimately culminated in surgery. Ibid. at 53.; Pl.'s Statement ¶ 14. Meanwhile, Lieutenant Camila's call to IAB triggered investigations by the Queens Patrol Borough, the 107th Precinct, and IAB. R. & R. at 31.

**B. Procedural History**

Ms. Martinez filed her initial complaint in 2016, raising a number of claims against the City and numerous officers relating to the day of her arrest. Compl. ¶¶ 8-9, 26-52 (Dkt. #1).

During discovery, the City failed to comply with discovery orders issued by Magistrate Judge Cheryl L. Pollak. R. & R. at 1. Then, on December 18, 2017, the City suddenly made disclosures that "changed the entire landscape of the lawsuit." Id. at 3, including the existence of Lieutenant Camila's call to IAB and the NYPD's internal investigations of the incident. Id. at 30. Ms. Martinez moved for sanctions. As the Court considered sanctions, the defendants waived defenses based on the statute of limitations. Mot. for Sanctions (Dkt. #83); Ltr. re: Equitable Tolling (Dkt. #95).

On January 23, 2018, Ms. Martinez filed the operative Second Amended Complaint. Second Am. Compl. (Dkt. #89). The Second Amended Complaint alleges (i) deprivation of due process, (ii) improper vehicle search, (iii) Section 1983 conspiracy, (iv) denial of access to courts/Section 1983 cover-up, (v) unreasonable force, (vi) unauthorized battery, (vii) negligent hiring, training, and retention, (viii) intentional infliction of emotional distress ("IIED"), (ix) negligent infliction of emotional distress ("NIED");

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4522440

(x) failure to intervene, (xi) deliberate indifference, (xii) supervisory liability, and (xiii) Monell claims. Id. at ¶¶ 81-135. Ms. Martinez identified the City and the following named individuals as defendants: Lieutenant Jason Westerman, Sergeant Jason Forgione, Officer Eric Ryan, Lieutenant David Camila, Sergeant Joseph DiGennaro, Captain Paul Valenga, Sergeant Keith Lahbere, Sergeant Joseph Pontecorvo, Officer Blake Ficken, Officer Albert Trotter, Officer Peter Knutsov, Officer Matthew Rippel, Detective James Davancro, Officer Byron Pera, Officer Tiffany Wolf, Officer Corey Wolff, Sergeant Richard Lavelle, Officer James Saddio, Officer Daniel Meudez, Officer Richard Nieto. She also listed 10 John and Jane Doe defendants. *

> The complaint is unclear as to which claims are being pursued against which defendants. But Ms. Martinez's response to the instant motion specifies that she seeks to pursue her unsealed-and-battery claim against Lieutenant Camila, Sergeant Lahbere; Officer Ryan, Sergeant DiGennaro, and the City via respondeat superior; her excessive force and deliberate indifference claims against Lieutenant Camila, Sergeant Lahbere, and Officer Ryan; and Sergeant DiGennaro; her denial of access claim against Lieutenant Camila, Sergeants DiGennaro, Pontecorvo, and Lahbere; and Officers Ryan and Trotter; her search-and-seizure claim against Sergeant DiGennaro and Officer Ryan; her supervisory liability claim against Lieutenant Camila and Sergeants DiGennaro, Pontecorvo, and Lahbere; and her failure to intervene claim in the alternative via all the constitutional claims. Pl.'s Mem. in Opp. 2-3

The day after Ms. Martinez filed the Second Amended Complaint, Magistrate Judge Pollak recommended granting summary judgment for her as a sanction for defendants' "egregious" discovery violations. R. & R. at 43. Then-presiding Judge Ann M. Donnelly adopted Magistrate Judge Pollak's findings regarding the violations, but she declined to adopt that sanction. Instead, she ordered the City to pay all of Ms. Martinez's reasonable expenses incurred as a result of its discovery failures. Mem. Decision & Order, at 7-8 (Dkt. #111) ("Donnelly Order"). Judge Donnelly returned the possibility of further sanctions in trial, especially if defendants feigned loss of memory due to the delay. Ibid.

*4 Ms. Martinez subsequently withdrew her Monell and Section 1985 conspiracy claims and the parties stipulated to the dismissal of Officers Pera, Wolf, Saddio, Meudez, and Russo. See Ltr. from Parties re: Mot. to Dismiss and Depo. (Dkt. #154). Ms. Martinez later withdrew her negligent hiring, training, and retention claim, with the proviso that she could reinstate that claim if the City asserted that any of the individual defendants were acting outside the scope of their employment. Defs.' Mem. in Supp. of Sanct. 1, at 4-5 (Dkt. #180) ("Defs.' Mem. in Supp.").

On August 14, 2020, defendants filed a motion to file as a motion for partial summary judgment and motion to dismiss. Defendants moved for judgment on the pleadings for the failure to intervene, unsaid-and-battery, IIED, and NIED claims against the City, Lieutenant Westerman, and Sergeant Forgione. Defs.' Notice of Mot. for Summ. J. (Dkt. #181). Defendants seek summary judgment on all of plaintiff's remaining claims except her Fourth Amendment excessive force claim. Ibid.

Ms. Martinez has opposed the motion in her response brief. Ms. Martinez also urges the Court to reconsider Judge Donnelly's decision regarding sanctions for defendants' misconduct, and to adopt Magistrate Judge Pollak's sanctions recommendation in full. Pl.'s Mem. of L. in Opp. to Mot. for Summ. J. 23 (Dkt. #184) ("Pl.'s Mem. in Opp."). Ms. Martinez also states for the first time that she also wishes to raise claim under Section 20 of New York's Civil Rights Law. Id. at 2 in their reply, defendants moved to dismiss any Section 28 claim. Defs.' Reply in Supp. 6 (Dkt. #192).

After the briefing of defendants' motion was completed, the parties stipulated to the dismissal of another nine defendants: Captain Valenga, Detective Davancro, Lieutenant Westerman, Sergeants Forgione and Lavelle, and Officers Ficken, Rippel, Wolff, and Knutsov. See Ltr. re: Stipulation of Voluntary Dismissal (Dkt. #196).

**STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law." Frost v. New York City

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4522440

Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020). In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant. See ibid. A nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U. S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[1] Given the stage of the litigation, the Court construes defendants' motion to dismiss as a motion for judgment on the pleadings. See Patel v. Contemp. Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) ("[A] motion to dismiss for failure to state a claim (or one of the other non-waivable defenses under Rule 12(h)) that is styled as arising under Rule 12(b) but is filed after the close of pleadings, should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c).") Motions for judgment on the pleadings under Rule 12(c) and motions to dismiss under Rule 12(b)(6) are evaluated under the same standard. See Standard v. New York, 101 F.3d 877, 880 (2d Cir. 1996). While claims of the former sort may proceed, claims of the latter kind are barred if the State provides an adequate postdeprivation remedy. Since Ms. Martinez's claim is of the latter sort, and Ms. Martinez has not adequately pleaded the absence of an adequate postdeprivation remedy, defendants prevail.

[4] [5] [6] The Supreme Court has recognized that "there is an important difference between a challenge to an established state procedure as belong to due process and a property damage claim arising out of the misconduct of state officers." * Parratt v. Taylor, 451 U.S. 527, 542, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting Bonner v. Coughlin, 517 F.2d 1311, 1319 (7th Cir. 1975), modified en banc, 545 F.2d 565 (1976)). States have an affirmative duty not to violate the Fourteenth Amendment by creating procedures "lacking in due process." Ibid. Therefore, when someone is deprived of property by a deficient "established state procedure," a due-process claim accrues automatically. Ibid. Conversely, while states must remedy "random and unauthorized" property deprivations by their employees, "predicting[" such random and unauthorized acts may be impossible. Id. at 541, 101 S.Ct. 1908. Therefore, the provision of "adequate state post-deprivation remedies" satisfies the Fourteenth Amendment

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4522440

with respect to such acts. Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (extending Parratt).

Ms. Martinez brings a "random and unauthorized acts" claim. She alleges that Officer Ryan and Sergeant DiGennaro violated her Fourteenth Amendment due process rights by "stealing" money and gift cards from her, and then neither conducting nor returning those items. Second Am. Compl. ¶ 82; id. at ¶¶ 19-20, 81-83. In claiming a due process violation, Ms. Martinez invokes a line of cases finding Fourteenth Amendment violations when plaintiffs' property was seized and uncharted by NYPD officers pursuant to a voucharing system that the Second Circuit found inadequate. Specifically, the court of appeals found the vouchering system (i) made proving ownership of seized property too difficult, (ii) provided misleading instructions—or an instruction at all—for retrieving property, and (iii) provided an insufficient mechanism for adjudicating ownership disputes between different claimants. See Alexandre v. Cortes, 140 F.3d 406, 412 (2d Cir. 1998); Butler v. Castro, 896 F.2d 698, 704 (2d Cir. 1990); McClendon v. Rosetti, 460 F.2d 111, 115 (2d Cir. 1972). But these cases do not control here. The Second Circuit was careful to distinguish between harms arising from the "official policy or custom of the City"—as when plaintiffs lost property as a result of the City's deficient vouchering procedures—and harms arising from "random and unauthorized" acts. See Alexandre, 140 F.3d at 411-13. Ms. Martinez alleges the latter type of harm. She alleges that defendants "stole" her property without Second Am. Compl. ¶ 82; id. at ¶¶ 19-20, 81-83. Her alleged deprivation of property resulted from theft by individual officers, not from any asserted lack of notice about how to navigate the NYPD's property custody system, or the burdens it places on claimants.

Accordingly, Ms. Martinez's claims are barred by the presence of "adequate state post-deprivation remedies." Hudson, 468 U.S. at 533, 104 S.Ct. 3194, such as causes of action for negligence, replevin, or conversion under New York state law, see, e.g., Gecard v. Rose, No. 19-CV-5742 (PKC) (LB), 2019 WL 3804675, at *3 (E.D.N.Y. Aug. 13, 2019); Cannier v. S.T.C. Police Officers, No. 09-CV-2226 (CBA) (LB), 2011 WL 1298895, at *7 (E.D.N.Y. Mar. 28, 2011) (collecting cases). Since Ms. Martinez does not allege that New York's post-deprivation remedies are insufficient, she must pursue this claim through those channels. See Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001) ("New York in fact affords an adequate post-deprivation remedy in the form of

vehicle search, denial of access, deliberate indifference, and supervisory liability claims. I grant the individual defendants summary judgment on the IIED and NIED claims and deny summary judgment for certain defendants on the negligence claim; and Plaintiffs' motion for summary judgment is granted on plaintiff's failure to intervene claim, except as to defendants Camila, Lahbere, DiGennaro, and Ryan. Ms. Martinez's Section 28 allegations cannot proceed because they are not pleaded in the complaint and in any event would not state a claim. Defendants' motion for summary judgment on Ms. Martinez's unseal-and-battery and deliberate indifference claims is denied. Finally, I decline to revisit Judge Donnelly's ruling regarding discovery sanctions.

**I. Summary Judgment Is Granted on Plaintiff's Due Process Claim**

[2] [3] Defendants' motion for summary judgment on plaintiff's due process claim is granted. Claims arising from a deprivation of property without due process of law come in two forms: deprivations deriving from (1) "established state procedures" and (2) "random, unauthorized acts by state employees." DeSimon, an Neighborhood Assist Comm. v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996). While claims of the former sort may proceed, claims of the latter kind are barred if the State provides an adequate postdeprivation remedy. Since Ms. Martinez's claim is of the latter sort, and Ms. Martinez has not adequately pleaded the absence of an adequate postdeprivation remedy, defendants prevail.

**DISCUSSION**

*5 Defendants' motion for summary judgment and for judgment on the pleadings is granted in part and denied in part. For the reasons explained below, summary judgment is granted to all defendants on the deprivation of due process,

issier also, a Court of Claims action.") Accordingly, I grant defendants summary judgment on the due process claim.

**II. Defendants prevail on plaintiff's unlawful-search claim.**

I also grant defendants' motion for summary judgment on plaintiff's claim that defendants engaged in an unreasonable search of her vehicle. In support of their motion, defendants raise four arguments: 1) Ms. Martinez lacks standing to challenge the search, 2) defendants had probable cause to conduct the search, 3) the community caretaker exception permitted seizure of the car and a subsequent inventory search, and 4) qualified immunity covers their actions. The record shows that the officers had probable cause for the vehicle search. See Byrd v. United States, --- U.S. ---, 138 S. Ct. 1518, 1527, 200 L.Ed.2d 805 (2018) (Fourth Amendment standing "is not a jurisdictional question and need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim"). I therefore grant defendants' motion on that basis and do not consider their other arguments.

**A. Probable cause existed to search the car.**

[7] [8] [9] [10] Because there is no genuine dispute of material fact regarding probable cause for the vehicle search, defendants are entitled to summary judgment. The defendants argue that they possessed the probable cause required to perform a search under the "automobile exception" to the warrant requirement. Under that exception, officers "may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime." United States v. Navedine, 829 F.2d 29, 30 (2d Cir. 1987). The permissible scope of the search includes "the entirety of the car, including the trunk, and the areas within it in which the object of the search may be found." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004). Probable cause for a vehicle search exists "where the totality of the circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). This is a "practical," "all-things-considered" standard evaluated based on the totality of the circumstances. Harris v. Harris, 568 U.S. 237, 244, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013). To establish probable cause, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment. See United States v. Premier & Real Prop. at 4192 S. Livonia Rd., 889 F.2d 1258, 1267 (2d Cir. 1989).

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

Martinez v. City of New York, --- F.Supp.3d --- (2021)
2021 WL 4502440

---

### III. Defendants Also Prevail on the Denial of Access Claim

### IV. The Assault-and-Battery Claim Survives Dismissal

### V. Summary Judgment Is Denied on Plaintiff's Deliberate Indifference Claim

### VI. Defendants Are Entitled to Summary Judgment on all Supervisory Liability Claims

Martinez v. City of New York, --- F.Supp.3d ---- (2021)
2021 WL 4502440

that "[t]he individually-named supervisory defendants" are liable to plaintiff on a theory of supervisory liability. Second Am. Compl. ¶ 122. While the complaint does not identify these defendants by name, *Iqbal* plaintiff's memorandum in opposition to summary judgment indicates these defendants are Lieutenant Canbi and Sergeants Lalibotte, DiGennaro, and Pontecorvo, Pl.'s Mem. in Opp. at 3, 14. The complaint does not cite any source of law as a basis for supervisory liability, but the parties' motion papers treat the claim as arising under Section 1983. *Id.* at 3; *see* Defs.' Mem. in Supp. at 25-26 (same).

[26] The Second Circuit has recently clarified that "there is no special rule for supervisor liability" under Section 1983. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). To state a claim against a supervisory official, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." *Id.* at 620. A plaintiff may not instead establish liability "by reason of [the official's] supervision of others who committed the violation." *Id.* at 618. Moreover, as plaintiff acknowledges, plaintiff cannot press both direct and supervisory claims against a single defendant, with both claims presented "on the same conduct." Pl.'s Mem. 14; *see, e.g., Barile v. City of New York, No. 11-CV-2841 (CBA) (VMS), 2016 WL 11439773, at *16 (E.D.N.Y. Apr. 22, 2016)* ("To the extent [plaintiff's] supervisory claim is premised on [a defendant's] participation in the alleged constitutional [ ] violation ... it is duplicative" of the underlying claim); *Chamberlain '986, F. Supp. 2d at 394*.

These principles are fatal to plaintiff's supervisory liability claims.

[27] [28] First, Lieutenant Canbi and Sergeants Lalibotte, DiGennaro, and Pontecorvo are entitled to summary judgment on the claims of due-process violations, deliberate indifference, denial of access to courts, and illegal search and seizure. When "there [is] no underlying constitutional violation, there is also no supervisory liability." *Raspardo v. Carlone, 770 F.3d 97, 129 (2d Cir. 2014).* Since summary judgment is warranted on these underlying claims, there can be no supervisory liability either.

[29] [30] Second, all three defendants are entitled to summary judgment on the supervisory liability claim for excessive force. A plaintiff "may not assert a second set of identical claims premised on the same conduct under the label 'supervisory liability.' " *Barile v. City of New York, No. 11-CV-2841 (CBA) (VMS), 2016 WL 11439773, at *16*

---

(E.D.N.Y. Apr. 22, 2016). Ms. Martinez's supervisory liability claim is premised on a theory of direct liability. Pl.'s Mem. in Opp. at 3. In other words, she argues that Lieutenant Canbi and Sergeants DiGennaro and Lalibotte should personally participated in using excessive force. *Ibid.* Ms. Martinez already brings excessive force claims against Lieutenant Canbi and Sergeants DiGennaro and Lalibotte. This claim merely duplicates it. Therefore, I grant their summary judgment. As for Sergeant Pontecorvo, Ms. Martinez has never alleged Sergeant Pontecorvo's "personal involvement" in the assault at all. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).* Accordingly, I grant summary judgment for Sergeant Pontecorvo on this claim as well.

**VII. Defendants' Motion Is Granted in Part on the Failure to Intervene Claims**

*12* [31] [32] [33] Police officers "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).* To hold an officer liable on this theory, a plaintiff must demonstrate that the officer's failure to intervene "permitted fellow officers to violate" the plaintiff's "clearly established statutory or constitutional rights," "and that it was "objectively unreasonable ... to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997).* Moreover, the officer faulted for failing to intervene must have had "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson, 17 F.3d at 557.* A plaintiff may plead direct liability and failure to intervene in the alternative, Fed. R. Civ. P. 8(d) (2), (3); *see, e.g., Bailey v. City of White Plains, No. 14-CV-1806 (VB), 2015 WL 8207492, at *5 (S.D.N.Y. Dec. 7, 2015).* Applying these principles, the individual defendants' motion for summary judgment is granted on plaintiff's failure to intervene claims except as against Lieutenant Canbi, Sergeants Lalibotte and DiGennaro, and Officer Ryan concerning Ms. Martinez's allegations of excessive force and deliberate indifference.

**a. Summary judgment is granted as to failure to intervene claims related to plaintiff's unsuccessful claims.**

[34] [35] Defendants are entitled to summary judgment on the failure to intervene claims linked to allegations of denial of access to courts, illegal search, due-process violation, and supervisory liability. Because a plaintiff may recover on a failure to intervene theory only by showing that the purported

---

failure led to the denial of clearly established statutory or constitutional rights. *Ricciuti, 124 F.3d at 129,* a "failure to intervene claim is contingent upon the disposition of the [underlying] primary claim," *Levy v. City of New York, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013).* Since summary judgment is appropriate for the defendants on these underlying claims, summary judgment is also appropriate on the failure to intervene claims predicated upon these.

**B. Summary judgment is denied in part as to failure to intervene claims tied to Ms. Martinez's surviving claims.**

[36] Ms. Martinez is entitled to proceed on a failure to intervene theory on her surviving constitutional claims for deliberate indifference and excessive force against defendants Canbi, Lalibotte, DiGennaro, and Ryan. In pressing a failure to intervene claim, Ms. Martinez invokes a portion of her Rule 56.1 statement that summarizes the conflicting accounts of the source of Ms. Martinez's injuries and her requests for medical aid. Pl.'s Mem. in Opp. at 13; *see* Pl.'s 56.1 ¶ 8. The conflicting accounts described there raise a genuine dispute of material fact as to whether Lieutenant Canbi, Sergeants Lalibotte and DiGennaro, and Officer Ryan failed to intervene in the use of excessive force or failed to intervene with medical care. Ms. Martinez points to evidence that plaintiff-tied each to Ms. Martinez while she was in custody. Sergeant Lalibotte was reportedly stationed at a desk with a full view of the Juvenile Room where Ms. Martinez was handcuffed. Pl.'s Statement ¶ 8.0. Officer Ryan "checked" on Ms. Martinez seventeen times. *Id.* at ¶ 8.0. Lieutenant Canbi claims he "restrained" Ms. Martinez. *Id.* at ¶¶ 8.0, 80.2. And Sergeant DiGennaro at various points had custody over Ms. Martinez in the Precinct. *Id.* at ¶ 8.4. These accounts, coupled with Ms. Martinez's description of physical abuse by several officers, is sufficient to raise a genuine issue of material fact as to whether some of the officers present injured her or turned a blind eye to a serious medical need, and, if they did, whether others failed to intervene. Accordingly, these two of Ms. Martinez's failure to intervene claims survives against defendants Canbi, Lalibotte, DiGennaro, and Ryan.

Plaintiff does not indicate that she brings failure to intervene claims against Sergeant Pontecorvo or Officer Trotter for deliberate indifference or excessive force. *See* Pl.'s Mem. in Opp. at 3-7. Insofar as plaintiff seeks to bring these claims, I grant summary judgment to these two officers because nothing on the record indicates that they had any "opportunity to intervene." *Anderson, 17 F.3d at 557.*

**C. The City is granted judgment on the pleadings.**

*13* The City moves for judgment on the pleadings "with respect to plaintiff's claims of failure to intervene" against the City. Defs.' Mem. in Supp. at 4. It is unclear from the Second Amended Complaint that plaintiff actually brought this claim against the City. *See* Second Am. Compl. ¶¶ 115-16. And if she did, it is unclear under what theory of liability, since these claims typically apply to individual officers. *See, e.g., O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)* (describing the duty to intervene as one borne by "[a]n law enforcement officer" to intervene on "behalf of a citizen whose constitutional rights are being violated by his presence by other officers."). To put it plainly: if plaintiff did bring this claim, she has abandoned it. In response to defendants' motion for summary judgment, plaintiff specifies that she only brings her failure to intervene claim as an alternative theory of liability for her constitutional claims, and the City is not a defendant on these claims. "[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016)* (internal quotations omitted). Accordingly, I grant the City's motion.

**VIII. Ms. Martinez's IIED and NIED Claims Are Abandoned**

Ms. Martinez has abandoned her IIED and NIED claims. These claims do not appear in her Memorandum in Opposition's list of claims "to be presented to the jury." *See* Pl.'s Mem. in Opp. at 2-3. And plaintiff offers no response to defendants' arguments for dismissal of these claims, save for a single cryptic sentence in a footnote: *Id.* at 13 n.6. I "infer from [her] partial opposition" that Ms. Martinez has "abandoned" this particular claim. *Kovaco, 834 F.3d at 143.* Since Ms. Martinez has not defended the IIED and NIED claims, the motion for summary judgment for the side-dual officers and judgment on the pleadings for the City on these claims is granted.

**IX. Plaintiff Has Not Stated a Claim Under Section 20 of the New York Civil Rights Law**

[37] I do not consider Ms. Martinez's allegation that defendants violated New York Civil Rights Law § 28 by denying her appropriate medical care. This claim is not contained in the complaint. And "[a] plaintiff may not assert a claim for the first time in opposition to a motion for summary judgment." *Flint v. Macy's, Inc., 758 F. App'x 153, 158 (2d*

---

Cir. 2018); *see also Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 843 (2d Cir. 2013); Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006).* Plaintiff "requests that the Court 'reach into equity' " to allow her to pursue this claim. Pl.'s Mem. in Opp. 21. But even assuming that the Court could do so, plaintiff has not justified doing so here. While the City engaged in discovery misconduct at the outset of the case, more than two years have elapsed since the obstruction abated. Ms. Martinez filed her Second Amended Complaint on January 23, 2018, and the defendants did not move for summary judgment until August 14, 2020. *Compare* Second Am. Compl. with Defs.' Notice of Mot. for Summ. J. Ms. Martinez has had ample time to seek to amend her claims further.

[38] In any event, this claim would fail as a matter of law. New York enacted Section 28 on June 15, 2020—more than four years after this litigation began. Absent a clear statement, New York's statutes lack retroactive effect. *Gold v. New York Life Ins. Co., 730 F.3d 137, 143 (2d Cir. 2013)* (citing *Majewski v. Broadalbin-Perth Cent. School Dist., 91 N.Y.2d 577, 584, 673 N.Y.S.2d 966, 696 N.E.2d 978 (1998)).* Section 28 contains no such clear statement. Defendants' motion is granted on plaintiff's failure to intervene claim, except as immediately." 2020 N.Y. Sess. Laws Ch. 103 (S. (6601-B) § 2 (McKinney). Such language typically indicates that the statute should be given prospective effect only. *See Wilson v. Antna Life & Cas. Co., 195 F. Supp. 2d 419, 425 (W.D.N.Y. 2002); see also Durkin v. Shea, 957 F. Supp. 1360, 1374 (S.D.N.Y. 1997)* (collecting cases). Ms. Martinez fails to make any argument for retroactivity, or even to acknowledge the statute's recent enactment. Section 28 is unavailable to redress harms alleged to have occurred in 2016.

**X. Further Sanctions Are Not Appropriate at This Time**

*14* [39] Finally, I decline to grant plaintiff's request for additional sanctions. Courts "generally adhere to prior decisions in subsequent stages of the same case unless cogent and compelling reasons militate otherwise." *Clark v. Trotter*

---

**CONCLUSION**

Defendants' motion for summary judgment and for judgment on the pleadings is granted in part and denied in part. Defendants' motion is granted for the due-process violation, vehicle search, denial of access, deliberate indifference, and supervisory liability claims, and I grant the individual defendants summary judgment for the IIED and NIED claims while also dismissing these claims against the City. Plaintiff's Section 28 claim cannot proceed. Defendants' motion is granted on plaintiff's failure to intervene claim, except as to defendants Lieutenant Canbi, Sergeants Lalibotte and DiGennaro, and Officer Ryan insofar as it serves as an alternative theory of liability for plaintiff's excessive force and deliberate indifference claims. Defendants' motion for summary judgment on Ms. Martinez's assault-and-battery and deliberate indifference claims is denied.

The Clerk of Court is directed to amend the case caption to reflect the dismissal from this action of Sergeant Pontecorvo and Officer Trotter.

SO ORDERED

All Citations

--- F.Supp.3d ----, 2021 WL 4502440

---

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

**2019 WL 1429559**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kevin THURMOND, Plaintiff,
v.
Avion THOMAS-WALSH, Medical Provider;
Frederick Bernstein, Facility Health Services
Director and Nurse Administrator, Defendants.

No. 18-CV-409 (KMK)

|

Signed 01/29/2019

**Attorneys and Law Firms**

Kevin Thurmond, Woodbourne, NY, Pro Se Plaintiff.

Janice Powers, Esq., Office of the New York State Attorney General, White Plains, NY, Counsel for Defendants.

**OPINION & ORDER**

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

*1* Pro se Plaintiff Kevin Thurmond ("Plaintiff"), currently incarcerated at Woodbourne Correctional Facility ("Woodbourne"), filed the instant Complaint ("Complaint"), pursuant to 42 U.S.C. § 1983, against Medical Provider Avion Thomas-Walsh ("Thomas-Walsh"), and Facility Health Services Director and Nurse Administrator Frederick Bernstein, M.D. FHAS ("Dr. Bernstein") (collectively, "Defendants"). [ ] (Compl. (Dkt. No. 2).) Plaintiff alleges that Defendants violated his rights under the First and Eighth Amendments because they were deliberately indifferent to his need for medication for his skin condition, and retaliated against him for filing grievances. (*Id.*) Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Not. of Mot. (Dkt. No. 21).) For the following reasons, Defendants' Motion is granted in part and denied in part.

[ ]
Plaintiff also sometimes refers to Thomas-Walsh as "Nurse Practitioner" or "NP" *See* Plaintiff's Declaration in Opposition to Defendants' Motion

---

to Dismiss. (Pl.'s Decl. in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 13-14 (Dkt. No. 23).)

**I. Background**

**A. Factual Background**

The following facts are taken from Plaintiff's Complaint, (Compl.), and Plaintiff's Opposition to Defendants' Motion to Dismiss, (Pl.'s Decl. in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") (Dkt. No. 23)), both of which include attached exhibits, and are taken as true for the purpose of resolving the instant Motion.

Plaintiff alleges that on December 24, 2012, he started to experience "attacks," during which his skin would "swell up, turn red and sting, and itch uncontrollably." (Compl. 5.) [ ] Plaintiff was prescribed Hydroxyzine Pamoate (or "Vistaril"), the generic form of Vistaril, and he was first prescribed it on December 24, 2013. (*Id.* at 25.) [ ]

[ ]   The Plaintiff's Complaint and Opposition both contain several exhibits and do not have consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

[ ]   The prescription label for Hydroxyzine Pamoate is attached to Plaintiff's Complaint as Exhibit B. (Compl. 25.) Hydroxyzine Pamoate is an antihistamine used to treat itching caused by allergies and "may also be used short-term to treat anxiety." *See* Hydroxyzine Pamoate, WebMD, https://www.webmd.com/drugs/2/drug-7092/hydroxyzine-pamoate-oral/details (last visited Feb. 19, 2019). Hydroxyzine Pamoate is the generic form of Vistaril. *See* Vistaril, RxList, https://www.rxlist.com/search-alld-vistaril/drug-center.htm (last visited Feb. 19, 2019).

On May 21, 2014, Plaintiff was prescribed a new medications Atarax (or Hydroxyzine Hydrochloride). [ ] (Compl. 7, 29.) Plaintiff alleges that Atarax did not work to relieve his symptoms. (*Id.* at 7.) While on Atarax, he continued to have "attacks" and also developed phobias about whether the medical personnel at the facility intended to hurt him. (*Id.*) Plaintiff alleges he took Atarax for three days and continued to have attacks. (Pl.'s Opp'n 4.) Plaintiff alleges it took him five days to be rescheduled to see Thomas-Walsh to let her

knew Atatus was not working at all. When he told her that Atatus was not working she allegedly responded, "No? I'm not giving you anything! [Get out!]" (*Id.*) [6]

[5]    Atatus is an antihistamine used to treat itching caused by allergies and "may also be used short-term to treat anxiety . . ." The generic name of Atatus is Hydroxyzine Hcl. *See* Hydroxyzine Hcl, WebMD, https://www.webmd.com/drugs/2/drug-5681/hydroxyzine-hcl-oral/details (last visited Feb. 19, 2019). Atatus can be used for "symptomatic relief of anxiety and tension associated with psychoneurosis." *See* Atatus, Rxl.ist, https://www.rxlist.com/consumer-drug.htm/description (last visited Feb. 19, 2019).

[6]    Throughout his Opposition, Plaintiff refers to "the defendant" when discussing his primary care provider, specifically the person who wrote the prescription at issue in May 2014 and whom he filed grievances against in February 2014. (*See* Pl.'s Opp'n 2–3.) The Court understands this "defendant" to be Thomas-Walsh, who was Plaintiff's Medical Provider and refers to her specifically in describing Plaintiff's allegations.

**\*2** On May 29, 2014, Plaintiff wrote a letter to Dr. Bernstein, the Facility Health Services Director and Nurse Administrator explaining that Thomas-Walsh had switched him from *Vistaril* to Atatus, that the latter was not working, that he was still having terribly painful attacks, and that Thomas-Walsh refused to switch him back to *Vistaril*. (*Id.* at 15–16.) Plaintiff detailed his anguish at length and alleged that he was afraid for his life because he had previously filed a grievance against Thomas-Walsh related to her taking his white blood cell count without his permission, and that he did not believe that his suffering would end while he was under her care. (*Id.*[7]) Dr. Bernstein responded on June 12, 2014, stating that he had reviewed Plaintiff's medical record and concluded that the "primary care provider prescribed . . . the correct medication." (Compl. 21.) Dr. Bernstein instructed Plaintiff that if the medication he was on was not helpful he should address this concern with his primary care provider, and that he could request an appointment with her during the next block sick call. (*Id.*) Dr. Bernstein also concluded that there was no medical reason to change Plaintiff's primary care provider and denied his request to have his primary care provider changed. (*Id.*)

Plaintiff alleges he was not given any other medications until July 8, 2014, at which time he was given Benadryl. (Compl. 7, 23.) [7] Plaintiff was not sent to a dermatologist until August 5, 2014. (*Id.* at 7.) During his August 5, 2014 appointment with the dermatologist, Plaintiff alleges he was diagnosed with a "severe and extremely painful skin disorder called 'Hives.'" (Pl.'s Opp'n 2.) [8] On August 6, 2014, Thomas-Walsh filled out a consultation request for Plaintiff to see the dermatologist again. (*Id.* at 29.)

[7]    The prescription label for Diphenhydramine ("similar to Benadryl") is attached to Plaintiff's Complaint as Exhibit A. (Compl. 23.)

[8]    Urticaria, or Hives, "is an outbreak of swollen, pale red bumps or plaques [ ]on the skin that appear suddenly—either as a result of the body's reaction to certain allergens, or for unknown reasons . . . Hives cause itching, but may also burn or sting." *See* Hives, WebMD, https://www.webmd.com/skin-problems-and-treatments/guide/hives-urticaria-angioedema#1 (last visited Feb. 19, 2019). Some patients may have acute or chronic urticaria. *Id.*

**\*3** During Plaintiff's follow-up visit with the dermatologist on September 18, 2014, the dermatologist prescribed *Vistaril* again and allegedly told Plaintiff that he should take *Vistaril* for "a year or two or as long as it takes for the Hives attacks to go away completely." (*Id.* at 2.) The dermatologist's September 18, 2014 consultant report confirmed the Hives or "Urticaria" diagnosis. (*Id.* at 29.)

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC") on September 11, 2014. (Compl. 29.) By opinion dated January 14, 2015, CORC accepted Plaintiff's grievance request in part. (*Id.* at 31.) The opinion states that "although no results prescribed for long term use, [Plaintiff] is currently prescribed Vistaril (hydroxyzine pamoate), and Benadryl for itch relief." (*Id.*) The opinion further states that "the grievant is not entitled to be seen by the health care provider of his choice" and that "CORC has not been presented with sufficient evidence of improper medical care, retaliation or malfeasance by staff." (*Id.*)

On October 30, 2017, Plaintiff underwent a mental health screening during which he reported "increased anxiety over

Plaintiff filed a grievance on February 24, 2014, alleging that an HIV test was conducted on him without his consent and requesting a change of provider. (Pl.'s Opp'n 12.) Plaintiff also alleged that the IGRC granted his request for a new provider. The Superintendent concluded that the medical record did not indicate Plaintiff was tested for an impaired immune system and that there was no documentation that the IGRC has found in his favor. (*Id.*) Accordingly, Plaintiff's grievance was denied. (*Id.*) Plaintiff appealed that decision on May 7, 2014, stating that Thomas-Walsh had told him to show her his rash and that he responded that he did not have one. She then asked him if it was hard for him to swallow and he responded that it was not. He also told her that there was no reason to test his immune system other than to see if he was HIV positive. (*Id.*)

On June 2, 2014, Plaintiff wrote a letter to Deputy Superintendent O'Neil to the same effect—stating that Thomas-Walsh had switched his medication in retaliation for his filing a grievance against her for taking his white blood cell count, and that he could not go back to sick call because it would require him to see her again. Plaintiff asked for a new medical provider. (Pl.'s Opp'n 14.)

On June 5, 2014, Plaintiff filed a grievance asking to be prescribed medication for itching. (Compl. 29.) The Superintendent denied his request on September 8, 2014, stating

> The Facility Health Services Director and the grievant's provider previously met with the grievant and explained to him that *Vistaril* . . . is used for psychological purposes and the *Atatus* . . . is used for itching. *Vistaril* is not [to] be used for that purpose long term. The grievant's provider prescribed *Vistaril* once because the grievant reported it helped relieve his itching at that time. The provider informed the grievant that this relief would be short term. The grievant must use *Atatus*.

(*Id.*)

not being able to receive medication," but denied any need for mental health services. (Pl.'s Opp'n 21.) During the screening Plaintiff reported he was taking *Vistaril* and *Zyrtec* for allergies and Hives. The nurse told him *Vistaril* was mental health medication, but Plaintiff "knew that it wasn't, because he had never seen [the] mental health [department]" and he was taking it for his Hives. (*Id.*)

Plaintiff alleges that Defendants allowed him "to go 40[1] days without any medication at all, even though they had knowledge that there was other medication to treat [his] attacks." (Compl. 5.) Plaintiff alleges Defendants denied him the medication that did work to stop his attacks, specifically, *Vistaril*, "in retaliation for [a] grievance filed against them." (*Id.*) Plaintiff claims that his "medication that was intentionally interrupted by [Thomas-Walsh] to cause the plaintiff pain in retaliation for Grievances that were filed on [February 24, 2014] and decided by the Superintendent on [April 7, 2014] prior to the incident, to have [Thomas-Walsh] removed as his medical provider because the defendant was having all kinds of tests taken on the [Plaintiff] without consulting him first." (Pl.'s Opp'n 2.)

Plaintiff alleges that as a result of being denied *Vistaril*, he "suffered serious harm" including further swelling, redness, stinging, and itchiness of his skin, that advanced to the point of his skin bleeding. (Compl. 5.) These attacks impacted all areas of Plaintiff's body and face. (*Id.*)

Plaintiff alleges that the fact that he was prescribed *Vistaril* again in September 2014 by the dermatologist proves that he was not switched off of *Vistaril* for Defendants' stated reason, specifically that it was a psychological purposes. Plaintiff alleges that this reason offered by Defendants was pretextual, that *Vistaril* is not just a psychological drug, and that with respect to him it was used to stop his itching. (Pl.'s Opp'n 6–7.) Plaintiff alleges in the alternative that inasmuch as *Vistaril*

is a psychological drug, then so is *Atatus* because they both "contain[ ] the ingredient Hydroxyzine." (*Id.* at 7.)

**B. Procedural Background**

**\*4** Plaintiff filed his Complaint on January 12, 2018. (Compl.) He was granted in forma pauperis status on January 18, 2018. (Dkt. No. 4.) On January 23, 2018, the Court issued an Order directing service on Defendants. (Order of Service (Dkt. No. 6).) Defendants were properly served. (Dkt. (entries for Jan. 23, 2018); Dkt. No. 7; Letter from Janita L. Powers, Esq. to Court (Apr. 11, 2018) (Dkt. No. 11); Dkt. Nos. 15–16.)

On May 7, 2018, counsel for Defendants submitted a premotion letter to the Court requesting permission to file a Motion To Dismiss. (*See* Letter from Janita L. Powers, Esq. to Court (Dkt. No. 17).) On May 15, 2018, the Court granted Defendants leave to file a Motion To Dismiss and set a motion briefing schedule. (Dkt. No. 18.)

On June 14, 2018, Defendants filed the instant Motion To Dismiss and accompanying papers. (*See* Not. of Mot.; Defs.' Mem. of Law to Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 21).) On July 17, 2018, Plaintiff filed his Opposition to Defendants' Motion to Dismiss. (Pl.'s Opp'n.) Defendants filed their Reply in Further Support of their Motion To Dismiss on July 30, 2018. (*See* Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 24).)

**II. Discussion**

**A. Standard of Review**

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).)

While a plaintiff need not provide "detailed factual allegations" to survive a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). In addition, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Where a court finds allegations that are "no more than conclusions," those allegations "are not entitled to the assumption of truth." *Id.* Although for the purposes of a motion to dismiss a court must accept as true all of the factual allegations contained in a complaint, that tenet "is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & SJ Prod. Rest., Inc.*, 992 F. Supp. 2d 504, 504 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).) Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted).

**\*5** Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, where the Plaintiff is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL

3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Sep. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[ ] either possessed or knew about and upon which they relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

**E. Eighth Amendment Deliberate Indifference Claim**

Defendants argue that Plaintiff fails to state an Eighth Amendment claim because his skin condition was not sufficiently serious and he failed to plausibly allege that the medication was not so unreasonable as to satisfy the objective standard of deliberate indifference. (Defs.' Mem. 1, 4–5; Defs.' Reply 2–7.) Defendants also argue that dispassionate about medication choice and dosage, and post hoc proven ineffectiveness of medication, do not satisfy the subjective standard of deliberate indifference. (Defs.' Mem.1, 5–10; Defs.' Reply 8–10.)

**1. Applicable Law**

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).) A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because it is an allegation that his "conditions of confinement [are] a form of punishment" and thus are a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at \*8 (S.D.N.Y. Mar. 30, 2017).

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted). In other words, "the inmate must show that the conditions, either

alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).) Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious." *Id.* To analyze this latter inquiry, a court examines "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993).). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

**\*6** "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In other words, "[a] medical-treatment claim arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (citation and quotation marks omitted). A defendant is aware of the risk of serious harm when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, at 837. Neither does "mere disagreements over the proper treatment . . . create a

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

### 2. Application

#### a. Objective Prong

"A skin rash is reasonably insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference claim." *Purdie v. City of New York,* No. 10-CV-5802, 2011 WL 1044133, at *5–6 (S.D.N.Y. Mar. 15, 2011) (dismissing deliberate indifference claim where plaintiff alleged "only a 'bad itch' on his penis and arms" (citing inter alia *Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir. 2009) (per curiam) ); *see also Cooper v. Orange County,* No. 15-CV-10575, 2017 WL 3309754, at *5 (S.D.N.Y. Aug. 2, 2017) (holding that the plaintiff failed to allege his skin rash was sufficiently serious when "the only stated symptoms of which were an undescribed level and duration of pain, and eventually scarring," and where the plaintiff did "not allege that the rash caused him to suffer chronic and substantial pain or that it significantly affected his daily activities"), *appeal dismissed,* No. 17-2815, 2018 WL 1276746 (2d Cir. Jan 24, 2018); *Myers v. Kaskiw,* No. 12-CV-910, 2014 WL 4184752, at *10 (N.D.N.Y Aug. 21, 2014) (holding that the plaintiff's skin rash and eczema were not sufficiently serious medical conditions to meet the objective element of the deliberate indifference standard); *Melendez v. Costello,* No. 12-CV-6226, 2013 WL 5937053, at *3 (W.D.N.Y. Nov. 1, 2013) (holding that the "[p]laintiff cannot establish the 'serious medical need' component of a deliberate indifference claim based on his eczema" (citing *Sledge,* 564 F.3d at 107) ); *Green's Coat Office Review Comm.,* No. 06-CV-6132, 2011 WL 1155596, at *13 & n.5 (W.D.N.Y. Apr. 9, 2012) (holding that the plaintiff failed to demonstrate that his skin condition, Pseudofolliculitis Barbae, "a facial skin condition that occurs when hair follicles curve back into the skin [and] become inflamed," was sufficiently serious); *Swindell v. Supple,* No. 02-CV-3182, 2005 WL 267723, at *7 (S.D.N.Y. Feb. 3, 2005) (holding that a "skin condition ... producing excessive itching, scratching, soreness from scratching, and cracked skin" on the plaintiff's arms, legs, and torso, and bleeding on the legs, was not a condition of "an urgent and substantially painful nature as would satisfy the" seriousness of deprivation requirement (citation omitted) ); *Samuels v. Jackson,* No. 97-

[footnote marker] *Cooper,* 2017 WL 3309754 at *5 (dismissing inmate the plaintiff's deliberate indifference claim related to his skin rash to receiving treatment for his skin rash because during the alleged delay the defendant had "repeatedly titrated [the] plaintiff for his complained-of condition"). [footnote]

[9] The Court is aware of only one case in the Second Circuit in which a plaintiff successfully stated an Eighth Amendment deliberate indifference claim based on a skin condition. In *Gonzalez v. Correctional Management Health Care,* 13-CV-1402, 2018 WL 5817004 (D. Conn. Nov. 6, 2018), the plaintiff was treated by a prison doctor for "painful tingling, itching, and burning skin with various creams/ointments and oral medications" from 2012 to June 2016. *Id.* at *7. In early 2016, after taking an oral medication for nine months, the plaintiff reported to his doctor that the medication was not alleviating his symptoms. At that time, the doctor did not prescribe new treatment for the skin condition but instead ordered other testing related to the plaintiff's liver. *Id.* In February 2015, the doctor finally prescribed a new drug that alleviated the plaintiff's skin symptoms. Subsequently, the doctor repeatedly adjusted the dosage of the new drug to try and optimize its effectiveness. The court concluded that the plaintiff alleged a plausible claim that the doctor was deliberately indifferent to his "painful and itchy skin condition[s]" with respect to the period from early 2014 to February 2015, during which the plaintiff had no effective medication, but not with respect to the periods before and after because during those periods the doctor prescribed various ointments and oral medications to try and alleviate the plaintiff's symptoms. *Id.* at *8. The *Gonzalez* court, however, did not consider the threshold question of whether a skin rash is a serious medical condition, or whether the delay or interruption in treatment was serious enough to satisfy the objective requirement of a deliberate indifference claim, nor the line of cases addressing skin conditions in the medical deliberate indifference context in which this Court cites above. In my event, the post-long delay in providing treatment to the plaintiff in *Gonzalez,* is easily distinguishable from the seven-week interruption in treatment to the patient-care during which Plaintiff allegedly had no medication.

[footnote] *47* Here, Plaintiff alleges an interruption of treatment. From December 24, 2013, to May 21, 2014, Plaintiff took Vistaril, which effectively treated his "attacks." (Compl. 7, 25.) Then, starting on May 21, 2014, Thomas-Walsh prescribed him Atarax, which did not relieve his symptoms, so that Plaintiff continued to experience his painful symptoms. (Compl. 7, 29.) Plaintiff took Atarax for three days but continued to have attacks, and reported this to Thomas-Walsh eight days later at a follow-up appointment. She allegedly responded, "No! I'm not giving you anything! [G]et out!" (Pl.'s Opp'n 4.) Plaintiff was not given any other medications until July 8, 2014, at which time he was given Benadryl. (Compl. 7, 23.) During Plaintiff's follow-up visit with the dermatologist on September 18, 2014, the dermatologist prescribed Vistaril again. (Pl.'s Opp'n 2.)

The Court is sympathetic to Plaintiff's contention that he was in serious pain. However, a skin rash or condition, even one that involves bleeding and scarring, is not a medical condition that gives rise to an Eighth Amendment deliberate indifference claim, even where there are delays in treatment. *See Myers,* 2014 WL 4184752, at *10 (holding that the plaintiff's skin rash and eczema were not sufficiently serious medical conditions to meet the objective element of the deliberate indifference standard); *Swindell,* 2005 WL 267723 at *7 (holding that a "skin condition ... producing excessive itching, scratching, soreness from scratching, and cracked skin" on the plaintiff's arms, legs, and torso, and bleeding on the legs, was not a condition of "an urgent and substantially painful nature as would satisfy the" seriousness of deprivation requirement); *Samuels,* 1999 WL 976517, at *5 (dismissing the inmate's deliberate indifference claim related to his delay in effective treatment for scabies because, even though the "plaintiff's condition was initially misdiagnosed and for two medications initially prescribed appear not to have worked," such allegations "establish nothing more than ordinary negligence"); *see also*

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

*CV-2430, 1999 WL 92617, at *3–5 (S.D.N.Y. Feb. 22, 1999) (holding that inmate's various skin conditions of "papules, vesicles, pustules, burrows, and intense itching" causing "constant scratching of the affected areas, causing open sores, and abrasions" and "permanent scars" did not constitute a sufficiently serious medical condition (alteration omitted) ).*

However, "if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Solataolahe,* 467 F.3d at 280 (citation and quotation marks omitted); *see also Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003) (noting that the "seriousness of a delay in medical treatment may be decided by reference to the effect of delay in treatment ... [c]onsequently, delay in medical treatment must be integrated in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay" (citation and quotation marks omitted) ). "When temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai,* No. 11-CV-6181, 2013 WL 2865474, at *4 (S.D.N.Y. July 12, 2012). For example, in *Smith,* an HIV positive inmate alleged that prison defendants deprived him of HIV medication on two occasions, first for seven days then for five days, despite his repeated requests for medication. *See* 316 F.3d at 181. The Second Circuit concluded that in assessing the seriousness of the plaintiff's medical condition, it was appropriate to consider that the plaintiff failed to present any evidence "that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health" and whether the plaintiff had been "exposed to an unreasonable risk of future harm due to the periods of missed HIV medication." *Id.* at 188-89. With respect to delays in providing treatment for serious skin conditions, courts in the Second Circuit have rarely held that a "[p]laintiff's discomfort during [a] period of misdiagnosis and his resulting scars" satisfy the objective requirement of a deliberate indifference claim. *Samuels,* 1999 WL 92617, at *5 (dismissing the inmate's deliberate indifference claim related to his delay in effective treatment for scabies because, even though the "plaintiff's condition was initially misdiagnosed and for two medications initially prescribed appear not to have worked," such allegations "establish nothing more than ordinary negligence"), *see also*

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

Cir. 2013) (citation, alteration, and quotation marks omitted); *see also Rushington v. Chabsky,* No. 10-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same) ("[b]ecause virtually an adverse action failure against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has required courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted; *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted).

#### 2. Application to Thomas-Walsh

##### a. Protected Speech

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Dawson,* No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citations omitted); *see also Dolan,* 794 F.3d at 294 ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." (citation and quotation marks omitted) ); *Houston v. Goe Gov.* 588 F. Supp. 2d 172, 174 (W.D.N.Y. 2009) ("The filing of lawsuits or prison grievances is a constitutionally protected activity." (citing *Graham,* 89 F.3d at 80) ); *Bumbardie v. Bhol,* 724 F. Supp. 2d 723, 731 (S.D.N.Y. 2007), casting that a "prisoner's filing of a grievance" and "the filing of a lawsuit" are "constitutionally protected activit[ies]" (citations omitted) ). Here, Plaintiff filed a grievance on February 24, 2014 alleging that Thomas-Walsh conducted an HIV test on him without his consent and reporting a change of provider. (Pl.'s Opp'n 12.) When his grievance was denied, Plaintiff appealed this decision on May 7, 2014. (*Id.*) Plaintiff alleges that Thomas-Walsh intentionally interrupted his use of Vistaril, which alleviated his symptoms, "to cause [him] pain in retaliation for [a]low moves that were filed on February 24, 2014[.]" (*Id.* at 2.) Plaintiff thus engaged in protected activity

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

months passed, Plaintiff was seen by Thomas-Walsh and the dermatologist on a number of occasions. (Compl. 7, 23, 25, 27; Pl.'s Opp'n 2, 4–5, 29.) *Cf. Hathaway v. Coughlin,* 37 F.3d at 66, *see also Hill v. Curtin,* 677 F.3d 116, 123 (2d Cir. 2011) (holding that an inmate failed to state a claim for deliberate indifference when he alleged that strongest pain medication was necessary to treat his medical condition); *Idris v. New York,* 339 F. Supp. 2d 935, 525 (S.D.N.Y 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." (citations omitted) ), *aff'd,* 176 F. App'x 79 (2d Cir. 2006). Here, there was disagreement among Plaintiff's doctors as to what the correct medication for Plaintiff was. That Atarax turned out to be ineffective and that Vistaril was ultimately prescribed for Plaintiff for his skin condition does not give rise to an Eighth Amendment claim. *See Hill,* 657 F.3d at 123; *see also Idris,* 339 F. Supp. 2d at 525. *Cf.* (*Id.* at 2) ("As for misdiagnosis, without more, allegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." (citation, alteration and internal quotation marks omitted) ); *Rennalls v. Alcala Sheeg,* No. 03-CV-4042, 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) ("While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, no claim is stated where a doctor disagrees with the professional judgment of another doctor." (citation and quotation marks omitted) ).

Plaintiff's conclusory allegation that Thomas-Walsh intended to hurt him by prescribing what Plaintiff describes as a "weaker medication," (Pl.'s Opp'n 5), does not amount to her having disregarded an "excessive risk to [Plaintiff's] health or safety," *Hathaway,* 37 F.3d at 66; *see also Evans v. Albany Cty. Corr. Facility,* No. 05-CV-1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (noting that "a showing of deliberate indifference requires more than just vague and conclusory allegations" (citation and quotation marks omitted) ). Plaintiff does not allege what "excessive risk" to his health and safety Thomas-Walsh and Dr. Bernstein were aware of and disregarded. Instead, Plaintiff alleges that Thomas-Walsh and Dr. Bernstein were aware that his skin rash, and that skin rash itch medication or prescribe him after. After all, Plaintiff does not allege that Thomas-Walsh denied him medicine of any kind. Plaintiff's conclusory

allegations thus do not plausibly allege that Thomas-Walsh and Dr. Bernstein were deliberately indifferent to his medical condition. Plaintiff's Complaint in fact recounts the numerous medical appointments Plaintiff had with Thomas-Walsh and the dermatologist related to his skin condition during the period in question, and the treatment he received during those appointments. (Compl. 7, 23, 25, 29; Pl.'s Opp'n 2, 29.) Thomas-Walsh prescribed Plaintiff Vistaril in December 2013, (*id.* at 7, 25), Atarax in May 2014, (*id.* at 7, 29), Benadryl in July 2014, (Compl. 23), and referred him to the dermatologist in August 2014. (Pl.'s Opp'n 29). The dermatologist ultimately placed him back on Vistaril in September 2014. (*Id.* at 2.) Simply put, Plaintiff's medical needs were not ignored. Therefore, Plaintiff's Eighth Amendment claim is dismissed as to Thomas-Walsh and Dr. Bernstein.

#### C. First Amendment Retaliation Claim

*19* Construing the Complaint liberally, as this Court must, Plaintiff states a claim for retaliation. Plaintiff alleges that Defendants denied him Vistaril, the medication that was effective in treating his hives, "in retaliation for [g]rievances filed against them." (Compl. 5), and claims that Thomas-Walsh intentionally prescribed Atarax "knowing it was not strong enough" to treat his hives in retaliation for his filing grievances against her in February 2014. (Pl.'s Opp'n 5.) Defendants argue that "[t]here is no retaliation where the inmate is able to file grievances and lawsuits" and that any "alleged adverse action [Defendants took] did not have an actual deterrent effect on [Plaintiff's] exercise of his First Amendment rights," because Plaintiff was able to file grievances and this lawsuit after the allegedly retaliatory conduct. (Defs.' Reply 10.)

##### 1. Applicable Law

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Burlies v. Vadim,* No. 95-CV-10161, 1997 WL 1269256, at *8 (S.D.N.Y. May 16, 2006) (citing *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir 2002). To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that ... [D]efendant took adverse action against ... [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord,* 758 F.3d 215, 225 (2d

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

### b. Adverse Action

*10* An adverse action in any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff ... himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 353–54 (citation omitted).

"[I]t is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (citation omitted); *see also Artigas v. Gage*, No. 16-CV-4628, 2018 WL 1750320, at *10 (S.D.N.Y. April 6, 2018) (holding that the plaintiff's numerous allegations that prison doctor interfered with his medical passes, outright denied his requests for treatment recommended by another doctor, and denied him any treatment while forcing him to wait at sick call over a week for two months, were sufficient to state an adverse action); *Davis*, 320 F.3d at 353 (reversing dismissal of a retaliation claim because denial of medically prescribed high fiber diet and delay in scheduling medical appointments could constitute an adverse action).

Defendants cite *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), to argue that there was no retaliation here because Plaintiff was able to file further grievances and this lawsuit after the allegedly retaliatory conduct occurred. Defendants represent Gill as a case in which the First Amendment retaliation claim was ultimately unsuccessful because the plaintiff was not himself deterred from filing further grievances. (Defs.' Reply 10.) This is a curious position because in *Gill*, the Second Circuit actually vacated the district court's dismissal of Plaintiff's First Amendment retaliation claim. *Gill*, 389 F.3d at 384. The Court explained that although "subjective chilling is a general requirement, where a plaintiff alleges that his protected conduct at issue is the prior filing of a grievance or lawsuit against the defendant,

it would be unfair to the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* at 383. Thus, it is not dispositive that Plaintiff here was able to file further grievances even after the alleged adverse action of switching his medication was taken.

Contrary to Defendants' argument, in evaluating Plaintiff's retaliation claim, the Court asks whether the denial of medication that allegedly occurred would "deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton*, 664 F. Supp. 2d at 367. Plaintiff alleges that from May 21, 2014, when Thomas-Walsh prescribed him Atarax, until he was given Toradol on July 8, 2014, (Compl. 7, 23), for seven weeks, he was without any medication at all. Ultimately, Plaintiff was without Vistaril between May 21 and September 18, 2014. (Pl.'s Opp'n 2.) During this time, Plaintiff alleges he was in excruciating pain. According to Plaintiff, his medication was withheld and delayed in retaliation for filing a grievance against Thomas-Walsh. (*Id.* at 2, 12.) The Court concludes that withholding effective medication for seven weeks in retaliation for filing a grievance constitutes an adverse action under the circumstances Plaintiff alleges. *See Olutosin v. Lee*, No. 14-CV-685, 2016 WL 2899273, *10 n.5 (S.D.N.Y. May 16, 2016) (denying motion to dismiss First Amendment retaliation claim where one of the alleged adverse actions was defer to providing mental care for his injured eye after a fight and stating "general allegations of denial of medical care are sufficient to allege an adverse action"); *Walker v. Schriro*, No. 11-CV-9299, 2013 WL 1234999, at *9 (S.D.N.Y. Mar. 26, 2013) (stating that "[d]enial of medical care could constitute an adverse action in prison context and retaliation for filing grievances could state a claim"); *Davis v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ); *Williams v. Fisher*, No. 02-CV-4558, 2003 WL 22170419, at *10–11 (S.D.N.Y. Sept. 10, 2003) ("Allegations that [a prison doctor] revoked Plaintiff's necessary medical rehabilitative treatment because he filed a grievance are sufficient to satisfy the second element of a retaliation claim [for the purposes of a motion to dismiss].").

*11* Cases in which courts in the Second Circuit have found the denial of medical treatment is not amount to an adverse action have involved de minimis injuries or denials of medication—for example, one missed dose of medication, or minor delays in receipt of medication. *See, e.g., Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326–27 (W.D.N.Y. 2007) (holding that ordering allegedly retaliatory urine test was not

an adverse action where plaintiff failed to allege that test was not administered for legitimate purpose and because urine tests are a fact of prison life and taking one test would not chill a prisoner of ordinary firmness); *Donohue v. Bartholomew*, 450 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (holding that inmate's refusal to administer prisoner a single dose of an over-the-counter pain reliever was de minimis, where prisoner had received his medication a few hours after he was admitted to infirmary and began receiving his regularly prescribed medication the next day, and which subsequently resulted in no serious or lasting harm to him). An alleged seven-week delay in receiving any effective medication, during which an inmate is allegedly in severe pain and bleeding, is not de minimis and indeed amounts to an adverse action.

### c. Causal Connection

The third prong requires a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts*, No. 08-CV-7778, 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009); *see also Davis*, 239 F.3d at 492 (holding that in order to satisfy the causation requirement, allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted) ). A plaintiff must allege facts suggesting that the protected conduct was a "'substantial or motivating factor' in the prison officials' decision to take action against [him]." *Smith v. Christopher*, No. 06-CV-1196, 2008 WL 4283519, at *10 (N.D.N.Y. Sept. 18, 2008) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ). "The element of intent [in a First Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct [was motivated by or substantially caused by [Plaintiff's] exercise of free speech." *Van Dunk v. Brower*, No. 11-CV-4524, 2013 WL 5970172, at *8 (S.D.N.Y. Nov. 7, 2013) (internally quoting *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) ); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 373 (S.D.N.Y. 2011) (same); *see also Washington v. Afify*, 681 F. App'x. 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confiscated him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him). *Finn v. Graham*, No. 15-CV-4339, 2018 WL 3399331, at *9 (S.D.N.Y. 14, 2018) (denying summary judgment motion where there was evidence the correction officer made comments to plaintiff that could be interpreted as threatening before issuing him

an allegedly false misbehavior report), *adopted by* 2018 WL 3399340 (N.D.N.Y. Mar. 19, 2018).

Circumstantial facts indicating a retaliatory motive include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir. 1995) ). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Here, Plaintiff filed a grievance against Thomas-Walsh on February 24, 2014 and appealed the denial of that grievance on May 7, 2014. (Pl.'s Opp'n 12.) On May 21, 2014, he was switched off of the medication that he alleges had effectively treated his "attacks" since December 24, 2013. (Compl. 7, 25.) This three-month gap between the protected speech and the alleged adverse action alone plausibly established an inference of causal connection. *See Espinal*, 558 F.3d at 129 (finding that a six-month gap between the protected conduct and adverse action were sufficient to support an inference of causal connection. Additionally, by opinion dated January 14, 2015, CORC accepted Plaintiff's grievance request in part, noting with approval that "although was usually prescribed for long term use, [Plaintiff] is currently prescribed Vistaril (by deputy into pressure), and Robaxin [ for itch relief." (Compl. 31.) Thus, Plaintiff's allegations that he needed Vistaril was arguably "vindicated at a hearing on the matter." *Burton*, 664 F. Supp. 2d at 368 (quotation marks omitted). Plaintiff alleges that Thomas-Walsh intentionally interrupted his medication to hurt him, knowing Atarax was not curing enough to alleviate his severe symptoms, because he filed a grievance against her related to the HIV testing and asked for a new medical provider. (*Id.* at 2, 9.) Taken together, Plaintiff's allegations about the timing of the change in prescription, CORC's ultimate finding, and Thomas-Walsh's words and

conduct, plausibly allege a causal connection between the February 24, 2014 grievance and the denial of medication to Plaintiff for seven weeks. *See Artigas*, 2018 WL 1750320 at *10 (holding that plaintiff showed a causal connection where he alleged that within a week of filing a grievance against the prison doctor, that same doctor issued him a limited medical pass for only a cane, excluding other prescribed aids recommended by another doctor, where that prison doctor had previously just signed plaintiff's pass without alteration); *Burton*, 664 F. Supp. 2d at 367–68 (concluding inmate stated a prima facie case of retaliation under the First Amendment where inmate alleged prison doctor retaliated against him for filing a grievance by denying him medical evaluation, treatment, and adequate pain medication, where all levels of the inmate grievance process determined that doctor had treated plaintiff's grievance as legitimate, and when doctor failed to direct a resolution which was later determined to require surgery on prisoner's elbow). Plaintiff therefore plausibly alleges a First Amendment retaliation claim against Thomas-Walsh and Defendants' Motion To Dismiss with respect to this claim against Thomas-Walsh is denied.

The Court is aware that some courts in the Second Circuit have concluded that there can be no retaliation where there is no deliberate indifference. *See, e.g., Cole v. Levitt*, No. 07-CV-767, 2009 WL 4573028, at *10 (W.D.N.Y. Dec. 4, 2009) (stating that we would prevail on retaliation claim where there was no evidence of medical deliberate indifference); *Tatta v. Bright*, 646 F. Supp. 2d 308, 320 (S.D.N.Y. 2007) (dismissing plaintiff's claim that he was denied adequate medical care in retaliation for filing grievances where plaintiff failed to establish the denial of adequate medical care). However, these courts did not expressly consider that the standards for what amounts to an instance of deliberate indifference under the Eighth Amendment and what constitutes an adverse action under the First Amendment are different. This Court is persuaded by the reasoning in *Olutosin*, 2016 WL 2899273, where the court considered the separate Eighth and First Amendment standards, and concluded that, "[t]hough the Court previously concluded that [p]laintiff failed to state a claim for deliberate indifference ... general allegations of denial of medical care are sufficient to allege an adverse action." *Id.* at *10 n.5. Thus, although the Court

here concludes that Plaintiff has failed to allege an Eighth Amendment deliberate indifference claim, it nonetheless concludes that Plaintiff has alleged an adverse action in the withholding of medical treatment as part of a First Amendment retaliation claim.

### 3. Dr. Bernstein

#### a. Supervisory Liability

*12* A supervisory official cannot be held liable in a § 1983 action based on respondeat superior. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003); *see also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each [g]overnment official has violated the Constitution through the official's own individual actions." Thus, "the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue"). "Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates," he cannot be liable under [§] 1983." *Hernandez*, 341 F.3d at 144 -45 (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 11-CV-1317, 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (noting that a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim" (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) ) ). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Moreover, " 'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the

defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873 (citation omitted).

Some courts have questioned the continuing applicability of these factors based upon the heightened pleading requirements set forth in *Iqbal*. *See, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (holding that "[o]nly the first and third parts of the *Colon* categories pass *Iqbal*'s muster"), *aff'd*, 387 F. App'x 55 (2d Cir. 2010). However, the Second Circuit has not yet ruled on the issue. *See Carpenter v. Apple*, No. 15-CV-1269, 2017 WL 3887998, at *9 (N.D.N.Y. Sept. 5, 2017) (citing *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ) ("We have not yet determined the contours of the supervisory liability test ... after [*Iqbal*].") (collecting cases). Notwithstanding the Second Circuit's silence, the majority of courts considering the issue have determined that "even after the U.S. Supreme Court's decision in *Iqbal*, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.' " *Hernandez v. Goord*, No. 01-CV-9585, 2013 WL 2355446, at *7 (S.D.N.Y. May 29, 2013) (citations and quotation marks omitted); *see also Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories 'still control[ ] with respect to claims that do not require a showing of discriminatory intent' *post-Iqbal*); *Manning v. Griffin*, No. 15-CV-3, 2016 WL 1274588, at *12 (S.D.N.Y. Mar. 31, 2016) (holding that the *Colon* factors 'remain relevant' only to the extent that the factor at issue is consistent with the requirements applicable to the relevant constitutional provision). This Court finds that distinction persuasive. "A supervisory defendant, specific response to a plaintiff's complaint suggests that the supervisor has considered the plaintiff's allegations and evaluated possible responses ... A pro forma response suggests nothing like that." *Nunez v. Fischer*, 893 F. Supp. 2d 423, 439–31 (S.D.N.Y. 2010) (holding that the plaintiff's

#### b. Application

Dr. Bernstein was the Facility Health Services Director and Nurse Administrator (Compl. 5.)[11] Plaintiff's sole allegation with respect to Dr. Bernstein is that Plaintiff wrote him a letter on May 29, 2014 explaining at great detail that Thomas-Walsh had switched him from Vistaril to Atarax, that the latter was not working, that he was still having terribly painful attacks, that Thomas-Walsh refused to switch him back to Vistaril, and that Plaintiff was afraid for his life because he believed Thomas-Walsh was retaliating against him because of a grievance he filed against her. (Pl.'s Opp'n 15–16.) Plaintiff attached a copy of this letter to his Opposition on June 12, 2014, stating that he had reviewed Plaintiff's medical record and concluded that Thomas-Walsh prescribed the correct medication and instructed Plaintiff to further consult with Thomas-Walsh if the medication continued to not be effective. (Compl. 21.) Dr. Bernstein also denied Plaintiff's request, in his response letter dated September 8, 2014 to report that Thomas-Walsh and Dr. Bernstein together explained to Plaintiff that Vistaril was not appropriate for long-term use. (Compl. 29.)

[1]       Plaintiff does not expressly allege that Dr. Bernstein was Thomas-Walsh's supervisor, but reading Plaintiff's Complaint liberally, and taking the fact that Dr. Bernstein responded to Plaintiff's letter into consideration. (Compl. 21.) the Court considers Plaintiff's Complaint to allege that Dr. Bernstein was Thomas-Walsh's supervisor.

Courts in the Second Circuit are divided on whether a supervisor's 'review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act.' *Burton*, 664 F. Supp. 2d at 360 (citation omitted). Judge Seibel noted in *Burton* that some courts distinguish between the 'denial of response to an inmate's grievance—for example, however summarily disposed—from a situation where a supervisor 'reviews and responds to a prisoner's grievance' and by doing so it is a desired response that specifically addresses the plaintiff's allegations and evaluated possible responses. ... A pro forma response suggests nothing like that.' *Nunez v. Fischer*, 893 F. Supp. 2d 423, 439–31 (S.D.N.Y. 2010) (holding that the plaintiff's

Thurmond v. Thomas-Walsh, Not Reported in Fed. Supp. (2019)
2019 WL 1429559

allegations that defendant received his letters. Defendant chose to subordinates for investigation, and sent the plaintiff a response that he provided insufficient information to support his allegations "prove only the scantest awareness of [the plaintiff's] claims" and failed to allege personal involvement (citation omitted.); *see also Kitt v. Senor,* No. 11-CV-438, 2011 WL 147053, at *7 (W.D.N.Y. Jan. 30, 2014) (declining to impose supervisory liability on a mere administrator to whom the plaintiff had sent a letter complaining about intentional interference with his pain medication and who responded to the plaintiff that he was "scheduled to see a medical clinician to assess [his] medical concerns" because the mere administrator's "generalized response to [the] plaintiff's complaint [was] not sufficient to establish personal involvement"); *Bowens v. Fischer,* No. 11-CV-4617, 2012 WL 4044991, at *5-6 (S.D.N.Y. Aug. 28, 2012), *adopted by* 2012 WL 6681695 (S.D.N.Y. Dec. 17, 2012) (holding that a *pro forma* letter sent to the plaintiff in response to his complaint did not allege sufficient facts to establish personal involvement).[12]

[12]
It appears that even before *Iqbal's* prohibition on the imposition of vicarious liability in § 1983 cases, courts in the Second Circuit declined to impose supervisory liability where a plaintiff made the conclusory allegation that he sent a letter to a prison supervisor alleging a deprivation of a right, but failed to allege sufficient further facts about the contents of the letter or the supervisor's response. *See, e.g., Applegate v. Alamo,* No. 02-CV-276, 2008 WL 2725687, *18 (S.D.N.Y. July 10, 2008) (holding that letter written to superintendent, without response, was insufficient to find personal involvement or awareness on behalf of superintendent); *Smoller v. Goord,* No. 98-CV-3614, 2002 WL 523371, *86 (S.D.N.Y. Mar. 29, 2002) (holding that letters sent to commissioner, where letters were delegated to other prison officials, were insufficient to establish supervisory liability).

*14 Drawing all reasonable inferences in favor of Plaintiff and reading his Complaint liberally, the Court concludes this taken together, Plaintiff's detailed letter to Dr. Bernstein, and Dr. Bernstein's response, plausibly suggest that Dr. Bernstein "considered ... [P]laintiff's allegations and evaluated possible

responses." *Matos, 692 F. Supp. 3d at 439-31*, and that Dr. Bernstein's letter was not just a *pro forma* response; *see Barraught v. Petter,* 158 F. Supp. 3d 387, 211-22 (S.D.N.Y. 2015) (imposing supervisory liability on a defendant the plaintiff sent a letter detailing the alleged retaliatory conduct where he attached a copy of the letter to his complaint, but declining to impose supervisory liability on the defendant that the plaintiff alleged responded to his complaint letter but failed to provide "any specific facts related to this alleged response"). Therefore, Plaintiff has plausibly alleged personal involvement by Dr. Bernstein and Defendants' Motion To Dismiss with respect to Plaintiff's First Amendment retaliation claim against Dr. Bernstein is denied.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Dismiss with respect to Plaintiff's Eighth Amendment medical deliberate indifference claim, and denies the Motion with respect to Plaintiff's First Amendment retaliation claim. In light of Plaintiff's *pro se* status, and because this is the first adjudication of Plaintiff's claims, his Eighth Amendment claim is dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion and Order. Failure to do so will result in the dismissal of this claim with prejudice. Plaintiff is advised that the amended complaint will replace, not supplement, the earlier complaint. The amended complaint must contain all of the claims against all Defendants. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda.

The Clerk of Court is respectfully direct to terminate the pending Motion, (*see* Dkt. No. 21) and mail a copy of this Opinion and Order to the Plaintiff.

SO ORDERED.

All Citations

Not Reported in Fed. Supp., 2019 WL 1429559

---

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6231799

2013 WL 6231799
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Frank MADERA, Plaintiff,
v.
Dr. Ellen EZEKWE, Dr. Ellen Gomprecht, Dr. Christina Montalbano, physicians for the New York State Department of Correctional Services, Dr. Lester Wright, Deputy Commissioner for Health Care Services for the New York State Department of Correctional Services, and Dennis Breslin, Superintendent of the Arthur Kill Correctional Facility, Defendants.

No. 11 CV 4459(RJD)(LB).
|
Dec. 2, 2013.

### Attorneys and Law Firms

Gregory Charles Farrell, Leanet Anchor, Robert Dennis Frinkleman, Vito E. Hayes, Hughes Hubbard and Reed LLP, New York, NY, for Plaintiff.

Job Hutton, State of New York, New York, NY, for Defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

*1 In this Section 1983 lawsuit, plaintiff Frank Madera—who was imprisoned at the Arthur Kill Correctional Facility ("Arthur Kill") on Staten Island from October 2008 to November 2013—sues officials of the New York State Department of Correctional Services ("DOCS"), including three treating physicians, for violating his Eighth Amendment right to adequate medical care. The Eighth Amendment violations are premised on delays, amounting to roughly two years, in a series of eye surgeries recommended by outside physicians. The defendants move for summary judgment.[1]

[1]
Madera cross-moves for summary judgment as to the defendants' affirmative defenses. The Court denies Madera's motion without prejudice to the

arguments raised therein, at least to the extent that they are not otherwise addressed in this decision. However, the Court cites Madera's Rule 56.1 statement in support of this motion and the defendants' counter-statement thereto, where necessary to supplement the record.

This is a close case, for defendants Dr. Felix Ezekwe and Dr. Ellen Gomprecht, both of whom served at various points as Madera's primary treating physicians at Arthur Kill. For the reasons set forth below—and particularly because the Court is required to draw all reasonable inferences in favor of the plaintiff—they are denied summary judgment. Summary judgment is granted, however, to defendants Dennis Breslin (Superintendent of Arthur Kill), Dr. Lester Wright (Deputy Commissioner and Chief Medical Officer of DOCS), and Dr. Christina Montalbano (Facility Health Services Director at Arthur Kill from August 2008 to November 2009 and one of Madera's treating physicians).

### BACKGROUND

The facts are drawn from the parties' Rule 56.1 statements and from the voluminous discovery materials proffered in support of these statements. Most of the facts are not in dispute: the central question, rather, is whether they can be read to suggest that the defendants were deliberately indifferent to Madera's medical problems. For the purposes of the summary motion, all references are drawn in his favor. The attached chronology sets forth some of the salient dates.

Madera arrived at Arthur Kill in March 2008. Def. R. 56.1 ¶ 1. In early April, he was evaluated by an optometrist who assessed the vision in his right eye at 20/40 and the vision in his left eye at 20/70. He was given prescription glasses to improve his vision. *Id.* ¶ 2.

Dr. Christina Montalbano was Madera's treating physician at Arthur Kill in late 2008. Montalbano Decl. at 2. In light of Madera's Type 2 diabetes—a condition that he had suffered since 1980, *see* Def. R. 56.1 ¶¶ 3-4, and which can lead to diabetic retinopathy and blindness-Dr. Montalbano recommended on September 12, 2008 that Madera be evaluated by an ophthalmologist. Montalbano Decl. at 3. At that time, and at all times relevant to this case, requests for referrals to outside physicians from DOCS physicians were reviewed for medical necessity by a company called

---

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6231799

APS Healthcare, Inc ("APS"). *Id.*, Farrell Opp. Decl. Ex. N. If APS preliminarily denied the request for referral, the request was then reviewed by the DOCS Regional Medical Director, who made the final decision as to whether the referral should be authorized. Montalbano Decl. at 3; Farrell Opp. Decl. Ex. N. APS and the DOCS Regional Medical Director denied Dr. Montalbano's September 2008 request because Madera had been examined for the optometrist in April 2008, approximately five months earlier. Montalbano Decl. at 3.

*2 In August 2008, Dr. Montalbano became the Facility Health Services Director for Arthur Kill. Pl. R. 56.1 ¶ 3. DOCS policy documents state that the Facility Health Services Director is the "health professional supervisor to the entire health unit staff and is "responsible for all medical aspects of health care delivery," including ensuring that "requests for consultation are reviewed and adequate specialty care services are provided in accordance with medical need." *Id.* 56.1 ¶¶ 14-16. According to Dr. Montalbano, this position "mainly entailed additional administrative responsibilities such as overseeing scheduling, dealing with grievances (when not handled by the Nurse Administrator) and attending Executive Team meetings, and generally did not involve additional patient-care responsibilities such as being involved with every referral sought by the physicians at the facility." Montalbano Decl. ¶ 10. Although he served at Facility Health Services Director, Dr. Montalbano was also responsible for handling his own caseload of approximately 200 patients. *Id.*

Dr. Ezekwe became Madera's primary treating physician in November 2008. Ezekwe Decl. ¶ 17. At various times in late 2008, Madera was treated for a variety of ailments, including chest pains, cellulitis, and a toe ulcer. *Id.* ¶¶ 15-21. Patients at Arthur Kill who required medical treatment from specialists were referred to physicians at the Staten Island University Hospital ("SIUH"). Def. R. 56.1 ¶ 9. Madera was treated at SIUH for chest pains or toe ulcers in late 2008 and for problems with his toe in early December 2008. Gomprecht Decl. ¶ 18; Ezekwe Decl. ¶ 19.

On December 16, 2008, Madera complained to Dr. Ezekwe that he had been suffering from blurry vision in his right eye for two weeks. Pl. R. 56.1 Counter-Statement ¶ 2. Farrell Opp. Decl. Ex. J7. By that point, the vision in Madera's right eye had declined significantly—it was measured by Dr. Ezekwe at 20/200—although Madera's overall vision was measured at 20/30.[2] Ezekwe Decl. ¶ 23. Dr. Ezekwe requested that

Madera be examined by an ophthalmologist at SIUH. Dr. Ezekwe's request to refer Madera to an ophthalmologist at SIUH for evaluation was marked "urgent," which, according to DOCS policy, means that Dr. Ezekwe had deemed this Madera should be scheduled for an appointment within five days. Pl. R. 56.1 Counter-Statement ¶ 4; Farrell Opp. Decl. Ex. J7. The request was approved by APS and Madera was scheduled to see an SIUH ophthalmologist on December 16, 2008. Pl R. 56.1 Counter-Statement ¶ 7. There are no medical records, however, from either SIUH or DOCS that reflect any ophthalmological evaluation of Madera on that date. Pl. R. 56.1 Counter-Statement ¶ 8.

[2]
Dr. Ezekwe states that "it is [his] understanding that all vision measurements in Plaintiff's medical records only test uncorrected vision," and hypothesizes that Madera's vision would have been better if he was wearing his prescription glasses. Ezekwe Decl. ¶ 23.

Three months later, in early April 2009, Madera again complained of blurry vision in his right eye. Dr. Ezekwe requested another "urgent" ophthalmological appointment at SIUH. Ezekwe Decl. ¶ 32. Madera was examined by an SIUH ophthalmologist on April 7, 2009. *Id.* ¶ 33. By this point, Madera's vision had markedly declined: it was measured at 20/400 and 30/70 (although the records do not specify which eye was which). Madera was also diagnosed with a cataract in his right eye and with a condition called narrow angles in both eyes. Farrell Opp. Decl. Ex. B. Narrow angles are an uncorrected configuration of the eye that prevents internal fluid in the eye from draining properly. Narrow angles do not, in themselves, impact eyesight. Harden Decl. Ex. C (Expert Report of Jeffrey Schultz, M.D.). However, they increase the risk of an attack of angle closure glaucoma, which can cause blindness if not address quickly. *Id.* Patients who have narrow angles are not supposed to have a free-dilation of a standard part of the eye examination for cataracts and diabetic changes in the retina because of the increased risk of angle closure. *Id.*

*3 Narrow angles can be treated by a relatively simple procedure, called laser peripheral iridotomy ("LPI"), in which a laser is used to make a small hole in the iris to relieve the pressure caused by the build-up of fluid. *Id.* LPI takes approximately five to ten minutes per eye. *Id.* Dr. Andrew Prince, an ophthalmologist who served as an expert witness for the defendants, testified that he generally performs LPI within one to six weeks of diagnosis of narrow angles. Farrell Opp. Decl. Ex. E. LPI was particularly important for Madera because it "had to be performed before [the pupils] could be

---

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6231799

dilated for evaluation of the cataracts for subsequent surgery." Harden Decl. Ex. C.

According to notes prepared at SIUH on April 7, Madera was "to see Dr. Negm for LPI and then will dilate to look if cataracts and fundus." Farrell Opp. Decl. Ex. B. The "post-clinic comments" section of a DOCS medical record, which appears to have been prepared by DOCS personnel based on the SIUH notes, includes the notation, "he see MD [i.e., [sic] then will dilate to look at cataract and fundus." Ezekwe Decl. Ex B (DOCS J915). This DOCS record also bears the notation "reviewed by: Felix Ezekwe, MD." *Id.*

SIUH personnel expected Madera to return on April 14. Ezekwe Decl. ¶ 37; Ex. B.[3] However, there was some confusion at Arthur Kill regarding the recommendations of the SIUH ophthalmologist. Ezekwe Decl. ¶¶ 38-39. Despite efforts by Arthur Kill medical staff to contact SIUH's phone, its ophthalmology clinic was only open one day per week (on Dr. Ezekwe's recollection), and the Arthur Kill staff did not realize that Madera was due back on April 14. It is unclear for a follow-up appointment at SIUH was entered into the DOCS computer system on April 17 and approved by APS on April 20. Def. R. 56.1 Resp ¶¶ 43-44.

[3]
Ex. B is a compilation of various medical records for Madera. The Bates numbers for the records described in this sentence are not visible in the copies provided to the Court.

Madera returned to SIUH on May 15, 2009, where he was again examined by an ophthalmologist who saw narrow angles and right eye cataract. The SIUH ophthalmologist indicated in his notes that Madera "needs insurance approval and recommended that he return in two weeks for LPI surgery. Pl. R. 56.1 Counter-Statement ¶ 11; Ezekwe Decl. Ex. B at DOCS146.[4]

[4]
The Bates numbers for other medical records described in this sentence are not visible in the copies provided to the Court. *See* n. 3 *supra*.

Around this time, at some point in May 2009, Dr. Gomprecht became Madera's primary treating physician.[5] Ezekwe Decl. ¶ 41; Gomprecht Decl. ¶ 2. She worked at Arthur Kill for one day each week. Dr. Gomprecht discussed the LPI procedure with Madera on May 9, 2009—three weeks after his ophthalmology appointment at SIUH and he signed a consent form. Gomprecht Decl. ¶¶ 31-32. During this

appointment, she recorded Madera's vision as 20/400 in his right eye and 20/70 in his left eye. *Id.* ¶ 36. Dr. Gomprecht entered an APS approved Madera's LPI surgery on June 12, 2009. Gomprecht Decl. Ex. B at DOCS 1902. Dr. Gomprecht requested that an appointment at SIUH be scheduled on a "routine" basis—meaning that an appointment should be scheduled within thirty days. Vierv Decl. *id.* 1, 6.

In January 2010, Dr. Ezekwe assumed the role of Facility Health Services Director. Ezekwe Decl. ¶ 2.

*4 Madera's LPI surgery was scheduled for June 30, 2009 at SIUH. The records reflect that Madera was transported to SIUH on that date but did not undergo surgery because the SIUH doctor was not available. The relevant SIUH notes state that Madera was "told to return" on July 7 for his LPI and then was told not return on that date. Def. R. 56.1 Resp.¶ 49; Farrell Supp. Decl. Ex. V12.

DOCS records show that Arthur Kill sent three "routine" requests for scheduled appointments on July 21, to re-schedule the LPI procedure, but was unable to reach anyone and could not leave a message because the scheduling voicemail-box was full. Vierv Decl. Ex. A at DOCS 462-63. She called back on July 7 (but she did not leave a voicemail. The appointment was finally re-scheduled on July 30, but September 1 was the first date available at SIUH. *Id.* On July 30, Madera also complained about his vision to an SIUH nurse, who authorized him to remain in his dorm area "due to impaired vision" for the next month. Farrell Opp Decl. Ex. 25, 113.

On August 15, 2009, Madera again complained about his eyesight. DOCS notes reflect that Madera had an increasing grey film over his right cornea and that his right eye was very cloudy. Farrell Opp Decl. Ex. 36. Madera also described vision problems in his left eye. *Id.* The notes state that Madera's diabetes was "very poorly controlled."[6] *Id.* (emphasis in original). This afternoon, on Dr. Montalbano's orders, Madera was taken to the SIUH emergency room, where he was diagnosed with "worsening cataracts." Montalbano Decl. ¶ 10; Ex. A. The DOCS Emergency Triage / Trip Form states that "Dr. Montalbano [is] aware" and that "follow-up with retina specialist [is] already scheduled for 9/01/09." Montalbano Decl. Ex. A.

[6]
Records show that Madera regularly purchased candy and other sweets from the prison

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6237198

commissary while imprisoned at Arthur Kill. Def. R. 56.1 ¶ 7. Madera states that he purchased these items for exchange with inmates who did him favors, such as push his wheelchair, and did not consume these himself. Pl. R. 56.1 Resp. ¶ 7.

On September 1, 2009, Madera underwent an LPI on his right eye. Def. R. 56.1 ¶ 16. The procedure did not improve his eyesight, nor was it intended to.

Five weeks later, in late October, Madera filed an Internal Grievance Complaint that stated that "a specialist at [SIUH] recommended laser surgery [but] I was suddenly taken off Dr. Ezekwe's case load and assigned to another [Arthur Kill] doctor, whereupon the recommended eye surgery was not performed even after I complained repeatedly." Farrell Opp. Decl. Ex. L. The grievance also stated that the surgery "still has not been performed" and that "[a]s a result, not eyes and vision have deteriorated[.]" Id. Madera's grievance was reviewed by the Internal Grievance Review Committee, which recommended that he "continue to address his issues through the sick call procedure" because it did not have the power to grant or deny outside transportation. Id. Madera then appealed the Internal Grievance Review Committee decision to Superintendent Breslin. Pl. R. 56.1 ¶ 61.

In the meantime, on October 20, 2009, Madera was taken to SIUH for a follow-up appointment. Def. R. 56.1 ¶ 18. The SIUH notes indicate that Madera's vision was assessed in "HM" in one eye and 20/70 in the other eye (although they again do not indicate which eye it is.) Id. The Gonopech Decl. Ex. II at GIO 20. They also indicate that Madera had a "dense white cataract" in his left eye. Id. The DOCS Request & Report of Consultation Form associated with the October 20 SIUH appointment notes that Madera should "return [in 1 month for LPI" on his left eye. Farrell Supp. Decl. Ex. V16.

On September 1, 2009, Madera underwent LPI on his right eye. Def. R. 56.1 ¶ 16. The procedure did not improve his eyesight, nor was it intended to.

In late March, Madera underwent a contrary integration in SIUH. Gonopech Decl. ¶ 79. In early April, he was diagnosed with significant double vertical contrary into the disease and underwent a cardiac catheterization at SIUH. Id. ¶ 81. He had another cardiac-related appointment at SIUH on April 19. Id. On April 30, Madera was given a colonoscopy and was diagnosed with hemorrhoids. Id.

On April 27, 2010, Dr. Gonopech submitted requests for two appointments with SIUH ophthalmology, one for a follow-up at the LPI and another for a cataract extraction. Gonopech Decl. ¶ 82. These requests were inputted into the DOCS computer system on April 29. Id.; Gonopech Decl. Ex. II at DOCS 4724. Gonopech notes suggest that the SIUH ophthalmologist requested that the LPI follow-up appointment take place before the cataract extraction procedure. Gonopech Decl. Ex. II at DOCS 4724. The right eye A-scan was scheduled for July 12, 2010 and the right eye cataract surgery was scheduled for August 9, 2010. Gonopech Decl. ¶ 82, Ex. II at DOCS 35.

Madera was examined at the SIUH ophthalmology clinic on May 18, 2010, where his vision was measured at "20/HM" and 20/50. Gonopech Decl. Ex. II at GIO 17. Several days later, on May 20, he complained of blurry vision in Dr. Ezekwe. The next day, Madera's eye was back to SIUH at the request of an SIUH ophthalmologist, where his vision was assessed at "20/HM OD 20/100 ph 20/60 OS." [13] Gonopech Decl. Ex. II at DOCS 34.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if there is "no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir.2006). "In deciding whether there is a genuine issue of material fact, [this Court] must interpret all ambiguities and draw all factual inferences in favor of the non-moving party." Id. "[I]f, when in any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Fincher v. City of Syracuse, 611 F.3d 98, 107 (2d Cir.2010).

### B. Scope of Complaint and Exhaustion of Administrative Process

Prisoners are required to exhaust the administrative remedies that are available to them before they can file suit challenging conditions of their confinement. 42 U.S.C.1997e(a). In order to properly exhaust the grievance process, they must "provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Swinson v. Koon, 446 F.3d 169, 180 (2d Cir.2006). In other words, the grievance must "alert the prison to the nature of the wrong for which redress [is] sought." Espinal v. Goord, 558 F.3d 119, 127 (2d Cir.2009). "The burden is not a heavy one: it can be analogized to notice pleading." Singh v. Goord, 460 F.Supp's. 45, 47 (2d Cir.2012).

### C. Deliberate Indifference to an Objective Medical Need

The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin, 467 F.3d at 280 (citing Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs." Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir.2003) (internal quotations omitted). "Thus standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." Id. at 183–84.

### 1. Serious Medical Need

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6237799

**\*10** The first prong requires that "the alleged deprivation of medical care ... be sufficiently serious." *Salahuddin,* 467 F.3d at 279. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Id.* at 280 (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal brackets omitted). Diminished eyesight can be sufficiently serious to provide the basis for an Eighth Amendment claim for the denial of medical care. *See Koehl v. Dainkaik,* 85 F.3d 86, 88 (2d Cir.1996); *Gonzalez v. Sarreck,* 2011 WL 5051341, at \* 17 (S.D.N.Y. Oct.24, 2011) (Sweet, J.). In *Koehl* the Second Circuit ruled that a prisoner who was denied prescription eyeglasses that were necessary to correct double vision and a loss of depth perception, and who he experienced headaches and injuries from walking into objects as a result, had a serious medical condition. *Id.; see also Tormasi v. Hayman,* 452 F. App'x 203, 206 (3d Cir.2011).

The impaired vision that Madera suffered while the LPI and cataract surgeries were delayed amounts to a serious medical need of constitutional dimension.[13] "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the prisoner's *underlying medical condition* alone[.]" *Smith,* 316 F.3d at 185 (emphasis in original). And when assessing delays in treatment, courts can take into account the failure to provide medical procedures that might have led to an earlier diagnosis of the prisoner's medical needs. For example, in *Lloyd v. Lee,* the court concluded that "the injury would have been discovered earlier, and some of the serious pain and discomfort that [the prisoner] experienced for more than a year could have been averted," if the defendant doctors had not delayed the prisoner's NRI. 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) (Chin, J.).

[13]
There is nothing in the record to suggest that Madera's present vision problems (as opposed to the diminished eyesight that he experienced prior to cataract surgery) stem from the allegedly inadequate medical treatment-i.e. the delayed LPI and cataract surgeries-that is the gravamen of his claim.

The record here suggests that the extraction of Madera's cataracts, which were significantly impairing his eyesight, was delayed for more than a year while he awaited the LPI procedures Madera complained of blurry vision at his right eye in late December 2008 and was scheduled for an "urgent" appointment with an SIUH ophthalmologist, but he apparently was not examined at SIUH at that time. In early April 2009, after making similar complaints of blurred vision, Madera was taken to SIUH and diagnosed with narrow angles and a right eye cataract. The relatively straightforward LPI procedures, which were required before Madera could undergo cataract surgery, were not completed until late March 2010, nearly one year after diagnosis. This evidence might also prompt the inference that Madera would have been diagnosed with narrow angles and the right eye cataract in late December 2008 if, as was intended, he had been evaluated at SIUH. When calculated from the missed appointment in December 2008, the delay in LPI surgery amounts to 15 months.

**\*11** During the period-and for several months afterwards, while he awaited cataract surgery-the vision in Madera's right eye was so compromised that he was able to perceive only "hand motion." The vision in his left eye deteriorated throughout that same period. As might be expected, the diminished eyesight directly impacted Madera's lifestyle: in July 2009, he was authorized to remain in his dorm unit and, in July 2010, he was permitted to use a wheelchair. This degree of visual impairment, lasting for well over a year, "significantly affect[ed] [Madera's] daily activities" and is plainly a condition that "a reasonable doctor or patient would find ... important and worthy of comment." *Salahuddin,* 467 F.3d at 280. It is thus sufficiently serious to support an Eighth Amendment claim.

2. Deliberate Indifference

The second prong of the Eighth Amendment medical standard requires that the prison official have been deliberately indifferent to the prisoner's serious medical need. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety." *Hathaway v. Coughlin,* 37 F.3d at 66. This prong is subjective: the prison official must have "be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The official "need not act solely with intent to cause harm, but liability may be imposed only if he knows that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate it." *Id.* (internal quotation marks omitted).

---

were not plausible "given their limited roles early in [his] treatment." *Id.* at 369–70.

A pattern of delays can also prompt an inference of deliberate indifference. In *Abdush-Shahid v. Coughlin,* for example, a case involving the delayed removal of a growth in the prisoner's neck, the court held that a series of delays and omissions that "taken separately may be no more 'negligence' could, when viewed as a pattern, "give rise to issues of fact concerning whether defendants' actions were the result of ... deliberate indifference[.]" 933 F.Supp. 168, 182 (N.D.N.Y.1996) (Koeel, J.).

**\*14** In addition to excessive or repeated delays, "[f]ailure to heed a physician's recommendation" is a factor that "may in some circumstances constitute deliberate indifference on the part of prison officials." *Demata,* 198 F.3d 233 (table), 1999 WL 753142, at *9 (citing *Lomnitsky v. Rosenthorn,* 929 F.2d 922, 927 (2d Cir.1991)). In *Demata,* the Second Circuit found that outward questions of fact existed as to deliberate indifference given that a physician had recommended and scheduled a colonoscopy on the prisoner that was never performed. 198 F.3d 233, 1999 WL 753142, at *5–6. Similarly, in *Johnson v. Wright* the Second Circuit held that the fact that prison officials refused to authorize a course of treatment for Hepatitis C that was repeatedly recommended by the prisoner's doctors could suggest that the officials were deliberately indifferent, even though their refusals were based on a written DOCS policy. 412 F.3d 398, 404–05 (2d Cir.2005).

[14]
The prisoner also complained of a third failure on the part of his medical providers-that they did not provide him with the proper dose of kidney medication-but the court concluded that the prisoner's mere disagreement with the course of treatment was insufficient to show deliberate indifference, particularly when the doctors repeatedly adjusted the dosage based on their evaluation of his condition. *Id.* at 369.

In *Gbaja v. Lee,* the district court concluded that a prisoner plausibly alleged deliberate indifference when his doctors requested an MRI but failed to follow up on their requests, leading to a nine month delay in treatment during which the prisoner repeatedly visited such cell and complained of extreme pain and loss of mobility in his shoulder. 570 F.Supp.2d at 568–69. The doctors in *Lloyd* consistently blamed hospital staff for delaying the MRI, but the court concluded that the prisoner had plausibly alleged that they were "engaging in a blame shifting process[.]" *Id.* at 568. The court held, however, that the plaintiff's allegations of deliberate indifference against two of the defendant doctors

---

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6237799

negligent." Id "An inadvertent failure to provide adequate medical care' is not sufficient. *Smith,* 316 F.3d at 178.

Deliberate indifference is a very high standard. "[A] delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that the treatment is unreliable, or that the cure is as risky or painful or bad as the malady" does not amount to deliberate indifference; *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (citing *Estelle v. Gamble,* 429 U.S. 97, 105–106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). For example, in *Salahuddin,* the Second Circuit held that a contemporaneous letter written by the defendant doctor demonstrated his subjective belief that the prisoner did not require imminent treatment and thus that the doctor was not deliberately indifferent. 467 F.3d at 281–82.

"[M]ere differences of opinion between the prisoner and the defendants concerning the proper course of treatment' will not suggest deliberate indifference. *Demata v. New York State Corr. Dep't of Health Servs.,* 198 F.3d 233 (table), 1999 WL 753142, at *2 (2d Cir. Sept.17, 1999). Nor will differences among the considered medical judgments of various physicians. *Victor v. Milicevic,* 361 F.App'x 212, 215 (2d Cir.2010 ). For example, in *Alvarez v. Gaord,* the court found that there was no deliberate indifference for a two-year delay in eye surgery because the delays were due, in part, to attempts by various doctors to address the plaintiff's condition through less-invasive procedures involving corrective lenses. 2010 WL 1903983, at *2–5, 10–11 (N.D.N.Y. May 17, 2010) (Schneider, M.J.)

**\*12** Courts have also refused to find deliberate indifference where delays in treatment were caused by circumstances that were outside the control of the charged officials. The logistical difficulties involved in scheduling outpatient appointments and transporting prisoners to outside facilities can present one such circumstance. *See, e.g., Malin v. Gioqueville,* 2012 WL 1565615, at *8 (E.D.N.Y. Feb.14, 2012) (Orenstein, M.J.), *adopted by the District Court of* 2012 WL 1565523 (E.D.N.Y. May 2, 2012) (Gaandis, J.); *Henderson v. Sommer,* 2011 WL 1344818, at *8 (S.D.N.Y. Apr.1, 2011) (Berman, J.); *Alvarez,* 2010 WL 1903892, at *2–4, *10–11. So too can the denial of recommended procedures by an outside review board. *See Mawo,* 2012 WL 1565615, at *9; *cf. St. John v. Aenata,* 2007 WL 3355385, *4, 7 (D.Conn. Nov.9, 2007) (Eginton, J.). Interviesing medical problems can also justify delays in treatment. *See Pearce v. Gomperth,* 2013 WL 990998, at

**\*14** (E.D.N.Y. Feb.13, 2013) (Bloom, M.J.), *adopted by the District Court at* 2013 WL 990997 (E.D.N.Y. Mar.13, 2013) (Matsumoto, J.); *Alvarez,* 2010 WL 1903892, at *4, *10–11.

Many of the cases in this Circuit in which prisoners were able to show deliberate indifference involve circumstances in which prison officials made treatment decisions based on improper motives or made statements that suggested bad faith. *Koehl,* for example, involved prison guards who, despite having spoken with a nurse who had seen documentation of the medical necessity for the prisoner's eyeglasses, confiscated those eyeglasses and made an obvious and derisory response to the prisoner's suggestion that the documentation was readily available in a nearby doctor's office. 85 F.3d at 88. In *Harrison v. Barkley,* the Second Circuit held that a doctor's refusal to remove a prisoner's painful, cavity-filled tooth until the prisoner consented to removal of another tooth was sufficient to show deliberate indifference at the summary judgment stage. 219 F.3d 132, 138 (2d Cir.2000). While the doctor stated that the removal of the other tooth was medically necessary because it was potentially life-threatening, the court suggested that the validity of the treatment presented a question of fact, given that it was uncorroborated and asserted only after a state court had intervened to order removal of the first tooth. Id. And in *Chance,* the Second Circuit denied the prison doctors' motion to dismiss because the prisoner alleged that the doctors "recommended [a medical procedure] not on the basis of their medical views, but because of monetary incentives." 143 F.3d at 703–04.

However, significant delays in treatment can, under certain circumstances, prompt an inference of deliberate indifference. In *Hathaway v. Foote,* the Second Circuit concluded that a jury could infer deliberate indifference from a prison doctor's two-year delay in referring the prisoner for hip surgery, where the doctor did not alert the prisoner to the existence of two broken pins in his hip and did not refer the prisoner until after he had filed suit to compel treatment. 37 F.3d 63, 67–69 (2d Cir.1994). The fact that the doctor had examined the prisoner on numerous occasions during those two years did not vindicate him, the court reasoned, because the doctor did not alter his ineffective course of treatment in light of the prisoner's frequent and repeated complaints of hip pain. Id. at 68.

**\*13** Two recent district court cases provide further examples of delays in treatment that were sufficient to give rise to an inference of deliberate indifference. *Price v. Reilly*

---

outpatient doctor and to document her recommendation. There is no evidence, however, that surgeon that Dr. Ezekwe took any steps to follow up on that apparently missed appointment-which he had himself deemed "urgent"-or took any steps to re-schedule it.

Madera was examined by an SIUH ophthalmologist on April 7, 2009, when he was diagnosed with narrow angles and a cataract and asked to return on April 14, apparently for LPI surgery. Contemporaneous record evidence shows that Arthur Kill medical personnel did not understand the instructions from SIUH until April 15. Madera was seen at SIUH one month later, on May 13. Dr. Ezekwe had not yet sought Madera's consent to LPI or requested approval for LPI from APS at the May 13 appointment. Contemporaneous record evidence indicated that Madera "need [ed] treatment authorization" for LPI and requested that Madera return in two weeks for surgery. The jury could draw the reasonable inference that the LPI would have gone forward on May 15 if Dr. Ezekwe had sought consent and approval for the operation.

**\*15** Dr. Gomprecht became Madera's primary treating physician in May 2009. While the SIUH ophthalmologist had recommended that Madera return in two weeks for surgery, Dr. Gomprecht did not meet with Madera to get his consent until June 9, three weeks later. An appointment was scheduled for June 30, but the SIUH doctor was inexplicably absent. The SIUH notes reflect that the hospital requested that Madera return on July 7 for the surgery. DOCS records show that an Arthur Kill nurse called SIUH to schedule a new appointment on July 21, but offer no explanation for the three week delay in scheduling.

The right eye LPI finally went forward on September 1. Madera was not seen at SIUH for a follow up appointment until October 20, nearly two months after the operation and approximately three weeks after he filed his grievance. At the October 20 appointment, the ophthalmologist asked that Madera return for left eye LPI in one month. Madera complained about his vision to an Arthur Kill nurse on November 2. Dr. Gomprecht met with him the next day, ostensibly for the purpose of discussing his eyesight. She did not do so however, and notes that she was directed by Madera's complaints about his footwear. Dr. Gomprecht characterizes her failure to discuss Madera's eyesight as an inadvertent oversight and describes the footwear issue as pressing, given Madera's diabetes. However, she apparently allowed Madera to continue wearing the same boots

Dr. Gomprecht did not meet with Madera regarding his eyesight until November 24, 2009, when she got his consent and sought permission from APS to schedule the left eye LPI. She stated, in an affidavit prepared for summary judgment, that it would have been inappropriate to schedule Madera for left eye LPI within the time period requested by SIUH given the ongoing issues that he was experiencing during this period. However, the court to which the candor issues actually interfered with LPI scheduling presents a question of fact, given that LPI is not a particularly invasive procedure, that Dr. Gomprecht initially attempted to schedule the LPI in late November just one week after the reviewed the earlier recommendation of SIUH physicians, and that the SIUH ophthalmologist was ultimately able to perform LPI on Madera's left eye just one day after he underwent a cardiac stress test.

APS sought additional information from Dr. Gomprecht in connection with her November 24 request to schedule the LPI procedure. Because Dr. Gomprecht did not respond, APS denied her request on December 15. Dr. Gomprecht, who says that she did not have access to the DOCS computer system, was unaware that APS had sought additional information about the requested surgery and apparently did not inquire up to the status of her request. She states that she did not hear of the Gomprecht initially attempted to schedule the LPI in late November just one week after she reviewed the earlier recommendation of SIUH physicians, and that the SIUH ophthalmologist was ultimately able to perform Madera's left eye LPI 14, three days after the referral was denied.

**\*16** At some point in early 2010, Madera's left eye LPI was scheduled. The operation was completed on March 24, 2010. On that date, the SIUH ophthalmologist recommended that a follow-up appointment and A-scan (in preparation for cataract removal) take place in two weeks. Dr. Gomprecht did not submit requests to schedule these appointments until April 27, 2010, more than a month later.

All told, approximately 15 months elapsed between the "urgent" appointment at SIUH that Dr. Ezekwe scheduled in late December 2008 and LPI surgery on Madera's left eye in March 2010. Another month elapsed before Dr. Gomprecht attempted to schedule, the cataract removal surgeries that would ultimately address Madera's failing eyesight. This period-during which both doctors were aware that Madera was suffering from a significant loss of vision-was marked by a long series of delays. Some of those delays were attributable, at least in part, to scheduling difficulties, to the review process for outpatient referrals, and to the SIUH

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6231799

ophthalmologist's absence at Madera's June 30, 2009 LPI appointment. Other delays may have been caused by Madera's other medical issues, including diabetes and heart problems. Yet the repeated instances in which Dr. Ezekwe and Dr. Gonspecht did not follow up on missed appointments and failed to schedule new appointments within the time frames recommended by SUNY ophthalmologists, when viewed in context of the overall pattern of delays, would allow a reasonable jury to conclude that they were deliberately indifferent to Madera's loss of vision.

The record might well prompt a different conclusion. A reasonable jury could find that Dr. Ezekwe and Dr. Gonspecht provided Madera a demanding patient presenting a host of serious health problems—with care that was more than adequate under the circumstances, and that the delays in addressing his eye problems stemmed not from indifference but from the challenges inherent in practicing medicine in the correctional environment. But on summary judgment, this Court views the record in the light most favorable to the plaintiff and draws all reasonable inferences in his favor, and is not permitted to choose which version of events that it finds more compelling. *See, e.g., Hathaway,* 841 F.2d at 50 (denying defendants' motion for summary judgment, but noting that the prisoner received "extensive medical attention" and "comprehensive, if not dating, health care").

b. Superintendent Breslin, Dr. Wright and Dr. Montalbano
The evidence on the record is insufficient to show that the remaining defendants—all of whom held supervisory roles—were deliberately indifferent. There is no supervisory liability for Section 1983 claims. *See Colvigia v. Brown,* 474 F. App'x 788, 789 (2d Cir.2012). Instead, supervisors can only be held liable for "personal involvement [that] satisfies the elements of the constitutional tort ... [B]ecause the mere assertion of an Eighth Amendment violation is deliberate indifference, a supervisor-like any other defendant-can be held directly liable for deliberate indifference[.]" *Tarkmen v. Yahwoff* 913 F.Supp.2d 314, 336 (E.D.N.Y.2013) (Gleeson, J.); *see also Ashcroft v. Iqbal,* 556 L.S. 662, 676–677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). [15]

[15] District courts in the Second Circuit have reached differing conclusions regarding the terms upon which *Iqbal* permits supervisors to be held liable for constitutional violations, but they agree that supervisors must satisfy the elements of the

---

Madera v. Ezekwe, Not Reported in F.Supp.2d (2013)
2013 WL 6231799

to follow-up on that, informal consumer is not constitute deliberate indifference.

D. Qualified Immunity
Public officials are protected by qualified immunity so long as "their conduct does not violate clearly established ... rights of which a reasonable person would have known." *Pearson v. Velich,* 718 F.3d 157, 166 (2d Cir.2013). The qualified immunity inquiry "turns primarily on objective factors." Id (*quoting Fluker v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should have known the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

*18  The principles governing this case are clearly established. It is well-settled that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical need, *see, e.g., Hathaway,* 37 F.3d at 66, and the Second Circuit made clear as early as 1996 that diminished eyesight can constitute such a condition. *See Koehl,* 85 F.3d at 88. Because a reasonable jury could conclude that Dr. Ezekwe and Dr. Gonspecht were deliberately indifferent to Madera's vision problems, they are not entitled to qualified immunity.

CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is GRANTED as to Dr. Montalbano, Superintendent Breslin, and Dr. Wright and DENIED as to Dr. Ezekwe and Dr. Gonspecht.

End of Document

particular constitutional tort, including the requisite ment ins. *See Tarkmen,* 915 F.Supp.2d 335–36.

*17  Madera does not take issue with the treatment provided by Dr. Montalbano in September 2008 (when he referred Madera for examination by an outside ophthalmologist) or August 2009 (when he ordered that Madera be taken to SIUH for emergency eye care). Instead, Madera bases his claim on Dr. Montalbano's supervisory capacity as Author Kill Facility Health Services Director from August 2008 to November 2009 and in particular on Dr. Montalbano's "failure to act despite his awareness of the extensive delays" that Madera was experiencing. Madera posits that Dr. Montalbano was aware of the surgical delays because he treated Madera in mid-August 2009. By that point, however, Dr. Gonspecht had already scheduled Madera's right eye LPI surgery for early September-just two weeks in the future. Dr. Montalbano left Author Kill two months later, in November 2009. Under these circumstances, this treatment will not permit an inference of deliberate indifference.

Madera's claims against Superintendent Breslin, like his claims against Dr. Montalbano, rest on Breslin's failure to act despite his awareness of Madera's eye problems and delays in surgery. Breslin testified that he was generally familiar with Madera's loss of vision. He also reviewed Madera's grievance and was advised by the Legal Aid letter that Madera's medical problems were ongoing as of January 2010. The receipt of letters and grievances alone will not confer liability. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (McMahon, J.) (*Ashdodi-Shahdi,* 913 F.Supp. at 181). More importantly, Madera offers no evidence to dispute Superintendent Breslin's testimony that he investigated Madera's complaints and was assured by Author Kill medical staff that they had embarked on an appropriate course of treatment. Because "supervisory officials are entitled to rely on the opinion of medical staff concerning the proper course of treatment," the record will not support the conclusion that Superintendent Breslin was deliberately indifferent. *Ashdodi-Shahdi,* 913 F.Supp. at 183; *Joyner,* 195 F.Supp.2d at 506.

The same holds true for Dr. Wright, whose involvement in this case is minimal-a point that Madera appears to concede by omitting Dr. Wright from his response to the defendants' summary judgment motion. According to Madera, in some unspecified point during his incarceration he approached Dr. Wright, who was visiting Author Kill, and complained of medical problems. Dr. Wright told Madera that he would "get back" to him with a note, but never did so. Dr. Wright's failure

SO ORDERED.

CHRONOLOGY

All Citations

Not Reported in F.Supp.2d, 2013 WL 6231799

---

Freeman v. Strack, Not Reported in F.Supp.2d (2000)
2000 WL 1459782

2000 WL 1459782
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darryl L. FREEMAN, Plaintiff,
v.
Wayne L. STRACK, Superintendent, Glen
S. Goord, Commissioner of the New York
State Department of Correctional Services,
Ivan Milder, M.D., Dennis Brooker, R.N.
and Catherine Frater, R.N., Defendants.

No. 99 Civ. 9876(AJP).

Sept. 29, 2000.

OPINION AND ORDER

PECK, Magistrate J.

*1  Pro se plaintiff Darryl L. Freeman brought this action for damages under 42 U.S.C. § 1983 and the Eighth Amendment, alleging that officials at Fishkill Correctional Facility "were deliberately indifferent to his medical needs by their wanton failure to provide adequate medical care at a time when plaintiff was suffering great pain due to an inflamed appendix which later ruptured solvent by reason of surgery." (Freeman Br. at 1.)

Defendants have moved for summary judgment, arguing that: (1) there was no deliberate indifference to Freeman's medical care (Defs. Br. at 7-13); (2) defendants Goord, Strack and Milder had no personal involvement as are alleged violation (id. at 13-17); (3) defendants are entitled to qualified immunity (id. at 17-19); and (4) claims brought against defendants in their official capacities are barred by the Eleventh Amendment (id. at 19-20). The parties have consented to disposition of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 16.)

Freeman concedes that his complaint should be dismissed as to defendants Strack and Goord because they were not personally involved in the alleged violation.[1] (*See* Freeman Br. at 3; Freeman Resp. at 4.) Accordingly, the complaint is dismissed as to those two defendants.

---

and checks. (Freeman Dep. at 31, Defs. & Freeman 56.1 Stmts. ¶ 43.) According to Nurse Frater "gave a superficial glance at the first page contained to [his] medical folder and said something to the effect, 'this is your first true down here at rack-call.'" (Freeman 56.1 Stmt. ¶ 44.)[4] Freeman claims that Nurse Frater told him he had a stomach virus and that "there [was] nothing she [could] do about that." (Freeman 56.1 Stmt. ¶ 44; *see also* Freeman Dep. at 30.)[5] Nurse Frater gave a Freeman a bottle of Kaopectate and advised him to eat small portions of food and to drink plenty of fluids. (Freeman Dep. at 29, Defs. & Freeman 56.1 Stmts. ¶ 44.) Freeman ¶ 7: Harbour Aff. Ex. D at 1 medical record, 116/98.) According to Nurse Frater told him that it was not necessary that he see a doctor (Freeman Dep. at 30-31.)

Nurse Frater admits that Freeman attended sick call on November 6, 1998, but alleges that Freeman told her he had diarrhea for two days rather than three. (Frater Aff. ¶ 6; *see also* Harbour Aff. Ex. D. at 1 medical record, 116/98.) She denies that Freeman requested to see a doctor, alleging that she would have recorded any such request in the "subjective" portion of his medical chart. (Frater Aff. ¶¶ 7-8; *see* Defs. Ex. D at 1 medical record, 116/98.)

"The FRP, which is governed by the New York Codes, Rules and Regulations ('NYCRR'), offers inmates extended private visits with their spouses and families. *See* N.Y. Comp.Codes R. & Regs. Tit.7, §§ 220.1-220.6 (1998). Generally, FRP visits take place overnight or over a weekend in a trailer within the prison facility." (*Hernandez v. Coughlin* 18 F.3d 833, 835 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117 (1994). (*See also* Defs. & Freeman 56.1 Stmts. ¶ 42.)

Nurse Frater claims she reviewed Freeman's medical history and determined that there was nothing in that history to suggest that his complaint of diarrhea was indicative of a more serious medical problem. (Frater Aff. ¶ 6.)

Nurse Frater denies telling Freeman he had a stomach virus, alleging that as a registered nurse, she is not authorized to make diagnoses. (Frater Aff. ¶ 9.)

*2  After seeing Nurse Frater, Freeman returned to his cube (i.e., his living quarters) and to his work assignment in the

---

[1] Goord is the Commissioner of DOCS. (*See, e.g.,* Amended Compl. ¶ 11; Defs. & Freeman 56.1 Stmts. ¶ 5.) Strack is the Superintendent of Fishkill. (*See, e.g.,* Amended Compl ¶ 11; Defs. & Freeman 56.1 Stmts. ¶ 7.)

*It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment ...." *Jackson v. Johnson,* 30 F.Supp.2d. 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) (& cases cited therein). Since plaintiff Freeman's complaint seeks only damages, his claims against all defendants in their official capacities are dismissed.

Finally, summary judgment is GRANTED in favor of the remaining defendants in their personal capacity, for the reasons discussed below.

FACTS

Background

Darryl L. Freeman has been serving a prison term since 1981 for attempted murder. (Harbour Aff. Ex. A; Freeman Dep. at 10; Defs. & Freeman 56.1 Stmts. ¶¶ 1-4.) At all times relevant to this action, Freeman was incarcerated at Fishkill Correctional Facility. (Defs. & Freeman 56.1 Stmts. ¶ 2.)

Defendants Ivan Milder, Catherine Frater and Dennis Brooker are employees of the New York State Department of Correctional Services ("DOCS"). Milder was Fishkill's Facility Health Services Director during the relevant period; Frater and Brooker are registered nurses at Fishkill. (Freeman Dep. at 23-24; Defs. & Freeman 56.1 Stmts. ¶¶ 11, 21, 27; Milder Aff. ¶¶ 3-4; Frater Aff. ¶¶ 1-3; Brooker Aff. ¶¶ 1-3.)

*The events of November 6, 1998 to November 25, 1998.*
On November 6, 1998, Freeman attended sick call where, according to Freeman, he told Nurse Frater that he had been experiencing "pains, cramps, and diarrhea for three days," requested to see a doctor, and asked for a medical excuse from his work program. (Freeman Dep. at 26-30, 33; Freeman 56.1 Stmt. ¶¶ 39-40.)[2] Freeman had not sought medical treatment for the diarrhea prior to November 6, 1998 because he was attending the Family Reunion Program ("FRP").[3] (Freeman Dep. at 27-28, Defs. & Freeman 56.1 Stmts. ¶ 42.) Freeman told Nurse Frater during the two-day program, he had eaten, among other things, barbeque chicken and macaroni

---

woodshop. (Freeman Dep. at 51-52, Defs. & Freeman 56.1 Stmts. ¶ 45.) According to Freeman, during the rack-call, returned to his cube and work "because Nurse Frater failed to allow [him] to see a Doctor as requested, and refused to issue a medical excuse from work." (Freeman 56.1 Stmt. ¶ 46; *see also* Freeman Dep. at 33.)

Freeman alleges that his diarrhea ceased "[a] couple of days after going to sick call," but that his pain persisted for the next nineteen days. (Freeman Dep. at 34.) Between his November 6, 1998 visit to Nurse Frater and the morning of November 25, 1998, however, Freeman did not request a sick call or one type of medical attention. (Freeman Dep. at 34-35, Defs. & Freeman 56.1 Stmts. ¶ 48.) Rather, he continued to go to the woodshop program and drink the Kaopectate that Nurse Frater had given him. (Freeman Dep. at 52-56; Defs. & Freeman 56.1 Stmts. ¶¶ 1-2.)[6] As soon as Freeman was transferred to work "because he was expecting the 'stomach virus' and ... diarrhea to eventually run its course ... with consumption of the Kaopectate by Nurse Frater." (Freeman 56.1 Stmt. ¶ 48; *see also* Freeman Dep. at 34.) Freeman told these fellow inmates about his abdominal pain, but did not inform any staff members. (Freeman Dep. at 35.)

Corrections Officer Rosemary Coon was assigned to Freeman's housing unit from 10:30 p.m. on November 24, 1998 to 6:30 a.m. on November 25, 1998. (Defs. & Freeman 56.1 Stmts. ¶¶ 50, 52; Coon Aff. ¶ 1-2.)[7] At some point during the night, Officer Coon observed Freeman awake, sitting up and smoking a cigarette. (Defs. & Freeman 56.1 Stmts. ¶ 53; Coon Aff. ¶ 3.) Freeman alleges that an earlier time, Officer Coon observed him "lying on his bunk in [a] fecal position." (Freeman 56.1 Stmt. ¶ 54.)[8]

[6] Officer Coon is not a defendant in this action. (*See* Amended Compl.)

[7] Officer Coon does not recall seeing Freeman in a fecal position. (Coon Aff. ¶ 3.) She alleges, however, that at one point she "asked plaintiff if anything was the matter and [he] indicated that he had a little indigestion and that the medication he had was not working." (Id.)

At approximately 5:20 a.m. on November 25, 1998, Freeman walked from his cube or bunk to Officer Coon's station (Freeman

Freeman v. Strack, Not Reported in F.Supp.2d (2000)
2000 WL 1459782

Dep. at 50-59; Defs. & Freeman 56.1 Stmts. ¶ 53.) According to Freeman, he was "bent at the waist, in a 75 degree forward lean, holding his stomach." (Freeman 56.1 Stmt. ¶ 56.) Freeman told Officer Coon that he had had stomach cramps and wanted to go to the central clinic. (Freeman Dep. at 56-59; Defs. & Freeman 56.1 Stmts. ¶ 57; Coon Aff. ¶¶ 4-5.) Freeman claims that he also told Officer Coon that there was something "seriously wrong" and that he was in a lot of pain (Freeman Dep. at 56, 59.) Officer Coon called the central clinic and told Nurse Dennis Brooker that Freeman had had stomach cramps and, according to Freeman, that he was in "a lot of pain." (Freeman Dep. at 59-60; Defs. & Freeman 56.1 Stmts. ¶¶ 58-59; Coon Aff. ¶ 5; Brooker Aff. ¶ 9; Barbour Aff. Ex. E; Hosang 5-2 Log, 11/25/98 at 5:20 a.m.)

8        Coon alleges that Freeman walked to his office "in an upright manner" without any apparent difficulty. (Coon Aff. ¶ 4.)

*3  Nurse Brooker told Officer Coon that he would not see Freeman at that time, but would schedule him for a 7:30 a.m. sick call. Officer Coon relayed this information to Freeman (Freeman Dep. at 49-42; Defs. & Freeman 56.1 Stmt. ¶ 60, 65; Coon Aff. ¶ 5; Brooker Aff. ¶ 10.)[9] After being told he was scheduled for 7:30 a.m. sick call, Freeman returned to his bed without complaint. (Defs. & Freeman 56.1 Stmts. ¶ 67; Coon Aff. ¶ 5; Freeman Dep. at 42.)

9        According to Nurse Brooker: "From 10:30 p.m. on November 24, 1998 and 6:30 a.m. on November 25, 1998, there were no doctors or physician's assistants present at Fishkill" and Nurse Brooker did not have access to x-ray equipment. (Brooker Aff. ¶¶ 6, 8.) However, Nurse Brooker alleges that "[d]uring this shift, either a doctor or a physician's assistant was on call and could be reached by telephone," in an emergency. (Id. ¶ 8.) Nurse Brooker claims that it is his usual practice to respond at night time calls requesting medical assistance by "taking information given ... by facility personnel and asking additional questions relating to symptoms and pain location," and "[b]ased upon the information received and a review of the patient's medical records, ... make a determination as to whether an immediate physical examination is necessary or if the patient would be referred to the morning sick call." (Id. ¶ 6.) He further claims that "without prior existing medical problems, plaintiff's symptom of bad

stomach cramps, alone, was not an emergency condition" and that he "was not told that plaintiff was vomiting, experiencing nausea, looking his abdomen or complaining of fever, all factors suggesting appendicitis or a emergency medical condition." (Id. ¶ 9.)

About two hours later, at approximately 7:30 a.m., Freeman went to sick call. (Freeman Dep. at 43-44; Defs. & Freeman 56.1 Stmts. ¶ 68.) Freeman was initially seen by Nurse Stalnacle who referred Freeman to physician's assistant Robert A. Macomber. (Freeman Dep. at 43-44; Defs. & Freeman 56.1 Stmts. ¶ 69; Barbour Aff. Ex. D at 1: medical record, 11/25/98; Macomber Aff. ¶¶ 6, 10.)[10]

10       Stalnack and Macomber are not defendants in this action. (See Amended Compl.)

Freeman told Macomber that he had pain in the right lower portion of his abdomen. (Freeman Dep. at 44; Defs. & Freeman 56.1 Stmts. ¶ 70; Macomber Aff. ¶ 6.) Macomber examined Freeman, ordered an abdominal x-ray, and upon its review, observed an abnormality in that area. (Freeman Dep. at 44-45; Defs. & Freeman 56.1 Stmts. ¶ 77; Macomber Aff. ¶ 9, 11.) Macomber transferred Freeman to St. Agnes Hospital where additional tests were performed and it was determined that Freeman had acute appendicitis. (Defs. & Freeman 56.1 Stmts. ¶ 78; Macomber Aff. ¶ 13; Barbour Aff. Ex. D: medical record, 11/25/98.) According to Freeman, it was approximately 10:30 a.m. when Macomber told him he was going to the hospital and 12:45 p.m. before Freeman left Fishkill. (Freeman Dep. at 45; Barbour Aff. Ex. C at 3: 6/4/99 Grievance at 2.) Freeman underwent an appendectomy at the hospital at approximately 7:00 p.m. that evening. (Defs. & Freeman 56.1 Stmts. ¶¶ 78, 80; Barbour Aff. Ex. C at 5: 6/4/99 Grievance at 2.)

Two days later, on November 27, 1998, Freeman was returned to Fishkill where he asked to be returned to his housing unit. (Defs. & Freeman 56.1 Stmts. ¶ 81.) Freeman alleges that he experienced "a lot of pain" for three to four weeks following his appendectomy, but that he stopped taking the prescribed Tylenol with codeine because he "did not like the way it made [him] feel." (Freeman Dep. at 47.)

Freeman submitted an inmate grievance dated June 4, 1999 complaining about Nurse Brooker's refusal to see him immediately on November 25, 1998. (Amended Compl. ¶ II.C; Barbour Aff. Ex. C: 6/4/99 Grievance at 2; see also Barbour Aff. Ex. C at 7.) The committee

which reviewed his complaint "recommen[ded] that the superintendent investigate this matter to determine if negligence occurred." (Barbour Aff. Ex. C at 8; 6/21/99 Response to Grievance.) Upon review, it was determined that "the Medical Department provided appropriate treatment based upon the plaintiff's symptoms." (Barbour Aff. Ex. C at 6: 7/6/99 Disposition.)

### ANALYSIS

#### I. GOVERNING LEGAL STANDARDS

##### A. Summary Judgment Standards

*4  Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir.1991).[11]

11       See also, e.g., Calp v. Koenigsmann, 99 Civ. 9557, 2000 WL 959455 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); DeFrank, 98 Civ. 7851, 2000 WL 270854 at *4 (S.D.N.Y. March 9, 2000) (Peck, M.J.); report & rec. adopted in relevant part, 2000 WL 897152 (S.D.N.Y. July 6, 2000) (Duchwald, D.J.); Greenfield v. City of New York, 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); Salahuddin v. Coughlin, 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); Watson v. McGinnis, 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.); Hernandez v. New York City Law Dep't Corp. Counsel, 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); Chambers v. TRW

Copy. Cts. Corp., 43 F.3d 29, 36 (2d Cir.1994); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994).[12] The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S.Ct. at 2552-53.[13]

12       See also, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *4; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *3; Salahuddin v. Coughlin, 999 F.Supp. at 534; Watson v. McGinnis, 981 F.Supp. at 817; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *5 (S.D.N.Y. March 9, 1997) (Peck, M.J.).

13       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *4; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *3; Salahuddin v. Coughlin, 999 F.Supp. at 534; Watson v. McGinnis, 981 F.Supp. at 817.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).[14] Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S.Ct.1356.

14       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 534.

15       See also, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 534.

Watson v. McGinnis, 981 F.Supp. at 818; Ruiz v. Selsky, 1997 WL 137448 at *3.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513.[16] The Court draws all inferences in favor of the nonmoving party-here, Freeman-only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489 (1987).[17] "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRW, 43 F.3d at 37.[18]

16       See also, e.g., Chambers v. TRW, 43 F.3d at 36; Gallo v. Prudential, 22 F.3d at 1223; Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *5.

17       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *5.

18       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *4; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *5.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986), cert. denied, 480 U.S. 932, 1997 S.Ct. 1570 (1987).[19] To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. at 2510.[20] While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment [,][f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. at 2510 (citation omitted).[21]

19       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *5; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818; Ruiz v. Selsky, 1997 WL 137448 at *3.

20       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *5; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818; Ruiz v. Selsky, 1997 WL 137448 at *3.

21       See also, e.g., Knight v. United States Fire Ins. Co., 804 F.2d at 11-12; Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *5; Greenfield v. City of New York, 2000 WL 124992 at *4; Salahuddin v. Coughlin, 999 F.Supp. at 535; Watson v. McGinnis, 981 F.Supp. at 818.

*5  "The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Freeman and that "pro se parties are 'to be given "special latitude on summary judgment motions.'" Salahuddin v. Coughlin, 999

F.Supp. at 535 (citing cases).[22] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[23]

22       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *5; Watson v. McGinnis, 981 F.Supp. at 818; see also, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest").

23       See also, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *5; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *5.

#### B. § 1983 and Deliberate Indifference to Serious Medical Needs

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988); Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), cert. denied, 512 U.S. 1240, 114 S.Ct. 2749 (1994).[24]

24       See, e.g., Calp v. Koenigsmann, 99 Civ. 9557, 2000 WL 959495 at *6 (S.D.N.Y. July 19, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *5 (S.D.N.Y. June 13, 2000) (Peck, M.J.); Gill v. DeFrank, 98 Civ. 7851, 2000 WL 270854 at *5 (S.D.N.Y. March 9, 2000) (Peck, M.J.); Greenfield v. City of New York, 99 Civ. 2330, 2000 WL 124992 at *4 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); Gill v. Jones, 98 Civ. 7851, 2000 WL 309285 (Pauley, D.J. & Peck,

M.J.); Jackson v Johnson, 15 F.Supp.2d 341, 355 (S.D.N.Y. July 23, 1998) (Kaplan, D.J. & Peck, M.J.); Silva v. Sanford, 91 Civ. 1776, 1998 WL 205126 at *8 (S.D.N.Y. April 24, 1998) (Peck, M.J.); Williams v. Vincent, 95 Civ. 0179, 1997 WL 527677 at *3 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.).

25       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *6; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. Stubbs, 81 F.Supp.2d at 453; Jackson v. Johnson, 15 F.Supp.2d at 255-56; Silva v. Sanford, 1998 WL 205126 at *8; Williams v. Vincent, 1997 WL 527677 at *3; Shaw v. Selsky, 96 Civ.2003, 1997 WL 137448 at *4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); Zamakshari v. Dvoskin, 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" and conduct that offends "evolving standards of decency." E.g., Wilson v. Seiter, 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); Estelle v. Gamble, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976).[26]

26       See also, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *6; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854 at *10.

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. See, e.g., Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); Estelle v. Gamble, 429 U.S. at 104-05, 97 S.Ct. at 291.[27]

27       Accord, e.g., Calp v. Koenigsmann, 2000 WL 959495 at *6; Carbonell v. Goord, 2000 WL 760751 at *5; Gill v. DeFrank, 2000 WL 270854

Freeman v. Strack, Not Reported in F.Supp.2d (2000)
2000 WL 1489782

2022 WL 357020

Freeman v. Strack, Not Reported in F.Supp.2d (2000)
2000 WL 1459782

of his continual appearances at sick call extending from a period starting in late November 1998 to mid-January 1989" but did not allow inmate, who ultimately died from untreated appendicitis, to see doctor until January 15, 1989).

**B. Nurse Brooker**

Freeman contends that had Nurse Brooker acted to see him at 5:20 am when told that Freeman was in pain and walked to see him, Nurse Brooker would have seen that Freeman was in a "life-threatening situation." (Amended Compl. ¶ IV-A.) Freeman alleges that "after it was explained to [Nurse Brooker] that [Freeman] had a medical concern and [Nurse Brooker] did not see [him], it was apparent" that Nurse Brooker intended Freeman to be in pain. (Freeman Dep. at 56.)

Freeman has failed to allege facts sufficient to subject Brooker to § 1983 liability. At 5:20 a.m. on November 25, 1998, Officer Cook called Nurse Brooker and told Nurse Brooker that Freeman had bad stomach cramps and, according to Freeman, that Freeman was in a lot of pain. (See, e.g., Freeman Dep. at 40; Brooker Aff. ¶ 9.) Nurse Brooker refused to see Freeman immediately, instead scheduling him for the 7:30 a.m. sick call, approximately two hours later. (See, e.g., Freeman 56.1 Stmt. ¶ 63; Brooker Aff. ¶ 10.) There was nothing in Freeman's medical history which would have put Nurse Brooker on notice that Freeman was suffering from the onset of appendicitis (see Defs. Ex. D: Freeman medical records) and there is no evidence that Officer Cook gave Nurse Brooker any reason to believe that there was an emergency on hand. The fact that Freeman had been suffering from abdominal pains for the past nineteen days was not documented because, as Freeman admits, he had not sought medical attention since his November 6 visit to Nurse Frater. (See, e.g., Freeman Dep. at 34-35.)

*10 As with Nurse Frater, there is no evidence that Nurse Brooker knew of and disregarded a substantial risk to Freeman's health. Accordingly, as Freeman has failed to show that Nurse Brooker acted with deliberate indifference, summary judgment is granted in Nurse Brooker's favor. See, e.g., Dias v. Vose 865 F.Supp. 53, 59-60 (D.Mass.1994) (doctor's failure to send inmate to hospital with emergency ward, while possibly negligent, was not deliberate indifference to serious medical need, even though delay in appendicitis surgery caused complications, absent evidence that doctor was conscious of risk to inmate if he were

not operated upon immediately), aff'd mem., 50 F.3d 1 (1st Cir.1995).[12]

---

[12] Compare, e.g., Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1994) (summary judgment inappropriate where there was evidence that five-hour delay in providing emergency treatment may have been intended to make plaintiff suffer); Thomas v. Arevalo, 95 Civ. 4704, 1998 WL 427527 at *8 (S.D.N.Y. July 28, 1998) (Sotomayor, D.J.) (denying summary judgment where there was evidence that defendants forced plaintiff to endure unnecessary surgery for thirteen days despite defendants' personal awareness of retinal detachment symptoms).

**C. Dr. Mikler**

Freeman has submitted copies of forty-nine inmate grievances from 1998 and 1999, complaining about medical care at Fishkill. (See Freeman Br. Ex. A.) Freeman contends that Dr. Mikler, as Fishkill's Facility Health Services Director, knowingly allowed the nurses at Fishkill to operate in a "wrong and illegal" manner. (Amended Compl. ¶ IV-A.) In addition, he argues that inadequate medical facilities at Fishkill—including the absence of any doctors or physician assistants at 5:20 a.m. on November 25, 1998 and Nurse Brooker's lack of access to x-ray equipment—contributed to Nurse Brooker's decision to schedule Freeman for a 7:30 a.m. sick call instead of treating Freeman's complaint as an emergency. (See Freeman Br. at 4-5.) While Freeman himself did not complain to Dr. Mikler, he contends that "[t]here should be no doubt that plaintiff would have received the same treatment of inadequate care had he forwarded a written complaint directly to Dr. Mikler. This pattern of abuse by Dr. Mikler in not responding to summary medical complaints are not so remote in time as to excuse late ... from having to prove that there was no subjective intent ... to cause plaintiff the pain and suffering that he was made to endure." (Freeman Br. at 4.)

As noted in Point I(C) above, a supervisory official may be held liable under § 1983 when there is "evidence that ... (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [citizens] by failing to act on information indicating that unconstitutional acts

Freeman v. Strack, Not Reported in F.Supp.2d (2000)
2000 WL 1459782

were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). Here, regardless of the level of medical care generally at Fishkill and even assuming that grievances alone could constitute evidence of that level of care, Freeman has failed to identify an underlying constitutional violation for which Mikler could be held responsible. As Freeman has shown at most negligence by defendants Frater and Brooker, it follows that Mikler, who is being sued in his supervisory capacity, cannot be subject to § 1983 liability. See, e.g., Brown v. Harris, 923 F.2d 979, 984 (2d Cir.) ("Obviously—if defendants Allen, Powell, and Thackeray cannot be held liable for their conduct because it was at most negligent, it follows logically that defendants Maffucci and Jackson, who are only implicated because of their supervisory authority over the practices and procedures followed at the prison, also

are not subject to being held liable."), cert. denied, 502 U.S. 849, 112 S.Ct. 152 (1991).

**CONCLUSION**

*11 For the reasons set forth above, all defendants are granted summary and the complaint is dismissed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1459782

---

Munoz v. Eliezer, Not Reported in Fed. Supp. (2018)
2018 WL 1626170

2018 WL 1626170
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Carlos MUNOZ, Plaintiff,
v.
Robinson ELIEZER C.O.; Keith C. Chase C.O.; Shyan A. Medina C.O.; Jeffrey Benson C.O.; James G. Gochl C.O.; Allen McCarthy, Nurse; Robert V. Benavegna, Dr., Defendants

16-cv-6049 (NSR)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Carlos Munoz, Pine City, NY, pro se.

Colleen Kelly Faherty, David Jolm Galalis, State of New York Office of the Attorney General, New York, NY, for Defendants.

**OPINION AND ORDER**

NELSON S. ROMAN, United States District Judge:

*1 Plaintiff Carlos Munoz ("Plaintiff"), proceeding pro se, commenced this action on July 28, 2016, pursuant to 43 U.S.C. § 1983 for alleged Eighth Amendment violations. (See Complaint ("Compl"), (ECF No. 2).) Plaintiff's claims are asserted against five corrections officers, Robinson Eliezer ("Eliezer"), Keith G. Chase ("Chase"), Shyan A. Medina ("Medina"), Jeffrey Benson ("Benson"), and James G. Gochl ("Gochl") (collectively, the "Defendant Officers"), and two medical professionals, nurse Allen McCarthy ("McCarthy") and Dr. Robert V. Bentivegna ("Dr. Bentivegna") (collectively the "Medical Defendants"). (Id.) By Order to Amend dated August 16, 2016, this Court directed Plaintiff to file an amended complaint detailing the personal involvement of the corrections officers and the manner in which his medical care was inadequate. (See Order to Amend (ECF No. 6), at 4-5.) On September 22, 2016, Plaintiff filed his Amended Complaint ("Am. Compl.") attempting to clarify his claims against the Defendants, this iteration is the operative complaint. (See Am. Compl. (ECF No. 8).)

Munoz v. Eliezer, Not Reported in Fed. Supp. (2018)
2018 WL 1626170

Supervision ("DOCCS"). Plaintiff initiated this action on or about July 28, 2016, for alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment and his right to adequate medical care. (See Am. Compl. at 4-7.)[1] Plaintiff alleges that the Defendant Officers violated his Eighth Amendment constitutional right to be free from excessive force when they allegedly attacked him on March 27, 2016. (See Am. Compl. at 4-5, summarized attached page ("UAP") I.1.) As to the Medical Defendants, Plaintiff alleges that he was denied adequate medical care. (Id.)

As Plaintiff is proceeding pro se and his Complaint is the standard, fillable form amended complaint, all citations thereto will be to pages, not paragraphs.

On March 27, 2016, Plaintiff was waiting to return to his cell from receiving his medication, which return was being directed by Defendant Eliezer. (See Am. Compl. at 4.) While waiting, Plaintiff asked Eliezer if he could go to the bathroom, as his "compuex ha[d] not been called to the messhall" yet. (Id.) In response, Eliezer said "get the fuck out of here, and go to chow", Plaintiff complied, but asked if "chow [was] mandatory on a [sic] Easter Sunday." (Id.) After Defendant Eliezer indicated he did not "make the rules", Plaintiff began walking "out the door" when he was suddenly called back by Eliezer who told him to "get on the fucking wall" (and then frisked him. (Id. at 4-5.) After Plaintiff complied with the orders, Eliezer began screaming profanities in Plaintiff's face and "smack[ing him] on [the] neck and ... face." (Id. at 5.)

After this interaction, the remaining Defendant Officers became involved. Plaintiff alleges that he was thrown to the floor while Gochl was aggressively attempted to place handcuffs on his wrists. (Id.) While this was occurring, Eliezer, Chase, Medina, and Benson began to "force [Plaintiff] in the [left side of his] face [and] leg." (Id., UAP I.) Plaintiff was brought to his feet, and "roughly slammed into the wall." (Id.) Thereafter, Plaintiff was directed onto a hallway, his handcuffed wrists were raised by Gochl to expose his ribs, and he was beaten with batons by Eliezer, Chase, Medina, and Benson in the "left leg, left shoulder and left side ribs." (Id.) Plaintiff contends that as a result of this alleged excessive force, he suffered a dislocated shoulder and three-to-four broken ribs. (Id.)

Immediately following this incident, Plaintiff was escorted to the Special Housing Unit ("SHU") where he was examined by nurse McCarthy. (Id.) McCarthy examined Plaintiff "from

Munoz v. Eliezer, Not Reported in Fed. Supp. (2018)
2018 WL 1626170

Presently before the Court is Defendants' motion to dismiss the Amended Complaint for failure to state a cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Defendants' Brief in Support of the Motion to Dismiss ("Defs. Br.") (ECF No. 15), at 1.)[1] For the following reasons, Defendants' motion is GRANTED in part and DENIED in part

I

Defendants served their motion on May 30, 2016. (See Defs. Not. Mot. (ECF No. 14), Ex. 4.) After being granted an extension of time, (see ECF No. 52), Plaintiff was required to oppose Defendants' motion by July 24, 2017, and Defendants were directed to serve their reply and file all motion papers, including Plaintiff's Opposition, on the Court's electronic filing system by August 8, 2017. (Id.) On August 8, 2017, Defendants filed their moving papers and a letter indicating they were unable to serve an opposition and requesting this Court deem the motion fully submitted. (See ECF No. 58.) Thereafter, on August 9, 2017, Plaintiff filed a letter complaining of the alleged excessive force and advising that he would soon be provided with a walker or wheelchair. (See ECF No. 3.) Plaintiff's letter made no mention of the pending motion or a request for an extension of time to file an opposition. (Id.) Further, Plaintiff had ample opportunity to respond to Defendants' motion before it was filed (at total of approximately two months), and to request an extension of time to respond after Defendants' filed their August 8, 2017 letter (an additional seven months). In light of the foregoing, the Court deems the motion fully submitted and renders the following decision on the papers, as filed.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Complaint and are accepted as true for purposes of this motion.[2]

[2] The Court assumes the truth of the facts alleged in Plaintiff's Complaint for purposes of this motion. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

*2 Plaintiff is a pro se inmate housed at Greenhaven Correctional Facility ("Greenhaven"), a prison facility that the New York State Department of Corrections and Community

the neck up" and noted the existence of lacerations on his head and a bruise under his right eye, but "never examined [Plaintiff's] shoulder or leg or ribs at all." (Id.) Plaintiff further alleges that "nothing was done." (Id.)

Two days later, Plaintiff visited Dr. Bentivegna, complaining of pain to his chest and ribs and extreme difficulty breathing, and requested that he be transferred to an outside hospital. (Id.) On April 6, 2016, nine days later, Plaintiff received x-rays which revealed "a dislocated shoulder" and three-to-four broken ribs. (Id.) Plaintiff also alleges that he was "denied medical attention for [his] injuries by Dr. Bentivegna." (Id.)

**DISCUSSION**

**I. Standard of Review**

**A. Rule 12(b)(6)**

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." (Id.)

*3 The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Where a pro se Plaintiff is concerned, Courts must construe the pleadings in a particularly liberal fashion. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). The Court must therefore interpret the pleading "to raise the strongest arguments that [it] suggest[s]." Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a pro se plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level." Jackson v. N.Y.S. Dep't of Labor, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the Court's duty to construe the complaint liberally is not "the equivalent of a

duty to co-write it," *Gelsplatter v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

## II. Exhaustion

Defendants first contend that Plaintiff's claims should be dismissed for failure to exhaust. (See Defs. Br. at 4-6.) In support of this contention, Defendants provide an affidavit of Jeffrey Hale, Assistant Director of the Inmate Grievance Program at DOCCS. (See Declaration of Collen K. Fahey-Keep (ECF No. 36), Exhibit A, Declaration of Jeffery Hale in Support of Defendants' Motion dated April 18, 2017 ("Hale Decl.").)

The Prison Litigation Reform Act ("PLRA") precludes the filing of an action "with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison or other correction facility until such administrative remedies as are available are exhausted." *Williams v. Corr. Officer Priamos,* 829 F.3d 118, 122 (2d Cir. 2016) (internal quotations omitted).

Whether an inmate has exhausted all administrative remedies turns on a review of "the state prison procedures [available] and the prisoner's grievance ...." See *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) (citing *Jones v. Bock,* 549 U.S. 199, 218 (2007)). Grievances at DOCCS are governed by the Inmate Grievance Program ("IGP"), which is based on a three-tiered system. *Id.* at 125. To adjudicate an inmate complaint: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"); (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility; and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Office Review Committee ("CORC")." *Id.; see also* N.Y. Comp. Codes, R. & Regs., tit. 7, § 701.7 (1999)*.

Notably, exhaustion is an affirmative defense, not a pleading requirement; thus, inmate plaintiffs need not "specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Instead, Defendants must demonstrate lack of exhaustion. *Cohn v. N. Y.S. Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7413(NSR), 2017 WL 4157372, at *5 (S.D.N.Y. Sept. 15, 2017) (citing *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009)).

Dismissal on a 12(b)(6) motion for failure to exhaust is permissible where "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams,* 829 F.3d at 122; *see also Parris v.*

---

administrative remedies. It is well settled that exhaustion is not a pleading requirement; thus, Plaintiff need not allege that he filed every grievance or any grievance at all. See *Jones,* 549 U.S. at 216; *Johnson,* 2011 WL 2946168, at *2 (citing *Smalls v. Jammone,* No. 08-CV-4367, 2010 WL 3291587, at *2 (S.D.N.Y. Aug. 13, 2010) for proposition that fact that plaintiff does not plead exhaustion is not proof of lack of exhaustion). That Plaintiff only referenced two grievance dates is evidence of nothing more than that he filed at least two grievances. See *McNair v. Rivera,* Nos. 12-CV-6212(ALC)(SN), 12-CV-8124(ALC)(SN), 13-CV-0152(ALC)(SN), 2013 WL 4779033, at *5 (S.D.N.Y. Sept. 6, 2013) (failure to exhaust not pled where general reference to grievances made). The allegation is ambiguous at best. *Compare to Parris,* 947 F. Supp. 2d at 364 (denying motion to dismiss regarding exhaustion where complaint "contains no reference to CORC"). This is sufficient a basis on which to deny the motion. *Jantsos,* 2011 WL 2946168, at *2 (denying motion to dismiss where complaint ambiguous as to exhaustion).

Further, this allegation is not the type exemplary of "clearly point[ing] to" non-exhausting. *Cohn,* 2017 WL 4157372, at *5 (collecting cases). These types of complaints include allegations amounting to an admission by the plaintiff that he did not exhaust for whatever reason. *Compare Corson v. Brown,* No. 13-CV-7054(JLS), 2015 WL 876464, at *3 (S.D.N.Y. Feb. 28, 2015) (lack of exhaustion clear where "plaintiff specifically pleads that he untimed the administrative process ... but concedes that he did not appeal that decision") *with Smalls,* 2010 WL 3291587, at *3 (declining to consider defendants' exmore evidence).

*5 In light of the foregoing, this Court finds no reason to consider the Hale Declaration, *see Parris,* 947 F. Supp. 2d at 362 (declining to consider defendants' affidavit "purportedly showing a lack of exhausted grievances"); accordingly demonstrating a lack of appealed grievances to CORC regarding the alleged incident, (*see* Hale Decl. ¶ 4.) to determine whether Plaintiff has exhausted his administrative remedies. This Court also declines to turn this motion into one for summary judgment. *See Sammons v. Crispo,* No. 52-CV-0461 (PAC)(DF), 2013 WL 1285417, at *3 (S.D.N.Y. Mar. 28, 2013) (deny ing exhaustion motion where complaint ambiguous and not converting to summary judgment). Defendants' motion to dismiss for failure to exhaust is denied without prejudice.

---

*N.Y.S. Dep't Corr Servs.,* 947 F. Supp. 2d 154, 261 (S.D.N.Y. 2013) (citing *Jantsos v. Westchester Cnty. Dep't of Corr. Med. Dep't,* No. 10-CV-6509, 2011 WL 2946168, at *3 (S.D.N.Y. July 19, 2011) for proposition that denial of motion appropriate where complaint ambiguous as to exhaustion).

*4 Further, on each motion, where a court is confined to the four corners of the complaint, the documents attached thereto, and those of which it is entitled to take judicial notice, see, e.g., *Zitomann v. Elam Corp.,* 746 F.3d 145, 152 (2d Cir. 2013); *Consiatas v. Hants,* 651 F.3d 518, 521 (2d Cir. 2011), a court is only permitted to consider outside documents related to exhaustion and submitted by defendants under limited circumstances, *see Smith v. kelter,* No. 15-CV-0563(NSR), 2017 WL 4838322, at *3 (S.D.N.Y. Oct. 23, 2017) (noting courts can take judicial notice of administrative records in Section 1983 cases in limited circumstances). These include instances where "the complaint a) was the standard *pro se* form complaint that has a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted." *Cohn,* 2017 WL 4157372, at *5.

This Court declines to consider the Hale Declaration because the Amended Complaint does not fall into any of the three above-articulated categories. First, though it is a form complaint, it does not have "a check-box regarding exhaustion", *Cohn,* 2017 WL 4157372, at *5; indeed, the pre-printed text of the document only references exhaustion insofar as it generally reminds inmates that exhaustion is a requirement to filing a federal lawsuit, (*see* Am. Compl. at 6.) Second, the Amended Complaint contains no "allegations clearly stating that Plaintiff had exhausted his administrative remedies." *Cohn,* 2017 WL 4157372, at *5. Plaintiff's listing of grievance numbers and dates, (*see* Am. Compl., UAP 2), is certainly not a clear statement that Plaintiff has exhausted his administrative remedies. The pre-printed reminder, (*see* Am. Compl. at 6), does no more to alter the outcome; it fails to constitute any representation by Plaintiff regarding exhaustion whatsoever.

Defendants nonetheless argue that Plaintiff's "lack of exhaustion is clear from the face of the complaint", (*see* Defs. Br. at 5), presumably attempting to fit Plaintiff's allegations into the third category articulated above, insofar as they contend that the phrase "[t]he grievances kept 8261.3-16 Apr. 04 2016 kept 8261.3-16 Apr. 18 2016", (*see* Am. Compl., UAP 2), is evidence that Plaintiff has failed to exhaust his

---

---

*Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Negligence or medical malpractice do not "rise to the level of a constitutional violation unless the malpractice involves culpable recklessness." *Hill,* 657 F.3d at 123 (citing *Chance,* 143 F.3d at 703) (internal quotations and alterations omitted). Relatedly, so long as a prisoner "receives adequate treatment", he "does not have the right to choose his medical treatment." *Id.* (citing *Estelle,* 429 U.S. 97); *see also Chance,* 143 F.3d at 703 (noting that a prisoner's preference for different treatment does not rise to the level of an Eighth Amendment violation).

*6 Read liberally, the Amended Complaint asserts two forms of deliberate indifference to serious medical needs, failure to treat and delay in care, (*see* Am. Compl., UAP 2); neither sustains an Eighth Amendment claim.

### A. Objective Prong

The objective prong requires a two part inquiry. *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006). First, there must be an actual "deprivation of adequate medical care." *Id.* at 279. Reasonable care cannot constitute a deprivation. *See Farmer,* 511 U.S. at 844-47. Then, the Court must determine whether that deprivation is sufficiently serious, which requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill,* 657 F.3d at 122 (citing *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996) ("*Hathaway III*")).

During all possible references from Plaintiff's facts, he alleges that McCarthy failed to provide treatment at all, (*see* Am. Compl., UAP 2), which requires the examination of whether the "medical condition is sufficiently serious." *Salahuddin,* 467 F.3d at 280. Plaintiff's alleged injuries of three-to-four broken ribs and a dislocated shoulder are certainly sufficiently serious for purposes of the Eighth Amendment, as both are objectively associated with extreme pain. *See Guiton v. New York,* 607 F. Supp. 2d 276, 286, 286 (S.D.N.Y. 2010) (broken arm was serious injury); *Griffin v. Crippen,* No. 05-CV-1072(TJM/DRH), 2016 WL 681194, at *8 (S.D.N.Y. Feb. 24, 2010) (broken rib met seriousness); *Torres v. N.Y.C Dep't of Corr.,* No. 97-CV-6296(MBM), 1997 WL 61539, at *1 (S.D.N.Y. Feb. 13, 1995) (broken rib could be sufficiently serious). Nevertheless, the inquiry does not end there, and as described *infra* III.B, Plaintiff has failed to demonstrate the requisite state of mind.

### B. Subjective Prong

*7 Plaintiff's Eighth Amendment claim is ripe for dismissal for failure to allege that the Medical Defendants had the requisite deliberate indifference to his health.

With respect to nurse McCarthy, Plaintiff alleges that she "examined [him] from the neck up" (*see* Am. Compl., UAP 1), and acted laceration and a bruise, (*id.*) but failed to "examine his shoulder or leg or ribs at all," (*see* Am. Compl.) Plaintiff does not allege that he informed McCarthy that he was feeling pain in his shoulder or ribs, or requested that she look at these areas. The allegations he did plead, even read in the light most favorable to him, indicate that McCarthy was unaware of the serious nature of Plaintiff's injuries. *Farmer,* 511 U.S. at 851 (deliberate indifference requires awareness of concrete risk), and the failure to provide any treatment to the injuries she was aware of, to wit lacerations and bruises,

---

amounts to negligence, at most, not an Eighth Amendment violation. *See Hill,* 657 F.3d at 123 (noting malpractice and negligence not constitutional violations). For the same reasons, Plaintiff cannot allege an Eighth Amendment violation on the basis that McCarthy did not examine anything below his neck. To the extent it would have been prudent for her to do so, then her conduct, again, only amounts to negligence. *See Harrison v. Chevrolio,* No. 17-CV-0766(NSR), 2018 WL 1399200, at *15 (S.D.N.Y. Mar. 19, 2018) (citing *Falcon v. Wright,* 459 F.3d 243, 259 (2d Cir. 2006) for proposition that "inadvertent failures to impart medical information" not enough for constitutional violation).

Even assuming Dr. Bentivegna's delay in treatment was sufficiently serious, the analysis is similar to that of McCarthy. Plaintiff has alleged no facts from which an inference regarding Dr. Bentivegna's state of mind can be made, *see Jantsos,* 2017 WL 3268859, at *8 (finding no deliberate indifference for a six-day delay), *James v. Correct Care Sols.,* No. 13-CV-0019(NSR), 2013 WL 5730176, at *6 (S.D.N.Y. Oct. 21, 2013) (noting that deliberate indifference requires more than allegations about a delay in treatment), nor does he allege that the delay in treatment was intentional or reckless, *see Holl v. Amdell,* 986 F. Supp. 2d 555, 562 (S.D.N.Y. 2013) (substantial prejudice absent of allegations that "the delay value either intentional or reckless"), or desire to punish plaintiff, *see Cruger v. Vaguil,* No. 12-CV-5345(PAC) (GWG), 2013 WL 1783715, at *13 (S.D.N.Y. July 9, 2013) (noting reservation of designation as deliberate indifference in Second Circuit to delays as "form of punishment" or where "life-threatening and fast-degenerating condition" exist, etc.) Plaintiff has failed to establish the subjective prong.[6]

> The statement that Plaintiff was "denied medical attention by Dr. Bentivegna", (*see* Am. Compl., UAP 1), is conclusory and thus equally unavailing. *See Adams v. Galy, or Orange,* 352 F. Supp. 2d 177, 411 (S.D.N.Y. 2005) (statement that defendants "were deliberately indifferent", without more, insufficient). *Jantsos,* 2017 WL 3268859, at *8 (noting conclusory statements insufficient for deliberate indifference).

In consideration of the foregoing, Defendants' motion to dismiss the Amended Complaint for failure to state a claim against the Medical Defendants is granted.

### IV. Qualified Immunity

---

With regard to Dr. Bentivegna, the claim amounts to a delay in treatment.[7] Consequently, the inquiry is narrow and "focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin,* 467 F.3d at 280. Courts have consistently found that delays in treatment of a condition that is not "fast degenerating" or "life-threatening", amounting to a few days, are not sufficiently serious. *See Demata v. S.1.N. Corr. Dep't of Health Servs.,* 198 F.3d 233, 233 (2d Cir. 1999); *Chiu v. Kielsmeiney,* 465 Fed.Appx. 46, 46 (2d Cir. 2012) (summary order) (three day delay not sufficiently serious); *Amaury v. Summer,* No. 14-CV-5366(NSR), 2017 WL 1268859, at *7 (S.D.N.Y. July 28, 2017) (noting six-day delay between x-ray and treatment, or over two-day delay, not sufficiently serious). As a comparison, Plaintiff's claim amounts to a one-day delay before being x-ray'd (*See* Am. Compl., UAP 1.) This is not sufficiently serious; the objective prong is not met as to Dr. Bentivegna.

[5]

> It is also possible that Plaintiff is claiming that he should have been transferred to the hospital as requested. Construing the facts in the light most favorably to Plaintiff, if he was not transferred, the claim amounts to nothing more than a preference of treatment, not recoverable under the Eighth Amendment. *See Chance,* 143 F.3d at 703; *see also Bueno v. Chiriello,* No. 17-CV-0790(NSR), 2018 WL 1399200, at *4 (S.D.N.Y. May 19, 2018).

---

*8 State officials are entitled to qualified immunity provided "[(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Morgan v. Ward,* 14-CV-7021(GHW), 2016 WL 12731, at *7 (S.D.N.Y. Feb. 5, 2016) (citing *Martinez v. Simonetti,* 202 F.3d 625, 633-34 (2d Cir. 2000)); *see also Ibqu'v Peliati,* 556 U.S. 730, 739 (2002); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Granting a 12(b)(6) motion for qualified immunity is appropriate where "the facts supporting the defense appear on the face of the complaint," *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67 (2d Cir. 1998)), and "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief," *id.* (quoting *Citibank, S.2, v K Corp.,* 968 F.2d 1489 (2d Cir. 1992)).

In light of Plaintiff's failure to state a claim for a violation of his constitutional rights by Defendants McCarthy and Bentivegna and the resulting conclusion that their conduct was reasonable, the Medical Defendants are entitled to qualified immunity. *See Jantsos,* 2017 WL 3268859, at *9; *see also Jenkins v. Greiner,* 195 F. Supp. 2d 500, 508 (S.D.N.Y. 2012) (qualified immunity where allegations demonstrated reasonableness). The motion in that regard is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint is hereby GRANTED in part and DENIED in part. The claims against the Medical Defendants are dismissed with prejudice. Only the Eighth Amendment claim for excessive force against the Defendant Officers remains, and they are thus directed to answer the Amended Complaint on or before April 20, 2018. In light of the fact that Plaintiff is incarcerated, the Court hereby waives the formal Pre-trial Conference and directs the parties to confer, complete, and submit the attached case management plan on or before May 4, 2018. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 34.

SO ORDERED.

Attachment

---

**Ridge v. Davis, Slip Copy (2022)**

2022 WL 357020

Munoz v. Eliezer, Not Reported in Fed. Supp. (2018)
2018 WL 1626170



**All Citations**

Not Reported in Fed. Supp., 2018 WL 1626170

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Davis v. Furey, Slip Copy (2021)
2021 WL 2827366

*I. Facts*

As discussed above, the court draws from defendants' Local Rule 56(a)1 Statement and plaintiff's Verified Amended Complaint.

**III. Factual Background**

*A. Background*

**IV. STANDARD OF REVIEW**

**V. ANALYSIS**

---

Davis v. Furey, Slip Copy (2021)
2021 WL 2827366

2021 WL 2827366
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Michael DAVIS, Plaintiff,
v.
Richard FUREY, et al., Defendants.

CIVIL CASE NO. 3:19-CV-1887 (JCH)
|
Signed 07/06/2021

**Attorneys and Law Firms**

Michael Davis, Suffield, CT, Pro Se.

James W. Donohue, Samantha C. Wong, Office of the Attorney General, Hartford, CT, for Defendants Kari, Inderia.

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Janet C. Hall, United States District Judge

**I. Introduction**

**II. Davis's Request for Additional Discovery**

Davis v. Furey, Slip Copy (2021) ...
2021 WL 2827366

Courts have uniformly held that the PLRA exhaustion requirement is satisfied where "prison officials address and resolve a grievance on the merits despite the fact that it might not comply with procedural rules." Candlin v. Hogan, No. 3:14-CV-1166 (VAB), 2018 WL 1582514, at *7 (D. Conn. Mar. 31, 2018) (citing cases). "The rationale for this requirement is that 'when a state treats a filing as timely and resolves it on the merits ... the grievance has served its function of alerting the state and inviting corrective action.' " Id. (citing Riccardo v. Rausch, 375 F.3d 521, 524 (7th Cir. 2004)). The record notes that the Health Services Review "Upheld" on September 18, 2019, included his complaint about Nurses Mitto and Lewis. Davis complained about the conduct and lack of "meaningful treatment" by two nurses who saw him for his back pain on January 26, 2019, in addition to requesting to be seen by a "Medical Doctor (provider)." See Defs.' Ex. F at 8.

**a. Eighth Amendment Deliberate Indifference to Medical Needs**

In Estelle v. Gamble, 429 U.S. 97 (1976), the United States Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." Id. at 104. (internal quotation marks and citation omitted). The Court explained that "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05.

Deliberate indifference involves medical needs exist when an official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Harmaya v. Barkley, 219 F.3d 132, 137-38 (2d Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994)) (quotations omitted). In order to state a deliberate indifference claim, the plaintiff must allege both that his medical need was serious and that the defendants acted with a sufficiently culpable state of mind. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir 2003) (citing Estelle, 429 U.S. at 105). Objectively, the alleged deprivation must be "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991). The conditions must be "one that may produce death, degeneration, or extreme pain." See Hathaway v. Coughlin,

99 F.3d 550, 553 (2d Cir. 1996) (citation and internal quotation marks omitted).

Merely negligent conduct does not constitute deliberate indifference. Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006), nor does a disagreement over proper treatment or a diagnosis create a constitutional claim so long as the treatment was adequate. Estelle, 429 U.S. at 107; Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir 1998); see also Olu v. Soprano, No. 3:26-CV-217 (SRU), 2020 WL 4316476, at *3 (D. Conn. July 27, 2020) ("It is well settled that an inmate's unfounded preference for treatment does not create a constitutional claim."). However, a medical provider may act with deliberate indifference by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentive. Chance, 143 F.3d at 703-04; see also Estelle v. Furdeauer, 2017 WL 3222512, at *16-17 (D. Conn. July 28, 2017).

**i. Lewis and Mitto**

*5 Davis argues that Nurses Lewis and Mitto failed to provide him with meaningful treatment; failed to give him a full screening; failed to instruct him to stretch, failed to provide him with pain relief, and verbally disrespected him. Verified Am. Compl. at ¶ 2. In his opposition memorandum, Davis contends that Mitto and Lewis failed to render either meaningful or timely treatment (i.e., he had to wait two hours and "run a few minutes"). Id., Pl.'s Opp. at 3-4 (Doc. No. 35-1).

Even assuming that Davis can satisfy the objective element, Davis cannot present his Eighth Amendment deliberate indifference claim on his own assessment that Mitto and Lewis did not provide sufficient medical care on January 26, 2019. An inmate's disagreement with the medical provider about his medical needs is not sufficient to raise a genuine issue of fact that an Eighth Amendment violation occurred. See Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."); Grieves v. McGrann, 331 F. Supp. 3d 225, 234 (W.D.N.Y. 2018) (citing cases holding that a plaintiff's disagreement with treatment is insufficient to establish an Eighth Amendment violation). The record cannot support a reasonable finding that Nurses Mitto and Lewis provided Davis with a particular treatment plan with an improper purpose, such as a monetary incentive. Chance, 143 F.3d at 703-04; Hsdison, 2017 WL 3222512, at *16-17. As

the extent that APRN Rodney erred in his assessment of Davis's lack of acute distress or physical abilities, or by failing to schedule a follow-up appointment, such conduct constitutes negligence or mere medical malpractice, which is not sufficient to support Eighth Amendment deliberate indifference. See Furner, 511 U.S. at 835. There is no evidence in the record before the court to support the inference that Rodney acted with conscious disregard. See supra at 11-12. Accordingly, as no reasonable juror could conclude that APRN Rodney acted with deliberate indifference to Davis's serious medical needs, the Motion for Summary Judgment is granted as to Davis's claim against Furey for deliberate indifference.

While the parties dispute whether APRN Rodney represented that he was a medical doctor (See Defs.' Rule 56(a)1 at ¶ 38; Pl.'s Rule 56(a)2 at ¶ 38), Davis has not submitted evidence raising any issues of material fact that could support an inference that APRN Rodney acted with conscious disregard to Davis's serious medical needs when he provided Davis with medical care.

**VI. CONCLUSION**

*7 For the foregoing reasons, the defendants' motion for summary judgment (Doc. No. 30) is GRANTED. The Clerk is instructed to close this case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 2827366

---

Davis v. Furey, Slip Copy (2021) ...
2021 WL 2827366

must, the record indicates that Mitto and Lewis may have acted negligently with respect to their assessment of Davis's medical needs, but negligence is not sufficient to support an Eighth Amendment claim. Salahuddin, 467 F.3d at 280. The fact that MacDonald-Walker Nurse MacPhearson later provided different medical treatment for him on March 12, 2020, does not raise an inference that Mitto and Lewis acted with deliberate indifference on January 26, 2020. See Am Comp at ¶ 9; Pl's Ex. A at 2 (Doc. 35-3); Parks v. Blanchette, 144 F. Supp. 3d 282, 322 (D. Conn. 2015) ("a difference of opinion ... even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference.") (internal quotation marks and citations omitted).

Absent any evidence that Nurses Mitto or Lewis acted with a conscious disregard of a substantial risk of serious harm to Davis on January 26, 2019, Davis has failed to show a material issue of fact requiring a jury trial on the issue of whether defendants acted with deliberate indifference to his medical needs.

**a. Two Hour Delay**

To the extent that Davis asserts deliberate indifference on the basis that he sustained a two-hour delay in receiving treatment on January 26, 2019, Davis's claim does not satisfy the objective element of the Eighth Amendment inquiry.

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay." Lombardo v. Graham, 807 F. App'x 120, 123 (2d Cir. 2020) (citing Salahuddin, 467 F.3d at 280) (other citations omitted) (summary order). The court's objective "serious medical need inquiry can take into account the severity of the temporary deprivation alleged by the prisoner." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003). The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." Id. "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Id. at 187; see also Bilal v. White, 494 F. App'x 143, 145-46 (2d Cir 2012) ("Even assuming that Bilal's conditions could serious complications if neglected over sufficient time, there is no

evidence that Bilal's conditions worsened over the hours of delay here[.]") (internal citations omitted); see also Ferguson v. Cai, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in the Second Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

*6 Relevant to the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. See Salahuddin, 467 F.3d at 280; Amaker v. Coombe, No. 96-CIV. 1622, 2002 WL 523188, at *9 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate a prisoner's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

Here, Davis has not presented any evidence that he experienced any serious risk of harm as a result of the asserted two-hour delay in receiving treatment from Mitto and Lewis on January 26, 2019. See Rodriguez v. Mercado, No. 00-CIV-8588, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (noting that patients "seeking care for a non-life-threatening injury generally experienced [ some delay in receiving treatment" and finding no constitutional claim based on no single or two hour delay where plaintiff had not alleged "life-threatening" or "fast-degenerating condition" or extreme pain that "more rapid treatment could have alleviated."). Thus, entry of summary judgment is appropriate because Davis has not shown that the asserted two-hour delay in treatment was sufficiently serious to support an Eighth Amendment violation. Moreover, the record fails to provide a basis upon which a reasonable jury could find that Mitto and Lewis were aware that Davis would suffer serious medical needs, but they acted with a conscious disregard to his need for timely treatment.

Because no reasonable jury could conclude, based on the evidence before the court, that Mitto or Lewis acted with deliberate indifference to Davis's medical needs, the Motion for Summary Judgment is granted in favor of the defendants.

---

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
2002 WL 1997885

2002 WL 1997885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dimar RODRIGUEZ, Plaintiff,
v.
Wardica J. MERCADO, et al., Defendants.

No. 00 CIV. 8588.JSRFM.

Aug. 28, 2002.

**Synopsis**
Prisoner brought a § 1983 action against corrections personnel, claiming that they strip-searched him in violation of his Fourth Amendment rights, used excessive force against him, and were deliberately indifferent to his medical needs. On cross-motions for judgment on the pleadings or summary judgment, the District Court, Maas, Magistrate Judge, issued a report and recommendation that: (1) there were issues of fact precluding summary judgment on inmate's Fourth Amendment claim; (2) any unseen inmate allegedly received were not sufficiently serious to support an Eighth Amendment claim of indifference to serious medical needs; (3) in any event, inmate did not show that any of the medical professionals at the jail were deliberately indifferent to his need; (4) there were issues of fact precluding summary judgment on Eighth Amendment excessive use of force claim; (5) inmate failed to show any personal involvement on the part of warden and another supervisory corrections officer which could give rise to liability under § 1983; and (6) one corrections officer was entitled to qualified immunity, but two were not.

Recommendation issued.

West Headnotes (8)

**[1]** Federal Civil Procedure ⟶ Civil rights cases in general

There were issues of fact, precluding summary judgment on jail inmate's Fourth Amendment claim, as to whether request that Muslim inmate remove his belt a second time was reasonable, and as to whether removal of inmate's to imake area for a second strip search was justified, or

was intended simply as a form of retribution or humiliation. U.S.C.A. Const. Amend. 4.

**[2]** Prisons ⟶ Hair, grooming, and clothing

If corrections officer did not know of a prior search of inmate's head during a routine institutional search, his request for removal of the Muslim inmate's belt was reasonable under the circumstances and could not give rise to a Fourth Amendment violation. U.S.C.A. Const. Amend. 4.

3 Cases that cite this headnote

**[3]** Prisons ⟶ Particular Conditions and Treatment
Sentencing and Punishment ⟶ Medical care and treatment

Any unseen jail inmate allegedly received when he was allegedly forced in the back and had his head struck against the wall by corrections officers were not sufficiently serious to support an Eighth Amendment claim of indifference to serious medical needs, where inmate claimed in time sustained only bruises, and the doctor who examined inmate the next day observed no bruises, and noted that inmate had not lost consciousness and was alert and responsive during the examination. U.S.C.A. Const. Amend. 8.

2 Cases that cite this headnote

**[4]** Prisons ⟶ Particular Conditions and Treatment
Sentencing and Punishment ⟶ Medical care and treatment

Even if jail inmate had demonstrated injuries severe enough to rise to the level of a serious medical need, he did not show that any of the medical professionals at the jail were deliberately indifferent to that need, as violation of the Eighth Amendment, where inmate did not allege that his injuries were life-threatening or fast-degenerating, or that he was experiencing extreme pain that more rapid treatment would have alleviated, and where inmate was seen

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
2002 WL 1997805

within eight or nine hours of the incident by a nurse who prescribed him an analgesic and who put smate on sick call for the following day. The reason he was seen by a physician who prescribed additional medication. U.S.C.A. Const.Amend. 8.

42 Cases that cite this headnote:

[5] **Federal Civil Procedure** ⟶ Civil rights cases in general

There were issues of fact, precluding summary judgment on Eighth Amendment excessive use of force claim, as to the degree of force that was used against jail inmate and whether that use of force was justified. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[6] **Civil Rights** ⟶ Criminal law enforcement; prisons

Jail inmate failed to show any personal involvement on the part of warden and another supervisory corrections officer which could give rise to liability under § 1983 for alleged Fourth and Eighth Amendment violations, where neither personally participated, and it was not shown that they promulgated any unlawful policy or were grossly negligent in the supervision of the officers who engaged in the alleged unlawful activity, or that warden failed to take appropriate action upon the discovery of the incident. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

[7] **Civil Rights** ⟶ Prisons, jails, and their officers; parole and probation officers

Corrections officer who was not shown to have been involved in alleged misconduct by another officer was entitled to qualified immunity as to inmate's claims of excessive force and denial of medical treatment. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

[8] **Federal Civil Procedure** ⟶ Civil rights cases in general

**The** Defendants have now moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56 (Docket No. 28). Damar has cross-moved for the same relief. (Docket No. 39). For the reasons set forth below, the Defendants' motion should be granted in part and denied in part and Damar's cross-motion should be denied.

**II. Background**

*A. Relevant Facts*

The factual recitation set forth below is based upon Damar's complaint, the parties' submissions in connection with their motions, including the transcript of Damar's deposition, [2] and matters of public record. Unless otherwise noted, the facts have been set forth in the light most favorable to Damar.

Damar's deposition ("Dep.") is attached to the Declaration of Genevieve Nelson, dated Feb. 12, 2002 ("Nelson Decl."), as Ex. C.

Damar has been incarcerated since November 15, 1999, when he was arrested for violating his parole on a 1995 robbery conviction by unlawfully possessing a weapon. (See Dep. at 8, http://m.nbcdealsop.docs.state.us.in.GC-A00990/WIQH/WINQ000 (last visited Aug. 8, 2002)). On April 26, 2000, he was lodged at the Bronx House of Detention for Men. (See Dep. at 29–30). At approximately 7:30 a.m. that day, correction officers at the facility conducted a routine institutional search of Damar's housing area, including both his cell and those of his neighbors. (See Compl. at 3; Dep. at 31–33). Damar was awakened in his cell by Officer Virgilio Correa, who directed that Damar remove all his clothing, including his "religious hat." [3] (Id.; Dep. at 32–34). Damar complied while Officer Correa remained outside the cell and examined Damar visually. (Dep. at 34–36). Officer Correa may also have searched Damar's hat. (Id. at 34–35).

Damar is a Muslim and was wearing a "kufi," (Dep. at 24–25, 33), headgear commonly associated with members of that faith.

After completing his examination of Damar's person, Officer Correa directed Damar to get dressed and step out of the cell so that he could search the interior (Id. at 36–37). While Officer Correa was conducting that search, Captain Amado Pla approached Damar outside the cell and directed him to remove his hat. (Id. at 43; Compl. at 3–4). According to his deposition, Damar told Captain Pla that he was wearing a

religious hat and had already been searched by Officer Correa. (Compl. at 4; Dep. at 43, 45). Rather than responding his command, however, Captain Pla responded by ordering two or three officers to remove Damar from the housing area. (Compl. at 4; Dep. at 45).

*2 Captain Pla tells a markedly different version of these events in his official report. For example, there is nothing in his report which would indicate any awareness on his part that Damar's kufi had previously been removed. Quite to the contrary, his report states that Damar was "disrupting the search by refusing to take off his kufi to be [s]earched" and, for this reason, "was ordered cuffed and removed from [the] the area." (Nelson Decl. Ex. D at 5214. According to a Department of Correction investigative that version of the incident is corroborated by a videotape, on which Damar is heard stating to Captain Pla, "If you want me to take it off, then you take it off." (Id. at 542). Similarly, a Notice of Infraction given to Damar after the incident, which is appended to the investigator's report, states that Damar's clothing]. (See Docket No. 28; 555). Damar denies making any of these statements. (Dep. at 72).

Damar testified that he was handcuffed in the vicinity of his cell and dragged down the hall to an elevator, where he was repeatedly kneed "very hard" in the back and his head was deliberately hit against the elevator wall. (Compl. at 4; Dep. at 45, 53–55, 57–59). Damar testified that Captain Pla and Officer Joseph Rodriguez were both in the elevator with him, along with two or three other officers. (Dep. at 56, 57). He was not asked, and his papers fail to disclose, which of these officers allegedly attacked him in the elevator.

After Damar was removed from the elevator, he was taken to the prison intake area "search room," where, he alleges, Captain Pla hit his head against the wall and other officers repeatedly punched and/or kneed him in the back. (Id. at 60–64; Compl. at 4). Damar then was instructed to remove his clothes for a second strip search, during the course of which he was beaten again. (Dep. at 63). Although he did not know the name of every employee in the search room, Damar testified that Officer Rodriguez was there. (Id. at 61).

Damar contends that he sustained bruises on his head, back, and wrists as a result of the illegal actions of the correction officers at the Manhattan House of Detention. (Id. at 82). Despite these injuries, however, Damar allegedly was put into a cell in the intake area for approximately two to three

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
2002 WL 1997805

Corrections officers who were alleged to have engaged in an unreasonable second search of jail inmate and to have used excessive force against him were not entitled to summary judgment on qualified immunity grounds, where there were factual issues as to what occurred, which had to be resolved in order to determine whether similarly-situated officials would have understood that their actions violated inmate's constitutional rights. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Damar Rodriguez, Pro Se, Wyoming Correctional Facility, Attica.

Genevieve Nelson, Esq., Assistant Corporation Counsel, New York City Law Department, New York.

**REPORT AND RECOMMENDATION**
**TO THE HONORABLE JED S. RAKOFF**

MAAS, Magistrate J.

**I. Introduction**

*1 Plaintiff Damar Rodriguez ("Damar"), [1] who is presently incarcerated at the Wyoming Correctional Facility, instituted this pro se action, pursuant to 42 U.S.C. § 1983, by submitting his complaint to the Pro Se Office of this Court on or about September 22, 2000. (Docket No. 2). In his complaint, Damar claims that the Defendants strip-searched him in violation of his Fourth Amendment rights, used excessive force against him, and were deliberately indifferent to his medical needs while he was detained at the Bronx House of Detention for Men. (Id. at 3–5). He seeks monetary damages in the amount of $5 million from four named defendants and three "John Doe" defendants (collectively, the "Defendants") for their alleged wrongs. (Id. at 5).

Because both the Plaintiff and one of the Defendants have the same surname, this Report and Recommendation refers to the plaintiff as "Damar" to avoid any confusion.

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
2022 WL 1997805

hours before he was returned to his housing area. (Id. at 68–69). Damar testified that while he was in the intake area cell he asked Officer Rodriguez if he could see a doctor, but Officer Rodriguez responded that he had "nothing to do with that." (Id. at 69).

When Damar was returned to the housing area, he asked an unidentified captain there if he could see a doctor because he "was feeling bad and [his] back and head [were] hurting and [his] wrists were sore." (Id. at 72–73). Damar testified that he had a "little" red lump on the right side of his head and a "blue and purple mark" resulting from his leg been handcuffed. (Id. at 82–83). Some time after 3:00 p.m., he was examined by a prison nurse who gave him two Tylenol and placed him on "sick call" for the following day. (Id. at 73–74).

*3 Within forty-eight hours of the incident Damar also was taken to a prison clinic where he was examined by a doctor [4] (Id. at 81). He contends that this occurred only because he had complained to the Legal Aid Society. (Id. at 83). At the clinic, the doctor noted that Damar had suffered no loss of consciousness, was alert, and had no acute injuries. (Nelson Decl. Ex. E at 336). Although Damar complained of pain in his right scalp, the doctor also noted that he observed no abrasion or bruise there. (Id.). The doctor prescribed Motrin for Damar's pain (Id. Dep. at 83). For some time thereafter, Damar continued to take Tylenol for recurring migraine headaches. (Dep. at 83–84). Damar also was prescribed Naprosyn for a preexisting back problem which he contends was exacerbated by the assault. (Id. at 83, 85).

Although Damar contends that the prison doctor did not see him until forty-eight hours after the incident, the doctor's report indicates that the examination took place on April 27, 2000, or 7:30 p.m., approximately thirty-six hours after the incident. (Nelson Decl. Ex. E at 336)

*B. Exhaustion of Administrative Remedies*

Damar alleges that he filed a written grievance shortly after this incident which was later referred to Warden Mercado. (Compl. at 2). He also asserted to the complaint a May 3, 2002, Department of Correction memorandum which indicates that Damar's grievance is "non-grievable." (Id. at 9). In their papers, the Defendants do not dispute that Damar has exhausted his available administrative remedies.

*C. Complaint* [5]

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
2002 WL 1997805

*A. Standard of Review*

*4 "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir.1988)(emphasis added). Here, the face of the pleadings is plainly inadequate to resolve the legal issues raised by the parties' cross-motions. In their notice of motion, however, the Defendants also sought summary judgment and, in accordance with Local Civil Rule 56.2, provided the required notice of the procedures that a pro se litigant must follow to oppose such a motion. (See Docket No. 28). Moreover, Damar responded to the Defendants' motion by filing his own cross-motion for summary judgment.

In these circumstances, it is clear that both sides were on notice that the Court might treat their motions as summary judgment motions and consider matters outside the pleadings. See In Re Izak Adani, 1Bernadino, Inc. ─ F.Supp.2d ─ No. 01 Civ. 4441, 208 F.R.D. 491, 2002 WL 1563286, at *3–*4 (S.D.N.Y. June 14, 2002)(McMahon, J.)(court may convert motion for judgment on the pleadings to motion for summary judgment if it is necessary to refer to matters outside the pleadings); Gill v. Jones, No. 95 Civ. 9031, 2001 WL 1346912, at *3 (S.D.N.Y. Nov. 1, 2001)(Duffy, J.)(same). Accordingly, I have treated the parties' motions as cross-motions for summary judgment.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986). If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,' and summary judgment must be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 569 (1986)(quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party

against whom summary judgment is sought and ... draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997). The Court must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55. Accord Anderson, 477 U.S. at 247–49, 106 S.Ct. at 2510; "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson 477 U.S. at 248, 106 S.Ct. at 2510. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id., 477 U.S. at 249–50, 106 S.Ct. at 2511 (Accord Cases Serv. Co., 391 U.S. at 290, 88 S.Ct. at 1592; Dombrowski v. Eimland, 387 U.S. 82, 87 S.Ct. 1425, 19 L.Ed.2d 577 (1967).

*5 Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. See Morris v. Citizod, N.A., No. 97 Civ. 2127, 1998 WL 386775, at *3 (S.D.N.Y. July 9, 1998)(Koeltl, J.). See also Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)(pro se complaint should be held to less stringent standard than formal pleadings drafted by counsel); McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999)(pleadings should be read liberally and interpreted to "raise the strongest arguments they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)). By the same token, however, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Odom v. Keane, No. 95 Civ. 9941, 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997)(Sotomayor, J.)(quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)). Accord Jorgensen v. Cassiry, B3 Fed.Appx. 41, No. 00 Civ. 0357, 2002 WL 1492125, at *5 (S.D.N.Y. July 11, 2002) (Preska, J.).

*B. Section 1983*

Section 1983 provides a procedure for persons alleging a constitutional deprivation to bring a claim, but itself creates no substantive rights. Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993). Accordingly, to state a claim under Section 1983, a plaintiff must allege that a defendant acting under color of state law has deprived him of a right, privilege, or

immunity possessed by the United States Constitution. 42 U.S.C. § 1983; *Barnes v. City of New York*, No. 96 CV 2762, 1998 WL 19485, at *4 (E.D.N.Y. Jan.20, 1998) (Johnson, J.). Here, there does not seem to be any dispute that each of the Defendants was an employee of the New York City Department of Correction acting under color of state law. The remaining question is whether Danner can establish a violation of any of his constitutional rights.

**C. Fourth Amendment Claim**

In his complaint, Danner alleges that the Defendants violated his Fourth Amendment rights in several respects. The Fourth Amendment generally protects against unreasonable searches and seizures, prohibiting unjustifiable government intrusion into areas in which a person has a legitimate expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J. concurring); *Gedney v. Nassau County*, 861 F.3d 717, 722 (2d Cir.1998). However, the protection that the Fourth Amendment affords a sentenced prisoner, such as Danner, is limited. For example, the Supreme Court has held that random "shakedown" searches of prison cells do not violate the Fourth Amendment because a prisoner has no legitimate expectation of privacy in his prison cell. *Hudson v. Palmer*, 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). During Danner's the Second Circuit also recently has upheld the warrantless search of a convict's cell for evidence of a prior crime. *Willie v. Artus*, — F.3d — , No. 00–136, 2002 WL 1968013 (2d Cir. Aug.26, 2002). Indeed, even regulations authorizing creditors visual body cavity searches of prisoners have been held to serve legitimate penological interests and, therefore, not to violate the Fourth Amendment *See Quinn v. Patrice*, 967 F.2d 71, 79–80 (2d Cir.1992). *See also Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)(rejecting Fourth Amendment challenge to visual body cavity searches of inmates and pretrial detainees after contact visits with outsiders).

*6  The first search conducted on April 26th occurred in Danner's housing block. As part of that procedure, Danner was asked by Officer Correa to remove his clothing so that Correa could perform a visual inspection for contraband. (Dep. at 32–33). This inspection was apparently conducted largely while Correa remained outside the cell. *Id.* (*Id.* at 34–36). After it was complete, Danner dressed himself and, at Correa's direction, waited outside his cell so that Correa could search it. (*Id.* at 36–37) There is no basis to conclude, nor does Danner

allege, that this type of routine search violated Danner's Fourth Amendment rights in any manner.

7  There is some suggestion that Officer Correa was also have searched Danner's hair while they both were inside the cell. (*See* Dep. at 34–35).

After the initial activity in his housing block, Danner was subjected to a second strip search in the intake area of the jail. Unlike routine visual body cavity searches, non-random searches—even in prisons—are not presumed to be reasonable. Rather, a court considering the constitutionality of such a search must engage in a balancing test, weighing "the need for the particular search against the invasion of personal rights that the search entails." *Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. In the prison context, given the great concern for the security of the facility, the inmates, and prison personnel, courts accord great deference to prison officials' decisions to conduct a search. *Deck v. Rutherford*, 618 U.S. 576, 591, 104 S.Ct. 2227, 2325, 82 L.Ed.2d 438 (1984)("We reaffirm that 'proper deference to the informed discretion of prison authorities demands that they act, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees.' ") (quoting *Wolfish*, 441 U.S. at 557 n. 38, 99 S.Ct. at 1885 n. 38)

[1] [2]  In this case, there is a sharp dispute as to whether the decision to remove Danner to the intake area for a second search was justified. Danner contends that he advised Captain Pitt that he had removed his bolt ornaments earlier and had been subjected to a thorough search of his person. Captain Pitt, on the other hand, gives no indication in his report that he was aware of such a prior search, noting only that Danner had refused his request to remove his bolt so that his head could be searched. If Captain Pitt did not know of a prior search of Danner's head, his request for removal of the bolt was reasonable under the circumstances and cannot give rise to a Fourth Amendment violation. On the other hand, if Captain Pitt knew that the search had taken place, his insistence on a second search would be more troublesome. On the present state of the record, it is impossible to adjudicate what actually transpired and, hence, not possible to grant summary judgment to either side with respect to the legality of the search that Captain Pitt sought to conduct outside Danner's cell.

For the same reason, it is impossible to determine at this juncture whether the decision to remove Danner from his

housing block to the intake area was reasonable. If it was, ordering a second search of Danner's person may have been reasonable; if, on the other hand, the strip search in the intake area was intended simply as a form of retribution or humiliation, Danner may have a viable Fourth Amendment claim.

*7  In sum, to the extent the Danner challenges the initial search of his cell, the Defendants are entitled to summary judgment. With respect to both the alleged second search that Danner removes his bolt and the strip search of Danner in the intake area, neither side is entitled to summary judgment because there is a dispute as to the material facts.

**D. Eighth Amendment Claims**

The Eighth Amendment protects prison inmates from the infliction of cruel and unusual punishments that "involve the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994)(quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). Accordingly, the Eighth Amendment is applicable both to medical care provided by prison officials to inmates, *see Hathaway*, 37 F.3d at 66 (citing *Estelle*, 429 U.S. at 103, 97 S.Ct. 285 at 290, 50 L.Ed.2d 251), and the use of excessive force by prison guards, *see Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1991).

*1. Medical Care*

To prevail on an Eighth Amendment claim alleging a failure to provide sufficient medical attention, an inmate must show that his treatment (or lack thereof) was so deficient as to constitute cruel and unusual punishment. This threshold is not met simply by showing that one or more defendants were negligent in diagnosing or treating a medical condition. *Estelle*, 429 U.S. at 105, 105–06, 97 S.Ct. at 291–97. Rather, the inmate must establish "deliberate indifference to [his] serious medical needs." *Id.*, 429 U.S. at 104, 97 S.Ct. at 291 (emphasis added).

The deliberate indifference standard incorporates both an objective and subjective test. First, an inmate must show that the alleged deprivation was, in objective terms, "sufficiently serious." *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)). Second, the inmate must establish that the defendant acted with a "sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66.

*a. Serious Injury*

The Second Circuit, in *Chance v. Armstrong*, 143 F.3d 698 (2d Cir.1998), enumerated several factors that courts may consider to determine whether a prisoner's medical condition is sufficiently serious to give rise to a potential Eighth Amendment violation: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997)). "It is well established that mere minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need." *Faering v. Bailly*, No. 98 Civ. 6718, 2001 WL 1131518, at *9 (S.D.N.Y. Sept.28, 2001)(Hahn, J.). The standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway*, 37 F.3d at 66 (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir.1990)(Pratt, J., dissenting)).

*8  [3]  Judged by this standard, Danner has not demonstrated that any of the injuries he allegedly received during the April 26th incident were "sufficiently serious." Despite the suggestion that he was kneed in the back and had his head struck against the wall, Danner claims to have sustained only bruises to his head, back, and wrists. (Dep. at 82). Moreover, the doctor who examined Danner the day after the incident observed no bruises on Danner's body, and noted that Danner had not loss consciousness and was alert and responsive during the examination. (Nelson Decl. Ex. E at 136). In addition, Danner has not adduced any evidence to suggest that any of his injuries after the April 26th incident were so urgent or life-threatening that they required immediate care. Courts in this circuit often have found no serious medical need in cases in which the injury complained of was similar to—or even more serious than—the injuries alleged by Danner. *See, e.g., Nunds v. St. Barnabas Hosp. Cont. Health Servs.*, 151 F.Supp.2d 303, 311 (S.D.N.Y.2001)(McMahon, J.) (bleeding finger not a severe injury); *Henderson v. Doe*, No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999)(Pauley, J.)(broken finger not a severe injury)(quoting *Rivera v. Johnson*, No. 95 Civ. 0845, 1996 WL 549336, at *2 (W.D.N.Y. Sept.20, 1996)(Elfvin, J.)); *Gibbs v. Voto-Teta*, 97 F.Supp.2d 305, 312 (S.D.N.Y.1999)(Sweet, J.)(pain from foot fracture, bruising, and degenerative arthritis not sufficiently serious). *But see Linden v. Westchester County*, No. 93 Civ. 8373, 1995

WL 686742, at *3 (S.D.N.Y. Nov.20, 1995)(Mukasey, J.)(prisoner who was beaten and sustained "cuts, bruises, and pain" alleged a serious medical need).[8]

8  Danner complains that he suffers from back pain and migraines as a result of the incident. (Compl. at 4; Dep. at 19–21, 84–85). However, he has not produced any evidence demonstrating that these problems are causally related to the alleged assault or that they significantly interfere with his everyday life. In fact, he admits that he has always had a "weak back" and that he suffered from back pain ... prior to the April 26th incident. (Dep. at 85).

*b. Deliberate Indifference*

[4]  Even if Danner had demonstrated injuries severe enough to rise to the level of a serious medical need, he still has not shown that any of the medical professionals at the Bronx House of Detention were deliberately indifferent to that need.

To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but he need not show that it was "undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)). Stated somewhat differently, "the plaintiff must demonstrate that the defendant actually wish[ed] him harm or at least [was] totally unconcerned with his welfare." *LaBounty v. Gomez*, No. 94 Civ. 3360, 1997 WL 104959, at *5 (S.D.N.Y. Mar.10, 1997)(Cote, J.) (quoting *Hathaway*, 37 F.3d at 69)(internal quotations and citation omitted); *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992)(same).

*9  A delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, "unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Smoker v. Casalbe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar 29, 2002)(Keplt, J.). *Accord Espinal v. Coughlin*, No. 98 Civ. 2579, 2002 WL 104591, at *3 (S.D.N.Y. Jan.3, 2002)(Patterson, J.)(quoting *Demata v. N.Y.S. Corr. Dept.of*

*Health Servs.*, 198 F.3d 233, 1999 WL 753147, at *2 (2d Cir. Sept.17, 1999)). Indeed, given the triage system utilized by most emergency medical treatment facilities, any one seeking care for a non-life-threatening injury generally experiences some delay in receiving treatment. *See Sonds*, 151 F.Supp.2d at 312 ("patients are frequently faced with delays in receiving medical care, particularly when, in this case, their medical condition is not grave") (quoting *Davidson v. Harris*, 960 F.Supp. 644, 648 (W.D.N.Y.1997))(internal quotations omitted).

Danner has not alleged that his injuries were "life-threatening" or "fast-degenerating," or that he was experiencing extreme pain that more rapid treatment would have alleviated. Also, by his own admission, Danner was seen within eight or nine hours of the incident by a nurse who prescribed him Tylenol. (Dep. at 71–74). The nurse also put Danner on sick call for the following day, when he was seen by a physician who prescribed additional medication. In these circumstances, any delay in treatment that Danner may have experienced upon his return to the housing area was, at most, mere negligence, which is not sufficient to state an Eighth Amendment claim. *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92; *Linden*, 1995 WL 686742, at *5 (prisoner who was denied a visit to infirmary for eight hours did not state an Eighth Amendment claim).

In sum, to the extent that Danner contends that the treatment actually provided by the prison medical facility was inadequate, his complaint amounts to nothing more than a challenge to the judgment of the medical professionals concerned, which is not enough to implicate the Eighth Amendment's prescription against cruel and unusual punishment. *See Estelle*, 429 U.S. at 106–07, 97 S.Ct. at 292 ("a complaint that a physician has been negligent in treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). *Sonsyi v. Schkeffler*, 542 F.2d 47, 49–50 (2d Cir.1977) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Espinal v. Goord*, No. 00 Civ. 2242, 2001 WL 476070, at *9 (S.D.N.Y. May 7, 2001)(Peck, Mag. J.)(citing *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292); *Troy v. Kuhlmann*, No. 96 Civ. 7190, 1999 WL 825622, at *6 (S.D.N.Y. Oct.15, 1999)(Jones, J.)("prisoner's disagreement with ... forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim").

*10  Danner's papers can also be read to allege that Officer Rodriguez displayed a lack of concern for Danner's welfare when Danner asked Officer Rodriguez to secure medical attention for him while he was in the intake area. Presumably, in Officer Rodriguez allegedly was present when Danner was assaulted in the elevator and intake area, a reasonable finder of fact could conclude that Officer Rodriguez was "totally unconcerned with [Danner's] welfare," *LaBounty*, 1997 WL 104959, at *5 (citing *Hathaway*, 37 F.3d at 69), and therefore exhibited a state of mind which might potentially expose him to liability for deliberate indifference to Danner's medical needs. Nonetheless, because Danner's alleged injuries were not sufficiently serious to meet the objective component of such a claim, Officer Rodriguez is entitled to summary judgment to the extent that Danner seeks to recover damages under the Eighth Amendment for alleged indifference to his medical needs. As set forth below, however, Officer Rodriguez does face some liability for Danner alleges that Officer Rodriguez also violated the Eighth Amendment through the use of excessive force after Danner was removed from the housing area.

*11  [5]  As noted previously, Danner has not adduced any evidence demonstrating that his alleged injuries were serious. Nevertheless, issues of fact clearly remain as to the degree of force that was used against him in the elevator and intake area and whether that use of force was justified. Danner alleges that he was removed from his housing area without justification, (Dep. at 72), and thereafter was assaulted in the elevator and in the intake area while handcuffed. (Compl. at 3–4; Dep. at 33–35, 57, 59, 69–63, 82). The Defendants dispute these allegations, contending that Danner disobeyed a proper order to remove his bolt and that they did not use any unnecessary force. (*See* Nelson Decl. Ex. D at 124–35, 142, 155). Because this disagreement cannot be resolved prior to trial, neither the Defendants nor Danner are entitled to summary judgment with respect to the Eighth Amendment excessive use of force claim.

*2. Excessive Force*

To establish an excessive force claim under the Eighth Amendment, a prisoner again must satisfy both an objective and a subjective component. *McMillian*, 503 U.S. at 8, 9, 112 S.Ct. at 999–1000; *Griffen v. Crippen*, 193 F.3d 89, 91 (2d Cir.1999). The objective component requires a prisoner to demonstrate that he endured an "injury sufficiently serious to warrant Eighth Amendment protection." *Venting*, 2001 WL 1139318, at *6 (citing *Hudson*, 503 U.S. at 298, 111 S.Ct. at 1724). However, a prisoner who has not sustained a significant injury may nevertheless prevail on an excessive force claim if he is able to show that "prison officials maliciously and sadistically use[d] force to cause harm." *McMillian*, 503 U.S. at 9, 112 S.Ct. at 1000.

To satisfy the subjective component of an excessive force claim, a prisoner must show that the defendants "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir.1994). This must be judged in light of the circumstances facing the prison officials at the time of the incident. *See McMillian*, 503 U.S. at 6, 112 S.Ct. at 998 ("the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm")(quoting *Whitley v. Albers*, 475 U.S. 312, 320–21, 106

S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)(internal quotations omitted)); *Blyden v. Mancusi*, 186 F.3d 252, 262–63 (2d Cir.1999)(quoting *McMillian*, 503 U.S. at 7, 112 S.Ct. at 999); *Beer v. New York*, No. 99 Civ. 1671, 2001 WL 1570552, at *4 (S.D.N.Y. Dec.31, 2001)(Buchwald, J.)("Because no summary judgment we are required to take all facts in plaintiff's supporting documentation to be true, we must deny defendants' summary judgment on [the] excessive force claim").

**E. Personal Involvement**

Defendants Koeln, Mercado, and Correa contend that they are entitled to summary judgment because they were not personally involved in any alleged unlawful conduct. (Def.'s Mem. at 12).

"In this Circuit ... personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)). *Accord Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994). The doctrine of respondeat superior does not suffice to establish liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978); *Blyden*, 186 F.3d at 264; *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.1973). Rather, to recover damages from a supervisor based upon an alleged constitutional violation, a plaintiff must show that the supervisor (1) directly participated in the violation; (2) learned of it through a report or appeal but failed to take action; (3) created or maintained the policy or custom which gave rise to it; or (4) was grossly negligent in the

**Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)**
2022 WL 1997885

supervision of subordinates who caused the violation to occur. *See Newburgh Enlarged Sch. Dist.*, 259 F.3d at 254.

[6]   In this case, Danar has not shown—nor, obviously, is there any reason to believe—that Defendants Kerik and Mercado personally participated in Danar's removal from the housing area, or that they were present in the elevator or intake area during the alleged incident. Danar also has adduced no evidence to suggest that these Defendants were in any way personally involved in providing medical treatment to him. Finally, he has not shown that they promulgated any unlawful policy or were grossly negligent in the supervision of the officers who engaged in the alleged unlawful activity.

Danar does contend that on the day after the alleged incident he spoke to Mercado who promised to conduct an investigation. If so, Mercado plainly was aware of Danar's allegations. (*See* Compl. Ex. 3 (letter dated May 11, 2000, from Danar to Department of Correction Appeals Attorney.) at 3–4; Pl's Mem. at 1). Although Danar contends that Mercado thereafter failed to take any action, the Defendants have produced records which establish that the Investigation Division of the Department of Correction did conduct an extensive review of the incident. (*See generally* Nelson Decl. Ex. D). In light of that investigation, Danar plainly cannot demonstrate that Mercado failed to take appropriate action upon the discovery of the incident. *Cf. Shelley v. Gilmore*, 116 F.3d 47, 51 (2d Cir.1997)(warden who referred letter to subordinates not personally involved); *Woods v. Goord*, No. 01 Civ. 3255, 2002 WL 731691, at *7 (S.D.N.Y. Apr.23, 2002)(Scheindlin, J.)(warden who referred inmate's complaint of medical mistreatment to lower-level supervisors not personally involved); *Woods v. Goord*, No. 97 Civ. 5143, 1998 WL 740782, at *6 (S.D.N.Y. Oct.23, 1998)(Sweet, J.) (receipt of letter or complaint from inmate does not render a defendant personally liable).

*12   In sum, because Danar has failed to show any personal involvement on the part of Defendants Kerik and Mercado which could give rise to liability under Section 1983, they are entitled to summary judgment dismissing the complaint as against them.

Danar has also failed to show any personal involvement on the part of Defendant Correa in any unlawful activity. Although Correa was involved in the initial shakedown search, Danar has not suggested that any aspect of this routine procedure violated the Fourth Amendment. Moreover, Danar has admitted that he is uncertain whether Correa was involved

---

**Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)**
2022 WL 1997885

Although summary judgment as to this issue need not always be denied when the facts giving rise to an excessive force claim are disputed, *id.*, 533 U.S. at 202, 121 S.Ct. at 2159, in Justice Ginsburg cautioned, if the claim "turns on which of two conflicting stories best captures what happened," the defendant is not entitled to summary judgment on qualified immunity grounds. *Id.*, 533 U.S. at 216, 121 S.Ct. at 2161 (Ginsburg, J., concurring).

*13   [7]   Turning first to Officer Correa, Danar could only be certain that Officer Correa was present during a routine inspection of Danar's person and cell. Moreover, there is no independent evidence which would suggest that Officer Correa was involved in any of the later misconduct alleged by Danar. Consequently, because there has been no showing that Officer Correa committed any constitutional violation, he is plainly entitled to qualified immunity.

[8]   Officer Rodriguez and Captain Piu are both alleged to have engaged in an unreasonable second search of Danar and to have used excessive force against him. With respect to these claims, the Defendants and Danar tell wholly contradictory stories. For example, although Danar alleges that he was beaten without provocation in the elevator, the Defendants deny that any unnecessary force was used. A similar dispute exists with regard to the Defendants' actions in the intake area. Accordingly, because there are factual issues which must be resolved in order to determine whether similarly-situated officials would have understood that their actions violated Danar's constitutional rights, neither Captain Piu nor Officer Rodriguez is entitled to summary judgment on qualified immunity grounds.

*G. Failure to Serve "John Doe" Defendants*

Danar's complaint was received by the Pro Se Office on September 21, 1999. Therefore, it was filed with the Clerk of the Court on November 9, 2000. Pursuant to Fed. R. Civ. P. 4(m), service of the summons and complaint on

---

in his removal from the housing area, accompanied Danar in the elevator, or was present when Danar was allegedly beaten and strip-searched again in the intake area. (Dep. at 58–61). Danar also has failed to provide any independent evidence to suggest that Correa was involved in any of these stages. In the absence of any proof that Correa engaged in any constitutionally-prohibited conduct, the complaint must also be dismissed as against him.

*F. Qualified Immunity*

Defendants Piu, Correa, and Rodriguez claim that they are entitled to qualified immunity as to Danar's excessive force and medical treatment claims. (Def's Mem. at 16). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Chalmers v. City of New York*, No. 01-9053, 298 F.3d 186, 2002 WL 1759778, at *1 (2d Cir. July 31, 2002)(quoting *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)(internal quotations omitted). The doctrine of qualified immunity "shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard*, 282 F.3d 123, 132 (2d Cir.2002). *Accord African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir.2002)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

In evaluating a motion for summary judgment based on qualified immunity, a court must engage in a two-part analysis. As a threshold matter, the court must determine whether the facts taken in the light most favorable to the plaintiff indicate that the defendants' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. If the court determines that a violation occurred, it must consider whether the right in question was clearly established at the time of the violation. This requires that "[t]he contours of the right ... be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*, 533 U.S. at 202, 121 S.Ct. at 2156.

As Justice Ginsburg noted in her *Saucier* concurrence, when a defendant seeks qualified immunity in response to an excessive force claim, the determination of both the substantive claim and the qualified immunity issue "require consideration of whether, in light of the particular circumstances, 'a reasonable officer, identically situated, [would] have believed the force employed was lawful.'" *Id.*, 533 U.S. at 210, 121 S.Ct. at 2161 (Ginsburg, J., concurring).

---

*IV. Conclusion*

For the reasons set forth above, the Defendants' motion for summary judgment should be granted except insofar as Danar claims that Defendants Rodriguez and Piu violated his Fourth Amendment rights and used excessive force against him in violation of the Eighth Amendment. Additionally, Danar's cross-motion for summary judgment should be denied in its entirety.

*V. Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Ira S. Rakoff and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 6(a), (e), 72(b).

*All Citations*

Not Reported in F.Supp.2d, 2002 WL 1997885

---

**Benitez v. Pecenco, Not Reported in F.Supp. (1995)**
1995 WL 444352

1995 WL 444352
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Henry BENITEZ, Plaintiff,
v.
Patricia A. PECENCO, Defendant.

No. 92 Civ. 7670 (DC).
|
July 27, 1995.

**Attorneys and Law Firms**

Henry Benitez, Comstock, NY, pro se.

Dennis C. Vacco, Atty. Gen. of the State of N.Y. by Richard T. Mathias, Judy E. Nathan, New York City, for defendants.

**MEMORANDUM DECISION**

CHIN, District Judge.

*1   Pro se plaintiff Henry Benitez brings this action under 42 U.S.C. § 1983 alleging that defendant violated his constitutional rights by failing to provide him with adequate medical attention and by endorsing a false disciplinary report against him. Before me are the parties' cross-motions for summary judgment. For the following reasons, defendant's motion is granted. Plaintiff's motion is denied.

*BACKGROUND*

Plaintiff is an inmate at the Greenhaven Correctional Facility ("Greenhaven") and is housed in the Special Housing Unit (the "SHU"). He was transferred to Greenhaven from another prison on May 5, 1992. Defendant Pecenco is a registered nurse at Greenhaven. In the spring and summer of 1992, she worked in the clinic area during the day shift. Her responsibilities included attending to inmates in the SHU.

Upon his arrival at Greenhaven, plaintiff was given a medical checkup by a Nurse Berthold during which he complained of low back pain but denied chronic medical problems. (Pl.Exh. A). The Ambulatory Health Record ("AHR") for that date states that an examination of plaintiff did not reveal any signs of "fresh trauma." (*Id.*). Plaintiff was checked again the next

---

**Benitez v. Pecenco, Not Reported in F.Supp. (1995)**
1995 WL 444352

told him to speak with the doctor. None of the AHRs between June 9 and July 3 indicate that prescription drugs had been ordered.

Defendant also noted on the July 4th AHR that plaintiff became verbally abusive to her at which point a corrections officer Zenkin intervened and warned plaintiff that he was abusing his sick call privileges. Zenkin later filed an inmate misbehavior report concerning the incident, which was signed by defendant as an "employee witness." Plaintiff was found guilty after a disciplinary hearing of verbal interference with prison employees and verbal harassment (a charge of making threats was dismissed). (Pl.Exh. C).

An AHR dated July 5, 1992 reveals that plaintiff had MRIs ordered to determine the cause of his lower back pain, but had refused to go for them. (*See* Pl.Exh. A, AHR dated July 5). The final AHR indicates that plaintiff was to be examined after July 31, 1992.

The parties have cross-moved for summary judgment. Plaintiff alleges that defendant refused to give plaintiff medication for back pain and signed a "trumped-up" disciplinary report against plaintiff. Defendant asserts that she did not give plaintiff his medication because she is not authorized to provide medication without an order from a physician. She also claims that the disciplinary report was not falsely made.

*DISCUSSION*

*1. Standards for Summary Judgment*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. at 2510–11 (citing adverse v. N.H. Rave & Co., 398 U.S. 144, 159, 90 S.Ct. 1598–1609 (1970)). To defeat a motion for summary judgment, however, the nonmoving party "must do more than

---

day by another nurse, and the AHR indicates that plaintiff stated he had "no medical problems at this time" and is not on any prescribed medication. (*Id.*, AHR dated May 6, 1992). The AHR also reveals that plaintiff had no signs or symptoms of distress.

Between May 8, 1992 and June 5, 1992, plaintiff was examined by various medical personnel (but not defendant Pecenco) 24 times. The record reveals that plaintiff intermittently complained of low back pain and a sore throat and that he requested band-aids. (Pl.Exh. A). The AHRs also reflect the medical staff's assessments that plaintiff showed no signs of acute distress and walked with a normal gait. Nevertheless, plaintiff was prescribed a painkiller, Robaxin, and was given the nonprescription medicines Advil and Motrin.[3] (*See, e.g.* Pl.Exh. A, AHRs dated May 10, 21, 23, 24, 26, 27, and June 5, 1992).

On Friday, June 5, 1992, plaintiff was examined by Dr. Chandir, who ordered a prescription pain killer, Florinef, for his back pain and who referred the case to a physician for consultation.[5] On Saturday, June 6, plaintiff complained of back pain to defendant and requested his prescription. Defendant informed plaintiff that she could not check on his prescription over the weekend and told him he would have to wait until Monday, June 8. She offered to give plaintiff Advil, which he refused. (Pl.Exh. A, AHR dated June 6, 1992).[5]

On Monday, June 8, plaintiff complained of back pain to another medical staff member but refused to accept either the Florinef that had been prescribed or Motrin. (Pl.Exh. A, AHR dated June 8). On June 9, 1992, plaintiff complained again of back pain but his condition was evaluated as a "non-emergency" by a Nurse Ryan, due to the fact that plaintiff had been recently examined by a doctor and had refused to accept medication. (Pl.Exh. A, AHR dated June 9). Plaintiff was sent to a physician for an examination on June 16, but was not seen because he refused to be examined without being escorted. (Pl.Exh. A, Physician's Consultation Report dated June 16, 1992).

*2   Defendant did not see plaintiff again until June 20, 1992 at which time plaintiff requested band-aids, which defendant provided. Defendant examined plaintiff for the last time on July 4, 1992 when plaintiff asked for pain medication that purportedly had been prescribed.[3] Defendant informed plaintiff that she had no knowledge of any prescription and

---

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. As the Court held in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). With these standards in mind, I turn to the parties' motions for summary judgment.

*II. Plaintiff's Medical Treatment*

*3   Plaintiff complains that defendant violated his Eighth Amendment right against cruel and unusual punishment by refusing to check on the status of his prescription medication or provide "emergency medical treatment." To succeed on a claim under section 1983 for inadequate medical care, an inmate must show "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976). Thus, two elements must be satisfied: first, the inmate's medical condition must be, in objective terms, sufficiently serious; and second, defendant must have acted with a sufficiently culpable state of mind. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994); *Friman v. Wilkinson*, 6 F.Supp. 181, 183 (S.D.N.Y.1994) (section 1983 claim based on deliberate indifference requires sufficiently disregard in "affected medical result that were serious").

Plaintiff cannot satisfy either of these elements; accordingly, his claim must be dismissed.

*A. Serious Medical Need*

Apart from plaintiff's conclusory assertions, there is nothing in the record to support his claim that he suffered from a serious medical condition. First, plaintiff's own conduct refutes any claim that his back pain was serious: plaintiff refused to cooperate with the physician for an examination and would not leave his cell for scheduled MRIs. (Pl.Exhs. A and B). *See James v. Smith*, 781 F.2d 149, 151–52 (2d Cir.1986) (prisoner's back condition not deemed serious medical need given his constant refusal to be examined by doctor). Furthermore, plaintiff was offered both over-the-counter and prescription medication for back pain on several occasions but refused to accept it. (*See, e.g.* Pl.Exh. A, AHRs dated May 21, 24, 25, and June 8, 1992).[3] In fact, his refusal

Bendzz v. Pocenco, Not Reported in F.Supp. (1995)
1995 WL 444352

*CONCLUSION*

*7 Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The complaint is dismissed.

SO ORDERED.

All Citations

Not Reported in F.Supp., 1995 WL 444352

End of Document

2022 WL 357020

---

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

2010 WL 985184
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Rodney BROWN, Plaintiff,
v.
J. WHITE, Franklin
Correctional Facility, Defendant.

Civil Action No. 9:08-cv-290 (GLS/ATB).

March 15, 2010.

**Attorneys and Law Firms**

Rodney Brown, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Denis J. Higgins, Esq., of Counsel, Albany, NY, for the Defendants.

**ORDER**

GARY L. SHARPE, District Judge

*1   The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge Andrew T. Baxter duly filed February 18, 2010. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties hereto.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate Judge Andrew T. Baxter filed February 18, 2010 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that defendant White's motion for summary judgment (Dkt. No. 44) is GRANTED and the complaint is DISMISSED IN ITS ENTIRETY, and it is further

ORDERED, that the Clerk enter judgment in favor of the defendant against the plaintiff, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe, United States District Judge.

In this amended civil rights complaint, plaintiff alleges that defendant denied him adequate medical care, in violation of the Eighth Amendment, from October 11, 2007 until January 15, 2008, while plaintiff was an inmate in the custody of the Franklin Correctional Facility ("Franklin"). (Dkt. No. 10). The defendant also contends the amended complaint is alleging that the retaliated against the plaintiff for demanding necessary medical care by lodging an unfounded misbehavior report against him. Plaintiff seeks unspecified monetary damages.

Presently before this court is the motion for summary judgment pursuant to FED R.CIV. P. 56, filed by the sole defendant, J. (Jerry) White, a nurse at Franklin (Dkt. No. 44). Plaintiff filed an untimely response which did not include a memorandum of law, affidavit, or response to the defendant's statement of material facts, as required by Local Rule 7.1(a). (Dkt. No. 48). For the following reasons, this court recommends that the defendant's motion for summary judgment be granted and the complaint dismissed in its entirety.

**DISCUSSION**

**I. Facts**

Plaintiff alleges that on February 27, 2007, he suffered head and lower back injuries due to a "slip and fall" at the Riker's Island Correctional Facility (Riker's Island). Plaintiff states that he received medical treatment from, *inter alia*,

---

a neurologist at Bellevue Hospital. Plaintiff was eventually transferred to Franklin on September 7, 2007 and criminal several sick-call visits to seek further treatment for the injuries purportedly resulting from the prior accident. (Amended Complaint (AC), Dkt. No. 10 at 7, Supplemental Ex. to AC, Dkt. No. 12 at 1).

*2   The Declaration of Nancy Armstrong[1] filed in support of the defendant's motion for summary judgment and related medical records (Ex. B, Dkt. No. 44-5) establish that the plaintiff was examined by the medical staff at Franklin upon his arrival on September 7, 2007, and by sick-call nurses on September 17, October 7, and October 9,2007.[2] (Dkt. No. 44-12 & Ex. B, Dkt No. 44-5). The report of plaintiff's initial medical screening at Franklin indicates that he claimed to have "left back problems" resulting from a fall in February-2007; but the medical records at Franklin did not include prior documentation of the Riker's Island accident. (Armstrong Decl. ¶ 5; Ex. B at 27). On September 17, 2007, the medical staff scheduled an appointment for the plaintiff with a doctor to address his medical complaints, but the appointment was set up for September 27, 2007, the medical staff contacted the plaintiff several times to address his medical complaints, provided direction and an analgesic balm, and instructed the plaintiff to use moist heat to address his lower back pain. (Armstrong Declaration, ¶¶ 14-1v. Ex. B at 26).

On the morning of October 11, 2007, plaintiff sought emergency medical attention because of "serious pain" to his head and lower back and was seen by defendant, nurse Jerry White.[4] According to plaintiff's amended complaint and his deposition (Def. Ex. F, Dkt. No. 44-9 at 22, 23, 32), Nurse White refused to examine or assist him, accused him of lying about his medical condition, and caused him to be "locked up" by issuing a misbehavior report. The amended complaint suggests that Nurse White had made a prior threat to take action against the plaintiff if he came to sick call again.

Plaintiff's amended complaint (which does not have numbered paragraphs) erroneously states that he saw Nurse White on October 11, 2006; but his attached exhibits make clear that the relevant events started in October 2007. Several of the dates set forth in this factual statement were not specified in the amended complaint but were determined by reference to other documents included in the record and do not appear to be in dispute.

In her sworn declaration, Nurse White states that, when the plaintiff appeared at Franklin's urgent care center on October 11th, she completed a "full exam" of the patient, and found that his vital signs were normal and that he was not in any kind of distress. (White Decl. ¶ 1; Dkt. No. 44-11) She states that

---

at Franklin. (Ex. F, Dkt. No. 44-9 at 8, 12, 14). (According to the Daily Med website, a service of the National Library of Medicine of the National Institutes of Health: (1) Percocet is a medication that combines oxycodone hydrochloride and acetaminophen—see http:// dailymed.nlm.nih.gov/ dailymed/drugInfo.cfm?id=13397; (2) Percodan combines the same active ingredient, oxycodone hydrochloride, with aspirin—see http:// dailymed.nlm.nih.gov/dailymed/drugInfo.cfm? id =13509.)

On October 9, 2007, plaintiff again complained of pain in his back and elsewhere. (Armstrong Declaration, ¶ 11; Ex. B at 26). An examination by a nurse of his back was negative, although the plaintiff was having slight difficulty bending at the waist. *Id.* The plaintiff refused Ibuprofen and stated that he would "take all of" whatever medication the nurse would give him. (Armstrong Decl. ¶ 11). Because the nurse was concerned that plaintiff would not take the medication as prescribed, and because he still had a doctor's appointment scheduled, she did not issue plaintiff the Ibuprofen. (Armstrong Decl. ¶¶ 14-16; Ex. B at 26).

On the morning of October 11, 2007, plaintiff sought emergency medical attention because of "serious pain" to his head and lower back and was seen by defendant, nurse Jerry White.[4] According to plaintiff's amended complaint and his deposition (Def. Ex. F, Dkt. No. 44-9 at 22, 23, 32), Nurse White refused to examine or assist him, accused him of lying about his medical condition, and caused him to be "locked up" by issuing a misbehavior report. The amended complaint suggests that Nurse White had made a prior threat to take action against the plaintiff if he came to sick call again.

---

[1]   Nancy Armstrong is the Nurse Administrator at Franklin and is not a defendant in this action. (Armstrong Decl., Dkt No. 44-12, ¶ 2).

[2]   In his deposition, plaintiff admits seeing up sick call visits at Franklin on multiple occasions. (Ex F, Dkt. No. 44-9 at 13, 19). (Page numbers cited for Ex. F, plaintiff's deposition are the transcript page numbers, not the numbers assigned and printed in the CM-ECF header. Similarly, the page number for medical records in Ex. B are the page numbers printed by the Attorney General's Office in the bottom right-hand corner, not the CM-ECF page number. Otherwise, page number cited for the record here assigned in the CM-ECF header.)

[3]   During his September 17th visit, plaintiff advised the nurse that he had previously been provided more potent pain killers-Tylenol 3 and Percocet (Armstrong Decl. refers to "Percodan") ¶ 9, Ex. B at 27 (refers to "Percocet")). In his deposition, the plaintiff mentioned, at least twice, that he was prescribed Percocet and Tylenol-3 with codeine by medical staff before he arrived

---

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

plaintiff's complaint was "chronic, but not acute," that he was issued over-the-counter pain medication, and was scheduled to see a doctor. Plaintiff's medical records corroborate that Nurse White examined the plaintiff and recorded his vital signs. (Ex. B at 29). Nurse White's contemporaneous progress notes also indicate that the plaintiff was refused for a psychiatric interview, and the social worker concluded he was fine, but manipulative. (Ex. B at 27, Armstrong Decl. ¶ 22).

*3   Nurse White concluded, based on her examination of the plaintiff and review of his prior medical records, that his complaint was not an emergency and should have been addressed in a regular nursing call. She issued a misbehavior report accusing plaintiff (of falsely claiming an emergency and interfering with her regular duties. Nurse White averred that she issued the misbehavior report, not because the plaintiff was complaining of medical problems, but because he was deliberately abusing the facility's emergency sick call policy. (White Declaration ¶¶ 5-9, Ex. B at 25).

Nurse White stated that she did not treat the plaintiff at any time before or after October 11th, implicitly denying the suggestion in the plaintiff's amended complaint that she had previously threatened him with retaliation if he made further sick call visits. There is no indication in the plaintiff's medical records that he ever had a confrontation with any of the medical staff at Franklin. (Ex. C, Dkt. No. 44-6 at 20; Ex. B, Dkt. No. 44-5 at 23-29).

[5]   In his deposition, plaintiff claimed that he was threatened with retaliation at one point if he made another sick call request, but could not identify who (on the medical staff made that alleged threat. (Ex. F, Dkt. No. 44-9 at 11) He also testified that, prior to October 11, 2007, he had not experienced any problems with Nurse White or anyone else with the Department of Corrections. (Ex. F, Dkt. No 44-9 at 31).

The Declaration of Carolyn St. Denis[5] (Dkt. No. 44-13) and the disciplinary records from Franklin (Ex. Q, Dkt. No. 44-10) confirm that Nurse White's October 11, 2007 inmate misbehavior report resulted in the plaintiff being confined in his regular room, but only until the next morning. A disciplinary hearing on October 16, 2007 resulted in a guilty disposition and imposition of certain sanctions on the plaintiff that were never implemented.[7] On October 18, 2007, the Superintendent of Franklin granted plaintiff's appeal, reversed the guilty finding, and vacated the sanctions. (Ex. G at 5).

---

[6]   Carolyn St. Denis is a records coordinator at Franklin. (St. Denis Decl. ¶ 1).

[7]   The sanction imposed were 15 days of first privileges of various kinds. In his deposition, plaintiff claimed that he "did none of the 15 days" before the Superintendent reversed the decision. (Ex. F. Dkt. No. 44-9 at 26-27).

At some point in this process, the plaintiff apparently showed the staff personal copies of his medical records (which apparently were not in the files of the medical staff at Franklin), corroborating his prior accident at February 27, 2007, and some of the subsequent medical treatment at other institutions. (Ex. G, Dkt. No. 44-10 at 8; Ex. C, Dkt. No. 44-6 at 21-22). These documents appear in the defendant's exhibit containing plaintiff's grievance documents. (Ex. C at 20-22). In response to plaintiff's grievance, Nurse Armstrong wrote a memorandum, indicating that there was "no documentation of (plaintiff's) previous injuries in his chart." (Ex. C at 20).

Although Nurse White's misbehavior report against the plaintiff was dismissed within one week, plaintiff's amended complaint suggests that he was deterred from seeking further medical treatment for months because of fear of retaliation from Nurse White or perhaps others on the medical staff.[8] The plaintiff was scheduled to see a doctor on December 13, 2007, but the appointment was postponed because he was in the special housing unit (SHU) at that time, for reasons unrelated to the merits of this action.

[8]   In the grievance report attached to the amended complaint, plaintiff alleges that he was threatened by unnamed nurses to leave sick call "or else," which placed him in fear for his safety. (Dkt. No. 10-1 at 5).

On December 15th, a nurse on the special housing unit at Franklin saw the plaintiff, who complained of headaches. The plaintiff stated at that time that, unless the nurse could give him Percocet, she had nothing to offer him. On January 15, 2008, plaintiff, complaining of headaches and low back pain was examined by a doctor who prescribed Naprosyn 500 mg for his discomfort and ordered x-rays. (Armstrong Decl. ¶¶ 23-26; Ex. B at 22-23). Plaintiff was transferred to Coxsackie in February 2008; his outgoing medical examination report from Franklin noted "chronic back pain," but "no acute health care issues," and reflected a continuing prescription for Naprosyn 500 mg.[9] (Ex. B at 21).

---

[9]   Naprosyn is the generic name for a commonly-used nonsteroidal anti-inflammatory drug (NSAID). Naprosyn is one of several brand names for Naproxen. See DailyMed website-http:// dailymed.nlm.nih.gov/dailymed/ drugInfo.cfm?id=8862# nlm13009-5.

*4   As reflected in the attachments to the amended complaint and Exhibit C to the summary judgment motion, plaintiff filed a grievance at Franklin, complaining about denial of appropriate medical attention and alleged threats by the medical staff to deter him from seeking further treatment. The grievance was denied by the Superintendent of the institution, and then appealed by the plaintiff. The decision of the Superintendent was upheld by the Central Office Review Committee (CORC) of the Department of Corrections.

**II. Summary Judgment**

The amended complaint alleges that defendant White showed deliberate indifference to plaintiff's medical needs by refusing to treat him during his visit to the urgent care center at Franklin on October 11, 2007. He also accuses Nurse White of issuing an unfounded inmate misbehavior report on the same day, which purportedly deterred him from seeking needed medical care for several months thereafter.

Defendant White has moved for summary judgment on the plaintiff's Eighth Amendment cause of action, arguing that there are no material facts in dispute to support the claim that (1) the plaintiff had a serious medical need that was not met or (2) that defendant was deliberately indifferent to any such medical need.

The defendant contends the amended complaint as alleging that the inmate misbehavior report filed by Nurse White constituted retaliation for the exercise of his purported First Amendment right to demand necessary medical attention.[11] In support of the summary judgment motion, the defendant argues (1) even if the misbehavior report was unfounded, the defendant never threatened the plaintiff nor demanded the process in the adjudication of the report; (2) it is doubtful that the First Amendment encompasses a right to demand medical care in a prison; and (3) the misbehavior report did not constitute an "adverse action" which would deter a similarly situated individual of ordinary firmness in seeking necessary medical attention.

---

[10]   The issues raised in the amended complaint relating to the filing of defendant White's inmate misbehavior report against the plaintiff, which he claims effectively deterred him from seeking medical care for several months, could reasonably be considered solely as part of his explicitly-stated Eighth Amendment claim. *Williams v. Denoise of Health Services, Dept. of Correctional Services,* 542 F.Supp. 885 (S.D.N.Y.1982), cited in defendant's amended complaint, as well as *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), considered disciplinary actions against the inmates relating to their medical care only as part of a deliberate indifference claim. However, since the defendant construes the amended complaint to raise a distinct First Amendment/retaliation claim, the court will address it.

Finally the defendant argues that the amended complaint should be dismissed on qualified immunity grounds because (1) even if his claims are accepted as true, plaintiff has failed to establish that the defendant violated his constitutional rights and (2) it was objectively reasonable for the defendant to believe that her conduct did not violate plaintiff's federally protected rights.

**A. Legal Standard for Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*5   In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes to demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317 321,

---

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

**2. Application of Legal Standards**

**a. Analysis of Purported Factual Disputes**

**B. Inadequate Medical Care**

**1. Legal Standards**

**a. Objective Element**

**b. Subjective Element**

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

**2. Application of Legal Standards**

**b. Objective Element**

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

desk disease); not observed or diagnosed. On at least two occasions, the plaintiff ostensibly refused treatment and medication because he wanted more patent pain killers His subjective claims of "serious pain," unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious." nature medical need. *Fanion v. Manus.* 156 F.Supp.2d at 260; *Lowaggan v. Guard,* 225 F.Supp.2d 121, 139 (W.D.N.Y.2002) (collection cases).

Even assuming plaintiff's conclusory and inconsistent allegations as true, notwithstanding the compelling contrary documents in defendant's declarations and supporting documents, his access to medical treatment was interrupted for a maximum period of three months-between October 11, 2007 and January 15, 2008. [13] There is on evidence that this purported delay resulted in any material change in plaintiff's condition or significantly altered his treatment. The physician who examined the plaintiff in January 2008 ordered x-rays and prescribed Naproxen 500 mg, the more potent pain killers plaintiff sought were not prescribed.

[13]   The court would emphasize that plaintiff's medical records clearly show that he was seen by a nurse in the SHU on December 15, 2007, at which time, plaintiff refused any treatment unless the nurse could give him Percocet. (Ex. B at 23).

Under these circumstances, the court finds no material fact in dispute that would support a claim that the alleged delay in the treatment of plaintiff at Franklin caused a serious risk of medical harm or extreme pain contemplated by the Eighth Amendment. *See, e.g., Evans v. Manus,* 336 F.Supp.2d at 261-62 (delay of up to six weeks to treat prisoner who claimed "extreme" neck pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a serious disruption of his medical care). *See also Smith v. Pineiro,* 1995 WL 444352 at *3-*4 1995 U.S. Dist. LEXIS 16411 ("Given plaintiff's refusal to cooperate with his medical care, his sporadic complaints of [back] pain [with no objective evidence that it was severe or excruciating], the extensive record of his treatment, and the complete absence of any credible evidence of a serious medical condition, a reasonable jury could only conclude that plaintiff did not suffer from a serious medical condition."); *Solgunt v. Adams,* 903 CV-0517, 2006 WL 2827687, at *16 2006 U.S. Dist. LEXIS 70967 (N.D.N.Y. Sept.29, 2006) (prisoner's sporadic and moderate complaints of lower back pain, even when considered in conjunction with prisoner's

sporadic complaints of gastrointestinal problem, were not sufficiently serious for purposes of Eighth Amendment, as a matter of law).

**c. Subjective Element**

As discussed above, plaintiff's conclusory suggestion that the defendant completely refused to provide him any medical attention on October 11, 2007 is overcome by the defendant's Rule 7.1(a)(3) statement and supporting sworn declaration and documents, which plaintiff did not rebut. Based on the information before her, Nurse White's medical judgment that the plaintiff was not suffering from a health emergency and did not require further treatment at that time was indisputably reasonable. Other than his bald accusations, plaintiff has not responded to the defendant's well-supported notion with any evidence backing his claim that Nurse White acted recklessly, or that she knew of and disregarded an excessive risk to the inmate's health or safety. He has not done anything to rebut the defendant's sworn declaration, which indicates that she had no intention to cause him serious harm or extreme pain. *See, e.g., Tyrilly v. Gamble,* 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

[14]   Even if one were to accept the plaintiff's unsupported allegations that Nurse White was completely dismissive of his complaints on October 11th, there would be no support for his claim that she acted with deliberate indifference to a serious medical need. *See, e.g. Savage v. Hour,* 9105-cv-857, 2007 WL 3047119 at *9, 2007 U.S. Dist. LEXIS 77643 (N.D.N.Y. Oct.18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it", while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manus,* 336 F.Supp.2d at 261-62, 265 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Plaintiff's primary objection to the course of his treatment at Franklin account to be that the medical staff did not prescribe him a more potent pain killer such as Percocet. As

it is questionable that the mishehavior report constituted an "adverse action," sufficient to meet the standard for retaliation.

[10]   Although defense counsel does not advance this argument in his memorandum of law, defendant White clearly includes this statement in her sworn declaration. As this court found above, based on the information before her, Nurse White's conclusion that plaintiff was not suffering from a medical emergency was indisputably reasonable. Accordingly, her filing of a misbehavior report, based on a violation of the prison regulations governing emergency sick call, was also reasonable, and, thus, not motivated by an intent to retaliate against plaintiff for the exercise of any constitutional right.

**a. Substantial Motivation**

In defendant White's sworn declaration, she states that she "believed, based on my examination and observations, [that] plaintiff was deliberately abusing the emergency sick call policy about which he was aware." (White Decl. ¶ 9). The medical records suggest defendant White's statement. It is clear from the October 11, 2007 entry that notwithstanding plaintiff's complaints of dizziness, he was examined in the nurse sickroom, his blood pressure, pulse, respiratory rate, and temperature were normal, and he was in no obvious distress (Ex. B at 25). Nurse White further states that plaintiff was a "frequent visitor for various complaints," and on the medical record there is stamped language indicating that the inmate was advised of the proper procedures for sick call and emergencies. *Id.*

Defendant alleges that the misbehavior report was filed for what she believed was a violation of facility rules, based upon a medical judgment, and not in retaliation for plaintiff's medical complaints. The conclusory suggestion in retaliation by the plaintiff is not sufficient to overcome the declaration of Nurse White and supporting documents. The record steeply supports the position that Nurse White made a considered and sincere medical judgment that the plaintiff did not require emergency medical attention on October 11, 2007 and that she did not harbor a "retaliatory" motivation. The Superintendent's dismissal of the disciplinary charges, while not explained, could be attributed to the plaintiff's disclosure of medical records corroborating his claims of a prior injury, which were not in his medical files at Franklin at October 11th. Thus, plaintiff cannot show that the insincere

---

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

stated above, differences in opinions as to the appropriate treatment clearly do not support a claim that "serious" medical needs were recklessly ignored. *See, e.g. Evans v. Manus,* 336 F.Supp.2d at 262, 265 (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated); *Morrison v. Manus,* 08 Civ. 4302, 2008 WL 5455639, 2008 U.S. Dist. Lexis 100116 (S.D.N.Y. Dec.18, 2008) (doctor refusing to switch prescription pain killers or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009); *Selwin v. Redux,* 01CIV7887, 2002 WL 31073804 at * 14-* 15, 2002 U.S. Dist. LEXIS 17589 (S.D.N.Y. Sept.17, 2002) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back injuries was not the proper basis for an Eighth Amendment claim).

**C. Retaliation**

**1. Legal Standards**

In order to establish a prima-viol retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Davis v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)), *overruled on other grounds, Swierkiewicz v. Sorema,* N.A. 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

[12]   The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from pursuing ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 3600531(2d Cir. Feb.10, 2003)) (omission in original). This objective test applies even if the plaintiff was

not himself subjectively deterred from exercising his rights. *Id.* [14]

[14]   Defendant's Memorandum of Law cites several Second Circuit cases, outside of the prison context, which suggest that a plaintiff must establish that alleged retaliatory conduct actually and effectively chilled his First Amendment rights to state a § 1983 action for retaliation for the exercise of such rights. *See, e.g. Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001). More recent cases such as *Gill v. Pidlypchak,* 389 F.3d at 381-83 make clear that the Second Circuit still applies a strictly objective standard in prison cases, even when the alleged retaliation involves First Amendment rights.

**2. Application of Legal Standards**

Defendant construes the amended complaint as alleging that her filing of an unfounded inmate misbehavior report against the plaintiff for seeking emergency medical treatment on October 11, 2007 constituted retaliation for his exercise of the purported First Amendment right to demand necessary medical treatment. The misbehavior report, guilty finding, and sanctions imposed after a disciplinary hearing, were vacated a week later by the Superintendent, without comment.

As the Defendant's Memorandum of Law notes, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, [15] as long as the prisoner is provided with procedural due process. *(Due No. 14-14 at 6-7). (Freeman v. Redenis,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff were entitled to, and did receive, full procedural due process. *(Franco's Kelly* 854 F.2d 584, 588-89 (2d Cir.1988). Any action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

[15]   In this case, the minor sanctions imposed on plaintiff implicated no protected liberty interest for which due process protections would have been required. *See Sandin v. Connor,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (rejecting a claim that thirty days in segregated confinement

of the misbehavior report was "substantially motivated" by plaintiff's constitutionally protected conduct.

**b. Adverse Action**

Defendant also argues that the misbehavior report could not be considered an "adverse action." Unfortunately, defendant's basis for this argument, that the misbehavior report against plaintiff could not be considered an "adverse action" because it did not actually deter him from exercising his First Amendment rights is, as noted in footnote 14 above, inconsistent with Second Circuit authority. We have rejected plaintiff's unsupported claim that the misbehavior report, for which, ultimately, he was confined in his cell for about 24 hours, deterred him from seeking further medical attention for several months (see Section II. B. 3. a., above).

[14]   However, the issue is not whether this plaintiff was actually deterred from seeking medical help, but whether the initiation of such disciplinary action would have deterred an inmate "of ordinary firmness" from demanding medical attention at least for the week or so before the Superintendent vacated the disciplinary charges. Notwithstanding the difference in the standard, this court agrees that plaintiff did not suffer an "adverse action."

In *Bartley v. Collins,* 95 Civ. 10161, 2006 WL 1289256 at *7, 2006 U.S. Dist. LEXIS 28285 (S.D.N.Y May 10, 2006), the court held that misbehavior reports which resulted in loss of privileges, but not significant time in keeplock, [17] were de minimis and did not constitute adverse action. Plaintiff's "full hed" restriction for one day and minor privilege restrictions are more akin to the de minimis deprivations that have not been found to constitute adverse action. Thus, defendant's "implied" cause of action for retaliation may be dismissed.

[17]   "Keeplock" is a form of disciplinary confinement where the inmate is confined to his own cell for the duration of the disciplinary sanction. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

**D. Qualified Immunity**

The court also finds that even if it could somehow be determined that the defendant's actions were somehow retaliatory, defendant would be entitled to qualified immunity in any event.

**1. Legal Standards**

In *Deleuse v. Goord,* then Magistrate Judge Gary L. Sharpe summarized the legal standards regarding qualified immunity of public employees:

Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ...

The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his action violate that right. *Id.* at 640, 107 S.Ct. at 3039; *[Warren v.] Keane,* 196 F.3d 330[at 332 ] (2d Cir.1999) ] "in evaluating whether a right was clearly established at the time a § 1983 defendant acted [the court must determine]: '(1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002). *See also, Okwedy v. Molinari,* 333 F.3d 339, 360 (2d Cir.2003).

[15]   *Deleuse v. Goord,* 9 02-cv-0717, 2005 WL 1357714 at *7, 2005 U.S. Dist. LEXIS 488 (N.D.N.Y. Jan 15, 2005).

**2. Application of Legal Standards**

Defendant has invoked qualified immunity with respect to the plaintiff's claim for deliberate indifference to his serious medical needs under the Eighth Amendment, arguing that, even accepting plaintiff's allegations as true, no such constitutional violation was established. Based on the clear findings above, the court concludes that the qualified immunity arguments regarding the Eighth Amendment claim need not be addressed.

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

---

Brown v. White, Not Reported in F.Supp.2d (2010)
2010 WL 985184

The court will, however, address the invocation of qualified immunity by the defendant with respect to the second First Amendment/retaliation claim as an additional basis for dismissal. As discussed in Section II. C. 2 above, at the time of defendant's conduct in this case, inmates did not have a "clearly established right" under the First Amendment to demand or complain about medical care. The Second Circuit has not decided the issue and the court has found no other Second Circuit or Supreme Court precedent that would, with reasonable specificity, clearly support such a right. A reasonable state employee in the defendant's position would not have understood that her acts on October 11, 2007 might have unlawfully abridged the First Amendment rights of the defendant. Defendant White would, therefore, also be entitled to the protection of qualified immunity with respect to a imputed retaliation claim.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendant White's motion for summary judgment (Dkt. No. 44) be GRANTED and the complaint DISMISSED IN ITS ENTIRETY and it is:

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1), FED. R. CIV. P. 6(a), 6(e), 72.

All Citations
Not Reported in F.Supp.2d, 2010 WL 985184.

---

1995 WL 489694
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Henry BENITEZ, Plaintiff,
v.
Dawn BENEWAY, Defendant.

No. 93 Civ. 3132 (DC).

Aug. 3, 1995.

Attorneys and Law Firms

Henry Benitez, Comstock, NY, pro se.

Dennis C. Vacco, Atty. Gen. of the State of N. Y. by Richard T. Mathieu, Judy E. Nathan, New York City, for defendant.

MEMORANDUM DECISION

CHIN, District Judge

*1 Pro se plaintiff Henry Benitez brings this action under 42 U.S.C. § 1983 alleging that defendant violated his constitutional rights by failing to provide him with adequate medical attention and by causing a false misbehavior report to be issued against him. Before me are the parties' cross-motions for summary judgment. For the following reasons, defendant's motion is granted. Plaintiff's motion is denied.

BACKGROUND

At the time of the events in question, plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven"). Defendant Dawn Beneway is an assistant physical therapist at Green Haven.

At Green Haven, inmates can receive physical therapy for their medical conditions only after a fine-step process, in accordance with the consent decree issued in Milburn v. Coughlin, 79 Civ. 5077 (RJW), (See Pl. Exh. 1, the "Milburn Decree"). First, the inmate must be seen by a primary care provider, or doctor, for a preliminary diagnosis. If the doctor determines that the inmate's medical condition would respond well to physical therapy, he orders a consultation to a specialist, in this case, a physiatrist. The physiatrist

then examines the inmate. If the physiatrist decides that physical therapy is needed, a recommendation for therapy is sent back to the primary care provider, who reviews the recommendation and renders a final decision. If the doctor agrees with the physiatrist that physical therapy is required, he sends his recommendation to the physical therapy office.

Once the approved recommendation is received by the physical therapy office, the inmate is scheduled for an evaluation with the physical therapist at which time a therapy program is prescribed. Only then is there an order for physical therapy and only at this time can an assistant physical therapist perform any physical therapy. (Plaintiff's Affidavit in Support of Motion for Summary Judgment, dated March 1, 1995, ¶¶ 6-12; Affidavit of Larry Zwillinger in Support of Defendant's Motion for Summary Judgment, dated December 27, 1994, ¶¶ 4-9.)

On February 4, 1993, plaintiff saw Dr. Harish Chekshi, a primary care provider at Green Haven, and complained of low back pain. In response to plaintiff's complaints, which Dr. Chekshi and might indicate a spinal herniated disc, a physiatrist consultation was ordered to determine if physical therapy would be helpful (Pl. Exh. A). Plaintiff's condition was classified as non-emergent, which required that he be seen by the physiatrist for consultation within 45 days of the order. (Zwillinger Aff. ¶ 14.)

On February 12, 16, and 17, plaintiff was seen on "Block Sick-Call," or BSC, by prison nurses. At each BSC, plaintiff complained of back pain and asked about the status of the order for the physiatrist consultation. On February 12, a nurse tried calling the physical therapy unit to check on the order, without success. (Pl. Exh. C. Ambulatory Health Record ("AHR") dated 2/12/93). On February 16, another nurse spoke with defendant, who informed her that she had not received an order for physical therapy. The nurse then sent a note to Dr. Chekshi (Pl. Exh. D. AHR dated 2/16/93). Finally, on February 17, plaintiff was informed by a nurse that the physical therapy unit had received the order for consultation and that he would be scheduled for an examination by a physiatrist the following week. (Pl. Exh. D. AHR dated 2/17/93).

*2 Plaintiff alleges that he spoke with defendant on both February 16 and 19 concerning her "non-compliance with Dr. Chekshi's consult." (Pl. Aff. ¶¶ 21-23). He asserts that defendant made no effort to ascertain the whereabouts of the consult and "refused to accord plaintiff prescribed

---

Benitez v. Beneway, Not Reported in F.Supp. (1995)
1995 WL 489694

physiotherapy evaluation." (Id.). On February 23, 1995, plaintiff mailed defendant a copy of a federal civil rights complaint alleging that defendant's inaction constituted "deliberate indifference toward plaintiff's rehabilitation physiotherapy needs." (Pl. Exh. E). [3]

On February 23, 1993, plaintiff was again seen on a BSC and complained of low back pain. The AHR for that day indicates that Dr. Chekshi informed plaintiff that the consultation order for physical therapy diagnosis had been submitted and that plaintiff had to be examined by the office before any treatment could take place. (Pl. Exh. G). The AHR reveals that plaintiff "agreed", plaintiff does not dispute this. (Pl. Exh. G and Pl. Aff. ¶ 25).

Plaintiff was examined by a physiatrist, Dr. Sreedharan, on February 24, 1995. After examining plaintiff, Dr. Sreedharan prescribed a treatment plan of physical therapy to be performed twice a week for four weeks. The physiatrist also noted on the examination form that plaintiff had previously refused to have an MRI or be seen by a neurologist. (Pl. Exh. H). [4]

On March 4, 1993, Dr. Chekshi reviewed Dr. Sreedharan's recommendations and indicated his authorization for physical therapy by initialing the certification portion of the request for consultation. (Pl. Exh. H). The report was then sent to the physical therapy unit and was received by Peter Battipaglia, the head Physical Therapist, on March 5, 1993. (Pl. Exhs. B and I; Pl. Aff. ¶ 34). Plaintiff was later examined by Mr. Battipaglia on March 9, 1995, who prescribed a regimen of physical therapy in accordance with Dr. Sreedharan's recommendation.

On March 16, 1993, plaintiff was treated for the first time by defendant. During the examination, plaintiff allegedly told defendant that he "liked her" and wanted to "take her out" when he was released from prison. Defendant also asserts that plaintiff told her "he was going to pursue his lawsuit until he got the answer he needed from me." (Def. Exh. L). Based on this incident, Corrections Officer M. Weber issued an inmate misbehavior report against plaintiff and charged him with interference with a prison employee, harassment and making threats. Plaintiff was found guilty of harassment. (Pl. Exh. K).

On April 13, 1993, Mr. Battipaglia, in response to a request sent by Dr. Sreedharan, noted that plaintiff had refused to cooperate five times with the physical therapy that had

previously been ordered and concluded that plaintiff did not require physical therapy. (Def. Exh. M).

The parties have cross-moved for summary judgment. Plaintiff asserts that defendant refused to consult with Dr. Chekshi concerning his physical therapy or to provide plaintiff with physical therapy. Plaintiff also alleges that defendant caused the misbehavior report to be issued against him in retaliation for his giving her a copy of his federal complaint. Defendant asserts that she did investigate the status of plaintiff's consult and that she was not authorized to provide plaintiff with any therapy until she had received an order and was directed to provide therapy by her supervisor, Mr. Battipaglia. She also claims that the misbehavior report was not falsely made.

DISCUSSION

I. Standards for Summary Judgment

*3 The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248-49, 106 S. Ct. at 2510-11 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S. Ct. 1598-1609 (1970)). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 1356 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249-50, 106 S. Ct. at 2510-11. As the Court held in Anderson: "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50, 106 S. Ct. at 2511 (citations omitted). With these standards in mind, I turn to the parties' motions for summary judgment.

II. Plaintiff's Medical Treatment

Plaintiff complains that defendant violated his Eighth Amendment rights by refusing to consult with plaintiff or Drs. Chekshi or Sreedharan concerning plaintiff's "prescribed physiotherapy treatment needs" and by refusing to accord him "rehabilitative physiotherapy treatment" between February 24 and 26, 1993 and again on March 1, 1993. (Compl. ¶¶ VII and IX). To succeed on a claim under section 1983 for inadequate medical care, an inmate must show "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976). Thus, two elements must be satisfied: first, the inmate's medical conditions must be, in objective terms, sufficiently serious; and second, defendant must have acted with a sufficiently culpable state of mind. See id.; see also Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir 1994), cert. denied, 115 S. Ct. 1108 (1995); Hebner v. Fell, 856 F. Supp. 381, 385 (S.D.N.Y. 1994) section 1983 claim based on deliberate indifference requires proof of intentional disregard to "afford medical needs that were serious"). Assuming for purposes of resolving the motions for summary judgment that plaintiff did suffer from a serious medical need, [5] the record before me does not constitute an evidence from which a jury could reasonably find that defendant exhibited deliberate indifference to plaintiff's condition. Accordingly, plaintiff's Eighth Amendment claim must fail.

*4 To demonstrate deliberate indifference, plaintiff must show that defendant intentionally denied him needed medical care over a period of time or completely withheld medical care. See Hathaway v. Coughlin, 841 F.2d 28, 30 (2d Cir 1988). Plaintiff's allegations that defendant refused to consult with him or the doctors concerning his physical therapy or provide him with physical therapy must fall far short of this standard, for several reasons.

First, there is no support in the record that defendant deliberately interfered with the processing of the consultation order. The record reveals that plaintiff was seen by Dr. Chekshi on February 4, 1993, who determined that plaintiff's back pain was a "non-emergent" condition requiring examination within 45 days, and that Dr. Chekshi requested a consultation by a physiatrist for possible physical therapy. (Pl. Exh. A). On February 16, 1993, defendant informed a nurse that the physical therapy order had not received any consultation. (Pl. Exh. D). On February 23, 1993, plaintiff spoke with Dr. Chekshi, who told him that while the order for physical therapy consultation had been submitted, plaintiff

would have to be examined by a physiatrist before an order for therapy could be written. (Pl. Exh. G). Plaintiff was seen on February 24, 1993 by Dr. Sreedharan, a physiatrist, who sent his recommendation for physical therapy back to Dr. Chekshi, who received it on March 4, 1993. (Pl. Exh. H). Dr. Chekshi sent his approval for physical therapy to the physical therapy unit, which was received on March 5, 1993. (Pl. Exhs. B and I). Plaintiff was evaluated by Mr. Battipaglia on March 9, 1993, and was prescribed a plan of physical therapy. (Pl. Exh. I).

This is the sum of the evidence concerning plaintiff's consult for physical therapy between February 4 and March 9, 1993. Apart from plaintiff's conclusory allegations, the record contains absolutely no evidence that defendant interfered with plaintiff's medical care or delayed the receipt of the consultation by either Dr. Chekshi or Dr. Sreedharan. Even assuming that defendant deliberately refused to check on the status of plaintiff's consultation, there is nothing in the record to indicate that plaintiff would, or should, have been examined more quickly. [6] Furthermore, there is nothing in the record to suggest that defendant's purported deliberate refusal to check on the status of plaintiff's consultation was in any way improper.

Second, defendant could not have provided plaintiff with any "rehabilitative physiotherapy treatment." As plaintiff himself acknowledges, an inmate must be evaluated by a physical therapist, who decides on an appropriate course of treatment, before an order for physical therapy can issue. (Zwillinger Aff. ¶ 9; Pl. Aff. ¶ 12). Thus, until an order for physical therapy was issued by Mr. Battipaglia on March 9, 1993, defendant was not authorized to administer plaintiff any therapy.

Because plaintiff has adduced no proof that defendant intentionally interfered with or intentionally delayed treatment prescribed by doctors, his claim must fail. See Bowman v. Campbell, 850 F. Supp. 144, 147 (N.D.N.Y 1994) (defendant nurse's motion for summary judgment granted where prisoner failed to adduce any proof that nurse intentionally withheld treatment).

III. Retaliation

*5 Plaintiff alleges defendant retaliated against him for having commenced a lawsuit by failing to provide him "prescribed rehabilitation physiotherapy treatment" and by ordering the issuance of a falsified misbehavior report

---

2022 WL 357020

Benitez v. Bennewy, Not Reported in F.Supp. (1996)
1995 WL 489694

[The body of this page consists of multiple dense columns of legal text reporting the cases *Benitez v. Bennewy*, 1995 WL 489694, and *Cumberbatch v. Port Authority of New York and New Jersey*, 2006 WL 3543670. The text is too small to transcribe reliably.]

**A. Medical Treatment**

**B. The Misbehavior Report**

*I OM ES IONN*

**SO ORDERED.**

---

2006 WL 3543670
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

James P. CUMBERBATCH and
David D. Cumberbatch, Plaintiffs,
v.
PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, The City of New York, Officer Poligow,
individually and in his Official Capacity as a
Police Officer of the Port Authority of New York
and New Jersey, Officer Santiago, individually
and in his Official Capacity as a Police Officer
of the Port Authority of New York and New
Jersey, John Does, individually and their Official
Capacities as New York City Police Officers
and Port Authority Police Officers, Defendants.

No. 03 Civ. 7490(BSJ).
|
Dec. 5, 2006.

**Attorneys and Law Firms**

Rene Myatt, Baldwin, NY, for Plaintiffs.

Thomas M. Hoey, New York, NY, for Defendants.

**OPINION & ORDER**

BARBARA S. JONES, United States District Judge.

**INTRODUCTION**

**BACKGROUND**

**A. The Parties**

**B. The Incident at Issue**

*Jaime waited a few minutes and then drove back up the block to where he expected his brother to exit the Terminal, which was also at or near the spot from where he originally was told to move. There were approximately four or five other cars parked there as well. Jaime saw David waiting at the door, and called to him. Officer Polgrew then approached again, and in substance "Didn't I tell you to move before?" and asked for Jaime's license and registration.

*2  Jaime provided the requested documents to Officer Polgrew. As he began to write a summons, the wind blew documents out of the Officer's hands. Jaime left the car to retrieve the papers, but Officer Polgrew told him to return to the vehicle, saying to Jaime, "You don't need them anyway."

After Jaime returned to the car, Officers Polgrew and Santiago rushed towards Jaime and grabbed him, and he stood up. When Jaime asked what the problem was, the officers told "you're under arrest." When Jaime asked what for, he never received a response, but Officer Polgrew referred to Jaime as a wise guy and called for back up on his walkie-talkie. Shortly after, several police officers appeared, who, along with Officers Polgrew and Santiago, pulled and jumped on Jaime, even though he was not resisting. At some point during the melee, Jaime was hit several times with fists and batons, kicked in the groin, and repeatedly sprayed in the eyes with pepper-spray.

Meanwhile, David asked Officer Polgrew "what are you arresting my brother for?" Officer Polgrew then hit David in his chest several times, tackled David over the concrete barrier, handcuffed him, flipped him back over the barrier, and slammed him down to the street. Several other PA Police officers then kicked David, whereupon his friend, Samson, told the officers that David had a bad left leg. In response, the officers kicked David on both knees, tauntingly asking him, "Where's your pride now?"

Once Plaintiffs were subdued, their hands were cuffed behind their backs and they were dragged and thrown into a PA Police van. As the van drove to the PA Police Precinct (the "Precinct"), Jaime "cried out" in pain from the mace. At the Precinct, Jaime was handcuffed to a bench, where Plaintiffs claim his continued requests for medical attention were met with a reply by an officer that "they wanted him to 'marinate.'" Despite his frequent requests for medical attention, Jaime received none until at least an hour after the incident.

* * *

The granting of an adjournment in contemplation of dismissal shall not be deemed to be a conviction or an admission of guilt. No person shall suffer any disability or forfeiture as a result of such an order. Upon the dismissal of the accusatory instrument pursuant to this section, the arrest and prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status he occupied before his arrest and prosecution.

NYCPL § 170.55(2). (8) (McKinney 2002).

**2. The PA Officers' Version**

While the Court must accept Plaintiffs' version of the events at trial for purposes of this motion, it bears noting that Officers Polgrew and Santiago provided a very different account of the material events than that provided by Plaintiffs. According to the Officers' deposition testimony, after Jaime provided his identification and registration information, Jaime taunted the Officers with words and repeatedly exited the vehicle in disregard of the Officers' commands that he remain inside. They perceived his actions as both threatening and a disturbance to the peace, and so determined to arrest him. The Officers also assert that Jaime resisted arrest, and that escalating force was necessary to restrain him. Such force included strikes to Jaime's limbs and the use of pepper-spray to his eyes.

Also according to Officer Polgrew, David resisted his orders that he "stand back" while Jaime was being apprehended. When David did not back up, Officer Polgrew perceived him as a threat. Officer Polgrew then used what he believed to be appropriate force against David, including pushing and punching him in the chest, dragging him to the ground, and handcuffing him.

The Officers also testified that the Plaintiffs were afforded timely and sufficient medical assistance.

**C. The Complaint**

Plaintiffs filed their Complaint on February 5, 2003—[almost 13 months after the incident in question]. The Complaint asserted the following 38 causes of action, sounding under 42 U.S.C. § 1983 and New York state laws.

The brothers were taken from the Precinct to New York Police Department Central Booking, where they were held. Jaime was charged with Trespass under N.Y Penal Law § 140.05, a violation. David was charged with Disorderly Conduct under N.Y Penal Law § 240.20, also a violation. They were arraigned and then released on their own recognizance. The brothers soon after sought medical attention at a hospital's emergency room.

2  Plaintiffs' papers incorrectly state that § 140.05 charges Criminal Trespass. That crime is actually charged under § 140.10 (3rd degree, a Class D misdemeanor), § 140.15 (2nd degree, a Class A misdemeanor), or § 140.17 (1st degree, a Class D Felony).

Jaime and David claim that during the incident they received physical injuries, including bruises to their faces, abrasions and lacerations, some of which have caused permanent scars. Both brothers claim to have suffered pain in their hands, faces, backs, arms, and legs, as well as "persistent" pain in their ribs, legs, and back. In addition to physical injuries, Plaintiffs claim that they have suffered emotional injury, pain and suffering, mental anguish, humiliation, and embarrassment as a result of the incident.

*3  Ultimately, the brothers accepted adjournments in contemplation of dismissal ("ACDs") of the charges against them.[3] The charges were dismissed on April 20, 2002.

3  N.Y Crim. P. Law § 170.55 provides, in relevant part:

An adjournment in contemplation of dismissal is an adjournment of the action without date ordered with a view to ultimate dismissal of the accusatory instrument in furtherance of justice. Upon issuing such an order, the court must release the defendant on his own recognizance ... If the case is not [ ] restored within [ ] six months or one year [because of, e.g., a further offense] ... the accusatory instrument is, at the expiration of such period, deemed to have been dismissed by the court in furtherance of justice.

Section 1983 provides a statutory right of action for a person who has been deprived of any Federal "right[ ], privilege[ ] or immunity[ ]" by a "person" acting "under color of any statute, ordinance, regulation, custom, or usage of any State." 42 U.S.C. § 1983.

**i. The § 1983 Claims**

- Assault through the use of objectively unreasonable force (claims 1 and 3, as against the PA Police Officers);[5]

- Except as otherwise noted, each pair of claims refers to Jaime and David, respectively.

- Denial of medical treatment (claims 2 and 4, as against the PA Police Officers);

- Arrest without probable cause (claims 5 and 6, as against the PA Police Officers);

- Conspiracy to fabricate and fabrication of a claim of the events leading up to the arrests, resulting in false imprisonment (claims 7 and 8, as against the PA Police Officers);

- False statements under oath, resulting in false imprisonment (claims 9 and 10, as against Officer Polgrew);

- Failure to intervene on Plaintiffs' behalf during the assault (claims 11 and 12, as against the PA Police Officers);

- Malicious prosecution (claims 13 and 14, as against the PA Police Officers);

- That de facto policies, practices and customs existed that condoned and fostered the conduct of the police officers (claims 15 and 16, as against the City of New York and the Port Authority, respectively); and

- Conspiracy to deprive Plaintiffs of their constitutional rights, (claims 27 and 28, as against the PA Police Officers).

**2. New York State Law Claims**

*4  - Assault and battery (claims 17 and 19, as against the PA Police Officers);

- False arrest (claims 21 and 22, as against the PA Police Officers);

- False imprisonment, as against the PA Police Officers (claims 23 and 24, as against the PA Police Officers);

- Intentional infliction of emotional distress, (claims 25 and 26, as against the PA Police Officers);

- Negligent battery and negligent infliction of emotional distress (claims 29 and 30, as against the PA Police Officers);

- Negligent hiring, screening, retention, supervision and training (claims 31 and 33, brought by Jaime, as against the City of New York and the Port Authority; claims 32 and 34, brought by David, as against the City of New York and the Port Authority); and

- Responsibility for the conduct of the police officers "pursuant to the state common law doctrine of respondeat superior" (claims 35 and 37, brought by Jaime, as against the City of New York and the Port Authority; claims 36 and 38, brought by David, as against the City of New York and the Port Authority)

**D. Procedural History**

The matter was assigned to me and referred to Magistrate Judge Andrew J. Peck for general pre-trial purposes. On May 1, 2003, Judge Peck dismissed the action, without prejudice, as against the City of New York and all Jane Doe NYPD Officers, thereby disposing of claims 15, 31, 32, 35 and 36. On June 19, 2003, Plaintiffs' malicious prosecution claims were, on consent, dismissed with prejudice, disposing of claims 13, 14, 19 and 20.

The remaining Defendants filed an Amended Answer on June 24, 2003, and discovery was taken. The instant motion, filed by Defendants on April 27, 2005, seeks summary judgment on the remaining 29 claims.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in

dispute and that one party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact" and "may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial." Phelps Credit Corp. v. Regent Health Group, Inc., 953 F.Supp. 482, 396 (S.D.N.Y.1997) (citations omitted). To defeat the motion, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). Because summary judgment searches the record, "the moving party may then be called upon to point out facts favorable to the non-moving party and show all reasonable inferences in that party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**DISCUSSION**

**I. STATUTE OF LIMITATIONS**

*5  As a threshold matter, Defendants maintain that (1) all of Plaintiffs' state law claims against the Port Authority, and (2) the intentional tort claims against the individual officers, are time-barred. The Court agrees, and for the reasons discussed below, claims 17, 19, 21, 22, 23, 33, 34, 37 and 38, are dismissed as untimely. As also explained below, however, the state law negligence claims against the Officers and all of the § 1983 claims are timely.

**A. The Time-Barred Claims**

**1. The State Law Claims Against The Port Authority Are Time-Barred**

In claims 33 and 34, Plaintiffs seek to hold the Port Authority liable for the acts of the PA Officers under a theory of negligent hiring, screening, retention, supervision and training. Moreover, in claims 37 and 38, Plaintiffs seek to hold the Port Authority liable for the acts of its officers under doctrine of respondeat superior.

Initially, it bears noting that under New York law, a plaintiff may not ordinarily plead respondeat superior and negligent hiring simultaneously. See Cornelle v. Ryder Truck Rental Inc.,

817 N.Y.S.2d 170 (1st, 169, 39 A.D.3d 744 (3d Dep't 2006).[7] In any event, neither of these claims may be maintained here because they are time-barred.

7  A plaintiff may plead both simultaneously, and seek punitive damages, where he can show facts evincing gross negligence in the hiring or retention of an employee. Cornelle, 817 N.Y.S.2d at 169. This requires a showing of conduct "in the hiring or retention "that evidences a high degree of moral culpability, is so flagrant as to transcend simple carelessness, or constitutes willful or wanton negligence or recklessness so as to evince a conscious disregard for the rights of others." Id. (citing Evans v. Stranger, 762 N.Y.S.2d 678, 680, 307 A.D.2d 439, 440 (3d Dep't 2003)).

While the New York statute of limitations for actions sounding in negligence generally is three years, see N.Y. C.P.L.R. § 214, a one year statute of limitations applies to all actions against the Port Authority, see N.Y. Unconsol. L. § 7107.[8] The accrual of pendant state law tort claims in federal actions is governed by state law. See, e.g., Diodle v. City of New York, 86 Civ. 5483(DC), 1996 WL 288240, at *2 (S.D.N.Y. May 31, 1996) (claims for false imprisonment, assault, battery, and intentional infliction of emotional distress arising from alleged law enforcement incident accrued on date of alleged incident). Because the Complaint was filed more than one year after the claims accrued, claims 17-18 and 21-26 are time-barred. See id.[10]

8  As explained in In Oort v. Commissioners of New Jersey, Inc.:

At common law, the Port Authority enjoys of sovereign immunity from suit. In 1950, both New York and New Jersey passed legislation waiving the Port Authority's immunity, but conditioned that waiver as follows: "The foregoing consent is granted upon the condition that any suit, action or proceeding prosecuted or maintained under this act shall be commenced within one year after the cause of action therefore shall have accrued..."

217 F.R.D. 126, 129 (E.D.N.Y.2003) (quoting N.Y. Unconsol. L. § 7107) (citations omitted).

Here, the claims against the Port Authority accrued no later than November 5, 2001. The Complaint was filed nearly 15 months later, on February 5, 2003. Thus, the state law claims against the Port Authority-claims 33, 34, 37 and 38-are dismissed as time-barred.

10  Plaintiffs' argument to the contrary is entirely misplaced. Specifically, they rely on N.Y. C.P.L.R. 215(8)(a), which provides:

Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action, which-notwithstanding that the time in which to commence such action has already expired or has less than a year remaining.

N.Y. C.P.L.R. 215(8)(a) (emphasis added). Plaintiffs mistakenly construe this section to mean that the statute of limitations begins to run

from the time of the dismissal of *their* criminal actions, *i.e.,* April 20, 2002. But 215/03(a) extends the statute of limitations for civil claims brought against a defendant-on a plaintiff-who was previously charged with a crime arising from the conduct underlying the purported civil claim.

### B. The Non-Time Barred Claims

#### 1. The State Law Negligence Claims Against the PA Officers In Their Individual Capacities Are Timely

**\*6** In claims 29 and 30, Plaintiffs assert claims against the Officers for negligent infliction of emotional harm.[11] That tort is recognized under New York law, see, e.g., *Shields v. Powell,* 781 N.Y.S.2d 342, 351, 11 A.D.3d 120, 134 (1st Dep't 2004), and carries a three year statute of limitations. *see* N.Y. C.P.L.R. § 214; *Sager v. Rouss Catholic Diocese of Brooklyn,* 639 N.Y.S.2d 640, 641, 275 A.D.2d 1105, 1106 (4th Dep't 1996). Because the Complaint was filed within three years of the incident, claims 29 and 30 for negligent infliction of emotional harm are timely.[12]

[11] To the extent that claims 29 and 30 assert claims for "negligent battery," they are not cognizable under New York Law, as there is no such offense. *See Lazaranko v. Rose,* No. 00 Civ. 2221(BSJ), 2003 WL 21283632, at \*6 (S.D.N.Y. Sept. 30, 2003), *Schetzen v. Robotic,* 709 N.Y.S.2d 193, 194, 273 A.D.2d 230, 231 (2d Dep't 2000).

[12] While Defendants claim that these negligence claims may not coexist with traditional intentional torts under New York law, *see Deen v. Moffitt,* 386 F.Supp.2d 479, 486 n. 5 (S.D.N.Y.2005) (claims for the infliction of emotional distress must be dismissed where the conduct underlying the claim may be addressed through traditional tort claims) (citing *Thomas v. County of Putnam,* 262 F.Supp.2d 241, 251 (S.D.N.Y.2003)), there no longer is any impermissible overlap here in light of the Court's dismissal of Plaintiffs' state law intentional tort claims, *see supra* Point I.A.2.

#### 2. The § 1983 Claims Are Timely

In claims 1-15 and 27-28, Plaintiffs assert numerous section 1983 violations based on various common-law theories of liability.[13] It is firmly established that New York's residual statute of limitations of three years for personal injury actions,

*See Tapia-on v. Cornwood Airlines,* 534 F.Supp.2d 383, 395 (S.D.N.Y.2004) (citing *Bajour v. Port Authority of New York and New Jersey,* 768 F.3d 34, 40 (2d Cir.1985)).

**\*7** Because a statute is municipality under § 1983 may proceed ... only if the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or is conducted pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels." " *Ramos v. City of New York,* 95 Civ. 3135(GEL), 2006 WL 2871969, at \*2 (S.D.N.Y. Oct. 5, 2006) (quoting *Monell,* 436 U.S. at 690-91); *accord City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988).[13]

[13] It is well settled that a municipality cannot be held liable under § 1983 under a theory of respondeat superior or vicarious liability. *See Cintrón-Harris,* 480 U.S. 378, 385 (1989); *Owens v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993), and Plaintiffs do not concede otherwise.

Here, the Complaint identifies no particular training, practice or policy that led to Plaintiffs' arrest or alleged mistreatment. Rather, Plaintiffs rest the existence of "de facto" policies and customs, as evidenced by their allegations of being swarmed and beaten by numerous officers. But this logic is entirely circular, and if permitted would expose the Port Authority to liability in every case where one or more of its employees is alleged to have done something wrong. *See Ramos,* 2006 WL 2871969, at \*2. The absence of specific allegations of "what policy or custom led to the allegedly unconstitutional conduct" is fatal to Plaintiffs' § 1983 claim against the Port Authority. *Id.; see also Williams v. City of Mount Vernon,* 428 F.Supp.2d 146, 159 (S.D.N.Y.2006) (dismissing municipal liability claim because the complaint's "conclusory allegations" regarding the existence of a "de facto policy" was legally insufficient). Accordingly, claim for which was the last remaining claim in this action against the Port Authority is dismissed.

### B. The § 1983 Claims Against the Officers

Officers Pofgyo and Santiago seek dismissal of all the § 1983 claims against them on the ground that they are shielded from liability under the doctrine of qualified immunity. For the reasons below, however, most of material fact preclude the entry of summary judgment on these § 1983 claims.

#### 1. Qualified Immunity

The qualified immunity doctrine protects state actors sued in their individual capacities from a damages suit, where the defendant's actions did not violate clearly-established rights. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Demars v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). In evaluating a claim of qualified immunity, this Court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Reynolds v. Linord,* No. 98 Civ. 6723(DLC), 2000 WL 335278, at \*7-8 (S.D.N.Y. Mar. 1, 2000) (citations omitted). In general, a right is clearly established where: (1) the right in question was defined with reasonable specificity; (2) the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *See id.*

**\*8** Because qualified immunity is "immunity from suit rather than a mere defense to liability," "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided when the defense is dispositive." *Saucier,* 533 U.S. at 200 (citation omitted). If such immunity applies, a dismissal of the plaintiff's claim, as a matter of law, is required. However, a defense of qualified immunity cannot "deprive a plaintiff of his his-cash Amendment right to have a jury resolve 'all disputed issues of material fact.' " *Torres v. Village of Sleepy Hollow,* 379 F.Supp.2d 478, 483 (S.D.N.Y.2005).

#### 2. The Excessive Force Claims

In claims 1 and 5, Plaintiffs claim that their Fourth Amendment right was violated by the Officers' alleged use of excessive and unreasonable force during their arrests. *See Graham v. Connor,* 490 U.S. 386, 395-96 (1989) (Fourth Amendment protects against the use of unreasonable or excessive force in connection with an arrest); *Medile v. Moran,* 297 F.3d 114, 120 (2d Cir.2002). In the arrest context, the reasonableness inquiry turns on whether the Officers' actions were "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Medile,* 297 F.3d at 120 (citation omitted). "[P]roper application [of this test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety

---

of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396; *accord Papineau v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006).

On a motion for summary judgment, the doctrine of qualified immunity generally cannot shield a defendant charged with the use of excessive force. *See, e.g., Robinson v. Via,* 821 F.2d 913, 923-24 (2d Cir.1987); *Brown v. City of New York,* No. 98 Civ. 3354(JLG), 2003 WL 4727779, at \*7 (E.D.N.Y. Feb. 13, 2003); *Mesteron v. Mazzeo,* 854 F.Supp. 116, 133-34 (E.D.N.Y.1994). Apart from the fact that the rights asserted in such cases are "clearly established," the issue of whether a constitutional violation has occurred is generally a question of fact, as one or more of the factors governing reasonableness (*e.g.,* the threat posed, the amount of resistance, etc.) is generally disputed. *See, e.g., Papineau,* 465 F.3d at 61; *Brown,* 2003 WL 4727779, at \*7. That is precisely the case here.

For purposes of this motion for summary judgment, the Court must accept Plaintiffs' version of the events at issue: namely, that significant force was used against them notwithstanding their lack of resistance. That the Officers' version of the events is markedly different cannot avoid them at this stage in the litigation. *See Williams,* 428 F.Supp.2d at 158 (denying summary judgment of excessive force claim because "[t]he claim has been adequately pled, and defendants cannot escape the charges simply by alleging a different version of the incident"); *Torres,* 379 F.Supp.2d at 483 ("it is no defense to a claim of qualified immunity that the defendant did not do what plaintiff said he did."). In short, it is for a jury to decide whether excessive force was used.

#### 3. The Inadequate Medical Treatment Claims

**\*9** For similar reasons, claims 2 and 6, for inadequate medical treatment, must also go to a jury. The Fourteenth Amendment's due process clause protects a pretrial detainee against a state actor's unreasonable deprivation of medical needs. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991); *Messina,* 854 F.Supp. at 139-40. "In order to adequately plead a violation of a ... Fourteenth Amendment right to adequate medical care, the plaintiff must allege action ... which is, at the very least, more than mere negligence, and, at the very most, a deliberate indifference to plaintiff's medical needs." *Messina,* 854 F.Supp. at 140 (citations omitted); *Bryant,* 923 F.2d at 984). "[P]roof of intent is not required, because the deliberate indifference standard 'is satisfied by something less than acts or omissions for the very purpose

of causing harm or with knowledge that harm will result.' " *Brown,* 2003 WL 4727779, at \*9 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

Here, genuine issues of material fact exist as to whether the Officers intentionally delayed or hindered medical treatment to Jaime and David, for no other reason than to punish them or to make them suffer. Contrary to Defendants' suggestion, the absence of a medical expert's opinion in this case is not fatal to Plaintiffs' claims. *See Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony.... Expert testimony certainly could have bolstered [plaintiff's] case at trial, but the absence of such expert proof does not mandate dismissal of his action where the facts support a finding of deliberate indifference.").[14] Thus, Plaintiffs' claims that they received inadequate medical treatment survive summary judgment.

[14] "[A] pretrial detainee's [Fourteenth Amendment] due process rights to adequate medical treatment are at least as great as the Eighth Amendment protections available to prison inmates." *Bryant,* 923 F.3d at 983 (citing *Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244 (1983)).

#### 4. The Probable Cause Claims

In claims 3 and 4, Plaintiffs claim that they were falsely arrested and imprisoned without probable cause. This claim arises from their Fourth Amendment right to be free from unreasonable seizures. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Calino v. City of New London,* 968 F.2d 864, 870 (2d Cir.1991). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. *Weyant,* 101 F.3d at 852. The existence of probable cause is measured by the totality of the objective circumstances, to be determined without regard to the arresting officer's subjective beliefs. *Williams,* 428 F.Supp.2d at 154 (citations omitted).

In the context of a qualified immunity defense-which affords state actors the constitutional benefit of the doubt-something less than probable cause is required. Specifically, qualified immunity attaches not only if s was objectively reasonable for the officer to believe that probable cause existed, but also if "officers of reasonable competence could disagree on whether

the probable cause] test was met." *Golino,* 950 F.2d at 870; *see also Robison,* 821 F.2d at 921. This so-called "arguable probable cause" standard,[15] recognizes that it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials-like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable." *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

[15] *See Cintron v. Brown,* 240, F.3d 194, 199 (2d Cir.2004) (using the term)

**\*10** Because the parties have sharply dispute the "totality of the circumstances" surrounding the bretheto arrests, summary judgment simply is not warranted. *See Weyant,* 101 F.3d at 855 (excessive plaintiff court's grant of summary judgment of § 1983 false arrest claim where issues of material facts existed as to existence of probable cause). While qualified immunity may provide a viable defense at trial, the Court cannot say, as a matter of law, that "arguable probable cause" to arrest Plaintiffs existed.

Apart from their qualified immunity defenses, the Officers contend that the disposition of Plaintiffs' charges by ACD provides an independent basis to dismiss Plaintiffs' false arrest claims, on the ground that an ACD is not a favorable termination. But this challenge is misplaced. While an ACD is relevant to a claim of *malicious prosecution,*[16] it is not relevant to a claim of *false arrest. See Pinsencere v. Monticello Police Dep't,* No. 01 Civ. 0119(NRB), 2003 WL 135791, at \* 42-3 (S.D.N.Y. Jan. 17, 2003) (drawing distinction); *Sorenson v. City of New York,* No. 98 Civ. 3352(RE), 98 Civ. 4725(HB), 1999 WL 511923, at \*2 (S.D.N.Y. Jul. 20, 1999) (same). The distinction arises because, unlike a claim of malicious prosecution, a claim for false arrest does not require a favorable termination. *Weyant,* 101 F.3d at 854 (citation omitted). Thus, the fact that Plaintiffs' charges were terminated by ACD-which in a second termination, rather than a favorable one, *see Hollander v. Trump Village Co-op., Inc.,* 448 N.E.2d 432, 434-35, 58 N.Y.2d 420, 424-25 (1983)-in no way precludes their § 1983 false arrest claims. *See Friedman,* 2003 WL 135751, at \*3; *Pinsentere v. City of New York,* No. 00 Civ. 4025(NRB), 2000 WL 1877100, at \*4 (S.D.N.Y. Dec. 27, 2000); *Coakley v. Jaffe,* 49 F.Supp.2d 615, 624 (S.D.N.Y.1999), *Sorenson,* 1999 WL 511923, at \*2.

[16] *See Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980).

[17] Defendants reliance on *Roesch v. Otarola,* 980 F.2d 850 (2d Cir.1994), is misplaced, as that case did not involve the interpretation of New York law. In *Roesch,* the Second Circuit held that a plaintiff's § 1983 false arrest claim was barred because the criminal proceedings against the plaintiff had been terminated pursuant to Connecticut's accelerated pretrial rehabilitation program. *Id.* at 853. As the Second Circuit subsequently explained in *Weyant,* however, the holding in *Roesch* does not extend to claims for false arrest under New York law, which, unlike Connecticut law, does not require a showing of favorable termination. *Weyant,* 101 F.3d at 110, 118 (2d Cir.1995) ("A favorable termination of the proceedings is not an element of th[e] tort [of false arrest].."). To the extent that some courts in this district have relied on *Roesch* to bar false arrest claims on the basis of an ACD, *see Bowles v. New York,* 37 F.Supp.2d 608, 611-12 (S.D.N.Y.1999); *Copeland v. City of New York,* No. 99 Civ. 2191(FB), 1999 WL 1201737, at \*2 (S.D.N.Y. Dec. 14, 1999), those decisions do not reference, and are squarely at odds with, *Weyant.*

#### 5. The Conspiracy Claims

In claims 27 and 28, Plaintiffs claim that the Officers conspired to deprive Plaintiffs of their constitutional and state law rights. Conspiracy to deprive another of his constitutional rights in § 1983 *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). To state a § 1983 conspiracy claim a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.; accord Cumberlob v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002).

As Defendants point out, mere conclusory allegations of a § 1983 conspiracy are insufficient. *See Dwares,* 985 F.3d at 89-100 (citing cases). Plaintiffs provide more than that here, however. They allege that the PA Officers agreed to, and did, assault and falsely arrest them, in violation of their rights under the Fourth and Fourteenth Amendments. Whether this can be proved at trial remains to be seen. But for now, the claims as alleged are sufficient.

Cumberbatch v. Port Authority of New York and New Jersey, Not Reported in F.Supp.2d...
2009 WL 3543670

**6. The Remaining Miscellaneous § 1983 Claims**

*11 Claims 9-12 will be consolidated with other claims, and will no longer be considered independently. Specifically, claims 9 and 10, concerning the making of false statements under oath, is not a separately cognizable claim under § 1985. Thus, the Court will consider the allegations Plaintiff makes in claims 9 and 10 as factual support for their allegation of conspiracy in claims 27 and 28. Claims 11 and 12, which allege that the Officers' failed to intervene on Plaintiff's behalf, cannot logically be pled against the same Defendants simultaneously with claims 1 and 5, which allege assault. [18] The Court will thus construe these claims as pleading in the alternative, and on that basis it will incorporate them into claims 1 and 5—i.e. the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.

[18] "A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his

presence by other officers," and may be held liable under § 1983 for failing to intervene. Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir.1997) (citation omitted).

**CONCLUSION**

For the foregoing reasons, the Court (1) GRANTS Defendants' motion for summary judgment as to claims 16-18, 21-26, 33-34, and 37-38; (2) DENIES summary judgment as to claims 14 and 27-30 and (3) consolidates claims 9-12 into other surviving claims.

The parties are directed to file a joint pre-trial order by January 29, 2007, and be ready for trial on March 6, 2007.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3543670

---

Vines v. McCrystal, Slip Copy (2020)
2020 WL 4818862

**2020 WL 4818862**
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Curtis Johnnell VINES, Plaintiff,
v.
Kevin MCCRYSTAL, et al., Defendants.

Case No. 3:18cv1432(MPS)
|
Signed 08/19/2020

Attorneys and Law Firms

Curtis Johnell Vines, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendants.

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Michael P. Shea, United States District Judge.

*1 Plaintiff, Curtis Johnnell Vines,[1] initiated this action by filing a civil rights complaint to assert claims that in April 2017, Physician Assistant McCrystal and Correctional Officers Olivo and Burrow were deliberately indifferent to his serious knee injury. See Compl., ECF No. 1.[2] Pending before the Court is a motion for summary judgment filed by Officers Olivo and Burrow,[3] and a document filed by the plaintiff that has been docketed as a motion to compel. For the reasons set forth below, the Court will deny the motion to compel and will grant the motion for summary judgment.

[1] It is evident from the plaintiff's signature on the complaint and the application to proceed in forma pauperis that the plaintiff's middle name is spelled Johnnell rather than Johnell, as he spelled it in the caption of the complaint. See Compl., ECF No. 1, at 1,9; ECF No. 2, at 1, 3, 4. Accordingly, the Court directs the Clerk to edit the docket to reflect the correct spelling of the plaintiff's middle name as Johnnell.

[2] The plaintiff was confined at Cheshire Correctional Institution when he filed this action. On April 20, 2020, he filed a Notice indicating that

officials would be discharging him from prison on April 30, 2020, and that his new mailing address would be 16 Jennings Way, Norwalk, CT. See Notice, ECF No. 74. The Notice does not include the town or city in which the plaintiff resides. State of Connecticut Department of Correction records reflect that the plaintiff, Inmate No. 264846, is no longer confined in a prison facility within the Department of Correction. See http://www.ctinmateinfo.state.ct.us

[3] It is clear from the affidavits of Correctional Officers Olivo and Burrow filed in support of the motion for summary judgment that the complaint incorrectly identifies the last name of Officer Olivo as Olivia and the last name of Officer Burrow as Barrows. See Compl., ECF No. 1, at 2; Olivo Aff., ECF No. 34-3; Burrow Aff., ECF No. 34-5. Accordingly, the Court directs the Clerk to edit the docket to reflect the correct spelling of the last names of Officers Olivo and Burrow.

**I. Background**

On November 19, 2018, after reviewing the complaint, the Court dismissed the claims seeking money damages from the defendants in their official capacities for violations of the plaintiff's federal constitutional rights and the claims seeking money damages from the defendants in their individual and official capacities for their negligent conduct pursuant to 28 U.S.C. § 1915A(b)(2), dismissed the request for a declaration that the defendants violated federal law and the request for a declaration that the defendants' alleged negligent conduct violated the plaintiff's rights under Connecticut law, and dismissed the Eighth and Fourteenth Amendment claims against Physician Assistant McCrystal in his individual capacity pursuant to 28 U.S.C. § 1915A(b)(1). See Initial Review Order, ECF No. 7, at 12-13. The Court concluded that the plaintiff had stated plausible Eighth Amendment claims of deliberate indifference to a medical need against Officers Olivo and Burrow in their individual capacities and permitted the plaintiff thirty days to file an amended complaint to address the deficiencies in the allegations asserted against Physician Assistant McCrystal as outlined in the Order Id at 13. In response, the plaintiff filed two Notices with attached exhibits. See ECF Nos. 13, 16.

*2 On April 5, 2019, after thirty days, the Court dismissed the claims against all defendants in their official capacities and dismissed the Eighth Amendment claims of deliberate indifference to a medical need against the Eighth Amendment deliberate indifference claim and the

---

Vines v. McCrystal, Slip Copy (2020)
2020 WL 4818862

Fourteenth Amendment due process claim asserted against McCrystal in the First Notice and dismissed the First Amendment retaliation claim and the Eighth Amendment deliberate indifference claim asserted against McCrystal in the Second Notice pursuant to 28 U.S.C. § 1915A(b)(1). See Order, ECF No. 17. The Court concluded that the case would proceed only as to the Eighth Amendment deliberate indifference to medical needs claims asserted in the complaint against Correctional Officer Olivo and Correctional Officer Burrow in their individual capacities. Id.

On September 30, 2019, Officers Olivo and Burrow filed an answer to the complaint. See November 4, 2019, Officers Olivo and Burrow now move for summary judgment. In response to the motion for summary judgment, the plaintiff has filed a memorandum and a motion to compel.

**II. Standard of Review**

When filing a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If a motion for summary judgment is supported by documentary evidence or sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). Thus, the party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id.

In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and ... draw all reasonable inferences in its favor." Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc., 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). The court may not, however, "make creditable determinations or weigh the evidence ... [because] [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Proctor v.

LeClaire, 846 F.3d 597, 607-08 (2d Cir. 2017) (internal quotation marks and citation omitted).

Where one party to proceeding pro se, the court reads the pro se party's papers liberally and interprets them to "raise the strongest arguments that they suggest." Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal interpretation, however, allegations unsupported by admissible evidence "do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

**III. Facts**

The relevant facts are taken from the defendants' Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1"), ECF No. 34-1, and Attachments A and B, [ECF Nos. 34-3, 34-5], filed in support of the Local Rule 56(a)1 Statement. Local Rule 56(a)2 requires the party opposing a motion for summary judgment to file a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. See Local Rule 56(a)2(i). The plaintiff did not file a Local Rule 56(a)2 Statement in opposition to the defendants' Local Rule 56(a)1 Statement. Accordingly, the facts that are asserted in the Local Rule 56(a)1 Statement and that have evidentiary support are deemed admitted. See Local Rule 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule...").[4] Because the Complaint, ECF No. 1], includes a signed and dated verification stating that the contents are true under penalty of perjury, the Court also considers the allegations asserted in it that are based on the plaintiff's personal knowledge. See Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment.")

[4] The Defendants have filed the notice required by this Court's rules governing motions for summary summary judgment filed against self-represented litigants. See ECF No. 34-2.

*3 On April 4, 2017, at approximately 9:45 a.m., the plaintiff injured his left knee playing basketball at MacDougall-

---

Vines v. McCrystal, Slip Copy (2020)
2020 WL 4818862

Walker Correctional Institution ("MacDougall-Walker"). Defs.' L.R. 56(a)1 ¶ 1, Compl. at 28. Officers transported the plaintiff to the medical department in a wheelchair. Id. ¶ 4, Compl. at 28. Nurse Burns and Physician Assistant McCrystal examined the plaintiff and noted that his knee was swollen and that he could not bear weight on it. Compl. at 35-36. McCrystal prescribed pain medication, crutches, and ice, referred the plaintiff for an x-ray of his left knee, and instructed Nurse to wrap the plaintiff's knee with an ACE bandage. Id. ¶ 4-5; Compl. at 6, 35-36. After receiving treatment from Nurse Burns and Physician Assistant McCrystal, two correctional officers escorted the plaintiff back to his cell. Id. ¶ 6.

That evening, Correctional Officer Olivo was assigned to the plaintiff's housing unit as a control officer. Id. ¶¶ 7-8. At some point between 4:30 p.m. and 5:00 p.m., during service of the dinner meal, the plaintiff approached Officer Olivo at the control booth, informed her that he had hurt his leg, and asked her to contact the medical department. Id. ¶ 11, Compl. at 6, 17, 19. Officer Olivo called the medical department to inform a staff member of the plaintiff's request to be seen by a medical provider because he had injured his leg. Id. ¶ 12. Officer Olivo learned that the plaintiff had been treated for his injury earlier that day and was told by the medical department that "there was nothing else they could do for him[ ] that evening." Id. Officer Olivo related this information to the plaintiff. Id. ¶ 13.

During the evening of April 4, 2017, Correctional Officer Burrow was assigned to the plaintiff's housing unit as a rover. Id. ¶¶ 7-8. Officer Burrow does not remember a specific conversation involving a request by the plaintiff to be sent to the medical department. Id. ¶ 9. Pursuant to Department of Correction policy, contact with the medical department regarding an inmate's request for treatment is made by the control officer assigned to the inmate's housing unit. Id. ¶ 10. As a rover assigned to the plaintiff's housing unit on April 4, 2017, Officer Burrow was not responsible for contacting the medical department regarding the plaintiff's request to be seen by a medical provider. Id. If the plaintiff had requested that Officer Burrow contact the medical department, she would have related that request to the control officer, Burrow. Aff. ¶ 6. ECF No. 34-5.

During the morning of April 5, 2017, a nurse examined the plaintiff. Compl. at 51. At approximately 9:20 a.m., the plaintiff underwent x-rays of his left knee. Defs.' L.R. 56(a)1 ¶ 14. The x-rays reflected a transverse fracture through the upper third of the plaintiff's left patella. Compl. at 48-49. At approximately 10:20 a.m., pursuant to an order of a

medical provider at MacDougall-Walker, correctional officers transported the plaintiff to the University of Connecticut Health Center ("UCONN") for treatment Defs.' L.R. 56(a)1 ¶ 15; Compl. at 26, 42-43, 51. Later that day, a surgeon performed an open reduction and internal fixation of the plaintiff's left patella fracture. Compl. at 63-66. The plaintiff remained at UCONN for three days. Id. at 51, 65-66. On April 7, 2017, he returned to MacDougall-Walker and a nurse admitted him to the infirmary to recover from the surgical repair of his left patella. Id. at 51.

**IV. Discussion**

Officers Olivo and Burrow argue that the plaintiff has failed to meet either the objective or the subjective component of the Eighth Amendment standard. The plaintiff, in an unsigned memorandum in opposition to the motion for summary judgment, contends that he made both defendants aware of his painful knee injury and that they failed to take steps to contact the medical department in order to facilitate the provision of medical treatment for his injury. See Mem. Opp'n Mot. Summ. J, ECF No. 42. As a preliminary matter, the Court will address the document filed by the plaintiff that is titled "Amended Summary Judgment" and has been docketed as a motion to compel. See ECF No. 39.

**A. Motion to Compel [ECF No. 43]**

*4 The plaintiff seeks the Court's assistance in conducting further discovery to secure surgical reports and "an expert opinion" from the surgeon who operated on his left knee. See [removed] quotes at UCONN on April 5, 2017. The plaintiff claims that he has been unable to retrieve these reports himself because it is his understanding that UCONN will only provide copies of the reports to attorneys and family members and he has not family members. The plaintiff states that he needs a copy of the surgical report to determine whether the less-than-twenty-four-hour delay in receiving further treatment for pain after he initially injured his knee constituted deliberate indifference. Although he appears to suggest that the surgical report would be helpful to his argument that the defendants subsequently dispensed by a physician in a fractional profile. He contends that he had to wait around during the time period between injuring his knee on April 4, 2017 and his transfer to UCONN on the morning of April 5, 2017 and that walking around may have caused further damage to his knee.

The motion is unsigned. Thus, it does not comply with Rule 11(a) of the Federal Rules of Civil Procedure. Even if the Court were to consider the unsigned motion as having been filed pursuant to Rule 56(d), Fed. R. Civ. P., it does not meet

---

WESTLAW

*[Body text is reproduced to the extent legible.]*

## B. Defendants' Motion for Summary Judgment [ECF No. 34]

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical need or medical condition by medical staff members as well as correctional staff members.

### 1. Objective Element

### 2. Subjective Component

## V. Conclusion

Ridge v. Davis, Slip Copy (2022)

2022 WL 357020

Valdiviezo v. Boyer, 752 Fed.Appx. 29 (2018)

752 Fed.Appx. 29
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Mario VALDIVIEZO, Plaintiff-Appellant,
v.
Captain BOYER, George R. Vierno Center,
City of New York, Ajose, Correction Officer,
George R. Vierno Center, John Doe, Emergency
Medical Response, George R. Vierno Center,
Jane Doe, Emergency Medical Response,
George R. Vierno Center, Defendants-Appellees,
George R. Vierno Center, G.R.V.C., Rikers
Island, George Motchan Detention Center,
G.M.D.C., Rikers Island, Defendants.

17-3093
|
October 18, 2018

**Synopsis**

**Background:** Pretrial detainee filed § 1983 action alleging
that city, correction officers, and two medical staff members
were deliberately indifferent to allegedly unconstitutional
conditions of confinement at correctional facility. The United
States District Court for the Southern District of New York,
Nathan J., granted defendants' motion to dismiss. Detainee
appealed.

**Holdings:** The Court of Appeals held that:

[1] detainee sufficiently stated § 1983 municipal liability
claim;

[2] detainee failed to state § 1983 claim against medical staff
members for deliberate indifference to medical needs based
on delay in medical care; but

[3] plaintiff court erred in finding that medical staff's orders to
have other detainees carry detainee after he was injured did
not violate the Fourteenth Amendment.

Affirmed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (3)

[1]  Civil Rights ⟶ Criminal law enforcement;
     prisons
     Pretrial detainee sufficiently stated § 1983
     municipal liability claim based on failure to
     act, where detainee alleged that city failed to
     correct the unsanitary conditions at correctional
     facility, despite receiving numerous grievances
     from multiple inmates, that unsanitary conditions
     of showers at facility reached unconstitutional
     level, and that city officials responded to the
     grievances in a patently inadequate way by
     inspecting, painting, and hand washing showers.
     42 U.S.C.A. § 1983.

     1 Cases that cite this headnote

[2]  Constitutional Law ⟶ Medical treatment
     Prisons ⟶ Health and Medical Care
     Pretrial detainee failed to state § 1983
     claim against correctional facility medical staff
     members for deliberate indifference to medical
     needs in violation of due process based on delay
     in medical care; although detainee alleged that
     he was in pain during medical staff's hour-
     long delay in calling for medical help, detainee
     failed to allege that the delay exacerbated injuries
     from his initial fall. U.S. Const. Amend. 14; 42
     U.S.C.A. § 1983.

     2 Cases that cite this headnote

[3]  Constitutional Law ⟶ Medical treatment
     Prisons ⟶ Health and Medical Care
     District court erred in finding that correctional
     facility medical staff's orders to have other
     detainees carry pretrial detainee after he was
     injured, causing two drops to the floor and loss
     of consciousness, did not violate the Fourteenth
     Amendment, where medical staff's decision to
     permit detainees, who were likely untrained, to
     carry a man complaining of neck and back injury
     could constitute inadequate care, and detainee
     alleged that his injuries were exacerbated as a
     result of drops, that, after detainee was dropped
     once, medical staff was aware that there was a
     risk that detainee would be dropped again, and
     that medical staff acted recklessly when they
     ordered detainees to pick him up again. U.S.
     Const. Amend. 14.

     9 Cases that cite this headnote

*30  Appeal from a judgment of the United States District
Court for the Southern District of New York (Nathan, J.).

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
judgment of the district court is AFFIRMED in part, and
VACATED AND REMANDED in part.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Mario Valdiviezo, pro se,
Comstock, NY.

FOR DEFENDANTS-APPELLEES: Jane L. Gordon, Qian
Julie Wang, Assistant Corporation Counsels, for Zachary W.
Carter, Corporation Counsel of the City of New York, New
York, NY.

PRESENT: ROBERT A. KATZMANN, Chief Judge,
RAYMOND J. LOHIER, JR., Circuit Judge, TIMOTHY C.
STANCEU, Judge.[*]

Timothy C. Stanceu, Chief Judge of the United
States Court of International Trade, sitting by
designation.

**SUMMARY ORDER**

Appellant Mario Valdiviezo, pro se, sued New York City
("the City"), two correction officers, and two medical
staff members under 42 U.S.C. § 1983 for unconstitutional
conditions of confinement and deliberate indifference to
his serious medical needs. The district court dismissed the
complaint for failure to state a claim. We assume the parties'
familiarity with the underlying facts, the procedural history
of the case, and the issues on appeal.

"We review *de novo* a district court's dismissal of a complaint
pursuant to Rule 12(b)(6), construing the complaint liberally,
accepting all factual allegations in the complaint as true, and
drawing all reasonable inferences in the plaintiff's favor."
*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.
2002). The complaint must plead "enough facts to state
a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,
556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)
(internal quotation marks omitted), *Bell
Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct.
1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal*,
556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
Although a court must accept as true all of the factual allegations
in the complaint, that requirement is "inapplicable to legal
conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

**I. Municipal Liability**

[1]  Municipalities, and individuals sued in their official
capacity, are liable under § 1983 only if the challenged
conduct was "pursuant to a municipal policy or custom."
*Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d
Cir. 2004) (citing *Monell v. Dep't of Soc. Servs. of the City
of N.Y.*, 436 U.S. 658, 692-94, 98 S.Ct. 2018, 56 L.Ed.2d
611 (1978) ), or caused by a "failure to train." *Segal v.
City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing
*City of Canton v. Harris*, 489 U.S. 378, 389 S.Ct. 1197,
103 L.Ed.2d 412 (1989) ). To satisfy *Monell*'s policy or
custom requirement, a plaintiff must show either that the
challenged practice "was so persistent or widespread as to
constitute a custom or usage with the force of law," or that
"the practice of subordinate employees was so manifest as to
imply the constructive acquiescence of senior policy-making
officials." *Littlejohn v. City of New York*, 795 F.3d 297, 315

(2d Cir. 2015) (internal quotation marks omitted). To establish
municipal liability based on a failure to act, a plaintiff must
show "that defendants knew to a moral certainty that the
City would confront a given situation; the situation presented
the City with a difficult choice or there was a history of the
mishandling the situation; and the wrong choice by the City
would frequently cause the deprivation of plaintiffs' rights."
*Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing
*Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir.
1992) ). A "general and conclusory allegation" of a municipal
policy or custom fails to state a facially plausible *Monell*
claim. *Littlejohn*, 795 F.3d at 315.

Valdiviezo alleged that the City failed to correct the unsanitary
conditions at Rikers, despite receiving numerous grievances
from multiple inmates. The constitutionality of housing
conditions is assessed by both the severity and duration of the
violation. *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017).
Valdiviezo plausibly alleged that the unsanitary conditions
of the showers at Rikers reached an unconstitutional level.
A liberal reading of Valdiviezo's complaint also indicates
that the City failed to adequately correct these conditions
for at least eighteen months, even after it received several
grievances from multiple inmates and attempted some remedy
— namely inspecting, painting, and hand-washing the showers.
A response that is "so patently inadequate in the task [may]
amount to deliberate indifference." *Reynolds*, 506 F.3d at
192-93. Valdiviezo's allegation that City officials responded
to the grievances by inspecting the showers at least suggests
that the City knew "to a moral certainty," *id.* at 192, about
the shower conditions in Valdiviezo's unit. Valdiviezo will
ultimately have to provide evidence that the City's response
was "patently inadequate to the task," but based on the facts
alleged, it is too early for us to conclude as a matter of law
that he will be unable to do so.

Valdiviezo also alleged that the City failed to implement
facility rules and regulations and failed to properly train
and supervise its corrections officers and medical personnel.
Valdiviezo did not allege facts showing that corrections
officers regularly failed to implement rules and regulations
or that the City failed to train corrections officers or medical
personnel. Nor did he allege facts showing that there was a
history of medical staff using detainees to transport patients.
Therefore, these *32 allegations were insufficient to state a
§ 1983 claim.

**II. Individual Liability**

[2]  The district court erroneously analyzed Valdiviezo's
deliberate indifference to medical needs claims under the
Eighth Amendment. Valdiviezo's claims should be analyzed
under the Fourteenth Amendment because he was a pretrial
detainee at the time of alleged incidents. *See Darnell*, 849
F.3d at 29 ("A pretrial detainee's claims are evaluated
under the Due Process Clause because, [p]retrial detainees
have not been convicted of a crime and thus may not be
punished in any measure—neither cruelly and unusually nor
otherwise." (internal quotation marks omitted) ). A pretrial
detainee must satisfy two prongs to prove a deliberate-
indifference claim. First, "an 'objective prong' showing
that the challenged conditions were sufficiently serious to
constitute objective deprivations of the right to due process."
*Id.* at 29. Second, a subjective prong "showing that the officer
acted with at least deliberate indifference to the challenged
conditions." *Id.*

Valdiviezo asserted that his medical care was inadequate in
two ways. First, he alleged that Ajose and Boyer delayed
calling for medical help, which did not arrive for an hour.
Second, Valdiviezo alleged that medical personnel directed
detainees to carry him out of the showers, causing him to be
dropped twice.

Although the district court analyzed the delay claim under the
wrong amendment, its dismissal of the claim was nonetheless
correct. For Fourteenth Amendment claims, this Court applied
the same standard as the Eighth Amendment to determine
whether an alleged action is objectively serious enough
to be a constitutional violation. *Cf. Darnell*, 849 F.3d at
30 (applying Eighth Amendment objective standards to a
Fourteenth Amendment conditions-of-confinement claim). In
order to meet the objective prong for a claim of deliberate
indifference to serious medical needs, the plaintiff must
show that he actually did not receive adequate care and
that the inadequacy in medical care was sufficiently serious.
*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). When
the basis for a prisoner's claim "is a temporary delay or
interruption in the provision of otherwise adequate medical
treatment," this Court examines whether the delay itself
created a risk of harm. *Smith v. Carpenter*, 316 F.3d 178,
185-86 (2d Cir. 2003). In considering whether a delay caused
a risk of harm, a court may consider "[t]he absence of
adverse medical effects or demonstrable physical injury." *Id.*
at 187. Although Valdiviezo alleged that he remained in pain
during the hour-long wait, he does not allege that the delay
exacerbated his injuries from his initial fall. Therefore, the

district court correctly dismissed Valdiviezo's claim based on
a delay in his medical care.

[3]  However, the district court erred in holding that the
medical staff's orders to have detainees carry Valdiviezo—
causing two drops to the floor, additional pain, and loss of
consciousness—did not violate the Fourteenth Amendment.
"In cases where the inadequacy is in the medical treatment
given," the analysis focuses on the inadequacy itself.
*Salahuddin*, 467 F.3d at 280 (citing *Smith*, 316 F.3d at 185).
The medical staff's decision to permit detainees, who were
likely untrained, to carry a man complaining of a neck and
back injury could constitute inadequate care, as it could have
resulted in more serious injury. *See id.* ("[F]ailing to take
reasonable measures in response to a medical condition can
lead to liability." (internal quotation marks omitted) ). *Smith*,
316 F.3d at 186 (a deliberate indifference claim may be based
on "conduct ... exposing an inmate to an unreasonable risk of
future harm"). And *33 Valdiviezo alleged that his injuries
were exacerbated as a result of the two drops; after the first
fall, he was in more pain, and he lost consciousness after the
second fall.

Further, the allegations are sufficient to plausibly raise an
inference that the medical staff had the requisite mens rea for a
Fourteenth Amendment deliberate-indifference claim. Under
the Fourteenth Amendment, the defendant's state of mind is

evaluated objectively. *Darnell*, 849 F.3d at 36. A plaintiff
must show "that the defendant-official acted intentionally to
impose the alleged condition, or recklessly failed to act with
reasonable care to mitigate the risk that the condition posed to
the pretrial detainee even though the defendant-official knew,
or should have known, that the condition posed an excessive
risk to health or safety." *Id.* at 35. Here, after Valdiviezo was
dropped once, causing him to cry out in pain, the medical
staff was aware that there was a risk that Valdiviezo would be
dropped again. Accordingly, Valdiviezo sufficiently alleged
that the two members of the medical staff acted recklessly
when they ordered the detainees to pick him up again. We
therefore vacate and remand with regard to this claim.

We have considered all of Valdiviezo's remaining arguments
and find them to be without merit. For the foregoing reasons,
the judgment of the district court is **AFFIRMED** with regard
to the claims against the two corrections officers and all
but one of the claims against the City. It is **VACATED
AND REMANDED** with regard to the claim against the two
unknown medical staff members and the claim against the
City regarding the unsanitary conditions of the showers.

All Citations

752 Fed.Appx. 29

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Ridge v. Davis, Slip Copy (2022)**

2022 WL 357020

**All Citations**

Slip Copy, 2022 WL 357020

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 3073184
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shakim Abd ALLAH, Plaintiff,

v.

Anthony ANNUCCI; Cheryl Morris;
Thomas Griffin; Jaifa Collado, Defendants.

No. 16-CV-1841 (KMK)
|
Signed 06/10/2020

**Attorneys and Law Firms**

Shakim A. Allah, Comstock, NY, Pro Se Plaintiff.

Brendan M. Horan, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Shakim Abd Allah ("Plaintiff"), currently an inmate at Great Meadow Correctional Facility ("Great Meadow"), brings this pro se Action against Anthony Annucci ("Annucci"), Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Cheryl Morris ("Morris"), DOCCS Director of Family and Ministerial Services; Thomas Griffin ("Griffin"), Superintendent of the Green Haven Correctional Facility ("Green Haven"); and Jaifa Collado ("Collado"), Deputy Superintendent of Program Services at Green Haven (collectively, the "initial Defendants"), alleging that they violated his rights under the First and Fourteenth Amendments and New York State law by denying Plaintiff the opportunity to attend certain religious events and by failing to provide certain religious accommodations while he was incarcerated at Green Haven. (*See* Am. Compl. (Dkt. No. 44).) By Opinion & Order dated September 24, 2018, the Court dismissed all claims against Annucci and Morris, and some claims against Griffin and Collado ("Defendants"). (*See* Dkt. No. 54.) Currently before the Court is Defendants' Motion for Summary Judgment (the "Motion"). (*See* Not. of Mot. (Dkt. No. 90).) For the reasons that follow, Defendants' Motion is granted.

I. Background

A. Factual Background

The following facts are taken from the exhibits submitted, (Dkt. Nos. 93–95), and Defendants' Statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement in Supp. of Motion ("Defs.' 56.1") (Dkt. No. 97)). [1] These facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation and quotation marks omitted). The facts as described below are not in dispute, except to the extent indicated.

1     Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at \*3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendants filed and served their Statement pursuant to Rule 56.1, (*see* Dkt. Nos. 97, 102), and filed and served a Statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (*see* Dkt. Nos. 90-1, 96). Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at \*3 (concluding

that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (considering "the statements and documents in [p]laintiff's opposition papers to determine if there are any material issues of fact based on the evidence in the record," but disregarding factual assertions that "do not contain citations to the record, or are not supported by the citations in the record"); *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper ... Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (citation and italics omitted)).

## 1. Plaintiff's Religious Practice

**\*2** Plaintiff entered the custody of DOCCS in 1977, and has remained incarcerated ever since. (Defs.' 56.1 ¶¶ 1–2.) In 1981 or 1982, Plaintiff discovered Islam and converted, and he has been registered with DOCCS as a Shi'ite Muslim since approximately 2010. (*Id.* ¶¶ 4–6.) As is clear from his deposition testimony, Plaintiff is a devout Shi'ite Muslim who has diligently observed his faith for decades, often at considerable personal sacrifice. (*See* Decl. of Brendan M. Horan, Esq. in Supp. of Mot. ("Horan Decl.") Ex. B ("Pl.'s Dep.") 212–13 (Dkt. No. 92-2).)

When Plaintiff first arrived at Green Haven in March 2014, there were between 500 and 600 other Muslim inmates, of whom approximately 200 regularly attended religious services. (Defs.' 56.1 ¶¶ 23–24.) In October 2015, there were over 1,950 total inmates at Green Haven, of whom approximately 249 had registered "Islam" as their religion and 14 identified as Shi'ite. (*Id.* ¶¶ 54–57.) When Plaintiff left Green Haven in 2017, there were approximately 15 to 18 Shi'ite inmates, and the rest of the Muslim inmates were Sunni. (*Id.* ¶¶ 26–27.)

During the relevant period, Green Haven offered a single weekly religious service for all Muslims, provided Muslim inmates with a single fundraising account (which was nominally for the benefit of all Muslims) and hosted weekly religious classes for all Muslims, without distinction by sect. (*Id.* ¶¶ 28–32.) At that time, DOCCS' central Division of Ministerial, Family, and Volunteer Services Central Office generally advised facilities to offer a single Jummah service "to the general Muslim community, regardless of sect." (*Id.* ¶ 83.) This advice was "based on consultation with inmates, prison administrators, and the outside religious community." (*Id.*) Additionally, Green Haven hosted "family days" or other events on certain holidays holy to both Sunnis and Shi'ites, particularly Eid-ul-Fitr, Eid al-Adha, and the six days of Shawwal. (*Id.* ¶¶ 33–34.) Green Haven also held specific religious events for Shi'ite inmates for the holidays of Ghadir Khum, Mubahila, and the 10 Days of Ashura. (*Id.* ¶ 51.)

During the relevant time period, Green Haven employed a single Muslim chaplain, Abdullah Wajid ("Wajid"), a Sunni; however, Plaintiff acknowledges that Wajid was "good chaplain" to all Muslim inmates. (*Id.* ¶¶ 36–40; Pl.'s Dep. 184.) DOCCS also employed a Shi'ite chaplain available to

all inmates statewide. (*See* Decl. of Muhammed S. Ahmed in Supp. of Mot. ("Ahmed Decl.") ¶ 35 (Dkt. No. 95).) Additionally, when a volunteer Shi'ite chaplain visited the facility, he was permitted to lead prayer services, as were individual Green Haven Shi'ite inmates. (Defs.' 56.1 ¶¶ 41–44.) Plaintiff also attended Shi'ite classes on Thursday evenings, facilitated by a fellow Shi'ite inmate Jamal Jones. (*Id.* ¶¶ 45–49; Pl.'s Dep. 156.)

Although in the early years after his conversion, Plaintiff had no objection to joining a prayer service led by a Sunni Muslim, as Plaintiff learned more about his religion, he developed the religious view that his prayer services must be led by a Shi'ite Muslim. (Defs.' 56.1 ¶¶ 21–22.) Moreover, Plaintiff attests that in the late 1990s, with the arrival of new chaplains from Saudi Arabia, tensions between Sunni and Shi'ite inmates increased and Sunni inmates began to insist that everyone pray according to Sunni custom. (Pl.'s Dep. 61–62, 160–62.) Accordingly, from at least 2005, Plaintiff would not pray with the Sunni community. (*Id.* at 179–82.)

Although Green Haven organized and supported a fundraiser for the Muslim community generally, Plaintiff attests that in practice the fundraiser benefitted only the Sunni community, and explains that it "was controlled and dominated by Sunni Muslims." (*Id.* at 218–20.) Plaintiff explains that he did not request funds from this fundraiser for the Shi'ite community because of tension between the Shi'ites and Sunnis at Green Haven. (*Id.* at 228.) However, Plaintiff acknowledges that he was able to obtain several hundred dollars for Shi'ite books by requesting the funds from Wajid who received the money from a DOCCS fund (separate from the Sunni fundraiser). (*Id.* at 221.) Plaintiff also attests that he once unsuccessfully requested an opportunity to conduct fundraising for the Shi'ite community, but that he made that request before Collado and Griffin joined the Green Haven staff. (*Id.* at 226.)

## 2. Denial of Attendance at Holy Day Events

**\*3** During the relevant period, Green Haven regulated inmate attendance at religious events through a "call out system." (Defs.' 56.1 ¶ 102) Under that system, when inmates requested to attend an event for their religious holidays, their names were added to a relevant "event package," which was distributed throughout the facility, including to the watch commander and housing areas, in advance of the event. (*Id.* ¶ 103.) If an inmate's name appeared in the package, housing

unit officers would then send the inmate to the appropriate area of facility at the relevant time. (*Id.* ¶ 104.)

In years prior to 2015, Plaintiff's name had appeared in the relevant packages for the holidays of Mubahila, Ghadir Khum, and the Days of Ashura, and so he was able to attend services. (*Id.* ¶¶ 106, 111.) Plaintiff believed his name was on the list for these holidays in October 2015 as well, and he further understood that inmates registered as Shi'ite Muslims were automatically placed on the "call out list" for these holidays. (*Id.* ¶¶ 110–12.) In fact, Plaintiff was listed as a participating inmate in the event package for these holidays in October 2015, and the packages were signed by Collado. (*Id.* ¶ 113.)

However, on October 2, 2015, the day of Ghadir Khum, when Plaintiff informed the housing officer on duty that he had a religious event that evening, the officer explained that he had no record of such an event. (Pl.'s Dep. 248.) Plaintiff was thus not permitted to attend services for Ghadir Khum. (*Id.*; Defs.' 56.1 ¶ 109). That evening, Plaintiff spoke with Wajid and explained what had happened. (Pl.'s Dep. 248.) Wajid expressed surprise and claimed that he had personally delivered the relevant "event package" to Plaintiff's block. (*Id.*)

A similar series of events unfolded on October 8, 2015, again precluding Plaintiff's attendance at services for Mubahila. (*Id.*) That afternoon, Plaintiff explained to the housing officer that he had a religious event and insisted that his name appeared in an event package. (*Id.*) Again, the officer denied that his housing block had received such a package. (*Id.* at 249.) Afterward, Wajid again insisted that he had, in fact, delivered the package to Plaintiff's block the previous evening. (*Id.*) Plaintiff then notified Collado, by letter dated October 9, 2015, that he was missing holy day services. (Defs.' 56.1 ¶¶ 116–17.) In the letter, Plaintiff explained that he had been denied the opportunity to attend two religious holidays and that on each occasion, he was "informed by the officer taking the go around that there was no event package or callout in A [Block] stating that there were any Shi'ite events." (*Id.* ¶ 118; Decl. of Superintendent Jaifa Collado ("Collado Decl.") Ex. H ("Plaintiff's 10/9/2015 Letter") (Dkt. No. 93-8).)

Collado received the letter on October 14, 2015. (Defs.' 56.1 ¶ 122.) Prior to receiving Plaintiff's letter, Collado was not aware that Plaintiff had been denied attendance at any religious event. (*Id.* ¶ 124.) The same day, Collado

corresponded with Wajid about the letter, and Wajid assured Collado that he would personally bring event packages for the Shi'ite holidays to Housing Block A and Housing Block B because he had been informed that they did not have copies of the package. (*Id.* ¶ 125; Collado Decl. Ex. I ("Collado Emails") 3–4 (Dkt. No. 93-9).) According to Collado, additional copies of the event package were also sent to A Block (where Plaintiff was located) by inmate runners, by email from Collado's assistant, and by email from Assistant Deputy Superintendent for Program Services David Howard ("Howard"). (*Id.* ¶ 126.) Collado believed that these transmissions would ensure that the housing officer would allow Plaintiff to attend future Shi'ite religious events later that month. (*Id.* ¶ 127.) From October 16, 2015 through October 25, 2015, Collado was away from Green Haven on vacation. (*Id.* ¶ 128.) While Collado was away, her responsibilities were covered by other prison officials, including Howard. (*Id.* ¶ 129.) According to Collado, she had no reason to believe that Howard was incapable of adequately handling Collado's responsibilities during his vacation. (*Id.* ¶ 130.)

**\*4** In 2015, the Days of Ashura began on October 15. (*Id.* ¶ 131.) Again, Plaintiff was told by housing officers that there was no event package regarding the holiday in his block, and thus Plaintiff was again unable to attend services. (Pl.'s Dep. 262–63.) On October 16, 2015, Howard sent an email to the watch commander, with a copy to Collado, clarifying that Plaintiff was allowed to participate in the Days of Ashura event and requesting that the watch commander ensure that Plaintiff be permitted attend the event. (*Id.* ¶ 132; Collado Decl. Ex. J ("Howard Emails") (Dkt. No. 93-10).) On October 19, 2015, Howard sent another email to the watch commander, again copying Collado, reiterating that Plaintiff was allowed to participate in the Days of Ashura event and requesting that he ensure that Plaintiff attend the event. (Defs. 56.1 ¶ 133; Howard Emails.) Additionally, despite being away, on the morning of October 19, 2015, Collado sent a follow-up email to Wajid directing that he "make sure that [Plaintiff] is allowed to participate [in the Days of Ashura observances]." (Collado Emails 1.) Several hours later, Wajid responded, explaining that he and Howard were handling the situation, and stating, "[p]lease try to enjoy your time off, we'll take care of things here." (*Id.*; Defs.' 56.1 ¶¶ 134–35)

Nevertheless, for the entire holiday period through October 24, 2015, the same pattern recurred; the officers on duty at Plaintiff's housing block explained that they had no event

package, and Plaintiff was unable to attend services. (Pl.'s Dep. 263.)

On November 12, 2015, after Collado returned from vacation, she responded to Plaintiff's letter. (Defs.' 56.1 ¶ 136.) Collado explained to Plaintiff that she had been out on vacation but instructed others to take care of the issue, and that she would now find out what had happened. (*Id.* ¶ 138.) During a subsequent investigation of the episode by Green Haven sergeants, one of the sergeants informed Plaintiff that Plaintiff was precluded from attending services because he was "under some type of disciplinary sanction." (Pl.'s Dep. 263.) Plaintiff denies this, however, explaining he "[n]ever got one ticket the whole time [he] was there." (*Id.*)

### 3. Plaintiff Files a Grievance

On October 23, 2015, Plaintiff filed a grievance in which he claimed that DOCCS had denied him "the right to have Jummah Services, religious holidays, a Shi'ite chaplain, equal number of weekly religious classes, fundraiser, as well as [an] Inmate Shi'ite clerk," and that DOCCS was providing all of the same "to members of other faith groups." (Collado Decl. Ex. C ("Plaintiff's Grievance") 3 (Dkt. No. 93-3); Defs.' 56.1 ¶ 54.) On November 23, 2015, Collado recommended that Plaintiff's Grievance be denied in full. (Collado Decl. Ex. F ("Collado Grievance Recommendation") (Dkt. No. 93-6).) In particular, Collado explained that Shi'ite inmates "participate in Jummah services with the Muslim community"; that Shi'ite holidays, including "Day of Ghadir, Mubahila and the 10 days of Ashura, are recognized in the religious Holy Day Calendar"; that Shi'ite religious needs "are being met by the Muslim Chaplain"; that Shi'ite inmates attend classes for the general Muslim community on Tuesdays and Wednesdays and "also have separate classes on Thursday evenings"; that in her 12 months at Green Haven, she had "never received a request for fundraising from the Shi'ite population"; and that there was no need to hire a paid Shi'ite clerk, because a volunteer Shi'ite clerk was fully meeting the office needs of the relatively small, 14-member Shi'ite community. (*Id.*) On February 10, 2016, Griffin accepted Collado's recommendation and denied Plaintiff's grievance for substantially the same reasons. (*See* Decl. of Assistant Commissioner Thomas Griffin ("Griffin Decl.") Ex. A. ("Grievance Denial") (Dkt. No. 94-1).) Aside from Plaintiff's grievance, Defendants received no formal request from the Shi'ite community to establish a fundraising organization. (Defs.' 56.1 ¶¶ 69–70.) Defendants also never received

any other request for separate weekly congregate services specifically for the Shi'ite community, nor for any of the other services requested by Plaintiff. (*Id.* ¶ 73.)

### B. Procedural History

Plaintiff filed his initial Complaint on March 11, 2016. (*See* Dkt. No. 2.) Plaintiff's request to proceed in forma pauperis was granted on March 16, 2016. (*See* Dkt. No. 4.) On September 2, 2016, the initial Defendants filed their first Motion To Dismiss (the "First Motion") and accompanying papers. (*See* Dkt. Nos. 23–26.) On October 3, 2016, Plaintiff filed his Opposition. (*See* Dkt. Nos. 28–30.) The initial Defendants filed their Reply on October 21, 2016. (*See* Dkt. No. 33.) On September 7, 2017, the Court issued an Opinion and Order dismissing all of Plaintiff's claims against Annucci and Griffin, but denying that First Motion as to Plaintiff's claims against Morris and Collado regarding the denial of Plaintiff's attendance at Ghadir Khum and Mubahila events. (*See* Op. & Order on Mot. to Dismiss ("2017 Opinion") 23 (Dkt. No. 41).) In light of Plaintiff's pro se status, and because it was the first adjudication of Plaintiff's claims on the merits, the dismissal was without prejudice, and Plaintiff was given thirty days to file an amended complaint. (*See id.*)

**\*5** On October 2, 2017, Plaintiff's Amended Complaint was docketed. (*See* Am. Compl.) Pursuant to a briefing schedule issued on November 14, 2017, (*see* Dkt. No. 46), the initial Defendants filed a second Motion To Dismiss (the "Second Motion") on December 14, 2017, (*see* Dkt. Nos. 47–48). On September 24, 2018, the Court issued an Opinion and Order dismissing all state law claims, all claims for declaratory and injunctive relief, all claims against Annucci and Morris, and claims against Griffin with respect to the denial of the attendance at Ghadir Khum and Mubahila events. (*See* Op. & Order on Mot. to Dismiss the Am. Compl. ("2018 Opinion") 23–24 (Dkt. No. 54).)[2] Accordingly, Plaintiff's only remaining claims are against Griffin and Collado for failure to provide equal religious accommodations, and against Collado for denial of attendance at holiday events. (*Id.*)

2    Plaintiff was transferred from Green Haven to Great Meadow after the Complaint was filed. (*See* Dkt. Nos. 37, 38 (notifying the Court of Plaintiff's change of address)). Accordingly, in its 2018 Opinion, the Court concluded that all claims for declaratory and injunctive relief were moot. *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d

Cir. 1996) ("It is settled in th[e] [Second] Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *see also Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (citation omitted); *Lipscomb v. Hufford*, No. 14-CIV-6562, 2017 WL 3267732, at *4 (S.D.N.Y. July 28, 2017) (collecting cases). Moreover, Plaintiff acknowledges that at his new location, he and the Shi'ite inmates now have their own services separate from the Sunni community, and that he participates in these services. (*See* Pl.'s Dep. 97–99, 134–35.) Plaintiff also acknowledges that since February 2019, the Shi'ite community is now able to promote their own separate fundraiser, has "separate everything," and that he is "very happy" with the current arrangements. (*Id.* at 171)

On September 27, 2019, Defendants filed the instant Motion and accompanying papers. (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 91); Horan Decl.; Collado Decl.; Ahmed Decl.; Defs.' 56.1.) On October 15, 2019, Plaintiff wrote to the Court requesting that the Motion be denied for failure to comply with Local Rule 56.2. (*See* Dkt. Nos. 98-1; 100.) On October 18, 2019, Defendants responded to Plaintiff's letter, noting that they had in fact complied with Local Rule 56.2, and attaching proof of service. (*See* Dkt. No. 98.) On October 22, 2019, the Court directed Plaintiff to respond to Defendants' Motion within 30 days. (Dkt. No. 99.) On December 12, 2019, Defendants wrote to the Court, noting that Plaintiff had never filed an opposition to the instant Motion. (Dkt. No. 103.) Four days later, the Court issued an Order deeming the Motion fully submitted. (Dkt. No. 104.)

### II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v.*

*Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. 3d at 521 (same).

**\*6** "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at \*7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted)). Nonetheless, "proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence ... are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at \*2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

Defendants argue that Plaintiff's remaining claims (all of which seek damages, rather than injunctive or declaratory relief) fail because the undisputed evidence establishes: that Collado was not personally involved in denying Plaintiff the opportunity to attend religious services; that the religious accommodations provided to Shi'ite Muslims at Green Haven were reasonable in light of the facility's legitimate penological interests; that there is no similarly situated religious group that received greater religious accommodations at Green Haven; and that Defendants are entitled to qualified immunity. (*See generally* Defs.' Mem.) The Court addresses these arguments only to the extent necessary to decide the instant Motion. In doing so, the Court first considers Plaintiff's claim that Collado violated Plaintiff's constitutional rights by denying

him the opportunity to attend several religious services during October 2015. The Court then considers Plaintiff's claim that Collado and Griffin violated Plaintiff's constitutional rights by denying additional religious accommodations.

### 1. Denial of the Opportunity to Attend Holiday Services

**\*7** "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations and italics omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "In an action under 42 U.S.C. § 1983, defendants cannot be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at \*7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in other words, "[b]ecause vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, a plaintiff must establish that a defendant's own conduct falls into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at \*4 (S.D.N.Y. Jan. 24, 2017)

(holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Here, Plaintiff has produced no evidence establishing Collado's personal involvement in denying Plaintiff access to holiday services. On the contrary, the undisputed evidence suggests that to the extent Collado was aware of Plaintiff's situation, she acted to ensure his attendance. Collado first learned of Plaintiff's difficulties attending religious events by letter from Plaintiff (dated October 9, 2015) on October 14, 2015. (Defs.' 56.1 ¶¶ 116–24.) The same day, Collado wrote to Wajid seeking to ensure that Plaintiff would be able to attend services for the Days of Ashura, and Wajid informed her that he would personally deliver the relevant event package to Plaintiff's housing unit. (*Id.* ¶ 125.) Moreover, under Collado's direction, additional copies of the event package were also delivered by inmate runners and by email. (*Id.* ¶ 126.) Because Collado promptly acted on Plaintiff's letter and referred the matter to an appropriate official, she cannot be held personally liable for the failure to ensure Plaintiff's attendance. *See Brown v. Griffin*, No. 18-CV-5439, 2019 WL 4688641, at \*7 (S.D.N.Y. Sept. 25, 2019) ("[A] supervisory official is not deemed to have been personally involved in a constitutional violation solely by virtue of having received a letter from a prisoner and having referred it to the appropriate department for investigation." (citation, quotation marks and ellipses omitted)); *Philip v. Schriro*, No. 12-CV-8349, 2014 WL 4184816, at \*5 (S.D.N.Y. Aug. 22, 2014) (collecting cases); *see also Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997))).

**\*8** Moreover, after October 14, 2015 and for the duration of the Days of Ahura, Collado was away from Green Haven, believing that other prison officials, including Howard and Wajid, would ensure that Plaintiff would be able to attend future services. (*Id.* ¶ 127–33.) Collado cannot be held liable for Howard's and Wajid's failures because it is well-established that "vicarious liability is inapplicable to ...§ 1983 suits." *Iqbal*, 556 U.S. at 676; *see also Rivera v. Westchester County*, No. 18-CV-8354, 2019 WL 3958425, at \*3 (S.D.N.Y. Aug. 22, 2019) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior)

is insufficient to show his or her personal involvement in that unlawful conduct." (citation and quotation marks omitted)). Relatedly, according to Plaintiff himself, the "only explanation" for the missing event packages is that they were discarded by an unknown housing officer during the midnight shift. (Pl.'s Dep. 265–66). Plaintiff does not allege that Collado had any authority over or relationship with this individual, but even if she did have such authority, again, such a supervisory relationship cannot establish Collado's own liability. *See Iqbal*, 556 U.S. at 676 (rejecting vicarious liability in § 1983 cases); *Rivera*, 2019 WL 3958425, at *3 (same).

While Plaintiff's frustration with the inexplicable failure to ensure his access to religious services in October 2015 is understandable, the record does not establish Collado's personal involvement in a constitutional violation. Accordingly, the Court grants summary judgment to Collado with respect to this claim. *See Fernandez v. City of New York*, No. 17-CV-789, 2020 WL 2086191, at *19 (S.D.N.Y. Apr. 30, 2020) (granting summary judgment to a § 1983 defendant where the record did not establish his personal involvement).

#### 2. Denial of Requested Religious Accommodations

##### a. Equal Protection Claims

To demonstrate an equal protection claim based on religion, a plaintiff must establish that "he was treated differently from similarly situated members of other religions." *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999). When pursuing such claims based on the allegedly discriminatory policies of a prison, plaintiffs generally advance such claims under a theory of "selective treatment." *Barry v. LaManna*, No. 19 CV 4189, 2019 WL 6790515, at *4 (S.D.N.Y. Dec. 12, 2019) ("To state a claim under the Equal Protection Clause, a plaintiff must plausibly allege [that] compared with others similarly situated, he was selectively treated; and that such selective treatment was based on impermissible considerations such as ... religion") (quotation marks and alterations omitted) (citing *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)); *Brown*, 2019 WL 4688641, at *5 (analyzing a claim for unequal prison treatment on the basis of religion under the Equal Protection clause). Under such a theory, a claimant must show both (1) that "he, compared with others similarly situated, was selectively treated," and (2) that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations,

such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff." *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (citation, quotation marks, and alterations omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Although "there is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory," with "some courts evaluat[ing] whether a comparator is similarly situated under the same standard used in 'class of one' equal protection claims" and other courts "apply[ing] a less demanding standard to selective enforcement claims," *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7 (S.D.N.Y. 2017) (citations omitted) (collecting cases), *aff'd*, 705 F. App'x 50 (2d Cir. 2017), "it is clear that, at a minimum, some showing of comparison with others similarly situated is required." *Brown*, 2019 WL 4688641, at *5; *see also Carnell v. Myers*, No. 17-CV-7693, 2019 WL 1171489, at *9 (S.D.N.Y. Mar. 13, 2019) (same).

**\*9** Here, although the Amended Complaint asserted that numerous religious groups received religious benefits that the Shi'ite prisoner community was denied, Plaintiff has failed to establish that any of these groups was "similarly situated." As the Supreme Court has explained, although "reasonable opportunities must be afforded to all prisoners to exercise [ ] religious freedom," not "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). Thus, it is well established that "[t]he number of inmates adhering to a particular religious group and whether that group requires distinct accommodations are material traits in assessing whether inmates are similarly situated under DOCCS' registration policy." *Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *17 (S.D.N.Y. Feb. 14, 2018); *see also Graham v. Mahmood*, No. 05-CV-10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008) (explaining that groups of 39 Nation of Islam adherents and 119 Sunni Muslim inmates were "not similarly situated" because "the two groups have different needs for access to meeting spaces and time slots"). Here, the undisputed evidence establishes that only 14 Green Haven inmates identified as Shi'ite in October of 2015—compared to over 200 Sunni inmates at the same time. (Defs.' 56.1 ¶¶ 54–57.) Moreover, Plaintiff acknowledges that he does not know of any other smaller religious group that had separate services or chaplains during that period. (*See* Pl.'s Dep. 246.) No other evidence in the record suggests that the Shi'ite community was similarly situated to the other

religious groups. Accordingly, Plaintiff's claims under the Equal Protection Clause fail. *See Brown*, 2019 WL 4688641, at *5 (dismissing equal protection claims of Wiccan inmates because the proposed comparator religious groups had at least ten times as many adherents); *Graham*, 2008 WL 1849167, at *15 (granting summary judgment to defendants with respect to a prisoner's equal protection claim based, in part, on the relative sizes of the compared religious communities).

### b. Free Exercise Claims

It is well-established that the First Amendment affords inmates constitutional protection to practice their religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (holding that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion" (citations omitted)); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (explaining that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citation omitted)). However, because of inmates' unique circumstances, their Free Exercise rights are necessarily more constrained than those of other persons. *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974))). Accordingly, "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Redd v. Wright*, 597 F.3d 532, 536 (citation and quotation marks omitted). [3]

---

[3]   In one respect, inmates may receive greater constitutional protection of their religious freedom than non-prisoners. While non-prisoners "enjoy no constitutional right to religious accommodations from generally applicable laws," prisoners may "demand a religious accommodation where facilitating exercise of the right has only a de minimis adverse effect on valid penological interests." *Rutherford v. Westchester County*, No. 18-CV-4872, 2020 WL 433841, at *6 n.6 (S.D.N.Y. Jan. 28, 2020) (quotation marks omitted) (citing

*Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 890 (1990) and *Holland v. Goord*, 758 F.3d 215, 222 (2d Cir. 2014)). However, "[w]hile it is well-established that inmates possess such a qualified right to religious accommodations, it is unclear whether the First Amendment independently provides such a right, or whether, in the aftermath of *Smith*, this right exists only in combination with the Religious Land Use and Institutionalized Person Act." *Id.* at *5 n.5 (citing *Ford*, 352 F.3d at 594 n.13).

A prisoner's free exercise claims are therefore "judged under a 'reasonableness' test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (citation and some quotation marks omitted). To state a free exercise claim, an inmate "must make a threshold showing that 'the disputed conduct substantially burdened his sincerely held religious beliefs.' " *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alterations omitted) (quoting *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013)); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (same). To show a belief is "sincere," the inmate "need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (citations, alterations, and quotation marks omitted). To show a "substantial burden," the inmate must show that "the state [has] put[ ] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *7 (S.D.N.Y. Feb. 24, 2015) (citations and quotation marks omitted). That is, "[t]he relevant question in determining whether [the inmate's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the inmate's religious] practice." *Ford*, 352 F.3d at 593–94. "Once [an inmate] establishes this burden, '[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct.' " *Smith v. Perlman*, No. 11-CV-20, 2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting *Salahuddin*, 467 F.3d at 308). [4]   The burden then shifts back to the inmate "to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (citation, quotation marks, and alteration omitted).

---

[4]   Under RLUIPA, defendants bear the heavier burden of demonstrating that their challenged

conduct was "(1) in furtherance of a *compelling* governmental interest; and (2) the *least restrictive* means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-l(a) (2000) (emphasis added). Here, RLUIPA is not implicated because RLUIPA does not permit suits for damages. *See Brown*, 2019 WL 4688641, at *6 (citing *Sossamon v. Texas*, 563 U.S. 277, 285–86 (2011) and *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013)).

**\*10** Crucially, where (as here) a plaintiff advances a Free Exercise claim pursuant to § 1983, a plaintiff must establish that the defendant (at least) had reason to know "the facts rendering [his conduct] illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted); *see also Brandon v. Kinter*, 938 F.3d 21, 38 (2d Cir. 2019) (declining to decide whether some forms of negligence are sufficient for a Free Exercise claim, but explaining that deliberate indifference is sufficient); *Grullon*, 720 F.3d at 139 (explaining that liability under § 1983 requires, at least, grossly negligent or deliberately indifferent conduct); *Valdez v. City of New York*, No. 11-CV-05194, 2013 WL 8642169, at *14, *19 (S.D.N.Y. Sept. 3, 2013) (analyzing whether a defendant knew that his conduct was "likely to cause [the p]laintiff to feel pressured to give up his religious practices" and whether another defendant "had any reason to know" that its conduct would pressure religious inmates), *report and recommendation adopted*, 2014 WL 2767201 (S.D.N.Y. June 17, 2014). Accordingly, insofar as Defendants did not have reason to know that their conduct burdened Plaintiff's religious practice, they cannot be held liable for having done so. *See Porter v. Bunch*, No. 16-CV-5935, 2019 WL 1428431, at *16 (S.D.N.Y. Mar. 29, 2019) (explaining that the defendant could not be held liable for failing to provide a religious accommodation where that accommodation had not been requested); *Perez v. Westchester Cty. Dep't of Corr.*, No. 05-CV-8120, 2007 WL 1288579, at *3 (S.D.N.Y. Apr. 30, 2007) (same). Moreover, under the doctrine of qualified immunity, a government official is immune from liability "whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable ... to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (quotation marks and footnote omitted). For this reason as well, insofar as Defendants' purported violations of Plaintiff's religious freedoms were the products of "reasonable mistakes of law or fact" they are shielded from liability. *Id.*

Here, the undisputed evidence establishes that neither Griffin nor Collado should have been aware that existent prison policies may have been unconstitutionally burdening Plaintiff's religious freedoms. First, Plaintiff concedes that the filing of his grievance was the first time that Griffin and Collado became aware of his request for various accommodations. (*See* Pl.'s Dep. 229.). Indeed, Plaintiff acknowledges that his grievance was likely Green Haven's first request for separate Shi'ite services. (*Id.* at 243.) And while Plaintiff attests that he had previously requested to conduct fundraising separately from the Sunni community, that request had occurred "before ... Collado ... and before even Griffin" arrived at Green Haven. (Pl.'s Dep. 226.) Similarly, neither Griffin nor Collado was aware of any prior request from Shi'ite inmates for religious accommodations. (Griffin Decl. ¶ 30; Collado Decl. ¶ 46.) Accordingly, prior to the filing of Plaintiff's grievance, Defendants lacked the relevant knowledge and intent to have violated Plaintiff's Free Exercise rights. *See Porter*, 2019 WL 1428431, at *16 (explaining that a defendant could not liable for failing to provide a religious accommodation where that accommodation had not been requested); *Perez*, 2007 WL 1288579, at *3 (same).

Second, even after Plaintiff filed his grievance, Defendants were still not put on notice that existent policies placed a "substantial burden" on Plaintiff's religious practices. Although Plaintiff's deposition provides a thoughtful account of why sharing worship services and fundraising accounts with the Sunni community was religiously unacceptable and practically unworkable, (*see, e.g.*, Pl.'s Dep. 217–19), Plaintiff's grievance was devoid of any such detail, (*see* Pl.'s Grievance). Indeed, Plaintiff's three-sentence grievance did not even state clearly that he wished a Jummah service separate from Sunni inmates, and certainly did not assert that the combined services were creating a burden on his religious practice. (*See* Pl.'s Grievance.) [5] Moreover, Defendants understood, based on DOCCS guidance, that the accommodations Plaintiff was requesting "were already provided to the general Muslim community without restriction by sect" and "were sufficient to satisfy the religious requirements of the Shia Muslim community." (Collado Decl. ¶¶ 40, 51; Griffin Decl. ¶¶ 31–32; Defs.' 56.1 ¶¶ 83–85.) From Defendants' perspective, therefore, Plaintiff's request was not only unclear, but also inconsistent with expert advice. Accordingly, Defendants lacked knowledge—or even reason to have knowledge—of the factual basis that may have rendered their policies a violation of Plaintiff's Free Exercise rights. *See Kramer v. Dep't of Correction*, No. 15-CV-00251,

2019 WL 4805152, at *9 (D. Conn. Sept. 30, 2019) (granting summary judgment to a defendant with respect to a free exercise claim because there was no evidence suggesting that the defendant knew that his conduct burdened the plaintiff's religious practices), *appeal docketed*; *see also Provost*, 262 F.3d 146, 155 (explaining that a defendant is only liable under § 1983 where he knows "the facts rendering [his conduct] illegal").

5       While the grievance states that "[a]s a Shi'ite Muslim, DOCCS is denying me my right to have Jummah services, religious holidays, etc.," (Pl.'s Grievance), reasonable officials—particularly those aware of Plaintiff's recent ordeal seeking to attend holiday services—would likely understand Plaintiff as complaining of difficulties in attending existent services, rather than as the assertion of a religious requirement for separate Shi'ite services.

**\*11** Finally, Defendants are also entitled to qualified immunity. The Supreme Court has emphasized that "clearly established law must be 'particularized' to the facts of the case and must not be defined 'at a high level of generality.' " *Naumovski*, 934 F.3d at 211 (citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Thus, while it is "well established that prisoners have a constitutional right to participate in congregate religious services," *Monroe v. New York State Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2818, 2019 WL 4688665, at *8 (S.D.N.Y. Sept. 25, 2019) (citation omitted), the relevant question is whether that right was implicated in the particular circumstances of an individual case. Here, such an infringement was not at all clear. As discussed above, Defendants had good reason to believe Plaintiff's religious needs were being met, and Plaintiff's three-sentence grievance offered insufficient detail to put them on notice that he required a separate Shi'ite Jummah service or Shi'ite fundraising account. Moreover, it is undisputed that accommodating Plaintiff's requests would

have carried administrative burden, necessitated additional staff, and may well have proved unfeasible given the space and security constraints at this maximum-security facility. (Defs.' 56.1 ¶ 90–95.) And as Plaintiff acknowledges, few other prisons at the time provided the accommodations that Plaintiff was seeking, particularly to a religious community as small as Plaintiff's. (Pl.'s Dep. 244.) Accordingly, and "[g]iven the uncertainty of the infringement on free exercise in this case and the deference shown to prison officials," *Porter*, 2019 WL 1428431, at *17 (citation omitted), any violation of Plaintiff's Free Exercise rights was not "clearly established." *See Gerard v. City of New York*, No. 17-CV-8076, 2019 WL 4194220, at *5 (S.D.N.Y. Sept. 3, 2019) (granting summary judgment to defendants where a plaintiff's Free Exercise rights were not "clearly established") (citation omitted); *see also Hall v. Ekpe*, 408 F. App'x 385, 388 n.3 (2d Cir. 2010) (explaining that "although it was clearly established at the time of the alleged violation that prison officials may not substantially burden the right of free exercise without some justification," the defendants were still entitled to qualified immunity because "it was not clearly established that security and financial concerns could not provide that justification for prisoners who had not demonstrated observance of their professed religion in a manner identified by the prison chaplain") (citation omitted). For this reason as well, Defendants are entitled to summary judgment.

## III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3073184

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 235 of 443

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

2018 WL 1578157
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Crystal REVELS, as Administratrix of
the Estate of Michael Revels, Plaintiff,

v.

CORRECTIONAL MEDICAL
CARE, INC., et al., Defendants.

9:17-cv-0088 (MAD/TWD)
|
Signed 03/28/2018

**Attorneys and Law Firms**

LAW OFFICES OF ELMER R. KEACH, III, P.C., ELMER
R. KEACH, III, ESQ., MARIA K. DYSON, ESQ., One Pine
West Plaza - Suite 109, Albany, New York 12205, Attorneys
for Plaintiff.

STEINBERG, SYMER & PLATT, LLP, JONATHAN E.
SYMER, ESQ., Steinberg, Symer & Platt, LLP, 27 Garden
Street, Poughkeepsie, New York 12601, Attorneys for
Defendants Correctional Medical Care, Inc., CBH Medical,
P.C., Emre Umar, and Deiah Farley.

THUILLEZ, FORD LAW FIRM, MOLLY C. CASEY, ESQ.,
20 Corporate Woods Boulevard - 3rd Floor, Albany, New
York 12211-1715, Attorneys for Defendant Russell Fricke.

GOLDBERG SEGALLA, LLP, CHELSEA E. MANOCCHI,
ESQ., JONATHAN BERNSTEIN, ESQ., 8 Southwoods
Boulevard - Suite 300, Albany, New York 12211-2526,
Attorneys for Defendants Schenectady County, Dominic
D'Agostino, and Jim Barrett.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

 *1  Plaintiff Crystal Revels, as administratrix of the estate
of Michael Revels, brought this action alleging federal
and state claims against Defendants Correctional Medical
Care, Inc. ("CMC"), CBH Medical, P.C. ("CBH"), Emre
Umar, Nurse Deiah Farley, John Does 1-3 (collectively, the

"CMC Defendants"), Schenectady County, Sheriff Dominic
D'Agostino, Jail Administrator Jim Barrett (collectively, the
"County Defendants"), and Doctor Russell Fricke. *See* Dkt.
No. 1.[1] Plaintiff's claims arise out of Mr. Revels's medical
care while incarcerated at the Schenectady County Jail.
Presently before the Court are three separate motions to
dismiss and a motion to strike filed by Defendants. *See* Dkt.
Nos. 27, 28, 30. For the following reasons, the motions are
granted in part and denied in part.

[1]   John Does 1-3 are unidentified medical staff at
      the Schenectady County Jail who were responsible
      for providing medical treatment to Mr. Revels. *See*
      Dkt. No. 1 at ¶ 14.

**II. BACKGROUND**[2]

[2]   The following facts are based on the allegations in
      Plaintiff's complaint. *See* Dkt. No. 1.

**A. The Decedent's Medical Care**
When Michael Revels entered Schenectady County jail on
September 9, 2015, he was dealing with a number of health
problems. *See* Dkt. No. 1 at ¶ 15. Six months earlier, Mr.
Revels had undergone a surgical procedure to remove a
cancerous tumor from his kidney. *See id.* at ¶ 16. Though
the surgery was successful and his cancer was in remission,
Mr. Revels required a range of medication to support his
kidney function, including diuretics. *See id.* Additionally, Mr.
Revels suffered from chronic heart disease, diabetes, and
hypertension, and those conditions required other medication.
*See id.* at ¶ 17. Therefore, Mr. Revels had a complicated
medication regimen that required close supervision. *See id.*

In jail, that medication regimen was frequently disrupted.
*See id.* at ¶ 18. Sometimes Mr. Revels received the
wrong medication, other times he received cheaper and less
effective medication, and he often received no medication
at all. *See id.* As a result, Mr. Revels began experiencing
symptoms including severe bloating, weakness, fatigue,
disorientation, incoherency, extreme weight gain, motor
impairment, episodes of unconsciousness, episodes of
paralysis, and confusion. *See id.* Defendant Fricke, the
doctor at Schenectady County Jail, and Defendant Farley, a
registered nurse employed at the jail, were well aware of Mr.
Revels's declining health. *See id.* at ¶ 19.

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 236 of 443

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

Shortly after arriving at the jail, Mr. Revels underwent urinalysis as well as a Blood Urine and Nitrogen Test, both of which showed kidney problems. *See id.* During his ten weeks in Schenectady County Jail, Mr. Revels's kidney function was repeatedly tested, and the tests consistently showed dangerously poor kidney function. *See id.* at ¶ 20. Additionally, Mr. Revels showed physical symptoms —including massive weight gain and bloating—indicative of kidney failure. *See id.* Throughout his time in jail, Mr. Revels wrote several sick call slips complaining of his various ailments, and he repeatedly voiced concern about the potential return of his kidney cancer. *See id.* at ¶ 21. Despite Mr. Revels's declining health, Defendant Fricke did not contact Mr. Revels's specialists or refer him to an outside doctor who was qualified to address Mr. Revels's condition. *See id.* at ¶ 22. Instead, Defendant Fricke unilaterally decided to withhold "various medications" from Mr. Revels. *See id.*

**\*2** On November 18, 2015, corrections officers discovered Mr. Revels unconscious on the ground. *See id.* at ¶ 23. For several minutes, the medical staff was unable to rouse him. *See id.* When Mr. Revels finally regained consciousness, he was unable to communicate for "a significant period of time." *See id.* The medical staff described the incident as a "paralytic episode"; it was not the first such episode during Mr. Revels's time in jail. *See id.* Despite Mr. Revels's paralytic episode on November 18, 2015, and despite the many other signs and symptoms of his poor health, he was not hospitalized or referred to a specialist. *See id.* at ¶ 24. Two days later, Mr. Revels was discovered on the floor of his cell—he was weak, wheezing, and suffering from auditory and visual hallucinations. *See id.* Only at that point Mr. Revels sent to the hospital, but his condition had already deteriorated past the point of recovery. *See id.* He was mostly incoherent and on life support until his death on November 25, 2015. *See id.*

At the hospital, Mr. Revels was diagnosed with Hyperkalemia and Respiratory Acidosis. *See id.* at ¶ 25. Hyperkalemia involves excessive potassium levels in the blood and can be caused by failure to appropriately monitor blood thinner and hypotension medications. *See id.* Mr. Revels eventually died from a Myocardial Infarction, which can be caused by Hyperkalemia and Respiratory Acidosis. *See id.* According to Plaintiff, Mr. Revels's death could have been prevented if he had received the appropriate medication, been monitored by a specialist, or been sent to the hospital. *See id.*

**B. CMC and CBH**

CMC is a corporation that provides medical care at numerous county jails, and Defendant Umar is the president of CMC. *See id.* at ¶¶ 6, 8, 27. CMC has "engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage, as well as inadequate medical and mental health care in general." *See id.* at ¶ 27. The complaint includes pages of troubling allegations regarding CMC's business practices and its track record of providing inadequate care in county jails throughout New York State. *See id.* at ¶¶ 26-42. But based on the allegations in the complaint, it is not clear what role, if any, CMC had at Schenectady County Jail during the time in question.

Plaintiff alleges that CBH is responsible for providing medical at the Schenectady County Jail. *See id.* at ¶ 7.[3] Plaintiff also alleges that, "upon information and belief, CBH Medical, P.C. is owned by Correctional Medical Care, Inc." *See id.* But the complaint includes no other allegations regarding CMC's relationship to CBH or CMC's role at the Schenectady County Jail. Additionally, the complaint does not contain any allegations relating to CBH or its policies, practices, or history of providing medical care.

[3]     Plaintiffs actually allege that CBH "is responsible for providing medical care at the Monroe Correctional Facility." *See* Dkt. No. 1 at ¶ 7. But based on representations made in the parties' briefs, the Court presumes that this was an error, and that Plaintiff's counsel intended to allege that CBH is responsible for providing medical care at the Schenectady County Jail. *See* Dkt. No. 30-2 at 14; Dkt. No. 40 at 9.

**C. Procedural History**

On January 26, 2017, Plaintiff Crystal Revels filed the complaint in this action. Plaintiff alleges three different causes of action: (1) deliberate indifference to a serious medical need in violation of the Fourteenth Amendment as to all Defendants except D'Agostino and Barrett; (2) implementation of municipal policies that violated Mr. Revels's constitutional rights as to Defendants CMC, CBH, Umar, Fricke, Schenectady County, D'Agostino, and Barrett; and (3) conscious pain and suffering and wrongful death under New York law as to all Defendants. *See id.* at ¶¶ 47-63.

Defendants filed three separate motions to dismiss. The County Defendants filed one motion to dismiss. *See* Dkt. No. 27. Defendant Russell Fricke filed a separate motion

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

to dismiss. *See* Dkt. No. 28. Finally, the CMC Defendants move to dismiss and move to strike certain allegations in the complaint. *See* Dkt. No. 30.

### III. LEGAL STANDARD

 **\*3**  A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Sutton ex rel. Rose v. Wachovia Secs., LLC,* 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss, a court may take judicial notice of documents filed in another court).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, 127 S.Ct. 1955 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief,"

*Twombly,* 550 U.S. at 558, 127 S.Ct. 1955, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570, 127 S.Ct. 1955.

### IV. DISCUSSION

#### A. Deliberate Indifference

As a pretrial detainee at the time of the incidents addressed in the complaint, Plaintiff's claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). The Supreme Court recently distinguished between Eighth and Fourteenth Amendment excessive force claims, holding that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *See Kingsley v. Hendrickson,* ––– U.S. ––––, 135 S.Ct. 2466, 2470-71, 192 L.Ed.2d 416 (2015).

In *Darnell,* the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell,* 849 F.3d at 35. The court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

Although *Darnell* involved a challenge to conditions of confinement, district courts in this circuit have held that *Kingsley* should also be applied to pretrial detainees' claims of deliberate indifference to serious medical needs. *See Villafane v. Sposato,* No. 16-CV-3674, 2017 WL 4179855, \*19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs"); *Lloyd v. City of New York,* 246 F.Supp.3d 704, 718 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"); *see also Torrez v. Semple,* No. 17-CV-1211, 2017 WL 3841686, at \*3 (D. Conn. Sept. 1, 2017) ("[F]or a claim of deliberate indifference to mental health needs or unconstitutional conditions of confinement under the

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 238 of 443

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants 'knew, or should have known, that the condition posed an excessive risk to health or safety' ") (quoting *Darnell*, 849 F.3d at 35).

**\*4** Under either the Eighth or the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-prong test. *Id.* at \*18. "First, 'the alleged deprivation of adequate medical care must be "sufficiently serious." ' " *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

*1. Objective Prong*[4]

[4] The standard for establishing the objective prong of a deliberate indifference claim was not affected by *Darnell*. *See Feliciano*, 2017 WL 1189747, \*10. Therefore, "the objective prong of a deliberate-indifference claim is the same regardless of whether the inmate is a convicted prisoner or a pretrial detainee." *Id.* The Court notes, however, that the term "objective prong" is somewhat misleading in the context of a Fourteenth Amendment deliberate indifference claim. As the Court explains below, after *Darnell*, both prongs of such a claim are now analyzed under an objective standard.

The objective prong requires "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, \*8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

Here, Defendants argue that Mr. Revels was provided medical care, and that Plaintiff fails to allege a deprivation of care that was sufficiently serious. *See* Dkt. No. 27-1 at 17; Dkt. No. 30-2 at 7-11. The Court disagrees. A number of district courts in this circuit have found kidney failure to constitute a sufficiently serious medical condition to satisfy the objective component of a deliberate indifference claim. *See Padilla v. Corr. Care Sols.*, No. 17-CV-1150, 2018 WL 550610, \*4 (N.D.N.Y. Jan. 22, 2018) (D'Agostino, J.); *Rivera v. Fed. Bureau of Prisons*, No. 08-CV-5590, 2009 WL 585828, \*5 (S.D.N.Y. Mar. 5, 2009); *Candelaria v. Greifinger*, No. 96-CV-17, 1998 WL 187383, \*3 (N.D.N.Y. Apr. 15, 1998).

It is well established that the state " 'is not constitutionally obligated ... to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail [him]self of' outside of prison." *Thompson v. Racette*, No. 11-CV-1372, 2012 WL 12884469, \*2 (N.D.N.Y. Aug. 2, 2012) (alterations in original) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment. *See Moolenaar v. Champagne*, No. 03-CV-1464, 2006 WL 2795339, \*6 (N.D.N.Y. Sept. 26, 2006). But this is not a case of Plaintiff simply disagreeing with a particular medication or diagnostic technique. Plaintiff alleges that Mr. Revels was recovering from kidney cancer, and that he repeatedly tested positive for kidney problems, showed clear symptoms of kidney failure and other serious medical conditions, and even endured multiple "paralytic episodes." Despite these obvious signs of deteriorating health, medical staff at the jail allegedly failed to provide any treatment other than withholding some or all of Mr. Revels's medications. By the time Mr. Revels was hospitalized, he was past the point of recovery. Plaintiff alleges that the lack of treatment caused Mr. Revels's death. Therefore, Plaintiff alleges a sufficiently serious deprivation of care.

*2. Mental Element Prong*

**\*5** "After *Darnell*, 'deliberate indifference' is now 'defined objectively,' and the 'Due Process Clause can be violated when an official does not have subjective awareness that

Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 239 of 443

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm.' " *Lloyd*, 246 F.Supp. at 719 (quoting *Darnell*, 849 F.3d at 35). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment "is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmett*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35).

### 3. Defendants Fricke and Farley

It has long been the rule in this circuit that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Clay v. Kellmurray*, 465 Fed. Appx. 46, 47 (2d Cir. 2012) (quoting *Chance*, 143 F.3d at 703). Even after *Darnell*, it remains the case that "something more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Davis v. McCready*, No. 14-CV-6405, 283 F.Supp.3d 108, ——, ——, 2017 WL 4803918, *9 (S.D.N.Y. Oct. 23, 2017); *see also Darnell*, 849 F.3d at 36 ("But any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence"). But distinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of expert opinion. *See McCready*, 2017 WL 4803918, at *9, 283 F.Supp.3d 108. The distinction between the two "depends on the degree of risk associated with the practitioner's conduct." *Id.*

In *Rivera v. Federal Bureau of Prisons*, No. 08-CV-5590, 2009 WL 585828 2009 (S.D.N.Y. Mar. 5, 2009), the court faced allegations very similar to the facts alleged in this case. While incarcerated, the plaintiff took a series of blood tests that indicated declining kidney function, but he received no diagnosis or treatment. *See id.* at 1. Eventually, the plaintiff was transferred to a different prison to receive medical attention for kidney failure and was told that he would need to begin dialyses within two to three years. *See id.* Even under the more demanding subjective test for Eighth Amendment deliberate indifference claims, the court found that the plaintiff had sufficiently alleged that the medical staff at the first prison was deliberately indifferent to his medical needs. *See id.* at *4; *accord Padilla v. Corr. Care Sols.*, No. 17-CV-1150, 2018 WL 550610, *4 (N.D.N.Y. Jan. 22, 2018) (D'Agostino, J.).

In this case, Plaintiff alleges that Mr. Revels's kidney function was repeatedly tested while he was in Schenectady County

Jail, and that those tests consistently indicated dangerously poor kidney function. Additionally, Mr. Revels displayed various, troubling symptoms, including severe bloating, weakness, fatigue, disorientation, incoherency, extreme weight gain, motor impairment, episodes of unconsciousness, episodes of paralysis, and confusion. Plaintiff also alleges that Defendants Fricke and Farley were aware of Mr. Revels's declining health because they signed off on his blood tests and because Mr. Revels submitted numerous written complaints. Defendants argue that Plaintiff has not plausibly alleged that Defendants Fricke and Farley knew or should have known of the excessive risk created by their failure to treat Mr. Revels's medical conditions. *See* Dkt. No. 48 at 5. But accepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court cannot find as a matter of law that Defendants Fricke and Farley were not reckless.

### 4. John Doe Defendants

**\*6** Plaintiff also brings a claim of deliberate medical indifference against three John Doe Defendants, who Plaintiff identifies only as medical staff at Schenectady County Jail. *See* Dkt. No. 1 at ¶ 14. The John Doe Defendants include the members of the medical staff who found Mr. Revels unconscious on November 18, 2015. The CMC Defendants argue that those members of the medical staff were not deliberately indifferent because they provided "medical attention ... when Mr. Revels was 'roused' after losing consciousness." Dkt. No. 30-2 at 10. But the allegation that the John Doe Defendants merely "roused" Mr. Revels does not prevent the Court from finding that Plaintiff plausibly alleges that the John Doe Defendants acted with objective recklessness. Therefore, the motion to dismiss as to the John Doe Defendants is denied.

### 5. Municipal Liability

A municipality "may not be held liable under Section 1983 unless the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson*, No. 04-CV-6338, 2004 WL 2123490, *2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This is because "[m]unicipalities are not subject to Section 1983 liability solely on the basis of a *respondeat superior* theory." *Id.*, at *2. As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection—an

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 240 of 443

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

"affirmative link"—between the policy and the deprivation of his constitutional rights.' " *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

"Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." *Powell v. Correc. Med. Care, Inc.*, No. 13-CV-6842, 2014 WL 4229980, *6 (S.D.N.Y. Aug. 15, 2014) (quoting *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990)); *see also Feder v. Sposato*, No. 11-CV-93, 2014 WL 1801137, *6 (E.D.N.Y. May 7, 2014) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, Armor ... [was] 'acting under the color of state law' for purposes of Section 1983").

"A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted).

Here, Plaintiff alleges that the inadequate care was caused by a policy or custom of CMC. *See* Dkt. No. 1 at ¶ 56. Indeed, the complaint contains pages of allegations regarding CMC's "policy and/or practice of not providing appropriate medical care." *See id.* But Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail. Instead, she alleges that CBH had that responsibility; it is not clear what role, if any, CMC played at the jail. *See id.* at ¶ 7. Although the complaint alleges, upon information and belief, that CBH is owned by CMC, it does not provide any further information regarding the relationship between the two entities. *See id.* Even if CMC does own CBH, that alone is not sufficient to hold CMC liable for CBH's conduct. *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) ("As a general matter ... a corporate relationship alone is not sufficient to bind [a parent corporation for the actions of its subsidiary]" (alteration in original)). Additionally, the complaint only mentions CBH a handful of times, and it does not contain any allegations that could allow the Court to conclude that CBH itself has a custom or practice of providing inadequate care. [5]

5    The CMC Defendants move to strike large chunks of Plaintiff's complaint that are related to the allegations of municipal liability against CMC. *See* Dkt. No. 30-2 at 19-24. Since the Court dismisses the municipal liability claims against CMC and CBH, the motion to strike is denied as moot.

**\*7** Similarly, Plaintiff's § 1983 allegations against the County Defendants rest entirely on CMC's alleged custom or practice of providing inadequate medical care. Since Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail, CMC's policies and practices do not provide a sufficient basis for establishing liability as to the County Defendants. Therefore, the County Defendants' motion to dismiss Plaintiff's § 1983 claims is granted.

## B. State Law Claims

### 1. The County Defendants

The County Defendants' move to dismiss Plaintiff's state law claims against the County, D'Agostino, and Barrett. *See* Dkt. No. 27-1 at 7, 12. First, the County Defendants argue that Defendants D'Agostino and Barrett cannot be held liable for the acts or omissions of corrections officers, and that there is no basis for vicarious liability alleged in the complaint. *See id.* at 7 (citing *Barr v. Albany County*, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980) ). Second, the County Defendants argue that state law claims against the County must be dismissed because it may not be held vicariously liable for the acts of corrections officers. *See id.* at 12 (citing *De Ratafia v. County of Columbia*, No. 13-CV-174, 2013 WL 5423871, *10 (N.D.N.Y. Sept. 26, 2013) ).

Plaintiff fails to address these arguments in her opposition to the County Defendants' motion to dismiss. Since Plaintiff does not assert any other basis for liability under state law against the County Defendants, Plaintiff's state law claims against the County Defendants are dismissed. *See Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim"); *see also Div. 1181 Amalgamated Transit Union–N.Y. Emps. Pension Fund v. R & C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, *4 (E.D.N.Y. Feb. 7, 2018) (collecting cases).

2018 WL 1578157

*2. The CMC Defendants*

The CMC Defendants argue that Plaintiff's state law claims should be dismissed because Plaintiff did not file a certificate of merit along with her complaint as required by C.P.L.R. § 3012-a. *See* Dkt. No. 30-2 at 18. The statute "requires counsel to submit a certificate of merit declaring that he or she has consulted with at least one licensed physician who is knowledgeable regarding the relevant issues in the action, has reviewed the case," and has concluded that there is a reasonable basis for commencement of an action. *Calcagno v. Orthopedic Assoc. of Dutchess Cty., PC*, 148 A.D.3d 1279, 1280 (3d Dep't 2017). However, "the mere failure to timely file [a certificate of merit] does not support dismissal of [an] action," *id.*, and Plaintiff submitted a certificate of merit on November 13, 2017, *see* Dkt. No. 50. Therefore, the CMC Defendants' motion to dismiss Plaintiff's state law claims is denied.

### V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the County Defendants' motion to dismiss (Dkt. No. 27) is **GRANTED** and Defendants Schenectady County, Dominic D'Agostino, and Jim Barrett may be terminated; and the Court further

**ORDERS** that Defendant Fricke's motion to dismiss (Dkt. No. 28) is **DENIED**; and it the Court further

**ORDERS** that the CMC Defendants' motion to dismiss (Dkt. No. 30) is **GRANTED in part** as to the deliberate indifference and municipal liability claims against Correctional Medical Care, Inc., CBH Medical, P.C., and Emre Umar, and the motion is **DENIED in part** as to Plaintiff's state law claims and the deliberate indifference claims against Defendants Deiah Farley, and John Does 1-3; and the Court further

 *8  **ORDERS** that the CMC Defendants' motion to strike (Dkt. No. 30) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578157

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6115101

2012 WL 6115101
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Daniel M. POLLETTA, Plaintiff,

v.

Monica FARINELLA, et al., Defendants.

Civil No. 3:11cv660 (JBA).
|
Dec. 10, 2012.

**Attorneys and Law Firms**

Daniel M. Polletta, Uncasville, CT, pro se.

Carmel A. Motherway, Attorney General's Office, Hartford, CT, for Defendants.

**RULING ON MOTION TO DISMISS**

JANET BOND ARTERTON, District Judge.

*\*1* Plaintiff Daniel M. Polletta, proceeding pro se, filed suit against Dr. Farinella, Lieutenant Ballaro, Correctional Officer Haney, and Nurse Marceau, alleging violations of his Eighth Amendment rights for actions by Defendants response to his requests for medical attention due to serious swelling and pain in Plaintiff's right ear. On September 17, 2010 Defendants moved [Doc. # 18] to dismiss the action for failure to state a claim under Rule 12(b)(6). Plaintiff's opposition was to be filed on or before October 8, 2012. (*See* Notice to *Pro Se* Litigant [Doc. # 20] ). As of December 10, 2012, plaintiff Daniel M. Polletta has neither filed his opposition to Defendants' Motion to Dismiss, nor sought extension of time within which to do so.

Under this Court's local rules, "[f]ailure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion, except where the pleadings provide sufficient grounds to deny the motion." D. Conn. L.R. 7(a)1. For the reasons that follow, Defendants' unopposed motion to dismiss will be granted.

**I. Facts**

Plaintiff alleges that starting in December 2010 he began to experience "marked physical pain in his ear," and his right ear "had swollen to an unusual size accompanied with an unbearable searing pain." (Compl. [Doc. # 1] at 7.) At about 8:30 or 9p.m. on December 5, 2010, Plaintiff saw "medical" and "Nurse Yvonne [Marceau] examined plaintiff's ear and said it looked like a 'spider bite.' " (*Id.* at 8.) Defendant Marceau then took Plaintiff's blood pressure and monitored his heart rate, and gave Plaintiff a "Sulfa/Trimeth DS to stabilize the condition" in his ear. (*Id.*)

The next day, December 6, 2010, Plaintiff's condition got worse. His was given another Sulfa/Trimeth DS in the morning, and that afternoon, Dr. Farinella examined him in the Medical Unit, and gave him another Sulfa/Trimeth DS, which Plaintiff alleges "was proving to be fruitless." (*Id.* at 8–9.) On December 7, 2010, Plaintiff went to the "medical line" at 9a.m. and was given another dose of the medication that had been prescribed to him. (*Id.*) Plaintiff alleges that at 7:30 p.m. that same day, he notified Correctional Officer Haney that he had vomited in his cell and wished to go to "medical," and that C.O. Haney did not call medical, and instead "returned to his station and finished reading his newspaper." (*Id.*) Twenty minutes later, Plaintiff alleges that Lieutenant Ballero was touring the unit, and when Plaintiff notified Ballero that C.O Haney had ignored his requests for medical attention, Ballero mocked Plaintiff's condition and walked away. (*Id.* 9–10 .)

Later in the evening on December 7, a male nurse came into Plaintiff's unit, and Plaintiff again requested medical assistance. (*Id.* at 10–11.) Around 9p.m., the nurse took Plaintiff's blood pressure and noted his heart rate, which were both "simultaneously and abnormally high." (*Id.* at 11.) The nurse suggested that Plaintiff continue taking Sulfa/Trimeth DS. (*Id.*)

*\*2* Plaintiff's condition did not improve, and he continued to be examined by Dr. Farinella on a daily basis. On December 9, he was taken off two medications, Cephalex N, Cipro, due to their alleged "effect on his stomach" and the medications' "non-effect on his ear." (*Id.* at 13.) Dr. Farinella instead prescribed Plaintiff a "steroid and cortisone." On December 10, Dr. Farinella consulted with an ear nose and throat resident at John Dempsey Hospital. (*See* Dr. Farinella's Notes, Attached to *id.* at 33.) On December 13, Dr. Farinella prescribed Plaintiff prednisone and Zantac (*see* Physician's Orders, attached to *id.* at 23), and scheduled Plaintiff an IV for the following day (*id.*). Dr. Farinella consulted againt with the ear nose and throat resident, who told her that it "could take a few more days to get better," but to continue him on the prednisone. (*See* Dr. Farinella's Notes at 32.) Plaintiff

demanded that he be taken to an outside hospital, but his requests were refused.

As a result of Defendants' alleged conduct, Plaintiff seeks compensatory damages of more than $75,000, punitive damages, and that Defendants be enjoined from subjecting him to "experimental treatment" and that Defendants provide him with "practical and reasonable medical conditions and care." (*Id.* at 17.)

## II. Discussion [1]

[1]   To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed.R.Civ.P. 12(b)(6).

Defendants move to dismiss Plaintiff's Complaint, alleging that Plaintiff's allegations fail to state a claim for deliberate indifference to medical need. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003); *see also Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). The standard for deliberate indifference incorporates both objective and subjective elements: "[t]he objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.; see also Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### A. Defendants Marceau and Farinella
As to Defendants Marceau and Farinella, Plaintiff fails to state a claim for deliberate indifference to his medical needs because, while Plaintiff alleges that he was in "searing" pain for a number of days in December 2010, Plaintiff's own allegations show that Marceau and Farinella were working to treat Plaintiff's condition. Dr. Farinella consulted with

an ear, nose and throat specialist, and prescribed multiple medications in order to alleviate Plaintiff's suffering.

There is no constitutional right to the treatment of one's choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). That Plaintiff did not receive the treatment of his choice, i.e., being taken to an outside hospital, is insufficient to state a claim for deliberate indifference. Plaintiff's allegations that Dr. Farinella and Nurse Marceau should have treated his condition differently are similarly insufficient to rise to the level of deliberate indifference:

> **\*3**  [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle,* 429 U.S. at 106. Here, Plaintiff has not alleged acts or omissions on the part of Dr. Farinella and Nurse Marceau that show that these Defendants acted with deliberate indifference to his medical needs. In fact, the allegations of the complaint show that Dr. Farinella met with Plaintiff on a daily basis, prescribed him several different types of medication and attended to his complaints, and even consulted with an outside doctor. Thus, these allegations fail to state a claim for deliberate indifference.

### B. Defendants Haney and Ballero
As to Defendants Haney and Ballero, Plaintiff's alleges that over the course of an hour and a half on December 7, 2010, both deliberately refused to get him medical assistance. While the Supreme Court has held that deliberate indifference can include indifference "manifested by ... prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle,* 428 U .S. at 105,

2012 WL 6115101

> [A] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. at 837, 114 S.Ct. 1970. Plaintiff does not allege that Haney and/or Ballero knew that "a substantial risk of serious harm" to Plaintiff existed, nor that they knowingly disregarded that "excessive risk." Further, the allegations state that Plaintiff received medical attention an hour and a half later that same evening, during which time his blood pressure and heart rate were recorded and monitored, and he was given another dose of the medication which he had been prescribed earlier. No harm is alleged to have resulted from the conduct of Ballero and Haney other than causing a delay of 1.5 hours in treatment by the nurse. This does not rise to the level of conduct that would be "repugnant to the conscience of mankind." *Estelle,* 429 U.S. at 106. Thus, Plaintiff's complaint fails to state a claim for deliberate indifference to medical need as to Defendants Haney and Ballero.

### III. Conclusion

After full review of Defendants' unopposed motion and Plaintiff's Complaint, the Court concludes that the pleadings do not provide sufficient grounds to deny the motion, and thus, Defendants' Motion to Dismiss [Doc. # 18] is GRANTED. The Clerk is directed to close this case.

**\*4** IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 6115101

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1778410

2014 WL 1778410
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Darrell WASHINGTON, Plaintiff,
v.
WESTCHESTER COUNTY DEPT.
OF CORRECTION, et al., Defendants.

No. 13 Civ. 5322(KPF).
|
Signed April 25, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge. [1]

[1]
    Doug Giannantonio, a third-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

**\*1** In early 2013, Plaintiff Darrell Washington, who is proceeding *pro se* and is currently incarcerated, received medical treatment for a severe bacterial infection he experienced while incarcerated at the Westchester County Jail. On July 29, 2013, Plaintiff initiated this action under 42 U.S.C. § 1983 against Defendants Westchester County Department of Correction and Correct Care Solutions, LLC, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants now move to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted in part, and Plaintiff is granted leave to file an amended complaint within 30 days.

**BACKGROUND** [2]

[2]
    The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. For convenience, Defendants' opening brief in support of the instant motion (Dkt.# 15) will be referred to as "Def. Br."; Plaintiff's opposition affirmation

(Dkt.# 23) as "Pl. Opp."; and Defendants' reply brief (Dkt.# 24) as "Def. Reply."

Prior to the filing of Defendants' motion to dismiss, Plaintiff submitted to the Court what he alleges to be the relevant medical records. (Dkt.# 9, 10). However, those materials were not submitted along with the Complaint; they were not referred to in the Complaint; and they were not submitted in connection with the briefing of this motion. Accordingly, the Court may not consider these documents in the context of a motion to dismiss. *See generally Kalyanaram v. American Ass'n of University Professors at New York Institute of Technology, Inc.,* 742 F.3d 42, 44 n. 1 (2d Cir.2014) (discussing circumstances under which courts can consider outside materials in resolving motions to dismiss). Yet to the extent the Court is permitted to review all papers submitted by a *pro se* plaintiff in order to raise the strongest arguments these papers suggest, the Court has reviewed these records, and notes that they facially support the factual allegations discussed herein.

**A. Plaintiff's Incarceration and MRSA Infection**
Plaintiff was arrested on or about January 23, 2013. (Compl.3). Prior to his arrest, Plaintiff had been prescribed a medication called Doxycycline, as well as an ointment, "for MRSA." (*Id.*) . [3] Accordingly, at the time Plaintiff was arrested, he had on his person both the Doxycycline and "some type of ointment." (*Id.*). Plaintiff does not actually allege that he had a MRSA infection prior to his incarceration, or that he suffered any symptoms of that infection, only that he had been prescribed and was taking medication "for MRSA." (*Id.*). [4]

[3]
    MRSA is an acronym for Methicillin-resistant Staphylococcus aureus, a bacterium that can cause serious infections.

[4]
    Plaintiff alleges in opposition that he "did not enter the facility with the deadly disease," and that he "caught" MRSA while at the Jail. (Pl.Opp.1–3). This statement is facially contradictory with Plaintiff's allegation in the Complaint that he was undergoing treatment for MRSA prior to his incarceration. The Court ordinarily may not consider factual allegations contained in opposition papers to a motion to dismiss unless they are consistent with those contained in the complaint.

See *Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000). This is not the case here, and for this reason, the Court disregards the inconsistent factual allegations in Plaintiff's opposition papers.

During the relevant time period, Plaintiff was incarcerated at the Westchester County Jail (the "Jail"), in Valhalla, New York. (Compl.3). The Jail is operated by Defendant Westchester County Department of Correction (the "County"). Defendant Correct Care Solutions, LLC ("Correct Care") provides medical care to prisoners at the Jail.

According to Plaintiff, upon his arrival at the Jail on January 23, 2013, Plaintiff informed a correctional officer and a doctor on staff that Plaintiff was on medication for MRSA. (Compl.3). The doctor informed Plaintiff that he could no longer take his prescribed medications, but that Plaintiff would be prescribed new medication. (*Id.*). In fact, Plaintiff was never prescribed any new medication, and the Doxycycline and ointment were locked up with Plaintiff's property at the Jail. (*Id.*).

On or about March 17, 2013, Plaintiff developed a large lump on his leg. (Compl.3). The lump worsened and "turned into a 2 inch hole." (*Id.*). Plaintiff's leg was "[highly] infected," and he "was in a lot of pain." (*Id.*). In response to Plaintiff's complaint, a doctor performed a blood test, measured the size of the lump, and placed Plaintiff in quarantine for approximately one week. (*Id.*).

The diagnostic test results subsequently revealed that Plaintiff was infected with MRSA. (Compl.3). Accordingly, a doctor prescribed antibiotics and painkillers to Plaintiff, which he took for approximately three weeks. (*Id.*). Plaintiff does not take issue with his medical treatment in connection with his March 2013 infection, but avers that he "feel[s] the doctors [at the Jail] are hiding something." (*Id.*).

**\*2** Plaintiff alleges that his medical issues are ongoing due to "the medication/MRSA." (Compl.5). Perhaps relatedly, Plaintiff contends that on or about June 14, 2013, he developed "a very bad rash" on his arm. (*Id.* at 3). It is unclear, however, whether this "bad rash" is related in any way to Plaintiff's MRSA infection; Plaintiff does not provide any further details about this rash or its treatment.

**B. The Instant Action**
On June 19, 2013, Plaintiff served a Notice of Claim, dated June 14, 2013, on the Westchester County Attorney,

indicating that Plaintiff planned to pursue a claim against the County and Correct Care under Section 50–e of the New York General Municipal Law. (Def. Br. 3; Dkt. # 18–1 at 2–3). The Westchester County Attorney subsequently rejected Plaintiff's Notice of Claim as untimely. (Def. Br. 3; Dkt. # 18–1 at 1, 4).

On July 29, 2013, Plaintiff initiated the instant action against Defendants (Dkt.# 2), seeking $1 million in damages to "pay for my medical bills and also for pain and suffering." (Compl.5). The allegations contained in Plaintiff's Complaint mirror those in his previously-filed Notice of Claim. (Def. Br. 3; *compare* Compl. 3, *with* Dkt. # 18–1 at 2).

To date, Plaintiff concededly has not filed a grievance with the Jail—or with any other jail, prison, or correctional facility —for improper medical treatment in relation to the events described in the Complaint. (Compl.4). Instead, Plaintiff contends that he does not know whether the Jail has a grievance procedure and "do[es]n[']t know how to file a grievance." (Compl.4).

The case was assigned to the undersigned on August 6, 2013. Pursuant to the briefing schedule set forth at the October 23, 2013 pre-motion conference (Dkt. # 11), Defendants moved to dismiss on November 22, 2013 (Dkt.# 13). Plaintiff filed his opposition on December 17, 2013 (Dkt.# 23), and the motion was fully briefed as of the filing of Defendants' reply on December 24, 2013 (Dkt.# 24). The Court now considers Defendants' motion to dismiss.

## DISCUSSION

**A. Applicable Law**
When considering a motion under Rule 12(b)(6), the Court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Fed.R.Civ.P. 12(b)(6); *Faber v. Metropolitan Life,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 548 F.3d 82, 88 (2d Cir.2009)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from

conceivable to plausible." (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 570)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman,* 517 F.3d 140, 149 (2d Cir.2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002)).

**\*3** "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). That said, the liberal pleading standard accorded to *pro se* litigants "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980).

### B. Analysis

Plaintiff alleges that his Eighth Amendment rights were violated when Defendants acted with deliberate indifference to his serious medical needs. He brings this claim under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Plaintiff's claim is best understood as a claim for two separate instances of alleged deliberate indifference to serious medical need: first, Defendants' decision to discontinue Plaintiff's medications upon his admission into the Jail, and second, Defendants' treatment of Plaintiff's leg infection in March 2013.

### 1. Defendant County's Affirmative Defense of Exhaustion Is Denied Without Prejudice

Preliminarily, the County raises, as an affirmative defense, Plaintiff's failure to exhaust his administrative remedies, in violation of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, Title VIII, § 803(d), 110 Stat. 1321–71 (1996) (codified as amended at 42 U.S.C. § 1997e). The PLRA requires prisoners to exhaust all "available" administrative remedies prior to filing a claim in federal court. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court

has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (internal citation omitted); *see also Cruz v. Jordan,* 80 F.Supp.2d 109, 111 (S.D.N.Y.1999) ("I hold that an action alleging deliberate indifference to medical needs is an action 'brought with respect to prison conditions,' requiring exhaustion[.]").

The purpose of the exhaustion requirement is to promote efficiency by reducing the quantity and improving the quality of prisoner litigation. *Porter,* 534 U.S. at 516; *see also Woodford v. Ngo,* 548 U.S. 81, 89 (2006) ("Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." (internal citation omitted)). Further, "[e]xhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' " *Woodford,* 548 U.S. at 89 (internal citation omitted).

**\*4** The Second Circuit has held that there are three exceptions to the PLRA's "mandatory" exhaustion requirement:

> [W]hen (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In light of this case law, Plaintiff's admitted failure to exhaust his administrative remedies is not dispositive. (*See* Compl. 4). Instead, the Court must determine whether, as relevant here, those administrative remedies were available to Plaintiff in

the first place. Plaintiff contends that he did not know how to file a grievance. (*Id.*). Courts within this District are uniform in holding that "[administrative] remedies are not available where prisoners are not informed of their existence." *Smith v. City of New York*, No. 12 Civ. 3303(CM), 2013 WL 5434144, at *8 (S.D.N.Y. Sept. 26, 2013) (internal citation omitted); *see also Rivera v. New York City*, No. 12 Civ. 760(DLC), 2013 WL 6061759, at *4–5 (S.D.N.Y. Nov. 18, 2013) (same).

Specifically, "[a]n institution keeps an inmate ignorant of the grievance procedure [and thus administrative remedies are 'unavailable'] when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about the use of that process." *Arnold v. Goetz*, 245 F.Supp.2d 527, 538 (S.D.N.Y.2003) (internal citation omitted). At the same time, however, " 'correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known.' " *Id.* at 537–38 (internal citation omitted). The availability of those remedies is adjudged not by whether the Plaintiff was unaware of them, but instead by whether " 'a similarly situated individual of ordinary firmness' " would have deemed them available. *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir.2004) (internal citation omitted). This is a question of fact. *Arnold*, 245 F.Supp.2d at 538.

The record here is devoid of any facts from which such a determination could be made. Most cases in this District considering the topic have explored, in detail, whether the correctional officers provided the inmate with a handbook explaining the grievance procedure, and whether officers explained the grievance procedure prior to the alleged incident; the record before the Court is—understandably, at this procedural juncture—silent as to this information. *See, e.g., Smith,* 2013 WL 5434144, at *10 ("Receipt of such a handbook generally indicates that the inmates were informed of the grievance procedure so as to make that procedure 'available' to them. It alone is not, however, dispositive." (internal citation omitted)); *Arnold,* 245 F.Supp.2d at 539 ("The defendants allege that the 'behavior booklet' provided to an inmate upon his 'entrance to the corrections system' outlines the available grievance procedures." (internal citation omitted)).

**\*5** Failure to comply with the PLRA's exhaustion requirement is an affirmative defense, on which the defendant bears the burden of proof. *Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir.1999); *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). The County has failed to carry its burden on this affirmative defense; however, its claim in this regard is denied without prejudice to raising such a defense at a later date, upon a more complete record. [5] *See Arnold,* 245 F.Supp.2d at 538–39 ("Since the nonmoving party is proceeding *pro se,* we are obligated to resolve existing doubts in the plaintiff's favor and to read his [ ] Complaint as raising the strongest argument it suggests (namely, that his lack of sufficient knowledge about the procedure is attributable to correctional officials rather than to himself. Giving the plaintiff the benefit of the doubt in this manner despite his failure to clarify his statements comports with the principle that the defendants bear the burden of proving that he failed to satisfy the PLRA's exhaustion requirement.").

[5]    Though the Court does not reach this issue here, it notes that Defendant Correct Care has not also raised the affirmative defense of Plaintiff's failure to comply with the PLRA's exhaustion requirement and, for that reason, may have forfeited this defense. *See Arnold,* 245 F.Supp.2d at 532 (noting that failure to exhaust is an affirmative defense and thus " 'may be waived by a defendant, or forfeited by failure to raise the defense' " (internal citation omitted)).

## 2. The Complaint Fails to Allege Defendants' Deliberate Indifference to a Serious Medical Need

The Court next turns to the merits of Plaintiff's constitutional claim. To sufficiently plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege that (i) the alleged deprivation results in a serious medical condition; and (ii) the defendant, in depriving plaintiff of medical treatment, acted with deliberate indifference. *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.2009).

### a. Plaintiff Has Alleged a Serious Medical Condition

A serious medical condition requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (internal citation omitted); *see also Jones v. Vives,* 523 F. App'x 48, 49 (2d Cir.2013) (summary order).

Defendants do not dispute that MRSA constitutes a serious medical condition that may produce death, degeneration, or extreme pain. (Def.Br.7). *See generally Gaines v. Armor Health Care, Inc.,* No. 12 Civ. 5663(JS)(WDW), 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013) (noting that MRSA was a sufficiently serious medical condition); *McNulty v. Yaneka,* No. 11 Civ. 8320(ER), 2013 WL 684448, at *7 n. 2 (S.D.N.Y. Feb. 25, 2013) (same). Accordingly, Plaintiff has satisfied the first element of his Eighth Amendment claim.

### b. Plaintiff Has Failed to Allege that Defendants Acted with the Requisite Deliberate Indifference

#### i. Applicable Law

Plaintiff must also allege, however, that Defendants acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway,* 99 F.3d at 553 (internal citation omitted); *see also Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011) (summary order). Such a state of mind " 'entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

**\*6** Mere allegations of medical malpractice are generally insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, " 'the charged official must act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.' " *Bell v.. Jendell,* No. 12 Civ. 6666(KMK), 2013 WL 5863561, at *4 (S.D.N.Y. Oct. 31, 2013) (quoting *Salahuddin,* 467 F.3d at 280) (emphasis in *Bell*); *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Similarly, "not every lapse in medical care is a constitutional wrong." *Salahuddin,* 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to

deliberate indifference. *See Ross v. Correct Care Solutions LLC,* No. 11 Civ. 8542(DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013) (" '[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' " (internal citation omitted)). Lastly, the law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference. *Thomas v. Westchester Cnty.,* No. 12 Civ. 6718(CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) ("treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference" (internal citation omitted)); *see also Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." (internal citation omitted)).

#### ii. The January 2013 Suspension of Medication

Plaintiff's first claim of deliberate indifference stems from his allegation that he had been prescribed medication for MRSA at the time of his arrest, but that Defendants discontinued those medications and failed to prescribe him new ones, despite their promise to do so. (Compl.3). Plaintiff does not allege that he was suffering from any symptoms of a MRSA infection at the time, nor that he had actually been diagnosed as having MRSA (as opposed to being prescribed medications for the condition, perhaps prophylactically). However, within weeks of Defendants' decision to cease Plaintiff's medication and failure to prescribe new medication, Plaintiff developed a large lump that resulted from a MRSA infection. Accordingly, Plaintiff contends that he should have been prescribed new medication for treatment of MRSA long before the March 17 incident.

**\*7** Delay in providing medication can rise to the level of deliberate indifference, but only where a plaintiff's allegations indicate that the defendants, for instance, "deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for [a period of time], or delayed major surgery for over two years." *Demata v. New York State Correctional Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (internal citations omitted); *cf. Ross,* 2013 WL 5018838, at *5 (denying motion to dismiss a deliberate-indifference claim where defendant "was informed about [the plaintiff's] sleep apnea" but *"deliberately refused*

to provide him with medical treatment ... on account of his prior complaint and lawsuits" (emphasis added)).

Plaintiff fails to allege any facts demonstrating that Defendants deliberately withheld his medication as a form of punishment, or discontinued his medication while being aware that serious, life-threatening consequences could result therefrom. Instead, Plaintiff's allegations indicate that Defendants agreed to prescribe him new medication, but simply failed to do so; this is insufficient to state a claim for deliberate indifference. *See Ferguson v. Cai,* No. 11 Civ. 6181(PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12, 2012) (dismissing Eighth Amendment claim where plaintiff failed to allege that the defendant "actually disregarded any such known risks," but simply that the defendant " 'forgot to call,' " which fell "well short of the high threshold for deliberate indifference"); *Bell,* 2013 WL 5863561, at *4–6 (same); *Baskerville v. Blot,* 224 F.Supp.2d 723, 735–36 (S.D.N.Y.2002) (dismissing claim based on prison nurse's "failure to obtain a refill of [plaintiff's] ... medication" where plaintiff's "assertions [did] not show that [the nurse] acted intentionally to withhold from him his prescribed medication or was in any way responsible for the delay in obtaining a refill").

In short, Plaintiff has failed to plead deliberate indifference in connection with the discontinuance of his medications, and Defendants' motion to dismiss as to this claim must be granted. The remaining issue, however, is whether such dismissal should be with or without prejudice. Here, too, the Court must construe the record as broadly in favor of Plaintiff's claims as the facts will permit. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (" 'A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " (internal citation omitted)). After reviewing the record, the Court concludes that more particularized pleading—specifically, if Plaintiff were able to allege more details concerning (a) whether he was diagnosed with MRSA prior to his incarceration; (b) whether he was in pain or exhibited symptoms of a MRSA infection at the time of his arrest; (c) whether Defendants were aware that Plaintiff had MRSA and had symptoms of MRSA at the time of his incarceration; and (d) whether Defendants ignored such symptoms or deliberately withheld medication—could cure the deficiencies in Plaintiff's Complaint. Accordingly, Defendants' motion to dismiss is granted without prejudice, and Plaintiff is granted leave to file an amended complaint.

*See Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795–96 (2d Cir.1999) (granting leave to amend a *pro se* complaint where "a liberal reading of the complaint [indicates] that a valid claim might be stated' " (citation omitted)). [6]

[6]     Plaintiff does not allege whether the doctor's decision to discontinue his medication was the result of any official policy or practice, such that liability would attach for the County. Section 1983 " 'extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.' " *Okin v. Village of Cornwall–on–Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (internal citation omitted). Because the Court is permitting Plaintiff to amend his complaint with regard to his Eighth Amendment claim, and because Defendants failed to brief this issue or move upon this ground in their motion to dismiss, the Court declines to reach the issue of whether the Complaint adequately states a claim for municipal liability against the County.

### iii. The March 2013 MRSA Infection

**\*8** Plaintiff also fails to plead sufficiently that Defendants acted with the requisite state of mind with respect to Plaintiff's March 2013 MRSA infection. Plaintiff avers that a large lump was present on his leg on or about March 17, 2013, and that Jail medical staff responded immediately by conducting a blood testing, placing Plaintiff in quarantine, and prescribing him antibiotics and pain medication. (Compl.3). Critically, Plaintiff's only complaint with the treatment of his March infection is his belief that the doctors were "hiding something" from him. (*Id.*). This does not rise to the level of deliberate indifference, rather, Plaintiff's Complaint paints a picture of an attentive medical staff responding proactively to Plaintiff's infection.

As an initial matter, medical providers have wide discretion in treating inmate patients and their determinations "are given a 'presumption of correctness.' " *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311–12 (S.D.N.Y.2001) (internal citation omitted). Here, Plaintiff does not indicate that he was denied medically necessary treatment, or even that he disagrees with the medical treatment he received. Rather, Plaintiff simply alleges that he distrusts the doctors. It is well-settled that a mere disagreement between the inmate and doctor concerning the appropriate treatment or medication does not constitute

2014 WL 1778410

deliberate indifference. *See Hill,* 657 F.3d at 123 (a "prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment" (internal citation omitted)); *Crique v. Magill,* No. 12 Civ. 3345(PAC) (GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention ... does not constitute deliberate indifference." (internal citation omitted)). Simply put, a doctor's determination of the appropriate treatment is a medical judgment and does not in and of itself amount to deliberate indifference or a violation of the Eighth Amendment.

Plaintiff similarly does not allege any facts related to the rash he developed in June 2013 and, more specifically, whether it was related to his MRSA infection, much less does he plead facts indicative of deliberate indifference to his medical needs. Plaintiff does not plausibly allege that Defendants acted with the requisite state of mind necessary to demonstrate deliberate indifference to a serious medical need. Defendants' motion to dismiss as to this claim must also be granted.

Again, the Court must consider whether the dismissal should be with or without prejudice. "Although pro se plaintiffs are generally given leave to amend a deficient complaint, a district court may deny leave to amend when amendment would be futile because the problem with the claim 'is substantive and better pleading will not cure it.' " *Thomas v. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171, at *7 (S.D.N.Y. July 3, 2013) (quoting *Cuoco,* 222 F.3d at 112). Plaintiff's allegations establish that Defendants responded expeditiously and appropriately to his MRSA infection; additional allegations would not change this fact. Plaintiff's claim in connection with his March 2013 MRSA infection is dismissed with prejudice.

### 3. Plaintiff's State Law Claims Are Dismissed as to Defendant County

**\*9** Plaintiff's allegations could also conceivably be construed as state-law tort claims for medical negligence. However, Plaintiff indisputably did not comply with the requirements of Section 50–e of the New York General Municipal Law, and his state law claims brought against Defendant County must be dismissed for that reason. [7]

[7]    N.Y. Gen. Mun. Law § 50–e states in relevant part:
In any case founded upon tort where a notice of claim is required by law as a condition

precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F .3d 789, 793 (2d Cir.1999) (internal citations omitted). Section 50–e "has been described by both the New York Court of Appeals and the Second Circuit as a 'condition precedent' as opposed to a 'statute of limitations.' " *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.,* No. 13 Civ. 6705(DLC), 2014 WL 241739, at *9 (S.D.N.Y. Jan. 22, 2014) (internal citations omitted). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle v. City of New York,* 728 F.Supp.2d 332, 348–49 (S.D.N.Y.2010) (internal citation omitted). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 423 (S.D.N.Y.2006) (internal citation omitted).

The Westchester County Attorney rejected Plaintiff's Notice of Claim as untimely, and the Court is unable to excuse or overlook Plaintiff's failure to comply with Section 50–e. Accordingly, Defendant County's motion to dismiss Plaintiff's New York State law claims is granted. [8]

[8]    Defendant Correct Care has not moved to dismiss the New York State law claims brought against it; accordingly, those remain.

### CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate Docket Entry 13.

Specifically, Defendant County's motion is DENIED without prejudice with respect to the County's affirmative defense for failure to exhaust administrative remedies.

Defendant County's motion is GRANTED with prejudice with respect to Plaintiff's New York State law claims.

Defendants' motion is GRANTED with prejudice with respect to Plaintiff's Eighth Amendment claim relating to his March 2013 MRSA infection.

Defendants' motion is GRANTED without prejudice with respect to Plaintiff's Eighth Amendment claim relating to Defendants' decision to discontinue his medication in January 2013. Plaintiff is granted leave to file an amended complaint within 30 days from the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1778410

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Ahlers v. Kaskiw, Not Reported in F.Supp.3d (2014)

2014 WL 4184752

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2014 WL 4184752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,

v.

Richard KASKIW, Defendant.

No. 9:12–cv–501 (GLS/ATB).
|
Signed Aug. 21, 2014.

**Attorneys and Law Firms**

Karl Ahlers, pro se.

C. Harris Dague, Ass't Att'y Gen., for the Defendant.

### SUMMARY ORDER

GARY L. SHARPE, Chief Judge.

**\*1** Plaintiff *pro se* Karl Ahlers commenced this action against defendant Dr. Richard Kaskiw,[1] pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth Amendment due process rights. (*See generally* Am. Compl., Dkt. No. 6.) Specifically, Ahlers, who is a civilly committed sex offender, confined at the Central New York Psychiatric Center (CNYPC), and in the custody of the New York State Office of Mental Health (OMH), alleged that, between July 2011 and September 2012, Kaskiw denied him an adequate diet and appropriate medical care. (*Id.*) In a Report–Recommendation (R & R) issued on July 9, 2014, Magistrate Judge Andrew T. Baxter recommended that Kaskiw's motion for summary judgment be granted and Ahlers' amended complaint be dismissed in its entirety. (Dkt. No. 21.) For the reasons that follow, the R & R is adopted in its entirety.

[1]   Ahlers originally named several additional defendants, all of whom have since been dismissed. (Dkt. No. 8.)

Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*4–5.

Here, neither party has filed objections to the R & R, and the court, therefore, has reviewed it for clear error. *See id.* While the thoughtful and well-reasoned R & R is free of clear error and is adopted in its entirety, the court takes this opportunity to comment on the proper legal framework for analyzing constitutional medical care claims filed by civilly committed sex offenders, which, as Judge Baxter noted, is an area of uncertainty in this District and Circuit. (Dkt. No. 21 at 6–12.) The confusion arises over whether the courts should apply the same deliberate indifference standard that is employed when such claims are raised by convicted prisoners and pretrial detainees, or whether a more plaintiff-friendly reasonable-professional judgment standard is warranted. (*Id.*)

For substantially the same reasons as articulated in the R & R, this court agrees with the majority of our sister courts, and concludes that the appropriate standard for constitutional medical claims asserted by civilly committed sex offenders is the same deliberate indifference standard that applies to convicted prisoners and pretrial detainees. (*See id.* at 8 (collecting cases).) To the extent that this court has hinted otherwise, and inadvertently contributed to the confusion, *see Treat v. Cent. N.Y. Psychiatric Ctr.,* No. 9:12–cv–602, 2013 WL 6169746, at \*2 n. 4, \*3 (N.D.N.Y. Nov. 20, 2013) (noting the different standards, and indicating that individuals who have been involuntarily committed may be entitled to more considerate treatment and conditions of confinement than prison inmates, but not squarely or definitively deciding the appropriate standard), the court now clarifies which standard it finds appropriate.

**\*2** Accordingly, having found no clear error in the R & R, the court adopts it in its entirety.

### V. Conclusion

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 9, 2014 Report–Recommendation (Dkt. No. 21) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Kaskiw's motion for summary judgment (Dkt. No. 17) is **GRANTED;** and it is further

**ORDERED** that Ahlers' amended complaint (Dkt. No. 6) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendant Kaskiw's motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.Nos.17, 18), which plaintiff has opposed (Dkt. No. 20). This matter was referred to me for Report and Recommendation on January 31, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff Karl Ahlers is a civilly-committed sex offender, confined at the Central New York Psychiatric Center ("CNYPC"), in the custody of the New York State Office of Mental Health ("OMH"). Liberally construed, the amended complaint ("AC," Dkt. No. 6) alleges that, between July 2011 and September 2012, Dr. Kaskiw denied plaintiff an adequate diet and appropriate medical care, in violation of the Due Process Clause of the Fourteenth Amendment.[1] For the reasons set forth below, this court recommends that defendant's summary judgment motion be granted, and that the remaining claim set forth in plaintiff's amended complaint be dismissed.

[1]      Chief Judge Sharpe's Decision and Order dated April 19, 2013, dismissed various other claims against five additional defendants who were named in the amended complaint. (Dkt. No. 8 at 17).

### FACTS

The amended complaint alleges that, based on an improper diagnosis that plaintiff suffered from a nut allergy, he was kept on a restricted diet at CNYPC, which deprived him of certain foods that were provided to other residents. (AC ¶¶ 2–9, 26–27, 46–48). Plaintiff's requests to be taken off the restrictive diet and to be scheduled for allergy testing, to determine whether he was allergic to nuts, were denied by Dr. Kaskiw and others. (AC ¶¶ 10–18, 21, 28–35, 38). The amended complaint states that, as a result of the restricted diet, plaintiff lost an average of one pound per month since December 2010. (AC ¶¶ 45, 48). Plaintiff also alleges that the medical staff refused to continue to prescribe Lidex cream to address a persistent itchy rash on plaintiff's legs and feet. (AC ¶¶ 39, 41 & Exs. 23, 25; Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4). [2]

[2]      The amended complaint also alleges that Dr. Kaskiw ignored (1) a complaint from plaintiff on March 26, 2012 "concerning pain that had developed" in his arms, legs, and abdomen (AC ¶¶ 24–25 & Ex. 15); (2) a request on July 13, 2012 concerning a prescription for an ophthalmologist which plaintiff never received (AC ¶ 40 & Ex. 24); and (3) a July 22, 2102 letter noting plaintiff's problems climbing multiple flights of stairs, and requesting an elevator pass (AC ¶ 42 & Ex. 26). Neither plaintiff's amended complaint, nor his motion papers, provide further information regarding any negative impact on plaintiff's health or well-being resulting from the alleged lack of response to these complaints; hence, they clearly do not support a constitutional claim for inadequate medical care based on the legal standards discussed below.

When plaintiff was transferred to CNYPC in May 2009, his prior medical records from other facilities contained numerous references to his nut allergies and the fact that his diet was not to include, *inter alia,* nuts and honey. (Kaskiw Aff. ¶¶ 17, 18, Dkt. No. 17–4; AG DEF1–3, 11–12, Dkt. No. 18). [3] Based upon plaintiff's documented medical history, the CNYPC staff imposed an allergy-tailored diet plan that excluded foods to which plaintiff was allergic, including nuts and honey. [4] (Kaskiw Aff. ¶ 20, AG DEF–12, 13).

3    For example, an August 8, 2007 Nursing Assessment from the Manhattan Psychiatric Center noted that plaintiff had allergies to honey, rice, and nuts, which resulted in abdominal discomfort and vomiting. (AG DEF–2).

4    "Examples of products that might contain tree nuts include ... [h]oney ....“ USDA Food Allergy Fact Sheet, http:// www.nfsmi.org/documentlibraryfiles/ PDF/20130227020259.pdf. Plaintiff's medical records also indicate that he was allergic to bee stings, which may have influenced the exclusion of honey in his restricted diet. (AG DEF–12–13, 20).

*3  On or about November 7, 2011, plaintiff attended a medical appointment with Dr. Kaskiw, during which he objected to his allergy-tailored diet plan and requested to have the plan discontinued so that he could regulate his own diet. Dr. Kaskiw advised plaintiff that eliminating his dietary restrictions was not medically appropriate, would be in violation of facility policy, and would present a danger to plaintiff. Plaintiff also requested further allergy testing, which Dr. Kaskiw refused as medically unnecessary, given plaintiff's well-documented allergy history. (Kaskiw Aff. ¶ 21; AG DEF–15).

Plaintiff thereafter made repeated complaints to Dr. Kaskiw and other OMH officials, claiming that he had no food allergies, objecting to his restricted diet, and demanding allergy testing. (AC ¶¶ 12–23, 26–38). OMH consistently responded that a change in plaintiff's dietary restrictions and re-testing for allergies were not medically indicated given his history of nut allergies. (Kaskiw Aff. ¶¶ 22–23; AG DEF 31–38).

On or about November 13, 2012, two months after plaintiff filed this lawsuit, he was given a Radioallergosorbent ("RAST") test by an outside allergy testing laboratory. The RAST test was positive for a "Class III" peanut allergy, indicating a "moderate to strong" food allergy. (Kaskiw Aff. ¶¶ 24–26; AG DEF–16–17). Based on the re-testing results, CNYPC continued plaintiff on a restrictive diet, excluding peanuts and peanut by-products. (AG DEF–28–30).

Medical records from the Manhattan Psychiatric Center indicated that, as of August 2007, plaintiff weighed 236 pounds, and that the nursing staff was tasked with educating him about the importance of better dietary choices. (AG DEF–7–8). Upon his transfer to CNYPC on May 28, 2009,

plaintiff's height was 75.5 inches and his weight was 260 pounds, placing him in the "obese" category on the American Medical Association's Body Mass Index ("BMI") scale. (Kaskiw Aff. ¶¶ 34–35 & Ex. 2). Plaintiff's weight was gradually reduced to 216 pounds ("overweight" on the BMI scale) as of September 28, 2011; to 203 pounds (still "overweight") as of September 29, 2012; and to 194 pounds (a normal and healthy weight on the BMI scale) as of December 28, 2013. (Kaskiw Aff. ¶¶ 36–38 & Ex. 2). Dr. Kaskiw observed that plaintiff's "gradual and steady" weight loss over the course of four years "placed him in a vastly improved, medically desirable, healthy place." Dr. Kaskiw concluded that "there has been no need for treatment or medical intervention to curb or other[ ]wise address [plaintiff's] weight loss or dietary restrictions." (Kaskiw Aff. ¶ 39).

Dr. Kaskiw prescribed Lidex cream to plaintiff on January 9, 2012, based on his complaints of dry, scaly skin on his ankles/feet. (Kaskiw Aff. ¶ 43; AG DEF 20–22). [5] On July 30, 2012, CNYPC medical staff examined plaintiff, following his request for Lidex cream, and found dry and itchy skin on his legs, with four to five scattered small scabs. A nurse practitioner determined that a prescription for Lidex cream was not indicated, and suggested plaintiff use an over-the-counter skin moisturizer available through the facility's commissary. (Kaskiw Aff. ¶ 44; AG DEF–23). Plaintiff was examined again on August 21, 2012 and presented with a raised rash on his arm and scabbed areas on his calves. A nurse practitioner advised plaintiff to try a lower-potency steroid cream first, instead of Lidex. (Kaskiw Aff. ¶ 45; AG DEF–24–25). Plaintiff was seen again on November 27, 2012, still complaining of dry, itchy skin and a raised rash on his legs. Plaintiff was treated by a nurse practitioner with Benadryl, Bacitracin and Lac–Hydrin. (Kaskiw Aff. ¶ 46; AG DEF–26–27).

5    Lidex cream is a topical steroid anti-inflammatory medication often prescribed to relieve symptoms of eczema, such as itching or skin dryness. (Kasiw Aff. ¶ 42).

### DISCUSSION

## I. Summary Judgment

*4  Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord, 467 F.3d 263,

272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. Medical Care

### A. Applicable Law

In analyzing the contours of the constitutional standard applicable to medical care claims of civilly committed sex offenders, it is helpful to discuss first the standards applied by the courts when such claims are raised by convicted prisoners and pretrial detainees. In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994) [6], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4. [7]

[6] Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

[7] As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

**\*5** Civilly committed sex offenders are neither convicted inmates, nor "pretrial detainees." However, most of the judges in the Northern District of New York who have analyzed constitutional medical care claims by civilly committed sex offenders at CNYPC have relied upon *Caiozzo* in applying the same deliberate indifference standard applied by the Second Circuit to sentenced prisoners and pretrial detainees. *See, e.g., James v. Morgan,* 9:13–CV–526 (DNH/CFH), 2014 WL

841344, at *2 (N.D.N.Y. March 4, 2014)[8]; *Ali v. Hogan,* No. 9:12–CV–0104 (DNH/RFT), 2013 WL 5466302, at *4 (N.D.N.Y. Sept. 30, 2013); *Smith v. Carey,* No. 9:10–CV–1247 (NAM/TWD), 2012 WL 6923338, at *7 (N.D.N.Y. Dec. 28, 2012) (Rep't–Rec.), *adopted,* 2013 WL 237722 (N.D.N.Y. Jan. 22, 2013); *Balkum v. Sawyer,* No. 6:06–CV–1467 (NPM), 2011 WL 5041206, at *11 (N.D.N.Y. Oct. 21, 2011); *Smith v. Hogan,* No. 9:09–CV–554 (GTS/GHL), 2011 WL 4343978, at *8 (N.D.N.Y. Aug. 1, 2011) (Rep't–Rec .), *adopted,* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011). Some of our judges, however, have noted uncertainty as to whether a different standard for medical care claims of civilly committed persons should be applied, at least in the alternative, based on the Supreme Court's case in *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982) and its progeny. *See, e.g., Groves v. New York,* No. 9:09–CV–412 (GLS/DEP), 2010 WL 1257858, at *6, *8 (N.D.N.Y. Mar. 1, 2010) (persons in nonpunitive detention have a right to "reasonable medical care," a standard demonstrably higher than the Eighth Amendment standard that protects prisoners-"deliberate indifference to serious medical needs") (citing *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd,* 60 F.3d 812 (2d Cir.1995) (table)) (Rep't–Rec.), *adopted,* 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010).

[8]  "Because plaintiff was civilly committed at the time of the incident, his medical care claims are analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment..... Despite this distinction, the same standard applies to Fourteenth Amendment medical care claims involving non-prisoners as to Eighth Amendment medical claims regarding prisoners." *Id.* (citing, *inter alia, Caiozzo,* 581 F.3d at 72).

*Youngberg* considered the legal standard that should be applied to assess the claim asserted on behalf of a "mentally retarded" individual, who was involuntarily committed to a state institution, and whose substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation" were allegedly violated. *Youngberg,* 457 U.S. at 309. The Supreme Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. The Youngberg court

held that the standard articulated by Chief Judge Seitz in the lower court opinion under review

> ... affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

**\*6** *Id.* at 321 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J., concurring).

It does not appear that the Supreme Court or the Second Circuit have explicitly ruled on whether *Youngberg* would require the application of a different standard for constitutional medical care claims for civilly committed persons than is now applied to sentenced prisoners and pretrial detainees.[9] There is disagreement among other courts on this question. *See, e.g., Battista v. Clarke,* 645 F.3d 449, 453 & n. 4 (1st Cir.2011) (the opinions as to whether a different, more plaintiff-friendly reasonable-professional-judgment standard applies to civilly committed individuals, based on *Youngberg v. Romeo,* are "not uniform") (collecting cases).

[9]  In *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012), the Second Circuit discussed *Youngberg* in assessing prior civil rights claims of the plaintiff in this action relating to the seizure of certain of his DVDs by officials at CNYPC:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22.... However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." ... The state also has an interest in treating the civilly committed individual.... The reasonableness of the seizure in this case depends on a balance of interests: the state's interests in order, security, and treatment, and Ahlers's property interest in his discs..... In striking the appropriate balance, decisions

made by the Defendants are entitled to a " 'presumption of correctness.' "

This panel decision indicates the Second Circuit may still adhere to the general proposition that civilly committed individuals are entitled to more considerate conditions of confinement than convicted prisoners. However, it does not shed much light on the appropriate standard to apply to medical care claims of a civilly committed sex offender following the decision in *Caiozzo* that the deliberate indifference standard applies to pretrial criminal detainees.

This court is persuaded by the opinions in other circuits that *Youngberg,* when construed in light of subsequent Supreme Court cases, does not compel a different standard for medical care claims for civilly committed individuals and prisoners or pretrial detainees. *See, e.g., Scott v. Benson,* 742 F.3d 335, 339 (8th Cir.2014) (because the Supreme Court later said that *Youngberg* "did not deal with decisions to administer or withhold medical treatment[ ]," *Cruzan by Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279–80 (1990), we apply the deliberate indifference standard from the Eighth Amendment to the medical care claims of a civilly committed plaintiff); *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 646–47 (5th Cir.1996) (although *Youngberg* announced a distinct standard to be applied in measuring the state's constitutional duties to mental incompetents, the Court's later decision in *DeShaney,* called into question the constitutional significance of the *Youngberg* decision) [10] (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199–200 (1989)). *See also Serna v. Goodno,* 567 F.3d 944, 949 (8th Cir.2009) (applying the Fourth Amendment standard applicable to a pretrial detainee to a civil detainee, based on an analogy drawn by the *Youngberg,* 457 U.S. at 320–21, between pretrial detainees and civilly committed persons, as two groups that could be subjected to liberty restrictions "reasonably related to legitimate government objectives and not tantamount to punishment") [11]. However, like the Fifth Circuit in *Hare,* 74 F.3d at 647, I need not resolve whether the professional judgment standard suggested by *Youngberg* has continuing vitality in the context of medical care claims, because, as discussed below, the standard is not substantially different from "deliberate indifference," and both would produce the same outcome on the facts of this case.

[10]     "*DeShaney* clarified that '[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions

of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.' 489 U.S. at 200.... In other words, *DeShaney* suggests that a State's declared intent to confine incompetents for their own benefit, as opposed to its announced purpose to punish convicted criminals, should have no bearing on the nature of the constitutional duty owed to either group.... Since the State restrains the individual liberty of both mental incompetents and convicted inmates in a like manner, the State should incur the same duties to provide for the basic human needs of both groups." *Hare,* 74 F.3d at 647. In holding that the "deliberate indifference" standard applies to claims that a pretrial detainee was deprived of basic human needs, including medical care, the Fifth Circuit also noted that subsequent Supreme Court cases such as *Farmer,* which articulated the deliberate indifference standards for prisoners, "cast doubt on the vitality of *Youngberg." Id.* As noted above, the Second Circuit in *Caiozzo* relied on *Hare* and *Farmer* in deciding to apply the deliberate indifference standard to pretrial detainees asserting medical care claims.

[11]     "The similarity in the grounds for detaining persons awaiting trial and persons determined to be sexually dangerous supports application of the analogy to pretrial detainees ...." *Serna v. Goodno,* 567 F.3d at 948.

### 1. Deliberate Indifference

The objective prong of the deliberate indifference standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining

2014 WL 4184752

when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

**\*7** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### 2. Professional Judgment

Chief Judge Seitz's concurring opinion in the Third Circuit elaborated on the professional judgment standard adopted, on review, by the Supreme Court in *Youngberg:*

[T]he defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.... By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that the choice in question was not a sham or otherwise illegitimate.... The 'substantial departure from accepted professional judgment' standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.

**\*8** *Romeo v. Youngberg,* 316 F.3d at 178. I agree with the judges who have parsed this standard and have concluded that it is not "all that far apart" from the deliberate indifference standard articulated in *Farmer.* See, e.g., *Battista v. Clarke,* 645 F .3d at 453 ("[b]oth the *Farmer* and *Youngberg* tests leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"). *See also Groves v. New York,* 2010 WL 1257858, at \*6 (concluding that "[a]t a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed" and focusing on the "deliberate indifference" standard in reviewing the medical care claim of the civilly-committed CNYPC sex offender).

I would respectfully disagree with the 1993 Eastern District of New York opinion in *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. at 1043, and other cases to the extent they suggest that *Youngberg* imposed a "reasonable medical care" standard for civil detainees that is "demonstrably higher" than the Eighth Amendment deliberate indifference standard. [12] Such a "reasonable medical care" "is easily confused" with a negligence or medical malpractice standard that was clearly not intended by the Court in *Youngberg. Hare v. City of Corinth, Miss.,* 74 F.3d at 646.

12  *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/ DEP), 2007 WL 527320, at \* 1 (N.D.N.Y. Feb. 20, 2007) distinguished *Haitian Centers* because it dealt with immigration issues and was "wholly outside the context of prisoner litigation." *Owens v. Colburn,* 860 F.Supp. at 974, a 1994 Northern District of New York case which applied the

"reasonable medical care" standard to pretrial detainees, was clearly overruled by the Second Circuit's 2009 opinion in *Caiozzo,* which held that the "deliberate indifference" standard should apply in that context.

### B. Analysis

Pursuant to the legal analysis above, this court will evaluate plaintiff's complaints about his medical care primarily under the "deliberate indifference" standard applicable both to prisoners under the Eighth Amendment and to persons in non-punitive detention under the Due Process Clause. However, in the alternative, I will also assess how plaintiff's claims would fare under the "professional judgment" standard, to the extent that applies to civilly committed individuals.

### 1. Restrictive Diet/Weight Loss

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health .... While prison officials are duty bound to provide inmates with nutritionally adequate food, 'absent religious or medical [ly] peculiar circumstances, a prisoner does not have a right to a specialized diet while incarcerated[.]' " *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/DEP), 2007 WL 527320, at *10 (N.D.N.Y. Feb. 20, 2007) (citations omitted). Prison officials have the discretion to control a prisoner's diet within these constitutional constraints, and " '[p]reference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.' " *Collado v. Sposato,* No. 12–CV–2151, 2012 WL 3113837, at *4 (E.D.N.Y. July 24, 2012) (quoting *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001)). To establish a deliberate indifference claim with respect to a medically prescribed diet, " 'one must establish that there was a sufficiently serious condition that resulted from the food not being received.' " *Gaines v. Armor Health Care, Inc.,* No. 12–CV–4666, 2012 WL 5438931, at *5 (E.D.N.Y. Nov. 2, 2012) (citing, *inter alia, Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400 (GTS/DEP), 2009 WL 1401645, at * 9 (N.D.N.Y. May 14, 2009)).

**\*9** As discussed above, plaintiff Ahlers was placed on a restricted diet based on nut allergies that were clearly documented in his medical records and that were eventually confirmed by independent laboratory testing, albeit after plaintiff filed this action. The only medical consequence of the restricted diet imposed on plaintiff was that, over the course of more than four years, he gradually lost 66 pounds,

going from a body weight that was classified as "obese" on the BMI scale, to a normal and healthy weight of 194 pounds. While "rapid weight loss or weight loss coupled with other conditions may present a serious medical condition[,]" [13] plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at *10 (even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period the court concludes that there is no evidence in the record from which a reasonable fact finder could conclude that plaintiff's " 'weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation' ") (citing *Bost v. Bockelmann,* 2007 WL 527320, at *8).

13
    *See, e.g., Anderson v. Kooi,* No. 9:07–CV–1257 (DNH/GHL), 2011 WL 1315721, at *12 (N.D.N.Y. Jan. 24, 2011) (citing *Kaminsky v. Rosenblum,* 929 F.2d 922, 924, 926–27 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss)) (Rep't Rec.), *adopted,* 2011 WL 1256942 (N.D.N.Y. Apr. 1, 2011).

The defendant and the OMH staff did not violate plaintiff's constitutional rights by imposing a diet on plaintiff that was contrary to his medical needs. Rather, they restricted plaintiff's diet in a manner that was reasonably consistent with his documented food allergies. As noted above, Dr. Kaskiw made a medical judgment that the restricted diet was medically necessary and that the resulting weight loss greatly improved plaintiff's overall health. Plaintiff's disagreement with Dr. Kaskiw's treatment decisions, even if it had some factual support (which it does not), clearly is not sufficient to create an issue of fact about whether plaintiff could establish the subjective element of the deliberate indifference standard. *See, e.g., Bost v. Bockelmann,* 2007 WL 527320, at *10 ("[to the extent that plaintiff complains about having been prescribed a high protein diet, as distinct from the high calorie intake diet which he sought in order to secure extra portions of food, the claim fails to rise to a level of constitutional significance, instead merely representing the sort of disagreement with a prescribed course of treatment that does not establish a defendant's deliberate indifference"). Even if there were occasional issues as to how plaintiff's restricted diet was implemented by food services workers

at CNYPC (who are not, in any event, defendants in this action), such arguably negligent oversight of plaintiff's food choices would not constitute deliberate indifference. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at * 11 (the evidence is lacking that any prison medical personnel or food service providers were cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed diet would result in a substantial risk of serious harm); *Gaines v. Armor Health Care, Inc.,* 2012 WL 5438931, at *5–6.

**\*10** Moreover, no reasonable fact finder could conclude that Dr. Kaskiw's medical care of plaintiff reflected such a "substantial departure from accepted professional judgment" as to make his treatment choices "a sham or otherwise illegitimate." [14] Hence, even if the "professional judgment" standard suggested by *Youngberg* applied to plaintiff's medical claims, defendant is still entitled to summary judgment.

[14]    This is part of Chief Judge Seitz's formulation of the "professional judgment" standard that was adopted by reference by the Supreme Court in *Youngberg. Romeo v. Youngberg,* 316 F.3d at 178; *Youngberg v. Romeo,* 457 U.S. at 321.

### 2. Lidex Cream

No rational fact finder could conclude, on the record in this case, that plaintiff's complaints about the treatment of his skin rash and eczema at CNYPC met either the objective or subjective prongs of the deliberate indifference test. [15] Plaintiff's skin condition is clearly not a sufficiently serious medical condition to meet the objective element of this standard. *See, e.g., Melendez v. Costello,* No. 6:12–CV–6226, 2013 WL 5937052, at *7 (W.D.N.Y. Nov. 1, 2013) ("[p]laintiff cannot establish the 'serious medical need' component of a deliberate indifference claim based on his eczema" (citing *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) ("Sledge failed to produce sufficient evidence that any one of the conditions complained of [i.e., eczema, back pain, stomach disorders, allergies, and asthma] qualified as a 'serious medical need.' ")); *Samuels v. Jackson,* 97–CV–2420, 1999 WL 92617, at *1–3 (S.D.N.Y. Feb. 22, 1999) (prisoner's "[p]apules, vesicles, pustules, burrows, and intense itching resulting in eczema" did not constitute a sufficiently "serious medical need" for purposes of Eighth Amendment). Nor, based on the authority cited above, is plaintiff's disagreement with his medical care providers about

the appropriate medication for his skin condition sufficient to create a factual issue as to whether they harbored subjective deliberate indifference to his serious medical needs. [16] To the extent that the "professional judgment" standard suggested by *Youngberg* applies to plaintiff's medical care claim, the treatment of plaintiff's skin condition with more conservative medications than the one he preferred certainly does not constitute a "substantial departure from accepted professional judgment."

[15]    Plaintiff's response to defendant Kaskiw's summary judgment motion suggests that he may dispute that his skin condition was treated at various times, albeit with medications other than those he requested. (Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4 ("it took almost one full year to treat my itchy rash on both legs and feet!")). Given the affidavits submitted by defendant Kaskiw and the supporting medical records, plaintiff's unsupported suggestion that he may have not received the documented treatment for his skin condition does not create an issue of fact that would defeat the summary judgment motion. *See, e.g., Benitez v. Pecenco,* No. 92 Civ. 7670, 1995 WL 444352 at *7 n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record). *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and

thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

16    As discussed in the factual summary above, the nurse practitioners who denied plaintiff the Lidex cream originally prescribed by Dr. Kaskiw, are not named defendants in this case. Although Dr. Kaskiw may have supervised the nurse practitioners at CNYPC, it does not appear that he was personally involved in denying Lidex cream to plaintiff, which would provide further support for granting defendant Kaskiw's motion for summary judgment with respect to this aspect of plaintiff's medical care claim. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff alleged that Dr. Kaskiw ignored two letters that plaintiff wrote requesting treatment with Lidex cream. (AC ¶¶ 39, 41). It is well-settled that the failure of a supervisory official to respond to a letter of complaint written by an inmate is not sufficient to show personal involvement. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)

(collecting cases); *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant Kaskiw's motion for summary judgment (Dkt. Nos.17, 18) be **GRANTED** on the grounds stated herein, and that the remaining claims in plaintiff's amended complaint be **DISMISSED** in their entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

*11  Dated: July 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4184752

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 628784

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Lara v. Bloomberg,  S.D.N.Y.,  January 8, 2008

2004 WL 628784
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William PABON and Felix Manuel
Ruiz, a/k/a Pedro Ruiz, Plaintiffs,

v.

Dr. Lester WRIGHT, Dr. Norman Selwin, Dr.
John Charles Bendheim, Dr. Vincent Marrone,
Dr. Henry Manis, Dr. Andrew Miller, Dr. Charles
Rush, Dr. Bharat Dasani, Dr. Ravi Hotchandani,
Dr. Robert Rosenzweig, Dr. Koenigsmann, Dr.
Chakorvorty, Dr. Phillip Marrone, Jacqueleine
A. Bodzak, and Catherine Metzler, Defendants.

No. 99 Civ.2196(WHP).
|
March 29, 2004.

**Synopsis**

**Background:** Two pro se state prisoners sued prison
physicians and private consulting physicians, alleging that
they violated Eighth Amendment by providing inadequate
treatment for prisoners' Hepatitis C. Physicians moved for
summary judgment.

**[Holding:]** The District Court, Pauley, held that prisoners'
allegations did not evince deliberate indifference to their
conditions.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (2)

**[1]**    **Prisons**  🔑  Particular Conditions and
Treatments

**Sentencing and Punishment**  🔑  Medical
Care and Treatment

State prisoners' allegations that physicians failed
to advise them of risks associated with use of
Interferon to treat Hepatitis C, and improperly
"forced" them to undergo liver biopsies before
beginning Interferon treatment, did not evince
deliberate indifference to prisoners' conditions,
as required to support claims for violation of
Eighth Amendment; allegations amounted to
claims for mere negligence or, at most, medical
malpractice. U.S.C.A. Const.Amend. 8.

29 Cases that cite this headnote

**[2]**    **Prisons**  🔑  Particular Conditions and
Treatments

**Sentencing and Punishment**  🔑  Medical
Care and Treatment

State prisoners' allegations that physicians
delayed treatment of their Hepatitis C by
requiring them to undergo prerequisite liver
biopsies did not evince deliberate indifference
to prisoners' conditions, as required to support
claims for violation of Eighth Amendment;
evidence of minimal delays in treatment
suggested at most several acts of negligence.
U.S.C.A. Const.Amend. 8.

26 Cases that cite this headnote

**Attorneys and Law Firms**

Mr. William Pabon, Green Haven Correctional Facility,
Drawer B, Stormville, NY, Legal Mail, Plaintiff pro se.

Mr. Felix Manuel Ruiz, Greenhaven Correctional Facility,
Drawer B, Stormville, NY, Legal Mail, Plaintiff pro se.

Jerry Slater, Donald Nowve, Assistant Attorney General for
the State of New York, New York, NY, for State defendants.

Michael F. Madden, Wayne L. Gladstone, Martin, Clearwater
& Bell, New York, NY, for defendants Drs. Robert
Rosenzweig, Vincent Marrone, Bhart Dasani, and Ravi
Hotchandani.

*ORDER*

PAULEY, J.

**\*1** Plaintiffs *pro se* William Pabon and Felix Manuel Ruiz (collectively, "plaintiffs") bring this action against defendants Dr. Lester Wright, Dr. Norman Selwin, Dr. John Charles Bendheim, Dr. Henry Manis, Dr. Andrew Miller, Dr. Charles Rush, Dr. Koenigsmann, Dr. Chakorvorty, Dr. Phillip Marrone, Jacqueline A. Bodzk and Catherine Metzler (collectively, the "State Defendants"), and defendants Dr. Bharat Dasani, Dr. Ravi Hotchandani, Dr. Vincent Marrone, and Dr. Robert Rosenzweig (collectively, the "Private Physician Defendants"), pursuant to 42 U.S.C. § 1983, alleging that defendants violated their Eighth and Fourteenth Amendment [1] rights through inadequate treatment of their Hepatitis C conditions. Currently before this Court are defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendants' motions are granted.

[1] Plaintiffs' claim that defendants' indifference to their medical needs violated their Fourteenth Amendment rights. The only relevance of plaintiffs' Fourteenth Amendment claim is that the Due Process clause "makes the Eighth Amendment's bar on cruel and unusual punishments applicable to the states." *Johnson v. Wright,* 234 F.Supp.2d 352, 358 (S.D.N.Y.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Accordingly, this Court treats plaintiffs' pleadings as substantively raising only a claim under the Eighth Amendment. *See Estelle,* 429 U.S. at 101.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed, and are derived from the parties' 56.1 statements, affidavits, and other submissions. Plaintiffs are inmates at Green Haven Correctional Facility ("Green Haven"). The State Defendants are medical professionals and consultants at Green Haven. The Private Physician Defendants are affiliated with Dutchess Gastroenterologists, P.C., and examined plaintiffs in a consulting capacity upon referrals from the State Defendants at Green Haven.

### A. *Pabon*

On October 25, 1996, a blood test performed at Green Haven indicated that Pabon may have contracted Hepatitis C, a chronic viral liver disease that can result in inflamation, scarring, and ultimately cirrhosis of the liver. In May 1997, Pabon was referred to Dutchess Gastroenterologists for further testing and treatment for Hepatitis C, and for a possible liver biopsy. On May 21, 1997, Dr. Rosenzweig saw Pabon at Dutchess Gastroenterologists for an evaluation at the request of Green Haven's medical staff. The consultation request from Green Haven indicated that Pabon had a history of Hepatitis C, with mildly elevated findings on liver function tests. Dr. Rosenzweig recommended that Pabon submit to additional tests to confirm the initial diagnosis of Hepatitis C and to screen for HIV. Pabon contends that Dr. Rosenzweig "forced [him] to undergo numerous diagnostic tests." (Pabon 56.1 ¶ 7.) Dr. Rosenzweig also advised that Pabon should return for a follow-up evaluation in two months.

Pabon's tests confirmed the Hepatitis C diagnosis, and he returned to Dutchess Gastroenterologists for evaluation on July 30, 1997. Dr. Hotchandani provided Pabon with information on Hepatitis C and Interferon, a medication for the treatment of Hepatitis C. Additionally, Dr. Hotchandani discussed with Pabon the need for a liver biopsy to assess the state of his liver as a prerequisite to beginning Interferon treatment. On October 9, 1997, Pabon underwent a liver biopsy in order to be eligible for Interferon treatment, and to screen for other liver diseases. (Affidavit of Michael T. Lofredo, Esq., dated January 9, 2003 ("Lofredo Aff.") Ex. E: Letter from Pabon to Dr. Marrone, dated September 15, 1997.) Pabon contends that he was "forced" to undergo the liver biopsy. (Pabon 56.1 ¶ 7.)

**\*2** Dr. Dasani of Dutchess Gastroenterologists evaluated Pabon on November 12, 1997, and explained that Pabon's liver biopsy showed mild Hepatitis C. While Dr. Dasani does not recall a specific conversation with Pabon informing him of the side effects, risks, and complications associated with Interferon, he notes that it is his custom and practice to do so with all patients being treated with Interferon. (Affidavit of Michael T. Loffredo, Esq., dated Jan. 9, 2003 ("Loffredo Aff.") Ex. H: Responses to Plaintiffs' Second Stage Interrogatories, dated Apr. 23, 2002, ¶¶ 3–4.) Pabon claims that he was not informed about Interferon's potential side effects. (Pabon 56.1 ¶ 9.) Dr. Dasani prescribed Interferon for Pabon, ordered a blood count test, and advised that Pabon should return for a follow-up evaluation in two weeks. A few days later, Pabon began receiving Interferon injections at Green Haven.

On December 3, 1997, Dr. Dasani examined Pabon again at Dutchess Gastroenterologists for complaints of gastric pain. Dr. Dasani conducted a physical examination and diagnosed Pabon with dyspepsia with abdominal pain. Dr. Dasani recommended Pabon for an EGD and advised that Pabon should take Zantac with the Interferon.

Pabon returned to Dutchess Gastroenterologists on February 10, 1998, with complaints of continuing gastric pain. Dr. Rosenzweig performed an endoscopy on Pabon which revealed mild erythema without erosions or ulcers. Pabon was still on his Interferon treatment at that time.

On October 28, 1998, Dr. Rush, the consulting infectious disease specialist for Green Haven, examined Pabon, and recommended the addition of Ribavarin, another drug for the treatment of Hepatitis C, because he believed Pabon's response to the Interferon was not complete. As a result, on November 4, 1998, Ribavarin was added to the melange of drugs administered to Pabon at Green Haven. On March 31, 1999, Dr. Rush conducted further testing on Pabon, and the results indicated Pabon's Hepatitis C was successfully being suppressed. In October 1999, Dr. Rush recommended the discontinuance of Interferon and Ribavarin because Pabon had a complete response to the drug therapy. On November 17, 1999, Pabon's Hepatitis C drug therapy was discontinued. Since that time, Dr. Rush has tested Pabon several times, reported that Pabon's Hepatitis C is likely cured, and recommended yearly monitoring for any reoccurrence of the condition.

Pabon contends that he experienced "dizziness, vomiting, pain in his abdominal area, severe headaches and other ailments as a result of undergoing the liver biopsy," (Pabon 56.1 ¶ 14), and that he suffered "severe and chronic depression, pain, suicidal tendencies, exacerbation of existing mental conditions, neuropathy, ejaculation problems, and marital problems," due to his Interferon treatment. (Pabon 56.1 ¶ 15.)

### B. Ruiz

Coincidentally, Ruiz was also diagnosed with Hepatitis C in May 1997. As with Pabon, the Green Haven physicians referred Ruiz to Dutchess Gastroenterologists to confirm the presence of Hepatitis C and to determine whether he was medically fit for Interferon treatment. Dr. Rosenzweig of Dutchess Gastroenterologists saw Ruiz once on July 16, 1997, when he was referred by Green Haven with a history of Hepatitis C and mildly elevated findings on liver function tests. Dr. Rosenzweig recommended that Ruiz have blood tests to detect other liver diseases and to screen for HIV. Dr. Rosenzweig also recommended Ruiz undergo a liver biopsy to determine whether a prescription of Interferon would be appropriate.

**\*3** On December 10, 1997, Ruiz returned to Dutchess Gastroenterologists, where Dr. Hotchandi examined him and recommended that he undergo a liver biopsy to assess the state of his liver before beginning on Interferon. Ruiz underwent a liver biopsy on April 1, 1998 at St. Francis Hospital, and began Interferon treatments on July 1, 1998.

On October 21, 1998, Dr. Rush of Green Haven examined Ruiz and recommended that Ruiz begin dual drug therapy with Ribavarin and Interferon to better treat his Hepatitis C. In November 1998, the Green Haven physicians began Ruiz on a treatment of Ribavarin and Interferon. On December 16, 1998, Dr. Rush examined Ruiz and noted that he was reacting positively to the dual therapy. On February 17, March 31, and October 20, 1999, Dr. Rush examined Ruiz again and recorded further decreases in his Hepatitis viral load. Ruiz completed one year of Ribavarin and Interferon treatment on November 18, 1999. Ruiz was examined by Dr. Rush on December 15, 1999, and July 26, 2000, and was recommended for routine monitoring of his condition. On April 25, 2001, Dr. Rush examined Ruiz a final time and noted that Ruiz's Hepatitis C viral load was at maximum suppression. On June 19, 2001 and November 2, 2002, Green Haven administered liver function tests to Ruiz, which indicated normal liver function.

While Ruiz was on dual drug therapy, he complained of weight loss and foot pain. The Green Haven physicians prescribed him analgesic medications and Ensure, a dietary supplement, to treat those conditions.

Ruiz contends that he experienced "dizziness, vomiting, pain in his abdominal area, severe headaches and other ailments as a result of undergoing the liver biopsy," (Ruiz 56.1 ¶ 12), and that he suffered "severe and chronic depression, pain, suicidal tendencies, exacerbation of existing mental conditions, neuropathy, ejaculation problems, and marital problems," due to his Interferon treatment. (Ruiz 56.1 ¶ 13.)

### DISCUSSION

## I. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The movant may meet this burden by demonstrating a lack of evidence to support the nonmovant's case on a material issue on which the nonmovant has the burden of proof. *Celotex,* 477 U.S. at 323.

**\*4** To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Matsushita Elec.,* 475 U.S. at 587. In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255. Although the same standards apply when a *pro se* litigant is involved, such a litigant is given "special latitude in responding to a summary judgment motion." *Gonzalez v. Long,* 889 F.Supp. 639, 642 (E.D.N.Y.1995); *see also Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment").

## II. *Eighth Amendment*

Plaintiffs argue that the State Defendants and Private Physician Defendants who evaluated them failed to adequately treat their Hepatitis C in violation of the Eighth Amendment. "To establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)

(quoting *Estelle V. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "The standard of deliberate indifference includes both subjective and objective components," and plaintiffs must satisfy both conditions in order to be successful against the defendants. *Chance,* 143 F.3d at 702; *accord Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). First, each plaintiff must show that "his medical condition is objectively a serious one." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citing *Estelle,* 429 U.S. at 104). Second, each plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." *Brock,* 315 F.3d at 162 (citing *Estelle,* 429 U.S. at 104).

### A. *Serious Medical Condition*

Under the objective prong of the analysis, a prisoner must demonstrate that the alleged medical need is "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*"Hathaway I"* ); *accord Brock,* 315 F.3d at 162. A condition constitutes a serious medical need under the Eighth Amendment if it is a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Morales v. Macklam,* 278 F.3d 126, 132 (2d Cir.2002). An inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do[es] [this Court] require a showing that his or her condition will degenerate into a life threatening one." *Brock,* 215 F.3d at 163.

**\*5** It is well-established that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002) (holding that Hepatitis C constitutes an objectively serious medical condition); *McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at \*8 (S.D.N.Y. Mar. 4, 2002) (same) (citing cases); *Carbonell v. Goord,* 99 Civ. 3208(AJP), 2000 WL 760751, at \*9 (S . D.N.Y. June 13, 2000) (same). Accordingly, as it is undisputed that plaintiffs each carried Hepatitis C, and that this action arises from defendants' treatment of that virus, plaintiffs have demonstrated a sufficiently serious medical need under the Eighth Amendment.

### B. *Deliberate Indifference*

The subjective component of "the deliberate indifference standard requires the plaintiff[s] to prove that the [defendants] knew of and disregarded ... [their] serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837);

2004 WL 628784

*accord Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ( *"Hathaway II"* ). In order to be found "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer,* 511 U.S. at 837. Proof of deliberate indifference may be found where a defendant "intentionally den[ies] or delay[s] access to medical care or intentionally interfer[es] with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05; *accord Farmer,* 511 U.S. at 847 (deliberate indifference standard satisfied where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").

Deliberate indifference requires intentional or criminally reckless conduct; negligent conduct is insufficient to satisfy the standard. *Farmer,* 511 U.S. at 835–40; *Hathway II,* 99 F.3d at 553 (deliberate indifference may be shown through "culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm." ' ). Thus, "[b]ecause the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, or, allegations of medical malpractice or negligent treatment are insufficient to state a claim under [S]ection 1983." *Johnson v. Newport Lorillard,* 01 Civ. 9587(SAS), 2003 WL 169797, at *2 (S.D.N.Y. Jan. 23, 2003); *accord Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of mistreatment under the Eighth Amendment."); *Chance,* 143 F.3d at 703 ("Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."); *Hathway II,* 99 F.3d at 553 ("[M]ere medical malpractice is not tantamount to deliberate indifference.").

*6 Moreover, it is well-established that "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *accord McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at *7 (S.D.N.Y. Mar. 4, 2002). While an incarcerated person is entitled to receive adequate medical care, he is not required to receive the same standard of medical care found in outside hospitals. *Archer v. Dutcher,* 733 F.2d

14, 17 (2d Cir.1984); *see also United States ex. rel. Hyde v. McGinnis,* 429 F.2d 864, 867–68 (2d Cir.1970) (an inmate is not entitled to the "type or scope of medical care which he personally desires"). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance,* 143 F.3d at 703.

Plaintiffs' action is predicated upon: (i) defendants' alleged failure to provide them with adequate medical treatment after they were each diagnosed with Hepatitis C by improperly conditioning the prescription of Interferon on their consent to a liver biopsy; (ii) defendants' alleged failure to inform them of Interferon's risks and side effects; and (iii) defendants' allegedly unreasonable delay in treating them. Even resolving all doubts in favor of plaintiffs, their allegations of defendants' medical indifference to their Hepatitis C conditions do not rise to the level of "deliberate indifference."

### i. Interferon

[1] Plaintiffs' claims that the defendants failed to advise them of Interferon's risks and improperly "forced" them to undergo a liver biopsy as a prerequisite to beginning Interferon treatment, amount to claims for mere negligence or, at most, medical malpractice. As noted, it is axiomatic that claims for negligence or negligence amounting to medical malpractice do not satisfy the "deliberate indifference" standard. *See, e.g., Estelle,* 429 U.S. at 105 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hernandez,* 341 F.3d at 144 (" 'Deliberate indifference' describes a mental state more blameworthy than negligence."); *Chance,* 143 F.3d at 703 (same); *McKenna,* 2002 WL 338375, at *6 (finding defendant's medical judgment did not constitute deliberate indifference to plaintiff's Hepatitis C condition). Indeed, "[d]isagreements over medications, diagnostic techniques ... forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a [Section] 1983 claim. These issues implicate[ ] medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Estelle,* 429 U.S. at 107; *accord Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000).

*7 Essentially, plaintiffs' complaints about defendants' treatment of their Hepatitis C with Interferon, and the "forceable" liver biopsy and blood tests they underwent, evince a difference in opinion as to how defendants should have treated their Hepatitis C. It is undisputed that defendants examined plaintiffs numerous times over several years,

administered diagnostic tests, and prescribed medications to treat plaintiffs' Hepatitis C. Indeed, the treatment prescribed by defendants was adequate as it successfully suppressed Hepatitis C in both plaintiffs. *Chance,* 143 F.3d at 703 (so long as the treatment administered is adequate, differences in opinion over the proper treatment does not create an Eighth Amendment claim).

Instead of turning a blind eye to plaintiffs' Hepatis C condition, the defendants evaluated plaintiffs, and conducted diagnostic tests to evaluate the proper treatment for plaintiffs. Defendants determined, in their medical judgment, that a liver biopsy would be necessary to evaluate whether plaintiffs were good candidates for Interferon treatment. (Expert Affirmation of Ivan Kahn, M.D., dated Oct. 10, 2002 ("Kahn Aff.") ¶¶ 13–16, Ex. A; Affirmation of Vincent Marrone, M.D. ("Marrone Aff.") ¶ 6.) That the defendants "forced" plaintiffs to submit to a biopsy and Interferon treatment, as plaintiffs contend, is of no moment since those complaints amount to nothing more than a claim for negligence or a question about defendants' medical judgements, which are insufficient to constitute deliberate indifference under the Eighth Amendment. *Estelle,* 429 U.S. at 107; *Hathaway II,* 99 F.3d at 553. Similarly, even accepting as true plaintiffs' contention that defendants failed to inform plaintiffs of Interferon's side effects and risks, those contentions also only amount to negligent conduct. *Chance,* 143 F.3d at 703; *Hathaway II,* 99 F.3d at 553. Indeed, the record is devoid of even an inference of intentional or criminally reckless conduct by the defendants. *Hathaway II,* 99 F.3d at 553. "In essence, rather than knowing of and disregarding an excessive risk to [p]laintiff[s'] health and safety ..., the physicians acted pursuant to their medical judgment to protect [p]laintiff[s'] health. Such conduct does not constitute deliberate indifference." *McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002); *accord Estelle,* 429 U .S. at 107 (holding plaintiff's claims of deliberate indifference against defendant physician insufficient where plaintiff was seen by medical personnel repeatedly over several months).

### ii. *Delay*

**[2]** Plaintiffs also argue that defendants were deliberately indifferent to their medical needs by: (i) failing to promptly treat their Hepatitis C condition; and (ii) delaying their prescriptions for Interferon treatment by requiring them to undergo a prerequisite liver biopsy. Accepting plaintiffs' contentions as true, their argument that defendants delayed in administering medical treatment is insufficient to satisfy the "deliberate indifference" standard.

**\*8** Viewing the facts in the light most favorable to plaintiffs and drawing every reasonable inference in their favor, the evidence as to minimal delays in defendants' treatment of plaintiffs' Hepatitis C suggests at most several acts of negligence, insufficient to support an Eighth Amendment violation. *Farmer,* 511 U.S. at 835; *Hernandez v. Keane,* 341 F.3d 137, 146 (2d Cir.2003). "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau County Correctional Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting *Chance,* 143 F.3d at 703). Further, "a delay in treatment does not necessarily invoke the Eighth Amendment. The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed medical care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Espinal v. Coughlin,* 98 Civ. 2579(RPP), 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (no deliberate indifference of treatment for ruptured ACL, a common knee injury, where surgery was delayed for three years) (quotation omitted); *accord Hathaway I,* 37 F.3d at 68–69 (finding an inference of deliberate indifference to plaintiff's chronic hip pain where defendant knowingly withheld for two years relevant information that plaintiff had broken pins in his hip from an earlier surgery).

Here, there is no evidence that defendants consciously disregarded a substantial risk of serious harm through deliberate delay of treatment. For example, defendants evaluated Pabon and Ruiz every two to three months, prescribed them Interferon, evaluated their respective responses to the medication, and prescribed Ribavarin to successfully treat their Hepatitis C. As noted, the treatments defendants prescribed were successful. Defendants treated both Pabon and Ruiz for other ailments allegedly related to their Hepatitis C treatment as well. Both plaintiffs continue to be monitored for any relapse of their conditions. The delays plaintiffs complain of amount to, at most, negligence, and are not actionable under the Eighth Amendment. *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *see also Walker v.. Kubicz,* 996 F.Supp. 336, 341 (S.D.N.Y.1998) (failure to promptly treat pneumonia not deliberate indifference where defendants made a preliminary diagnosis, prescribed a course of

treatment, and advised plaintiff to return for a follow-up examination).

Plaintiffs also complain that defendants delayed in prescribing them Interferon by conditioning any prescription on their submission to a liver biopsy. As noted, that defendants conditioned any prescription of Interferon on a "compulsory" liver biopsy, as plaintiffs contend, relates to medical judgments defendants made to ensure that Interferon treatment was appropriate for plaintiffs. (Kahn Aff. ¶¶ 13–16, Ex. A.; Marrone Aff. ¶ 6.) Allegations of negligent medical judgments amounting to medical malpractice do not meet the deliberate indifference standard necessary to sustain an Eighth Amendment action. *Estelle,* 499 U.S. at 105–07; *Hodge v. Coughlin,* 92 Civ. 0622(LAP), 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd* 52 F.3d 310 (2d Cir.1995); *McKenna,* 2002 WL 338375, at *7. If anything,

defendants' conduct "demonstrates a routine performance of routine medical responsibilities, not deliberate indifference to medical needs." *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Accordingly, plaintiffs cannot sustain an Eighth Amendment claim against any of the defendants.

*CONCLUSION*

**\*9** For the reasons set forth above, defendants' motions for summary judgment are granted. The Clerk of the Court is directed to mark this action closed.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 628784

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 270 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

2019 WL 7602181
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose TORRES, Plaintiff,
v.
CITY OF NEW YORK, Captain Johnson,
individual, Officer Lewis, individual, and
Officer Durity, individual, Defendants.

17cv6604 (GBD) (DF)
|
Signed 08/14/2019

**Attorneys and Law Firms**

Jose M. Torres, Coxsackie, NY, pro se.

Carolyn Kay Depoian, Samantha Rena Millar, NYC Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

 **\*1** In this action, *pro se* plaintiff Jose Torres ("Plaintiff"), asserts claims against defendants City of New York (the "City"), Captain Timothy Johnson ("Johnson"), Officer Junior Lewis ("Lewis"), and Officer Dave Durity ("Durity") and, together with Johnsen and Lewis, the "Officer Defendants") (all, collectively, "Defendants") under 42 U.S.C. § 1983, based on alleged deprivations of Plaintiff's constitutional rights in connection with a March 1, 2016 body-cavity search (with the forcible removal of contraband from his rectum) to which Plaintiff was subjected while he was in custody at the Anna M. Kross Center (the "AMKC") on Rikers Island. (Complaint, dated Aug. 16, 2017 ("Compl.") (Dkt. 2).) Currently before the Court is a motion by Defendants for summary judgment, seeking dismissal of all of the claims asserted against them. (Dkt. 38.) For the reasons discussed below, I recommend that Defendants' motion be granted.

**BACKGROUND**

**A. Factual Background** [1]

[1] The facts summarized herein are primarily drawn from the parties' statements pursuant to Local Civil Rule 56.1, and the evidence referenced therein. (*See* Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated Sept. 27, 2018 ("Def. 56.1 Stmt.") (Dkt. 40); Plaintiff's Statement in Opposition to Defendants' Statement of Undisputed Facts [Pursuant to] Local Rule 56.1, dated Jan. 1, 2019 ("Pl. 56.1 Stmt.") (Dkt. 46).) Unless otherwise noted in this Court's discussion, citations herein to one party's Rule 56.1 Statement, without cross-reference to the other party's response, indicate that the cited factual assertion is not in dispute. Where the parties' Rule 56.1 Statements suggest that the relevant facts are in dispute, this Court has consulted the record and considered the parties' cited evidence.

**1. The First Search on March 1, 2016**

On February 25, 2016, Plaintiff began serving a two-to-four year sentence at the AMKC. [2] (Def. 56.1 Stmt. ¶¶ 1, 2.) On the previous night, prior to entering into the custody of the New York City Department of Correction ("DOC"), Plaintiff swallowed 10 to 12 balloons (made out of plastic surgical gloves) containing various types of contraband, including marijuana, K2, tobacco, matches, a match striker, and rolling papers. (*Id.* ¶¶ 3, 4, 7.) The balloons exited Plaintiff's system over the following three days. (*Id.* ¶ 6.)

[2] On January 7, 2016, upon a guilty plea, Plaintiff had been convicted of burglary in the third degree. (*See* Declaration of Samantha Rena Millar in Support of Defendants' Motion for Summary Judgment, dated Sept. 27, 2018 ("Millar Decl.") (Dkt. 41), Ex. E, at 3-4 (Plaintiff's criminal history).)

During the afternoon of March 1, 2016, an AMKC Security Team (the "Security Team") – comprised of Johnson, Lewis, and Durity, in addition to approximately five to seven other officers – conducted a search of Dorm 4, where Plaintiff was then being housed. (*Id.* ¶¶ 11, 13-14.) At that time, Plaintiff had a balloon containing K2 that he had inserted into his

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

rectum, additional K2 that was rolled up into a piece of paper and hidden in the groin area of his pants, and U.S. currency and matches that were being held in the waistband of his underwear. (*Id.* ¶¶ 11-12.) When the Security Team entered, Plaintiff reached toward the front of his pants to determine whether the K2 that he had hidden in the groin area of his underwear had fallen. (*Id.* ¶ 15.) Upon observing this motion, Johnson and Lewis instructed Plaintiff to go to the bathroom, where Plaintiff was then instructed to remove his clothing in order to be strip searched. (*Id.* ¶¶ 16-17.) According to Plaintiff, in addition to Defendants, there were two other unidentified officers present in the bathroom, one of whom was holding a video camera that, although turned on, was not recording at the time. (*See* Pl. 56.1 Stmt. ¶ 12; Millar Decl., Ex. B (Transcript of deposition of Jose Torres ("Pl. Dep.")), at 97:3-98:13, 108:13-19.)

**\*2** After recovering K2, matches, and U.S. currency from Plaintiff's clothing during the strip search, Lewis instructed Plaintiff to squat, and Plaintiff complied. (Def. 56.1 Stmt. ¶¶ 18-20.) At that point, Lewis observed an object protruding from Plaintiff's anus. (*Id.* ¶ 20.) An officer then touched Plaintiff's buttocks for "a couple of seconds" (Pl. Dep., at 107:14-20; *see* Def. 56.1 Stmt. ¶ 22), causing Plaintiff to jump up and turn around (Def. 56.1 Stmt. ¶ 23), which led another officer to bring Plaintiff to the floor through a chokehold (*id.* ¶ 24; Pl. Dep., at 102:2-14). According to Plaintiff, he then began resisting the officers, and, by "tussling" his body, he attempted to push himself away from the officers in order to prevent them from touching his buttocks. (Pl. Dep., at 101:12-18, 105:5-20.)

As to which officer allegedly engaged in the particular acts that Plaintiff described, Plaintiff testified at his deposition that, at the time of the incident, he did not know which officer, or how many officers, initially touched his buttocks, but that he later learned from another inmate that it had been Johnson who engaged in that conduct. (*Id.*, at 106:15-21, 107:4-13.) Regarding the chokehold, Plaintiff at first testified that he did not recall if Lewis or another officer had brought him to the ground through a chokehold (*id.*, at 102:17-20), but he later testified that Lewis was the officer who had done so (*id.*, at 110:25-111:2). In addition, although Plaintiff initially testified that Durity "did not intervene" and "just watched what happened" (*id.*, at 110:18-25), he later testified to his assumption, given Durity's proximity to him during the commotion, that, at some point in the course of events, Durity had pinned him down on the ground, also through a chokehold (*id.*, at 111:4-112:2).

Plaintiff testified that, after these events, he ultimately calmed down and put his clothes back on, once Johnson told him that the officers were "not going to touch [him] no more." (*Id.*, at 108:25-109:5.) Plaintiff suffered no injuries as a result of this search. (Def. 56.1 Stmt. ¶ 32.)

### 2. The Second Search on March 1, 2016

After dressing himself, Plaintiff was handcuffed by Lewis, and was then brought by Johnson and Lewis into a secondary room in the housing area, where, after other inmates were escorted away from the area, only Johnson, Lewis, and Plaintiff were present. (*Id.* ¶¶ 31, 33-34; *see* Pl. Dep., at 118:1-4, 120:1-5.) Johnson and Lewis then instructed Plaintiff to surrender the contraband, which was still inserted in his rectum (Def. 56.1 Stmt. ¶¶ 35-36), but Plaintiff denied having it and repeatedly refused to comply with the officers' orders (Pl. Dep., at 121:10-122:19, 123:4-25). Following Plaintiff's refusal to surrender the contraband, his handcuffs were removed by Lewis (*id.*, at 124:3-7), and he was then ordered to remove his clothing, and to bend over and squat (*id.*, at 124:18-125:6).

According to Plaintiff, while he was bending over and spreading his butt cheeks, Lewis reached for and touched his buttocks for several seconds, which caused Plaintiff to "jump[ ]" and "turn[ ] around quick" (*id.*, at 125:1-15, *see id.*, at 126:23-127:4), and then led Lewis to take Plaintiff down through a chokehold (*id.*, at 125:15-17, 126:22-127:8). Plaintiff testified that Johnson then held his shoulders down such that Plaintiff was forced to lie on his back, and, despite Plaintiff's kicking Lewis several times on the ground, Lewis "spread[ ] [Plaintiff's] legs apart, st[uck] his hand in [his] anus, and pull[ed] a balloon out." (*Id.*, at 125:21-25, *see id.*, at 127:9-128:6.) Plaintiff further testified that Lewis, upon pulling the balloon out of his rectum, "threw it on the floor" and told Plaintiff that he "should have just g[iven] it up." (*Id.*, at 128:7-10.)

### 3. Plaintiff's Injury and Medical Treatment

**\*3** On March 3, 2016, Plaintiff visited the AMKC medical clinic, complaining of pain in his rectum caused by the incident that had taken place two days earlier. (Def. 56.1 Stmt. ¶ 48; *see* Millar Decl., Ex. C (Plaintiff's health records), at 1-2.) According to the medical record from Plaintiff's

Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 272 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

visit, Plaintiff stated to the examining physician that "he had pushed K2 wrapped in a plastic up his rectum, ... [that] it was taken out on search by the DOC officer who put his finger up his rectum to take it out, and [that] he ... felt sexually assaulted." (Millar Decl., Ex. C, at 1.) The medical record further reflects that Plaintiff, upon examination was found to have a "small pinkish mass outside his anus," but was not found to be bleeding. (*Id.*, at 2.) Plaintiff was examined for a second time later that day, and he again complained of having pain in his rectum. (Millar Decl., Ex. C, at 2, 8.) According to the medical record from that examination, Plaintiff's rectum was tender to palpation, and he was evaluated as having a rectal mass and no bleeding. (*Id.*, at 9.) [3]

[3]     In his Rule 56.1 statement, Plaintiff asserts that he did, in fact, have rectal bleeding, and in support of that assertion, he relies upon his own Complaint, as well as various email communications sent by representatives of the Legal Aid Society to DOC immediately after the March 1 incident that state that Plaintiff had been experiencing rectal bleeding. (Pl. 56.1 Stmt. ¶ 35 (citing *id.*, Ex. E; Compl., at 3).) As Plaintiff's Complaint and letters from counsel do not constitute admissible evidence, this Court does not consider them for purposes of reviewing this summary judgment motion. *See* Local Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible.").

Plaintiff was also seen by a psychologist on March 3 for the purpose of a "mental health intake." (Millar Decl., Ex. C, at 10-14.) According to the psychologist's notes from that session, Plaintiff again stated that he had attempted to hide contraband in his rectum, but that, during the process of being strip searched, "someone stuck their finger up into his rec[tu]m." (*Id.*, at 10.) The psychologist, in his assessment of Plaintiff's mental condition, noted that Plaintiff felt "traumatized" by the incident, and that, although "[h]e in no way view[ed] this as a sexual assault," "he [was] very upset over this incident." (*Id.*, at 13.)

### B. Procedural History

On August 29, 2017, Plaintiff commenced this action against the City, DOC, Johnson, Lewis, and Durity. (*See generally* Compl.) In claiming that the body-cavity search and recovery of contraband violated his constitutional rights, Plaintiff cited,

in his Complaint, to the First, Fourth, Eighth, and 14th Amendments. (*Id.* ¶ 11.) Shortly thereafter, in an Order dated October 16, 2017, Judge Daniels dismissed Plaintiff's claims against DOC on the basis that "an agency of [the City] is not an entity that can be sued." (Dkt. 9, at 2.)

On September 27, 2018, after the completion of discovery, Defendants filed a motion for summary judgment (Dkt. 38), accompanied by a supporting memorandum of law (Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to [Rule] 56, dated Sept. 27, 2018 ("Pl. Mem.") (Dkt. 42)); a Rule 56.1 Statement (Def. 56.1 Stmt.), and a counsel declaration (Millar Decl.), with exhibits thereto. On January 15, 2019, Plaintiff filed an opposition memorandum (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Pursuant to Rule] 56, dated Dec. 28, 2018 ("Pl. Mem.") (Dkt. 49)), accompanied by a responsive Rule 56.1 Statement (Pl. 56.1 Stmt.), with exhibits thereto. [4] On February 21, 2019, Defendants filed a reply memorandum. (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to [Rule] 56, dated Feb. 21, 2019 ("Def. Reply") (Dkt. 52).)

[4]     On January 22, 2019, this Court granted Defendants' motion to seal Plaintiff's memorandum of law and the exhibits attached to his Rule 56.1 Statement, on the basis that those documents contained information subject to the Confidentiality Stipulation and Protective Order that had previously been entered in this case. (Dkt. 48; *see* Dkt. 47.)

### DISCUSSION

## I. SUMMARY JUDGMENT STANDARDS

### A. Rule 56

**\*4** Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This burden may be satisfied "by pointing out the absence

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 273 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*, 477 U.S. at 325). Where the party opposing summary judgment "fails to properly address [the moving] party's assertion of fact ..., the court may ... consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e) (2).

While a party opposing summary judgment must generally "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment," *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23), summary judgment may not be granted on default, *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "[T]he district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). If that burden is not met, summary judgment must be denied, "even if no opposing evidentiary matter is presented." *Id.* (emphasis removed) (internal quotation marks and citation omitted).

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his [or her] favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even when viewed in this light, there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

When the non-moving party is proceeding *pro se*, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted). Even a *pro se* plaintiff, however, cannot defeat a motion for summary judgment by relying merely on the allegations of his or her complaint. *See Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996). Rather, when confronted with evidence of facts that would support summary judgment, a *pro se* plaintiff, like any other party, must come forward with evidence in admissible form that is capable of refuting those facts. *See Jermosen v. Coughlin*,

877 F. Supp. 864, 867 (S.D.N.Y. 1999) (in order to defeat summary judgment, a *pro se* plaintiff must present "concrete evidence from which a reasonable juror could return a verdict in [his or her] favor" (internal quotation marks and citation omitted)); *see also* Fed. R. Civ. P. 56(c).

### B. Local Civil Rules 56.1 and 56.2

Under this Court's rules, a party moving for summary judgment must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and the opposing party must submit a correspondingly numbered statement in response, additionally setting out, if necessary, material facts showing genuine triable issues, *see* Local Civ. R. 56.1(b). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record. *See Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

**\*5** Under this Court's rules, a party moving for summary judgment against a *pro se* litigant must submit "a separate document, together with the papers in support of the motion, a 'Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment.' " Local Civ. R. 56.2. Additionally, "the moving party shall inform the *pro se* litigant of the consequences of failing to respond to the summary judgment motion." *Id.*

### II. PLAINTIFF'S CLAIMS AGAINST THE OFFICER DEFENDANTS

Section 1983 permits a plaintiff whose federal constitutional rights have been violated to sue any person who acted to deprive him of those rights, under color of state law. 42 U.S.C. § 1983. Plaintiff claims that the chokeholds that were allegedly used to restrain him constituted excessive uses of force, and that the alleged "abusive body cavity search" that was used to remove contraband from Plaintiff's rectum constituted both excessive force and sexual assault. (*See* Pl. Mem., at 2-18.) Based on this Court's understanding

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 274 of 443

2019 WL 7602181

of Plaintiff's memorandum of law, Plaintiff is asserting these claims against each of the Officer Defendants by virtue of the individual roles that they allegedly played in the March 1 searches. (*Id.*) In interpreting Plaintiff's papers "to raise the strongest arguments that they suggest" in light of his *pro se* status, *see McPherson,* 174 F.3d at 280, this Court understands that his claims against the Officer Defendants are grounded in the Eighth Amendment's proscription against cruel and unusual punishment and/or in the limited right to bodily privacy afforded to inmates under the Fourth Amendment. [5] Defendants have addressed Plaintiff's Eighth Amendment claims at length (*see generally* Def. Mem.; Def. Reply), but they have given little attention to Plaintiff's potential Fourth Amendment claims (*see* Def. Mem., at 11-12 (arguing only that Plaintiff's claims "would also fail even under the less onerous standards of the Fourth and Fourteenth Amendments for evaluating sexual assault allegations brought by pre-trial detainees," and not discussing how the Fourth Amendment might apply in Plaintiff's case)).

[5]  Although, as noted above, Plaintiff also referenced the First and 14th Amendments in his Complaint (*see* Compl. ¶ 11 (alleging that his "free speech" and "due process" rights were violated)), this Court, even construing the Complaint and his other submissions liberally, does not perceive Plaintiff as having a potentially colorable First or 14th Amendment claim. As for the First Amendment, Plaintiff has not alleged, for example, that Defendants in any way burdened his right to raise a complaint about the conduct of the body-cavity search or retaliated against him for doing so, *see Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004), and, while the Due Process Clause of the 14th Amendment governs excessive-force claims brought by pretrial detainees, *see Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2475 (2015), Plaintiff's excessive-force claim is instead governed by the Eighth Amendment, as he was not awaiting trial at the time in question, but rather had entered the AMKC to commence serving a custodial sentence, following his conviction, *see id.*

In addressing Plaintiff's claims under the Eighth Amendment standard, Defendants contend that, as a matter of law, Plaintiff cannot establish any excessive-force claim against Lewis, based on either his use of a chokehold in restraining Plaintiff or his removal of the contraband from Plaintiff's rectum (*see* Def. Mem., at 13-19), and, in addition, that Plaintiff cannot

establish a constitutional claim based on allegations that the removal of the contraband constituted a sexual assault (*see id.,* at 6-13). Defendants also contend that Plaintiff's Eighth Amendment claims against Johnson and Durity necessarily fail, as a matter of law, based on a lack of evidence that either was "personally involved in any sexual assault or use of excessive force against [P]laintiff." (*See id.,* at 19-22.) Finally, Defendants argue that all of the Officer Defendants are entitled to qualified immunity on Plaintiff's claims. (*See id.,* at 22-23.)

**\*6** This Court will first review Defendants' arguments under the Eighth Amendment standards that Defendants' correctly cite, and will then turn separately to Plaintiff's potential Fourth Amendment claims. Despite the fact that Defendants did not set out or address the applicable standards for evaluating Plaintiff's allegations in the Fourth Amendment context, this Court finds that Defendants are, in fact, entitled to summary judgment in their favor on all of Plaintiff's claims. As discussed below, this Court finds that Plaintiff's Eighth Amendment claims cannot survive because the evidentiary record shows that Plaintiff's injury was, at most, *de minimus* and that the officers' conduct was not sufficiently "egregious" to render them liable for an Eighth Amendment violation. While Plaintiff's Fourth Amendment claims present a closer call, they ultimately fail because, regardless of whether the Officer Defendants may have violated Plaintiffs' limited right to bodily privacy, they are entitled to qualified immunity on those claims.

### A. Plaintiff's Eighth Amendment Claims

#### 1. Applicable Legal Standards

Given Plaintiff's status as a convicted prisoner at the time of the March 1 searches, his excessive-force (and sexual assault) claims implicate the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Whitley v. Albers,* 475 U.S. 312, 327 (1986). A prison official's use of force violates the Eighth Amendment when, objectively, "the alleged punishment [was] ... sufficiently serious," and, subjectively, "the prison official ... [had] a sufficiently culpable state of mind." *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir. 1997) (internal quotation marks and citations omitted). The objective component "focuses on the harm done, in light of 'contemporary standards of decency,' " and thus, "[i]n assessing this component, the court must ask whether 'the alleged wrongdoing was objectively 'harmful enough' to

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 275 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

establish a constitutional violation.' " *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson*, 503 U.S. at 8). Further, the Eighth Amendment "does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Id.* (quoting *Hudson*, 503 U.S. at 10).

The subjective component of the Eighth Amendment excessive-force analysis "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances...." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (internal quotation marks and citation omitted). "The test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). In answering this question,

> a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Id.* (quoting *Scott*, 344 F.3d at 291).

In addition to these components, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite' " to a Section 1983 claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). For this reason, the doctrine of *respondeat superior* does not establish liability under Section 1983. *Parris v. New York State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

## 2. Use of a Chokehold

As an initial matter, while Plaintiff testified unequivocally that Lewis was the officer who placed him in a chokehold during the second contraband search in the secondary room, it is not entirely clear from Plaintiff's deposition testimony who he believes placed him in a chokehold during the first search in the dormitory bathroom. As noted above, while Plaintiff initially testified that he did not recall which officer had brought him to the ground through a chokehold at that time

(*see* Pl. Dep., at 102:17-20), he later appeared to change his testimony to assert that it was Lewis who had done so then, as well (*id.*, at 110:25-111:2). In any event, even if Plaintiff could testify credibly at trial that Lewis used a chokehold against him twice, such acts would not constitute unconstitutional uses of force, in light of the circumstances.

**\*7** As discussed above, "the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Wright*, 554 F.3d at 269 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " (quoting *Hudson*, 503 U.S. at 10)). While an inmate is not required to demonstrate a minimum threshold of injury to bring a claim of excessive force, the "extent of injury suffered is relevant to the Eighth Amendment inquiry insofar as it indicates the amount of force applied." *Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011). Thus, courts in this Circuit routinely find that minimal injuries and pain are "insufficient to satisfy the objective prong for claims of Eighth Amendment violations." *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (collecting cases).

In particular, the use of chokeholds, where they do not cause more than minimal injury, are generally not considered sufficiently harmful to satisfy the objective component of an Eighth Amendment claim. *See, e.g., Rodriguez*, 802 F. Supp. 2d at 480-81 (dismissing plaintiff's excessive-force claim alleging that officers punched him in the head and arm, and then placed him in an extended chokehold rendering him unconscious, where medical records showed only minor facial swelling); *Perry*, 659 F. Supp. 2d at 582 (dismissing plaintiff's excessive-force claim alleging that officers both slapped and choked him, where plaintiff testified that he suffered only "minor pain that abated after about four days"); *Yearwood v. LoPiccolo*, No. 95cv2544 (DC), 1998 WL 474073 (S.D.N.Y. Aug. 10, 1998) (dismissing plaintiff's excessive-force claim alleging that he was rendered unconscious by an officer choking him, while another officer hit him on the side of his head, where medical records showed that he had "suffered only a minor bump to the side of his head and slight bleeding in his groin area").

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Lewis's use of a chokehold on Plaintiff was sufficiently harmful to satisfy the objective prong of the Eighth Amendment, even assuming that a

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 276 of 443
Torres v. City of New York, Not Reported in Fed. Supp. (2019)
2019 WL 7602181

chokehold was used on two separate occasions, and even assuming the maneuver represented a greater use of force than was necessary or reasonable under the circumstances. Plaintiff testified that he was not injured in any way as a result of the first contraband search in dormitory bathroom. (*See* Pl. Dep., at 113:4-6.) As to the second search that was conducted in the secondary room, while Plaintiff claims that he suffered certain injuries from the extraction of the contraband from his rectum, he does not appear to claim that he sustained any injury as a result of the chokehold, and the medical records from his subsequent visit to the AMKC medical clinic reflect no such injury. (*See* Millar Decl., Ex. C.) Given the absence of any claim or evidence of an injury relating to Lewis's alleged uses of a chokehold in restraining Plaintiff, this Court concludes that Plaintiff cannot prevail on his claim that his Eighth Amendment rights were violated in this respect, and that Defendants are therefore entitled to summary judgment on the claim.

### 3. Forceable Removal of Contraband

Plaintiff also claims that Lewis's removal of the contraband from Plaintiff's rectum constituted an excessive use of force in violation of his Eighth Amendment rights (*see* Pl. Mem., at 8-12), but this claim, too, cannot survive summary judgment, as the evidence in the record demonstrates that any physical injury to Plaintiff caused by the removal of contraband was *de minimis*, and thus insufficient to satisfy the objective prong of the applicable standard. [6]

[6]  This Court will separately consider, below, whether this act violated Plaintiff's Eighth Amendment rights by amounting to sexual assault, which, according to Plaintiff, caused him emotional, as well as physical injury.

**\*8** As noted above, and as asserted by Defendants (*see* Def. 56.1 Stmt. ¶¶ 49-50), the medical record reflects that, two days after the events of March 1, Plaintiff complained of having pain in his rectum, and was assessed as having a "small pinkish mass outside his anus" (Millar Decl., Ex. C, at 2, 8-9). Although Plaintiff asserts that he had also suffered from "rectal bleeding" during this period (Pl. 56.1 Stmt. ¶ 35), the record does not contain any evidence demonstrating that this was the case, and indeed, Plaintiff's medical records reflect that he was, in fact, not experiencing any bleeding in his rectal area (Millar Decl., Ex. C, at 2, 9). There is also no evidence in the record demonstrating that Plaintiff suffered any continued pain thereafter.

Based on the evidence contained in the record, this Court concludes that no reasonable jury could find that Plaintiff suffered anything beyond a *de minimis* physical injury, such that Lewis's removal of the contraband could be found to have been objectively 'harmful enough' to establish a violation of Plaintiff's constitutional rights. As discussed above, "[c]ourts in this Circuit have consistently held that an injury is *de minimis* when it is temporary and/or minor in severity." *Smith v. City of New York*, No. 04cv3286 (TPG), 2010 WL 3397683, at \*10 (S.D.N.Y. Aug. 27, 2010), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013). While Plaintiff evidently experienced some pain, and was observed as having a "small pinkish mass" following the removal of contraband, there is no evidence that those symptoms were anything more than "minor in severity," or lasted for more than a few days, or even that they were caused by Lewis's conduct (given that Plaintiff had admittedly swallowed and passed multiple balloons in the days just before the events at issue, and had apparently reinserted one into his rectum).

Further, while causing an inmate to bleed may, in certain circumstances, be suggestive of more than *de minimis* injury, *see Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 509 (S.D.N.Y. 2008) (evidence that correctional officer caused plaintiff to suffer "swelling on the left side of his face, a cut to the inside of his mouth, his ear to bleed, and hearing impairment," by striking plaintiff several times without provocation, was sufficient to survive summary judgment), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012), modest bleeding is generally insufficient to demonstrate the necessary severity, *see, e.g., Strange v. Westchester Cty. Dep't of Corr.*, No. 17cv9968 (NSR), 2018 WL 3910829, at \*2 (S.D.N.Y. Aug. 14, 2018) (dismissing excessive-force claim where allegations that prison nurse "examined [plaintiff's] body in a very rough manner and ... caus[ed] [his] toe to bleed and swell" indicated a *de minimis* amount of force). Moreover, Plaintiff's claim of rectal bleeding here is not even supported – and, in fact, is contradicted – by his medical records, which reflect that, at least by the time he was examined, he was not bleeding. In light of those records, Plaintiff's assertion that he was made to bleed does not raise a genuine issue of fact as to whether his claimed injury was sufficiently severe. *See White v. Williams*, No. 9:12-CV-1775, 2016 WL 4006461, at \*9 (N.D.N.Y. June 22, 2016) (dismissing claim upon finding that plaintiff's injuries were *de minimis* where the plaintiff's "claim that he

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

was bleeding profusely," as a result of correctional officer's striking him, was "belied by the medical records"), *report and recommendation adopted*, 2016 WL 4005849 (July 25, 2016).

Accordingly, even viewed most favorably to Plaintiff, the record shows that any physical injuries caused by Lewis's removal of the contraband from Plaintiff's rectum were *de minimis*, and thus insufficient to meet the Eighth Amendment standard. Additionally, given this Court's finding that Plaintiff cannot prevail on his excessive-force claims (both with respect to the chokehold and the removal of the contraband), this Court finds that Plaintiff's claims against Johnson and Durity for their alleged personal involvement in Lewis's acts (*i.e.*, for their alleged failure to intervene to prevent those acts), must necessarily fail as well. *Coleman v. City of New York*, No. 07cv1051 (CM), 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010) (holding that, in the absence of a constitutional violation against certain officers, failure-to-intervene claims against other officers must be dismissed as well). This Court therefore recommends the dismissal of Plaintiff's excessive-force claims against all of the Officer Defendants.

### 4. Claimed Sexual Assault

**\*9** Plaintiff also claims that Lewis's forcible removal of contraband from Plaintiff's rectum in the secondary room constituted sexual assault in violation of his Eighth Amendment rights. (*See* Pl. Mem., at 2-8.) Plaintiff further claims that Johnson, by both failing to intervene in the alleged sexual assault and by "join[ing] in to aide [Lewis] in the assault," was personally involved in this alleged constitutional violation. (*Id.*, at 14-18.) As discussed below, this Court finds that no reasonable jury could find that Plaintiff's Eighth Amendment rights were violated in this regard.

"[P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," and, "[i]ndeed[,] prison security and safety may require frequent searches of an intensely personal nature." *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 560 (1979)). In determining whether a prison official has violated an inmate's Eighth Amendment rights by committing a sexual assault during a search, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* In making this

determination, courts look to the "timing" of the search, the "comments made" during the search, and "subsequent comments made by the officers." *Shepherd v. Fisher*, No. 08cv9297 (RA), 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017) (citing *Crawford*, 796 F.3d at 258-59). Courts in this circuit generally require that the plaintiff demonstrate that defendants "engaged in egregious conduct" to prevail on a challenge to a contraband search, *Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016), and "[e]ven where inmates allege aggressive or inappropriate behavior during strip searches, courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation." *Vaughn v. Strickland*, No. 12cv2696 JPO, 2013 WL 3481413, at *3 (S.D.N.Y. July 11, 2013).

Thus, where correctional officers are shown to have had a legitimate interest in searching for contraband and a reasonable belief as to the presence of secreted contraband, and where the plaintiff has not demonstrated that the search was conducted for purposes of sexual gratification or humiliation, courts generally will not find that the officers' conduct constituted a violation of the plaintiff's Eighth Amendment rights. *See, e.g.*, *LaRocco v. N.Y.C. Dep't of Corr.*, No. 99cv9759 (SHS) (RLE), 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001) (allegations that correctional officer forced inmate to "undergo a routine where he had to lift his penis and spread his buttocks about three times" were "not severe enough to be considered objectively, sufficiently serious" under the Eighth Amendment (internal quotation marks omitted)), *report and recommendation adopted*, Sept. 26, 2001 (Dkt. No. 31); *cf. Frazier v. Ward*, 426 F. Supp. 1354, 1366 (N.D.N.Y. 1977) (finding that body-cavity search violated the Eighth Amendment where it was "not based on reasonable belief standards [ ] and [was] extremely dehumanizing in its method of conduct"). This applies in instances in which the correctional officers make contact with the plaintiff's buttocks and rectum in the course of conducting a cavity search. *See, e.g.*, *Sankara v. O'Hara*, No. 15cv7761 (PKC) (JLC), 2017 WL 6001841, at *6 (S.D.N.Y. Dec. 4, 2017) (allegations that correctional officers strip searched and then "digitally penetrated" plaintiff could not constitute an Eighth Amendment violation where officers had a "legitimate interest in locating drugs or weapons," and there was "no allegation that the search occurred for purposes of sexual gratification or humiliation"), *appeal dismissed*, No. 17-4052 (L), 2018 WL 3031132 (2d Cir. May 17, 2018), *cert. denied*, 139 S. Ct. 328 (2018); *Morrison v. Cortright*, 397 F. Supp. 2d 424, 425 (W.D.N.Y. 2005) (allegations that correctional officer "shone a flashlight up [plaintiff's] anus

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 278 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

and r[a]n his middle finger between plaintiff [sic] buttocks" did not constitute sexual assault in violation of the Eighth Amendment (internal quotation marks omitted)); *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10cv8314 (DLC), 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (groping of plaintiff's buttocks by correctional officers during a strip search did not constitute an Eighth Amendment violation).

 **\*10** The core facts concerning Lewis's removal of contraband from Plaintiff's rectum are not in dispute, and cannot lead a reasonable jury to conclude that Lewis (or Johnson, the other officer present in the secondary room) engaged in the type of "egregious" conduct necessary to find that the officers violated Plaintiff's Eighth Amendment rights by engaging in sexual assault. In particular, Plaintiff does not dispute that Lewis's manual search for contraband was based on a reasonable belief that Plaintiff had secreted contraband in a body cavity. Indeed, as discussed above, upon conducting an initial search of Plaintiff's dormitory, the Officer Defendants observed Plaintiff make certain motions in his dormitory that led them to believe that Plaintiff had hidden contraband in his pants (*see* Def. 56.1 Stmt. ¶ 15), and upon conducting a strip search, they observed that Plaintiff had been hiding various items of contraband in his clothing, and that an object was protruding from his anus (*id.* ¶¶ 18-20). Further, the record is devoid of evidence that the removal of the contraband from Plaintiff's rectum was done to "arouse or gratify" the Officer Defendants or to "humiliate" Plaintiff. *Crawford*, 796 F.3d at 257-58. Although Plaintiff reported during his visit to the AMKC medical clinic that he "felt sexually assaulted" (*see* Millar Decl., Ex. C, at 1), Plaintiff does not allege that the Officer Defendants said anything of a sexual nature during the course of the search, or exhibited any conduct that could reflect that Lewis, or Johnson for that matter, undertook the cavity search "for purposes of sexual gratification or humiliation." *See Sankara*, 2017 WL 6001841, at *6.

In sum, regardless of the severity of an emotional trauma that Plaintiff claims to have suffered as a result of Lewis's removal of the contraband from his rectum, or his potential perception of the event as having constituted a sexual assault, the undisputed facts do not demonstrate that Lewis, as a matter of law, committed sexual assault so as to render his conduct a violation of Plaintiff's Eighth Amendment rights. Plaintiff's claim against Lewis is therefore subject to dismissal. In light of this finding, Plaintiff's claim against Johnson for his alleged personal involvement in Lewis's alleged sexual assault should also be dismissed. *Coleman*, 2010 WL 571986, at *5.

## B. **Plaintiff's Fourth Amendment Claim**

As suggested by Plaintiff's opposition papers, his Complaint may also be read to raise a Fourth Amendment claim against the Officer Defendants based on the cavity search to which Plaintiff was subjected. (*See* Pl. Mem., at 7 ("The abusive body cavity search Plaintiff was subjected to ... violated Plaintiff's Eighth Amendment as well as [ ] Fourth Amendment [rights]."); *see also* Compl. ¶ 11.) Even though Defendants do not appear to acknowledge that a convicted inmate in custody, like Plaintiff, may possess Fourth Amendment rights (*see* Def. Mem., at 11-12), this Court finds that, to a limited extent, Plaintiff did have a right to bodily privacy under the Fourth Amendment. As discussed below, however, even though that right may have been violated by the Officer Defendants, the law is not well developed in the particular context presented by this case. For this reason, this Court cannot find that the Officer Defendants would have reasonably understood that their actions may have been unlawful, and thus concludes that they are entitled to qualified immunity for their actions.

### 1. **Applicable Legal Standards**

The Fourth Amendment provides that people have a right "to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. While the Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 626 (1984), and while "[t]here is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment," *Vann v. Griffin*, No. 16cv9903 (VB), 2018 WL 6199860, at *4 (S.D.N.Y. Nov. 28, 2018) (quoting *Vaughn*, 2013 WL 3481413, at *4), the Second Circuit has held nonetheless that "inmates do retain a limited right to bodily privacy under the Fourth Amendment," *Harris*, 818 F.3d at 57 (2d Cir. 2016) (reaffirming *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) ("maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy")).

When evaluating an inmate's claim that an officer violated his or her limited right to bodily privacy, the "court must [first] determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy.' " *Id.* (citing *Covino*, 967 F.2d at 77). Second, "the court must determine 'whether

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 279 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

the prison officials had sufficient justification to intrude on [the inmate's] [F]ourth [A]mendment rights." *Id.* (citing *Covino*, 967 F.2d at 78). Where the inmate's claim challenges an "isolated search," rather than a regulation or policy, "courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)." *Harris*, 818 F.3d at 58. *Bell* sets out a four-factor "test of reasonableness," which

> **\*11** requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.

*Bell*, 441 U.S. at 559.

The first factor, the scope of the intrusion, "varies with the type of search" (*i.e.* strip search, visual-cavity search, or manual body-cavity search), and "also varies depending on who searches whom, i.e., whether the search involved an officer of the same gender as the inmate." *Harris*, 818 F.3d at 58.

With respect to the second factor, the manner in which the search is conducted, the Supreme Court has emphasized that "searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560. Thus, "[a] strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59-60 (suggesting that visual body-cavity search at issue was unreasonable where the record did not explain "why the visual body cavity search was conducted in such a violent and forceful manner").

As to the third factor, the justification for the search, "Supreme Court precedent suggests that officers must provide a justification that is supported by record evidence." *Harris*, 818 F.3d at 60. In particular, "whether an officer is searching for contraband is highly relevant to the reasonableness inquiry." *Id.* at 60 (citing *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (female nurse's manual body-cavity search of female inmate for matches was reasonable where "plaintiff had set her paper dress afire" and "there was a reasonable necessity for a search of sufficient thoroughness to

give assurance that she had no more matches")). Further, the Supreme Court has cautioned that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," and thus officers' actions are entitled to deference by the court, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response...." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) (quoting *Block v. Rutherford*, 468 U.S. 576, 584 (1984)); *see also Covino*, 967 F.2d at 79 (noting that, "although inmates do possess a limited right to bodily privacy, some aspects of that right must yield to searches for contraband ..., so that prison administrators may maintain security and discipline in their institutions (citation omitted)).

As to the final factor, the place in which the search is conducted, "a body cavity search conducted in the presence of unnecessary spectators is less reasonable than one conducted in the presence of only those individuals needed to conduct the search." *Harris*, 818 F.3d at 62.

If an evaluation of these four factors indicates that the need for the particular search did not outweigh the invasion of the inmate's right to bodily privacy, then the search was unreasonable and the inmate's Fourth Amendment rights were violated. *See Bell*, 441 U.S. at 558.

### 2. Body-Cavity Search and Removal of Contraband

#### a. Subjective Expectation of Bodily Privacy

As a threshold matter, this Court considers whether the evidence demonstrates that Plaintiff had, or lacked, "an actual, subjective expectation of bodily privacy" with respect to the type of body-cavity search that was performed on him. *Covino*, 967 F.2d at 77. On this question, Plaintiff testified at his deposition that, upon being escorted to the secondary room, he had expected that he would be placed in a "dry cell" [7] until he expelled the contraband. (*See* Pl. Dep., at 118:10-15.) Further, from Plaintiff's apparently surprised reaction to each instance in which his buttocks were touched by an officer – *i.e.*, in the dormitory bathroom (*see* Pl. 56.1 Stmt. ¶ 23 (Plaintiff "jumped up" and "stood straight")), and in the secondary room (*id.* ¶ 40 (Plaintiff "jumped")) – a reasonable inference may be drawn that he did not expect that any officers would make contact with his buttocks as part of a search for contraband. The record therefore contains evidence

2019 WL 7602181

that Plaintiff did have a subjective expectation that his bodily privacy would be respected, requiring the Court to proceed to consider whether there is also evidence that could support a jury determination that Plaintiff's body-cavity search was, in this instance, an "unreasonable" intrusion on his rights, under the four-factor test articulated in *Bell*.

7       Although the parties do not define a "dry cell" in their submissions, this Court understands it to mean a cell in which the toilet has no running water, so that the inmate can expel suspected contraband without being able to flush it away. *See Porter v. Bunch*, No. 16cv5935 (KMK), 2019 WL 1428431, at *16 (S.D.N.Y. Mar. 29, 2019); *Patterson v. Patterson*, No. 1:16-CV-00844, 2019 WL 1284346, at *1, n.1 (W.D.N.Y. Mar. 20, 2019).

### b. Factors Relating To Reasonableness

**\*12**  Most of the core facts underlying Lewis's removal of contraband from Plaintiff's rectum are not in dispute. Those facts, however, do not all point to the same conclusion as to whether the body-cavity search in question was "reasonable" under *Bell*. Rather, the first two *Bell* factors weigh in favor of a finding that the search was unreasonable, while the last two factors weigh to the contrary.

### i. Scope of the Intrusion

With respect to the first factor (the scope of the intrusion), there is no cause for concern here as to the gender of the participants in the search, *see Harris*, 818 F.3d at 59, as the only AMKC correction officers who were involved in the secondary room search, *i.e.*, Lewis and Johnson, were male, and there is no evidence in the record that anyone but men were present at any point when Plaintiff's clothes were removed during the course of the events at issue.

The type of search to which Plaintiff was subjected, however – *i.e.*, a manual body-cavity search – is the most invasive type of search used in the prison context. Although the parties appear to dispute whether Lewis digitally penetrated Plaintiff's anus (*see* Def. 56.1 Stmt. ¶ 39; Pl. 56.1 Stmt. ¶ 25), Plaintiff testified that he did (*see* Pl. Dep., at 125:21-22 (testifying that Lewis "st[uck] his hand in [Plaintiff's] anus")), and Defendants do not dispute that Lewis at least made physical contact with Plaintiff's anal area in the course

of removing the contraband (*see* Def. 56.1 Stmt. ¶¶ 39, 41). Although the fact that a manual body-cavity search was conducted does not mean that the search was *per se* unreasonable, *see Corley v. City of New York*, No. 14cv3202-GHW, 2017 WL 4357662, at *16 (S.D.N.Y. Sept. 28, 2017) (noting, in the pre-trial detainee context, that "body cavity searches, which are arguably a more intrusive way of searching prisoners for contraband, have withstood Fourth Amendment challenges"), the highly intrusive nature of the search, even if conducted by male correction officers, weighs in favor of a finding that the search was unreasonable.

### ii. Manner in Which the Search Was Conducted

The second factor (the manner in which the search was conducted), similarly suggests a lack of reasonableness. It is true that Plaintiff concedes that he repeatedly denied having any contraband (Pl. Dep., at 121:10-122:19, 123:4-25), that he refused to comply with the officers' orders to surrender it (*id.*), and that, upon being restrained by Lewis, he kicked Lewis several times (*see id.*, at 128:5-6). Nonetheless, the parties do not dispute that, in order for the Officer Defendants to recover the contraband, they not only restrained Plaintiff, but forced him to the ground, held him down, spread his legs, and forcibly removed the contraband from inside his body. (*See* Def. 56.1 Stmt. ¶¶ 40-42; Pl. 56.1 Stmt. ¶¶ 26, 28; Pl. Dep., at 127:5-128:10.) The Officer Defendants have offered no legitimate penological justification for recovering the observed contraband in this manner, when alternatives were likely available to recover it without the use of force. On this point, Plaintiff specifically contends that, upon determining that he had partially inserted contraband into his rectum, the Officer Defendants could have placed him in a dry cell to permit him to expel the contraband, without any use of force at all. (*See* Pl. Mem., at 9.) Although the record does not reflect whether a dry cell was, in fact, available at the AMKC, this Court notes that the use of dry cells in prisons located within this Circuit is "not unusual." *Porter*, 2019 WL 1428431, at *16 (collecting cases involving the use of dry cells where inmates are suspected of possessing contraband). The officers also presumably could have taken Plaintiff to see medical personnel for purpose of removing the contraband from inside his body. The degree of force that, by Defendants' own admission, was used in this instance, when alternatives were likely available, suggests that the method of the search was unreasonable. [8]

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

8   The availability at the AMKC, at the relevant time, of alternative methods for removing an item observed as protruding from an inmate's anus would be more evident, had Defendants produced any policy statement or internal directive regarding the procedures that correction officers at the AMKC were supposed to follow in such circumstances, and had such statement or directive indicated, for example, that the inmate should be taken to a dry cell or to medical personnel. While Plaintiff has repeatedly argued that, by forcibly removing the contraband from his rectum, the Officer Defendants violated a Directive of the New York State Department of Corrections and Community Supervision ("DOCCS") (*see, e.g.,* Pl. Mem., at 4, 5 (citing DOCCS Directive No. 4910)), Plaintiff has offered no explanation as to why this New York *State* Directive would have been applicable at the AMKC, which is a New York *City* facility (*see* Def. Reply, at 2). This Court notes, however, that, even if the AMKC had a policy prohibiting the type of body-cavity search that occurred here, this, at most, would be relevant to the reasonableness of the manner in which the search was conducted – a factor which this Court has already found weighs in Plaintiff's favor. Standing alone, the violation of a prison directive or regulation would not go so far as to demonstrate a constitutional violation. *See Whitley v. Bowden,* No. 17cv3564 (KMK), 2018 WL 2170313, at *10, n.15 (S.D.N.Y. May 10, 2018) (noting that "the law is settled that the failure to follow a [prison] [d]irective or prison regulation does not give rise to a federal constitutional claim.") (quoting *Rivera v. Wohlrab,* 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002)); *Doe v. Connecticut Dep't of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir. 1990) ("[A] violation of state law neither gives [plaintiffs] a [Section] 1983 claim nor deprives defendants of the defense of qualified immunity to a proper [Section] 1983 claim." (citation omitted)).

### iii. Justification for the Search

**\*13**  As to the third *Bell* factor (the officer's justification for the search), the record plainly establishes that, even if the *means* that the Officer Defendants ultimately used to recover the contraband from Plaintiff was unjustified, the officers had a legitimate penological reason for conducting a body-cavity search in the first instance. As discussed above, it is undisputed that, during the initial search of Plaintiff's dormitory, the Officer Defendants observed Plaintiff make certain motions that led them to believe that he was in possession of contraband (*see* Def. 56.1 Stmt. ¶ 15), and soon thereafter, upon conducting a strip search, they found that Plaintiff had indeed been hiding various contraband in his clothing (*id.* ¶ 18). Further, it is undisputed that the officers observed an object protruding from Plaintiff's anus that Plaintiff repeatedly refused to surrender to them (*see id.* ¶¶ 20, 35-36; Pl. Dep., at 121:10-122:19, 123:4-25). On this record, it is apparent that Lewis and Johnson would have had a reasonable belief that Plaintiff was in possession of contraband, and that no reasonable jury could find that the Officer Defendants lacked a legitimate justification for conducting a cavity search.

### iv. Place in Which the Search Was Conducted

Finally, the fourth *Bell* factor (the place in which the search was conducted), also weighs in favor of a finding of reasonableness. According to Plaintiff, the search during which the contraband was removed took place in an isolated part of a cell block (*see* Pl. Dep., at 113:21-114:2), and the only individuals present in the area, other than Lewis and Johnson (*see id.,* at 118:1-4, 120:1-5). Indeed, Plaintiff testified that other inmates were escorted away from the area upon Plaintiff's arrival, and prior to the search's being conducted. (*See id.,* at 114:17-18, 120:4-5.) The fact that the search was "conducted in the presence of only those individuals needed to conduct the search" supports the reasonableness of the search.

The four relevant factors are therefore in tension, and do not unequivocally answer the question of whether the intrusion on Plaintiffs' limited Fourth Amendment rights was sufficient to constitute a violation of those rights. Indeed, while this Court leans toward the conclusion that, given the intrusiveness of the rectal search and the unnecessary use of physical force to remove the contraband, the search was unduly intrusive, reasonable minds could differ as to whether Lewis and, by failing to intervene, the other Officer Defendants were constitutionally prohibited from acting as they did. The very closeness of the question, however, combined with the fact that neither the Supreme Court nor the Second Circuit has addressed whether an inmate's Fourth Amendment rights would be violated in the particular context at issue here,

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 282 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

demonstrates that the Officer Defendants are entitled to qualified immunity on this claim.

### c. Entitlement of the Officer Defendants to Qualified Immunity

Qualified immunity is an affirmative defense that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In determining whether a right is clearly established at the time defendants acted, [courts] examine whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995) (citation omitted). The Supreme Court has cautioned that "clearly established law" may not be defined at a "high level of generality," but instead it must be " 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted) (reversing circuit court's decision where it "failed to identify a case where an officer acting under similar circumstances" was held to have committed a constitutional violation). Thus, while courts "do[ ] not require a case directly on point," for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see Peek v. City of New York*, No. 13cv4488 (AJN), 2014 WL 4160229, at *3 (S.D.N.Y. Aug. 18, 2014) ("For a right to be clearly established, there must be either controlling law on point or a 'robust consensus of cases of persuasive authority.' " (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); internal quotation marks omitted).

**\*14** Further, even where it has been shown that the official violated a clearly established right, the defense of qualified immunity is nevertheless available to the officer "if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010)). Thus, "qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate

the law.' " *Powlette v. Morris*, No. 13cv7378 (KPF), 2016 WL 3017396, at *6 (S.D.N.Y. May 23, 2016) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).

Defendants generally contend that the Officer Defendants are entitled to qualified immunity here, "given the circumstances surrounding [the Officer Defendants'] searches of [P]laintiff," and the absence of any controlling case law providing that their actions were unconstitutional in light of those circumstances. (Def. Mem., at 22-23.) The Court need not reach the issue with respect to Plaintiff's Eighth Amendment claims, as Plaintiff has not, in any event, demonstrated a genuine issue of material fact that warrants a trial on the merits of those claims. As to Plaintiff's Fourth Amendment claims, however, this Court is constrained to agree with Defendants that, at the time of the conduct at issue, Plaintiff's right to be free from the type of search that was conducted was not sufficiently established to enable him to proceed against the Officer Defendants, even if the Court were to determine that the *Bell* factors, on balance, weigh in Plaintiff's favor.

In this regard, Plaintiff has not pointed to, and this Court is not aware of, any case law providing that correction officers who have a legitimate penological justification for conducting a body-cavity search of an inmate for suspected contraband, and who conduct such a search in a private setting and with officers of the same gender as the inmate, are then constitutionally prohibited from using force to remove an object observed to be protruding from the inmate's anus. Even if this Court were to conclude that this constituted a violation, this Court is persuaded that it was "objectively reasonable" for the Officer Defendants to believe that their actions in recovering the contraband were lawful, such that they are entitled to qualified immunity from any civil liability. *See Berg*, 897 F.3d at 109.

Accordingly, I recommend that the Officer Defendants be granted summary judgment in their favor on Plaintiff's Fourth Amendment claims, as well as on his Eighth Amendment claims.

### III. PLAINTIFF'S CLAIMS AGAINST THE CITY

Finally, Plaintiff asserts a claim against the City under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), contending that the City was aware of, but failed to respond to, a pattern of constitutional conduct that led to the violation of his constitutional rights (*see* Pl. Mem., at 21-25). As discussed below, this Court finds that Plaintiff cannot prevail on his *Monell* claim against the City, whether

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 283 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

that claim is premised on the alleged deprivation of Plaintiff's Eighth Amendment rights, or his Fourth Amendment rights.

Under *Monell*, a municipality may, in certain circumstances, qualify as a "person" under Section 1983, such that it may be subject to suit. *See Monell*, 436 U.S. at 690-91. To bring a municipality within the reach of Section 1983, a plaintiff must show "(1) the existence of an officially-adopted 'policy, custom, or practice' and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally-protected rights." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Board of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997); *Monell*, 436 U.S. at 694). A municipality may only be held liable where the entity itself commits a wrong; it "cannot be held liable under [Section] 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

**\*15** The Supreme Court has held that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To prove that a municipality's failure to train its employees amounted to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," *id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)), it is "ordinarily necessary" to demonstrate a "pattern of similar constitutional violations by untrained employees," *id.* at 62 (citation omitted). Thus, a single incident of excessive force cannot, without more, "establish a municipal policy of failing to properly train and supervise [ ] officers," *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992), because it would "unduly threaten [a municipality's] immunity from *respondeat superior* liability," *id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 830 (1985)).

Plaintiff alleges that the City's "failure to train, supervise, and discipline its employee[s] in the appropriate use of physical force [and] executing searches" led to the violation of his constitutional rights, and that this failure amounted to "deliberate indifference." (*See* Pl. Mem., at 21.) In support of this claim, Plaintiff relies on incident reports involving Lewis that, according to Plaintiff, "point[ ] to numerous inmates who were subjected to excessive force by [Lewis] prior to [the] March 2016 incident." (*See id.*, at 23 (citing Pl. 56.1 Stmt., Ex. D)). Plaintiff contends that these reports "establish that

there is a long history of which [Lewis] mishandled situations in which force was necessary to subdue inmates." (*Id.*, at 23.) Yet, as Defendants correctly point out (Def. Reply, at 9-10), the incident reports merely describe incidents in which Lewis used force in recovering contraband from inmates, and do not reflect that Lewis used an unconstitutional level of force in those incidents or otherwise engaged in any conduct determined to be unlawful (*see* Pl. 56.1 Stmt., Ex. D). Nor do the incident reports describe the conduct of any other correction officers employed by the City. (*Id.*)

Plaintiff also points to an investigation report, dated September 18, 2016, which concluded that the Security Team that conducted the search of Plaintiff violated an "Operations Order" by failing to capture the events on videotape. (*See* Pl. Mem., at 24 (citing Pl. 56.1 Stmt., Ex. C, at D00152).) According to Plaintiff, the fact that "no action was taken in regards to this violation after an internal investigation ... establishes a policy [of the City] of failing to train [its] employees." (*Id.*) [9]

[9]   As Defendants point out (*see* Def. Reply, at n.5), the AMKC Warden later found, as is reflected in subsequent correspondence relating to the internal investigation, that the Security Team had not, in fact, violated the Operations Order (*see* Pl. 56.1 Stmt., Ex. C, at D00151). On that basis, the Warden determined that "no further action [was] warranted." (*Id.*)

Overall, the evidence on which Plaintiff relies is insufficient to create a genuine issue of material fact on his *Monell* claim. First, and fundamentally, for the reasons discussed above, the evidence of record is insufficient to support his underlying claims against the Officer Defendants. Second, even if Plaintiff's individual claims could survive summary judgment, the evidence he has offered of a policy or practice by the City is lacking. The incident reports involving Lewis, and the investigation report concerning the purported failure of the Security Team to record Plaintiff's body-cavity search on videotape, fail to demonstrate any "pattern of similar constitutional violations." *See Connick*, 563 U.S. at 61. Accordingly, the City is entitled to summary judgment dismissing Plaintiff's *Monell* claim.

## CONCLUSION

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 7602181

**\*16** For all of the foregoing reasons, I respectfully recommend the Defendants' motion for summary judgment (Dkt. 38) be granted in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 7(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. Such objects, and any responses, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, United States Courthouse, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for extension of time for filing objections must be directed to Judge Daniels. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7602181

---

**End of Document** 

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 4784756

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ficklin v. Rusinko, W.D.N.Y., September 14, 2020

2019 WL 4784756
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose M. TORRES, Plaintiff,
v.
CITY OF NEW YORK, Captain Johnson,
Officer Lewis, and Officer Durity, Defendants.

17 Civ. 6604 (GBD) (DCF)
|
Signed 09/30/2019

**Attorneys and Law Firms**

Jose M. Torres, Coxsackie, NY, pro se.

Carolyn Kay Depoian, Samantha Rena Millar, NYC Law
Department Office of the Corporation Counsel, New York,
NY, for Defendants.

<u>MEMORANDUM DECISION AND ORDER</u>

GEORGE B. DANIELS, United States District Judge:

**\*1** *Pro se* Plaintiff Jose M. Torres brings this action under 42
U.S.C. § 1983 against Defendants Captain Timothy Johnson,
Officer Dave Durity, Officer Junior Lewis (collectively,
the "Officer Defendants"), and the City of New York,
alleging that Defendants violated his constitutional rights
by subjecting him to a body cavity search while he was
in custody at the Anna M. Kross Center (the "AMKC")
on Rikers Island. (Compl., ECF No. 2.) Defendants move
for summary judgment pursuant to Federal Rule of Civil
Procedure 56, seeking to dismiss all of Plaintiff's claims.
(Notice of Mot., ECF No. 38.)

Before this Court is Magistrate Judge Debra C. Freeman's
August 14, 2019 Report and Recommendation (the "Report"),
recommending that Defendants' motion for summary
judgment be granted.[1] (Report, ECF No. 55, at 1, 34.)
Magistrate Judge Freeman advised the parties that, pursuant
to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure
72(b), failure to file timely objections to the Report would
constitute a waiver of those objections on appeal. (*Id.* at 34.)

No objections have been filed.[2] Having reviewed the Report
for clear error and finding none, this court ADOPTS the
Report's recommendation to dismiss the complaint.

[1]  The relevant factual and procedural background
is set forth in greater detail in the Report and is
incorporated by reference herein.

[2]  On September 10, 2019, Plaintiff requested an
extension of time to file objections to the Report.
(Pl.'s Letter dated Aug. 18, 2019, ECF No. 56.)
On September 13, 2019, this Court granted an
extension to September 23, 2019. (Order, ECF No.
57.) Plaintiff has filed no formal objections to the
Report.

**I. FACTUAL BACKGROUND**

**A. Balloons of Contraband.**
On February 25, 2016, Plaintiff began serving a two-to-four-
year prison sentence. (Defs.' Statement of Undisputed Facts
Pursuant to Local Civil Rule 56.1 ("Defs. 56.1 Stmt."), ECF
No. 40, ¶¶ 1–2.) On the evening of February 24, 2016, prior to
reporting to the AMKC on Rikers Island, Plaintiff swallowed
10 to 12 balloons containing various types of contraband. (*Id.*
¶¶ 3–4, 7.) The balloons exited Plaintiff's system over the
following three days. (*Id.* ¶ 6.)

**B. First Search on March 1, 2016.**
On March 1, 2016, Plaintiff was incarcerated in the Dorm 4
Main housing area ("Dorm 4") of the AMKC. (*Id.* ¶ 9.) On
that day, Plaintiff had a balloon containing K2[3] inserted into
his rectum, K2 rolled up in a piece of paper concealed in the
groin area of his pants, as well as money and matches
stuffed in the waistband of his underwear. (*Id.* ¶¶ 11–12.)
When a security team at the AMKC—which included the
Officer Defendants—entered Dorm 4 in order to conduct
a search, Plaintiff reached toward the front of his pants to
determine whether the K2 hidden in his groin area had fallen
out. (*Id.* ¶¶ 13–15.) Defendants Johnson and Lewis observed
Plaintiff's motion and subsequently instructed Plaintiff to go
to the bathroom of Dorm 4 so that he could be strip searched.
(*Id.* ¶¶ 16–17.)

[3]  K2 is an informal name for a synthetic form of
marijuana.

*Torres v. City of New York*, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 286 of 443

2019 WL 4784756

**\*2**  During the strip search, Lewis recovered from Plaintiff's clothing K2, matches, and money, and further instructed Plaintiff to squat. (*Id.* ¶¶ 18–19.) Plaintiff complied, and Lewis observed an object protruding from Plaintiff's anus. (*Id.* ¶ 20.) Subsequently, an unidentified officer[4] touched Plaintiff's buttocks for a few seconds, which prompted Plaintiff to jump up and turn around. (*Id.* ¶¶ 22–23.) At that time, another unidentified officer[5] brought Plaintiff to the ground through a chokehold.[6] (*Id.* ¶ 24.) In addition, Plaintiff testified that in order to prevent the officers from touching his buttocks, he began to resist them and tried to push himself away from them by "tussling" his body. (Millar Decl., Ex. B (July 24, 2018 Tr. of Dep. of Jose M. Torres), at 101:12–18, 105:5–106:14.) Plaintiff did not suffer any injuries as a result of the search. (Defs 56.1 Stmt. ¶ 32.)

[4]  Plaintiff testified at his deposition that he initially did not know which or how many officers touched his buttocks, but that another inmate informed him that Johnson was the officer who had done so. (Millar Decl., Ex. B (July 24, 2018 Tr. of Dep. of Jose M. Torres), at 106:15–21, 107:4–13.)

[5]  Plaintiff initially testified that he was unsure whether Lewis or another officer had brought him down to the floor through a chokehold, but he later testified, "Lewis was the one that yoked me up." (Millar Decl., Ex. B (July 24, 2018 Tr. of Dep. of Jose M. Torres), at 102:17–20, 110:25–111:2.)

[6]  Lastly, Plaintiff initially testified that Durity "did not intervene," "did not stop [anything]," and "just watched what happened," but he later testified that he "would assume" Durity was the officer who had *also* pinned him down on the floor through a chokehold at some point because "he was the only one close to [Plaintiff]" at the time. (Millar Decl., Ex. B (July 24, 2018 Tr. of Dep. of Jose M. Torres), at 110:18–25, 111:4–112:2.)

### C. Second Search on March 1, 2016.

Shortly thereafter, Johnson and Lewis escorted Plaintiff to another room in Dorm 4 where only the three of them were present. (*Id.* ¶¶ 33–34.) Johnson and Lewis then instructed Plaintiff to surrender the contraband that was still in his rectum. (*Id.* ¶¶ 35–36.) After Plaintiff repeatedly denied having the contraband and repeatedly refused to comply with the officers' orders, Lewis removed Plaintiff's handcuffs and instructed him to remove his clothing, bend over, and squat.

(Millar Decl., Ex. B (July 24, 2018 Tr. of Dep. of Jose M. Torres), at 121:10–125:6.) Plaintiff testified at his deposition that when he bent over and spread his butt cheeks, Lewis touched his butt cheeks for "[a]bout three, four seconds" and "tried to reach" for his anus. (*Id.* at 125:1–13, 126:22–127:2.) Plaintiff testified that he then jumped up and turned around, which then led Lewis to pin Plaintiff down on the ground through a chokehold. (*Id.* at 125:14–17, 127:1–8.) While on the ground, Plaintiff began kicking Lewis several times. (*Id.* at 128:5–6.) Plaintiff further testified that Johnson "laid [Plaintiff] down on [his] shoulders," forcing him to lie on his back, and that Lewis then spread Plaintiff's legs apart, stuck his hand in Plaintiff's anus, and removed a balloon containing K2. (*Id.* at 125:18–25, 127:9–128:10.)

### D. Plaintiff's Injury and Medical Treatment.

On March 3, 2016, Plaintiff went to the AMKC medical clinic and complained of pain in his rectum in connection with the removal of contraband. (Defs 56.1 Stmt. ¶ 48; *see* Millar Decl., Ex. C (Medical Records), ECF No. 41-3, at D00049–51.) According to the medical record, upon examination, Plaintiff was diagnosed with a "small pinkish mass outside his anus" with no bleeding. (Millar Decl., Ex. C (Medical Records), at D00050; *see* Millar Decl., Ex. D (Injury to Inmate Report dated Mar. 3, 2016), ECF No. 41-4, at D00019.) On the same day, Plaintiff went to the AMKC medical clinic for a second time, complaining of the same pain. (Millar Decl., Ex. C (Medical Records), at D00185.) Plaintiff's medical record from the second examination reflects that he had "hemorrhagic mass in the rectum" with his rectum being "tender to palpation" without any evidence of bleeding. (*Id.* at D00186.)

**\*3**  On March 3, 2016, Plaintiff also saw a psychologist. (*Id.* at D00315–19.) According to the medical record, Plaintiff felt "traumatized" by the second search, but "in no way views this as a sexual assault." (*Id.* at D00318.)

## II. LEGAL STANDARDS

### A. Reports and Recommendations.

A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth in a magistrate judge's report. 28 U.S.C. § 636(b)(1)(C). Portions of a magistrate judge's report to which no or "merely perfunctory" objections have been made are reviewed for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006)

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 287 of 443

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 4784756

(citations and internal quotation marks omitted). Clear error is present only when "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation and internal quotation marks omitted).

### B. Rule 56 Motion for Summary Judgment.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)) (internal quotation marks omitted). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation and internal quotation marks omitted).

Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (citation omitted).

### C. *Pro Se* Plaintiffs.

**\*4** Submissions of *pro se* litigants are read liberally and interpreted to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation and internal quotation marks omitted). The Second Circuit has held that "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citation omitted).

## III. SUMMARY JUDGMENT IS GRANTED

### A. Plaintiff Cannot Prevail on His Eighth Amendment Claims Against the Officer Defendants.

The Report construes Plaintiff's complaint as asserting an excessive force claim under the Eighth Amendment against each of the Officer Defendants for their use of chokeholds and the removal of contraband from Plaintiff's rectum. (Report at 10–12.) The Report also construes Plaintiff's complaint as asserting a sexual assault claim under the Eighth Amendment against each of the Officer Defendants stemming from the extraction of the contraband. (*Id.*)

Magistrate Judge Freeman appropriately found that Plaintiff's Eighth Amendment claims cannot survive summary judgment given that the evidence in the record shows that Plaintiff's injury was *de minimis* and that the Officer Defendants' use of chokeholds and removal of the contraband were not sufficiently egregious. (*Id.* at 12–21.) An official's use of force violates the Eighth Amendment when both objective and subjective requirements are met: (1) the use of force must be "objectively, sufficiently serious[,]" and (2) subjectively, the official must have a "sufficiently culpable state of mind." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (citation and internal quotation marks omitted). Additionally, the Eighth Amendment does not reach "*de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Hudson v. McMillian*, 503 U.S. 1, 10 (1992) (citation omitted). Finally, in the Second Circuit, it is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite." *Wright v. Smith*, 21 F.3d 496,

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 4784756

501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).

First, Magistrate Judge Freeman correctly determined that Defendants' use of force on Plaintiff was not sufficiently harmful to satisfy the objective component of Plaintiff's excessive force claim. As reflected in his medical records from his visits to the AMKC medical clinic and his deposition testimony, there is no evidence or claim of an injury stemming from the alleged use of chokeholds. (Report at 15.) Therefore, Magistrate Judge Freeman correctly determined that Defendants are entitled to summary judgment on this claim.

Second, Magistrate Judge Freeman properly found that the removal of contraband from Plaintiff's rectum did not constitute use of excessive force in violation of his Eighth Amendment rights because "the evidence in the record demonstrates that any physical injury to Plaintiff caused by the removal of contraband was *de minimis*, and thus insufficient to satisfy the objective prong of the applicable standard." (*Id.*) Thus, Magistrate Judge Freeman properly found that summary judgment is warranted on this claim as well.

With respect to the sexual assault claim, Magistrate Judge Freeman correctly found that the undisputed facts fail to establish that Lewis committed sexual assault by forcibly removing contraband from Plaintiff's rectum. A prison officer "looking for contraband may subject inmates to reasonable strip searches and cavity searches" because "prison security and safety may require frequent searches of an intensely personal nature." *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 560 (1979)). In determining whether a prison official has violated an inmate's Eighth Amendment rights by engaging in sexual assault in the course of a search, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford*, 796 F.3d at 257–58. Here, as Magistrate Judge Freeman correctly noted, Lewis's removal of contraband "was based on a reasonable belief that Plaintiff had secreted contraband in a body cavity." (Report at 20.)

*5 In addition, there exists no evidence in the record that the Officer Defendants derived sexual gratification from the removal of the contraband from Plaintiff's rectum or that they engaged in such conduct in order to "humiliate" Plaintiff.

*Crawford*, 796 F.3d at 257–58. Magistrate Judge Freeman appropriately determined that "Plaintiff does not allege that the Officer Defendants said anything of a sexual nature during the course of the search, or exhibited any conduct that could reflect that Lewis, or Johnson for that matter, undertook the cavity search for purposes of sexual gratification or humiliation." (Report at 20–21 (quotation marks omitted).) Therefore, Magistrate Judge Freeman properly found that dismissal of this claim is warranted.

Lastly, Magistrate Judge Freeman appropriately found that Plaintiff's claims against Johnson and Durity for not intervening to prevent Lewis's actions should be dismissed, given that Plaintiff cannot prevail on his excessive force or sexual assault claims. *Coleman v. City of New York*, No. 07 Civ. 1051 (CM), 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010). Therefore, Magistrate Judge Freeman's Eighth Amendment claims against the Officer Defendants are dismissed.

### B. Plaintiff Cannot Prevail on His Fourth Amendment Claim Against the Officer Defendants.

The Report construes Plaintiff's complaint as asserting claims against each of the Officer Defendants for violating Plaintiff's Fourth Amendment rights by subjecting Plaintiff to a body cavity search during which contraband was removed from his rectum. (Report at 10–12.) Magistrate Judge Freeman correctly held that "this Court cannot find that the Officer Defendants would have reasonably understood that their actions may have been unlawful, and thus concludes that they are entitled to qualified immunity for their actions." (*Id.* at 21–22.)

The Second Circuit has held that "inmates retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (reaffirming *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) (noting that "maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy")). Courts must undertake a two-part inquiry when evaluating an inmate's claim that officers infringed his or her right to bodily privacy: (1) whether the inmate has "exhibit[ed] an actual, subjective expectation of bodily privacy[,]" and (2) "whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights." *Covino*, 967 F.2d at 77–78. Further, "if the inmate's Fourth Amendment claim challenges an isolated search, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)." *Harris*, 818 F.3d at 58 (citation omitted). The *Bell* four-factor test of reasonableness requires

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 4784756

balancing the need for the search at issue against the invasion of personal rights associated with the search. *See Bell*, 441 U.S. at 559. Specifically, courts must consider (1) the scope of the intrusion, (2) the manner in which the search was conducted, (3) the justification for commencing the search, and (4) the place in which the search was conducted. *See id.*

As Magistrate Judge Freeman appropriately found, such a determination requires this Court to assess "whether there is also evidence that could support a jury determination that Plaintiff's body-cavity search was ... an 'unreasonable' intrusion on his rights, under the four-factor test articulated in *Bell*." (Report at 25.) Magistrate Judge Freeman properly assessed each of the four *Bell* factors and correctly determined that the last two factors—the officer's justification for the search and the place in which the search was conducted— weigh in favor of a finding that the search was, in fact, reasonable. (*Id.* at 25–29.) The record establishes that the Officer Defendants had a "legitimate penelogical reason" for conducting a body cavity search based on their observations of Plaintiff's conduct, and the fact that the body cavity search was conducted in an isolated part of a cell block where only Lewis and Johnson were present. (*Id.*)

**\*6** Finally, Magistrate Judge Freeman correctly found that the Officer Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim. Qualified immunity is an affirmative defense, "shield[ing] federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and internal quotation marks omitted). Indeed, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citation and internal quotation marks omitted).

Magistrate Judge Freeman appropriately determined that "this Court is constrained to agree with Defendants that, at the time of the conduct at issue, Plaintiff's right to be free from the type of search that was conducted was not sufficiently established to enable him to proceed against the Officer Defendants, even if the Court were to determine that the *Bell* factors, on balance, weigh in Plaintiff's favor." (Report at 30–31.) Accordingly, this Court adopts Magistrate Judge Freeman's recommendation that the Officer Defendants be granted summary judgment on Plaintiff's Fourth Amendment claims.

### C. Plaintiff Cannot Prevail on His First and Fourteenth Amendment Retaliation Claims.

Magistrate Judge Freeman appropriately determined that Plaintiff does not have a colorable First or Fourteenth Amendment claim for retaliation. To state a claim under § 1983 for retaliation under the First Amendment, a plaintiff must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Magistrate Judge Freeman correctly determined that "Plaintiff has not alleged, for example, that Defendants in any way burdened his right to raise a complaint about the conduct of the body-cavity search or retaliated against him for doing so." (Report at 10 n.5.) Accordingly, Plaintiff's First Amendment claim against Defendants cannot prevail.

### D. Plaintiff Cannot Prevail on His *Monell* Claim Against the City.

Magistrate Judge Freeman correctly found that Plaintiff cannot prevail on his claim against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), whether his claim is premised on the alleged violation of Plaintiff's Eighth Amendment or Fourth Amendment rights. In order to hold a municipality liable under § 1983, a plaintiff must establish "(1) the existence of an officially-adopted policy, custom, or practice and (2) a direct and deliberate causal connection between that policy, custom, or practice and the violation of plaintiff's federally-protected rights." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citations and internal quotation marks omitted). Further, "[a] decision not to train certain employees about their legal duty to avoid violating citizens' rights" counts as an officially adopted policy in so far as "[a] pattern of similar constitutional violations by untrained employees" can be demonstrated. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (citations omitted).

Torres v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 4784756

Magistrate Judge Freeman properly rejected Plaintiff's claims against the City because Plaintiff provides insufficient evidence of a "pattern of similar constitutional violations." (Report at 34 (quoting *Connick*, 563 U.S. at 61).) As Magistrate Judge Freeman correctly noted, "Plaintiff alleges that the City's 'failure to train, supervise, and discipline its employee[s] in the appropriate use of physical force [and] executing searches' led to the violation of his constitutional rights and that this failure amounted to 'deliberate indifference.' " (*Id.* at 32–33 (citation omitted).) Magistrate Judge Freeman properly rejected this argument since there is no evidence that Lewis or any other officers used an unconstitutional level of force at the time of this incident or on any previous occasions. Evidence of a policy or practice by the City is lacking. (*Id.* at 33–34.) Consequently, Magistrate Judge Freeman properly found that "the City is entitled to summary judgment dismissing Plaintiff's *Monell* claim." (*Id.* at 34.)

## IV. CONCLUSION

**\*7** Magistrate Judge Freeman's Report is ADOPTED. Defendants' motion for summary judgment, (ECF No. 38), is GRANTED. The Clerk of Court is directed to close the motion accordingly, and to mail a copy of this memorandum decision and order to Plaintiff at Greene Correctional Facility, P.O. Box 975, Coxsackie, New York 12051.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4784756

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6561598
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Morgan GREENBURGER, Plaintiff,

v.

New York State Corrections Officer Philip R.
ROUNDTREE, in His Individual Capacity, Defendant.

CIVIL ACTION NO. 17 Civ. 03295 (PGG) (SLC)
|
Signed 01/16/2020

**Attorneys and Law Firms**

Jonathan C. Moore, David Bruce Rankin, Luna Droubi,
Beldock Levine & Hoffman LLP, New York, NY, for Plaintiff.

**REPORT AND RECOMMENDATION**

SARAH L. CAVE, United States Magistrate Judge.

 **\*1 TO THE HONORABLE PAUL G. GARDEPHE**,
United States District Judge:
On May 3, 2017, Plaintiff Morgan Greenburger
("Greenburger") filed a complaint alleging that Defendant
Philip R. Roundtree ("Roundtree"), a Corrections Officer
at Sing Sing Correctional Facility ("Sing Sing") where
Greenburger was incarcerated, violated Greenburger's federal
civil rights by brutally beating him and then lying about
the incident. (ECF No. 1 at ¶¶ 1–3). Roundtree, who has
since been terminated from his position at Sing Sing, failed
to answer the complaint or otherwise appear in this action.
The Clerk of Court entered a Certificate of Default against
Roundtree and, after issuing an order to show cause to which
he did not respond and holding a hearing at which he did not
appear, the District Court entered a default judgment against
Roundtree. (ECF Nos. 17, 19, 23). The District Court referred
the matter to the Honorable Henry B. Pitman, United States
Magistrate Judge, for an inquest into damages (ECF No. 22),
which referral was reassigned to the undersigned on October
3, 2019.

For the reasons set forth below, I respectfully recommend
that the District Court award Greenburger the total sum of
$273,246.88, comprised of: (1) compensatory damages in the
amount of $118,000; (2) punitive damages in the amount of

$85,000; (3) attorneys' fees in the amount of $67,420; and (5)
costs in the amount of $2,826.88.

## I. BACKGROUND

Given Roundtree's default, the Court accepts as true all well-
pleaded factual allegations in the complaint, except as to
damages. See City of New York v. Mickalis Pawn Shop,
LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("it is an 'ancient
common law axiom' that a defendant who defaults thereby
admits all 'well-pleaded' factual allegations contained in
the complaint") (quoting Vt. Teddy Bear Co., Inc. v. 1-800
Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)); Whitehead
v. Mix Unit, LLC, No. 17 Civ. 9476 (VSB) (JLC), 2019 WL
384446, at *1 (S.D.N.Y. Jan. 31, 2019).

### A. **Factual Background** [1]

[1]    The factual background is set forth in the complaint
(ECF No. 1) and supported in Greenburger's
declaration, his counsel's declaration, and their
accompanying exhibits (ECF No. 32).

On May 11, 2016, the staff at Sing Sing placed Greenburger
on "special watch" after he told them that he had eaten a
toothbrush. (ECF Nos. 1 ¶ 11; 32-2 ¶¶ 4–5). "Special watch"
requires that a corrections officer be on duty to monitor the
inmate at all times. (ECF Nos. 1 ¶ 12; 32-2 ¶ 5). While on
special watch, the toilet was covered to prevent Greenburger
from hurting himself, so he asked to use a urine bottle;
Roundtree told him to wait "a few minutes." (ECF Nos. 1
¶ 13; 32-2 ¶¶ 6–7). Greenburger waited, again asked for
a urine bottle, waited another fifteen minutes, and asked
a third time, informing Roundtree that it was becoming
an emergency. (ECF Nos. 1 ¶ 15; 32-2 ¶¶ 8–9). Roundtree
screamed at Greenburger in response, threatening to beat him
if he asked again. (ECF Nos. 1 ¶ 16; 32-2 ¶ 10). Greenburger
said he wanted to avoid conflict, but "just needed to use the
urine bottle." (ECF Nos. 1 ¶ 17; 32-2 ¶ 11). After asking
Greenburger, "are you sure you want it?" Roundtree opened
the door to Greenburger's cell, placed the urine bottle inside
near the door, and told Greenburger to take it. (ECF Nos. 1 ¶¶
18–19; 32-2 ¶¶ 12, 14). As Greenburger reached for the bottle,
Roundtree beat Greenburger on the "head, back, shoulders,
and left arm" with enough force that the baton splintered.
(ECF Nos. 1 ¶¶ 20–21; 32-2 ¶¶ 15–17; 32 ¶ 5(a)).

**\*2** After a delay of nearly two hours, during which a towel placed on Greenburger's head to stop the bleeding had become saturated with blood, he was taken to Mount Vernon Montefiore Hospital, where he received five staples to close the head wound. (ECF Nos. 1 ¶¶ 23–25; 32-2 ¶¶ 19–21, 23; 32 ¶ 3(b)). Photographs of Greenburger, even after his wounds were cleaned and tended to, show his head wrapped in a bandage and marks on his back. (ECF No. 32-2 ¶ 22, Ex. A). [2] The head wound measured two inches long and one-half inch deep. (ECF No. 32 ¶¶ 3(d), 5(b)). At the hospital, Greenburger suffered from dizziness, reported pain at a level of ten out of ten, and was diagnosed with a shoulder sprain. (ECF Nos. 1 ¶ 24–25; 32 ¶¶ 3(a), (c)). Once discharged from the hospital, Greenburger was returned to the Sing Sing infirmary, where he remained from May 11, 2016 to May 16, 2016, a period of five days. (ECF Nos. 32 ¶ 4(a); 32-2 ¶ 23). In the infirmary, Greenburger had to sleep on the floor under constant watch of a guard. (ECF No. 32-2 ¶ 24).

[2]     Exhibit A of ECF No. 32-2 is filed under seal at ECF No. 35.

Roundtree claimed Greenburger instigated the altercation by punching him in the neck and head. (ECF No. 1 ¶ 27). Disciplinary charges were initiated against Greenburger for assaulting staff and refusing a direct order, and he was placed in the Solitary Housing Unit ("SHU") at Sullivan Correctional Facility from May 16, 2016 to July 5, 2016, a period of 50 days. (ECF Nos. 1 ¶ 29; 32 ¶¶ 4(a), 5(e), Ex. 4; [3] 32-2 ¶ 27). While in SHU at Sullivan, Greenburger was kept in his cell 23 hours a day, with one hour outside in an isolated fenced-in area. (ECF No. 32-2 ¶¶ 28(a)–(b)). His cell had no windows, and was open on both sides, precluding any privacy. (Id. ¶¶ 28(c), (f)). In SHU, Greenburger was only allowed two books, paper, and pencils and did not have regular commissary access. (Id. ¶¶ 28(h)–(i), 30). He did not have access to a telephone or his personal clothing, and was permitted one visitor per week. (Id. ¶¶ 28(j)–(l), 30). From July 5, 2016 to August 9, 2016, a period of 35 days, Greenburger was held in the Residential Mental Health Unit ("RMHU"), where the conditions were the substantially the same as in SHU, except that he could access mental health programs in RMHU. (Id. ¶ 29).

[3]     Exhibit 4 of ECF No. 32 is filed under seal at ECF No. 35.

Greenburger alleges that he has suffered significant emotional injuries from his stay in solitary confinement, including flashbacks about the incident with Roundtree, weight loss of over 25 pounds, frustration, and stress. (ECF Nos. 32 ¶¶ 4(e)–(g); 32-2 ¶¶ 28(n)–(p)). He points to his time in solitary confinement as a contributing factor to two subsequent suicide attempts, stunted social skills, and continued efforts to isolate himself. (ECF No. 32-2 ¶¶ 34–35).

On or about October 2, 2016, after he had been released from SHU, Greenburger received notice that the disciplinary charges against him had been reversed. (ECF Nos. 1 ¶ 30; 32-2 ¶ 33). The complaint alleges that Roundtree was terminated as a result of his actions against Greenburger. (ECF No. 1 ¶ 3).

### B. Procedural Background

Greenburger commenced this action on May 3, 2017 by filing the complaint against Roundtree alleging violations of his federal civil rights. (ECF No. 1). Magistrate Judge Pitman granted Greenburger's motion for an extension of time to serve the summons on Roundtree by alternative service, and on October 30 and November 1, 2017, by email and post mail, service was performed. (ECF Nos. 12–14). On May 15, 2018, the Clerk of the Court issued a certificate of default against Roundtree. (ECF No. 17). The District Court issued an order to show cause directing Roundtree to appear and demonstrate why a "default judgment should not be entered against [him] for failing to serve and file an answer after having been served with the summons and complaint." (ECF No. 19). Roundtree neither responded to the order to show cause nor appeared at the hearing on December 12, 2018; accordingly, the District Court entered a default judgment against him and referred this matter to Magistrate Judge Pitman for an inquest on damages. (ECF Nos. 22–23).

**\*3** On December 18, 2018, Magistrate Judge Pitman entered an order directing Greenburger to submit by January 18, 2019 proposed findings of fact and conclusions of law and directing Roundtree to respond by February 15, 2019. (ECF No. 24). The order warned Roundtree that if he failed to respond to Greenburger's submissions or contact the Court by February 15, 2019 to request an in-court hearing, the Court would issue a report and recommendation concerning damages based only on Greenburger's written submissions, without an in-court hearing. (Id.) In support of the damages inquest, Greenburger submitted his own declaration as well as declarations from his attorneys, all accompanied by exhibits, and proposed findings of fact and conclusions of law. (ECF Nos. 32, 35, 37). Roundtree did not respond or otherwise contact the Court. On

October 3, 2019, the inquest on damages was reassigned to the undersigned.

## II. DISCUSSION

### A. Default Judgment and Liability

A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). A defendant's default is deemed "a concession of all well-pleaded allegations of liability," but it is not deemed an admission of damages. Rovio Entm't, Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 545 (S.D.N.Y. 2015). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Am. Jewish Comm. v. Berman, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313, at *3 (S.D.N.Y. June 15, 2016) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)), adopted by 2016 WL 4532201 (S.D.N.Y. Aug. 29, 2016).

A plaintiff "bears the burden of establishing [its] entitlement to recovery and thus must substantiate [its] claim with evidence to prove the extent of damages." Dunn v. Advanced Credit Recovery Inc., No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *2 (S.D.N.Y. Mar. 1, 2012). The evidence the plaintiff submits must be admissible. Poulos v. City of New York, No. 14 Civ. 03023 (LTS) (BCM), 2018 WL 3750508, at *2 (S.D.N.Y. July 13, 2018), adopted at 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018); see House v. Kent Worldwide Mach. Works, Inc., 359 F. App'x 206, 206 (2d Cir. 2010) (summary order) ("damages must be based on admissible evidence"). The plaintiff must demonstrate that the compensation it seeks "relate[s] to the damages that naturally flow from the injuries pleaded." Am. Jewish Comm., 2016 WL 3365313, at *3 (quoting Greyhound, 973 F.2d at 159).

Where the damages are "not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence." Am. Jewish Comm., 2016 WL 3365313, at *4 (internal citation omitted). If the documents the plaintiff has submitted provide a "sufficient basis from which to evaluate the fairness of" the requested damages, the court need not conduct an evidentiary hearing. Fustock v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989); see Transatlantic Marine Claims Agency, Inc. v.

Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (court may determine appropriate damages based on affidavits and documentary evidence "as long as [the court has] ensured that there [is] a basis for the damages specified in the default judgment") (internal citation omitted).

Roundtree's default equates to a concession of liability as to the allegations in the complaint, which asserted a claim under 42 U.S.C. § 1983 that Roundtree's conduct violated Greenburger's Eighth and Fourteenth Amendment rights. (ECF No. 1 ¶¶ 1–3, 33–39). The Court still must look to the complaint to determine whether Greenburger's allegations are prima facie sufficient to demonstrate liability under Section 1983. See Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas, 509 F. App'x 206, 207 (2d Cir. 2013) (liability of defaulting defendant depends on whether "allegations are sufficient to state a cause of action"); Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012) ("Without a response from Defendants, this Court must first determine whether the allegations in Plaintiff's complaint are sufficiently pleaded to establish Defendants' liability."). The Court will therefore first assess whether Greenburger has properly established the elements of his claim.

### 1. Section 1983 liability

*4 Greenburger asserts two types of injury under Section 1983: (1) that the blows Roundtree inflicted with the baton constituted an excessive use of force; and (2) that Roundtree's false statements led to his unlawful detention in solitary confinement for 90 days. (ECF Nos. 1; 32-1 at 8–15).

### a. Excessive force

With respect to Greenburger's excessive force claim, "the primary source of substantive protection is the Eighth Amendment." Cox v. Malone, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002) (citing Whitley v. Albers, 475 U.S. 312, 327 (1986)), aff'd 56 F. App'x 43 (2d Cir. 2003). To establish an Eighth Amendment violation,

> an inmate must meet both an objective and a subjective requirement. To meet the objective requirement, the alleged violation must be sufficiently serious by objective standards....

> The objective component is context-specific, turning upon contemporary standards of decency ... To meet the subjective requirement, the inmate must show that the prison officials involved had a wanton state of mind when they were engaging in the alleged misconduct.

Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (internal citations omitted).

"When prison officials maliciously and sadistically use force to cause harm," a plaintiff need not demonstrate significant injury because, in those circumstances, "contemporary standards of decency always are violated." Hudson v. McMillian, 503 U.S. 1, 9 (1992). "Thus, the malicious use of force to cause harm constitutes an Eighth Amendment violation per se." Cox, 199 F. Supp. 2d at 140 (citing Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1999)).

Here, Greenburger adequately alleged that Roundtree, without provocation or cause, struck him in the head, back, shoulder, and left arm, resulting in serious injuries, including a head wound two inches long and one-half inch deep. (ECF Nos. 1 ¶¶ 2, 20–22, 28; 32 ¶¶ 3(d), 5(b)). By his default, Roundtree has conceded these "well-pleaded allegations of liability." Rovio Entm't, Ltd., 97 F. Supp. 3d at 545. On this inquest, Greenburger has also substantiated his injuries from Roundtree's use of excessive force through declarations and supporting exhibits, including photographs and medical records. (ECF No. 32). In addition, based on the facts that the disciplinary charges against Greenburger arising from the incident were dismissed and that Roundtree was terminated from his position at Sing Sing, the Court infers that Roundtree's statements that Greenburger initiated the attack were false, Greenburger was not a threat to Roundtree, and the force that Roundtree used against Greenburger was "inherently excessive." Poulos, 2018 WL 37505058, at *5. Accordingly, the Court finds that Greenburger has adequately demonstrated his entitlement to recover for "all cognizable injuries proximately caused by" Roundtree's May 11, 2016 use of excessive force. Id.; see also Dixon v. Agbai, No. 15 Civ. 850 (AT) (AJP), 2016 WL 3702749, at *3 (S.D.N.Y. July 8, 2016) (finding that the record supported the determination that defendant's "excessive force proximately caused" plaintiff's injuries).

### b. Solitary confinement

With respect to Greenburger's claim that his detention in SHU for 90 days violated his liberty without due process, he "must first establish that he possessed a protected liberty interest." Cox, 199 F. Supp. 2d at 141 (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). For liberty interests that arise under the Due Process Clause of the Fourteenth Amendment,

> *5 the Supreme Court has narrowly circumscribed its scope to protect no more than the most basic liberty interests in prisoners.... The Due Process Clause does not protect against every change in the conditions of confinement having a substantial adverse impact on inmates ... if those changes are within the normal limits or range of custody which the conviction has authorized the state to impose.

Arce v. Walker, 139 F.3d 329, 333 (2d Cir. 1998) (internal citations omitted).

"[D]isciplinary confinement does not create a liberty interest triggering due process protection unless the confinement imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Cox, 199 F. Supp. 2d at 142 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). To determine "whether conditions create an atypical and significant hardship, courts should compare the specific conditions of the inmate's confinement to both the conditions in the general population and in other categories of segregation." Cox, 199 F. Supp. 2d at 142. In conducting this comparison, a court considers the following factors:

> (1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary

2020 WL 6561598

segregation imposed compared to discretionary confinement.

Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir. 1998). As former District Judge Shira A. Scheindlin has noted,

> There are, however, significant differences between disciplinary SHU and general population. General population inmates spend considerably more time outside their cells, are entitled to at least three showers per week, and eat together in the 'mess hall.' In fact, out of the twelve hours general population prisoners spend in their cells, eight of them are spent sleeping. SHU inmates, on the other hand, spend 23 hours per day in their cells, are entitled to only two showers per week, and cannot partake in communal meals.

Cox, 199 F. Supp. 2d at 143.

Courts have reached different conclusions with respect to how much SHU detention represents "an atypical and significant hardship" under Sandin. "Some courts have held that SHU confinement for one year or less does not implicate a protected liberty interest," while others have held that that length of confinement raises an issue of material fact that precluded summary judgment. See Cox, 199 F. Supp. 2d at 143 (comparing cases). Thus, the time period alone in which Greenburger spent in solitary confinement—90 days —ordinarily would not rise to the level of an "atypical and significant hardship" as to violate a protected liberty interest. Id.; see also Jackson v. Johnson, 15 F. Supp. 2d 341, 361–62 & n.8 (S.D.N.Y. 1998) (finding that 99 days in "keeplock" did not constitute "a significant and atypical hardship" under Sandin and collecting cases).

Here, however, the only reason Greenburger was in SHU was Roundtree's misconduct—the violent assault followed by Roundtree's false statements giving rise to the disciplinary charges, which were not vacated until after Greenburger had completed his disciplinary sentence. (ECF No. 32-2 ¶ 33, Ex. C). What Greenburger endured by being placed in the SHU in this situation is akin to a Section 1983 claim predicated on malicious prosecution or false imprisonment. See, e.g., King v. Macri, 993 F.2d 294 (2d Cir. 1993) (plaintiff was victim of malicious prosecution who was beaten in custody and confined for two months); Gentile v. Cty. of Suffolk, 926 F.2d 142 (2d Cir. 1991) (plaintiff was victim of police misconduct that resulted in several days of wrongful confinement and pendency of criminal charges for six years). Thus, the Court finds that the fact that he spent even one day in SHU, let alone 90 days, as the result of Roundtree's misconduct, constitutes "an atypical and significant hardship" that states a claim for violation of a protected liberty interest for which he is entitled to recover under Section 1983. Cf. Cox, 199 F. Supp. 2d at 143 (finding that imposition of 180 days in SHU for failure to comply with a pat frisk search "seem[ed] disproportionately harsh").

**B. Damages**

*6 The Court now turns to the question whether Greenburger has provided sufficient evidence to support his claimed damages. Transatlantic Marine, 109 F.3d at 111; Bleecker v. Zetian Sys., Inc., 12 Civ. 2151 (DLC), 2013 WL 5951162, at *6 (S.D.N.Y. Nov. 1, 2013). "A finding that the plaintiff has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages." Kerman v. City of New York, 374 F.3d 93, 123 (2d Cir. 2004). In Section 1983 actions, the "cardinal principle of damages in Anglo-American law" applies, providing for "compensation for the injury caused to plaintiff by defendant's breach of duty." Carey v. Piphus, 435 U.S. 247, 254–55 (1978) (internal citation omitted). In a Section 1983 action seeking damages for a violation of constitutional rights, "the level of damages is ordinarily determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986); Poulos, 2018 WL 3750508, at *3. The damages in Section 1983 actions, then, are primarily compensatory, intended "to compensate persons for injuries that are caused by the deprivation of constitutional rights." Carey, 435 U.S. at 254; see Bermudez v. City of New York, No. 11 Civ. 750 (LAP), 2014 WL 11274759, at *6 (S.D.N.Y. Mar. 25, 2014) ("Section 1983 civil actions rely on the same analysis as state common law tort actions and serve the same primary goal of compensation."). "The measure of damages for pain and suffering or emotional distress is the fair and reasonable compensation to be fixed by the trier of fact in the light off all the evidence in the case." Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001).

Neither Section 1983 nor case law applying it "provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value." Mathie v. Fries, 935 F. Supp. 1284, 1304–05 (E.D.N.Y. 1996), aff'd 121 F.3d 808 (2d Cir. 1997). The Court may instead consult analogous cases involving similar injuries. See Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990); Cartright v. Lodge, No. 15 Civ. 9939 (KMW) (RLE), 2017 WL 1194241, at *7 (S.D.N.Y. Mar. 30, 2017).

In addition, where " 'the defendant's conduct is shown to be motivated by evil motive or intent,' or if the defendant's conduct 'involves reckless or callous indifference to the federally protected rights of others,' " punitive damages may be awarded. Amid v. Chase, 720 F. App'x 6, 13 (2d Cir. 2017) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). To demonstrate recklessness or callousness consummate with punitive damages, the plaintiff must demonstrate a "subjective consciousness of a risk of injury or illegality[,] and a criminal indifference to civil obligations." Amid, 720 F. App'x at 13 (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999)).

Greenburger has submitted proposed findings of fact and conclusions of law supported by declarations and documentary evidence. (ECF Nos. 32, 35, 37). Greenburger's declaration is admissible to demonstrate his damages. See Maldonado v. La Nueva Rampa, Inc., No. 10 Civ. 8195 (LLS) (JLC), 2012 WL 1669341, at *2 (S.D.N.Y. May 14, 2012); Poulos, 2018 WL 37505058, at *4. The records of the Department of Corrections, including records of medical treatment provided to Greenburger in connection with the incident involving Roundtree, are accompanied by a certification by a custodian of records that attests to the requirements of Federal Rule of Evidence 803(6) (see ECF No. 32 Exs. 2–3), and therefore are admissible as business records. See Poulos, 2018 WL 3750508, at *4. The Court finds that Greenburger has met his evidentiary burden and that a hearing is unnecessary because his submissions constitute a "sufficient basis from which to evaluate the fairness" of his damages request. Fustok, 873 F.2d at 40. Based on Greenburger's written submissions, the Court will analyze his request for compensatory and punitive damages.

**1. Compensatory damages**

Under Second Circuit precedent, "damages recoverable for loss of liberty for the period spent in a wrongful confinement

are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering." Kerman, 374 F.3d at 125. Accordingly, the Court will separately analyze Greenburger's damages with respect to excessive force and with respect to his time in solitary confinement.

**a. Excessive force**

*7  In Section 1983 actions involving excessive use of force by a police officer, "[s]ubstantial awards are warranted where the damage is significant." Justin R. ex rel. O'Toole v. Niang, No. 06 Civ. 6228 (BSJ) (RLE), 2010 WL 7891579, at *4 (S.D.N.Y. July 20, 2010) (citing cases involving six-figure awards for injuries arising from physical assaults by law enforcement officers). "A beating severe enough to leave marks is sufficient proof of a compensable injury." Atkins v. New York City, 143 F.3d 100, 104 (2d Cir. 1998).

Cases involving single incidents of strikes by law enforcement officers that resulted in lacerations and loss of consciousness, but did not cause broken bones or other injuries requiring surgery, frequently involve damage awards in the range of $50,000 to $100,000. See Dancy v. McGinley, 843 F.3d 93, 113–14 (2d Cir. 2016) (affirming $81,500 award to 17-year-old plaintiff who suffered abrasions to face, head, and torso from police officer's excessive force); Blissett v. Coughlin, 66 F.3d 531, 536 (2d Cir. 1995) (affirming $75,000 award to inmate whom prison guards struck with baton, punched, slapped, and held in SHU for eight days); Poulos, 2018 WL 3750508, at *2, *7 (recommending $100,000 award to plaintiff whom prison guard struck in the head causing three-inch laceration, permanent scar, reduced vision, intermittent eye twitching, and pain); Lewis v. City of Albany Police Dep't, 547 F. Supp. 2d 191, 210 (N.D.N.Y. 2008), aff'd 332 F. App'x 641 (2d Cir. 2009) (affirming $65,000 award to plaintiff who suffered protracted injuries from police officer pushing his face into the ground); Hightower v. Nassau Cty. Sheriff's Dep't, 325 F. Supp. 2d 199, 207–09 (E.D.N.Y. 2004) (reducing $150,000 award to $65,000 to plaintiff who suffered bruises, contusions, swollen lip, and back pain from two altercations with prison guards), vacated in part on other grounds, 343 F. Supp. 2d 191 (E.D.N.Y. 2004); Morales v. City of New York, No. 99 Civ. 10004 (DLC), 2001 WL 8594, at *2, *7, *10 (S.D.N.Y. Jan. 2, 2001) (reducing $2.75 million jury award to $50,000 to plaintiff who suffered "deep bruises" and months of counseling resulting from police officer's excessive use of force); see also Poznyakovskiy v. City of

New York, No. 06 Civ. 4342 (JG), 2008 WL 842438, at *1 (E.D.N.Y. Mar. 11, 2008) (recommending $50,000 award to plaintiff whom non-officer struck on head with baseball bat resulting in loss of consciousness, five centimeter laceration, humiliation, and headaches); Denman v. Sanders, No. 05 Civ. 25 (RLE), 2006 WL 452018, at *8 (S.D.N.Y. Feb. 24, 2006) (reducing to $50,000 damages awarded to plaintiff punched in head by non-officer resulting in bleeding).

Greenburger suggests a damage award of $350,000 to compensate him for Roundtree's assault and the subsequent wrongful disciplinary action arising from Roundtree's false statements. (ECF No. 32-1 at 14). [4] He bases this amount on the five days of medical care he received after Roundtree's assault, the head wound requiring five stitches, the two hours he spent in severe pain with his head wrapped in a blood-soaked towel, his sprained shoulder, "bruising and pain to his left hip, shoulder, arm, elbow, wrist, leg, knee, and foot," and "significant and lasting pain" to his back. (Id.; ECF No. 32 ¶¶ 3–4; 32-2 ¶¶ 19–21, 31). Since the incident, he has suffered emotional distress, including substantial weight loss, flashbacks, and two suicide attempts. (ECF Nos. 32 ¶¶ 4(f)–(g); 32-2 ¶¶ 28(n)–(p), 34–36).

[4]     Unless otherwise indicated, citations are to ECF page numbers.

**\*8** In further support of his suggested damages amount, he cites to several cases in which courts in the Second Circuit have upheld jury awards ranging from $75,000 to $250,000. (ECF No. 32-1 at 13–14). In Williams v. Marinelli, the court held that the jury's $250,000 award to an inmate who was assaulted by a fellow inmate and suffered multiple head lacerations, three bumps on his head, an abrasion on his face, swelling, and bruises all over his body did not "fall[ ] outside the reasonable range" of comparable cases. No. 13 Civ. 1154 (MPS), 2017 WL 1143740, at *21–22 (D. Conn. Feb. 8, 2017).

In DiSorbo v. Hoy, the Second Circuit reduced to $250,000 the jury's award of compensatory damages to a woman whom police officers "choked, slammed against the wall, thr[ew] to the ground, and struck while defenseless on the floor," and "forcibly dragged through the [police] station." 343 F.3d 172, 175–76 (2d Cir. 2003). In Bender v. City of New York, the Second Circuit reduced from $300,700 to $150,000 the jury's award to a woman whom a police officer struck in the mouth without permanent injury, was detained for 24 hours, kept in custody for five hours before arraignment, had

a six months' pendency of criminal charges, and suffered emotional distress. 78 F.3d 787, 792–95 (2d Cir. 1996). In Hutchinson v. McCabee, the court upheld a jury's award of $120,000 for past and future pain and suffering to an inmate who had been attacked twice by other inmates and sustained "serious injuries to his face, shoulder and neck" and was hospitalized for nine days. 168 F. Supp. 101, 102, 104 (S.D.N.Y. 2001). In King v. City of New York, the court reduced from $300,000 to $200,000 the jury's award to a plaintiff whom multiple police officers had beaten, including with a baton and a walkie-talkie, resulting in abrasions and a gash on his head. No. 92 Civ. 7738 (JGK), 1996 WL 737195, at *4–6 (S.D.N.Y. Dec. 24, 1996).

Having reviewed the records in this case, the cases Greenburger cites, as well as dozens of Section 1983 cases involving injuries similar to those Greenburger sustained from Roundtree's use of excessive force, the Court finds that his requested award of $350,000 in compensatory damages falls outside the range of reasonableness, and that his circumstances more closely resemble those of plaintiffs for whom awards in the range of $75,000 to $120,000 were deemed reasonable. See Blissett, 66 F.3d at 536 ($75,000); Poulos, 2018 WL 3750508, at *6–7 ($100,000); Hutchinson, 168 F. Supp. 2d at 104 ($120,000). The head wound that Greenburger sustained was deep, requiring five stitches, but appears to have healed, and the only lasting physical pain he describes is to his back. (ECF Nos. 32 ¶ 3(b), (d); 32-2 ¶ 31). He does attest to continued emotional effects, but the record does not detail additional medical treatment or medication for pain or mental health. Accordingly, the Court recommends a compensatory damages award for his excessive force claim in the middle of this range, that is, $100,000.

### b. Solitary confinement

The sealed records Greenburger has submitted in support of this inquest demonstrate a history of mental health treatment during his incarceration, both before and after his 90 days in SHU. (ECF No. 32 ¶ 4(b)–(c), Ex. 3). He attests in his Declaration to flashbacks of the incident with Roundtree, substantial weight loss, two suicide attempts, and forced self-isolation. (ECF No. 32-2 ¶¶ 28(n)–(p), 34–35). He provides examples of several cases in which other courts have awarded damages for wrongful solitary confinement in the range of $100 to $200 per day of confinement and requests an award above that range, of $250 per day. (ECF No. 32-1 at 11–12).

**\*9** The most relevant and contemporaneous case awarding damages for wrongful solitary confinement is <u>Parker v. City of New York</u>, in which, as a result of a class-wide settlement, class members who spent time in solitary confinement while pretrial detainees were awarded $175 per day, and class members under 18 or having serious mental illness were awarded $200 per day. No. 15 Civ. 6733 (CLP), 2018 U.S. Dist. LEXIS, 205598, at \*4 (E.D.N.Y. Dec. 4, 2018). The Court recommends, given Greenburger's history of mental illness, an award of $200 per day, or $18,000, for his wrongful solitary confinement.

### 2. <u>Punitive damages</u>

#### a. <u>Legal standard</u>

A plaintiff may receive punitive damages in a <u>Section 1983</u> case where he "demonstrates that 'the defendant's conduct is ... motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' " that is, where he " 'has produced evidence of a positive element of conscious wrongdoing or malice.' " <u>DeMichele, No. 09 Civ. 9334 (PGG), 2012 WL 4354763, at \*22 (S.D.N.Y. Sept. 24, 2012)</u> (quoting <u>Cameron v. City of New York, 598 F.3d 50, 69 (2d Cir. 2010)</u>). The Court must ensure that the punitive damages it awards are "fair, reasonable, predictable, and proportionate." <u>Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2013)</u>. Courts consider three factors in evaluating a punitive damages award: (1) "the degree of reprehensibility of the" defendant's conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award"; and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." <u>BMW of North America, Inc. v. Gore, 517 U.S. 559, 575 (1996)</u>. The first of these <u>Gore</u> factors, reprehensibility, may be the most important of the three, <u>see</u> <u>Medina v. Donaldson, No. 10 Civ. 5922 (VMS), 2014 WL 1010951, at \*17 (E.D.N.Y. Mar. 14, 2014)</u>, and relevant considerations include: "1) whether a defendant's conduct was violent or presented a threat of violence; 2) whether a defendant acted with malice as opposed to mere negligence; and 3) whether a defendant has engaged in repeated instances of misconduct." <u>DiSorbo, 343 F.3d at 186</u>.

As to the second <u>Gore</u> factor, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." <u>DiSorbo, 343 F.3d at 187</u> (internal citation omitted). If the plaintiff's compensable injury was small but the reprehensibility of the defendant's conduct great, "the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high." <u>Payne, 711 F.3d at 102</u>. Generally, a compensatory to punitive damages ratio of 1:1 or less is reasonable. See <u>Alla v. Verkay, 979 F. Supp. 2d 349, 378–79 (E.D.N.Y. 2013)</u>; <u>Payne, 711 F.3d at 102–03</u>; <u>Poulos, 2018 WL 3750508, at \*7–9</u>. A multiplier, however, need not be used if it is not the "best tool" to assess the comparison between the two awards. <u>DiSorbo, 343 F.3d at 187</u>.

The purpose of the third <u>Gore</u> factor "is to ensure that the defendant had notice that his or her actions could result in a comparable punitive damages award." <u>Medina, 2014 WL 1010951, at \*16</u> (citing <u>DiSorbo, 343 F.3d at 188</u>).

#### b. <u>Application</u>

Greenburger requests a punitive damages award of $150,000 to punish Roundtree and deter other corrections officers from engaging in similar conduct. (ECF No. 32-1 at 16). In support, he cites to <u>Section 1983</u> cases involving excessive force and malicious prosecution where courts have upheld punitive damages awards between $75,000 and $175,000. (<u>Id.</u> citing <u>DiSorbo, 343 F.3d at 189</u> ($75,000); <u>Alla, 979 F. Supp. 2d at 375</u> ($150,000); <u>Tretola v. Cty. of Nassau, 14 F. Supp. 3d 58, 90 (E.D.N.Y. 2014)</u> ($175,000)).

**\*10** The Court agrees that Greenburger is entitled to an award of punitive damages. As a corrections officer engaged in law enforcement, Roundtree's training "gave him notice as to the gravity of misconduct under color of his official authority." <u>Medina, 2014 WL 1010951, at \*16</u>. Without provocation, Roundtree entered Greenburger's cell with the intent to harm him in retaliation for his requests for a urine bottle, struck him with a baton so hard that it "splintered," caused a two-inch gash that bled profusely while Roundtree delayed medical treatment, made false statements that Greenburger instigated the attack leading to disciplinary charges that were subsequently vacated, and Greenburger's 90-day detention in solitary confinement. (See <u>supra</u> § I.A). From these facts the Court infers that Roundtree acted with a "subjective consciousness of a risk of injury or illegality[,] and a criminal indifference to civil obligations" that justifies an award of punitive damages. <u>Amid, 720 F. App'x at 13</u> (internal citation omitted).

The Court finds that an award of $150,000 is not warranted and may be deemed excessive under the Gore factors. Although Roundtree's assault was unprovoked, it involved only a single incident, and did not involve broken bones or surgery, unlike Alla where the court upheld the jury's award of $150,000 in punitive damages. See 979 F. Supp. 2d at 378–79. Roundtree did not strike Greenburger with the same amount of force or cause the same degree of long-term physical damage as the defendant in Alla. By making false statements that led to Greenburger's wrongful disciplinary charges and three months in solitary confinement, however, Roundtree's conduct is somewhat more reprehensible than that of the officer in Poulos, where the court recommended an award of $75,000 in punitive damages. 2018 WL 3750508, at *9. An additional amount of punitive damages is therefore appropriate to punish Roundtree and deter others from this abuse of official authority. Therefore, the Court recommends that Greenburger be awarded $85,000 in punitive damages, which is proportionate to the recommended compensatory damages award, "sufficient to punish the defendant for his misconduct[,] and adequate to serve as a deterrent." Id.

### C. Attorneys' Fees

Greenburger requests an award of attorneys' fees in the amount of $77,437.50. (ECF No. 37-1 at 11).

### 1. Recoverability of attorneys' fees in Section 1983 actions

Attorneys' fees are available in to a plaintiff who prevails under Section 1983. Dixon, 2016 WL 3702749, at *2; 42 U.S.C. § 1988(b). "A plaintiff who obtain[s] a default judgment is considered a prevailing party eligible to recover attorney's fees and costs." Id. at *12 (internal citation omitted). "The function of an award of attorney's fees is to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." Kerr v. Quinn, 692 F.2d 875, 877 (2d Cir. 1982).

The district court has broad discretion to determine the amount to be awarded. Vincent v. Comm'r of Soc. Sec., 651 F.3d 299, 307 (2d Cir. 2011). The court's "discretion is narrowed by a presumption that successful civil rights litigants should ordinarily recover attorneys' fees unless special circumstances render an award unjust." Raishevich v. Foster, 247 F.3d 337, 344 (2d Cir. 2001). Courts employ

a two-part inquiry to assess "whether special circumstances make it appropriate to deny attorneys' fees." Id. First, the court must inquire "whether the plaintiff's claim was so strong on the merits and so likely to result in a substantial judgment that counsel in similar cases could be easily and readily retained." Id. (internal citation omitted). This inquiry is objective and evaluates the "likely response of the bar ... in light of the posture of the case at the time counsel is sought, not in the light of hindsight." Kerr, 692 F.2d at 878. Second, if the court finds the first requirement met, the court "may use its discretion to deny fees if, in light of all the circumstances and the size of recovery, an award of such fees might work an injustice." Raishevich, 247 F.3d at 344–45 (internal citation omitted). In this evaluation, the Court considers factors such as "the award of punitive damages, the amount of the compensatory award, the degree and measurability of the harm to the plaintiff, and the public interest in the particular claim." Id. at 345.

### 2. Method for calculating attorneys' fees

 *11  In Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cty. of Albany, 522 F.3d 182 (2d Cir. 2008), the Second Circuit articulated the method for calculating reasonable attorney's fees: a reasonable hourly rate multiplied by a reasonable number of hours extended on the work constitutes the "presumptively reasonable fee," also known as the "lodestar." See Tatum v. City of New York, No. 06 Civ. 4290 (PGG) (GWG), 2010 WL 334975, at *3 (S.D.N.Y. Jan. 28, 2010). A court using the lodestar method sets the lodestar, then considers "whether, in light of variables such as the difficulty of the case, it should adjust the lodestar before settling on the reasonable fee." Arbor Hill, 522 F.3d at 187.

To aid in the court's analysis, a fee application should be supported by "contemporaneous time records" relaying the rates charged and hours worked by each attorney. N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983). The attorneys "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983); see Themis Capital v. Democratic Republic of Congo, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (reducing hours by twenty percent for "impermissibly broad" block billing). A court should look at the "nature of the legal matter and context of the fee award in considering the reasonable rate and reasonable time spent on the matter." Tessemae's LLC, 2019 WL 2635956, at *3.

To determine the hourly rate, a court considers "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289–90 (2d Cir. 2011) (internal citation omitted). In addition, the Second Circuit has a "forum rule" requiring the use of "hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." Id. at 289 (internal citation omitted). A court's determination of the reasonable hourly rate is aided by the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The court may adjust base hourly rates to account for case specific variables such as the complexity of the issues and attorneys' experiences. See Jean-Louis v. City of New York, 342 F. Supp. 3d 436, 441–42 (S.D.N.Y. 2018) (referring to factors set forth in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87, 92–93 (1989)); Williams v. Metro-North R.R. Co., No. 17 Civ. 03847 (JGK), 2018 WL 3370678, at *5 (S.D.N.Y. June 28, 2018) (listing the Johnson factors).

To determine the reasonable number of hours worked, the court should strike a balance "between principles of thoroughness and efficiency." LCS Grp. LLC v. Shire LLC, 383 F. Supp. 3d 274, 280 (S.D.N.Y. 2019). The court must examine the amount of time spent on each task and decide "how much of that time was reasonably expended given the scope and complexity of the litigation." Pichardo v. C.R. Bard, Inc., No. 09 Civ. 7653 (SHS), 2015 WL 13784565, at *4 (S.D.N.Y. Jan. 26, 2015) (internal citation omitted). The court should also consider the number of attorneys involved. Tessemae's LLC, 2019 WL 2635956, at *5. The court can rely on "its own familiarity with the case, as well as its experience with the parties' evidentiary submissions and arguments." Kreisler, 2013 WL 3965247, at *3. Time spent preparing a fee application may be awarded. See Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A., No. 11 Civ. 1529 (KMW) (KNF), 2015 WL 1062327, at *3 (S.D.N.Y. Mar. 3, 2015).

*12 The court may reduce the hours spent on the litigation to exclude excessive, redundant, or otherwise unnecessary time. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (citing Hensley, 461 U.S. at 434); see LCS Grp. LLC, 383 F. Supp. 3d at 281 ("A court may apply an across-the-board

reduction to effectuate the reasonable imposition of fees."); Tatum, 2010 WL 334975, at *6 (a court will exclude hours that were not "reasonably expended") (quoting Hensley v. Eckhart, 461 U.S. 424, 434 (1983)).

Ultimately, "[t]he essential goal in shifting fess (to either party) is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838 (2011).

### 3. Application

#### a. Greenburger should be awarded attorneys' fees.

Applying the two-part test to determine whether "special circumstances" render attorneys' fees inappropriate in this case (see supra § II.C.1), the Court recognizes that it is not easy for an inmate to obtain counsel for a civil rights claim against a corrections officer and even harder for that inmate to "convince a jury to award damages against an officer" if the case even reaches a jury. Dixon, 2016 WL 3702749, at *13. The compensatory and punitive damages the Court recommends above are substantial to reflect the severity of Greenburger's "physical and emotional injuries, and the strong public interest in deterring correction officers from engaging in violent and malicious conduct." Id. Accordingly, the Court finds that no special circumstances preclude attorneys' fees in this case and in its discretion recommends that fees be awarded.

#### b. Calculating reasonable attorneys' fees.

The time records Greenburger's counsel submitted reflect a total of 196.35 hours of time spent on work performed by four attorneys at Beldock Levine & Hoffman LLP ("BLH") for a total of $77,437.50. (ECF No. 37-1). Jonathan Moore is a partner, with an hourly rate of $700.00, and David Rankin is a partner with an hourly rate of $500. (Id. at 11; ECF Nos. 32 ¶ 18; 32-1 at 16; 37 at 1). In addition, Luna Droubi is now a partner at BLH with a current hourly rate of $425 (ECF No. 37-2), but also billed certain amounts of time at hourly rates of $125.00 and $100.00, and one block of time at a flat rate of $1,500.00. (ECF No. 37-1 at 11). Abigail Robinson is a paralegal at BLH with an hourly rate of $175.00. (ECF No. 32 at 11).[5]

5      The billing records BLH has submitted also list
       a Gillian Cassell-Stiga as having billed 0.6 hours
       at an hourly rate of $300.00 for a total of $180.
       (ECF No. 37-1 at 11). While 0.60 hours were spent
       by a timekeeper with the same initials ("GCS")
       on October 19, 2017 to edit the "letter request
       to effectuate service by alternate means," the
       declarations submitted in support of BLH's fee
       request do not mention this individual, describe
       her role in the case, or explain why her rate and
       hours are reasonable. (See ECF Nos. 37, 37-2).
       Accordingly, the Court excludes this individual
       from its analysis and from the amount of fees
       awarded.

#### i. Reasonable hourly rates

Greenburger requests that the Court approve hourly rates of
$700 for Moore, $500 for Rankin, $425 for Droubi, and $175
for Robinson. (ECF Nos. 32 ¶ 7; 37 at 1; 37-1 at 11; to 37-2 at
5). Surveying attorneys' fee awards in Section 1983 actions,
the Court notes that "[r]ates found reasonable by courts in
this District for experienced civil rights attorneys appear to
cluster in the $350–450 per hour range." Salama v. City of
New York, No. 13 Civ. 9006 (PKC), 2015 WL 4111873, at *2
(S.D.N.Y. July 8, 2015) (collecting cases); Tatum, 2010 WL
334975, at *5 (approving rates of $400 and $450 and noting
that "consistent precedent in the Southern District reveals that
rates awarded to experienced civil rights attorneys over the
past ten years have ranged from $250 to $600") (internal
citation omitted). Other precedent in this District supports
awarding experienced solo civil rights practitioners and civil
rights attorneys from small firms hourly rates as high as $550
to $650. See Payne v. Kirkland, No. 14 Civ. 7098 (ALC), 2017
WL 5952707, at *4 (S.D.N.Y. Nov. 30, 2017); see also Dixon,
2016 WL 3702749, at *15 (citing precedent in this District
awarding hourly rates to experienced civil rights attorneys
of $250 to $600, and to associates of $200 to $350). Hourly
rates for paralegals of $100 to $150 per hour are typical for
awards in this District. See Williams, 2018 WL 3370678, at
*8; Tatum, 2010 WL 334975, at *5 (finding that $125 was
reasonable rate for paralegals).

**\*13**  Moore's requested hourly rate of $700 falls above the
high end of previous fee awards in this District. See, e.g.,
Payne, 2017 WL 5952707, at *4. The Court recognizes that

Moore has more than 40 years of experience as a civil rights
practitioner, including his role as co-lead counsel in some of
the more high-profile civil rights litigations in this District.
(ECF No. 37) (noting Moore's role in Floyd v. City of New
York, 283 F.R.D. 153 (S.D.N.Y. 2012)). In this case, in which
the defendant has defaulted, there were no contested motions
or novel legal issues, and the District Court held only one in-
person hearing, Moore's role has been, appropriately, more
modest. In these circumstances, the Court finds that an hourly
rate of $600 for Moore is reasonable. See Alicea v. City
of New York, 272 F. Supp. 3d 603, 609 (S.D.N.Y. 2017)
(citing cases approving hourly rates of $550 to $650 for
experienced civil rights attorneys); Tatum, 2010 WL 334975,
at *5 (noting general acceptance of hourly rates of $250 to
$600 for experienced civil rights attorneys in this District).

Rankin's requested hourly rate of $500 falls within the range
of rates approved by courts in this District for comparable
experienced civil rights attorneys, and therefore, the Court
finds that it is reasonable. Dixon 2016 WL 3702749, at *15.
Similarly, Droubi's hourly rate of $425 falls within this range
and is therefore reasonable. Id. Her rates of $100 and $125
for the small number of hours on administrative tasks is also
reasonable. See Tatum, 2010 WL 334975, at *9 (reducing
to $125 hourly rate for administrative tasks performed by
attorneys).

Robinson's requested hourly rate of $175 falls above the range
of rates for paralegals typically approved by courts in this
District and, therefore, the Court finds that her rate should be
reduced to $150 per hour, comparable to that of experienced
paralegals for which fees have been awarded in other cases.
See Williams, 2018 WL 3370678, at *8.

#### ii. Hours reasonably expended

As noted above, Greenburger seeks reimbursement for 196.35
attorney hours expended on this matter, broken down as
follows: 6

6      Although Greenburger seeks reimbursement for
       196.35 attorney hours (ECF No. 37-1 at 11),
       the hours listed for Moore, Rankin, Droubi, and
       Robinson total 195.75 hours.

| **Timekeeper** | **Hours** |
| --- | --- |

| Moore | 11.15 |
| Rankin | 49.00 |
| Droubi | 4.00 (@ $100) |
| | 2.30 (@ $125) |
| | 80.55 (@$425) |
| | $1500 [7] |
| Robinson | 48.75 |

[7]    A fee of $1,500.00 for Droubi for an in-person meeting on December 19, 2016 is also indicated. (ECF No. 37-1 at 5).

The Court has reviewed BLH's billing records and, while the timekeepers' hours are generally reasonable, notes several items that should be reduced or excluded from the fee award. The timekeepers regularly recorded time for internal BLH meetings, calls, and emails. [8] As other judges in this District have noted and as this Court is aware, due to "corporate scrutiny of outside counsel fees and commonplace rules prohibiting billing for internal conferences, it is highly unlikely counsel would be able to bill a client for this quantity of internal conferences." Williams, 2018 WL 3370678, at *10 (collecting cases reducing hours for excessive interoffice communications and recommending that time spent on internal conferences be reduced by 75%).

[8]    See ECF No. 37-1 at 3/17/16, 5/3/16, 5/27/16, 7/12/16, 7/19/16, 7/21/16, 8/2/16, 8/17/16, 8/24/16, 12/19/16, 8/17/17, 10/23/17, 11/1/17, 10/11/18, 10/16/18, 10/17/18, 10/18/18, 10/24/18, 11/1/18, 11/27/18, 12/17/17, 1/15/19, 1/18/19, 3/14/19, 3/15/19, 3/19/19, 5/2/19, 5/3/19.

In addition, the Court notes several entries that appear to be duplicative, [9] and two entries in which travel time was billed at full rates (instead of half rates as indicated elsewhere). [10] See Automobile Club of New York, Inc. v. Dykstra, No. 04 Civ. 2576 (SHS), 2010 WL 3529235, at *3 (S.D.N.Y. Aug. 24, 2010) ("Travel time should be compensated at a reduced hourly rate in this district."). Finally, the Court notes

at least two entries in which time was recorded for matters that are clerical and typically non-billable to a client. [11] See Lilly v. City of New York, 934 F.2d 222, 234 (2d Cir. 2019) (approving district court's reduction of fee award for amounts incurred for clerical tasks); Williams, 2018 WL 3370678, at *10 (" 'Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.' ") (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc)).

[9]    ECF No. 37-1 at 10/20/17, 11/17/17.

[10]    ECF No. 37-1 at 2/12/16, 12/12/18.

[11]    See, e.g., ECF No. 37-1 at 3/29/19, 4/11/19.

 *14  To bring the hours expended into a reasonable range, "[c]ourts in this District have applied percentage reductions of up to fifty percent." Williams, 2018 WL 3370678, at *12; compare Alicea, 272 F. Supp. 2d at 612 (applying 50% reduction for excessive and unjustified billing); with Automobile Club of New York, 2010 WL 3529235, at *3 (applying 10% across-the-board reduction in hours to address three types of tasks). The issues that the Court noted above are relatively minor in a case for which the timekeepers' overall billing practices were relatively clear, concise, and appropriate, and therefore, the Court finds that a reduction of 10%, at the lower end of this range, is appropriate.

Applying the reasonable rates set forth in Section II.C.3.b.i and the 10% reduction to the number of hours, the Court recommends an award of attorneys' fees in the total amount of $67,420, calculated as follows:

| Timekeeper | Hours | Reduced by 10% | Hourly Rate | Total |
| --- | --- | --- | --- | --- |
| Moore | 11.15 | 10.0 | $600 | $6,000 |

**Greenburger v. Roundtree, Slip Copy (2020)**

2020 WL 6561598

| Rankin | 49.00 | 44.1 | $500 | $22,050 |
|---|---|---|---|---|
| Droubi | 4.00 | 3.6 | $100 | $360 |
| | 2.30 | 2.1 | $125 | $262.50 |
| | 80.55 | 72.5 | $425 | $30,812.50 |
| | $1500 | $1350 | flat fee | $1,350 |
| Robinson | 48.75 | 43.9 | $150 | $6,585 |
| **TOTAL** | | | | **$67,420** |

**D. Costs**

Costs are recoverable under Section 1988. See Kuzma v. I.R.S., 821 F.2d 930, 933–34 (2d Cir. 1987); Dixon, 2016 WL 3702749, at *19; Tatum, 2010 WL 334975, at *12. A plaintiff's request for costs must "be supported by appropriate documentation." Dixon, 2016 WL 3702749, at *19.

Greenburger seeks reimbursement of costs in the amount of $3,479.86. (ECF Nos. 37-1 at 11; 37-3). [12] From a review of the receipts submitted on this inquest, the Court was able to substantiate the following expenses:

[12]   Greenburger's counsel lists costs in their billing records (ECF No. 37-1) and supports the amounts with receipts (ECF No. 37-3). Where the amounts in the billing records and receipts differ, the Court adopts the lesser of the two.

| **Expense** | **Requested Amount** | **Substantiated Amount** |
|---|---|---|
| Delivery/messenger | $8.75 | $8.75 |
| Transportation | $5.50 | $5.50 |
| Overnight courier | $103.97 | $103.97 |
| Filing fees | $400.00 | $400.00 |
| Court services | $225.00 | $225.00 |
| Photocopies | $291.75 | $0 |
| Professional service | $1,176.00 | $1,176.00 |
| Postage | $35.73 | $0 |
| Computer assisted law research | $351.43 | $51.74 |
| Process service fees | $621.75 | $621.75 |
| Telephone | $44.84 | $26.53 |
| Medical records | $146.52 | $139.02 |
| Car rental | $68.62 | $68.62 |
| **TOTAL** | **$3,479.86** | **$2,826.88** |

The Court finds that Greenburger has substantiated costs in the amount of $2,826.88 with contemporaneous documentation showing that his counsel paid the amounts for which he is now seeking reimbursement. *See Sanchez v. Jyp Foods Inc.*, No. 16 Civ. 4472 (JLC), 2018 WL 4502008, at *17 (S.D.N.Y. Sept. 20, 2018) (noting that adequate substantiation is required for an award of costs); *Raymond James & Assocs., Inc. v. Vanguard Funding, LLC*, No. 17 Civ. 3327 (VSB) (SDA), 2018 WL 8758763, at *6 (S.D.N.Y. Apr. 16, 2018) (awarding documented expenses for, inter alia, filing and service of process fees); *Tatum*, 2010 WL 334975, at *13 (awarding costs for filing fees, process server fees, subpoena fees, travel, etc. to prevailing Section 1983 plaintiff). In addition, the Court may take judicial notice of the filing fees reflected on the docket as a support for an award of those costs. *See Whitehead*, 2019 WL 384446, at *6 (taking judicial notice of $400 filing fee and awarding costs in that amount); *BWP Media USA, Inc. v. Uropa Media, Inc.*, No. 13 Civ. 7871 (JSR) (JCF), 2014 WL 2011775, at *4 (S.D.N.Y. May 16, 2014) (taking judicial notice of $400 filing fee and awarding costs in that amount); *Lee v. Santiago*, No. 12 Civ. 2558 (PAE) (DF), 2013 WL 4830951, at *14 (S.D.N.Y. Sept. 10, 2013). Accordingly, the Court recommends that Greenburger be awarded $2,826.88 in costs.

### III. CONCLUSION

For the reasons set forth above, I respectfully recommend that the District Court award Greenburger the total sum of $273,246.88, comprised of: (1) $118,000 in compensatory damages; (2) $85,000 in punitive damages; (3) $67,420 in attorneys' fees; and (4) $2,826.88 in costs.

**\*15** As Magistrate Judge Pitman did with his Order of June 18, 2019 (ECF No. 33), the undersigned will email a copy of this order to Mr. Philip R. Roundtree at philiproundtree@bellsouth.net; jroundtree@fas.harvard.edu; and philipr1010@yahoo.com. The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to Mr. Roundtree at the following addresses:

Corrections Officer Mr. Philip R. Roundtree

c/o Sing Sing Correctional Facility
354 Hunter Street
Ossinning, New York 10562

Mr. Philip R. Roundtree
Apt. 2-K
754 Mace Avenue
Bronx, New York 10467

Mr. Philip R. Roundtree
5367 Berry Road
Fredonia, New York 14063

Mr. Philip R. Roundtree
114-23 202nd Street
St. Albans, New York 11412

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).

**All Citations**

Slip Copy, 2020 WL 6561598

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4746460
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Morgan GREENBURGER, Plaintiff,

v.

Philip R. ROUNDTREE, New York State Corrections
Officer, in his individual capacity, Defendant.

17 Civ. 3295 (PGG) (SLC)
|
Signed 08/16/2020

**Attorneys and Law Firms**

Jonathan C. Moore, David Bruce Rankin, Luna Droubi,
Beldock Levine & Hoffman LLP, New York, NY, for Plaintiff.

**ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

*\*1* Plaintiff Morgan Greenburger brings this Section
1983 action against Defendant Philip Roundtree, a former
Corrections Officer at the Sing Sing Correctional Facility
where Greenburger was detained in 2016. (Cmplt. (Dkt. No.
1)) This Court entered an Order of Default against Roundtree
(Dkt. No. 23) and referred this case to the assigned Magistrate
Judge for an inquest on damages. (Dkt. No. 22) Magistrate
Judge Sarah Cave has issued a Report and Recommendation
("R&R") in which she recommends that Greenburger be
awarded $118,000 in compensatory damages, $85,000 in
punitive damages, $67,420 in attorneys' fees, and $2,826.88
in costs for a total award of $273,246.88. (R&R (Dkt. No.
39) at 1-2) For the reasons set forth below, the R&R will be
adopted in its entirety.

**BACKGROUND**

**I. FACTS** [1]

[1]    The parties have not objected to Judge Cave's
recitation of the alleged facts. Accordingly, the
Court adopts her account of the facts in full. See
Silverman v. 3D Total Solutions, Inc., No. 18 CIV.
10231 (AT), 2020 WL 1285049 (S.D.N.Y. Mar.
18, 2020) ("Because the parties have not objected

to the R&R's characterization of the background
facts ..., the Court adopts the R&R's 'Background'
section...."). Given Roundtree's default, these facts
are assumed to be true. Idir v. La Calle TV, LLC,
No. 19-CV-6251 (JGK), 2020 WL 4016425, at
\*2 (S.D.N.Y. July 15, 2020) ("In the event of a
defendant's default, the plaintiff's properly pleaded
allegations in the complaint, except those related to
damages, are accepted as true.").

On May 11, 2016, staff at Sing Sing placed Greenburger
on "special watch" after he reported that he had eaten a
toothbrush. (Cmplt. (Dkt. No. 1) ¶ 11; Pltf. Decl. (Dkt. No.
32-2) ¶¶ 4–5) Inmates on "special watch" are monitored by
a corrections officer at all times. (Cmplt. (Dkt. No. 1) ¶ 12;
Pltf. Decl. (Dkt. No. 32-2) ¶ 5) The toilet in Greenburger's
cell was covered to prevent him from hurting himself. When
Greenburger asked to use a urine bottle, Defendant Roundtree
told him to wait "a few minutes." (Cmplt. (Dkt. No. 1) ¶ 13;
Pltf. Decl. (Dkt. No. 32-2) ¶¶ 6-7)

Greenburger waited and again asked for a urine bottle, telling
Roundtree that it was becoming an emergency. (Cmplt. (Dkt.
No. 1) ¶ 15; Pltf. Decl. (Dkt. No. 32-2) ¶¶ 8-9) Roundtree
screamed at Greenburger in response, threatening to beat him
if he asked again. (Cmplt. (Dkt. No. 1) ¶ 16; Pltf. Decl. (Dkt.
No. 32-2) ¶ 10) Greenburger said he wanted to avoid conflict,
but "just needed to use the urine bottle." (Cmplt. (Dkt. No. 1)
¶ 17; Pltf. Decl. (Dkt. No. 32-2) ¶ 11) Roundtree opened the
door to Greenburger's cell, placed the bottle inside, and told
Greenburger to take it. (Cmplt. (Dkt. No. 1) ¶¶ 18-19; Pltf.
Decl. (Dkt. No. 32-2) ¶¶ 12, 14) As Greenburger reached for
the bottle, Roundtree beat Greenburger on the "head, back,
shoulders, and left arm" with so much force that the baton
he was using splintered. (Cmplt. (Dkt. No. 1) ¶¶ 20–21; Pltf.
Decl. (Dkt. No. 32-2) ¶¶ 15–17; Rankin Decl. (Dkt. No. 32)
¶ 5(a))

*\*2* After two hours – during which time a towel placed
on Greenburger's head became saturated with blood –
Greenburger was transported to Mount Vernon Montefiore
Hospital, where five staples were necessary to close his head
wound. (Cmplt. (Dkt. No. 1) ¶¶ 23-25; Pltf. Decl. (Dkt. No.
32-2) ¶¶ 19-21, 23; Rankin Decl. (Dkt. No. 32) ¶ 3(b)) The
wound was two inches long and a half-inch deep. (Rankin
Decl. (Dkt. No. 32) ¶¶ 3(d), 5(b)) At the hospital, Greenburger
reported dizziness and pain at a level of ten out of ten. He
was also diagnosed with a shoulder sprain. (Cmplt. (Dkt. No.
1) ¶¶ 24-25; Rankin Decl. (Dkt. No. 32) ¶¶ 3(a), (c)) Once
discharged from the hospital, Greenburger was treated in the

Sing Sing infirmary from May 11 to May 16, 2016. (Rankin Decl. (Dkt. No. 32) ¶ 4(a); Pltf. Decl. (Dkt. No. 32-2) ¶ 23) In the infirmary, Greenburger was made to sleep on the floor and was under constant watch by guards. (Pltf. Decl. (Dkt. No. 32-2) ¶ 24)

Defendant Roundtree claimed that Greenburger had instigated the altercation by punching him in the neck and head. (Cmplt. (Dkt. No. 1) ¶ 27) Disciplinary charges were brought against Greenburger, and he was placed in the Solitary Housing Unit ("SHU") at Sullivan Correctional Facility from May 16, 2016 to July 5, 2016, a period of 50 days. (Cmplt. (Dkt. No. 1) ¶ 29; Rankin Decl. (Dkt. No. 32) ¶¶ 4(a), 5(e), Ex. 4; Pltf. Decl. (Dkt. No. 32-2) ¶ 27) While in the SHU, Greenburger was kept in his cell 23 hours a day. (Pltf. Decl. (Dkt. No. 32-2) ¶¶ 28(a)-(b)) His cell had no windows, and was open on both sides, precluding any privacy. (Id. ¶¶ 28(c), (f)) He was allowed only two books, paper, and pencils, and did not have access to his commissary account, to a telephone, or to his personal clothing. (Id. ¶¶ 28(h)-(i), 30) He was permitted only one visitor per week. (Id. ¶¶ 28(h)–(l), 30)

After serving fifty days in the SHU, Greenburger was held for thirty-five days in the Residential Mental Health Unit ("RMHU"), where conditions were substantially the same as in the SHU, except that he had access to mental health programs. (Id. ¶ 29)

Greenburger claims that he suffered emotional injuries from his stay in solitary confinement, including flashbacks, weight loss of more than 25 pounds, frustration, and stress. (Rankin Decl. (Dkt. No. 32) ¶¶ 4(e)-(g); Pltf. Decl. (Dkt. No. 32-2) ¶¶ 28(n)-(p)) He further claims that his time in solitary confinement led to two suicide attempts, stunted social skills, and a tendency to self-isolate. (Pltf. Decl. (Dkt. No. 32-2) ¶¶ 34-35)

On October 2, 2016, after he had been released from the SHU, Greenburger was notified that the disciplinary charges against him had been dropped. (Cmplt. (Dkt. No. 1) ¶ 30; Pltf. Decl. (Dkt. No. 32-2) ¶ 33) According to the Complaint, Defendant Roundtree's employment as a correctional officer at Sing Sing was terminated as a result of the May 11, 2016 incident in which he beat Greenburger. (Cmplt. (Dkt. No. 1) ¶ 3)

## II. PROCEDURAL HISTORY
The Complaint was filed on May 3, 2017, and asserts claims under Section 1983 for Roundtree's violations of

Greenburger's Eighth and Fourteenth Amendment Rights. (Cmplt. (Dkt. No. 1)) Roundtree was served on October 30, 2017 (Dkt. No. 14), but he has not responded to the Complaint or otherwise appeared in this action.

On May 15, 2018, at Greenburger's request, the Clerk of Court issued a certificate of default against Roundtree. (Dkt. No. 17) On November 6, 2018, Greenburger moved for a default judgment. (Dkt. No. 20) On November 13, 2018, this Court directed Roundtree to show cause – at a hearing scheduled for December 12, 2018 – why a default judgment should not be entered against him. (Dkt. No. 19)

Defendant was served with the Court's November 13, 2018 order (Dkt. No. 21), but he did not appear at the December 12, 2018 hearing. (Dkt. No. 23) Accordingly, on December 12, 2018, this Court issued an Order of Default against Roundtree (id.) and referred the case to the assigned Magistrate Judge for an inquest on damages. (Dkt. No. 22)

**\*3** On June 14, 2019, Greenburger submitted proposed findings of fact and conclusions of law and supporting declarations. (Dkt. No. 32) Despite being served with these materials (Dkt. No. 38), Roundtree did not submit any opposition.

On January 16, 2020, Judge Cave issued a 33-page R&R. (R&R (Dkt. No. 39)) The R&R notifies the parties that they have 14 days to file any objections pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). (Id. at 33) The R&R further states that the "[f]ailure to object within fourteen (14) days will result in a waiver of objections and will preclude appellate review." (Id. (emphasis omitted))

On January 30, 2020, Greenburger objected to the R&R to the extent that Judge Cave recommends that – for purposes of an attorneys' fee award – the hourly rate of Beldock Levine & Hoffman LLP ("BLH") partner Jonathan Moore be reduced from $700 per hour to $600 per hour. (Dkt. No. 40, 41) Although the R&R was mailed and emailed to Roundtree (R&R (Dkt. No. 39) at 32-33), he has not filed any objections.

## DISCUSSION

## I. LEGAL STANDARD
In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."

28 U.S.C. § 636(b)(1)(C). Where a timely objection has been made to the magistrate judge's recommendations, the district court judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.

Where no objections are filed to a magistrate judge's R&R – despite clear warning that a failure to file objections will result in a waiver of judicial review – judicial review has been waived. See Thomas v. Arn, 474 U.S. 140, 147-48 (1985); see also Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision." (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam))); see also Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 174 (2d Cir. 2000) ("Failure to timely object to a report generally waives any further judicial review of the findings contained in the report.").

## II. ANALYSIS

Because the only objection submitted by the parties concerns Moore's hourly rate, the parties have otherwise waived their right to review. This Court has nonetheless reviewed the entirety of the R&R for clear error. As discussed below, the Court finds no error – clear or otherwise – in Judge Cave's thorough and well-reasoned analysis of the issues. As to the billing rate issue, having conducted a de novo review, the Court adopts Judge Cave's recommendation that Moore be awarded $600 per hour and overrules Plaintiff's objection.

### A. Liability

As Judge Cave notes, "Roundtree's default equates to a concession of liability as to the allegations in the complaint, which asserted a claim under 42 U.S.C. § 1983 that Roundtree's conduct violated Greenburger's Eighth and Fourteenth Amendment rights." (R&R (Dkt. No. 39) at 7) (citing Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012) ("Without a response from Defendants, this Court must first determine whether the allegations in Plaintiff's complaint are sufficiently pleaded to establish Defendants' liability.")) The R&R notes that "Greenburger asserts two types of injury under Section 1983: (1) that the blows Roundtree inflicted with the baton constituted an excessive use of force; and (2) that Roundtree's

false statements led to his unlawful detention in solitary confinement." (Id. at 8)

**\*4** As to excessive force, " 'the primary source of substantive protection is the Eighth Amendment.' " (Id.) (quoting Cox v. Malone, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002)) To establish an Eighth Amendment violation,

> an inmate must meet both an objective and a subjective requirement. To meet the objective requirement, the alleged violation must be sufficiently serious by objective standards.... The objective component is context-specific, turning upon contemporary standards of decency.... To meet the subjective requirement, the inmate must show that the prison officials involved had a wanton state of mind when they were engaging in the alleged misconduct.

(Id.) (quoting Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999))

Judge Cave found that the Complaint's allegations, taken as true, establish an Eighth Amendment violation, because Greenburger "alleged that Roundtree, without provocation or cause, struck him in the head, back, shoulder, and left arm, resulting in serious injuries, including a head wound two inches long and one-half inch deep." (Id. (citing Cmplt. (Dkt. No. 1) ¶¶ 2, 20-22, 28))

As to Greenburger's due process claim based on the time he spent in solitary confinement, Judge Cave found that the viability of this claim hinges on whether Greenburger's allegations " 'establish that he possessed a protected liberty interest.' " (Id. at 9 (quoting Cox, 199 F. Supp. 2d at 141)) " '[D]isciplinary confinement does not create a liberty interest triggering due process protection unless the confinement imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (Id. at 10 (quoting Cox, 199 F. Supp. 2d at 142)) Because Greenburger was placed in the SHU solely as a result of "Roundtree's misconduct – the violent assault followed by Roundtree's false statements giving rise to the disciplinary charges" – Judge Cave concludes that Greenburger's detention in

solitary confinement constitutes "an atypical and significant hardship." (Id. at 11) Judge Cave goes on to find that Greenburger has stated "a claim for violation of a protected liberty interest for which he is entitled to recover under Section 1983." (Id.)

This Court finds no clear error in Judge Cave's liability findings. Taken as true, the Complaint's allegations establish that Roundtree is liable under Section 1983 for violating Greenburger's rights under the Eighth and Fourteenth Amendments.

### B. Damages

Greenburger requests $350,000 in compensatory damages, $150,000 in punitive damages, $77,437.50 in attorneys' fees, and $3,479.86 in costs. (Proposed Findings of Fact and Conclusions of Law (Dkt. No. 32-1) at 17; Billing Records (Dkt. No. 37-1) at 11) As discussed below, the R&R recommends that Greenburger be awarded $118,000 in compensatory damages, $85,000 in punitive damages, $67,420 in attorneys' fees, and $2,826.88 in costs. (R&R (Dkt. No. 39) at 1-2)

### 1. Compensatory Damages

As Judge Cave notes, " 'damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering.' " (R&R (Dkt. No. 39) at 14 (quoting Kerman v. City of New York, 374 F.3d 93, 125 (2d Cir. 2004))) Thus, Judge Cave "separately analyze[d] Greenburger's damages with respect to excessive force and with respect to his time in solitary confinement." (Id.)

**\*5** As to damages for excessive force, the R&R states that in "Section 1983 actions involving excessive use of force by a [law enforcement] officer, '[s]ubstantial awards are warranted where the damage is significant.' " (Id. (quoting Justin R. ex rel. O'Toole v. Niang, No. 06 Civ. 6228 (BSJ) (RLE), 2010 WL 7891579, at *4 (S.D.N.Y. July 20, 2010) (citing cases awarding more than $100,000 for injuries arising from physical assaults by law enforcement officers))) " 'A beating severe enough to leave marks is sufficient proof of a compensable injury.' " (Id.) (quoting Atkins v. New York City, 143 F.3d 100, 104 (2d Cir. 1998))

After reviewing "dozens of Section 1983 cases involving injuries similar to those Greenburger sustained," Judge Cave determined that Greenburger's "requested award of $350,000 in compensatory damages falls outside the range of reasonableness, and that his circumstances more closely resemble those of plaintiffs for whom awards in the range of $75,000 to $120,000 were deemed reasonable." (Id. at 17) (citing e.g. Blissett v. Coughlin, 66 F.3d 531, 536 (2d Cir. 1995) ($75,000 award to inmate whom prison guards struck with baton, punched, and slapped); Poulos v. City of New York, No. 14-CV-3023 (LTS) (BCM), 2018 WL 3750508, at *2, *7 (S.D.N.Y. July 13, 2018), report and recommendation adopted, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018) ($100,000 award where prison guard struck plaintiff in the head, causing a three-inch laceration, permanent scar, reduced vision, intermittent eye twitching, and pain); Hutchinson v. McCabee, 168 F. Supp. 101, 102, 104 (S.D.N.Y. 2001) ($120,000 award for past and future pain and suffering where inmate had sustained "serious injuries to his face, shoulder and neck" and was hospitalized for nine days)) Judge Cave recommends that Greenburger be awarded $100,000 in compensatory damages, noting that his head wound was "deep, requiring five stitches, but appears to have healed, and the only lasting physical pain he describes is to his back." (Id.) (citing Pltf. Decl. (Dkt. No. 32-2) ¶ 31)

As to damages for Greenburger's placement in solitary confinement, Judge Cave cites Parker v. City of New York, No. 15 CV 6733 (CLP), 2018 WL 6338775, at *1 (E.D.N.Y. Dec. 4, 2018), a class action in which the court approved a settlement that awarded inmates with serious mental illness $200 for each day spent in solitary confinement and $175 to most others. (R&R (Dkt. No. 39) at 18) Given Greenburger's history of mental illness, Judge Cave recommends that he be awarded $200 per day, or a total of $18,000, as compensation for his wrongful solitary confinement. (Id.)

Seeing no error in Judge Cave's findings, the Court will award Greenburger a total of $118,000 in compensatory damages.

### 2. Punitive Damages

As the R&R notes, a "plaintiff may receive punitive damages in a Section 1983 case where he 'demonstrates that the defendant's conduct is ... motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' that is, where he 'has produced evidence of a positive element of conscious

wrongdoing or malice.' " (R&R (Dkt. No. 39) at 18) (quoting De Michele v. City of New York, No. 09 Civ. 9334 (PGG), 2012 WL 4354763, at *22 (S.D.N.Y. Sept. 24, 2012)) Judge Cave concludes that Greenburger should be awarded punitive damages because, "[a]s a corrections officer engaged in law enforcement, Roundtree's training 'gave him notice as to the gravity of misconduct under color of his official authority.' " (Id. at 20 (quoting Medina v. Donaldson, No. 10 CIV. 5922 VMS, 2014 WL 1010951, at *16 (E.D.N.Y. Mar. 14, 2014))) "Without provocation, Roundtree entered Greenburger's cell with the intent to harm him in retaliation for his requests for a urine bottle, struck him with a baton so hard that it 'splintered,' caused a two-inch gash that bled profusely while Roundtree delayed medical treatment, made false statements that Greenburger instigated the attack leading to disciplinary charges that were subsequently vacated, and Greenburger's 90-day detention in solitary confinement." (Id.)

**\*6** After reviewing punitive damage awards in comparable cases, however, Judge Cave concludes that the $150,000 in punitive damages Greenburger seeks is excessive. Unlike in Alla v. Verkay, 979 F. Supp. 2d 349, 378-79 (E.D.N.Y. 2013), where the court awarded $150,000 in punitive damages, this case does "not involve broken bones or surgery" or "long-term physical damage." (R&R (Dkt. No. 39) at 20) In "making false statements that led to Greenburger's wrongful disciplinary charges and three months in solitary confinement," however, "Roundtree's conduct is somewhat more reprehensible than that of the officer in Poulos, where the court recommended an award of $75,000 in punitive damages." (Id. at 20-21) Accordingly, Judge Cave recommends a punitive damages award of $85,000, finding that such an award would "punish Roundtree and deter others from this abuse of official authority." (Id. at 21)

Finding no error in Judge Cave's analysis, this Court will award Plaintiff $85,000 in punitive damages.

### 3. Attorneys' Fee Award

As the R&R notes, "[a]ttorneys' fees are available ... to a plaintiff who prevails under Section 1983," and a " 'plaintiff who obtain[s] a default judgment is considered a prevailing party.' " (R&R (Dkt. No. 39) at 21 (quoting Dixon v. Agbai, No. 15 Civ. 850 (AT) (AJP), 2016 WL 3702749, at *12 (S.D.N.Y. July 8, 2016), report and recommendation adopted, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016)) (citing 42 U.S.C. § 1988(b))) In Arbor Hill Concerned Citizens

Neighborhood Association v. County of Albany, 522 F.3d 182 (2d Cir. 2008), the Second Circuit "articulated the method for calculating reasonable attorney's fees: a reasonable hourly rate multiplied by a reasonable number of hours extended on the work constitutes the 'presumptively reasonable fee,' also known as the 'lodestar.' " (Id. at 22 (quoting Tatum v. City of New York, No. 06 Civ. 4290 (PGG) (GWG), 2010 WL 334975, at *3 (S.D.N.Y. Jan. 28, 2010)))

As to the proper hourly rate, Judge Cave found that the requested hourly rates of $500 for BLH partner David Rankin and $425 per hour for BLH partner Luna Droubi were reasonable. (Id. at 27) As to the $175 per hour rate for a BLH paralegal, Judge Cave deemed this rate excessive and reduced it to $150 per hour. (Id.) The Court sees no error – much less clear error – in these findings. See Lewis v. Amer. Sugar Ref., Inc., No. 14-CV-02302 (CRK), 2019 WL 116420, at *4 (S.D.N.Y. Jan. 2, 2019) (awarding rates of $500 and $450 for partners and $125 for paralegals while observing that "[c]ourts in this district have approved hourly rates of $250 to $600 for civil rights attorneys with over ten years of experience").

As to the requested hourly rate of $700 for BLH partner Jonathan Moore, Judge Cave notes that Moore "has more than 40 years of experience as a civil rights practitioner, including his role as co-lead counsel in some of the more high-profile civil rights litigations in this District." (R&R (Dkt. No. 39) at 26-27) Here, however, "the defendant has defaulted" and "there were no contested motions or novel legal issues." (Id. at 27) Under these circumstances, Judge Cave found that the $700 per hour billing rate was excessive, and she reduced Moore's hourly rate to $600. (Id. (citing Tatum, 2010 WL 334975, at *5 (noting that hourly rates ranging from $250 to $600 are considered reasonable for experienced civil rights attorneys in this District)))

Plaintiff objects to any reduction in Moore's hourly rate, asserting that Moore charges paying clients $700 per hour, and that he "is one of the most accomplished civil rights litigators in this City, if not the nation." (Pltf. Obj. (Dkt. No. 41) at 2-3) Plaintiff also notes that courts in this District have occasionally approved hourly rates above $600 for experienced civil rights litigators. (Id. at 7 (citing Williams v. Metro-N. R.R. Co., No. 1:17-CV-03847 (JGK), 2018 WL 3370678, at *8 (S.D.N.Y. June 28, 2018), report and recommendation adopted, No. 17 CIV. 3847 (JGK), 2018 WL 3368713 (S.D.N.Y. July 10, 2018) (recommending $800 per hour for lead counsel in an employment action)))

**\*7** Acknowledging Moore's qualifications, a $700 per hour billing rate is excessive under the circumstances of this case. This is a single-plaintiff, single-defendant Section 1983 action in which the Complaint is seven pages long and in which the defendant defaulted. See, e.g., Perez Garcia v. Hirakegoma Inc., No. 17 CIV. 7608 (SLC), 2020 WL 1130765, at \*12 (S.D.N.Y. Mar. 9, 2020) ("[R]eductions are particularly appropriate in this case, from which are absent any novel or complex legal or factual questions and in which the defendant has defaulted."); Xin Long Lin v. New Fresca Tortillas, Inc., No. 18 Civ. 3246 (RJD) (RER), 2019 WL 3716199, at \*9 (E.D.N.Y. May 1, 2019), report and recommendation adopted, 2019 WL 3714600 (E.D.N.Y. May 28, 2019) (reducing rates in part because "[t]his action is relatively straightforward, especially because Defendants defaulted"). Plaintiff's objection will therefore be overruled, and the attorneys' fee award will be premised – as to Moore's billings – on a rate of $600 per hour.

As to the number of hours worked, Plaintiff seeks reimbursement for a total of 196.35 hours. (R&R (Dkt. No. 39) at 28) Although the hours billed were generally reasonable, Judge Cave observed that counsel billed for an excessive number of "internal BLH meetings, calls, and emails"; that "several entries ... appear to be duplicative"; that "travel time" was sometimes "billed at full rates (instead of half rates as indicated elsewhere)"; and that two entries sought reimbursement for "matters that are clerical and typically non-billable." (Id. at 28-29)

As the R&R states, "[t]o bring the hours expended into a reasonable range, '[c]ourts in this District have applied percentage reductions of up to fifty percent.' " (Id. at 29 (quoting Williams, 2018 WL 3370678, at \*12)) Judge Cave found that the issues with counsel's time records were "relatively minor," however, and that "the timekeepers' overall billing practices were relatively clear, concise, and appropriate." (Id.) Accordingly, Judge Cave recommends

an across-the-board reduction of 10 percent. (Id. (citing Automobile Club of New York, Inc. v. Dykstra, No. 04 Civ. 2576 (SHS), 2010 WL 3529235, at \*3 (S.D.N.Y. Aug. 24, 2010) (applying 10% across-the-board reduction))) The Court agrees with Judge Cave's recommendation, and will apply a 10 percent reduction to BLH's hours in recognition of the billing issues cited by Judge Cave.

### 4. Costs

Costs are recoverable in a Section 1983 action, but a "plaintiff's request for costs must 'be supported by appropriate documentation.' " (R&R (Dkt. No. 39) at 30 (quoting Dixon, 2016 WL 3702749, at \*19)) Greenburger seeks $3,479.86 in costs, but Judge Cave found that he failed to provide documentation for expenses associated with photocopying, postage, legal research, telephone calls, and medical records. (Id. at 31) Based on her review of receipts submitted by Plaintiff, Judge Cave could substantiate only $2,826.88 in costs – $652.98 less than Plaintiff requests. The Court finds no error in Judge Cave's analysis, and Greenburger will therefore be awarded $2,826.88 in costs.

### CONCLUSION

For the reasons stated above, Judge Cave's R&R is adopted in its entirety. Plaintiff is awarded $118,000 in compensatory damages, $85,000 in punitive damages, $67,420 in attorneys' fees, and $2,826.88 in costs. The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4746460

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

2019 WL 1090802
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Equarn WHITE, Plaintiff,
v.
John MARINELLI, et al., Defendants.

9:17-CV-1094 (LEK/ATB)
|
Signed 03/08/2019

**Attorneys and Law Firms**

Equarn White, Attica, NY, pro se.

Erik Boule Pinsonnault, New York State Attorney General, Albany, NY, for Defendants.

<u>**MEMORANDUM-DECISION AND ORDER**</u>

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 *1  Plaintiff, a state prisoner, brings various constitutional claims stemming from his incarceration at Upstate Correctional Facility. Dkt. No. 1 ("Complaint"). The Complaint names twenty-two correctional officers as defendants. Id. at 1. On November 17, 2017, the Court granted Plaintiff leave to proceed in forma pauperis, reviewed the Complaint, and dismissed many of Plaintiff's claims. Dkt. No. 4 ("November Order"). Defendants Tracy Nelson, Randel Smith, and George Waterson have moved to dismiss the surviving claims. Dkt. No. 19 ("Motion to Dismiss"). While the Motion to Dismiss was pending, Plaintiff filed his Motion to Amend, attaching a 253-page proposed Amended Complaint that seeks to revive the dismissed claims and add numerous claims and defendants. Dkt. Nos. 28 ("Motion to Amend"), 28-2 ("Amended Complaint"). The Honorable Andrew T. Baxter, U.S. Magistrate Judge, issued a report-recommendation concerning both motions. Dkt. No. 34 ("Report-Recommendation"). Plaintiff has filed objections. Dkt. No. 35 ("Objections").

For the reasons set forth below, the Court adopts the Report-Recommendation in part and modifies it in part. It grants the Motion to Dismiss the Eighth Amendment claim against Waterson, but it denies the motion as to the Eighth Amendment conditions-of-confinement claim against Randel Smith and First Amendment retaliation claim against Nelson. It denies the Motion to Amend. However, Plaintiff may renew his Motion to Amend with a revised proposed amended complaint.

**II. LEGAL STANDARD**

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and it "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636. However, "where [the] parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision." Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002); see also Thomas v. Arn, 474 U.S. 140, 150 (1985) (holding that Congress did not "intend[ ] to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings").

The Court may excuse a party's failure to object "in the interests of justice," and modify or reject the report-recommendation, if "the magistrate judge committed plain error in ruling against the defaulting party." Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir. 2000). Therefore, when no party objects to a magistrate judge's report-recommendation, courts in this circuit review it only to determine whether the magistrate judge made a clear error. Boice v. M+W U.S., Inc., 130 F. Supp. 3d 677, 684 (N.D.N.Y. 2015); see also Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").

**III. PROCEDURAL HISTORY**

**A. Initial Review**

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 312 of 443

White v. Marinelli, Not Reported in Fed. Supp. (2019)
2019 WL 1090802

**\*2** On November 17, 2017, the Court held that the following claims survived its initial sua sponte review conducted pursuant to 28 U.S.C. § 1915:

(1) An Eighth Amendment medical indifference claim against Nurse George Waterson for failing to treat an infected rodent bite;

(2) An Eighth Amendment conditions-of-confinement claim against Sergeant Randel Smith for placing Plaintiff in Cell 18 next to an inmate "Reeder" who kicked and banged on Plaintiff's cell, depriving him of sleep, in December 2015; and

(3) A First Amendment claim alleging that Offender Rehabilitation Counselors Denise Bernier, Tracy Nelson, and Roxanne LeClerc retaliated against Plaintiff by withholding copies of video footage he had requested to support a grievance and referring him to the sex offender program.

The Court also found that the following claims were plausible, but were time-barred because they accrued before September 24, 2014; however, it allowed Plaintiff an opportunity to amend if he could identify a reason the Court should toll the statute of limitations:

(4) Eighth Amendment deliberate medical indifference claims against Sergeants Luc Maynard and Patrick Baker, Officer Richard Winston, mental health worker John Marinelli, Nurse Heath Baker, and Lieutenant Robert Barkman, based on Plaintiff's mental health needs in Spring 2014; and

(5) Eighth Amendment conditions of confinement claims against: (a) Maynard, Winston, Officer Adam Gallagher, Officer Brian Fournier, and Sergeant Richard Scott based on unsanitary conditions in Cell 13 May 2014; and

(b) Sergeants Michael Eddy and Laura Gokey, Marinelli, and Randel Smith for keeping Plaintiff in Cell 15 next to Reeder (the loud neighbor), resulting in sleep deprivation, in May 2014.

Finally, the Court dismissed the following claims for failure to plausibly allege a constitutional violation:

(6) A Fourteenth Amendment deprivation of property claim against Scott and Bernier;

(7) Eighth Amendment medical indifference claims against: (a) Heath Baker, for failing to treat a rash,

foot fungus, and shingles; (b) Nurse Michele Byno, for discontinuing Plaintiff's mental health medication in October 2014; and (c) Nurse Christy Conklin, for failing to treat an infected rodent bite;

(8) Eighth Amendment conditions of confinement claims against: (a) Fournier and Officer Michael Bashaw for not allowing Plaintiff to attend dinner on May 6, 2014; and (b) Fournier, Officer Jeffry Premo, Officer Nicholas Ashline, and Randel Smith for barring him from the barber shop and commissary;

(9) An Eighth Amendment claim against Nelson for verbal sexual harassment;

(10) Fourteenth Amendment due process claims against: (a) Bernier and LeClerc for placing Plaintiff in a sex offender program; and (b) Eddy related to Plaintiff's security status;

(11) Fourteenth Amendment equal protection claims against Bernier and LeClere for placing him in the sex offender program;

(12) Fourteenth Amendment due process claims against Bernier and Nelson for failing to respond to Plaintiff's FOIL requests;

(13) First Amendment claims alleging that Scott, Heath Baker, Nurse Administrator Nancy Smith, Fournier, Bashaw, Randel Smith, Premo, Ashline, and Laura Gokey retaliated against Plaintiff for filing grievances;

**\*3** (14) A First Amendment access-to-court claim against Bernier;

(15) Conspiracy claims against Heath Baker and Marinelli; and

(16) Related claims against two supervisory officers: (a) Nancy Smith, for failing to remedy the violations regarding Plaintiff's medical needs; and

(b) Superintendent Donald Uhler, for failing to transfer Plaintiff from his noisy cell.

Nov. Order at 14–43.

**B. Motions to Dismiss and Amend**

Bernier and LeClerc answered the Complaint. Dkt. No. 22 ("Answer"). Waterson, Randel Smith, and Nelson moved to dismiss the three surviving claims against them. Mot. to

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 313 of 443

Dismiss. They argued that the Eighth Amendment allegations against Smith and Waterson, and the First Amendment allegations against Nelson, fail to state claims. Id. at 2, 6–17. Plaintiff then filed his Motion to Amend. Bernier, LeClerc, Nelson, Randel Smith, and Waterson opposed that motion. Dkt. No. 32 ("Opp'n to Mot. to Amend"). The other defendants named in the original and proposed amended complaints have not been served process. Id. at 4.

### C. Report-Recommendation

On December 12, 2018, Judge Baxter issued the Report-Recommendation. In it, he recommends that this Court deny the Motion to Dismiss and allow discovery concerning the Eighth Amendment conditions-of-confinement claim against Randel Smith. R. &. R at 1. However, he concludes that the Court should dismiss the other two surviving claims: the Eighth Amendment medical indifference claim against Waterson and the First Amendment retaliation claim against Nelson. Id. Judge Baxter also recommends that the Court deny Plaintiff's Motion to Amend because the 253-page proposed Amended Complaint is not appropriately "short and plain." Fed. R. Civ. P. 8(a)(2). In support, he finds that "most of plaintiff's proposed amendments are futile because they fail to correct the defects identified in the [November Order]." R. &. R. at 19. However, he suggests granting Plaintiff leave to file a revised proposed amended complaint to add *only* his revised conditions-of-confinement claims against Maynard, Winston, Marinelli, Patrick Baker, Heath Baker, Barkman, Scott, Gallagher, Fournier, Eddy, and Laura Gokey, which the Court had previously dismissed as untimely. Id. at 2. He concluded that "[i]n his Proposed Amended Complaint, Plaintiff has provided documentation that he had timely initiated the administrative grievance process with respect to those claims, and that he had not received final determinations on those grievances until at least October 2014. Therefore, Plaintiff has presented a colorable argument in favor of equitable tolling with respect to those claims." Id.

Accordingly, the Magistrate Judge concludes that "the revised amended complaint should only include: (1) those claims that survive Defendants' motion to dismiss," meaning (a) the Eighth Amendment claims against Randel Smith "related to inmate noise and rodent infestation, and [ (b) ] retaliation claims against defendants Bernier and LeClerc," and "(2) the [May and June 2014] conditions of confinement claims that have a colorable argument in favor of equitable tolling." Id. at 23 n.14; see also id. at 20–23 (describing conditions of confinement claims).

### IV. DISCUSSION

**\*4** Since Defendants have not objected to the Report-Recommendation, the Court reviewed the Magistrate Judge's decisions in favor of Plaintiff for clear error. It has found none. Thus, Plaintiff's Eighth Amendment conditions-of-confinement claim against Randel Smith survives, and Plaintiff may amend his complaint to add his conditions-of-confinement claim against Maynard, Winston, Marinelli, the Bakers, Barkman, Scott, Gallagher, Fournier, Eddy, and Gokey within thirty days.

At issue are Plaintiff's objections, filed on January 2, 2019. Obj. He attacks the Report-Recommendation on two fronts. First, he argues that the Eighth Amendment medical indifference claim against Waterson and the First Amendment retaliation claim against Nelson each state a claim and should not be dismissed. Second, he argues that the Motion to Amend should be granted. He asserts that the claims raised in his proposed Amended Complaint are plausible, not futile. The Court will address each set of objections in turn.

As explained below, the Court agrees with the Magistrate Judge that the Complaint fails to state a claim against Waterson, but finds that it does state a valid retaliation claim against Nelson. Furthermore, the Court adopts Judge Baxter's recommendation to deny Plaintiff's Motion to Amend. It agrees that the proposed Amended Complaint fails to revive some claims that were dismissed in the November 2017 Order. However, the Court finds that several of Plaintiff's claims in the proposed Amended Complaint are plausible. Accordingly, it will allow Plaintiff to file an Amended Complaint with respect to those claims.

### A. Motion to Dismiss

Rule 12(b)(6) requires a complaint to be dismissed if it "fail[s] to state a claim on which relief may be granted." To state a valid claim, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a)(2). The Court may disregard "legal conclusions couched as factual allegations" that are "devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, a court must take the "well-pleaded factual allegations" as true, id. at 679, and "draw[ ] all reasonable inferences in the plaintiff's favor," Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). To " 'nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible,' " the facts need only " 'raise a reasonable expectation that discovery will

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 314 of 443

reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018) (quoting Twombly, 550 U.S. at 556–57, 570). Where, as here, a plaintiff is litigating pro se, the Court must construe his or her pleadings "liberally and interpret[ ] them to raise the strongest arguments that they suggest." Sykes v. Bank of Am., 723 F. 3d 399, 403 (2d Cir. 2013).

When deciding a motion to dismiss under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). It may also consider "documents or information contained in [the] defendant's motion papers if the plaintiff has knowledge or possession of the material and relied on it in framing the complaint," as well as "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." Envtl. Servs. v. Recycle Green Servs., 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (quoting In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) ).

**\*5** The facts alleged in the Complaint and Amended Complaint were recited in the November Order and Report-Recommendation, and they are elaborated as necessary below. To decide the Motions to Dismiss and Amend, the Court will take them as true and draw all permissible inferences in Plaintiff's favor. Harris, 572 F.3d at 71.

### 1. Eighth Amendment Medical Indifference Claim Against Waterson

The Magistrate Judge correctly found that the facts alleged in both the Complaint and Amended Complaint failed to state an Eighth Amendment medical mistreatment claim against Waterson. On April 16, 2016, a mouse bit Plaintiff on the toe. Am. Compl. at 109–110, ¶ 164. [1] Waterson, a staff nurse, came to Plaintiff's cell and viewed the "bite mark as it was bleeding." Id. He told Plaintiff he would get a bandage, but did not return that day. Id. On April 17, another nurse, Heath Baker, treated the bite with povidone-iodine, an antiseptic. Id. ¶ 166. The next day, April 18, Defendant Waterson returned, "s[aw] that Plaintiff['s] foot was infected, but refused to treat Plaintiff." Id. Plaintiff gave him a sick call slip—a request to see a doctor—but Waterson destroyed it. Id. ¶¶ 166–67. In his original Complaint, Plaintiff alleged that the next morning, April 19, he experienced "severe stomach pain," and his skin was "turning yellow and green" around the bite mark. Compl.

at 47, ¶ 123. That afternoon, he began "coughing up blood and whispered that he need[ed an] emergency sick call." Am. Compl. at 111, ¶ 168. "[F]ive minutes later, nurse [Christy] Conklin came to Plaintiff's cell. And 30 minutes later, [she] came back" and treated him with pain medication for head and stomach pain, hydrogen peroxide antiseptic, and bacitracin ointment for the bite. Id.

[1]    Because the Court is also addressing the Motion to Amend in this Memorandum-Decision and Order, for efficiency, it cites to the facts in the proposed Amended Complaint. With respect to the Eighth Amendment claim against Waterson, the facts in the Amended Complaint mirror the allegations in Plaintiff's original Complaint unless otherwise noted.

An Eighth Amendment claim has "subjective" and "objective" components. Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). The subjective component requires that the defendant have acted with a culpable state of mind: "deliberate indifference" to the plaintiff's health. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The standard equates to criminal recklessness; the prison official must "consciously disregard a substantial risk of serious harm." Id. at 839. Plaintiff asserts that Waterson acted with such deliberate indifference because he ignored then intercepted Plaintiff's requests for medical staff to treat the bite. Obj. at 4. The Court assumes, without deciding, that these allegations are sufficient to satisfy the subjective element.

However, Plaintiff must also make an objective showing that he (1) was "actually deprived of adequate medical care," meaning that prison officials "fail[ed] to take reasonable measures in response to [his] medical condition;" and (2) that "the inadequacy in medical care is sufficiently serious" in view of the "harm, if any, the inadequacy has caused or will likely cause" Plaintiff. Salahuddin, 467 F.3d at 279. He must have had a "condition of urgency, one that may produce death, degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Whether a condition is sufficiently serious depends on "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Id.

**\*6** Even if Waterson had a culpable mindset, Plaintiff fails to satisfy the objective element—because even if Waterson

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 315 of 443

2019 WL 1090802

sought to withhold "adequate medical care" from Plaintiff, he failed. Salahuddin, 467 F.3d at 279. Nurses Baker and Conklin "took reasonable measures in response" to Plaintiff's bite and infection when they treated his toe with antiseptic and pain medication. Id.; Am. Compl. ¶ 168. Plaintiff's wound was not even infected when Baker sterilized it on April 17, and he does not allege that nurse Conklin's April 19 treatment failed to resolve the infection or other symptoms. Therefore, there is nothing to suggest that Plaintiff was deprived of "reasonably necessary care." Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989). That he requested a tetanus shot does not change the analysis. Nov. Order at 23–24; see also Chance, 143 F.3d at 703 ("So long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Therefore, at most, Plaintiff can allege that Waterson (by ignoring Plaintiff's request for a bandage on April 16, after the bite, and by destroying his sick call slip on April 18, when the infection developed) delayed Baker and Conklin's otherwise reasonable treatments by one day each. "When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment,' " the Court must "focus on the seriousness of the particular risk of harm that resulted from 'the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting Smith v. Carpenter, 316 F.3d 178, 184–86 (2d Cir. 2003) ). A delay in providing necessary medical care only violates the Eighth Amendment if it exposes the inmate to "the unnecessary and wanton infliction of pain," or an "unreasonable risk" that he will suffer similarly "serious harm" in the future. Smith, 316 F.3d at 186–87. The Second Circuit " 'has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, see Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984)[where delay also caused "extreme pain" and miscarriage], ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years.' " Demata v. N.Y. State Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999) (citations omitted). In short, the facts must demonstrate that the delay "exposed the inmate to undue suffering" before he was treated, "or the threat of tangible residual injury" afterward. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).

Plaintiff does not provide facts suggesting that the one-day delays in treating his bite and subsequent infection exposed him to extreme pain or threatened his future health.

Even though Waterson may have "deliberately delayed" the treatments, Plaintiff was not in pain at least until the morning of April 19, and Conklin treated that pain within a few hours. Am. Compl. at 111, ¶ 168. Given the short time period, the pain was not "chronic," and Plaintiff does not suggest that it interfered with his daily activities. Chance, 143 F.3d at 702. In addition, the facts do not indicate that the infection was "life-threatening," "fast-degenerating," or otherwise risked further deterioration; it quickly resolved after Conklin applied another antiseptic, some pain medication, and ointment. Am. Compl. ¶ 168. With any allegations of more severe injuries or lasting complications, Plaintiff's statement that his toe infection and stomach ache caused him "extreme pain" for a few hours does not plausibly demonstrate that he endured "cruel and unusual punishment" of a constitutional dimension. See Frith v. City of New York, 203 F. Supp. 3d 386, 389–90 (S.D.N.Y. 2016) (one-day delay in treating infected mouth abscess that allegedly caused "extreme pain" did not state a claim because plaintiff did not provide enough facts to show "that the delay itself caused or exacerbated the infection, caused him extreme pain, or caused any permanent harm"). [2]

[2] Compare Gomez v. Cty. of Westchester, 649 F. App'x 93, 96 (2d Cir. 2016) (one-day delay in providing pain medication for "extreme tooth pain" did not support Eighth Amendment claim) and Bilal v. New York State Dep't of Corr., No. 09-CV-8433, 2010 WL 2506988, at *11 (S.D.N.Y. June 21, 2010), aff'd, 494 F. App'x 143 (2d Cir. 2012) (dismissing claim based on allegations that plaintiff suffered "extreme" back and head pain for a "few hours" without pain medication, where the delay did not worsen his condition); with Chance, 143 F.3d at 702–03 (six-month delay in treatment for dental condition that developed into infection and extreme pain stated claim) and Archer, 733 F.2d at 16 (holding that beating that caused the pregnant plaintiff "vaginal bleeding" and "cramps" causing "extreme pain" during twelve-day delay in treatment, precipitating a miscarriage, stated claim).

*7 Therefore, even if Plaintiff's Amended Complaint establishes that Waterson deliberately ignored Plaintiff's infected mouse-bite, its allegations demonstrate that other professionals gave Plaintiff all the medical care that was "reasonably necessary" to treat his condition and did so before it became sufficiently serious. Langley, 888 F.2d at 254. As

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 316 of 443

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

a result, Plaintiff's Eighth Amendment medical mistreatment claim against Waterson must be dismissed. Salahuddin, 467 F.3d at 279.

### 2. First Amendment Retaliation Claim Against Tracy Nelson

Plaintiff also objects to the Magistrate Judge's recommendation to dismiss Plaintiff's retaliation claim against Nelson, a Supervising Offender Rehabilitation Coordinator ("SORC").

To prove a retaliation claim under § 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004). "It is well established that the filing of a prison grievance is a constitutionally protected activity." Burton v. Lynch, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) (citing Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) ). An "adverse action" is one that "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" (by filing a grievance, for example). Gill, 389 F.3d at 381. A "causal connection" is one in which the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Because "prisoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," id., the Second Circuit has "insisted on a higher level of detail in pleading" prisoners' retaliation claims, Gill, 824 F.2d at 194, and instructed courts to "examine [them] with skepticism and particular care," Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, Plaintiff must supply "specific and detailed factual allegations" suggesting that Defendants retaliated against him for filing grievances, and may not rely on "wholly conclusory" statements to support such claims. Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015).

Plaintiff alleges that on March 28, 2016, he filed a grievance against Nelson and Bernier for ignoring Plaintiff's Freedom of Information Law ("FOIL") requests for video footage that supported his grievances against Bernier, LeClerc, and others, [3] and for charging an exorbitant price for the footage ($96.00 instead of the appropriate $0.60 cents). Compl. at 44, ¶ 115; see also id. at 38–45. Nelson showed up at Plaintiff's cell on April 21, 2016 and had a protracted conversation with

him. Id. at 50–52, ¶¶ 127-32. Plaintiff states that this was highly unusual; in his four years, six months in state custody, a SORC had never visited or spoken to him. Id. at 52, ¶ 131. Nelson was holding a copy of his March 2016 grievance. Id. at 52, ¶ 132. She "tried to get [him] to apologize about calling her Denise Bernier['s] flunky," and for his accusation that she was involved in "corruption." Id. Plaintiff also alleges that she asked him to expose his penis. Id. at 52, ¶ 131. When Plaintiff refused, Nelson threatened that she had "been working for DOCCS for 15 years" and knew that "all [she] had to do [was] tell the C.O." that Plaintiff exposed himself and he would be disciplined. Id. Approximately fifteen months later, in August 2017, a New York court ordered Nelson to grant Plaintiff's FOIL request and produce the video footage. Compl. at 62–63, ¶ 164(D). Instead of complying, Nelson destroyed "3 different DVDs and multiple documents" related to Plaintiff's request. Obj. at 9; Compl. at 44, ¶¶ 108, 113–14. And Nelson continued to insist that Plaintiff pay the excessive $96.00 to process his F.O.I.L. request. Id.

[3]     Nelson allegedly destroyed footage of LeClerc "telling Plaintiff that [his] sex offense referral was for grievances and complaints," "of a nurse telling Plaintiff that a doctor at Greenhaven [Correctional Facility] knew about an infection but failed to treat Plaintiff," Compl. at ¶ 164(D), and of the mouse biting Plaintiff and his subsequent conversation with nurses, id. at 47–48, ¶ 124. Bernier allegedly withheld footage of a conversation between Plaintiff and a hearing officer, Gutwine, during Plaintiff's December 2015 disciplinary hearing. Id. at 33, ¶ 91.

**\*8** The Magistrate Judge found that the Complaint lacks facts showing that Plaintiff's March 2016 grievance prompted Nelson to charge the exorbitant fee and destroy the video footage. R. & R. at 15. Indeed, Plaintiff concedes in the Complaint that Nelson had already decided to charge Plaintiff $96.000 before Plaintiff filed the March 2016 grievance and, therefore, does not plausibly suggest that the overcharging was retaliatory. Compl. at 38–40, 44, ¶¶ 103, 106–08, 114. However, at least two alleged facts plausibly suggest that Nelson acted with a retaliatory animus in destroying the tapes: first, her April 16, 2016 visit to Plaintiff's cell—in which she rebuked Plaintiff for filing the grievance and tried to coax him expose himself so that she could file disciplinary charges. Baskerville v. Blot, 224 F. Supp. 2d 723, 733 (S.D.N.Y. 2002) (defendants' statements chiding plaintiff for filing grievances, and administrative finding that plaintiff's discipline was unjustified, sufficed to allege that discipline

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 317 of 443

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

was retaliatory, even though plaintiff did not allege grievances were filed recently). Second, destroying the tapes violated the state court's order. Obj. at 9; Compl. at 38–44, 52, ¶¶ 108, 112–114, 131. Such improper conduct evinces improper motives. See *Shakur*, 391 F.3d at 116 ("[F]ailure to abide by established procedures or standards can evince an improper objective" or "personal prejudice.").

Indeed, there is no obvious reason other than retaliation why Nelson would have destroyed the video footage Plaintiff requested. The fact that a year passed before she did so does not prove otherwise; until the state court ordered Nelson to produce the non-movant, in 2017, she could simply withhold it from Plaintiff; there was no reason to destroy it. Obj. at 9; see also *Espinal*, 558 F.3d (finding passage of time less of an obstacle where there was a plausible reason officers would have waited so long to retaliate); cf. *Clark*, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, *by itself*, no causality at all").

**B. Motion to Amend**

"Leave to file an amended complaint 'shall be freely given when justice so requires,' and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (quoting Fed. R. Civ. P. 15 and citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ). To determine if an amendment would "prejudice" the opposing party, courts must consider whether its allowance would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). An amendment is "futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim." *Id.* at 110.

A proposed amended complaint may also be subject to dismissal (and therefore futile) if it is not "short and plain." Fed. R. Civ. P. 8(a)(2). As the Second Circuit has written:

> Rule 8 [of the Federal Rules of Civil Procedure] provides that a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The [complaint's] statement [of the plaintiff's claim] should be plain because the principal function of pleadings under the Federal Rules is to give the [defendants] fair notice of the claim asserted

so as to enable [them] to answer and prepare for trial. The statement should be short because "[u]nnecessary prolixity [meaning too much unneeded detail] in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."

When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, Fed. R. Civ. P. 12(f), or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised. When the court chooses to dismiss, it normally grants leave to file an amended pleading that conforms to the requirements of Rule 8.

**\*9** *Salahuddin v. Cuomo*, 861 F.2d 40, 41–42 (2d Cir. 1988) (concluding that the district court was within its discretion to dismiss a 15-page, single-spaced complaint that was not "vague or incomprehensible," but contained too much detail; granting leave to amend); see also *Jones v. Nat'l Commc'ns & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008) ("[T]he district court's determination, that [plaintiff's] single-spaced 58–page complaint with 87 additional pages of attachments, alleging over twenty separate causes of action against more than 40 defendants, violated the short and plain statement requirement of Rule 8, was not an abuse of discretion.").

*1. Excessive Length*

Plaintiff's proposed Amended Complaint comprises 308 paragraphs, divided into numerous subparagraphs, and spans 253 pages. Large portions of it are devoted to legal argument. Accordingly, it is neither "short" nor "plain," as Rule 8(a)(2) requires. In addition, the Magistrate Judge was correct to conclude that it fails to allege information adequate to revive many of the claims dismissed in the November Order. Requiring defendants to answer such a lengthy complaint, with so much extraneous material, would waste their time and stall this case unnecessarily. The Court could comb through the proposed amended complaint to identify and strike the irrelevant and non-factual material. But doing so "would [waste] resources upon which other litigants have an equal call." *VTech Holdings Ltd. v. PriceWaterhouseCoopers, LLP*, No. 03-CV-1419, 2003 WL 21756623, at *2 (S.D.N.Y. July 30, 2003). In sum, allowing the Motion to Amend would

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

prejudice Defendants, delay this case, and strain judicial time and resources—which alone justifies denying it. Block, 988 F.2d at 350.

That said, the Court agrees with Plaintiff that many of the allegations in his proposed Amended Complaint provide enough detail to correct defects in certain claims that were dismissed in the November Order. Obj. at 11–12. Therefore, the Court will allow Plaintiff to file a proposed Amended Complaint that includes only the facts relevant to the claims that survive this Memorandum-Decision and Order, which the Court will list below.[4] The revised amended complaint should not include claims that this Court has previously dismissed or deems futile in this opinion. Since Plaintiff has had two opportunities to plead those claims and has described the underlying events in significant detail, and since this case has stalled in the pleading stage for over a year and consumed significant judicial time and resources in the interim, the Court dismisses those claims without leave to re-plead. See De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 72 (2d Cir. 1996) (stating that a court may "dismiss a [claim] without leave to replead when a party has been given ample prior opportunity to allege [the] claim").[5]

[4]    Any legal argument should be limited to indicating which legal claims his factual allegations are intended to support. Plaintiff will have the opportunity to submit a more detailed legal analysis, with citations to caselaw, if Defendants file another motion to dismiss or for judgment in their favor.

[5]    The Court will not set a page limit for the amended complaint, but advises Plaintiff that it does not appear that his surviving claims should require him to use more than the approximately seventy pages he used in his original Complaint.

The Court will first address the claims in the proposed Amended Complaint that are viable; then, it will address the claims that are futile.

### 2. Assault Claims against Michael Gokey, Sarah Tomkins, and John Does

**\*10**  First, Plaintiff alleges that on September 2, 2014, he was "sexually assaulted by staff" including Michael Gokey and unidentified officers at Green Haven. Am. Compl. at 52, ¶ 101(F)(1). He states that he was "punched in the testicles, and staff ... rammed their fingers in [Plaintiff's] anus," causing swelling and other injuries. Id. He also alleges that at least eight times from March 24 to September 8, 2015, Officer Sarah Tompkins would "pull Plaintiff to the side" in the "library and make inappropriate comments." Am. Compl. at 63, ¶ 109. Among other things, she said that her "home girl," referring to Tracy Smith, "said your sexy ass is scared of pussy." Am. Compl. at 63, ¶ 109. After Plaintiff filed a grievance against Smith for sexual harassment, Tompkins chided him about it, saying, "you['re] not stupid enough to file a grievance against me." Id. ¶ 115. Plaintiff then describes how, on September 22, 2016, Tompkins conspired with four other officers to assault Plaintiff in a vacant classroom near the prison library. Id. ¶¶ 118–19. The officers then falsely charged Plaintiff with "lewd conduct" and assaulting staff. Id. ¶¶ 119–21.

### i. Eighth Amendment Claims Against Gokey, Tomkins, and Does

Prison guards may not use force in such a way—"maliciously and sadistically to cause harm"—even if they cause only minor injuries (or, for that matter, no injuries). Griffin v. Crippen, 193 F.3d 89, 92 (2d Cir. 1999). Such physical assaults by guards to humiliate an inmate, or in retaliation for past conduct, violate the Eighth Amendment. Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015) ("A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment."); Edwards v. McGrain, No. 09-CV-582, 2012 WL 6701826, at *5 (W.D.N.Y. Dec. 26, 2012) (Eighth Amendment claim based on beating by correctional officers in retaliation for grievance overcame summary judgment despite only minor injuries). Accordingly, Plaintiff states a valid Eighth Amendment excessive force claim against Gokey, Tompkins, and the John Doe officers who acted in concert with them.[6]

[6]    Although the claims regarding Gokey accrued two weeks before the September 24, 2014 time-bar, Plaintiff's September 8, 2014 grievance may have tolled the limitations period. R. & R. at 21 (citing Gonzales v. Hasty, 651 F.3d 318, 324 (2d Cir. 2011) ).

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 319 of 443

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

*ii. First Amendment Retaliation Claims Against Tompkins*

Given the facts suggesting that Tracey Smith was friends with Tompkins and told her about her sexual harassment of Plaintiff and his grievance about it, it is also plausible that Tompkins instigated the September 22, 2016 beating in retaliation for that grievance. See Am. Compl. at 63–64, ¶¶ 109, 115. Therefore, Plaintiff also states a First Amendment retaliation claim against Tompkins—both for the beating and the false disciplinary charges (for lewd conduct and assault) designed to fabricate a justification for it. Ford v. Martuscello, No. 14-CV-1566, 2016 WL 5322166, at *5 (N.D.N.Y. June 23, 2016), adopted, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016) (inmate stated claim that defendants, in beating inmate, retaliated for complaints against other officers where facts suggested the officers were aware of his grievances against their friends and assaulted plaintiff within one to four months of their filing); Gill, 389 F.3d at 384 (holding that filing a false misbehavior report was an adverse action for purposes of retaliation analysis).

*3. First Amendment Retaliation Claim Against Laura Gokey and Randel Smith*

In his original Complaint, Plaintiff also alleged that Sergeants Laura Gokey and Randel Smith retaliated against him by keeping him in a cell neighboring inmate Reeder, who loudly "banged and kicked" Plaintiff's cell door so incessantly that Plaintiff "was only able to sleep two to three hours a day and began to hallucinate, developed migraines, and lost his impulse control." Nov. Order at 27. "Plaintiff claim[ed] that he was placed in a cell adjacent to [Reeder] on two occasions: first, during his initial confinement at Upstate in Cell 15 from May 2014 until [September] 2014 and, second, in Cell 18 from December 29, 2015 until April 25, 2016." Id. at 40. Plaintiff repeats the same allegations in his proposed Amended Complaint. Am. Compl. at 51–59, ¶ 101. The Court previously upheld Plaintiff's Eighth Amendment claim based on these allegations, but dismissed his related retaliation claim because Plaintiff failed to describe any particular grievance that precipitated his cell placements. Nov. Order at 27, 35–36; R. & R. at 9–11, 26.

*11 However, additional facts in the Amended Complaint describe just such a grievance and plausibly allege a causal connection to Gokey and Smith's actions. Plaintiff now asserts that on September 8, 2014, he filed a grievance regarding the September 2, 2014 sexual assault by staff. Am. Compl. at 52,

¶ 101(F)(1). "A couple of inmates told Plaintiff that one of the officers was [Laura] Gokey's husband Michael Gokey, who's known for assaulting inmates." Id. ¶ 101(F)(2). Laura Gokey plausibly knew about the grievance because it was against her husband, and on September 10, 2014, she took Plaintiff from his cell for another guard to photograph his injuries and questioned him about the assault. Id. During the questioning, she told him that he "should let it go." Id. Later, when Plaintiff asked why other inmates around him were being transferred to different cells when he was not, even though Reeder was "depriving him of sleep," Gokey "whispered, 'because they don't write grievances.' " Id. ¶ 101(F)(3).

On September 19, 2014, Plaintiff received a letter stating that he should have been moved to a different floor, and that Randel Smith, Laura Gokey, and another officer (Eddy) knew why he had not yet been moved. Id. ¶ 101(M). When Plaintiff asked Smith why, he lied that there was "no [other] cell open." Id. Smith also allegedly misrepresented to the IGRC that he interviewed Plaintiff about his September 8, 2014 grievance against Smith and Gokey concerning Reeder. Am. Compl. at 55–56, ¶ 101(L), (M), (N)(2); Dkt. Nos. 28-3 at 40–41 ("Exhibit S"), 28-3 at 42–43 ("Exhibit T"). The Inmate Grievance Review Committee ("IGRC") dismissed the grievance because Smith stated that Plaintiff could not "substantiate" it. Id. On December 29, 2015, when Plaintiff was transferred back to Upstate, Smith interviewed him and returned him to the cell neighboring Reeder over Plaintiff's protest. Id. at 58, ¶ 101(N)(7).

The proposed allegations, taken as true, suggest that Gokey and Smith had retaliatory motives and influenced the decision to keep Plaintiff in the cell next to Reeder. According to the Amended Complaint, Gokey: (1) was married to subject of Plaintiff's grievance and therefore, had a reason to retaliate; (2) warned Plaintiff to withdraw the grievance; (3) had the power to prevent Plaintiff's transfer; and (4) suggested that Plaintiff was being kept in Cell 15 next to Reeder because of his grievances. And Smith: (1) must have known about Plaintiff's 2014 grievance regarding Reeder, given that he told the IGRC he had interviewed Plaintiff about it; (2) was willing to lie to Plaintiff and the IGRC to keep Plaintiff in the cell; and (3) another officer suggested that Smith knew the reasons Plaintiff was not being moved despite protocol indicating that he should have been. Finally, Plaintiff alleges that it was a common practice at Upstate to place inmates who filed grievances next to Reeder as punishment. Am. Compl. at 60, ¶ 104; Dkt. No. 28-3 at 63 ("Exhibit EE"). These facts make it plausible that Gokey and Smith refused to move Plaintiff in

White v. Marinelli, Not Reported in Fed. Supp. (2019)
2019 WL 1090802
Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 320 of 443

late 2014, and that Smith returned him to the same cell when he returned to Upstate, in retaliation for Plaintiff's grievances against them.

Although Smith and Gokey's 2014 actions were outside the applicable limitation period (that is, before September 24, 2014), the Magistrate Judge concluded that equitable tolling may apply to the claims based on those actions, a conclusion to which Defendants did not object. R. & R. at 22. Thus, the allegations against both Gokey (in 2014) and Smith (in 2014 and 2015) regarding Reeder and Plaintiff's resulting sleep deprivation state a claim for First Amendment retaliation.

*4. Due Process Claim against Eric Gutwine*

In December 2015, Officer Gutwine held a disciplinary hearing concerning Tompkins' and her cohorts' allegedly false charges that Plaintiff engaged in "lewd conduct" and assaulted staff members in the classroom near the prison library. Am. Compl. at 68–69, ¶¶ 120–21. Gutwine found Plaintiff guilty and sentenced him to 270 days of confinement in the Special Housing Unit ("SHU") and "loss of privileges." Id. at 83, ¶ 124(C). The finding caused Plaintiff's subsequent transfer back to Upstate on December 24, 2015 (where Randel Smith allegedly placed him next to inmate Reeder) and was used as the basis for referring Plaintiff to the Sex Offender Counseling and Treatment Program ("SOCTP"). Id. at 83–84, ¶ 127; Obj. at 15. Plaintiff alleges that he was denied due process at the hearing. These allegations may state a claim under the Fourteenth Amendment, and the Court cannot conclude they are futile.

 **\*12**  To establish that prison officials violated the Due Process Clause, Plaintiff must show that they deprived him of a liberty interest without adequate procedural protections. Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995) ). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." Arce v. Walker, 139 F.3d 329, 336 (2d Cir. 1998).

In the Complaint, Plaintiff focused on his referral to SOCTP as the relevant liberty deprivation underlying his due process

claim. Compl. at 61–64. The Court previously concluded that such "sex offender classification and programming do not trigger due process rights" in prison. Nov. Order at 30–31 (citing Blake v. Fischer, No. 09-CV-266, 2010 WL 2522198, at *10 (N.D.N.Y. Mar. 5, 2010), adopted, 2010 WL 2521978 (N.D.N.Y. June 15, 2010) ). In his Amended Complaint and Objection, however, Plaintiff clarifies that he was also confined in the SHU for 290 days. Obj. at 15; Am. Compl. at 83, ¶ 124(C). "Where the plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest was infringed]." Palmer, 364 F.3d at 64–65. "In the absence of a detailed factual record," the Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the Sandin plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." Id. at 65–66. In this case, Plaintiff's allegation that he was held in the SHU for 270 days, especially coupled with the sleep-depriving conditions he allegedly experienced there, implicate a liberty interest. See Colon v. Howard, 215 F.3d 227, 232 (2d Cir. 2000) (holding after a trial that confinement in SHU for 305 days implicated a liberty interest); Thomas v. Calero, 824 F. Supp. 2d 488, 500 (S.D.N.Y. 2011) (denying motion to dismiss because 291 days in SHU implicated liberty interest).

Nonetheless, to state a claim for a violation of due process, Plaintiff must also allege facts showing that the hearing lacked "that minimal process guaranteed by the Constitution" to assure basic fairness in the correctional context. Shakur v. Selsky, 391 F.3d 106, 119 (2d Cir. 2004); see also Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (listing constitutional requirements). Many of the alleged defects in Plaintiff's hearing were not so fundamental as to deny him the process due under the Constitution.

First, Gutwine delayed the hearing six times, from October 5 to December 9, 2015. Am. Compl. ¶¶ 122(A), (B)(11). New York regulations provide that when an inmate is in segregated confinement pending his disciplinary hearing, the hearing must commence within seven days unless the "commissioner or his designee" authorizes the delays. 7 N.Y.C.R.R. 251-5.1. However, violations of New York regulations governing disciplinary hearings do not always violate the stricter, minimum standards imposed by the Fourteenth Amendment. Shakur, 391 F.3d at 119. Here, the delay did not violate

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 321 of 443

the regulation because the hearing officer granted requests for extensions of time. Am. Compl. ¶¶ 122(A), (B)(11). In any event, the delay only resulted in Plaintiff's pre-hearing confinement in the SHU for approximately 65 days —a duration which, in normal SHU conditions, does not implicate a liberty interest (or, therefore, any constitutional right to process) under normal SHU conditions. See *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that sixty and ninety-day SHU confinements "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions' " (quoting *Palmer*, 364 F.3d at 65) ).

*13 Second, Plaintiff asserts that an off-the-record conversation shows that Gutwine "predetermin[ed] Plaintiff's guilt." Am. Compl. at 81, ¶ 124. Gutwine allegedly advised Plaintiff he was "digging [him]self in a deeper hole" because he had "contradicted [him]self" several times, and asked Plaintiff why he believed the corrections officers would lie, among other things. Id. ¶ 124(A). But "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). Gutwine's skepticism would have been a rational response to perceived contradictions within Plaintiff's testimony. Even if Gutwine was mistaken, and Plaintiff's testimony was consistent, such a misunderstanding does not suggest that Gutwine prejudged any evidence he had not yet seen. *Sawyer v. Prack*, No. 14-CV-1198, 2016 WL 5440596, at *11 (N.D.N.Y. July 29, 2016), adopted, 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016). Accordingly, Plaintiff has not stated a claim that Gutwine was so biased as to deny Plaintiff a fundamentally fair hearing.

Nevertheless, the other defects Plaintiff alleges—that Gutwine denied without explanation his requests to present witnesses and documents, and that his inmate assistant failed to marshal any such evidence while Plaintiff was incapacitated in the SHU—may provide a viable basis for a due process claim.

A prisoner facing a loss of liberty has a qualified "right ... to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real*, 471 U.S. 491, 495 (1985) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974) ). Institutional interests in safety and "swift discipline in individual cases" give prison officials the "discretion to keep the hearing within reasonable limits

and to refuse to call witnesses" when doing so "may create a risk of reprisal or undermine authority." Id. Thus, a hearing officer may deny a request to call a witness "on the basis of irrelevance or lack of necessity," *Scott v. Kelly*, 962 F.2d 145, 147 (2d Cir. 1992), and may "limit access to other inmates to collect statements or to compile other documentary evidence," *Ponte*, 471 U.S. at 495. "Courts will not ... second guess the [reasonable] judgment of prison officials with respect to such matters." *Sira*, 380 F.3d at 75. Still, "prison officials who decide to circumscribe inmates' procedural rights at disciplinary proceedings must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." Id.; *Ponte*, 471 U.S. at 492 (holding that due process "requires that prison officials state their reason for refusing to call witnesses requested by an inmate at a disciplinary hearing"). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of [his or her] position." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30–31 (2d Cir. 1991).

In addition, prisoners who are confined to the SHU and "unable to 'marshal evidence and present a defense' " have a right to "be assigned to the inmate [or staff member] to act as his surrogate—to do what the inmate would have done were he able." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988) )."[S]uch help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses"—the investigatory tasks which the inmate, were he able, could perform for himself." *Eng*, 858 F.2d at 898. Furthermore:

*14 The assistance must be provided in good faith and in the best interests of the inmate. "For example, an assistant ... who is requested to interview a group of prisoners too numerous to interview must attempt to determine independently who the most relevant witnesses might be and to interview them.

Id. "[A]n assigned assistant who does nothing to assist a disabled prisoner—one who is segregated from the general prison population—has failed to accord the prisoner his limited constitutional due process right of assistance." Id.

The proposed Amended Complaint plausibly alleges that before the hearing, Plaintiff's staff inmate assistant declined to interview witnesses or retrieve documents, and that at the hearing, Gutwine denied Plaintiff's requests to call witnesses. Am. Compl. at 71, ¶¶ 122(B)–124. Neither defendant offered

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

any legitimate reason for their decisions. Id. Thus, Plaintiff appears to state a claim that the inmate assistant (who is not identified) and Gutwine prevented Plaintiff from marshaling witnesses and evidence in his defense and did so without justification.

Nevertheless, Plaintiff's due process claims may face another hurdle. It is "inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991). Since it is not clear from the Proposed Amended Complaint why any of the requested documents or witnesses were relevant to Plaintiff's case, the Court cannot determine whether Gutwine may have acquitted Plaintiff if he had been allowed to present the evidence he requested. Still, it appears reasonably likely that Plaintiff will be able to clarify the relevance of the suppressed evidence and witnesses in his revised Amended Complaint. Therefore, Court will allow him to attempt to replead his due process claim against Gutwine and the inmate assistant in his revised amended complaint.

That said, the Court expresses no opinion on whether Plaintiff's present allegations, which do not show prejudice, state a due process claim. It may indeed be sufficient for Plaintiff to plead what he already does: that the staff assistant and Gutwine prevented Plaintiff from presenting the requested witnesses and evidence and did so without justification. See Chavis v. Zodlow, 128 F. App'x 800, 805 (2d Cir. 2005) (denying pre-Twombly motion to dismiss because prisoner was denied opportunity to call witnesses; not requiring prisoner to plead prejudice). In other words, it is possible that "harmless error" is an affirmative defense; if so, it would be incumbent on prison officials to show it "clear from the face of the complaint and matters of which the court may take judicial notice" that any such errors were harmless. Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 (2d Cir. 2014) (describing standard for dismissal based on affirmative defense). Indeed, in an appeal from or collateral attack on a criminal conviction, the state has the burden to show that any constitutional error was harmless. Lainfiesta v. Artuz, 253 F.3d 151, 158 (2d Cir. 2001) (holding that "[w]hen evaluating presumptively correct convictions on collateral habeas review" [t]he burden of persuasion is on the government" to show "harmless error"); Chapman v. California, 386 U.S. 18, 24 (1967) (holding that on direct review of a criminal conviction the state must "prove beyond

a reasonable doubt that the error complained of did not contribute to the verdict obtained.").

**\*15** On the other hand, to show that the state unconstitutionally suppressed evidence in the first place, even a criminal defendant must show that the suppression "deprive[d] [him] of a fair trial." United States v. Bagley, 473 U.S. 667, 674 (1985). Therefore, he must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995). Likewise, a criminal defendant alleging his attorney was unconstitutionally inadequate must show that "any deficiencies in counsel's performance [were] prejudicial to the defense," meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 691–92 (1984). Accordingly, the Court's tentative view is that to state a due process claim based on the suppression of witnesses or evidence at his disciplinary hearing, Plaintiff must plead facts showing that the evidence and testimony the hearing officer suppressed, or that his inmate assistant failed to marshal, would have been reasonably likely to change the outcome of the hearing. Accord Sawyer v. Prack, No. 14-CV-1198, 2016 WL 5440596, at \*12 (N.D.N.Y. July 29, 2016), adopted, No. 14-CV-1198, 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016) (dismissing due process claim because Plaintiff failed to "demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing"); Hinton v. Prack, No. 12-CV-1844, 2014 WL 4627120, at \*12 (N.D.N.Y. Sept. 11, 2014) (dismissing due process claim based on unexplained denial of witnesses "because Plaintiff failed to allege, in any fashion, how he was prejudiced").

The issue of who must show prejudice (or lack thereof) will be moot, and the due process claims will survive, if Plaintiff explains more clearly in his revised amended complaint why the suppressed evidence could have changed the outcome of his disciplinary hearing. Therefore, the Court will not decide now whether Plaintiff must plead prejudice to state a viable claim that the hearing officer's exclusion of witnesses and documents violated the Due Process Clause. It will assess such claims based on any allegations supporting them in any revised amended complaint.

*5. Access-to-Courts Claim Against Bernier*

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

Plaintiff's "access to courts" claim against Bernier concerns video footage of Plaintiff's disciplinary hearing, including the "off-the-record" conversation with Gutwine. Plaintiff alleges that he requested copies of the video footage to support his petition for judicial review of the hearing outcome under Article 78 of the New York Civil Practice Law and Rules, but that Bernier withheld that footage, Obj. at 13; Am. Compl. at 88, ¶ 136. The state court ultimately denied Plaintiff's petition, stating that it "did not find that petitioner['s] claims that he was denied the right to call witnesses and present documentary evidence demonstrated a violation of his due process rights." Id. ¶ 136(D).

The Constitution guarantees prisoners "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Lewis v. Casey, 518 U.S. 343, 351 (1996). To establish a constitutional claim for denying access to the courts, a plaintiff must show that the defendant acted deliberately and maliciously, Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003), and "hindered" the plaintiff's efforts to pursue a "non-frivolous" legal claim, Lewis, 518 U.S. at 353–54. "Depriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives [the plaintiff] of something of value —arguable claims are settled, bought, and sold. Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions." Id. at 353 n.3.

Plaintiff does not explain how the video footage might have changed the state court's conclusion that the exclusion of witnesses and documentary evidence from his hearing was constitutional. Am. Compl. at 90, ¶ 136(D). Therefore, he does not plausibly allege that Bernier "hindered" his case in state court. Lewis, 518 U.S. at 353–54. And the conversation Plaintiff describes in his Amended Complaint did not even "arguably" support his claim that Gutwine was unconstitutionally biased. Id. Accordingly, even if Bernier withheld the video of that conversation, she did not violate Plaintiff's right to access the courts.

### 6. Eighth Amendment Medical Indifference Claim Against Michele Byno

**\*16** Plaintiff's proposed Amended Complaint would also revive his Eighth Amendment claim that by withholding Plaintiff's mental health medication ("Romeron and Celexa") from October 14 to 30, 2014, Byno was deliberately indifferent to the "substantial risk of serious harm" posed by Plaintiff's depression. Obj. at 13; Am. Compl. at 39–43, ¶¶ 81–83.

In its November Order, the Court concluded that withholding Plaintiff's depression medication for sixteen days plausibly posed a "substantial risk of serious harm," but that Plaintiff had "not pleaded facts suggesting that Byno was aware that withholding ... medication would result in [such] an excessive risk to Plaintiff's health or that [she] acted with the necessary culpable state of mind." Nov. Order at 21. Now, Plaintiff alleges that he told Byno at his Upstate intake on May 3, 2014 "about his previous suicide attempts before arriving at Upstate," had "actually ... just arrived from Downstate C.F. mental health observation cell for trying to hang himself," and that he "felt homicidal and suicidal." Am. Compl. at 41, ¶ 83(A)(2). After Heath Baker and Marinelli allegedly discontinued Plaintiff's medical health medication in June 2014, Plaintiff attempted suicide again, and on September 1, 2014, he told Byno that "my mental health meds being discontinued ... was a factor for me trying to kill myself." Id. ¶ 83(A)(4). Moreover, although Byno had stopped supplying Plaintiff's pills and told him on October 16, 2014 that they had been "discontinued," she told prison administrators that he "ha[d] been receiving [his] medication on a regular basis" during the same period. Am. Compl. at 39–40, ¶¶ 82, 83(A) (5)–(6); see also Dkt. No. 28-3 at 31 ("Exhibit N") (letter from New York Office of Mental Health stating that "nursing" staff at Upstate so indicated).

Byno's awareness of Plaintiff's recent history of suicide attempts when Plaintiff was denied medication, and dissimulation to hide the sixteen-day gap in Plaintiff's medication in October 2014, would provide plausible grounds to infer that she possessed the culpable mental state required to violate the Eighth Amendment. Therefore, Plaintiff's Eighth Amendment claim against her is not futile.

### 7. Eighth and First Amendment Claims Against Heath Baker

#### i. Shingles

Plaintiff asserts that in misdiagnosing Plaintiff's shingles as "stretch marks" in October 2014 and failing to treat them, nurse Heath Baker "was deliberately indifferent to Plaintiff['s] serious medical needs" in retaliation for Plaintiff's filing grievances, which violated his First and Eighth

White v. Marinelli, Not Reported in Fed. Supp. (2019)

2019 WL 1090802

Amendment rights. Obj. at 12–13 (citing Am. Compl. ¶¶ 77–80 and numerous exhibits).

Plaintiff alleges that "around May 19, 2014," Baker learned that Plaintiff filed grievances against him on May 10, 13, and 14 for allegedly denying Plaintiff medical treatment. Am. Compl. at 36–38, ¶¶ 80(F)(2)–(5), (10); Dkt. No. 28-3 at 12–13 ("Exhibit E") (grievance review letter stating that Baker "saw the grievant at sick call on 5/7/14, 5/12/14, 5/14/14, and 5/20/14"). [7] Burton, 664 F. Supp. 2d at 367 (noting that grievances are protected activities). As explained earlier, grievances are protected activities, and courts have found it "plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." Id. at 367. Therefore, Plaintiff's allegations against Baker regarding his shingles satisfy the first two elements of a retaliation claim.

[7] Plaintiff believes that Baker learned about another grievance Plaintiff filed against Baker in September 2014. Am. Compl. at 38, ¶ 80(F)(12). He cites a letter stating that "RN Baker assessed the grievant on 9/10/14 for claims of sexual assault by staff." Am. Compl. at 38, ¶ 80(F)(12) (citing Dkt. No. 28-3 at 29) ("Exhibit M"). The fact that the writers knew this information, which was presumably available in Plaintiff's medical records, does not suggest that they informed Baker of Plaintiff's grievance.

*17 However, Plaintiff's allegations do not suggest that Baker intentionally mis-diagnosed his shingles because of the grievance filed five months earlier. True, a "plaintiff can establish a causal connection that suggests retaliation by showing that [the] protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009). But to support an inference of retaliatory intent on its own, without other evidence, "the [temporal] proximity must be 'very close.' " Dhar v. City of New York, 655 F. App'x 864, 866 (2d Cir. 2016) (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ); compare Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (holding that there was insufficient evidence of a "causal nexus" when the only evidence was temporal and there was a three-and-a-half-month lapse between the complaint and the alleged adverse action) with Espinal, 558 F.3d at 122, 129 (finding lapse of six months supported

retaliation claim, where facts suggested that officers "waited to exact their retaliation at an opportune time" to beat plaintiff, and told him that "this is what happens to [i]nmates when they submit law suits against us"). And there is reason to demand a particularly close proximity in this case, where Plaintiff admits that Baker examined the rash but asserts that he mis-diagnosed it. "Determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients." Banks v. Annucci, 48 F. Supp. 3d 394, 409 (N.D.N.Y. 2014). The fact that Baker's alleged mis-diagnosis came five months after the grievance is insufficient to raise a "reasonable expectation" that Plaintiff will discover evidence to overcome that presumption and establish retaliatory intent. Twombly, 550 U.S. at 556. Therefore, the First Amendment retaliation claim against Baker is futile.

Given that same "presumption of correctness," Banks, 48 F. Supp. 3d at 409, the facts in the proposed Amended Complaint also fail to show that Baker "consciously disregard[ed] a substantial risk of serious harm" to Plaintiff's health, Farmer, 511 U.S. at 839, or even that Plaintiff was denied adequate care, so as to violate the Eighth Amendment. Salahuddin, 467 F.3d at 279. Even if Baker misdiagnosed Plaintiff's shingles symptoms, Plaintiff concedes that prison medical staff treated the virus after four days, Am. Compl. at 33, ¶ 78, and provides no facts suggesting "that the delay ... caused or exacerbated the infection, caused him extreme pain, or caused any permanent harm," Frith, 203 F. Supp. 3d at 390. As with his infected bite, Plaintiff's general statements that the shingles caused "unbearable pain," Am. Comp. at 33, ¶ 80, in those four days are insufficient. Gomez, 649 F. App'x at 96; Frith, 203 F. Supp. 3d at 389. Accordingly, any Eighth Amendment claim based on Baker's delayed treatment for Plaintiff's shingles would fail.

### ii. Mental Health

The Objections also reference claims that in May and June, 2014, Baker was deliberately indifferent to Plaintiff's mental health needs. Obj. at 10–11; see also Nov. Order at 19–21. The Court previously found that the mental health-related allegations would survive sua sponte screening if they were not time-barred. Nov. Order at 19. Defendants do not object to the Magistrate Judge's finding that the proposed Amended Complaint sets forth a potential basis to toll the statute of limitations with respect to those claims. Therefore, the Court adopts that finding.

White v. Marinelli, Not Reported in Fed. Supp. (2019)
2019 WL 1090802

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 325 of 443

### iii. Rash, Acne, Fungus

Plaintiff also alleges that Baker ignored conditions in "May and June," which may refer to Plaintiff's facial acne, a rash on his thigh, and/or a foot fungus. Obj. at 12; see also Nov. Order at 22. However, he points to no allegations in the Amended Complaint that would show that his acne, rash, or fungus constituted "serious medical conditions," as required to support an Eighth Amendment violation. Nov. Order at 22 (citing Thompson v. Carlsen, No. 08-CV-965, 2010 WL 3584409, at *6 (N.D.N.Y. Aug. 16, 2010) ). The facts do not indicate that they were " 'condition[s] of urgency' that may result in 'degeneration' or 'extreme pain,' " meaning that they do not state an Eighth Amendment claim. Chance, 143 F.3d at 702 (citation omitted). Moreover, although Plaintiff refers to Baker's actions in "May and June," 2014, Plaintiff asserts that Baker decided that the acne, fungus, and rash did not require treatment on May 14, 2014, around five days before Baker learned of Plaintiff's grievances against him. Am. Compl. ¶¶ 80(F)(10). Thus, based on those allegations, Baker's decisions concerning those physical conditions were not First Amendment retaliation, either. As such, they fail to state a claim for relief.

### 8. Supervisory Liability Claims

### i. Nancy Smith

**\*18** Plaintiff claims that Nancy Smith violated his First and Eighth Amendment rights by failing to correct Baker's retaliatory indifference to Plaintiff's acne, rash, fungus, and shingles. Specifically, Plaintiff asserts that Smith, like Baker, was "deliberate[ly] [indifferent] to Plaintiff['s] serious medical needs in retaliation for filing multiple grievances." Am. Compl. at 35, ¶ 80(F).

To state an Eighth Amendment claim based on a supervisor's acquiescence in subordinates' unconstitutional conduct alleged in a grievance, Plaintiff's claim must meet the same elements as it would against a line officer; the Amended Complaint must show that the supervisor "knew of and disregarded and excessive risk to [Plaintiff's] heath or safety." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017); see also Zenon v. Downey, No. 18-CV-458, 2018 WL 6702851, at *7 (N.D.N.Y. Dec. 20, 2018) (discussing supervisory

liability in light of Iqbal and Turkman). In addition, the "constitutional violation complained of in [the] grievance must [have been] 'ongoing' ... such that the 'supervisory official who review[ed] the grievance [could] remedy [it] directly.' " Burton, 664 F. Supp. 2d at 360. (citations omitted). " 'Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate,' because the violation is not 'ongoing and the defendant has [no] opportunity to stop the violation after being informed of it.' " Id. at 361 (citation omitted).

As discussed, the failure to treat the skin conditions and fungus, and the delay in treating the shingles, did not pose a "substantial risk of serious harm" to Plaintiff's health. Chance, 143 F.3d at 703. Moreover, Plaintiff does not allege that his conditions persisted beyond Smith's review of his grievance regarding Baker. Burton, 664 F. Supp. 2d at 360. In any event, "[i]t is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment." Graham v. Wright, No. 01-CV-9613, 2003 WL 22126764, at *1 (S.D.N.Y. Sept. 12, 2003) (citation omitted). Accordingly, Plaintiff's proposed claims against Nancy Smith based on the acne, rash, fungus, and shingles are futile.

As to the retaliation claim, Plaintiff does not list any grievance he filed against Nancy Smith; his only factual allegation against her asserts that she investigated Plaintiff's June 9, 2014 grievance against Baker concerning his rash and foot fungus before that grievance was denied. Dkt. No. 28-3 at 24–25 ("Exhibit K"). [8] Plaintiff does not provide any reason to believe she retaliated against him for that complaint. See R. & R. at 15 (citing cases dismissing claims that corrections officers retaliated based on complaints against other officers on similar facts); cf. Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (granting summary judgment against such a claim even though defendant took alleged adverse action three days after Plaintiff filed grievance against another officer). Therefore, Plaintiff First Amendment retaliation claim against Smith also fails.

[8]     The grievance also complained that Baker was giving Plaintiff "the wrong mental health pills." Ex. K at 25. But as indicated earlier, the Court previously concluded that those claims would survive sua sponte review if shown to be timely and will allow Plaintiff to amend his complaint to seek

Case 9:19-cv-01438-LEK-TWD Document 199 Filed 06/21/22 Page 326 of 443
White v. Marinelli, Not Reported in Fed. Supp. (2019)
2019 WL 1090802

to establish their timeliness. Nov. Order at 19; R. &. R. at 21.

### ii. Donald Uhler

**\*19** Plaintiff also fails to resuscitate his claim that Uhler violated the Eighth Amendment by permitting inmate Reeder to "kick and bang" on Plaintiff's cell in 2016. Nov. Order at 40.

In his Amended Complaint, Plaintiff states that Reeder was "written up for kicking his door" in July 2014. Am. Compl. At 60, ¶ 104(A). Plaintiff also sent the IGRC a grievance on September 18, 2014, stating that "for the past four months" Reeder had been "bang[ing] all day and night depriving [him] of sleep and peace of mind," and requesting a transfer. Ex. S; Am. Compl. at 60, ¶ 104(B). The IGRC denied the request, and Uhler affirmed. Dkt. No. 28-3 at 45 ("Exhibit U"); see also Am. Compl. ¶ 104(B)–(C). On January 5, 2016, Plaintiff filed another grievance reporting that Reeder was "kicking and banging" again. Id. ¶ 103. The IGRC also denied that grievance and, on January 31, 2016, Plaintiff again appealed to Uhler. Id. On February 8, Corrections Officer Todd Manly came to Plaintiff's cell to investigate and heard Reeder's banging. Id. However, on March 4, 2016, Uhler affirmed the denial of the request for a transfer, finding (incorrectly) that there was "no evidence of inmate Reeder banging." Id. ¶ 104; see also Nov. Order at 40.

These allegations still fail to establish that Uhler violated Plaintiff's Eighth Amendment rights. Like the original Complaint, the Amended Complaint still does not allege that Reeder continued to deprive Plaintiff of sleep after Uhler reviewed his grievance in March 2016. Nov. Order at 40. Plaintiff does not contradict his earlier statement that Reeder's banging stopped depriving him of sleep on January 27, 2016. Compl. at 32, ¶ 89. Thus, the Court cannot infer that Uhler had a reasonable opportunity to remedy the unconstitutional conditions after he reviewed Plaintiff's appeal between January 31 and March 4, 2016. Am. Compl. at 50–60, ¶¶ 103–04.

Plaintiff argues that Uhler should have prevented Plaintiff from being placed next to Reeder in the first place because of the complaints concerning Reeder in 2014, "15 months prior" to the 2016 incident. Am. Comp. at 61, ¶ 104(C). Perhaps Uhler should have remembered those 2014 complaints, foreseen that Reeder would resume his behavior, and predicted that Plaintiff would lose sleep if

placed next to Reeder again. At most, however, Uhler's lack of foresight constitutes negligence—not the criminal recklessness required to state a claim under the Eighth Amendment. Farmer, 511 U.S. at 835, 839.

Plaintiff does not direct the Court to any other factual allegations suggesting that Uhler knew of and disregarded an excessive risk to his health or safety. Turkmen, 789 F.3d at 250. Accordingly, his claims against Uhler are futile.

### 9. Sexual Harassment Claims Against Nelson

Plaintiff attempts to reallege that Nelson's comments at his cell on April 21, 2016—attempting to induce him to expose his penis—violated the Eighth Amendment. "There has been no case" in the Second Circuit "in which a plaintiff ha[s] established an actionable [Eighth Amendment] claim of sexual harassment ... without having physical contact with the alleged perpetrator, or without, at the very least, alleging egregious sexual conduct." Holland v. City of New York, 197 F. Supp. 3d 529, 547 (S.D.N.Y. 2016). Plaintiff argues that Nelson's remarks are "egregious" because there were "many incidents of sexual misconduct, including forceful sexual activity ... unsolicited touching, and sexual comments" at Upstate, "where sexual assaults of prisoners was well known but inadequately addressed." Obj. at 14. As described earlier, the incidents of unprovoked physical violence against Plaintiff, such as the alleged 2014 sexual assault by Mr. Gokey and other officers, would violate the Eighth Amendment on their own. Crawford, 796 F.3d at 257–59. However, Plaintiff does not allege that Nelson was aware of any of these incidents. And even if she was, her alleged remarks on April 21, 2016 would not state a claim. Unlike the physical abuse alleged in Crawford and Boddie, Nelson's alleged verbal harassment, though degrading to Plaintiff, does not constitute "severe and repetitive sexual abuse" and, therefore, is not sufficiently serious to be "cruel and unusual punishment." Crawford, 796 F.3d at 256–57; see also Morales v. Mackalm, 278 F.3d 126, 132 (2d Cir. 2002) (affirming dismissal of Eighth Amendment claim where female prison employee asked plaintiff "to have sex with her and to masturbate in front of her and other female staffers").

### 10. New Claims in Amended Complaint

**\*20** Plaintiff also seeks to add several claims in his Amended Complaint that do not appear to have been asserted in his Complaint. See Am. Compl. at 222–36, ¶¶ 289–36. Neither the parties, nor the Court, nor the Magistrate Judge has addressed whether these claims are plausible. The Court need

2019 WL 1090802

not address them here. Plaintiff may attempt to assert them
in his revised Amended Complaint, subject to review by the
Magistrate Judge under the standard in Foman, 371 U.S. at
182, and, if necessary, appeal to this Court.

Nevertheless, given the age of this case and the fact
that discovery has not yet commenced, Plaintiff's revised
Amended Complaint, which will be due thirty days from the
filing of this Memorandum-Decision and Order, will be his
last opportunity to amend the Complaint without showing
good cause for allowing him to do so. Further motions to
amend will not be freely granted.

**C. Motion to Show Cause**

Plaintiff also filed a motion asserting that defendants Smith,
Waterson, Nelson, and Bernier, should be deemed to have
consented to Plaintiff's Motion to Amend and/or should be
sanctioned because they served Plaintiff their Opposition to
the Motion to Amend several days late. Dkt. No. 35 at 21–
25 ("Motion to Show Cause"). [9] He asserts that although the
response was due on October 19, 2018, Defendants did not
send it to him until October 22, and he did not receive it until
October 25, 2018. Id. at 24.

[9]
Although Plaintiff asserts that he submitted the
Motion to Show Cause to the Magistrate Judge
on October 29, 2018, Obj. at 17; Mot. to Show
Cause at 21, the motion was not electronically filed
until Plaintiff submitted a copy with his Objections.
Docket.

The Motion to Show Cause is denied. Courts may excuse a
late filing " 'after the time has expired if the party failed to
act because of excusable neglect.' " S&R Dev. Estates LLC
v. Town of Greenburgh, No. 16-CV-8043, 2017 WL 44854,
at *2 (S.D.N.Y. Jan. 4, 2017). Four factors are considered in
evaluating excusable neglect: " '[1] the danger of prejudice
to the [non-movant], [2] the length of the delay and its potential
impact on judicial proceedings, [3] the reason for the delay,
including whether it was within the reasonable control of the
movant, and [4] whether the movant acted in good faith.' "
Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d
Cir. 2003) (alterations in original) (quoting Pioneer Inv. Servs.
Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395
(1993) ). Plaintiff does not allege that the delay in service
prejudiced him—and the Court finds that it did not. He did
not move to file a reply to Defendants' Opposition, even
though he had approximately six weeks to do so before the
Magistrate Judge issued the Report-Recommendation. L.R.

7.1(b)(2). The short delay in serving the Opposition did not
delay judicial proceedings, and there is no evidence that
Defendants acted in bad faith; they did not stand to gain
from the short delay in service. While Defendants have not
argued that they were tardy for reasons outside their control,
the Court finds that the other factors weigh against levying
sanctions on Defendants or deeming the Motion to Amend
unopposed.

That said, Defendants are reminded that they must serve all
papers on Plaintiff before the applicable filing deadlines. L.R.
7.1(b). Plaintiff should bring any future failures to comply
with this rule to the Court's attention.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 34)
is **ADOPTED in part and MODIFIED in part** as described
in this Memorandum-Decision and Order; and it is further

**\*21  ORDERED**, that the Motion to Dismiss (Dkt. No. 19)
is **DENIED** with respect to Plaintiff's Eighth Amendment
conditions-of-confinement claim against Randel Smith and
his First Amendment retaliation claim against Nelson, but
**GRANTED** with respect to the Eighth Amendment medical
indifference claim against Waterson; and it is further

**ORDERED**, that the Motion to Amend (Dkt. No. 28) is
**DENIED without prejudice**. Plaintiff may renew his Motion
to Amend with a revised proposed amended complaint that
alleges **only** the following claims: (1) the First Amendment
retaliation claim against Tracy Nelson, Denise Bernier, and
Roxanne LeClerc; (2) the Eighth Amendment deliberate
medical indifference claims against Sergeants Luc Maynard
and Patrick Baker, Officer Richard Winston, mental health
worker John Marinelli, Nurse Heath Baker, and Lieutenant
Robert Barkman, and nurse Michele Byno based on Plaintiff's
mental health needs; (3) the Eighth Amendment conditions
of confinement claims against (a) Maynard, Winston, Officer
Adam Gallagher, Officer Brian Fournier, and Sergeant
Richard Scott based on unsanitary conditions in Cell 13 in
May 2014; (b) Sergeants Michael Eddy and Laura Gokey,
Marinelli, and Randel Smith for keeping him in Cell 15
next to inmate Reeder, resulting in sleep deprivation, in May
2014; and (c) Sergeant Randel Smith for placing him in
Cell 18 next to inmate Reeder in December 2015; (4) the
Eighth Amendment excessive force claims against Michael
Gokey, Sarah Tompkins, and the unidentified Doe guards

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 328 of 443

**White v. Marinelli, Not Reported in Fed. Supp. (2019)**
2019 WL 1090802

who participated in the September 2014 and 2015 assaults on Plaintiff; (5) the First Amendment retaliation claims against (a) Tompkins and her Doe accomplices regarding the 2015 assault and false disciplinary report; and (b) Laura Gokey and Randel Smith regarding inmate Reeder; (6) the Fourteenth Amendment due process claims against Eric Gutwine and Plaintiff's Jane Doe inmate assistant regarding his December 2015 disciplinary hearing; and (7) any other claims that the Court has not already dismissed; and it is further

**ORDERED**, that Plaintiff shall file any such renewed motion to amend his complaint within thirty days of the filing date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that any such renewed motion to amend will be Plaintiff's final opportunity to amend his Complaint without a showing of good cause; and it is further

**ORDERED**, that Plaintiff's Motion to Show Cause (Dkt. No. 35 at 21–25) is **DENIED**; and it is further

**ORDERED**, that this case continues to be referred to Magistrate Judge Andrew Baxter for full pretrial and report-recommendations concerning dispositive motions.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1090802

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 555943

2020 WL 555943
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,

v.

M. MOORE, T. Lamica, E. Velie, D. Rondeau,
D. Gagne, and B. Truax, Defendants.

Civ. No. 9:17-CV-1086 (GLS/DJS)
|
Signed 01/13/2020

**Attorneys and Law Firms**

CHRISTOPHER MASON, Plaintiff Pro Se, 12-A-0162, Cape
Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape
Vincent, New York 13618.

HON. LETITIA JAMES, Attorney General of the State of
New York, OF COUNSEL: ERIK BOULE PINSONNAULT,
ESQ., Assistant Attorney General, Attorney for Defendants,
The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983 alleging the violation of his constitutional rights.
Dkt. No. 1, Compl. The Complaint was initially reviewed by
Senior District Judge Gary L. Sharpe pursuant to 28 U.S.C. §
1915(e) and 28 U.S.C. § 1915A. Dkt. No. 5. Following that
review, the only claims that remain in this action are Eighth
Amendment excessive force and failure to intervene claims.
*Id.* at p. 11.

Presently before this Court is a partial Motion for Summary
Judgment seeking dismissal of any Eighth Amendment
excessive force claim regarding the use of chemical agents
and the dismissal of the failure to intervene claims against
Defendants Moore and Truax. Dkt. Nos. 45 & 45-1, Defs.'
Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 47.
Defendants have filed a Reply in further support of the

Motion. Dkt. No. 48. For the reasons that follow, the Court
recommends that the Motion be granted in part and denied in
part.

**II. BACKGROUND**

**A. Plaintiff's Failure to File a Response
to Defendants' Rule 7.1 Statement**

Pursuant to this District's Local Rules, "[t]he Court shall
deem admitted any properly supported facts set forth in
the Statement of Material Facts that the opposing party
does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As
required by the Local Rules, Defendants' counsel advised
Plaintiff of the consequences of failing to file a response to
Defendants' Rule 7.1 Statement of Material Facts. Dkt. No.
45 at p. 3. Plaintiff, however, did not file a direct response
to Defendants' Statement of Material Facts. Although a *pro
se* litigant is entitled to a liberal construction of his filings,
*see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir.
2013), his *pro se* status does not relieve him of his obligation
to comply with the relevant procedural rules, *see Marino v.
Watts*, 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018),
*report and recommendation adopted sub nom. Marino v.
Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018). The
Court therefore will deem the facts as set forth in Defendants'
Statement of Material Facts admitted, to the extent they are
properly supported and not inconsistent with other record
evidence offered by Defendants in support of their Motion.

**B. Factual Background**

This case arises out of a cell extraction that took place at
Upstate Correctional Facility on October 3, 2014. On that
date, Plaintiff's cellmate, an inmate named Hyatt, was to be
removed from his cell, but refused. Dkt. No. 45-4, Truax Decl.
at ¶ 4; Dkt. No. 45-4, Moore Decl. at ¶ 4. Inmate Hyatt was
non-compliant with numerous orders from correctional staff
to exit the cell. Dkt. No. 45-3, Ex. A, Pl.'s Dep. at p. 37.
Correctional staff made multiple attempts to convince Hyatt
to voluntarily leave his cell, including bringing five or six
different staff members in to speak with him. *Id.* at p. 27.
Ultimately, the use of a chemical agent was authorized by the
Superintendent of Upstate, Moore Decl. at ¶ 5, and extraction
teams were brought in to remove Hyatt and Plaintiff from
the cell. *Id.* at ¶ 9; Truax Decl. at ¶ 6. Prior to the chemical

Mason v. Moore, Not Reported in Fed. Supp. (2020)

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 330 of 443

2020 WL 555943

agent being sprayed into the cell, Plaintiff was directed by Defendant Moore to get in the cell's shower "[t]o prevent Plaintiff's being affected by the CS aerosol." Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 41 & 107-108. Moore claims that Plaintiff refused to do so, but Plaintiff alleges that he complied with this direction. Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 94 & 108. The chemical agent was sprayed into the cell multiple times and correctional staff then entered to extract the inmates. Moore Decl. at ¶ 11. Plaintiff claims that during the extraction he was repeatedly punched and kicked by corrections officers and that neither Moore nor Truax intervened to stop the attack. Pl.'s Dep. at pp. 55-56. Defendants deny that any improper force was used and instead contend that Plaintiff was fully compliant once officers entered his cell. Moore Decl. at ¶ 13; Truax Decl. at ¶ 8. Plaintiff was brought to be decontaminated following the use of the chemical agent. Moore Decl. at ¶ 14; Truax Decl. at ¶ 9.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

**\*2** Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289

(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. ANALYSIS

### A. Claims Regarding the Use of Chemical Agents

Defendants first seek summary judgment on any Eighth Amendment claim that may be presented in the case regarding the use of chemical agents in Plaintiff's cell. Defs.' Mem. of Law at pp. 6-9. For the reasons that follow, it is recommended that this part of Defendants' Motion be granted.

First, the Court agrees with Defendants that the Complaint as pled does not present any excessive force claim based simply on the use of chemical agents. Plaintiff's Complaint specifically states that "*upon entry* [ ] is when the 'Excessive Force' took place. Compl. at p. 6 (emphasis added). It then discusses the actions of the Defendants who entered Plaintiff's cell and allegedly assaulted him. *Id.* There is no dispute that Defendant Moore was responsible for spraying the chemical agent into the cell and that this occurred *before* officers entered the cell. Moore Decl. at ¶¶ 12-13. As such, the Complaint's excessive force allegations do not encompass the use of the chemical agent itself.

Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 331 of 443

Mason v. Moore, Not Reported in Fed. Supp. (2020)

2020 WL 555943

**\*3** In the alternative, summary judgment would be appropriate on the merits of such a claim in any event. "The Eighth Amendment prohibition on cruel and unusual punishments precludes the unnecessary and wanton infliction of pain and protects inmates against the use of excessive force." *Jones v. Rock*, 2013 WL 4804500, at \*17 (N.D.N.Y. Sept. 6, 2013) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Eighth Amendment excessive force claims have both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson v. McMillian*, 503 U.S. at 8). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright v. Goord*, 554 F.3d at 268).

Viewing the evidence in the light most favorable to Plaintiff, the Court presumes, without deciding, that Plaintiff's testimony regarding the breathing difficulties and burning sensations he endured following the use of the chemical agent, *see* Pl.'s Dep. at pp. 46-47, are sufficient to establish the objective prong of the Eighth Amendment claim at this stage of the proceedings. *See, e.g.*, *El-Massri v. New Haven Corr. Ctr.*, 2018 WL 4604308, at \*10 (D. Conn. Sept. 25, 2018) (citing cases).

Plaintiff cannot, however, raise factual questions sufficient to withstand summary judgment with regard to the subjective component of an Eighth Amendment claim. The record is clear that Sgt. Moore was the individual who sprayed the chemical agent into Plaintiff's cell. Moore Decl. at ¶ 12. He alone, therefore, could be the proper Defendant to such a claim. As to him the record fails to establish any degree of the wantonness required to assert an Eighth Amendment claim. The cell extraction resulted from the refusal of Plaintiff's cellmate, inmate Hyatt, to leave the cell. Pl.'s Dep. at p. 24. By Plaintiff's own account, his cellmate, inmate Hyatt, was "belligerent," screaming and yelling, and "very hostile" to security staff attempting to get Hyatt to leave the cell. *Id.* at pp. 24 & 26. Plaintiff also testified that Hyatt repeatedly refused to leave the cell and told security personnel to get staff to remove him. *Id.* at p. 24. The record further establishes that security staff made numerous attempts to discuss the matter

with inmate Hyatt before resorting to an extraction, including having "roughly about five, six people" speak with Hyatt. *Id.* at p. 27. Plaintiff also testified that prior to the chemical agents being sprayed into his cell he was told by Defendant Moore to go into the cell shower. Pl.'s Dep. at pp. 41 & 107-108; *see also* Moore Decl. at ¶ 11. After the incident Plaintiff was immediately taken to a decontamination shower. Truax Decl. at ¶ 10. "In evaluating the use of a chemical agent in a prison setting, courts have refused to find actionable conduct where, as here, the deployment was used 'in a good-faith effort to maintain or restore discipline.' " *Anderson v. Darby*, 2017 WL 933085, at \*5 (E.D.N.Y. Feb. 13, 2017), *report and recommendation adopted*, 2017 WL 927611 (E.D.N.Y. Mar. 6, 2017) (quoting *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 501 (S.D.N.Y. 2014)). The fact that inmate Hyatt, not Plaintiff, was the disruptive inmate does not change the analysis. *Cruz-Droz v. Marquis*, 2018 WL 1368907, at \*3 (D. Conn. Mar. 16, 2018) ("Courts considering this issue have held that the exposure of non-disruptive inmates to a chemical agent is not cognizable under section 1983."); *White v. City of New York*, 2017 WL 3575700, at \*4 (S.D.N.Y. Aug. 17, 2017).

**\*4** For these reasons, summary judgment is appropriate as to any Eighth Amendment claim regarding the use of chemical agents.

### B. Plaintiff's Failure to Intervene Claim

The Complaint alleges that Defendants Moore and Truax failed to intervene to stop excessive force that was being used against Plaintiff. Compl. at pp. 7-8. "A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation." *Henry v. Dinelle*, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011). A failure to intervene claim requires that Plaintiff prove that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Konovalchuk v. Cerminaro*, 2014 WL 272428, at \*23 (N.D.N.Y. Jan. 24, 2014) (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

Defendants seek summary judgment on this claim on the ground that Plaintiff failed to show that either Defendant witnessed any improper use of force against Plaintiff or that, even if they had, that given the short time span of the incident

in question they had no opportunity to intervene. Defs.' Mem. of Law at pp. 10-11. On the record before the Court questions of fact preclude a grant of summary judgment.

First, there are clear questions of fact about whether any improper use of force took place at all. [1] Plaintiff alleges that despite being compliant with staff direction he was punched between seven and eight times and kicked seven or eight times by correctional staff. Pl.'s Dep. at pp. 55-56. Defendant Truax's Declaration states that Plaintiff followed staff direction and that he was not subjected to excessive physical force. Truax Decl. at ¶¶ 8 & 13. Defendant Moore similarly states that when officers entered the cell Plaintiff was compliant and was not subjected to inappropriate force. Moore Decl. at ¶¶ 13 & 19. Moore does, however, state that prior to entering the cell Plaintiff failed to comply with orders about where to go within his cell. *Id.* at ¶ 11. The declarations, therefore, establish that the Defendants were aware of what was happening inside Plaintiff's cell. As a result, viewed in the light most favorable to Plaintiff, Defendants presumably could have seen if improper force was used.

[1]     The existence of such factual questions is perhaps best shown by the fact that the Defendants accused of improperly using force have not sought summary judgment as to that claim.

This case is thus unlike *Clark v. Gardner*, 256 F. Supp.3d 154 (N.D.N.Y. 2017) upon which Defendants rely. In *Clark*, the plaintiff was allegedly assaulted by an unknown group of individuals and the supervisory staff member of the unit where the assault allegedly took place was sued for failure to protect. 256 F.Supp.3d at 167. There, the mere allegation that that the defendant was the supervising officer was not sufficient to establish liability for failure to protect. *Id.* at 168. Here, however, Defendants are on record as having been able to witness the event in question. *See generally* Moore Decl.; Truax Decl. Given the question of fact about whether Plaintiff was punched or kicked while allegedly compliant with staff direction, *see* Pl.'s Dep. at pp. 55-56, summary judgment is inappropriate on Plaintiff's claim.

**\*5** The Court also recommends rejecting Defendants' argument that because the incident in question lasted only approximately fifteen to twenty seconds, Pl.'s Dep. at p. 81, summary judgment is appropriate on the ground that Defendants would have had not an opportunity to intervene. *See* Defs.' Mem. of Law at p. 11. The Second Circuit has rejected the notion that there is any "bright-line" for the

amount of time under which a failure to intervene claim is not actionable. *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). Instead it has emphasized that:

> Failure-to-intervene claims can arise out of a limitless variety of factual circumstances. In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations. Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance.

*Id.* Here, again viewing the evidence in the light most favorable to Plaintiff, the allegation is that Plaintiff, while in the view of Defendants Moore and Truax, was compliant with staff directions, but was nonetheless punched and kicked multiple times. Pl.'s Dep. at pp. 55-56; Moore Decl. at ¶ 13. This, if true, may provide a basis for failure to protect liability. Under the circumstances, this question is best left to a jury to resolve the factual dispute. *Figueroa v. Mazza*, 825 F.3d at 108; *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (discussing factual nature of inquiry into whether there was sufficient time to intercede to prevent harm).

## V. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 45) be **GRANTED as to claims regarding the use of chemical agents and DENIED as to Plaintiff's failure to intervene claim**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

2020 WL 555943

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [2] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[2]      If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 555943

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 554816
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,

v.

M. MOORE et al., Defendants.

9:17-cv-1086 (GLS/DJS)
|
Signed 02/04/2020

**Attorneys and Law Firms**

FOR PLAINTIFF: Christopher Mason, Pro Se, 12-A-0162, Cape Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape Vincent, NY 13618.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: ERIK BOULE PINSONNAULT, Assistant Attorney General, The Capitol, Albany, NY 12224.

**ORDER**

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order (R&R) by Magistrate Judge Daniel J. Stewart duly filed on January 13, 2020. (Dkt. No. 51.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed,[1] and the court having reviewed the R&R for clear error, it is hereby

[1]     On January 28, 2020, plaintiff *pro se* Christopher Mason filed a letter indicating that he does not have any objections to the R&R. (Dkt. No. 52.) Instead,

he requests a telephone conference to settle this case. (*Id.*) The court refers this request to Judge Stewart for his review and consideration.

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for partial summary judgment[2] (Dkt. No. 45) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   **GRANTED** as to plaintiff *pro se* Christopher Mason's Eight Amendment excessive force claim regarding the use of chemical agents, which claims is **DISMISSED**; and

   **DENIED** as to Mason's Eight Amendment failure to intervene claim against defendants M. Moore and B. Truax; and it is further

[2]     Defendants did not move for summary judgement as to Mason's Eight Amendment excessive force claim other than to the extent that it pertained to the use of chemical agents, and, accordingly, the claim survives to the extent that it pertains to the use of physical force during the cell extraction on October 3, 2014. (Dkt. No. 45, Attach. 1 at 1.)

**ORDERED** that this case is now deemed trial ready and a trial date and deadlines will be set in due course; and it is further

**ORDERED** that Mason's letter motion (Dkt. No. 52) is **REFERRED** to Magistrate Judge Daniel J. Stewart for his review and consideration; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 554816

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991729
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Theresa M. Trzaskoma, Allegra Noonan, Sher Tremonte LLP, Yu Han, Morrison & Foerster LLP, New York, NY, for Plaintiff.

Ryan T. Donovan, Ryan E. Manley, Harris, Conway & Donovan, PLLC, Albany, NY, for Defendant Jason Hanson.

Andrew R. Safranko, Lamarche Safranko Law PLLC, Albany, NY, for Defendant Joseph Sharpe.

Cynthia E. Neidl, Katie Louise Birchenough, Greenberg Traurig, LLP, Albany, NY, for Defendant Scott Mere.

Eric Michael Soehnlein, Sean O'Brien, Lippes Mathias Wexler Friedman LLP, Buffalo, NY, Lawrence H. Schaefer, Lippes Mathias Wexler Friedman LLP, Albany, NY, for Defendant Zachary Peck.

Barry Nelson Covert, Diane M. Perri Roberts, Maxwell C. Radley, Patrick Mackey, Lipsitz Green Scime Cambria LLP, Buffalo, NY, for Defendant Craig Robideau.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants Jason Kearney, John Kingston.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

*\*1* On April 11, 2019, Raymond Lewis filed his amended complaint against several corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility in Malone, New York ("Bare Hill"), at all times relevant to this matter: Jason Hanson, Joseph

Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason Kearney and John Kingston. [1] Dkt. No. 61 ("Amended Complaint"). Plaintiff's claims arise from circumstances surrounding a use of force incident that occurred at Bare Hill on April 23, 2016, and Plaintiff's subsequent requests for medical aid on April 24, 2016. See Am. Compl. at 4. Now before the Court are motions for summary judgment filed by Robideau, Peck, Mere, Kearney, and Kingston (collectively, "Defendants"). Dkt. Nos. 136 ("Robideau Motion"), 136-5 ("Robideau Memorandum"), 136-4 ("Robideau Statement of Material Facts" or "Robideau SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"), 137-1 ("Peck Memorandum"), 137-2 ("Peck Statement of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein Declaration"); 138 ("Mere Motion"), 138-2 ("Mere Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139; ("Kearney & Kingston Motion"), 139-16 ("Kearney & Kingston Memorandum"), 139-17 ("Kearney & Kingston Statement of Material Facts" or "Kearney & Kingston SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston Declaration"), 139-3 ("Mitchell Declaration"), 139-4 ("Plaintiff's Deposition"), 139-5 ("Kearney Deposition"), 139-6 ("Kingston Deposition").

[1]
    The Amended Complaint also contained claims against Bruce Yelich, but all such claims were dismissed pursuant to the Court's order on the Motion to Dismiss filed by Kearney, Kingston, and Yelich. See Dkt. Nos. 79, 100.

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response Memorandum"), 149-3 ("Plaintiff's Response to Defendants' Statements of Material Facts and Statement of Material Facts" or "Plaintiff's SMF") [2], 149-1 ("Plaintiff's Declaration"), 149-2 ("Noonan Declaration"). And all five defendants have replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"), 154-2 ("Robideau Reply SMF"), 154 ("Roberts Reply Declaration"); 152 ("Peck Reply Memorandum"), 152-1 ("Peck Reply SMF"), 155 ("Mere Reply Memorandum"), 155-1 ("Mere Reply SMF"); 151 ("Kearney & Kingston Reply Memorandum").

[2]
    Because Plaintiff has set forth his response to Defendants' statements of material facts in the same document as his own statement of material facts, the Court will cite to the sections responding to Defendants SMFs (pages 1–42) by their page

2022 WL 991729

number, but will cite to the sections setting forth Plaintiff's own material facts (pages 43–54) by their paragraph designation in order to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

For the reasons set forth below, each of Defendants' motions for summary judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Alleged Phone Violation and Transfer to the SHU

**\*2**  The following facts are not in dispute except where noted.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he

did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

**\*3**  Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

#### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment

because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and assaulted him in retaliation for filing the lawsuit. Pl.'s SMF ¶¶ 14, 31, 35. Defendants each deny any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶ 15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would "look into" it. Id. at 27. After over an

hour with no word about his inhaler, Plaintiff again began kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

**\*4** Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF ¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions, and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only asked for his inhaler one time, after which Mere responded he would "look into" getting it, and that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶ 37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF

¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

### 4. Plaintiff's Hospital Treatment

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

 *5  Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

### 6. Plaintiff's Grievance

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or questioned, and was not named in the final report. Mere SMF ¶¶ 58–61. Similarly, Robideau argues that the Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

### B. Procedural History

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

**\*6** Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " ' genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

### IV. DISCUSSION

#### A. Robideau Motion for Summary Judgment

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

##### 1. Eighth Amendment Excessive Force

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious ... [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*7** Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11, 14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record,

absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.

### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G ("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.' " Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

### b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly, 2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

**\*8** Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony ... is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, ... we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited."). The Fincher court eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it

2022 WL 991729

concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

### c. Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony ... is not conclusory or speculative ... because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip. [3]

[3] Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

**\*9** Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the

2022 WL 991729

fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report at 3). [4]

[4]   For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report at 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report at 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's

statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."),

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v. Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) (Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted, No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically ... [even where] the proof of excessive force [is] weak.").

 *10  The Court thus declines to grant Robideau's motion for summary judgment regarding Plaintiff's Eighth Amendment claim of excessive force.

### 2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force under the Fourth and Fourteenth

Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Robideau's motion regarding these claims.

### 3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants Robideau's motion regarding this claim.

### 4. First Amendment Retaliation Claim Against Robideau

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). " ' 'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " Id. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim," because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " Id. (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten ... in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

**\*11** Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

#### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y. 2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."[5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

[5] The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison

disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

**\*12** Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence of causal connection in the form of an alleged admission of retaliatory motive by defendant prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's motion for summary judgment on this claim.

### B. Mere Motion for Summary Judgment

Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified immunity. Id.

#### 1. Eighth Amendment Excessive Force Under 42 U.S.C. § 1983 as to Mere

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.' " Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly assaulted in the SHU.[6] Mere Mem. at 7–9. To support this claim, Mere points to (1) his own deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8; Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I ("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"), Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report, which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3) Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23, 2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51, Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report created after the OSI investigation did not identify Mere as "involved staff" or present during the use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended Complaint does not allege he was involved in the use-of-force event in the SHU, and that Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–8.

[6]  It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff during his transfer to the SHU. Pl.'s SMF at 18.

**\*13** However, contrary to Mere's assertions, Mere's non-presence in the SHU during the assault is explicitly disputed on the record. Plaintiff testified several times during his deposition that Mere was present in the SHU strip-frisk room during the assault, along with Robideau, Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

Q. Okay. Was Officer Mere one of the individuals who assaulted you once you got to the SHU to the strip frisk room?

A. I believe he was.

Q. I'm sorry?

A. I believe he was because he was in the room with them.

Q. He was in the strip frisk room?

A. Yes.

...

Q. Okay. Was he one of the ones that assaulted you?

A. All of them assaulted me.

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him

2022 WL 991729

to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

**\*14** To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly

provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[ ] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having an asthma attack. Id. at 209:3–209:8; Pl.'s Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

**\*15** Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating

in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards ... intentionally deny[ ] or delay[ ] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

### a. SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B)(1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient

to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and that Mere participated in that assault. If believed, this is sufficient to create an inference of causation between the protected activity and the alleged assault, even if it is not conclusively established that Mere himself is the one who made the statement. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary judgment on retaliation claim unwarranted where evidence supported an "inference of causation" between filing of grievances and assault by multiple corrections officers because one had "mocked [plaintiff] for filing a grievance during the alleged attack").

### b. Denial of Adequate Medical Care

**\*16** A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and supported on the record, constitutes an adverse action sufficient to establish a claim for retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–200:17, a factfinder could reasonably infer that this adverse-action

was similarly motivated. Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can support an inference of causation.").

#### c. Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay, No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

#### 4. Qualified Immunity as to Mere

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir.

2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

**\*17** Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id. [7]

[7]   Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event ... and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably find that it was not objectively reasonable for Mere to believe his actions did not violate Plaintiff's Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was not objectively reasonable for the individual defendants to believe that their actions did not violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331 (W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive

force, that "if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate indifference to a serious medical need and retaliation stemming from his alleged failure to provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere asserts it was objectively reasonable for him to not leave his post to personally retrieve the inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage the use of other DOCCS officers such as the SHU Roundsmen ... and would rely upon their assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly after, Plaintiff claims he informed Mere he could not breathe, thought he was having an asthma attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into" it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

**\*18** Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington

v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

### C. Peck Motion for Summary Judgment

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious medical need in violation of the Eighth Amendment, and retaliation in violation of the First Amendment.

#### 1. Excessive Force as to Peck

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

#### 2. Deliberate Indifference to a
#### Serious Medical Need as to Peck

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

##### a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation ... be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280,

279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

**\*19** Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at 14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was having a hard time breathing and was having an asthma attack, but Peck did not do anything to help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff

further alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44 [8]. According to Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report, which found Peck exhibited "a lack of care custody and control by departmental standards," to find Peck did not act reasonably.

[8]     Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court should disregard the assertions Plaintiff makes in his declaration because they contradict Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion for summary judgment may be disregarded to the extent it contradicts past deposition testimony, the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38, 43 (2d Cir. 2000). The Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in his later declaration that he did not receive his inhaler until after Peck did not respond, when he admitted in his previous deposition that he received an inhaler before Peck even began his shift. Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the day before while Mere was on watch, he was still short of breath the next day, and thus requested

the inhaler again from Peck. Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶ 31, 38.

**\*20** Further, the record belies Peck's assertion that he acted reasonably because he contacted a supervisor in response to Plaintiff's request. Notably, Peck does not cite to any record material to support this factual assertion. See Peck Mem. at 14. Indeed, Peck denied during his deposition that he ever requested medical attention for Plaintiff, Peck Dep. at 43:2–43:8, Peck testified that when he contacted a roundsmen about getting a supervisor, he did not recall mentioning any need for medical attention and "[t]he only thing [he] wanted to have the roundsman do was to have a sergeant come down," id. at 46:14–47:2, Peck also testified he did not recall ever telling Sergeant Tamer that Plaintiff had requested medical attention and did not contact medical directly at any point, id. at 57:5–57:23.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find Peck knew Plaintiff was in severe medical need due to his inability to breathe, but did not act to obtain aid, and thus did not act reasonably in response to Plaintiff's requests. Therefore, Peck is not entitled to summary judgment under the objective prong of the deliberate indifference standard.

### b. Subjective Prong

The subjective prong of the deliberate indifference standard requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill, 657 F.3d at 122 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive risk to inmate health or safety because he was not informed of Plaintiff's physical condition, he did not notice any injuries upon beginning his assignment, and that Plaintiff testified that the extent of his medical request was for an inhaler because he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit Plaintiff's account and find that he informed Peck he was having an asthma attack and was unable to breathe. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–

2. Given Peck's deposition testimony, a reasonable factfinder could likewise find that Peck did not undertake any action to provide medical aid in response to Plaintiff's reports that he could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive risk to Plaintiff's health, and that Peck disregarded it by failing to take any action to provide aid. [9] See Warren v. City of New York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at \*11 (E.D.N.Y. Mar. 26, 2021) (denying summary judgment where material dispute of fact existed regarding whether defendant provided plaintiff medical attention in response to asthma attack); Ennis v. Davies, No. 87-CV-1465, 1990 WL 121527, at \*3 (S.D.N.Y. Aug. 14, 1990) (holding that a jury could reasonably find that inmate's request for his asthma medication was sufficient to make the defendants aware of a serious medical need and failure to provide medication constituted deliberate indifference).

[9]     Peck argues that, to meet the subjective prong of the deliberate indifference claim against a non-medical official, "the plaintiff must establish that the official 'intentionally delayed access to medical care' " after the plaintiff made the problem known. Peck Mem. at 13. However, an examination of the higher court decisions from which this doctrine springs indicates that, while they consider showing intentional delay to be *sufficient* to establish deliberate indifference, they do not state that such a showing is *necessary* to establish deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 104–105 (1976) ("[D]eliberate indifference to serious medical needs of prisoners ... [is manifested] by prison guards in intentionally denying or delaying access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) ("[I]f defendants did decide to delay emergency medical aid ... in order to make Archer suffer, surely a claim would be stated under Estelle."). However, to the extent such a showing is necessary, the Court finds that a reasonable jury could find intentional delay here due to Peck's alleged complete inaction in the face of Plaintiff's statements he was having an asthma attack and could not breathe. See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (finding dispute of material fact regarding whether defendants intentionally delayed care

2022 WL 991729

where evidence showed they ignored plaintiff's complaints and refused medical care).

**\*21** Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

### 3. Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation

cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at \*7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, [10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

[10]    The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

**\*22** Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters

of general prison administration.' " Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment ... [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

**\*23** Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D. Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in violation of the First Amendment, and are entitled to qualified immunity. See Kearney & Kingston Mem. at 7.

### *1. Excessive Force and Personal Involvement as to Kearney and Kingston*

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to Plaintiff's claim of excessive force because the record fails to establish that they were personally involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal involvement may be established by showing a defendant facilitated or attempted to cover up a constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a constitutional violation, that is sufficient to find that defendant personally participated in the violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to his supervisors in order to cover up' constitutional violations will 'give rise to a plausible inference' that the defendant 'was personally involved in the purported constitutional violations.' ") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)). Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No 79, that these allegations of facilitation and cover-up were sufficient to

establish personal involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

**\*24** Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish the elements of his Eighth Amendment claim for excessive force [11] directly against Kearney and Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No. 18-CV-5852, 2022 WL 888950, at \*3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of the supervisory context and stating that "it is well-settled that to establish liability under Section 1983, a plaintiff must 'plead and prove that each

Government-official defendant, through the official's own individual actions, has violated the Constitution' " (quoting Tangreti, 983 F.3d at 618)); Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at \*2 (S.D.N.Y. Mar. 1, 2022) (observing that to find personal involvement and "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." (citing Tangreti, 983 F.3d at 620)).

[11]   While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943 at \*8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff must show both an objective and subjective component. "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency ... when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.' " Wright v. Goord, 554 F.3d 255, 268–69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*25** A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly,

through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. C.f. Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he

told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not write a misbehavior report for Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

**\*26** A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

### 2. Retaliation as to Kearney and Kingston

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

#### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at *4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL 2370295, at *10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, Abreu, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

#### b. Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. See Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants

Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000))); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion ... for a jury ... would be entitled to view the evidence as a whole.").

**\*27** On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

#### c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not

merely that Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangreti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston [12] are granted summary judgment on any claims pressed against them based on supervisory liability.

[12]   Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim, 93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

*28   To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights ... alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

## V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No. 136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

**ORDERED**, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby

**DISMISSED** from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

**ORDERED**, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Peck for excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

**ORDERED**, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment

and for retaliation survive Defendant Kearney's Motion; and it is further

**ORDERED**, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 991729

---

**End of Document**                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2690243
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benjamin FRANKLIN, Plaintiff,

v.

ONEIDA CORRECTIONAL
FACILITY, et al., Defendants.

No. 9:03–CV–1452 (LEK/DEP).
|
July 1, 2008.

**Attorneys and Law Firms**

Benjamin Franklin, pro se.

Office of Attorney General, Risa L. Viglucci, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 *1  This matter comes before the Court following a Report–Recommendation filed on May 22, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report–Rec. (Dkt. No. 72).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report–Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge XX's Report–Recommendation. Furthermore, after examining the record, the Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 72) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 64) is DENIED; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Benjamin Franklin, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 claiming deprivation of his constitutional rights during the course of his confinement. In his complaint, plaintiff alleges that as a result of the failure of prison officials to adequately protect him he was assaulted on several occasions by corrections officers and denied medical treatment for injuries suffered during the course of those incidents. Plaintiff asserts that defendants' actions constituted cruel and unusual punishment, in violation of the Eighth Amendment, and seeks relief of an unspecified nature.

Currently pending before the court is a motion by the defendants requesting the entry of summary judgment dismissing plaintiff's complaint, both procedurally based upon Franklin's alleged failure to satisfy his obligation to exhaust available internal administrative remedies before filing suit, and on the merits, arguing that as a matter of law plaintiff cannot establish the existence of a constitutional deprivation under the Eighth Amendment. Having carefully considered the record now before the court I am unable to conclude at this juncture that that plaintiff's claims are procedurally barred, in light of his contention that he chose not to file a grievance as a result of threats of retaliation by prison officials, and further based upon the fact that in response to a complaint registered by him with the Commissioner of the New York State Department of Correctional Services ("DOCS"), a full investigation was conducted into the plaintiff's allegations, thereby fulfilling the objective of the grievance requirement. Turning to the merits, I find that the facts surrounding plaintiff's excessive force claims are genuinely disputed, and recommend against dismissal of those claims. [1]

1    Defendants' motion does not address the merits of plaintiff's failure to protect and medical indifference claims.

I. *BACKGROUND* [2]

2    In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See Wells– Williams v. Kingsboro Psychiatric Ctr.,* No. 03– CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007)* (citations omitted).

 *2    At the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the DOCS. Prior to his temporary transfer into the Downstate Correctional Facility on May 16, 2003, plaintiff was assigned to a special housing unit ("SHU") cell within the Oneida County Correctional Facility ("Oneida"), located in Oneida, New York. [3] Plaintiff maintains that while in SHU confinement, he was regularly assaulted by corrections officers, including defendants Austin and Mullen, denied lunch, and refused medical attention both for the injuries suffered in the fight which led to his transfer into the unit and those resulting from the ensuing staff assaults. *Id.* ¶¶ 18–24. While maintaining that the assaults were continuous during the time of his SHU confinement, plaintiff's complaint makes specific reference to beatings by Austin and Mullen on March 21, 2003, and again on April 7, 2003. *Id.* ¶¶ 16–24, 26. Plaintiff also asserts that prior to the first such assault, he informed defendant Santos that he feared for his safety based upon threats made by those two officers. *Id.* ¶¶ 9–10.

3    Plaintiff's confinement in the SHU was apparently disciplinary in nature, stemming from his involvement in a fight with a fellow inmate. Fourth Amended Complaint (Dkt. No. 26) ¶¶ 8, 16.

In support of their motion, defendants Mullen and Austin have submitted affidavits in which they deny having assaulted the plaintiff. Mullen Aff. (Dkt. No. 64–11) ¶ 5; Austin Aff. (Dkt. No. 64–10) ¶ 5. In addition, Corrections Officer Mullen notes that he was not even present and working at Oneida on April 7, 2003, one of the two dates specifically mentioned in plaintiff's complaint. Mullen Aff. (Dkt. No. 64–11) ¶ 8.

Sometime prior to May 22, 2003, at which time he was designated to the Upstate Correctional Facility, Franklin sent a handwritten letter to the DOCS Commissioner complaining of various conditions including, *inter alia,* the assaults which are the subject of this action. [4] *See* Viglucci Aff. (Dkt. No. 64–6) Exh. A. That letter prompted an investigation into Franklin's allegations, consisting of interviews of the parties involved, including the plaintiff. *Id.* As a result of that investigation DOCS officials concluded that plaintiff's allegations were unfounded, and he was advised of that determination. *See generally* Fourth Amended Complaint (Dkt. No. 26); *see also generally* Franklin Aff. (Dkt. No. 70).

4    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002)*.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 5, 2003, and was thereafter granted leave to proceed *in forma pauperis.* [5] Dkt. Nos. 1, 3. Following the issuance of orders deeming plaintiff's earlier pleadings to be deficient, *see, e.g.,* Dkt. Nos. 5, 12, 15, 25, plaintiff submitted a fourth amended complaint which was ultimately approved for filing. Dkt. Nos. 26, 28. Named as defendants in plaintiff's fourth amended complaint are various DOCS employees, including Corrections Lieutenant Santos, Corrections Officers D.J. Mullen and Austin, and an additional corrections officer identified only as "John Doe". *See* Dkt. No. 26. Plaintiff's complaint, which is modest in terms of specifics, asserts claims of cruel and unusual punishment, based both upon the alleged use of excessive force by defendants Mullen and Austin, the failure of defendant Santos to protect him from those officers, and the refusal of the defendants to provide him with required medical treatment. *Id.*

5    This action was originally commenced in the Western District of New York, but was subsequently transferred here by order issued by Senior District Judge John T. Elfin on December 5, 2003. Dkt. Nos. 1, 4.

 *3    On June 27, 2007, following the close of pretrial discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 64. In their motion, defendants argue that plaintiff's claims are procedurally barred, based upon his failure to exhaust

available administrative remedies before filing suit, and additionally assert that as a matter of law, the record fails to establish the existence of an Eighth Amendment violation. *Id.* Plaintiff has since filed papers in opposition to defendants' motion, Dkt. No. 70, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*
Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material

issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Failure to Exhaust Administrative Remedies*
The record now before the court reflects that the plaintiff did not file a formal grievance, utilizing the available procedures within the DOCS system, concerning the matters raised in his complaint. Plaintiff attributes this failure to his belief that DOCS prison officials would not process any grievance from him concerning the matter, and additionally notes that he has been threatened by corrections officers with retribution for filing any grievances against them. *See, e.g.,* Plaintiff's Opposition (Dkt. No. 70) at p. 30, ¶¶ 6–8. In their motion, defendants argue that this omission provides a procedural basis for dismissal of plaintiff's claims, regardless of their relative merit.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an

opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914–15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91–92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 U.S. 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

 **\*5** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 U.S. at 697–98) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly

raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements. [6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

[6]
    In practicality these three prongs of the prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*8 n .14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

  1. *Availability of Remedy*
New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec. 11, 2000)).

[7]
    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating

circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*6** Certain of plaintiff's claims implicate misconduct on the part of corrections officials. In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment. [8] 7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F.Supp.2d 539, 543 (S.D.N.Y.2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified). This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation. [9] *See* 7 N.Y.C.R.R. § 701.8(a). An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility. 7 N.Y.C.R.R. § 701.8(b). If, after reviewing the grievance, the superintendent finds it to be facially lacking in merit, the matter reverts back to the inmate grievance resolution committee ("IGRC") for review. 7 N.Y.C.R.R. § 701.8(c). If, on the other hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead, request investigation by the inspector general's office. 7 N.Y.C.R.R. § 701.8(d). Once the grievance is determined, a matter which must occur within twenty-five business days of filing, *see* 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement. *See Singh v. Goord,* 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*4 (S.D .N.Y. Dec. 11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

[8]   Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor. 7 N.Y.C.R.R. § 701.8(a).

[9]   The regulations pertaining to the grievance process describe harassment as any allegation involving "employee misconduct meant to annoy, intimidate, or harm an inmate ...." 7 N.Y.C.R.R. § 701.2(e); *see also* DOCS Directive No. 4040.

Despite this entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Hemphill,* 380 F.3d at 687–88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at \*8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Id.* at 688 (internal quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

**\*7** Based on the record now before the court, construed in a light most favorable to the plaintiff, it appears that a genuine triable issue of fact exists regarding the availability of the IGP to the plaintiff. As was previously noted, plaintiff asserts that he received specific threats of adverse action against him in the event of the filing of any grievances. Under the circumstances the court is unable to conclude at this stage in the proceedings, as a matter of law, that the grievance process was available to the plaintiff.

### 2. *Presentation of Defense/Estoppel*

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In their answer to plaintiff's fourth amended complaint, defendants have raised failure to exhaust as an affirmative defense. *See* Answer (Dkt. No. 37) ¶ 10. Because the defendants have properly raised exhaustion as a defense, and plaintiff does not assert any basis to estop them from pursuing it, I find that this prong of the exhaustion test does not come into play in this case.

### 3. *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). As the Supreme Court has noted, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388.

In this instance, prompted by plaintiff's letter complaining of the use of excessive force and other deprivations to the DOCS Commissioner, an investigation was conducted into plaintiff's allegations. While in this case the established IGP procedure or the alternative expedited procedure for complaining of staff misconduct was bypassed by the plaintiff, his complaint to the Commissioner resulted in what could be viewed as the functional equivalent of a grievance investigation. Since at trial a finding may be made that the filing of a grievance would have been redundant, and likely would ultimately have led to the same result, with deference undoubtedly being given to the investigation previously conducted, it cannot be definitively said at this point that there exists no sufficient basis to excuse the exhaustion requirement. Accordingly, I recommend denial of the portion of defendants' motion which asserts this procedural basis for dismissal of plaintiff's claims. *See Heath v. Saddlemire,* No. 96–CV–1998, 2002 WL 31242204, at *4–5 (N.D.N.Y. Oct. 7, 2002) (Scullin, C.J.).

C. *Merits Of Plaintiff's Excessive Force Claim*

**\*8** In their motion, defendants next assert that plaintiff's excessive force claim is subject to dismissal as a matter of law. While acknowledging that plaintiff claims to have been assaulted by prison officials, defendants argue that "[p]laintiff's allegations are so outrageous, that they can only be considered to have been fabricated." Defendants' Memorandum (Dkt. No. 64–3) at 7.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element to prevail a plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made

to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> **\*9** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.

> Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.4d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [10] *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

[10] It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9–10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

In his complaint, though unsworn, *see* Dkt. No. 26 ¶¶ 19–21, and as confirmed in affidavits provided in opposition to defendants' motion, *see* Dkt. No. 70 at pp. 10, 27, plaintiff claims to have been assaulted by defendants Austin and Mullen. In support of their motion, defendants assert that the allegations are fabricated and inherently incredible, and thus should be discounted as a matter of law. In support of that position, defendants offer the denial by those corrections

officers of any wrongdoing, the results of an investigation by the DOCS in which the allegations were determined to be unfounded, and particulars regarding the procedures at Oneida which, they maintain, make it impossible for the actions to have occurred as described by the plaintiff, without detection.

As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted. Under these circumstances I recommend a finding that genuine, triable issues of material fact exist which must be resolved before plaintiff's excessive force claims can be adjudicated.

IV. *SUMMARY AND RECOMMENDATION*

While the record in this case firmly establishes that plaintiff did not pursue an internal claim under the IGP relating to the violations asserted in his complaint in this action, the record also discloses the existence of fact questions regarding whether he should be excused from that requirement, and additionally whether the claim should be deemed to be exhausted by virtue of his complaint to the DOCS Commissioner and a subsequent investigation into that complaint. Turning to the merits of the only portion of plaintiff's Eighth Amendment claim now challenged, I find the existence of triable issues of material fact surrounding plaintiff's excessive force claim against the defendants and therefore recommend the denial of summary judgment dismissing that claim as a matter of law.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 64) be DENIED in its entirety.

**\*10** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

2008 WL 2690243

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2690243

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. MacWilliams, K. Crossett, E.
Facteau, C.O. Demers, R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1    **Federal Civil Procedure** 🔑 Civil Rights
     Cases in General

     Genuine issue of material fact existed as to
     whether corrections officer repeatedly hit the
     inmate after the inmate was subdued and
     thus summary judgment was precluded on the
     inmate's excessive force claim. The inmate
     alleged in his complaint, testified under oath
     at his deposition, and stated in a sworn
     affidavit that the corrections officer punched him
     unnecessarily in the head several times during
     the inmate's cell extraction. Although the cell
     extraction was supposed to be videotaped, the
     video was never recorded. Despite the fact that
     the inmate's injuries were slight and were at least
     indirectly brought about by his own action of
     refusing handcuffs, there were credibility issues
     to be determined. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights. In his complaint Cicio, who
refused multiple orders from prison officials to exit his cell
in order to effectuate a transfer to another location, complains
that in the course of the ensuing cell extraction, during
which he was removed through the use of force, one of
the corrections officers who participated exerted excessive
force causing him to suffer injuries, while the others involved
failed to intervene, all in violation of the Eighth Amendment's
protection against cruel and unusual punishment. As relief
for the violation, plaintiff seeks the recovery of compensatory
and punitive damages from defendants.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint.
In their motion defendants challenge the legal sufficiency of
plaintiff's excessive force and failure to intervene claims and
additionally assert their entitlement to Eleventh Amendment
immunity from suit in their official capacities and good
faith qualified immunity from suit as individuals. Because
a reasonable factfinder could conclude from the record now
before the court that more force than necessary to subdue
and remove Cicio from his cell was applied maliciously
and sadistically by prison officials, I am constrained to
recommend that defendants' motion be denied, except as to
plaintiff's claims against defendant Woods and those against
defendants in their official capacities, which are subject to
dismissal.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of this case, the
       following recitation is from the record now before
       the court, with all inferences drawn and ambiguities
       resolved in favor of the plaintiff. *Terry v. Ashcroft,*
       336 128, 137 (2d Cir.2003). It should be noted that
       while most of the pertinent facts are undisputed,
       defendants sharply contest plaintiff's allegation
       that he was unnecessarily punched by defendant
       MacWilliams during the forcible removal from his
       cell.

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01438-LEK-TWD    Document 199    Filed 06/21/22    Page 368 of 443
2010 WL 1063875

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at \*4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal to surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

 **\*2**  On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and

guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶

13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWilliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWilliams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion, [3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3]    Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063875

before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).[4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

[4]    With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though defending without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

### B. *Excessive Force*

2010 WL 1063875

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. — U.S. – – – – , — S.Ct. ——, — L.Ed.2d – – – – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

*6 [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 372 of 443

2010 WL 1063875

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints.[5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

> 5   Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants

observed the incident but stood by without intervening on his behalf . [6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6] Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). [7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01438-LEK-TWD   Document 199   Filed 06/21/22   Page 374 of 443
2010 WL 1063875

99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

[8] In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

[9] In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

[10] Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and

failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

### IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such

objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063864
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. Macwilliams, K. Crossett, E.
Facteau, C.O. Demers, R.Woods, R. Gill, Defendants.

Civil Action No. 9:08–cv–431 (GLS/DEP).
|
March 22, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, C. Harris Dague, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for the Defendants.

### ORDER

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate Judge

David E. Peebles, duly filed February 24, 2010. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report–Recommendation
for clear error, it is hereby

ED, that the Report–Recommendation of Magistrate Judge
David E. Peebles filed February 24, 2010 is ACCEPTED in
its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion for summary judgment
(Dkt. No. 35) is GRANTED to the extent that plaintiff's
claims against defendants in their official capacities and those
against defendant Woods is DISMISSED but the defendants'
motion otherwise is DENIED, and it is further

ORDERED, that the Clerk of the court serve a copy of this
order upon the parties in accordance with this court's local
rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063864

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7342723
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lori GJENASHAJ, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

19cv4142
|
Signed 12/14/2020

**Attorneys and Law Firms**

Edward S. Stone, Joseph Irving Stone, New York, NY, for Plaintiff.

Brachah Goykadosh, New York City Law Department, New York, NY, for Defendants.

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

**\*1** Plaintiff Lori Gjenashaj brings this federal civil rights action for excessive force and failure to supervise against the City of New York and two members of the New York City Police Department ("NYPD"). Defendant Lieutenant Matthew Harrison moves for summary judgment dismissing the claims against him. For the reasons that follow, Lieutenant Harrison's motion for summary judgment is granted in part and denied in part.

BACKGROUND

The following facts are undisputed unless otherwise noted. This action arises out of a chaotic sequence of events that began when Gjenashaj fired two blank rounds from a starter pistol at her daughter and mother-in-law inside the family's Staten Island home. (Pl.'s Resp. to Def. Lt. Harrison's Rule 56.1 Statement of Undisputed Facts, ECF No. 99 ("Pl.'s 56.1"), ¶ 4.) As Gjenashaj ran out the front door, her husband wrestled the pistol from her and followed her outside. (Decl. of Brachah Goykadosh in Supp. of Def. Lieutenant Matthew Harrison's Mot. for Summ. J., ECF No. 94 ("Goykadosh Decl."), Ex. L ("Pl.'s Dep."), at 90:3–22.) Gjenashaj jumped

into the family SUV, and her husband got in the front passenger side and placed the pistol under his seat. (Pl.'s Dep., at 90:3–91:21; Goykadosh Decl., Ex. J ("Q. Gjenashaj Dep."), at 79:20–82:11.) Hearing gunshots, a neighbor called 911. (Decl. of Edward Stone in Opp'n to Def. Lieutenant Matthew Harrison's Mot. for Summ. J., ECF No. 98 ("Stone Decl."), Ex. F, at 4.)

Responding to a radio alert, NYPD police officers attempted to stop the SUV and apprehend Gjenashaj. (Pl.'s 56.1 ¶ 5.) She pulled the SUV over and her husband exited the vehicle. (Q. Gjenashaj Dep., at 92:3–12, 117:21–23.) However, Gjenashaj refused to exit the SUV and once again fled. (Pl.'s 56.1 ¶ 5.)

Next, Gjenashaj drove to a friend's home and knocked on the front door. (Pl.'s 56.1 ¶¶ 3, 8.) When no one answered, she threw a brick at the door several times. (Pl.'s 56.1 ¶ 8.) Thereafter, her friend's thirteen-year-old son opened the door and told Gjenashaj that her mother was not home. (Pl.'s 56.1 ¶¶ 8–12.) While wielding the pistol, Gjenashaj borrowed the boy's cell phone and called her friend. (Pl.'s 56.1 ¶¶ 11–13.) Threatened by Gjenashaj's words and tone, the friend called 911 and reported a disturbance at her home. (Pl.'s 56.1 ¶¶ 13–15.) Two NYPD officers responded to the incident, spoke to Gjenashaj's friend, and viewed a cell phone video of Gjenashaj holding the pistol. (Pl.'s 56.1 ¶¶ 16–17; Goykadosh Decl., Ex. C ("Campanella-Rivera Grand Jury Test"), at 3:8–24.) In a radio transmission, Lieutenant Harrison and Police Officer Giancarlo Maratea were advised that Gjenashaj fled the scene and had a gun. (Pl.'s 56.1 ¶¶ 18–19.)

The police located and surrounded Gjenashaj's SUV. (Pl.'s 56.1 ¶¶ 21–25.) Lieutenant Harrison and Officer Maratea arrived on scene and approached the SUV with their firearms drawn—Harrison on the passenger's side and Maratea on the driver's side. (Pl.'s 56.1 ¶¶ 21–28.)

At this point, the parties' versions of events diverge sharply. According to Lieutenant Harrison, Gjenashaj turned up the volume on the radio in her SUV, picked up the gun, and pointed it at the passenger side window where he was standing. (Def.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 95 ("Def.'s 56.1"), ¶ 32.) In fear for his life, Lieutenant Harrison shouted "Gun!" and retreated from Gjenashaj's SUV to take cover. (Def.'s 56.1 ¶¶ 34–41.) Both officers repeatedly ordered Gjenashaj to throw the gun out of her vehicle, show them her hands, and exit the SUV. (Def.'s 56.1 ¶¶ 42–43.) According to Lieutenant Harrison, when Gjenashaj emerged from the SUV, she turned

towards the officers and assumed a two-handed shooting stance with the pistol. (Def.'s 56.1 ¶ 50.) Officer Maratea testified that Gjenashaj raised her pistol and pointed it at him and Lieutenant Harrison. (Def.'s 56.1 ¶¶ 44, 47–49.) When Gjenashaj aimed at the police, Officer Maratea discharged four rounds. (Def.'s 56.1 ¶¶ 55–56.) Hearing a "pop" sound, Lieutenant Harrison fired a single shot. (Def.'s 56.1 ¶¶ 57–59.)

**\*2** Gjenashaj presents a different narrative. She asserts she never pointed her pistol at Lieutenant Harrison when he was on the passenger side of the vehicle; never heard either officer shout "Gun!" or anything else; and held her hands up signaling surrender when she exited the vehicle. (Pl.'s Dep., 113:9–14, 113:18–19, 119:9–21; Pl.'s 56.1 ¶ 52.) Importantly, Gjenashaj claims that she exited the SUV without the pistol. (Pl.'s Dep., 118:22–23.)

It is undisputed that Gjenashaj was shot twice and that she then reentered her vehicle. Thereafter, Harrison and Maratea ordered her multiple times to toss the pistol out of the SUV. (Pl.'s 56.1 ¶¶ 60–61, 63.) Ultimately, she complied. (Pl.'s 56.1 ¶ 65.) When the officers approached to handcuff her, Gjenashaj resisted arrest by kicking Lieutenant Harrison. (Pl.'s 56.1 ¶¶ 69–70.) Gjenashaj was then removed from her vehicle, brought to the ground, and handcuffed. (Pl.'s 56.1 ¶ 72.)

A grand jury indicted Gjenashaj for multiple state crimes and she ultimately pled guilty to menacing, possession of a weapon, and fleeing the police. (Pl.'s 56.1 ¶¶ 74–75.)

## DISCUSSION

### I. Legal Standard

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate "the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). There is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007) (quotation marks omitted). This Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). After the movant makes an

initial showing that there is no material issue of fact, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial" without relying merely on allegations or denials in the pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); accord Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).

### II. Personal Involvement of Defendants in Use of Excessive Force

Lieutenant Harrison contends that summary judgment is warranted because he was not personally involved in the alleged use of excessive force against Gjenashaj. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); accord Moffit v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991). "A police officer is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." Vesterhalt v. City of New York, 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)).

Here, Lieutenant Harrison was present at the scene, discharged his firearm, and effectuated Gjenashaj's arrest. (Pl.'s 56.1 ¶¶ 23–60.) He was, in short, personally involved in the alleged use of excessive force. Ricks v. O'Hanlon, 2010 WL 245550, at \*4 (S.D.N.Y. Jan 19, 2010) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986)).

### III. Excessive Force and Qualified Immunity

**\*3** Lieutenant Harrison argues that he is entitled to summary judgment on the excessive force claim because he is protected by qualified immunity. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 US. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In deciding a government official's qualified immunity claim on summary judgment, the court must consider (1) "whether the facts shown 'make out a violation of a constitutional right' "; and (2) " 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.' " Taravella v. Town of Wolcott, 599 F.3d 129 (2d Cir. 2010) (quoting Pearson, 555 U.S. 223 at 232).

a. Violation of a Constitutional Right

Lieutenant Harrison avers that Gjenashaj fails to establish a constitutional violation because his use of deadly force was reasonable. When a plaintiff claims "that law enforcement officials used excessive force in the course of making an arrest, ... such claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). Under this standard, granting summary judgment is appropriate only when "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004). In particular, "an officer's decision to use deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others.' " Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 762 (2d Cir. 2003) (citing O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003)).

Here, "[t]he key determination of 'reasonableness' ... depends on which version of events one credits." Russo v. DiMilia, 894 F. Supp. 2d 391, 409 (S.D.N.Y. 2012). The parties dispute: (1) whether Gjenashaj pointed the gun at Lieutenant Harrison while she was inside the SUV; (2) whether Gjenashaj heard either officer yell "Gun!" or any other command; (3) whether Gjenashaj exited the vehicle with her hands up; (4) whether Gjenashaj was holding the gun when she exited the vehicle; and (5) whether Gjenashaj pointed the gun at the officers and assumed a two-handed shooting stance. (Pl.'s 56.1 ¶¶ 32, 34–42, 44, 47–49; Pl.'s Dep., 113:9–19, 118:22–119:21.)

Based on Gjenashaj's testimony, she exited the car without the pistol and was shot by the officers while her hands were up signaling surrender. Thus, "if [Gjenashaj's] version [of events] is true ... a reasonable jury could find that the use of deadly force was excessive." Russo, 894 F. Supp 2d at 410. Under these facts, a jury could find that Lieutenant Harrison did not have probable cause to believe that Gjenashaj "pose[d] a significant threat of death or serious injury to the officer or others." See Cowan, 352 F.3d at 762. Indeed, the Second Circuit has consistently held that summary judgment is inappropriate if "it is clear that determination of [a constitutional violation] 'turns on which of two conflicting stories best captures what happened on the street.' " Cowan, 352 F.3d at 763 (quoting Saucier v. Katz, 533 U.S. 194, 216 (2001)); see, e.g., Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999) ("Because the district court could not

determine whether the officers reasonably believed that their force was not excessive when several material facts were still in dispute, summary judgment on the basis of qualified immunity was precluded."); Hemphill v. Schott, 141 F.3d 412, 416–18 (2d Cir. 1998) (holding that the district court erred by entering summary judgment on qualified immunity when there were disputes remaining about "material factual issues"). Accordingly, the genuine disputes of material facts present here preclude summary judgment on this issue.

b. Clearly Established Right at Issue

**\*4** Even assuming there was a violation of a constitutional right, summary judgment is still inappropriate. Lieutenant Harrison argues that because his conduct did not violate a clearly established constitutional right, he is entitled to summary judgment based on qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson, 555 U.S. at 231 (quotation marks omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

As previously discussed, there are genuine issues of material fact regarding the reasonableness of Lieutenant Harrison's conduct. Because these "disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied." Cowan, 352 F.3d at 764 (denying summary judgment on a qualified immunity claim after determining in the excessive force analysis that there were genuine issues of material fact regarding the reasonableness of the officers' conduct); see also Bennett v. Falcone, 2009 WL 816830, at *6 (S.D.N.Y. Mar. 25, 2009) ("For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient.").

IV. Supervisory Liability

Gjenashaj claims that Lieutenant Harrison has supervisory liability because he was the "highest ranking officer" on the scene. (Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., ECF No. 97 ("Pl.'s Mem."), at 14.) Specifically, Gjenashaj avers that Harrison should have required Officer Maratea to wear a body-worn camera; did not follow proper NYPD procedures for dealing with emotionally

disturbed individuals; and failed to follow a series of NYPD guidelines. [1] (Pl.'s Mem., at 14.)

[1]  "In addition, Lieutenant Harrison failed to notify the Precinct Commander, failed to establish a proper command structure at the scene, failed to require the deployment of protective shields and failed to even attempt to use non-lethal devices to ensure the safety of all those present as required by the guidelines. Supervisors also failed to request assistance from a medical expert and to seek assistance from the subject's family or friends as further required by the guidelines." (Pl.'s Mem., at 14.)

But § 1983 "does not provide a remedy for violations of best police practices." Bah v. City of New York, 2017 WL 435823, at *6 (S.D.N.Y. Jan. 31, 2017). Indeed, "[a] violation of the Patrol Guide or departmental policy does not, in and of itself, amount to the violation of a right protected by the Constitution or federal law." Bah, 2017 WL 435823, at *6 (citing United States v. Wilson, 699 F.3d 235, 243 (2d Cir. 2012)). Gjenashaj's claims amount to nothing more than—perhaps valid—grievances that the officers should have abided by proper NYPD procedures. Moreover, to the extent that she claims the officers should have used

protective shields or non-lethal force, this is encompassed in her excessive force claim. Therefore, the supervisory liability claim is dismissed. See, e.g., Lopez v. City of New York, 186 F. Supp. 3d 304, 313 n.7 (S.D.N.Y. 2016) ("Section 1983 is not a remedy for violations of the NYPD Patrol Guide."); see also Rizk v. City of New York, 462 F. Supp. 3d 203, 220 (E.D.N.Y. 2020) ("[A]n act or omission that violates police policy but does not also violate constitutional rights is not actionable under § 1983.").

CONCLUSION

**\*5**  For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part. Specifically, Defendant Lieutenant Harrison's motion for summary judgment on the excessive force claim is denied. His motion for summary judgment on the supervisory liability claim is granted. The Clerk of Court is directed to terminate the motion pending at ECF No. 93.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 7342723

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 816830

2009 WL 816830
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,
v.
Officer FALCONE # 105, Officer Buono
of New Rochelle Police Dept., Defendants.

No. 05–CV–1358 (KMK)(LMS).
|
March 25, 2009.

West KeySummary

1    **Arrest** 🔑 Use of force

**Federal Civil Procedure** 🔑 Civil rights cases
in general

An arrestee's deposition testimony that when
the police officer pulled him out of the police
car, the arrestee's ankle got stuck, and that the
officer's action caused him to bump his head, was
insufficient to create a fact issue as to whether
the officer used excessive force, as required
to survive the officer's motion for summary
judgment in a § 1983 action. By the arrestee's
own admission, the impact to his forehead was
"nothing," and only "a little sissy thing." When
the arrestee caught his ankle in the police car,
the officer allegedly told the arrestee to get
himself out of the car. There was no evidence that
the officer did anything to intentionally cause
the injury or otherwise engaged in any force
against the arrestee. U.S.C.A. Const.Amend. 4;
42 U.S.C.A. § 1983.

15 Cases that cite this headnote

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Lalit K. Loomba, Esq., Wilson, Elser, Moskowitz, Edelman
& Dicker LLP, White Plains, NY, for Defendant.

*ORDER PARTIALLY ADOPTING
REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1**   Donald Mack Bennett ("Plaintiff"), proceeding pro
se, brought this Action against Officer Buono ("Buono")
and Officer Falcone # 105 ("Falcone") (collectively,
"Defendants") of the New Rochelle Police Department
("NRPD") asserting claims, pursuant to 42 U.S.C. § 1983
("Section 1983"), for excessive use of force and denial
of medical treatment in connection with Plaintiff's arrests
on February 4, 2004 and September 30, 2004. Defendants
moved for summary judgment on Plaintiff's claims, and
on September 26, 2008, Magistrate Judge Lisa Margaret
Smith, to whom this motion was referred, recommended that
the Court grant Defendants' motion. For the reasons stated
herein, the Court adopts Magistrate Judge Smith's Report and
Recommendation ("R & R") to the extent it is consistent with
this Order, and denies in part and grants in part Defendants'
motion for summary judgment.

*I. Background*

Plaintiff filed his Complaint with the Pro Se Clerk's
Office on December 2, 2004,[1] alleging violations of his
constitutional rights in connection with his arrest by Buono
on February 4, 2004 and his arrest by Falcone on September
30, 2004. Plaintiff further alleged that Thomas Chanpalilli
("Chanpalilli"), a store owner, wrote a false claim against
him in connection with his September 30, 2004 arrest. On
February 2, 2005, then-Chief Judge Michael B. Mukasey, to
whom this case was originally assigned,[2] issued an Order of
Partial Dismissal, dismissing the Complaint as to Chanpalilli
and dismissing Plaintiff's claims asserting criminal charges
against Defendants. (Dkt. No. 3.) Defendants filed a motion
to dismiss, which was denied (Dkt. No. 24), and then filed
their Answer on March 28, 2007 (Dkt. No. 25). On June 20,
2008, Defendants filed the instant motion. (Dkt. No. 44.)

1       Plaintiff's Complaint was filed and docketed on
        February 2, 2005, after Plaintiff was permitted by
        the district court to proceed *in forma pauperis.*
        (Dkt. No. 3.)

2009 WL 816830

2    This case was later reassigned to Judge Barbara S. Jones on February 28, 2005, and on August 6, 2007, it was reassigned to this Court.

This case was referred to Magistrate Judge Smith for review pursuant to 28 U.S.C. § 636(b) on May 7, 2007. [3]  On March 20, 2008, Magistrate Judge Smith entered an Order denying Plaintiff's motion for further responses to the interrogatories he served on Defendants on October 18, 2007. On September 26, 2008, Magistrate Judge Smith issued the R & R, concluding that this Court should grant Defendants' motion for summary judgment. Plaintiff was advised of his right to file objections to the R & R, and on November 3, 2008, [4] Plaintiff filed his objections to the report. [5]

3    The case was initially referred by Judge Jones to Magistrate Judge Ronald L. Ellis, and on May 7, 2007, it was referred by Chief Judge Kimba M. Wood to Magistrate Judge Smith.

4    On October 10, 2008, Magistrate Judge Smith entered an Order re-sending the R & R to Plaintiff at his correct mailing address and extending Plaintiff's time to file written objections from the date of the Order. (Dkt. No. 49.) On October 23, 2008, this Court granted Plaintiff's request for an additional extension of time and gave Plaintiff until December 3, 2008 to submit his objections to the R & R. (Dkt. No. 50.)

5    Plaintiff sent a letter to the Court on February 25, 2009, requesting a 120–day extension of any further proceedings in the case, so that Plaintiff could recover from certain health issues prior to appearing before the Court in this action. Because the Court is deciding Defendants' motion for summary judgment on the papers, Plaintiff's request is denied as moot.

Plaintiff additionally requested that the Court appoint counsel from the pro bono panel. This is Plaintiff's third such request. Magistrate Judge Smith twice previously has denied Plaintiff's request for pro bono counsel without prejudice to renew after sufficient evidence has been obtained upon which the Court could consider the merits of Plaintiff's application. (Dkt. Nos. 31 & 41.) For the reasons stated in Magistrate Judge Smith's May 31, 2007 Decision and Order denying Plaintiff's application (Dkt. No. 31), the

Court denies Plaintiff's request for appointment of counsel without prejudice to renew should subsequent submissions or proceedings indicate that this litigation is sufficiently meritorious to warrant appointment or should Plaintiff offer sufficient evidence to show that he is unable to represent himself or that "special reasons" warrant appointment of counsel in this particular case. See Hodge v. Police Officers, 802 F.2d 58, 60–62 (2d Cir.1986).

The factual background of this case is fully set forth in the R & R, and the Court assumes the Parties' familiarity therewith. [6]

6    The facts set forth in the R & R are taken from Plaintiff's Complaint, Defendants' Rule 56.1 Statement ("Defendants' 56.1 Statement"), and the evidence submitted by Defendants in support of their motion, including deposition testimony from Plaintiff, deposition testimony from Plaintiff's witness (Ms. Coreth Sewell), and affidavits from Buono, another NRPD officer who responded to the dispatch concerning the February 4 incident (Officer Randy Reif), and Falcone. Because Plaintiff did not submit a response to Defendants' 56.1 Statement, Magistrate Judge Smith deemed the facts taken from Defendants' 56.1 Statement as admitted, but construed the facts in the light most favorable to Plaintiff. In his Objections to the R & R, Plaintiff objects to a number of the factual assertions relied upon by Magistrate Judge Smith in recommending that the Court grant summary judgment. In light of Plaintiff's pro se status, the Court has examined carefully Plaintiff's objections, summary judgment motion papers, and evidentiary proffers. See Sease v. Phillips, No. 06–CV–3663, 2008 WL 2901966, at *1 n. 1 (S.D.N.Y. July 24, 2008) (exercising discretion to excuse pro se plaintiff's failure to comply with the local rules because of his status as a pro se plaintiff).

It bears noting, however, that, although Plaintiff claims he never received Defendants' 56.1 Statement (Pl.'s Obj. ("Obj.") 4), it was annexed to Defendants' Notice of Motion for summary judgment, and Defendants submitted an affidavit of service stating that Plaintiff was served with Defendants' 56.1 Statement on June 20, 2008. Further, Plaintiff's response to Defendants' summary judgment motion relies on exhibits and

facts referenced in Defendants' 56.1 Statement, which belies Plaintiff's assertion that he did not receive these materials. (*See, e.g.,* Pl.'s Reply Aff. in Opp'n to Defs.' Summ. J. ("Pl.'s SJ Aff.") 4 (noting that plaintiff received the NRPD police incident report related to his February 4, 2004 arrest with Defendants' motion for summary judgment).)

## II. Discussion

### A. Standard of Review

*1. Review of Magistrate Judge's Report & Recommendation*
A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans & Fin., Inc.,* No. 05–CV–8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007). Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), parties may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," Fed.R.Civ.P. 72(b)(2), and must be made "[w]ithin 10 days after being served with a copy of the recommended disposition." *Id.; see also* 28 U.S.C. § 636(b)(1).

 **\*2** Where a party submits timely objections to a report and recommendation, as Plaintiff has here, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3); *Donahue,* 2007 WL 831816, at *1. The district court "may adopt those portions of the ... report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *See Eisenberg v. New England Motor Freight, Inc.,* 564 F.Supp.2d 224, 226 (S.D.N.Y.2008) (quoting Fed.R.Civ.P. 72(b)(2)).

With regard to a magistrate judge's decision on a non-dispositive matter, such as a discovery dispute between the parties, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). The magistrate judge's findings may be considered "clearly erroneous" where, " 'on the entire evidence,' the [district court] is 'left with

the definite and firm conviction that a mistake has been committed.' " *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). "Pursuant to this highly deferential standard of review, magistrate[ ] [judges] are afforded broad discretion in resolving discovery disputes." *Aurora Loan Servs. v. Posner & Assocs., P. C.,* 499 F.Supp.2d 475, 477 (S.D.N.Y.2007) (internal quotation marks omitted).

*2. Motions for Summary Judgment*
Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Segal v. City of New York,* 459 F.3d 207, 211 (2d Cir.2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his [or her] favor." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

"A fact is material when it might affect the outcome of the suit under the governing law." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that the materiality of the facts considered by the court will be governed by substantive law). "The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " *Goenaga,* 51 F.3d at 18 (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991)); *see also McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F.Supp. 1205, 1212 (S.D.N.Y.1990).

2009 WL 816830

A court's goal should be to "isolate and dispose of factually insupportable claims." *Celotex,* 477 U.S. at 323–24.

**\*3** Pleadings submitted by pro se litigants are held to a lesser standard than those drafted by attorneys. *See Fed. Express Corp. v. Holowecki,* 552 U.S. 389, ——, 128 S.Ct. 1147, 1158, 170 L.Ed.2d 10 (2007) ("Even in the formal litigation context, *pro se* litigants are held to a lesser pleading standard than other parties."); *accord Erickson v. Pardus,* 127. S.Ct. 2197, 2200 (2007) (per curiam). The Court therefore construes Plaintiff's pleadings liberally so as to interpret them to raise the strongest arguments that they suggest. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006); *see also Dimps v. Dist. Council 37,* No. 01–CV–1735, 2002 WL 206992, at \*2 (S.D.N.Y. Feb. 8, 2002) ("Pro se plaintiffs are entitled to a far more generous reading of their pleadings than would otherwise be afforded to one who is represented by an attorney" (internal quotation marks and alterations omitted)). This more lenient approach to construing a pro se plaintiff's pleadings does not, however, "relieve [P]laintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (internal quotation marks omitted). In particular, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lyerly v. Koenigsmann,* No. 04–CV–3904, 2006 WL 1997709, at \*2 (S.D.N.Y. July 17, 2006) (internal quotation marks omitted).

### B. Plaintiff's Objection to Magistrate Judge Smith's March 20, 2008 Order

In his Objections to the R & R, Plaintiff argues that Defendants refused to answer the interrogatories he had served on them. (Obj.1.) The Court construes Plaintiff's objection as a request to modify or set aside Magistrate Judge Smith's March 20, 2008 Order (Dkt. No. 42), wherein she ruled that Defendants were not required to make any further responses to Plaintiff's interrogatories. As noted above, the Court will only set aside Magistrate Judge Smith's discovery order if it is clearly erroneous or is contrary to law. Magistrate Judge Smith's March 20, 2008 Order reflects careful consideration of the interrogatories, responses, objections, and record. Having reviewed Magistrate Judge Smith's decision, the Court finds no clear error and therefore denies Plaintiff's request to modify it or set it aside.

### C. Plaintiff's Objections to the R & R

The Court construes Plaintiff's objections as pertaining to the R & R in its entirety. (*See* Obj. 3 (noting that Plaintiff "objects totally" to the R & R, which he states is "frivolous").) The Court reviews *de novo* those aspects of the R & R to which the Plaintiff has raised specific and timely objections, with the balance subject to review for clear error only.[7] *See* Fed.R.Civ.P. 72(b).

[7]      Plaintiff has raised alternate grounds for relief and additional claims for damages in his Objections to the R & R. For example, Plaintiff states that he wants perjury charges brought against Defendants. (Obj.5.) However, as explained in then-Chief Judge Mukasey's February 2, 2005 Order (Dkt. No. 3), a private citizen cannot prosecute a criminal action, such as perjury, in federal court. *See Conn. Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81, 86– 87 (2d Cir.1972) (noting that it is a "truism" long recognized by federal courts that crimes are always prosecuted by the government and not by private complaint); *accord Brown v. Seniuk,* No. 01–CV– 1248, 2002 WL 32096576, at \*1 (E.D.N.Y. Mar. 25, 2002) ("[I]t is axiomatic that a private citizen cannot bring a criminal complaint."); *Shoemaker v. Am. Broad. Cos.,* No. 99–CV–2610, 1999 WL 1084247, at \*4 (S.D.N.Y. Dec. 1, 1999) (dismissing claims alleging the violation of federal and state criminal laws on basis that private citizens cannot bring suit under criminal statutes). In addition, Plaintiff asks the Court to grant him an injunction against the NRPD, which, according to Plaintiff, is "very corrupt." (Obj.5.) However, the NRPD is not a party in this case, and Plaintiff never sought leave to amend his Complaint to add the NRPD as a party. Further, even if Plaintiff had sought such leave, it would be denied by the Court, as the time for discovery has long passed and permitting an amendment would cause undue delay in the resolution of the dispute and would unduly prejudice Defendants. *See, e.g., Zahra v. Town of Southold,* 48 F.3d 674, 685–86 (2d Cir.1995) (affirming denial of leave to amend where undue delay existed); *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 150–51 (S.D.N.Y.2003) (denying leave to amend complaint where (1) the moving party waited nearly two years to amend, (2) the amendment would be prejudicial because it was sought after the allowable discovery period, and (3) discovery

2009 WL 816830

would have to be reopened for the proposed new defendants).

### 1. Plaintiff's Objections to R & R Regarding Claims Against Buono

#### a. Excessive Force Claim

As to Plaintiff's excessive force claim against Buono, Magistrate Judge Smith concluded that Buono was entitled to summary judgment on grounds of qualified immunity because, based on the record, "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." (R & R 7–8 (quoting *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995) (alterations in original)).) In particular, Magistrate Judge Smith found that the record did not support Plaintiff's claim that he had been kicked and also established that Plaintiff physically resisted being taken into custody by lying down with his feet out of the door to prevent the officers from closing the door to the police vehicle. (R & R 8 (citing Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 27, 35; Decl. of Lalit Loomba, Esq. ("Loomba Decl."), Ex. I at 24).) Having reviewed the matter *de novo,* the Court finds that there is a material question of fact regarding what transpired when Plaintiff was taken into custody and, as a result, summary judgment, on either Fourth Amendment or qualified immunity grounds, is inappropriate.

**\*4** Plaintiff's objections consist of a number of factual assertions that he believes undercut Magistrate Judge Smith's determination. First, Plaintiff argues that he was not disorderly at the laundromat but was merely "washing his clothes." (Obj.1.) However, Plaintiff pleaded guilty to disorderly conduct following his arrest, a fact he admitted during his deposition. (Dep. of Donald Mack Bennett ("Pl.'s Dep.") 73.) In addition, Plaintiff alleges that Buono followed him to the laundromat for the specific purpose of harassing him. (Obj.2.) In contrast, Defendants state that Buono responded to the laundromat after receiving a call from police headquarters about a disorderly person inside the laundromat. (Defs.' 56.1 ¶ 21.) This statement is bolstered by Officer Reif, an NRPD officer patrolling in a separate police vehicle who also responded to the dispatch. (Defs.' 56.1 ¶ 23; Aff. of Randy Reif ("Reif Aff.") ¶ 4.) Regardless, in determining whether excessive force was used in connection with an arrest, the question is whether Buono's actions were objectively reasonable "without regard to their underlying intent or motivation." *Mickle v. Morin,* 297 F.3d 114, 120 (2d Cir.2002). Therefore, Plaintiff's allegations regarding

Buono's intentions are not relevant to the Fourth Amendment "reasonableness" inquiry.

Plaintiff's most substantive factual objection is that he never resisted arrest and that Buono stomped on his left ankle—with full knowledge that Plaintiff's ankle was injured. (Obj.2.) Indeed, Plaintiff has consistently alleged and testified that Buono "stomped" on his left ankle in effectuating his arrest. (Compl. 3; Pl.'s SJ Aff. 4.)

Officers Reif and Buono conversely claim that they did not kick Plaintiff. (Defs.' 56.1 ¶ 32; Aff. of Jason Buono ¶ 8; Reif Aff. ¶ 11.) In addition, both officers, as well as Ms. Coreth Sewell, a patron of the laundromat who witnessed relevant events and was later deposed, stated that Plaintiff resisted the officers' attempts to get him into the police vehicle by lying down and sticking his legs out of the police vehicle to prevent the officers from closing the vehicle door—a fact that Plaintiff contests. [8] (Defs.' 56.1 ¶¶ 27, 35; Loomba Decl., Ex. I at 24; Compl. 3; Obj. 2.) However, Ms. Sewell did testify that she heard Mr. Bennett scream out in pain and tell the officers that they were hurting him. (Loomba Decl., Ex. I at 23.)

---

[8]     Plaintiff argues that he objects to everything stated by Ms. Sewell. (Obj.2.) However, such an objection is neither specific nor timely, *see* Fed.R.Civ.P. 72(b). Plaintiff did not object to Ms. Sewell's deposition during the discovery period. It bears noting, further, that Ms. Sewell was a witness originally identified by Plaintiff.

---

"The Fourth Amendment, which protects against unreasonable seizures, governs a claim that excessive force was used in connection with an arrest." *Mickle,* 297 F.3d at 120 (citing *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "Determining whether the force used during an arrest is 'reasonable' requires balancing the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Lennon,* 66 F.3d at 425 (quoting *Graham,* 490 U.S. at 396). A police officer is entitled to use reasonable and necessary force to effect an arrest and to protect himself, his fellow officers and others. *See Graham,* 490 U.S. at 396. Thus, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 397 (internal quotation marks omitted); *accord Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir.2000) ("A claim that excessive force was used in the course of a seizure is subject

to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest."). However, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit." *Husbands v. City of New York,* No. 05–CV–9252, 2007 WL 2454106, at * 10 (S.D.N.Y. Aug. 16, 2007) (internal quotation marks omitted).

**\*5** Plaintiff argues that the force that was used against him was unnecessary because he did not resist arrest, and he was suffering from a preexisting injury that was evident to the police officers. *See Pierce v. Chautauqua County,* No. 06–CV–644C, 2007 WL 2902954, at \*7 (W.D.N.Y. Sept.28, 2007) (noting that fact that plaintiff was already injured would weigh against the officers' claims that the force they implemented was necessary). Thus, Plaintiff has stated that there was little or no need for force. If Plaintiff's account is to be credited, which the Court must do for purposes of the instant motion, and Buono intentionally stomped on Plaintiff's previously broken left ankle, the Court cannot hold that this use of force was objectively reasonable as a matter of law. *See Davis v. City of New York,* No. 04–CV–3299, 2007 WL 755190, at \*12 (E.D.N.Y. Feb. 15, 2007) (noting that if plaintiff "was intentionally kicked in the shoulder for no reason while handcuffed on the floor, the Court cannot hold that the alleged gratuitous use of force by an officer can constitute an objectively reasonable use of force as a matter of law"); *Graham v. Springer,* No. 03–CV–6190, 2005 WL 775901, at \*6 (W.D.N.Y. Apr.5, 2005) ("If the Court accepts plaintiff's version as true, which it must, it cannot say that the kick or kicks were objectively reasonable as a matter of law.").

In this case, Plaintiff and Defendants offer materially different accounts of the February 4, 2004 arrest. Though Plaintiff's evidence is paper-thin—it consists primarily of his own testimony and Ms. Sewell's account that he screamed out in pain—it is nevertheless sufficient to indicate the existence of a disputed material fact as to whether or not Buono applied excessive force in effecting Plaintiff's arrest. *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (finding dismissal of an excessive force claim inappropriate where there were "genuine issues of material fact concerning what transpired"). In addition, there is a material question of fact with respect to the extent to which Plaintiff was resisting arrest. *See Genia*

*v. N.Y. State Troopers,* No. 03–CV–870, 2007 WL 869594, at \*19 (E.D.N.Y. Mar.20, 2007) (denying summary judgment on excessive force claim where there was dispute about whether Plaintiff resisted arrest).

District courts generally "may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York,* 426 F.3d 549, 551 (2d Cir.2005); *see also Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 622 (2d Cir.1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Plaintiff's story concerning Buono's alleged use of excessive force "is certainly inconsistent with other evidence and is subject to serious question, it is not so blatantly false that the Court may simply reject it as a matter of law." *Moore v. Casselberry,* 584 F.Supp.2d 580, 587 (W.D.N.Y.2008) (noting that "discrepancies go to the weight to be accorded to plaintiff's testimony"); *see also Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (reversing grant of summary judgment and noting that although the plaintiff's "case may well be without merit .... [Plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution"). As a result, "[d]espite the fact that Defendants' rendition of the facts contradicts that of Plaintiff, and, notwithstanding Defendants' corroborating evidence," which in this case includes Ms. Sewell's statement that Plaintiff was resisting arrest, "Plaintiff's allegations survive Defendants' Motion for Summary Judgment." *Rossi v. Stevens,* No. 04–CV–1836, 2008 WL 4452383, at \*6 (S.D.N.Y. Sept. 30, 2008).

**\*6** For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient. Qualified immunity operates to shield a government official sued "individually" (in a personal capacity) from suits for damages under Section 1983 unless the complained-of conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Neu v. Corcoran,* 869 F.2d 662, 665 (2d Cir.1989) (applying *Harlow* ). Courts perform a two-part inquiry in determining whether an official is entitled to qualified immunity. *See Pearson v. Callahan,* 555U.S. 223, —— – ——, 129 S.Ct. 808, 815–18, 172 L.Ed.2d 565 (2009); *accord Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). The first inquiry is "whether a constitutional right would have been violated on the facts

Case 9:19-cv-01438-LEK-TWD  Document 199  Filed 06/21/22  Page 388 of 443

alleged." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The second inquiry is "whether the [constitutional] right was clearly established." *Id.; see also Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007). According to the Supreme Court's recent decision in *Pearson,* 129 S.Ct. at 818, a lower court may exercise discretion in deciding which of the two prongs of qualified immunity should be addressed first. *Id.* (rejecting requirement in *Saucier,* 533 U.S. at 201, that the two prongs be determined sequentially).

If Plaintiff's account is to be credited, Buono "would not be entitled to qualified immunity on [Plaintiff's] excessive force claim[ ], because a reasonable officer would have known that repeatedly punching, kicking, and stomping on [Plaintiff] violated a clearly established constitutional right not to be subjected to excessive force during arrest." *Pierre–Antoine v. City of New York,* No. 04–CV–6987, 2006 WL 1292076, at *6 (S.D.N.Y. May 9, 2006); *see also Johnson v. City of New York,* No. 05–CV–2357, 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (noting that if plaintiff's claims that he was "stomped on" and "kicked" by officers were resolved in his favor, it "could lead a reasonable jury to find that his Fourth Amendment rights were violated" and qualified immunity also would not be available because "it could not be objectively reasonable for [the officer] to have believed that the use of gratuitous force ... [was] allowed under the law" (internal alterations omitted)). At a minimum, the question of whether it was reasonable for Buono to believe that his actions did not violate clearly established constitutional rights is one that depends on whether one believes his version of events. For the reasons discussed above, Buono's version of events is adequately (even if barely) disputed by Plaintiff, and the matter of Buono's qualified immunity therefore cannot be resolved as a matter of law.

### b. Deprivation of Medical Treatment Claim

As to the claim of unconstitutional denial of medical treatment, Magistrate Judge Smith noted that Plaintiff provided no evidence that he in fact requested medical attention from Buono. (R & R 9.) Further, Magistrate Judge Smith found that Plaintiff's claim, which is governed by the Due Process Clause of the Fourteenth Amendment,[9] additionally failed on the merits because Plaintiff provided no evidence that he suffered from a serious medical condition following his arrest. (*Id.*) Having reviewed the matter *de novo,*

the Court agrees with Magistrate Judge Smith and adopts that portion of the R & R.

9     While a convicted prisoner's right to medical assistance stems from the Eighth Amendment's ban on cruel and unusual punishment, the right of a pretrial detainee to medical care arises under the Due Process Clause of the Fourteenth Amendment. *See Weyent v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Boomer v. Lanigan,* No. 00–CV–5540, 2002 WL 31413804, at *6 (S.D.N.Y. Oct. 25, 2002).

**\*7** In his Objections to the R & R, Plaintiff offers no evidence showing that he made a request for medical treatment to Buono or that Buono specifically denied him medical treatment but states that "plaintiff did not receive any medical attention from [N]ew [R]ochelle or it took over a week to be[ ] seen by the chronic care physician."[10] (Obj.3.) Accordingly, Plaintiff has not established any personal involvement by Buono in the alleged constitutional deprivation of his right to medical treatment. *See Beck v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) ( " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977))); *Bangura v. County of Nassau,* No. 07–CV–2966, 2009 WL 57135, at *6 (E.D.N.Y. Jan. 7, 2009) (dismissing Eighth Amendment denial of access to medical care claim where there was an absence of facts to support the defendant's personal involvement and the facts were insufficient to allege a constitutional violation); *Bennett v. Hearle,* No. 04–CV–5086, 2007 WL 2119866, at *2 (S.D.N.Y. July 23, 2007) (dismissing claim against defendant where same plaintiff in this case had not submitted any evidence suggesting that defendant was involved in the alleged violation of plaintiff's rights (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994))).

10     At his deposition, Plaintiff testified that, after Buono drove him to police headquarters, "Officer Tanya Williams ... with two other officers" was standing there, and "then they brought me inside." (Pl.'s Dep. 71.) After he was brought to the booking desk, "[he] asked them ... to go to the hospital." (*Id.*) Plaintiff never testified that Buono was one of the officers who brought him inside to the booking desk or denied him medical treatment.

2009 WL 816830

Plaintiff's evidence on this point consists of his later statement in his summary judgment response papers that he told Buono that he needed medical attention. (Pl.'s SJ Aff. 4.) Even assuming *arguendo* that Plaintiff's later statement that he told Buono he needed medical care is not inconsistent with his earlier deposition testimony, Plaintiff's denial of medical treatment claim fails because, as discussed above, he has not offered any evidence showing that Plaintiff had a serious medical condition to which Buono showed deliberate indifference.

Even if Plaintiff sufficiently alleged Buono's personal involvement in the denial of medical treatment, in order to prevail on his claim, Plaintiff must prove that Buono "denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyent v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). To prove that Buono unconstitutionally denied Plaintiff medical treatment, Plaintiff must show deliberate indifference under both an objective and a subjective standard. *See Boomer v. Lanigan,* No. 00–CV–5540, 2002 WL 31413804, at *6 (S.D.N.Y. Oct. 25, 2002) ("To prove a violation [under the Fourteenth Amendment], a plaintiff must show deliberate indifference under an objective and subjective test." (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996))). The objective standard contemplates "a condition of urgency that may produce death, degeneration or extreme pain," of which the failure to treat "could result in further significant injury or the unnecessary and wanton infliction of pain." *Vondette v. McDonald,* No. 00–CV–6874, 2001 WL 1551152, at *4 (S.D.N.Y. Dec.5, 2001) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)) (internal quotation marks and alterations omitted); *see also Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (noting that the standard "contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain' " (quoting *Hathaway,* 37 F.3d at 66)). The subjective prong of the test requires Plaintiff to establish that Buono acted with a sufficiently culpable state of mind. That is, the official must "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed." *Boomer,* 2002 WL 31413804, at *6 (quoting *Estelle,* 429 U.S. at 104–05) (internal quotation marks omitted). Thus, mere negligence will not constitute deliberate indifference. *See Chance,* 143 F.3d at 703 (noting that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim").

**\*8** Defendants do not contest the fact that Plaintiff had a pre-existing injury to his left ankle, which occurred on April 5,

2003, when Plaintiff tripped on a sidewalk in New Rochelle. (Defs.' 56.1 ¶¶ 13–14.) However, Plaintiff admits that the cast for this injury had been removed by July 4, 2003 (Pl.'s Dep. 26–27), and he has not submitted any evidence concerning any injuries he allegedly suffered as a result of his arrest. [11] In addition, Plaintiff has offered no evidence proving that Buono acted intentionally to deprive Plaintiff of requested medical treatment. Accordingly, "[P]laintiff has failed to offer concrete evidence from which a jury could reasonably find that he suffered from a serious medical condition, or that [Defendant] regarded plaintiff's medical condition with deliberate indifference." *Vondette,* 2001 WL 1551152, at *4.

[11]    The Court notes that the absence of a serious medical injury is not, however, fatal to Plaintiff's excessive force claim. *See, e.g., Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987) (noting that while a jury may consider the lack of serious injury as evidence that the implemented force was not excessive, it does not entitle defendants to judgment as a matter of law); *Li v. Aponte,* No. 05–CV–6237, 2008 WL 4308127, at *6 (S.D.N.Y. Sept.16, 2008) ("Bruising alone is sufficient to preclude summary judgment on the ground that the force employed was *de* [*minimis* ].").

*2. Plaintiff's Objections to R & R Regarding Claims Against Falcone*

*a. Excessive Force Claim*

Plaintiff also claims that Officer Falcone used excessive force and denied Plaintiff necessary medical care in connection with his September 30, 2004 arrest. [12] Magistrate Judge Smith recommended that the Court grant summary judgment on Plaintiff's excessive force claim because (1) the limited use of force exercised by Falcone against Plaintiff did not infringe upon Plaintiff's Fourth Amendment rights, and, alternatively, (2) Falcone was entitled to qualified immunity because it was objectively reasonable for him to believe that the use of force he employed in effecting Plaintiff's arrest did not violate clearly established constitutional rights. (R & R 12–13.)

[12]    This arrest obviously involves entirely separate claims than those related to the February 4, 2004 arrest.

To determine whether Falcone used excessive force in effecting Plaintiff's arrest in violation of the Fourth Amendment, the Court must examine whether Falcone's

2009 WL 816830

actions were "objectively reasonable" in light of the facts and circumstances presented to him, without regard to his underlying intent or motivation. *See Graham,* 490 U.S. at 397. As noted above, this requires evaluating "the reasonableness of the force used by considering the totality of the circumstances faced by the officer on the scene." *Lennon,* 66 F.3d at 425.

Plaintiff alleges that Falcone pulled him out of the police car at police headquarters, causing Plaintiff to bang his ankle and his head, and subsequently shoved Plaintiff into a locker at the NRPD headquarters, causing him to suffer a small gash on his forehead. (Pl.'s Dep. 111; Compl. 3.) Plaintiff acknowledges that he never sought medical attention for these injuries. (Pl.'s Dep. 108.) Falcone, in his defense, asserts that he did not transport Plaintiff to the police station. (Aff. of Louis Falcone ("Falcone Aff.") ¶ 7.) Indeed, Defendants have provided the NRPD incident report of the September 30, 2004 arrest, which reflects that Plaintiff was transported to police headquarters by Officer Timothy Grosso. (Falcone Aff., Ex. 2.) Plaintiff has not produced any evidence to refute Defendants' claim that Falcone did not transport him to headquarters, but rather has alleged that Falcone lied about the date of the arrest. (Pl.'s SJ Aff. 7.) Plaintiff asserts that the arrest could not have occurred on September 30, 2004, because he was in the hospital recovering from a heart attack he had on September 26, 2004 —although he has not produced any hospital records or other evidence showing he was in the hospital on that date. (Pl.'s SJ Aff. 7.) However, in his Objections to the R & R, Plaintiff now claims that his arrest actually occurred on September 26, 2004, the same day he was allegedly in the hospital. [13] (Obj.4.) Additionally, in the affidavit he submitted in response to Defendants' motion to dismiss, Plaintiff stated that his forehead "looks to be permanently scar [r]ed" from the gash he received at police headquarters. (Pl.'s Further Reply Aff. to Defs.' Mot. to Dismiss 2.) However, during his deposition, Plaintiff admitted that the cut on his forehead was "nothing," a "scrape," and only "a little sissy thing." (Pl.'s Dep. 107, 111.)

[13]   Defendants have submitted a booking sheet from the NRPD showing that Plaintiff was arrested on September 30, 2004 and that the arresting officer was Falcone. (Falcone Aff., Ex. 4 (NRPD Booking Sheet).) Further, as discussed above, although Plaintiff claims in his Objections to the R & R that the arrest actually took place on Sunday, September 26, 2004 (Obj.4), in the affidavit he submitted in response to Defendants' summary judgment motion, he stated that he was in the hospital

recovering from a heart attack on that date (Pl.'s SJ Aff. 7). Regardless, the Court finds that this fact has no bearing on Plaintiff's excessive force claim because, as discussed above, even crediting Plaintiff's account of the incident, Plaintiff has not shown that Falcone engaged in conduct that violated his constitutional rights.

**\*9** Even assuming that it was Falcone who transported Plaintiff to police headquarters, however, Plaintiff has not proven either that Falcone engaged in conduct that violated Plaintiff's constitutional rights or that he suffered any serious injuries. First, Plaintiff has failed to identify any evidence that Falcone engaged in excessive force. Plaintiff's testimony is that when Falcone pulled Plaintiff out of the police car, Plaintiff's ankle got stuck in the car. (Pl.'s Dep. 111.) After this happened, according to Plaintiff, Falcone walked away, telling Plaintiff to get himself out of the car. (*Id.*) Taking Plaintiff's own version of events, the Court finds that no reasonable juror could find anything unconstitutionally excessive about Falcone's conduct. While it may be that Plaintiff's ankle got caught in the car, there is no evidence that Falcone did anything to intentionally cause that injury or otherwise engage in any force against Plaintiff. Indeed, when Plaintiff complained about being stuck in the car, Falcone applied no force but instead allegedly left it to Plaintiff to get himself out of the car. Further, given Plaintiff's own admission that the impact to his forehead was "nothing" (Pl.'s Dep. 111) and only a "little sissy thing" (*id.* at 107), he has no claim related to this injury, notwithstanding his attempts to embellish this claim. *See Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 619 (2d Cir.1996) ("[A] party may not create an issue of fact by submitting [statements] in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *accord Smith v. Ward Leonard Elec. Co.,* No. 00–CV–3703, 2004 WL 1661098, at \*8 (S.D.N.Y. July 23, 2004) (noting that a plaintiff "cannot rely on his affidavit to change what he testified to at his deposition"). While the Court is aware that the absence of a serious medical injury is not fatal to an excessive force claim, *see Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987), Plaintiff's deposition testimony indicates that no excessive force was used against him in the prison cell, *see Lennon,* 66 F.3d at 426 (granting summary judgment where no material facts were in dispute and no reasonable jury could have found that the force used was so excessive that no reasonable officer would have made the same choice); *Williams v. City of New York,* No. 05–CV–10230, 2007 WL 2214390, at \*11 (S.D.N.Y. July 26, 2007) ("Even drawing all inferences in favor of

2009 WL 816830

[plaintiff], no jury could conclude that [plaintiff's] scrapes and bruises reflect more than a de minimis injury."). Thus, crediting Plaintiff's account of events, the Court finds that no reasonable juror would find that the use of force by Falcone was not objectively reasonable under the Fourth Amendment.

Similarly, the Court agrees with Magistrate Judge Smith that Falcone is, at a minimum, entitled to qualified immunity on Plaintiff's excessive force claim. As discussed above, public officials generally are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *See Scott,* 127 S.Ct. at 1774 (applying the two-part inquiry); *Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir.2007) (same); *see also Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (noting that availability of qualified immunity test depends on whether " 'a reasonable officer could have believed' " his action " 'to be lawful, in light of clearly established law and the information [he] possessed' " (quoting *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))). Viewing the evidence in the light most favorable to Plaintiff, Falcone would not reasonably have believed that whatever force he used to remove Plaintiff from the police car and into the NRPD headquarters, which Plaintiff alleges caused him to get his ankle stuck and receive a scratch to the forehead that was "nothing" (Pl.'s Dep. 111) was in violation of Plaintiff's clearly established constitutional rights.

 **\*10** Plaintiff's remaining objections concerning the excessive force claim are baseless. Plaintiff states that he never stole anything from the store on September 30, 2004 and that there was no proof that he did. (Obj.4.) Plaintiff, however, pled guilty to petit larceny and admitted during his deposition that he stole a can of beer. (Defs.' 56.1 ¶¶ 42, 56; Pl.'s Dep. 99.) Plaintiff also argues that he has a witness, who will appear at trial to testify that Plaintiff did not steal a beer and that Falcone is lying. (Obj.4.) However, Plaintiff's broad contention that he has a surprise witness that he can produce at trial is insufficient to create a genuine issue of fact and thereby avoid summary judgment. Plaintiff could have submitted an affidavit from this eyewitness or had the witness deposed. Rather, Plaintiff is asking the Court to rely on unspecified statements by an unidentified, non-party witness. This the Court will not do.

Given Defendants' undisputed evidence and Plaintiff's failure to raise a triable issue of fact, the Court finds that Plaintiff

cannot establish that Falcone violated Plaintiff's constitutional rights and moreover, at a minimum, Falcone is entitled to qualified immunity on Plaintiff's excessive force claim as no jury could "find that it was objectively unreasonable for [Falcone] to believe that the force used to [remove Plaintiff from] the car was not excessive." *Lennon,* 66 F.3d at 426; *see also Bennett,* 2007 WL 2119866, at \*2 (granting summary judgment where plaintiff's submissions failed to controvert evidence submitted by defendant).

### *b. Deprivation of Medical Treatment Claim*

As to the Section 1983 claim for unconstitutional denial of medical treatment, Magistrate Judge Smith found that there was no evidence in the record that Plaintiff ever sought medical assistance from Falcone, or that he was ever denied such assistance. (R & R 13–14.) Plaintiff has not filed any objections to this portion of the R & R, and, thus, the Court reviews for clear error only.

Having reviewed all of the submissions made by Plaintiff, including Plaintiff's deposition, the Court finds no evidence, and indeed, no implied allegation, that Falcone personally denied Plaintiff medical treatment. As a result, Plaintiff has not tendered any material fact as to which there is a genuine issue for trial, and summary judgment is therefore granted in favor of Falcone on this claim. *See Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001) (noting that "it is well settled ... that personal involvement" in the constitutional violation "is a prerequisite to an award of damages under § 1983" (internal alterations omitted)); *see also Lopez v. Zenk,* No. 06–CV–4601, 2008 WL 3285895, at \*1 (E.D.N.Y. Aug. 8, 2008) (stating plaintiff must allege that individual defendant was personally involved in the constitutional violation (citing *Thomas v. Ashcroft,* 470 F.3d 491, 498 (2d Cir.2006))); *James v. Phillips,* No. 08–CV–1539, 2008 WL 1700125, at \*8 (S.D.N.Y. Apr. 9, 2008) (dismissing denial of medical care claim because plaintiff had not come forward with evidence of personal involvement by defendant).

### *III. Conclusion*

 **\*11** For the reasons stated herein, the Court adopts Magistrate Judge Smith's R & R to the extent it is consistent with this Order. Accordingly, it is hereby

2009 WL 816830

ORDERED that Defendants' motion for summary judgment is GRANTED on Plaintiff's denial of medical treatment claim against Officer Buono and DENIED on Plaintiff's excessive force claim against Officer Buono; it is further

ORDERED that Defendants' motion for summary judgment is GRANTED on Plaintiff's denial of medical treatment and excessive force claims against Officer Falcone; it is further

ORDERED that the Clerk of the Court is to terminate the pending motion (Dt. No. 44) and enter judgment in favor of Defendant Officer Falcone.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 816830

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 125774
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Thomas DALLIO, Plaintiff,

v.

Scott SANTAMORE; William Comstock; Frank
Buksa; Amos LeClaire; Alicia McGuoirk; Lawrence
Hopkinson; Craig Ramsdell; Andrew Bouchey;
Paul Gilmore; Donald Quinn; Roy Girdich; C.O.
Gettman; Lt. O'Connell; R.N. Kimberly Perrea; R.N.
Lillian Riley; and R.N. Debra Smith, Defendants.

No. 9:06–CV–1154 (GTS/DRH).
|
Jan. 7, 2010.

West KeySummary

1    **Federal Civil Procedure** 🔑 Civil Rights
Cases in General

A genuine issue of material fact as to
whether corrections officers used excessive force
in restraining a prisoner precluded summary
judgment in favor of the officers in the prisoner's
Eighth Amendment excessive force action.
The prisoner struck an officer, was quickly
restrained, and was then allegedly assaulted by
multiple officers, which was unreasonable and
unnecessary to sustain institutional order and
safety since the prisoner was compliant and
defenseless. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Thomas Dallio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Dean J. Higgins, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action filed by Thomas Dallio ("Plaintiff") against
sixteen employees of the New York State Department of
Correctional Services ("Defendants") are (1) Defendants'
motion for summary judgment (Dkt. No. 78), (2) United
States Magistrate Judge David R. Homer's Report–
Recommendation recommending that Defendants' motion be
granted in part and denied in part (Dkt. No. 87), and (3)
Plaintiff's Objections to the Report–Recommendation (Dkt.
No. 88). For the following reasons, Plaintiff's Objections
are rejected; the Report–Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in part
and denied in part; and Plaintiff's Complaint is dismissed in
part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**

Plaintiff filed his Complaint in this action on September 27,
2006. (Dkt. No. 1.)

Construed with the utmost of liberality, Plaintiff's Complaint
alleges that, between approximately November 10, 2003, and
November 20, 2003, while he was incarcerated at Upstate
Correctional Facility in Malone, New York, the above-
captioned Defendants violated his rights in the following
manner: (1) by subjecting him to excessive force in violation
of the Eighth Amendment; (2) by failing to intervene to
prevent others from subjecting him to excessive force, in
violation of the Eighth Amendment; (3) by being deliberately
indifferent to his serious medical needs, in violation of
the Eighth Amendment; (4) by conspiring to violate his
aforementioned constitutional rights; and (5) by committing
various torts against him (including assault, battery and
negligence) under New York State law. (*See generally* Dkt.
No. 1 [Plf.'s Compl.].)

More specifically, Plaintiff alleges as follows: (1) Defendants
Santamore, Comstock, LaClaire, Buksa, Ramsdell, and
Hopkins assaulted him after he was fully restrained in his cell;
(2) Defendants Gilmore and McGuoirk failed to intervene
during this incident; (3) Defendants Riley and Perrea failed
to properly treat him for his subsequent injuries; and (4)

Defendants conspired against him by falsifying investigative reports and medical records. (*Id.*)

For a more detailed recitation of Plaintiff's factual allegations, the Court refers the reader to the Complaint in its entirety, and Magistrate Judge Homer's Report–Recommendation. (Dkt.Nos.1, 87.)

### B. Defendants' Motion for Summary Judgment and Plaintiff's Response

On October 1, 2008, Defendants filed a motion for summary judgment. (Dkt. No. 78.) In their motion, Defendants argue that Plaintiff's Complaint should be dismissed for the following reasons: (1) Plaintiff has failed to establish an excessive-force claim and/or a failure-to-intervene claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff was subjected to force that was sufficiently serious or that Defendants used that force with a sufficiently culpable mental state; (2) Plaintiff has failed to establish a medical-indifference claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff experienced a medical need that was sufficiently serious or that Defendants were deliberately indifferent to such a medical need; (3) Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; (4) Plaintiff has failed to establish a conspiracy claim because insufficient record evidence exists from which a rational fact finder could conclude that Defendants reached an agreement to deprive Plaintiff of his constitutional rights; and (5) Plaintiff's pendant state law claims (of assault, battery and negligence) should be dismissed under the Eleventh Amendment and New York Corrections Law § 24 because (a) Plaintiff sued Defendants for damages arising out of acts that they allegedly performed or failed to perform within the scope of their employment, and (b) New York Civil Law Practice Law and Rules § 215(3) bars Plaintiff's intentional tort claims on the ground of untimeliness. (Dkt. No. 78, Attachment 20, at 7–18.)

**\*2** On October 31, 2008, Plaintiff filed his response in opposition to Defendants' motion. (Dkt. No. 85.) In his response, Plaintiff argues as follows: (1) he has adduced sufficient record evidence to establish an excessive-force claim and a failure-to-intervene claim under the Eighth Amendment; (2) he has adduced sufficient record evidence to establish a medical-indifference claim under the Eighth Amendment; (3) Defendants are not protected from liability

as a matter of law by the doctrine of qualified immunity, based on the current record; and (4) Plaintiff has adduced sufficient record evidence to establish a conspiracy claim. (Dkt. No. 85, Attachment 2, at 1–14.) In addition, Plaintiff concedes that his state law claims are barred by New York Corrections Law § 24. (*Id.* at 13.)

### C. Magistrate Judge Homer's Report–Recommendation

On October 26, 2009, Magistrate Judge Homer issued a Report–Recommendation recommending as follows: (1) that all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley be dismissed with prejudice pursuant to Fed.R.Civ.P. 56; [1] (2) that Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore *not* be dismissed pursuant to Fed.R.Civ.P. 56 due to the existence of genuine issues of material fact regarding those claims; and (3) that Plaintiff's claims against Defendant Smith be dismissed without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 87.)

[1]    The Court notes that included in these claims are all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims. (Dkt. No. 87, at 14–20.) The Court notes also that Magistrate Judge Homer recommends the dismissal of all of Plaintiff's claims against Defendants Bouchey and Gettman based on Plaintiff's failure to demonstrate their personal involvement in the constitutional violations alleged. (*Id.* at 20–21.)

### D. Plaintiff's Objections

On November 4, 2009, Plaintiff timely filed his Objections to the Report–Recommendation. (Dkt. No. 88.) In his Objections, Plaintiff asserts, *inter alia,* the following arguments: (1) he did not hit his head against the wall, but rather his injuries were caused by Defendants, a fact that Defendants are collectively trying to "cover up"; [2] (2) because Magistrate Judge Homer failed to refer to a number of his exhibits in the Report–Recommendation, he failed to resolve all ambiguities and draw all reasonable inferences in his favor; (3) Plaintiff did not receive adequate due process during his grievance investigation in that he was denied an opportunity to "present witnesses and other evidence in support of his Grievance Complaint"; and (4) Defendants

Perrea, Riley, Girdich, and O'Connell should not be dismissed from the action because the record evidence demonstrates that these Defendants "act[ed] in concert with each other to participate in the violation of Plaintiff's Eighth Amendment rights." (Dkt. No. 88, at 1–5.)

[2]      More specifically, Plaintiff argues that Defendant McGuoirk and the Department of Correctional Services ("DOCS") Inspector General's investigator tried to "cover up" the fact that he did not hit his head. To the extent that Plaintiff is attempting to assert, for the first time, a claim against the DOCS Inspector General's investigator, such a claim is dismissed because, among other things, the DOCS Inspector General is not a named party Defendant. *Excell v. Burge,* 05–CV–1231, 2008 WL 4426647, at *3 n. 4 (N.D.N.Y. Sept.25, 2008) (Kahn, J. adopting DiBianco, M.J.) (noting that a person "not listed in the caption and ... never served with process ... is not ... a defendant [in the action]").

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

[3]      On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

[4]      *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

### B. Standard Governing a Motion for Summary Judgment

**\*3** Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 87, at 8–9.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

After carefully reviewing all of the papers herein, including Magistrate Judge Homer's thorough Report–Recommendation, the Court can find no error (clear or otherwise) in the Report–Recommendation. Magistrate Judge Homer employed the proper standards to Plaintiff's claims, accurately recited the facts surrounding these claims, and reasonably applied the law to those facts. The Court would only add the following three observations.

First, with regard to Plaintiff's argument that he did not receive adequate due process during his grievance investigation, the Court declines to consider the due process claim implicitly asserted in the argument because Plaintiff is asserting that due process claim for the first time in his Objections to the Report–Recommendation. *Williams v. Cooney,* 01–CV–4623, 2004 WL 434600, at *2 n. 1 (S.D.N.Y. Mar.8, 2004) (noting that a district court "has discretion to review arguments which are raised for the first time in objections to the Report"). In any event, even if the Court were to consider this late-blossoming due process claim, the Court would reject that claim on three alternative grounds: (1) Plaintiff has failed to introduce any admissible record evidence that he exhausted his administrative remedies with regard to this claim; (2) Plaintiff has failed to introduce any admissible record evidence that he was in fact not provided with an opportunity to present evidence in support of his grievance; and (3) "the manner in which grievance investigations are conducted do[es] not create a protected liberty interest." *Odom v. Poirier,* 99–CV–4933, 2004 WL 2884409, at *10 (S.D.N.Y. Dec.10, 2004) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 [S.D.N.Y.2003] ), *accord Thomas v. Picio,* 04–CV–3174, 2008 WL 820740, at *5 n. 5 (S.D.N.Y. Mar.26, 2008). For all of these reasons, the Court rejects Plaintiff's newly asserted due process claim.

Second, with regard to Plaintiff's argument that Magistrate Judge Homer's omission of references to Plaintiff's numerous exhibits in the Report–Recommendation is evidence that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor, this argument fails to specifically address any of Magistrate Judge Homer's factual or legal conclusions. Instead, the argument generally attacks the findings and conclusions of the Report–Recommendation. As a result, the portion of the Report–Recommendation challenged by the argument is subject to only clear-error review. In any event, this portion of Magistrate Judge Homer's Report–Recommendation, as well as the other portions of his Report–Recommendation, would survive even a *de novo* review. Contrary to Plaintiff's argument, Magistrate Judge Homer relied on Plaintiff's version of the facts (and thus on Plaintiff's exhibits) in concluding that a question of material fact exists regarding Plaintiff's excessive-force claims and failure-tointervene claims. For these reasons, the Court rejects Plaintiff's argument that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor.

*4 Finally, with regard to Plaintiff's argument that he did not hit his head against the wall, but rather his injuries were caused by Defendants, and Defendants are collectively trying to "cover up" this fact, Plaintiff has failed to point to (or introduce in his Objections) any admissible record evidence as to when, where, or how Defendants came together and planned to (1) assault him, and (2) subsequently cover up the assault. As a result, the Court rejects Plaintiff's argument that his conspiracy claim should survive summary judgment.

For all of these reasons, Magistrate Judge Homer's Report–Recommendation is accepted and adopted in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 87) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 78) is ***GRANTED*** in part and ***DENIED*** in part, in the following regards:

(1) all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley (including all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims) are ***DISMISSED*** with prejudice pursuant to Fed.R.Civ.P. 56;

(2) Plaintiff's claims against Defendant Smith are ***DISMISSED*** without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b);

(3) remaining in this action, following the issuance of this Decision and Order, are Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore. (Plaintiff's claims against these Defendants are *not* dismissed due to the existence of genuine issues of material fact regarding those claims.)

**REPORT–RECOMMENDATION AND ORDER**[1]

[1]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Thomas Dallio ("Dallio"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this civil rights action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 alleging that defendants, sixteen DOCS employees, violated his constitutional rights under the Eighth Amendment. Compl. (Docket No. 1).

Presently pending is the motion of fifteen of the defendants [2] for summary judgment pursuant to Fed.R.Civ.P. 56. Docket Nos. 78, 79, 83, 84. Dallio opposes the motion. Docket No. 85. For the following reasons, it is recommended that the motion be granted in part and denied in part.

[2]  Defendant R.N. Debra Smith has never been served with process or other wise appeared in the action. See Docket Nos. 11 (summons returned unexecuted as to Smith after service was attempted by the United States Marshals Service), 36 & 38 (answers filed for 11 defendants except Smith), 78–1 (defendants' motion herein filed on behalf of all defendants except Smith). Under Fed.R.Civ.P. 4(m), a complaint must be served upon a defendant within 120 days. See also N.D.N.Y.L.R. 4.1(b) (same). The complaint herein was filed on September 27, 2006 and the summonses were issued on November 20, 2006. Docket No. 1; Docket entry dated Nov. 20, 2006. Thus, more than 120 days have elapsed without completion of service of process on Smith. Accordingly, it is recommended that the complaint be dismissed without prejudice as to Smith in accordance with Rule 4(m) and Local Rule 4.1(b).

### I. Background

The facts are related herein in the light most favorable to Dallio as the non-moving party. See subsection II(A) *infra*.

### A. The Incident

On November 10, 2003, defendants Scott Santamore and William Comstock, corrections officers at Upstate Correctional Facility, arrived at Dallio's cell to escort him to a holding area while his cell was searched. Compl. ¶ 19; Comstock Decl. (Docket No. 78–11) ¶ 1; Santamore Decl.

(Docket No. 78–10) ¶ 2. After the search, Santamore and Comstock escorted Dallio back to his cell and instructed him to stand against the wall so that his waist chain could be removed. Comstock Decl. ¶¶ 1–3; Santamore Decl. V 3. The waist chain was removed, Dallio was ordered to turn and proceed into his cell, and when Dallio turned, he punched Comstock in the face. Comstock Decl. ¶¶ 3–5; Santamore Decl. ¶¶ 5–7; Dallio Decl. (Docket No. 85–2) ¶ 6; Dallio Dep. Tr. (Docket No. 78–14) at 26. A struggle ensued as Comstock, Santamore, and Dallio all fell into Dallio's cell. Comstock Decl. ¶ 6–8; Santamore Decl. ¶¶ 8–12.

**\*5**  An alarm was sounded and a response team composed of defendants Alicia McGuoirk, Amos LaClaire, [3] Frank Buksa, Craig Ramsdell, Lawrence Hopkins, and Paul Gilmore quickly arrived at Dallio's cell. Docket No. 78, Ex. D at 28, 32–35; LaClaire Decl. (Docket No. 78–4) ¶ 1; Buksa Decl. (Docket No. 78–5) ¶ 1; Ramsdell Decl. (Docket No. 78–6) ¶ 2; Hopkinson Decl. (Docket No. 78–7) ¶ 2; Gilmore Decl. (Docket No. 78–9) ¶¶ 3–5. Dallio immediately fell to the ground, was restrained, and ceased physical resistance but was then kicked and punched over twenty times in his face, abdomen, back, and legs. Dallio Decl. ¶¶ 2, 6–7, 15; Dallio Dep. at 31–37. Gilmore and McGuoirk stood by while Santamore, Comstock, LaClaire, Buksa, Ramsdell, and Hopkinson assaulted Dallio. Dallio Decl. ¶¶ 16, 18. [4] During the incident, Dallio's arms (Gilmore Decl. ¶ 13; Hopkinson Decl. ¶¶ 3–4; LaClaire Decl. ¶ 2; Docket No. 78, Ex. D at 33, 35) and legs (Gilmore Decl. ¶ 12; Ramsdell Decl. ¶ 4; Buksa Decl. ¶ 1; Docket No. 78, Ex. D at 32, 34) were restrained, immobilized with a bed sheet (Gilmore Decl. ¶¶ 12, 14, 15; Buksa Decl. ¶¶ 1–2), and Dallio was placed under his bunk without further incident. Gilmore Decl. ¶ 16; Buksa Decl. ¶ 3; Docket No. 78, Ex. D at 32. [5] Dallio was then left alone in his cells. [6]

[3]  The complaint spells the name as "LeClaire." Compl. The correct spelling is LaClaire." See LaClaire Decl. (Docket No. 78–4). The correct spelling will be used herein.

[4]  Defendants dispute Dallio's account.

[5]  A video tape was made by a surveillance camera fixed on the hallways outside Dallio's cell which shows the events which occurred outside the cell but not those inside. It also contains sound recordings of the raised voices while the parties

were inside the cell. *See* Video (Docket No. 78–20). The video shows Dallio strike Comstock, Comstock, Santamore, and Dallio then tumbling into Dallio's cell, and officers responding to the cell. Dallio can be heard on the tape yell that he was not resisting and that excessive force was occurring. *Id.; see also* Dallio Dep. Tr. at 28 (testifying that he agreed that the video was an accurate depiction of what occurred in the hallway).

6    McGuoirk was then sent back to Dallio's cell to check on him and heard strange noises coming from his cell. McGuoirk Decl. ¶ 4. McGuoirk observed Dallio hitting his head and rubbing his face against the wall multiple times. *Id.* ¶¶ 4–6. McGuoirk reported this behavior to Gilmore and the medical department. *Id.* ¶ 7. McGuoirk then returned to Dallio's cell and observed him engaging in the same activity. *Id.* ¶¶ 8–9. Dallio now denies this conduct, but during an interview with the DOCS Inspector General's investigator, Dallio admitted to hitting his head against the wall of his cell in frustration after the incident. Docket No. 83, Ex. E at 169.

Later that day, Dallio was issued a misbehavior report which charged him with violating a direct order, assault on a staff member, and violent conduct. Docket No. 78, Ex. D at 22. A disciplinary hearing was conducted on the charges and at its conclusion, Dallio was found guilty of all three charges. Docket No. 78, Ex. D at 17; *see also* Docket No. 78, Ex. D at 68–150 (disciplinary hearing transcript). After administrative appeals, Dallio received a total sentence of twenty-four months in the special housing unit (SHU)[7] and twenty-four months loss of packages, commissary, and telephone privileges. Docket No.78, Ex. D at 13–16.

7    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On November 24, 2003, Dallio filed a grievance against the defendants for the alleged assault. Docket No. 78, Ex. F at 4.

After an investigation, defendant Donald Quinn determined that "[b]ased on the documentation submitted and Inmate Dallio's lack of witnesses or evidence his allegations cannot be substantiated." Docket No. 78, Ex. F at 7; *see also* Docket No. 78, Ex F at 7–60 (attachments of all documents and interviews considered during the investigation). The grievance was denied based on the internal investigation. Docket No. 78, Ex. F at 3. Dallio appealed, but the denial was affirmed, based upon both the findings of the internal investigation and the outcome of Dallio's disciplinary hearing. Docket No. 78, Ex. F at 2–3.

On November 24, 2003, Dallio filed a complaint with the Office of the DOCS Inspector General (IG) concerning the incident. Docket No. 83, Ex. E at 15–19. After another lengthy investigation, the IG concluded that the "[m]edical documentation and photo's [we]re consistent with The Use of Force reported by [the defendants]" and that Dallio's allegations were unsubstantiated. Docket No. 83, Ex. E at 1–2; *see also* Docket No. 83, Ex. E at 20–180 (compilation of all the correspondence, interviews, documentation, photographs, and records utilized by the IG in evaluating Dallio's complaints).

**B. Medical Treatment**

 **\*6**  After the incident, Dallio was taken to the medical department where defendant Kimberly Perrea, a registered nurse, and Perrea completed a physical examination. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 19; Docket No. 85, Ex. I. Examination revealed (1) bruising and superficial abrasions to the forehead, (2) bruising on both cheeks, (3) bruising and swelling of the bridge of Dallio's nose, (4) one superficial abrasion on the left elbow, (4) superficial abrasions to the left shoulder and bruising to the left clavicle, (5) swelling and abrasions on the right flank, (6) a bruised right knee, (7) a bruised right hip with superficial abrasions, (8) redness throughout the middle and lower portions of Dallio's spine and back, sternum, and front of the neck, and (9) superficial abrasions and redness on Dallio's right wrist. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 36; Docket No. 85 Ex. I. The medical report indicated that Dallio should cleanse the areas which received abrasions with soap and water when he returned to his cell. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. During his deposition, Dallio testified that he suffered from internal bleeding in his eye, injuries to his spinal area, difficulty walking, bruising throughout his face and legs, and lacerations. Dallio Dep.

at 45–48. Defendants Lt. O'Connell and Roy Girdich both subsequently made rounds after the incident and observed Dallio's condition and failed to take any actions. Compl. ¶¶ 35, 44–45.

On November 11, 2003, Dallio was examined by a non-party member of the medical staff who noted Dallio's subjective complaints of bruising on his head, legs, back and stomach, chest pains, and difficulty breathing. Docket No. 83, Ex. E at 144. There was no physician or nurse practitioner on duty due to the holiday and when Dallio was informed of this, he became upset. *Id.* Dallio appeared in no obvious distress and could breathe easily as he had no difficulty yelling at the nurse. *Id.* Later that day, Dallio sought emergency treatment to see a physician but was warned that his current medical condition was not an emergency and that further abuse of the system would result in a misbehavior report. *Id.*

On November 12 and 13, 2003, Dallio complained of a spinal injury from the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. (Docket No. 78–8) ¶ 5 (noting Dallio's complaints of discomfort, desire to see a chiropractor, the absence of objective signs of distress, and that he was given Tylenol to relieve pain). Both days, Dallio was observed standing in no distress, waving his extremities without any difficulty with his range of motion, responding easily to questions and yelling at staff to express his displeasure, and was treated with pain relievers. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 9 ("At times from November 10, 2003 to November 15, 2003 [Dallio] frequently yelled at me...."). Additionally, Dallio complained of an injury to his right eye which was not noted to have occurred at the time of the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 6 (noting that "medical records for November 14, 2003 reveal that other medical personnel observed no injury to either of his eyes."). When the eye was examined, it was found to be reddened but without symptoms. Docket No. 83, Ex. E at 143. Dallio asked to be referred to a chiropractor for his complaints of spinal pain. Docket No. 83, Ex. E at 143.

**\*7** The following two days, November 14 and 15, 2003, Dallio continued to complain about his eye injury. Docket No. 83, Ex. E at 141–42. Dallio was seen by optometry on July 3, 2003 and by ophthalmology on October 9, 2003, his eye was reddened, but no further treatment was indicated. Docket No. 83, Ex. E at 141–42. Dallio was again noted to be moving all extremities without difficulty, standing in no apparent distress, ambulating without difficulty, speaking clearly, and continually yelling at medical staff. Docket No.

83, Ex. E at 141–42. [8] Again on November 17, 2003, Dallio was noted to have no difficulty with ambulation, movement, or speech. *Id.*

[8]    Dallio's examination was eventually terminated due to his behavior. Docket No. 83, Ex. E at 141–42. It was similarly terminated on November 17 due to his behavior and aggression toward staff. Docket No. 83, Ex. E at 141.

On November 18, 2003, Dallio requested treatment for injuries suffered during the incident. Docket No. 83, Ex. E at 140. Dallio was offered Tylenol and Motrin, and refused both. *Id.* He again demanded to see an eye doctor. *Id.* On November 20, Dallio lodged his last set complaints of back pain. *Id.* He again refused pain medication and was noted to be waving his arms around wildly and yelling at staff. *Id.* After twenty minutes, the examination was terminated due to Dallio's behavior. *Id.*

This action followed.

## II. Discussion [9]

[9]    Initially Dallio alleged pendant state law claims for assault, battery, and negligence. However, he has since conceded that his state law claims are barred. Plaintiff's Memorandum of Law (Docket No. 85–3) at 13. Accordingly, defendants' motion as to those claims should be granted.

In his complaint, Dallio alleges that defendants have violated his Eighth Amendment rights by subjecting him to excessive force, failing to intervene, and being deliberately indifferent to his serious medical needs. Additionally, Dallio alleges that defendants conspired to falsify reports and medical records and to remain silent about his injuries after the incident to make him appear culpable for the incident. The moving defendants seek summary judgment on all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing

the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P.* 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223– 24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

 **\*8** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the

Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

 **\*9** In this case, the moving defendants have proffered substantial evidence to refute Dallio's claim of excessive force. The defendants themselves have offered affidavits that the force used was only that necessary to restrain Dallio from assaulting officers further. Dallio was found guilty of assault and that finding was affirmed on administrative appeal. The video tape confirms Dallio's assault on Comstock. An independent investigation by the IG found no basis for Dallio's contentions. The physical injuries allegedly suffered by Dallio were consistent with the self-inflicted injuries

observed by McGuoirk. Opposed to this evidence are only Dallio's own testimony and his voice on the video tape asserting that the officers were assaulting him in his cell after he had been restrained.

The question presented by this motion, then, is whether any question of fact exists as to whether any defendant used excessive force against Dallio or failed to intervene to prevent the use of such force. The evidence must be construed in the light most favorable to Dallio as the non-moving party. So construed, Dallio's testimony and statements heard on the vido tape stand in stark contrast to the substantial evidence proffered by defendants. This competing evidence rests on each side on the credibility of Dallio on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Dallio's version of events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

As described above, Dallio's evidence would concede that he in fact struck Comstock but that he was quickly restrained in his cell and, so restrained and defenseless, was struck repeatedly by Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson while Gilmore and McGuirk stood by and took no steps to intervene. Despite the relatively minor injuries Dallio suffered, the defendants' actions in assaulting an inmate who was restrained and compliant could constitute a *per se* constitutional violation. Thus, viewing the facts in the light most favorable to Dallio, he has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury.

Furthermore, if Dallio's evidence is credited, defendants' actions could be found wanton and malicious. The need for force dramatically subsided once Dallio was restrained and compliant on the ground. Viewing the facts in the light most favorable to Dallio, defendants continued to assault him. This conduct could be found unreasonable and unnecessary to sustain institutional order and safety once Dallio was compliant. Thus, such actions, as alleged by Dallio, are more than sufficient as well to raise a question of material fact as to the subjective prong of the Eighth Amendment analysis.

**\*10** Accordingly, defendants' motion for summary judgment should be denied as to defendants Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson on Dallio's claim of excessive force.

### 2. Failure to Intervene

Daillo further claims that Gilmore and McGuoirk failed to intervene when they saw the other defendants assaulting him. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). In order to establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

Viewing the facts in the light most favorable to Dallio, he has raised a material issue of fact as to the failure to intervene of Gilmore and McGuoirk. While the two defendants may not have had advanced warning that the other defendants' attack against Dallio when they responded to the alarm and arrived at Dallio's cell, it became clear when Dallio was restrained and became compliant that Gilmore and McGuoirk could and should intercede to prevent additional harm when they observed six officers punching and kicking a defenseless inmate. Additionally, as discussed *infra,* a reasonable person in the officer's position would be well aware that such a use of force was contrary to an individual's constitutional rights. Thus, crediting Dallio's evidence, by standing idly by, Gilmore and McGuoirk failed to take no reasonable steps to intervene and terminate the violation of Dallio's constitutional rights. This conclusion is further supported as to Gilmore in light of his position as a supervisor,

Therefore, defendants' motions for summary judgment on Dallio's claim against Gilmore and McGuoirk for failing to intervene should be denied.

### 3. Medical Treatment [10]

10    Liberally construing Dallio's complaint, he alleges deliberate indifference to his cardiac conditions as well. Defendants traditionally filed Dallio's medical record. Docket No. 78, Ex. G. There are no indications of deliberately indifferent to Dallio's treatment. In the four months following the incident, Dallio was examined solely for cardiac issues on twenty different occasions, underwent four diagnostic tests, signed four refusals of treatment, and had one referral to a specialist. Additionally, from June 2005 until June 2007, Dallio's medical records reflect at least sixty related examinations for cardiac care, six diagnostic examinations revealing unremarkable results, four specialist consultations, five trips for emergency medicine, and nine treatment refusals. These 600 pages of records confirm that defendants were actively involved in Dallio's care on a near-daily basis and were neither deliberately indifferent nor delayed any treatments. Any claims based on Dallio's alleged cardiac condition should, therefore, be denied.

The Eighth Amendment prohibition also extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care

should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*11**  Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Defendants correctly contend that, even viewing the facts in the light most favorable to Dallio, the bleeding in his right eye, bruises, and superficial abrasions were insufficient to constitute a serious medical condition either separately or in combination. In a recent decision in this district in another case, Dallio's Eighth Amendment claims for similar injuries sustained in another incident were deemed insufficient on a motion for summary judgment. *See Dallio v. Herbert,* No. 06–CV–118 (GTS/GHL), 2009 WL 2258964, at \*5 (N.D.N.Y. July 28, 2009) (granting judgment to defendants for lack of serious injuries where Dallio suffered black eyes, bruising in his abdomen and kidney area, kick marks to his abdomen, open lacerations and bruising on his knees, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers) (citing cases).

Even assuming that Dallio has raised a question of fact on this prong, he has still failed to prove deliberate indifference to that condition. Dallio received medical attention immediately after the incident, complaining of relatively minor injuries that only required cleansing with soap and water. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. Dallio disagreed with this course of treatment, but such disagreements are insufficient to sustain a constitutional violation. *Sonds,* 151 F.Supp.2d at 312.

Moreover, in the following ten days, Dallio was seen by the medical staff on eight of those days. Docket No. 84, Ex. E at 140–44. Thus, despite Dallio's conclusory allegations of a failure to provide medical treatment, the

record demonstrates that medical staff treated Dallio on a near-daily basis. Such involvement with an inmate's care is not indifferent. Additionally, examination of Dallio generally revealed that he was standing and waiting at his cell door, he ambulated without any difficulty, he appeared in no physical distress, and he had no problem speaking clearly, yelling, or waving his arms at medical staff to signify his displeasure. [11] *Id.* Such uncontradicted determinations by multiple individuals, both parties and non-parties to this action, belie Dallio's subjective and uncorroborated complaints of disabling pain and indifferent treatment. Additionally, Dallio was consistently offered pain medication to increase his level of comfort. On at least two occasions, Dallio refused this medication. Docket No. 83, Ex. E at 140. Dallio's voluntary actions in refusing the pain medication cannot be attributed to any alleged delay or interference by any defendant.

[11]    Any allegations that Dallio's progressive and frequent fits of rage were exaggerated or contrived are belied by the medical record which indicates at least twenty-seven instances from June 2005 until June 2007 where Dallio showed extreme anger and yelled at staff. Additionally, from prior to the incident until January 2004, there were seventeen similar instances where Dallio became argumentative and uncooperative with medical staff generally resulting in the termination of the examination.

 **\*12**  Furthermore, Dallio's contentions that he had injured his eye are not supported by any objective medical evidence. While it is undisputed that Dallio suffered from a reddened eye, the cause and timing of the irritation is immaterial to this claim, for medical staff noted and evaluated the condition and determined that it was not an emergency. Docket No. 83, Ex. E at 143. These findings were supported by the multiple record entries, by multiple medical staff, which agreed that there was no injury to the eye. Riley Decl. ¶ 6. No medical evidence has been proffered by Dallio to the contrary. Even if there was an injury and the multiple opposing medical conclusions were wrong, the misdiagnosis would, at worst, constitute negligence. *See Estelle,* 429 U.S. at 107. This is still insufficient to sustain a claim for deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Moreover, to the extent that Dallio contends that he should have been seen by a chiropractor or eye doctor, [12] such

contentions are also insufficient to support a constitutional claim. Docket No. 83, Ex. E at 143. An inmate has no right to a physician of his or her choosing. *See Dean v. Coughlin,* 804 F.3d 207, 215 (2d Cir.1986). Moreover, any decisions relating to the appropriateness or timing of a specialist consultation are within the purview of the medical staff and any disagreement the inmate has with the decision qualifies as a disagreement over treatment, which is not an actionable Eighth Amendment claim. *Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 312 (S.D.M.Y.2001).

[12]    Medical records indicate that Dallio had seen eye specialists on July 3 and October 9, 2003. Docket No. 83, Ex. E at 141–42. Additionally, records subsequent to the incident indicate an ophthalmology consult within a month of the incident as well as multiple examinations by medical staff over eye problems and broken glasses, glasses orders, and follow-up appointments and consultations. Therefore, there is no dispute in the record on this motion that Dallio's eyes were being treated in an appropriate manner and defendants' actions neither delayed treatment nor showed deliberate indifference to Dallio's treatment.

Accordingly, defendants' motion as to this claim should be granted as to Perrea and Riley.

### C. Conspiracy

Dallio alleges that all defendants conspired to violate his constitutional rights.

#### 1. § 1983

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d

Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

 **\*13** In this case, even construing the facts in the light most favorable to Dallio, he has failed to advance anything more than conclusory allegations of a conspiracy. Dallio fails to show specifically when, where, or how defendants came together and planned to assault him. Moreover, Dallio fails to show when or how multiple departments agreed, either expressly or implicitly, to collaborate with one another and independently perpetrate the alleged web of deceit by filing false incident reports, medical records, and investigations. Without anything more than a conclusory allegation that all defendants conspired with one another, Dallio's claims fall short of raising a material question as to whether defendants' actions constituted a conspiracy. [13]

[13]   Dallio relies on *Juan v. Rafferty,* 577 F.Supp. 774 (D.N.J.1984), to support the proposition that his assertions that all defendants filed false reports is sufficient to withstand the current motion. Dallio's reliance is misplaced. In *Juan,* (1) defendants filed a motion to dismiss as opposed to the present motion for summary judgement and (2) the litigation was in its infancy as discovery had not yet been completed. *Id.* at 778. Therefore, the pleadings were sufficient at that early stage to present a basis for a claim. *Id.* The present case is at a far different point. Discovery is now complete and actual evidence rather than allegations of agreements among multiple parties must be advanced. Like *Juan,* Dallio has survived the pleadings stage of the litigation. However, unlike *Juan,* allegations alone at this stage are insufficient as evidence must now be presented for the claim to withstand the current motion. As no evidence was provided, the claim fails to raise a material question of fact.

**2. § 1985**

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00–CV–3667 (RWS), 2001 WL 290051, at \*8 (S.D.N.Y. Mar.26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Dallio does not assert any facts giving rise to a conspiracy. First, Dallio vaguely assert conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Second, as discussed *supra,* there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Dallio of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion for summary judgment as to Dallio's claims of conspiracy should be granted.

**D. Bouchey and Gettman**

Defendant Andrew Bouchey was named in the complaint as a member of the response 20 team. Compl. (Docket No.

1) ¶ 22. However, the undisputed evidence shows that he was not personally involved in the incident. As such, no personal involvement has been shown and Bouchey is entitled to judgment on all claims against him. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotations and citations omitted).

**\*14** Similarly, defendant C.O. Gettman was identified in the complaint as the individual responsible for taking the photographs subsequent to the incident. Compl. ¶¶ 36–37. All submissions indicate without contradiction that the individual responsible for these photographs was named Clarke. *See generally* Docket No. 78, Ex. D at 7. As such, no evidence of any personal involvement has been shown with regard to Gettman either. Accordingly, he as well should be granted judgment. *Wright,* 21 F.3d at 501.

### E. Qualified Immunity

Defendants claim that even if Dallio's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if a plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

Here, the second prong of the inquiry need not be reached concerning Dallio's claims other than his Eighth Amendment excessive force and failure to intervene claims because, as discussed *supra,* accepting all of Dallio's evidence as true, he has not shown that any of the defendants in those claims violated his constitutional rights.

As to Dallio's excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9–10. Thus, accepting all of Dallio's allegations about the incident as true, qualified immunity cannot be granted to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, or Gilmore since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation.

**\*15** Accordingly, defendants' motion for summary judgment on this ground should be (1) granted in the alternative as to Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley, and (2) denied as to Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No.78) be:

A. **GRANTED** as to defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley as to all claims against them, and these defendants should be terminated from this action; and

B. **DENIED** as to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore as to Dallio's Eighth Amendment claims of excessive force and failure to intervene; and

2. The complaint be **DISMISSED** without prejudice as to defendant Smith pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

**Dallio v. Santamore, Not Reported in F.Supp.2d (2010)**

2010 WL 125774

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of*

*HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 125774

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Banks v. County of Westchester,  S.D.N.Y.,  March 9, 2016

2012 WL 4094196
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Woodrow FLEMMING, Plaintiff,

v.

Debbie KEMP; Jeffrey Hyde; George Waterson; Correctional Officer John A. Tatro; Correctional Officer Darrin C. Carrigeux; Correctional Officer Todd C. Manley; Leo Palmer; Correctional Officer Wayne I. Palmer; Correctional Officer Kevin Eddy; Correctional Officer Jerry J. Herbert; and Terry James, Defendants.

No. 09–CV–1185 (TJM/DRH).
|
Aug. 30, 2012.

**Attorneys and Law Firms**

Woodrow Flemming, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1**  Plaintiff pro se Woodrow Flemming ("Flemming"), an inmate in the custody of the New York State Department of Correctional and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that eleven DOCS employees [2] violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Second Am. Compl. (Dkt. No. 9). Presently pending are defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or summary judgment pursuant

to Fed.R.Civ.P. 56 [3] and Flemming's cross motion for summary judgment, also pursuant to Fed.R.Civ.P. 56. Dkt. Nos. 178, 179, 183. [4] Both motions are opposed. Dkt. Nos. 183, 186, 191, 192, 193. For the following reasons, it is recommended that defendants' motion be granted and Flemming's cross motion be denied.

[2]    Six other defendants were previ0usly dismissed. Dkt. No. 10.

[3]    The motion is made on behalf of all remaining defendants except Eddy, who has never been served with process or otherwise appeared in this case. *See* Dkt. Nos. 13, 15, 58 (at p. 3), 170 (at p. 7). This action should be dismissed without prejudice as to Eddy in accordance with Fed.R.Civ.P. 4(m) (requiring completion of service upon a defendant within 120 days).

[4]    As defendants have submitted materials beyond the face of the pleadings, it will be construed as a motion for summary judgment.

**I. Background**

The facts are related herein in the light most favorable to Flemming as the non-moving party. *See Sheppard v. Beerman,* 18 F .3d 147, 150 (2d Cir.1994).

**A. Procedural History**

On August 14, 2008, Flemming filed this action in the Western District of New York, naming 122 defendants for alleged violations of his First, Fourth, Sixth, Eighth, and Fourteenth Amendment rights. Dkt. No. 1. In an order dated December 10, 2008, the Western District concluded that Flemming's complaint failed to state a cause of action, but allowed him an opportunity to file an amended complaint and replead the action before dismissing the case. Dkt. No. 5.

On July 5, 2008, Flemming filed an amended complaint, naming 113 defendants for substantially similar violations under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments. First Am. Compl. (Dkt. No. 6). Flemming contended that (1) the general conditions he was exposed to in the Special Housing Unit ("SHU") [5] were unconstitutional (*Id.,* ¶¶ 27, 28, 33, 36, 42–44); (2) provision of a restricted diet

of loaf and cabbage was against his Eighth Amendment rights (*Id.,* ¶¶ 28, 60); (3) disciplinary hearings were conducted improperly leading to wrongful deprivations of privileges and good time credits (*Id.,* ¶¶ 30, 52); (4) he was never provided with a rule book (*Id.,* ¶ 56); (5) the general conditions of confinement were below constitutional standards (*Id.,* ¶ 31); (6) defendants conspired and retaliated against him for filing grievances and lawsuits (*Id.,* ¶¶ 32, 37–38, 59, 62); (7) being housed in SHU while on a medical machine was unconstitutional (*Id.,* ¶ 33); (8) denial of his cane and wheelchair were in contravention of the Eighth Amendment (*Id.,* ¶ 36); (9) transfer from the Regional Medical Unit to Upstate SHU [6] was retaliatory (*Id.,* ¶¶ 38, 40, 70); (10) he was subjected to chemical agents and a use of force on September 5, 2005 which were both in violation of his Eighth Amendment rights (*Id.,* ¶¶ 41, 62, 70, 72); (11) he was the victim of a sexual assault (*Id.,* ¶ 55); and (12) his legal work was seized which interfered with his constitutional right to access the courts (*Id.,* ¶ 58).

[5]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[6]     "Upstate is a maximum security correctional facility comprised exclusively of ... SHU ... cells in which inmates are confined, generally, for twenty three hours each day to serve out lengthy disciplinary confinements for serious violations of prison rules." Hyde Decl. (Dkt. No. 178–3) ¶ 5.

**\*2**  Pursuant to an Order dated March 31, 2009, the Western District ruled that "[a]ll of [Flemming's] claims **except** the claim regarding the September 5, 2005 cell extraction allegedly involving use of a chemical agent are dismissed with prejudice." Dkt. No. 8 at 7–8 (emphasis in the original). Moreover, Flemming was "advised that an amended complaint is intended to **completely replace** the prior complaint ... and thus ... renders any prior complaint of no legal effect." *Id.* at 8 (internal quotation marks and citations omitted) (emphasis in the original). Lastly, Flemming was "granted leave to file a Second Amended Complaint regarding **only** his claims of excessive force during the cell extraction ... on September 5, 2005." *Id.*

at 9 (emphasis in the original). Further amendment of the additional First, Fourth, Eighth, and Fourteenth Amendment claims were determined futile since Flemming continued to proffer vague and conclusory allegations which failed to state a claim, despite a prior opportunity to amend his complaint, as well as due process claims and events occurring prior to August 19, 2005 being time barred and due process claims being uncognizable. *Id.* at 3–6. The court specifically held that Flemming's subsequent proposed amended complaint would be limited only to the "circumstances surrounding the cell extraction and who [Flemming] intends to hold liable....," (*Id.* at 8) dismissing with prejudice any other claims Flemming previously asserted. *Id.* at 6–9.

Flemming filed a Second Amended Complaint, naming the present defendants, on April 6, 2009. Second Am. Compl. Similar to the complaints filed before it, Flemming contends that he was subjected to chemical agents as well as excessive force in violation of his Eighth Amendment rights. Second Am. Compl. at 7–9. Flemming also asserted claims of retaliation, complaints about his conditions of confinement, complaints about the conditions of SHU including deprivation of his medical machine, deprivation of privileges, and placement on a restricted diet, unconstitutional searches and seizures, and defective prison disciplinary procedures and hearings. *Id.* at 8–10, 12–13, 15. By Order dated June 12, 2009, the Western District dismissed the claims against the supervisory defendants and directed service. Dkt. No. 10 at 5–6. In an order dated September 21, 2009, the Western District transferred the case to the Northern District. Dkt. No. 18.

**B. September 5, 2005** [7]

[7]     The submissions of both Flemming and defendants include multiple copies of identical papers dealing with the use of force report, unusual incident report, inmate injury report, subsequent photographs, disciplinary transcripts, and medical health records. For ease and efficiency, citation will be made to the documents from defendants' submissions.

Flemming suffers from glaucoma for which he took daily eye drops. Waterson Decl. (Dkt. No. 178–4) ¶ 6; Flemming Dep. (Dkt. No. 178–21) at 15–16. "The policy at Upstate at the time was not to allow eye drop vials and dispensers to be kept in cells as they were increasingly used for purposes of committing aggravated harassments and unhygienic acts

toward staff such as spraying or throwing or urine and other liquid substances." Waterson Decl. ¶ 7. Flemming was informed of this policy on September 1, 2005 and provision of his eye drops was "made one-on-one administered (as opposed to self-carry and allowed to be retained in cell) ...." Waterson Decl. ¶ 8; *see also* Dkt. No. 179 at 6. Flemming provided his eye drops to security staff as required. Waterson Decl. ¶ 8.

**\*3** At approximately 6:45 a.m. on September 5, 2005, defendant nurse practitioner Waterson approached Flemming's cell and requested return of his eye drops which had been given to him during the morning medication round. Waterson Decl. ¶ 9; DVD 1 at 6:42 [8]. Waterson repeatedly requested return of the eye dropper, as it was no longer allowed to be retained in Flemming's cell, but Flemming refused and became argumentative. Waterson Decl. ¶ 9; Dkt. No. 179 at 9; DVD 1 at 6:42. Defendant Eddy, who was accompanying Waterson on rounds, also approached the window and unsuccessfully ordered the return of the eye dropper. Waterson Decl. ¶ 10; DVD 1 at 6:42–43 (showing exchange between Eddy explaining that all medical wants was the eye dropper back and that Flemming needed to follow a direct order, and Flemming, who was continually refusing). This became the basis of a misbehavior report, authored by Eddy, which charged Flemming with failing to follow direct orders and breaking medical and property protocols. Waterson Decl. ¶¶ 11–13. Eddy then notified defendant Sgt. Hyde about the problem. Hyde Decl. (Dkt. No. 178–3) ¶ 15. Hyde visited Flemming at his cell at approximately 8:44 a.m., again seeking the return of the eye dropper. Hyde Decl. ¶ 15. Hyde "instructed [Flemming] repeatedly to either hand over the medications or prepare to exit [the] cell for a search [and] ... Flemming continue to refuse ... and became increasingly argumentative." Hyde Decl. ¶ 15.

[8] A videotape (hereinafter "VHS") and two DVDs were traditionally filed with the Court with defendants' motion. Dkt. No. 178–5.

Refusal to follow orders and interference with staff cannot be tolerated within a maximum security facility as they constitute a threat to safety and security ... Nor can retention of unauthorized items be allowed. As relevant here, the policy at Upstate was not to allow the eye drop vials ... to be kept in cells as they were being increasingly used for purposes of committing aggravated harassments and unhygienic acts towards staff such as spraying of urine and other substances. Overtly disobeying orders also has the

tendency to incite other inmates towards misbehavior and possible violence.

Hyde Decl. ¶¶ 19–21. Flemming's disciplinary history is replete with violations for "creating disturbances, interfer[ing] with staff, refus[ing] to follow direct orders, failure to submit to search/frisk, violent conduct and harassment towards staff." Hyde Decl. ¶ 23.

When an inmate refused to return unauthorized items and submit to a search, it was within the discretion of the correctional staff to determine how to best gain the inmate's compliance while ensuring the safety of the inmate and officers. Hyde Decl. ¶ 24. Because entering the cell with physical force was inherently dangerous, DOCCS approved the use of chemical agents to allow officers to gain entry into the cell without resorting to physical contact. Hyde Decl. ¶¶ 25–27. These chemical agents, colloquially known as tear gas, could be deployed in non emergent situations after the acquisition of medical clearance. Waterson Decl. ¶ 16. "[T]ear gas[ ] is an aerosol irritant affecting the skin and mucus membranes and can cause tearing and uncontrolled shutting of the eyes, burning sensations, coughing, excess nasal and mouth mucus discharge, difficulty breathing, vomiting and prostration." Waterson Decl. ¶ 17. The effects "usually subside quickly after removal of the person from the area where [the tear gas] is dispersed and decontamination of the person." Waterson Decl. ¶ 18.

**\*4** Watertson was contacted by defendant Hyde later that morning, "seeking medical clearance for possible use of chemical agents against inmate Flemming due to his refusal to return the eye drops and/or submit to a search of his cell." Waterson Decl. ¶ 15. Waterson reviewed Flemming's medical chart and concluded that he did not have "any serious respiratory or cardiac ailment, allergies or contact lenses that would be a contraindication for use of chemical agents." Waterson Decl. ¶ 19. Waterson did note that Flemming had mild asthma, which was treated as needed with an inhaler, but "has consistently good oxygen saturations ... and only one episode of wheezing in the weeks prior ....," Thus, the gas would not trigger an asthma attack. *Id.* ¶ 20. Waterson's review of Flemming's chest x-ray from April 26, 2005, which indicated an enlarged heart also "confirmed the absence of any significant cardiac or respiratory condition ....," as there were no signs of abnormality or disease. *Id.* ¶ 21; *see also* Dkt. No. 179 at 39 (chest x-ray from August 2005, comparing findings with April 26, 2005, showing enlarged heart but no abnormalities or evidence of disease). Moreover, Flemming's prescription for nitroglycerin had also been discontinued as he had no cardiac history. Waterson Decl. ¶ 22. Lastly,

while Flemming had sleep apnea and used a machine at night, Waterson did not view that as a contraindication. *Id.* ¶ 23. Therefore, Waterson determined, in his professional judgment, that deployment of the gas "would not pose any undue health risk or substantial risk of serious harm ...." *Id.* ¶ 20. Accordingly, Waterson deemed Flemming medically cleared. *Id.* ¶ 24; Dkt. No. 178–6 at 4; Dkt. No. 179 at 9. Administratively, defendant Kemp was notified and approved the use of chemical agents. Dkt. No. 178–6 at 4.

In compliance with the directive, attempts were made to contact representatives from both ministerial services and guidance/counseling, but no staff were available on a holiday weekend. Hyde Decl. ¶ 30. At approximately 10:37 a.m., Corrections Officer King began videotaping with a handheld video camera. [9] Dkt. No. 178–7 at 8; VHS. Officers Canning and Salls approached the cell and Canning gave Flemming another final and direct order to submit to a search, but Flemming refused to comply. Dkt. No. 178–6 at 4; DVD 2 at 10:45. Hyde also gave approximately six orders after Canning requested Flemming's cooperation with turning around, backing up to the cell door, and placing his hands through the feed-up slot so that restraints could be applied and he could exit the cell. Hyde Decl. ¶ 34; Dkt. No. 178–7 at 7; DVD 2 at 10:46–47. Hyde also warned that chemical agents would be applied if Flemming continued his non-compliance. Hyde Decl. ¶ 34.

[9]     The hand held camera ran out of batteries prior to Flemming being returned to his cell, so those events were captured on the still cameras located in the facility. Dkt. No. 178–7 at 8.

In his complaint, Flemming contends that he was lying in his bed, receiving treatment from his machine, when Hyde administer the chemical agents into his cell, entered the cell, and began beating him. Second Am. Compl. at 8. Conversely, defendants' assert that at 10:48 a.m., Hyde administered the first application, two one-second bursts, of gas through the feed-up slot. Hyde Decl. ¶ 36; Dkt. No. 178–6 at 1, 4; Dkt. No. 178–7 at 7; VHS at 10:48; DVD 2 at 10:47. Flemming was then repeatedly told, and continually refused, to turn around and place his hands through the slot. Hyde Decl. ¶ 37; VHS at 10:48–50. Another application of two, one-second bursts of gas was applied through the hatch at approximately 10:50 a.m. Hyde Decl. ¶ 38; Dkt. No. 178–6 at 1, 4; Dkt. No. 178–7 at 7; DVD 2 at 10:49. Altogether, Flemming was exposed to the gas for approximately seven minutes. Hyde Decl. ¶ 42; Waterson Decl. ¶ 26. Hyde continued to order

Flemming to turn around and place his hands through the slot, which Flemming finally did at approximately 10:52 a.m. Hyde Decl. ¶¶ 39–40; Dkt. No. 178–7 at 7; VHS at 10:53; DVD 2 at 10:52. Restraints were placed on Flemming's wrists by Corrections Officer Tulip, and he and Corrections Officer Brousseau guided Flemming out of his cell. Hyde Decl. ¶ 43; Dkt. No. 178–6 at 1; Dkt. No. 178–7 at 7, 9, 10; VHS at 10:53. Flemming was removed from his cell at approximately 10:55 a.m., without the officers ever entering his cell. Hyde Decl. ¶¶ 41, 43; VHS at 10:54–55; DVD 2 at 10:53–54.

**\*5** Conversely, Flemming testified that multiple officers, including Palmer, Tatro, Manley, Corrigaux, and Eddy, beat and kicked him upon entering his cell. Second. Am. Compl. at 8–9; Flemming Dep. at 25–28, 37–38. Flemming stated that he was handcuffed in his cell, not through the feed up slot, and that he sustained injuries to his legs, ribs, and hips. Flemming Dep. at 26–28. The officers contend, and the video demonstrates, that at the time Flemming was restrained and removed from his cell he was not beaten, kicked, dragged, or otherwise assaulted by any of the staff. Hyde Decl. ¶ 43; VHS at 10:54–55; DVD 2 at 10:53–54.

Flemming was then placed against the opposite wall for a pat frisk, conducted by Officer Tulip. Hyde Decl. ¶ 44; Dkt. No. 178–7 at 10. Flemming was then escorted to the decontamination room by Officers Tulip and Brousseau, shouting to the other inmates as he left the cell block that he "was O.K." and that "they haven't hurt [him]." Hyde Decl. ¶¶ 44–45; Dkt. No. 178–7 at 9, 10; DVD 2 at 10:55–57. Waterson arrived while Flemming was being escorted to decontamination. Waterson Decl. ¶ 25. Waterson heard Flemming stating to the other inmates in SHU that he was fine and had not been injured. Waterson Decl. ¶ 25. Video captured the same. VHS at 10:55–56. Flemming was taken immediately to the decontamination room where he was washed and his T-shirt was removed by defendant Eddy, despite Flemming's continued declarations that he was fine and did not require a decontamination shower. Hyde Decl. ¶¶ 47–48; Dkt. No. 178–7 at 7, 13. This too is confirmed by video. VHS at 10:57–58.

After decontamination, Flemming was placed in a holding area where he was maintained upright first by Officers Tulip and Brousseau, and next by Officers Rushlow and Paquin. Hyde Decl. ¶ 49; Dkt. No. 178–7 at 7, 9–12; VHS at 10:58–59; DVD 2 at 10:58. After Flemming's slippers were removed, a towel was placed under them so that his feet would not become cold. Hyde Decl. ¶ 50; VHS at 11:00;

DVD 2 at 10:59. After decontamination, Waterson entered the holding cell around 11:00 a.m. to perform a visual inspection of Flemming which showed "no obvious signs of physical injury or distress." Waterson Decl. ¶ 28; *see also* Dkt. No. 178–6 at 2, 3; Dkt. No. 179 at 10; VHS at 11:00; DVD 2 at 11:00. Flemming disputes this, claiming injuries were reported to Waterson about his arms, legs, ribs, and hips and difficulty breathing, but were never recorded. Flemming Dep. at 31–33. Waterson returned six minutes later and took Flemming's "blood pressure (which was normal), assessed his breathing (also normal) and listened to chest sounds through a stethoscope (which were clear)." Waterson Decl. ¶ 29; *see also* Dkt. No. 178–6 at 3; VHS at 11:06–07 (capturing verbal report by Waterson of Flemming's vitals); DVD 2 at 11:05–06 (same). Flemming did complain of chest pain, but Waterson "attributed ... [the] complaints ... to be temporary irritation of his lungs due to exposure to the chemical agents that would resolve quickly." Waterson Decl. ¶¶ 29, 32; *see also* Dkt. No. 178–7 at 19 (inmate injury report). Flemming did not suffer any respiratory attack or symptoms from the gas and was subsequently returned to his cell. Waterson Decl. ¶¶ 32–33. Flemming disagrees, contending that he was wheezing and breathing hard. Flemming Dep. at 32–34. Video does not show this, demonstrating that throughout the escort and time in the holding cell Flemming was conversing with various officers in a loud, clear voice without any indications of wheezing or shortness of breath. Photographs were also taken of Flemming by defendant Paler and Sgt. Kourofsky. Hyde Decl. ¶ 54; Dkt. No. 178–7 at 30–33.

**\*6** Throughout the morning and during his deposition testimony, Flemming continually denied possessing unauthorized medicine and specifically his eye dropper. Hyde Decl. ¶ 56 Flemming Dep. at 16–19, 22–23, 36. As Flemming was waiting in the holding area, he admitted to the possession, and described to the officers the location, of the eye dropper. Hyde Decl. ¶ 56; *see also* VHS at 11:11, 11:15–16 (reporting to officers that the bottle was in his lower bunk, under the green spread); DVD 2 at 11:10, 11:13–15 (same). Flemming's cell was searched by Eddy and James and the eye dropper was recovered. Hyde Decl. ¶ 57; Dkt. No. 178–6 at 4; Dkt. No. 178–7 at 7. Flemming was returned to his cell at approximately 11:20 a.m. by Officers Rushlow and Paquin and he entered the cell alone and without incident. Hyde Decl. ¶¶ 58–60; Dkt. No. 178–7 at 7, 9–12; DVD 2 at 11:20–21.

After Flemming was back in his cell, Waterson, Hyde and Sgt. Kourofsky went to see him. Waterson Decl. ¶ 33; Hyde Decl. ¶ 61; DVD 1 at 11:26. Flemming's only complaint was that his wrists were sore. Waterson Decl. ¶ 34; Hyde Decl. ¶ 61. Flemming held his wrists up so that Waterson could examine them and Waterson "saw no obvious injuries (no cuts, bleeding, swelling or redness) and also observed that he was able to move his hands and wrists freely." Waterson Decl. ¶ 34; *see also* Hyde Decl. ¶ 61; DVD 1 at 11:27. Flemming's testimony disputes this as well, claiming bruises and lacerations to his wrists due to the application of restraints. Flemming Dep. at 46–47. Photographs were taken. Waterson Decl. ¶ 34; Hyde Decl. ¶ 61; Dkt. No. 178–7 at 15, 34; DVD 1 at 11:27. Waterson attributed the pain to the fact that Flemming was restrained for half-an-hour, but did not feel that further treatment was warranted. Waterson Decl. ¶ 35.

Overall, Waterson found that Flemming tolerated the tear gas relatively well as he "was talking clearly, breathing easily without labored breaths or wheezing, was able to take deep breaths in response to my commands, seemed relaxed ..., had no trouble seeing or complaints about his eyes, ... and he no longer had any excessive mucus or ... discharge." Waterson Decl. ¶ 36. Flemming's vitals were also stable. Waterson Decl. ¶ 36. There were no signs of injuries consistent with an assault. Waterson Decl. ¶ 37.

At that point, Hyde issued a second misbehavior report charging Flemming with the failure to follow a direct order. Hyde Decl. ¶¶ 63–64; Dkt. No. 178–7 at 18 (misbehavior report). Additionally, the results of the cell search uncovered the location of the eye dropper bottle as well as excess law library materials. [10] Hyde Decl. ¶ 65; Dkt. No. 178–7 at 17, 20–21 (contraband receipt). James removed these papers from the cell, placed them on a cart, and confiscated it pending the subsequent disciplinary proceeding. Dkt. No. 178–7 at 16–17 (misbehavior report). While defendant James was separating the aforementioned contraband papers from those which could be properly returned to Flemming, Flemming began to use foul language towards James and threatened to have intercourse with James' wife. Dkt. No. 178–7 at 16–17 (misbehavior report); DVD 1 at 11:37–39. James then issued a third misbehavior report for various infractions including threats, interference, and harassment. Dkt. No. 178–7 at 16–17 (misbehavior report).

[10]    Flemming contends that these documents and decisions were being used to chalenge his criminal conviction. Flemming Dep. at 64–67, 71–72.

**\*7** Officers Palmer, Manley, Tatro, Corrigeux and, recently promoted, Sgt. Hebert are all named as defendants for

events that allegedly occurred on September 5. Hyde Decl. ¶ 74. However, none were involved with the deployment of chemical agents, extraction, decontamination, cell search, or subsequent return of Flemming. Hyde Decl. ¶ 74. In fact, Manley did not begin working at Upstate until November 2005 and Tatro and Corrigeux were on vacation on that date. Hyde Decl. ¶ 75; Dkt. No. 178–14 at 1–2 (showing vacation time taken on September 5 by Corrigeux and Tatro), 3 (reassignment papers for Manley indicating employment to begin at Upstate in November). Hebert and Palmer were assigned to duties in other locations at Upstate on September 5. Hyde Decl. ¶¶ 77–78; Dk. No. 178–16 at 4–5 (showing Herbert stationed in Building 8); 6–7 (showing Palmer stationed in Building 10). Flemming's testimony indicates that all of these defendants were involved in the assault, restraint, or escort of Flemming on September 5. Flemming Dep. at 51–60.

### C. Subsequent Medical Care

Flemming requested an examination on September 6, 2005, but when Waterson saw Flemming he complained only of fungus on his hands and general aches and pains. Waterson Decl. ¶ 38; Dkt. No. 179 at 10–11. Flemming was given over-the-counter pain relief and anti-inflammatory cream. Waterson Decl. ¶ 38; Dkt. No. 179 at 11. These complaints, to Waterson, appear completely unrelated to the events which occurred on September 5. Waterson Decl. ¶ 39. Flemming disagrees and testified to the fact that he saw a medical professional the following day and was complaining about his wrist, hand, and other injuries from the use of force. Flemming Dep. at 48–49.

Flemming was seen again on September 8, complaining of pain in his left shoulder and requesting Tylenol. Dkt. No. 179 at 11. The range of motion in Flemming's shoulder was good, the problem deemed chronic, and pain medication was provided. Id. Flemming was seen again by Waterson on September 10, 2005, requesting anti-fungal cream and acetaminophen, both of which were issued to him. Waterson Decl. ¶ 41; Dkt. No. 179 at 12. On September 13, 2005, Flemming was seen by another nurse for wheezing and shortness of breath which were both improved with use of his inhaler. Waterson Decl. ¶ 42; Dkt. No. 179 at 12. These complaints were consistent with those made in August (Dkt. No. 179 at 5), related to Flemming's asthma, as opposed to "an exacerbation caused by the chemical agents [because i]f there had been any respiratory distress related to the chemical

agents, it would have been immediate and persistent and would not have arisen for the first time [eight] days later." Waterson Decl. ¶ 43.

On September 23, 2005, Flemming complained of wrist pain for the first time since the alleged use of force, but Flemming also stated "that the pain had been present since June." Waterson Decl. ¶ 45; see also Dkt. No. 179 at 14. X-rays of Flemming's wrists were also taken in October 2005 and showed normal findings without evidence of any fractures or abnormalities. Waterson Decl. ¶ 46; Dkt. No. 179 at 22, 41. On September 30, 2005, Flemming also underwent x-rays of his left knee and hip which showed only degenerative changes. Dkt. No. 179 at 40. Flemming also had chest x-rays again in December 2005 which continued to show normal findings. Waterson Decl. ¶ 44; Dkt. No. 179 at 42. On September 30, Flemming made complaints of hip and knee pain, but reported that they were due to a fall and not an alleged use of force. Dkt. No. 179 at 16. Flemming contends that o n October 16, he was involved, and sought treatment for, another use of force giving him lower back, temple, head, and right elbow pain. Dkt. No. 179 at 21.

### D. Disciplinary Proceedings

**\*8** As a result of the three misbehavior reports Flemming received, he underwent a combined Tier III [11] hearing which concluded on October 11, 2005. Dkt. No. 178–9. At the conclusion of the hearing, Flemming was found guilty of all the charges except one, and was sentenced to six months confinement in SHU and six months loss of various privileges and good time credits. Dkt. No. 178–9 at 58–59; see also Dkt. No. 178–8 at 6–7. On November 22, 2005, the Commissioner affirmed the disciplinary disposition. Dkt. No. 178–8 at 1.

[11]     DOCCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).

### II. Discussion

Flemming contends (1) his First Amendment rights were violated when defendants engaged in a retaliatory transfer and

denied his access to courts by removing legal papers that were in his cell and confiscated pursuant to a search; (2) his cell was searched in violation of his Fourth Amendment rights; (3) his Eighth Amendment rights were infringed when he was subjected to chemical agents given his medical history, subjected to excessive force, and forced to live in subpar conditions of confinement in SHU; and (4) his Fourteenth Amendment rights were violated when he was subjected to unconstitutional disciplinary proceedings. Defendants move for summary judgment contending that (1) Flemming's claims other than those arising from the use of excessive force on September 5, 2005 are barred by the law of the case; (2) Flemming's use of force claim is barred by res judicata; (3) Flemming's constitutional claims are meritless; and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56; Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On

occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Law of the Case

**\*9** "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....") (internal quotation marks and citations omitted)). Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided." *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted).

In the present action, Flemming previously filed his First Amended Complaint alleging a host of First, Fourth, Eighth, and Fourteenth Amendment violations. In no uncertain terms, the Western District ruled that the only surviving claims were Flemming's Eighth Amendment claims occurring on September 5, 2005. Every other constitutional claim was dismissed with prejudice. Furthermore, contemplation of an additional opportunity to amend was also addressed and deemed fruitless. As Flemming's additional allegations regarding the other constitutional violations have already been decided, they need not be revisit at this later stage of litigation. Accordingly, the law of the case bars reexamination of any claims except those under the Eighth Amendment for the events of September 5.

Therefore, defendants' motion on this ground as to all claims except those under the Eighth Amendment for the events of September 5, 2005 should be granted.

### C. Res Judicata

"Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen,* 449 U.S. at 94 (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach by which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Burgos,* 14 F.3d at 790 (citations omitted).

Res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Burgos,* 14 F.3d at 790 (citing *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986)). "Thus, where a plaintiff was precluded from recovering damages in the initial action by formal jurisdiction or statutory barriers, not by plaintiff's choice, a subsequent action for damages will not normally be barred by res judicata even where it arises from the same factual circumstances as the initial action." *Id.* Even if res judicata is inapplicable to a § 1983 action because the state court forum was incapable of awarding the requested relief, it does not preclude the application of collateral estoppel. *See Phifer v. City of New York,* 289 F.3d 49, 56 (2d Cir.2002).

 **\*10** Defendants' contend that a prior grant of a motion to dismiss in *Flemming v. Goord,* No. 06–CV–26 (TJM/ DRH) (N.D.N.Y.) (Dkt. No. 178–17) (hereinafter "the prior action") triggers the bar of *res judicata* in the present case and precludes further review of the events occurring on September 5, 2005. Defs. Mem. of Law (Dkt. No. 178–22) at 16. In the prior action, Flemming's complaint identified defendants that "were not included in the voluminous incident reports submitted and relied upon by Flemming [and] Flemming did not use those reports to amend his complaint properly and to name the proper parties from the documents upon which he relied." Dkt. No. 178–7 at 7. Accordingly, since it was impossible for the court to "determine what, if anything ... any person named in the second amended

complaint allegedly did, or failed to do ..." the motion to dismiss was granted. *Id.* at 8.

Flemming's prior action specifically referenced the use of force and use of chemical agents on September 5 and was dismissed with prejudice. Dkt. No. 178–17 at 8. This serves as a final adjudication on the merits. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n. 3 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.' ") (citations omitted). While some of the proper defendants were named in the instant case, and none of the proper defendants were named in the prior action, the underlying nucleus of operative facts remains the same. Flemming was the plaintiff in both actions. Moreover, all named parties are related, could have, and should have been named in the prior action when the same constellation of events surrounding September 5 was initially pled.

Accordingly, defendants' motion on this ground should be granted.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth

Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 1178 (2010) ("The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de *minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*11** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

Flemming's version of events claims that numerous officers entered his cell, beat him, dragged him from his cell, beat him again, and restrained him. Flemming's version is untenable given the affidavits of the defendants which were fully supported by the video evidence, captured by multiple cameras throughout the facility. The video evidence shows that Flemming was ordered by multiple individuals, on multiple occasions, to produce the eye dropper which was ultimately found in his possession. Flemming was also ordered to turn around and place his hands out of the feed up slot so that he could be restrained and removed from his cell for a search. This request was given dozens of times and Flemming continually failed to comply. As the time passed, the other inmates on the tier also became agitated further compounding the potential security issues. After a thorough

medical examination and clearance, Flemming was subjected to less than eight minutes of tear gas and was removed from his cell. The video shows that no officers entered the cell, no one beat or dragged Flemming as he left on his own accord, and as Flemming was escorted from the tier he was yelling that he was unhurt and had not been injured. Flemming was decontaminated, again stating to officers that this was unnecessary and he was unhurt. Flemming was visually inspected by medical, who insured and verbally reported that his vitals were stable, and photographed. Flemming then told the officers where the contraband was located, in direct contravention of his deposition testimony, and the officers secured the contraband. Flemming was then returned to his cell without incident.

The Supreme Court has held that

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment ... Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

**\*12** *Scott v. Harris,* 550 U.S. 372, 380–81 (2007). Clear videotape evidence has been relied upon in this Circuit, and District, to grant motions for summary judgment where the use of force, including chemical agents, was warranted and reasonable, despite contradictory and conclusory statements proffered by the inmate plaintiff. *See Johnson v. Woods,* No. 07–CV–1018 (DNH/DRH), 2010 WL 2039164, at \*14–16 (N.D.N.Y. Mar. 2, 2010) (granting motion for summary judgment and dismissing use of force claims for extraction and use of chemical agents based upon defendants' submissions which were confirmed by video evidence) (Dkt. No. 178–23 at 46–64); *Green v. Morse,* No. 00–CV–6533–CJS, 2009 WL 1401642 (W.D.N.Y. May 18, 2009) (granting summary judgment and dismissing use of force claims regarding cell extraction and chemical agents based on video

footage) (Dkt. No. 178–23 at 23–37); *Lipscomb v. Vann,* No. 02–CV–596 (GLS/DEP) at 17 (holding that dismissal was appropriate in an excessive force case using chemical agents where the "written and visual accounts [via videotape] ... are lacking in any evidence from which a reasonable factfinder could conclude ... that excessive force was applied to carry out the mission of removing Lipscomb from his cell against his will.") (Dkt. No. 178–23 at 65–92). In this case, there is no possibility that a reasonable juror could ever believe Flemming's recitation of the events surrounding September 5.

Moreover, evaluating Flemming's contentions in light of the *Scott* factors compels a the sameconclusion. First, Flemming suffered no severe injury during the course of the extraction or exposure to the chemical agents. Flemming's complaints were of chest pain, which Waterson attributed to the brief exposure to tear gas. Flemming's vitals were promptly checked after the use of chemical agents and he was determined to be stable. He was speaking clearly and was not wheezing or experiencing an asthma attack. This was further corroborated by his medical records which indicated his lungs were clear and that in the days following September 5 he was not treated for any signs or symptoms of respiratory or cardiac distress.

However, a serious injury is only a factor in the analysis. A *de minimus* injury may still survive summary judgment if there was a malicious use of excessive force. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513 (2010) (granting certiorari for an Eighth Amendment case which was dismissed based upon the inmate's *de minis* injury without discussion or regard for the fact that "injury suffered ... is one factor ... [yet] it is [force] that ultimately counts," in determining whether excessive force was used). Maliciousness is determined by the five factor test enumerated above, in *Scott.* Accordingly, after applying such a test in light of the record and videos, no reasonable person could conclude that defendants' actions were malicious or wanton rather than necessary to uphold discipline and ensure safety.

 **\*13** The first factor militates in favor of defendants. As previously discussed, Flemming did not suffer from sufficiently serious injuries as a result of the extraction. The defendants' declarations and video tape all show that Flemming was agitated and yelling.

The second and fourth factors also weigh in favor of defendants. Multiple defendants and unnamed corrections officers attempted multiple times to persuade Flemming

verbally to return the eye dropper bottle or peacefully leave his cell for it to be searched. Defendants attempted to call in counsel from the ministerial or guidance services, but those individuals were unavailable probably due to the holiday weekend. When it was clear that Flemming was not going to comply with their repeated orders, or voluntarily leave his cell, requests were made for the deployment of chemical agents so that no physical force would be necessary to enter or restrain Flemming. Flemming's continued non-compliance posed a serious threat to defendants' health and safety. As the situation progressed, it was clear that other inmates were becoming agitated by the increased levels of yelling and noise on the tier.

The third factor, the amount of force used in relation to the need, also supports defendants' motion for summary judgment. After approximately four hours and three separate trips by multiple officers attempting to persuade Flemming to comply, defendants resorted to the introduction of gas into the cell. When the gas was deployed, Flemming remained non-compliant, yelling and refusing to follow direct orders. When Flemming did finally comply, no further gas was dispensed into the cell, he was restrained through the feed up slot, immediately removed from his gas filled cell, pat frisked, and taken to the decontamination room.

Lastly, as previously discussed, the record undeniably shows defendants' attempts to temper and diffuse the situation far before the suggestion of chemical agents. Flemming's repeated refusals indicated that he was not willing to comply with the direct orders. This was inciting the other inmates. Additionally, Flemming was refusing to return his eye dropper which led officers to be at risk for harassment and unhygienic acts. Defendants were charged with running a correctional facility, ensuring the health and safety of both inmate and officers alike. Defendants' declarations and the facility video tapes and DVDs fail to raise any question of material fact that defendants could have pursued a different option or that their actions were not reasonably calculated to ensure safety.

Accordingly, defendants' motion should be granted on this ground.

### 2. Use of Chemical Agents

### a. Excessive Force

2012 WL 4094196

For the same reasons articulated *supra,* Johnson's allegations that the use of chemical agents was excessive force are also insufficient to raise any material issue of fact. First, the use of chemical agents alone does not represent "malicious or sadistic" actions. *Combs v. Wilkinson,* 315 F.3d 548, 557 (6th Cir.2002) (citations omitted). Second, the use of such chemicals did not cause any harm or pain to Flemming, as noted by his statements, vitals, and subsequent medical records. Third, the introduction of gas was appropriate and necessary given Flemming's repeated non-compliance which had unfolded and increased throughout the hours as defendants attempted to obtain his cooperation.

### b. Deliberate Indifference

**\*14** Flemming also contends that Waterson was deliberately indifferent to his medical needs, particularly his pulmonary disease, asthma, and sleep apnea, in medically clearing Flemming pursuant to the request to deploy chemical agents and his subsequent care.

The Eighth Amendment prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Flemming fails to establish that Waterson was deliberately indifferent in either regard. First, Waterson completed a detailed assessment of Flemming's medical history and current condition prior to deeming him medically fit to receive the tear gas. Waterson contemplated his diagnoses and various radiology and test reports which indicated that Flemming had good oxygen saturations, no cardiac or respiratory conditions, abnormalities or diseases, and no general contraindications based on the treatments, including the sleep apnea machine, that Flemming was receiving. Waterson also noted that Flemming was no longer receiving nitroglycerin, which further corroborated the absence of any cardiac concerns. Such detailed examination and explanation of Flemming's medical conditions refutes claims of deliberate indifference, conversely showing careful inspection and consideration prior to providing the necessary medical clearance.

**\*15** Further, the treatment provided to Flemming immediately after the deployment of the chemical agents also fails to demonstrate deliberate indifference. Waterson's declaration establishes that the effects of tear gas are temporary and quickly alleviated with removal from the gassed area and decontamination. The defendant officers immediately restrained and removed Flemming from his cell the moment he complied with their directives to turn and place his hands out of the feed up slot. The officers also escorted Flemming directly to the decontamination room, providing him with a shower and removing his clothing despite Flemming's uncontroverted statements that he was unharmed.

Minutes after Flemming was removed from his cell, Waterson arrived to do a visual inspection and take Flemming's vitals. Both evidence from the video and corresponding medical records indicate that Flemming's vitals were stable and his lungs were clear. Flemming did complain of chest pains, but Waterson explained that they were a temporary irritation from the gas exposure. Such contentions are further supported by the medical records in the subsequent days which showed Flemming reporting to sick calls, but not complaining of specific pain or respiratory difficulties. Such notations contradict claims of serious medical need. Flemming was treated with pain medication and cream for his generalized complaints, none of which seem reasonably related to the events of September 5. Such treatment refutes any claims of deliberate indifference. Additionally, to the extent that there were later injuries complained of, specifically Flemming's wrist and asthma, they were immediately treated, occurred at a time too distant to be categorized as an exacerbation of any alleged injury occurring on September 5, and were attributed to other preexisting causes.

Accordingly, defendants' motion on this ground should be granted.

### E. Personal Involvement

Defendants contend that Flemming has failed to establish that Palmer, Manly, Tatro, Corrigeuz or Herber were personally involved in any of the alleged constitutional deprivations.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

**\*16** (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

While Flemming contends that these individuals were involved in various aspects of the events on September 5, such conclusory and unsupported claims are belied by the use of force and unusual incident reports on which Flemming relies to prove his claim. None of these individuals were seen on the video tape, submitted memoranda for the various incident reports detailing their respective involvement, or were referenced in anyone else's submissions relating to the use of force. Moreover, time sheets, log book entries, and reassignment paperwork indicate that (1) Manley did not begin working at Upstate until after September 2005; (2) Tatro and Corrigeux were on vacation; and (3) Palmer and Herbert were working in different buildings. Accordingly, there exists no issue of fact that none of these defendants were directly involved in the actions on September 5. Moreover, none of these individuals were supervisory defendants involved in training, supervising, or creating policies. Accordingly, in the alternative, defendants' motion should be granted on this ground as to these defendants.

### F. Meritless Constitutional Claims

Despite the fact that the law of the case precludes review of these additional claims, defendants argue that, in the alternative, they should still be dismissed as meritless. Defs. Memorandum of Law at 28–32.

#### 1. Due Process

Flemming's contentions surrounding the inadequacy of his disciplinary proceedings and loss of privileges and good time credit are barred because of the "favorable termination"

rule of *Heck v. Humphrey,* 512 U.S. 477, 487–88 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641 (1997). There is no evidence that Flemming's disciplinary convictions were ever vacated, overturned, or expunged. In fact, supporting documentation indicates they were expressly affirmed. Thus, the *Heck* rule still applies and any procedural challenges are barred. Because Flemming's recovery of damages here for faulty hearing procedures and his requested relief would necessarily imply the invalidity of his disciplinary convictions, the requested relief based on that hearing is barred.

### 2. Destruction of Property

**\*17**  Any claims Flemming has made regarding destruction of his property during a cell search also fail to state an actionable claim. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L .R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N .Y. Corr. Law § 24(2).

Such claims fail as a matter of law for at least two reasons. First, the Article 78 [12] procedure exists and affords an adequate state court remedy. Second, because Flemming is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate

these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

[12]  N.Y. C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

### 3. Cell Searches

To the extent that Flemming claims a Fourth Amendment deprivation, such claims are meritless. The Fourth Amendment does not protect against searches and seizures of prison cells where the contraband and legal work here was kept. *Hudson v. Palmer,* 468 U.S. 517, 527–28 (1984).

### 4. Confiscation of Legal Work

Flemming contends that defendants confiscated legal work in connection with his appeal of his conviction. In order to state a claim of denial of access to the courts a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

Even viewing the facts in the light most favorable to Flemming, he has failed to establish any actual injury. First, with regard to Flemming's direct appeal, he testified that he was represented by counsel, but still wanted to submit his own papers, which he was able to submit successfully. Flemming Dep. at 63–68. These papers included three legal arguments from his attorney and eleven from Flemming, and were filed in June and July 2005 respectively, both prior to the alleged confiscation. *Flemming v. New York,* No. 06–CV–15226(RJH)(HBP), 2009 WL 6325520, at \*4 (S.D.N.Y. Aug. 10, 2009) (Dkt. No. 178–20 at 6). This direct appeal was denied, as was the subsequent application for leave to appeal. *Id.* at \*5 (Dkt. No. 178–20 at 7).

**\*18**  Flemming then filed papers for a habeas corpus action in the New York Appellate Division, First Department on September 1, 2006, subsequent to the alleged confiscation. *Flemming v. New York,* 2009 WL 6325520, at \*6 (Dkt. No. 178–20 at 8). The court's opinion stated that it allowed Flemming to file an amended petition, which he did, "on or about February 7, 2007, asserting over fifty purported

claims for relief." *Id.* The court went on to issue a twenty-six page decision which addressed every claim Flemming proffered. Such submissions refute any claims that paperwork which was taken from the cell produced an actual injury. It is clear from the court's decision that Flemming was able to adequately, though ultimately unsuccessfully, pursue his legal claims. Accordingly, defendants' motion should be granted on this ground.

### 5. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15. Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Flemming has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment, Flemming has failed specifically to alleged who he filed grievances and lawsuits against and when they were filed. Flemming has failed to allege any facts to establish that defendants' adverse actions were motivated by, or temporally related to, any constitutionally protected conduct. Thus, all Flemming has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

Accordingly, defendants' motion should be granted as to these claims.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects

governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

*19 A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* it has not been shown that defendants violated Flemming's constitutional rights.

Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Dkt. No. 178) be **GRANTED** as to all moving defendants and all claims;

2. Flemming's cross-motion for summary judgment (Dkt. No. 183) be **DENIED;** and 3. The Second Amended Complaint be **DISMISSED** without prejudice as to defendant Eddy.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

2012 WL 4094196

**PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,*
984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892
F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.
72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4094196

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Flemming v. Kemp, Not Reported in F.Supp.2d (2012)

2012 WL 4094009

KeyCite Yellow Flag - Negative Treatment

Distinguished by Banks v. County of Westchester, S.D.N.Y., March 9, 2016

2012 WL 4094009
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Northern District of New York
Woodrow FLEMMING, Plaintiff,
v.
Debbie KEMP; Jeffrey Hyde; George Waterson;
Correctional Officer John A. Tatro; Correctional Officer
Darrin C. Carrigeux; Correctional Officer Todd C.
Manley; Leo Palmer; Correctional Officer Wayne I.
Palmer; Correctional Officer Kevin Eddy; Correctional
Officer Jerry J. Herbert; and Terry James, Defendants.

No. 09–CV–1185.
|
Sept. 17, 2012.

**Attorneys and Law Firms**

Woodrow Flemming, Malone, NY, pro se.

Aaron M. Baldwin, Office of the Attorney General Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David R. Homer, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his August 30, 2012 Report–Recommendation and Order, Magistrate Judge Homer recommended that (1) Defendants' motion for summary judgment (Dkt. No. 178) be granted as to all moving defendants and all claims; (2) Flemming's cross-motion for summary judgment (Dkt. No. 183) be denied; and (3) the Second Amended Complaint be dismissed without prejudice as to Defendant Eddy. [1]

[1] As Magistrate Judge Homer noted, the motion is made on behalf of all remaining defendants except Eddy, who has never been served with process or otherwise appeared in this case. *See* Dkt. Nos. 13, 15, 58 (at p. 3), 170 (at p. 7). Magistrate Judge Homer recommended that this action be dismissed without prejudice as to Eddy in accordance with Fed.R.Civ.P. 4(m) (requiring completion of service upon a defendant within 120 days).

Plaintiff has filed nearly illegible objections to the Report–Recommendation and Order. (Dkt. No. 203).

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole,* 2011 WL 3809920, at * 2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. *See Calderon v. Wheeler,* 2009 WL 2252241, at *1, n. 1 (N.D.N.Y. July 28, 2009); *Green v. City of New York,* 2010 WL 148128, at * 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

As Judge Suddaby noted in *Calderon:*

> On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ( "In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no

justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

**\*2** *Calderon,* 2009 WL 2252241, at \*1, n. 1.

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see *Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

With this standard in mind, and after having reviewed Plaintiff's objections, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Homer's thorough report. Plaintiff has attempted to reargue the positions he took before Magistrate Judge Homer and attempted to fill the gaps in his argument, but he has not pointed to specific erroneous determinations by Judge Homer and the Court finds none. To the extent that Plaintiff argues that he should have been appointed counsel before Magistrate Judge Homer reviewed the motion for summary judgment, the argument is without merit. Plaintiff, a pro se litigant in numerous cases before the courts of the Second Circuit, has demonstrated the threshold ability in this case to articulate his claims and to argue his positions to the Court, has not

demonstrated an inability to investigate the crucial facts of his claims, and, for the reasons articulated by Magistrate Judge Homer and adopted herein, has not presented a meritorious action. Under these circumstances, appointment of counsel was not and is not warranted. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *see also Flemming v. Wurzberger,* 2010 WL 3199620, at \*2–\*3 (N.D.N.Y. July, 15, 2010) (denying Plaintiff appointment of counsel); *Flemming v. Wurzberger,* 2006 WL 1285627, at \*3 (W.D.N.Y. May 10, 2006) (denying Plaintiff's motion for appointment of counsel as moot after the court granted defendant's motion for summary judgment).

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Homer's August 30, 2012 Report–Recommendation and Order in its entirety. Therefore,

(1) Defendants' motion for summary judgment (Dkt. No. 178) is **GRANTED** as to all moving defendants and all claims;

(2) Flemming's cross-motion for summary judgment (Dkt. No. 183) is **DENIED;** and

(3) the Second Amended Complaint is **DISMISSED** without prejudice as to Defendant Eddy and with prejudice as to all other Defendants.

**IT IS SO ORDERED**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4094009

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2632600
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,
v.
M. HOGAN, et al, Defendants.

No. 9:09–CV–520 (NAM/ATB).
|
June 11, 2013.

**Attorneys and Law Firms**

Raszell Reeder, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

Justin C. Levin, Assistant Attorney General.

*ORDER*

NORMAN A. MORDUE, District Judge.

 **\*1**  The above matter comes to me following a Report–
Recommendation by Magistrate Judge Andrew T. Baxter,
duly filed on the 17th day of May 2013. Following fourteen
(14) days from the service thereof, the Clerk has sent me
the file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. Defendant William Allan's summary judgment motion
(Dkt. No. 162) is granted, and the complaint is dismissed in
its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

ANDREW T. BAXTER, United States Magistrate Judge.

**I. Background**

Plaintiff commenced this action pro se, seeking damages
for injuries resulting from various incidents occurring
between 2007 and 2008. (Dkt. No. 1). Liberally construed,
plaintiff's original complaint set forth several First and Eighth
Amendment claims, including excessive force, denial of
medical care, failure to receive proper Ramadan meals, and
challenges to his conditions of confinement. *Id.*

On November 16, 2009, defendants filed a motion to dismiss
the complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No.
69). While defendants' motion to dismiss was pending,
plaintiff filed an amended complaint ("First Amended
Complaint") on January 4, 2010. (Dkt. No. 84). Although
the motion to dismiss was filed prior to the First Amended
Complaint, the only amendment to the original complaint
was the addition of two named defendants in place of
two of the John/Jane Doe defendants. The new defendants
requested that they be allowed to join the pending motion to
dismiss. (Dkt.Nos.72, 87). The court granted these requests.
(Dkt.Nos.77, 88).

On September 29, 2010, then-Chief District Judge Mordue
granted defendants' motion in part and denied it in part.
(Dkt. No. 122). On October 8, 2010, this action was referred
to Magistrate Judge Victor E. Bianchini for settlement
proceedings, pursuant to the Pro Se Prisoner Settlement
Program, and the case was stayed in all other respects until
the proceedings were completed. (Dkt. No. 124).

On November 1, 2010, plaintiff filed a motion to amend,
together with a Second Amended Complaint. (Dkt. No. 129).
In light of the stay, the Court did not address the motion.
On January 31, 2011, the stay was lifted. (Dkt. No. 133).
Before this Court could address plaintiff's November 1, 2010
motion, plaintiff filed another motion to amend on May 4,
2011, together with a Third Amended Complaint. (Dkt. No.
141). In an order dated June 22, 2011, this court denied
plaintiff's motion to amend filed on May 4, 2011, but granted,
in part, the November 1, 2010 motion. (Dkt. No. 145).
The operative pleadings were then plaintiff's First Amended

Complaint, filed January 4, 2010, without the claims that were dismissed as a result of Judge Mordue's September 29, 2010 Order, read together with plaintiff's Second Amended Complaint. Defendants filed a motion for summary judgment on December 27, 2011. (Dkt. No. 150). Plaintiff filed a response on January 9, 2012. (Dkt. No. 154).

**\*2** On September 19, 2012, Judge Mordue granted defendants' motion for summary judgment (Dkt. No. 150), and all claims against all defendants were dismissed except for plaintiff's claim based on excessive force against defendant Allan, which was denied without prejudice to defendant Allan filing another summary judgment motion (Dkt. No. 161). On October 19, 2012, defendant Allan filed his motion for summary judgment. (Dkt. No. 162). Plaintiff opposed the motion. (Dkt. No. 165).

## II. *Facts and Contentions*

Plaintiff alleges that on August 25, 2008, defendants Uhler, Allen, Marcil, and other correction officers wanted plaintiff to come out of his cell, but he "disagreed with coming out," because "they did not come with [a] camera." (First Am. Compl. ¶ 24, 41). A "distraction unit" was called, bringing a camera, so plaintiff "agreed to come out," but defendants Uhler, Allen, Marcil and others still used mace "repeatedly." *Id.* Plaintiff was placed in full restraints and escorted to the SHU. (First Am. Compl. ¶ 24–25; Pl.'s Dep. 109–12 (Dkt. No. 162–3)).

For the reasons below, the court recommends granting defendant's motion and dismissing plaintiff's complaint in its entirety.

## III. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. *Fed.R.Civ.P. 56; Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c)(1) (A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## IV. Excessive Force

**\*3** Plaintiff alleges that various correction officers and a "distraction" unit used excessive force against him on August 25, 2008.

### A. Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s]

2013 WL 2632600

[an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**B. Application**

Plaintiff claims that on August 25, 2008, Sergeant Rendle told plaintiff to get dressed so he could return to his cell in the Special Housing Unit ("SHU"). (Pl.'s Dep. 101) (Dkt. No. 162–3). Plaintiff said that he and Sergeant Rendle exchanged "disrespectful statements," and he told Sergeant Rendle, "The door is locked, but when I catch you, you know I'm going to hurt you ." (Pl.'s Dep. 101–02). Because plaintiff refused to comply with direct orders, it was apparent that plaintiff was not going to voluntarily leave his cell, and an extraction team was called.

**\*4** Sergeant Rendle's report states that when he returned to plaintiff's cell with the extraction team, plaintiff was standing in his cell with something in his right hand. (Dkt. No. 162–9 at 18). Sergeant Rendle ordered plaintiff several times to drop what he was holding in his hand, after which plaintiff threw it against the door of the cell and retrieved what appeared to Sergeant Rendle to be feces from the toilet. *Id.* Sergeant Rendle's report indicates that plaintiff continued to refuse to comply with direct orders. *Id.* In an effort to subdue plaintiff

so he could be removed from his cell, the extraction team used chemical agents. *Id.* Even after the chemical agents were used, plaintiff refused to comply, so the extraction team entered and restrained plaintiff. *Id.*

Plaintiff disputes the reason why the extraction team came to his cell on August 25, 2008, and claims that he complied with instructions and stood with his back to the door so he could be handcuffed. (Pl.'s Dep. 103–04). Plaintiff claims that Sergeant Rendle started spraying mace at plaintiff without provocation or warning. (Pl.'s Dep. 104–05). Plaintiff claims that when the members of the extraction unit told him to get on the floor, he complied. (Pl.'s Dep. 105–07). Plaintiff testified that after he was handcuffed, no more mace was sprayed. (Pl.'s Dep. 117). The chemical agent affected plaintiff's eyes and his breathing, and within one minute he was taken to the decontamination shower, and within seven minutes, the effects from the chemical agent were gone. (Pl.'s Dep. 113, 115). Plaintiff claims that defendant Allan is responsible for the use of excessive force against him on August 25, 2008. The other officers on the extraction team are not defendants in this action. [1]

[1]      The Use of Force Report dated August 25, 2008, indicates that R. Rendle, M. Chagnon, N. Moore, E. Owen, and T. Saunders assisted on the extraction team, none of whom were named as defendants in this action. (Dkt. No. 162–9 at 11, 14).

Defendant Allan was one of the lieutenants in charge of the Correction Emergency Response Team (CERT) at Clinton in August 2008. (Dkt. No. 162–9 at 1–2). The record contains a declaration by defendant Allan, who affirmed that he was called to plaintiff's cell on August 25, 2008, and he attempted to convince plaintiff to comply with orders to exit his cell so he could be escorted back to the SHU. (Dkt. No. 162–9 at 2). Defendant Allan affirmed that plaintiff continued to ignore orders to exit his cell, and defendant Allan then ordered Sergeant Rendle to use force to extract plaintiff from his cell. Sergeant Rendle sprayed two one-second bursts of chemical agents a total of five times at plaintiff. (*Id.*). Defendant Allan affirmed that even after the chemical agents were sprayed, plaintiff still would not exit his cell. (*Id.*). The extraction team then entered plaintiff's cell and using body holds, placed plaintiff in restraints and escorted him to the decontamination shower. (*Id.*). Plaintiff was escorted to the SHU, where he was examined by defendant Nurse Farnan, who found no injuries. (Dkt. No. 162–9 at 15).

Defendant Allan submitted a video of the cell extraction that occurred on August 25, 2008.[2] (Dkt. No. 159). The video is approximately 30 minutes long and documents the cell extraction team at plaintiff's cell through when he arrives at his new cell. (*Id.*). The video depicts that when the extraction team arrives at the cell, plaintiff is given one last direct order to exit the cell, and he is told to come to the front of the cell so he can be handcuffed through the food slot. (*Id.* at 2:32:30). Plaintiff approaches the door to the cell, and one of the extraction team asks what is in plaintiff's hand. (*Id.* at 2:32:47). Plaintiff is repeatedly told to drop what he has in his hand. (*Id.* at 2:32:48, 50, 52, 55). At that point, plaintiff backs away from the door and goes to the floor. (*Id.* at 2:32:54). He is again told repeatedly to drop what he has in his hand (*Id.* at 2:32:58; 2:33:00, 04, 06, 09, 22, 24, 30, 54, 55, 56; 2:34:11, 22, 39, 42, 50), and get away from the toilet (*Id.* at 2:34:37; 2:35:08, 11, 29, 32). A member of the team is heard to remark, "He almost got you that time," apparently in reference to plaintiff throwing material at the cell door. (*Id.* at 2:35:05). After plaintiff is subdued by the extraction team, the camera pans over the door, showing where what appears to be feces have been thrown at the door. (*Id.* at 2:36:49–53). The camera also shows a toilet that has been used, but not flushed. (*Id.* at 2:36:55–57).

[2]    The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident. *See, e.g., Kalfus v. New York and Presbyterian Hosp.,* 476 F. App'x 877, 880–81 (2d Cir.2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse,* 00–CV–6533, 2009 WL 1401642, 2009 U.S. Dist. LEXIS 42368, at *27 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's excessive force claim) (citations omitted).

 **\*5** The video corroborates that when plaintiff approached the door, he was not complying with orders, but instead had what was apparently feces in his hand. When he was asked to drop what he was holding, plaintiff moved away from the door. Defendant Allan authorized the use of chemical agents

to subdue plaintiff, allowing the extraction team to enter his cell and restrain him. Plaintiff was repeatedly warned and refused to comply with the guards' orders. He then escalated his defiance by throwing feces at the door of his cell.

No reasonable finder of fact would credit plaintiff's claims that he was compliant with orders to exit his cell peacefully. Defendant Allan did not authorize the use of force to subdue plaintiff without provocation. The defendants used necessary force to restore discipline and subdue plaintiff, who was aggressively refusing to comply with orders. In addition, defendants' actions indicate that their use of chemical agents was in response to the perceived threat that plaintiff aggressively refuse to comply. Defendants have shown that there is no issue of fact as to either of the elements of an Eighth Amendment violation. Accordingly, the claim against defendant Allan should be dismissed. *See, e.g., Alston v. Butkiewicus,* No. 3:09–CV207, 2012 WL 6093887, 2012 U.S. Dist. LEXIS 173770, at *40–42 (D.Conn. Dec. 7, 2012) (use of chemical agent did not constitute excessive force when inmate refused to comply with direct orders); *Carolina v. Pafumi,* No. 3:12–cv–163, 2013 WL 1673108, 2013 U.S. Dist. LEXIS 55209, at *8–12 (D.Conn. April 17, 2013) (use of chemical agent to subdue noncompliant inmate did not constitute excessive force); *Green v. Morse,* 2009 U.S. Dist. LEXIS 42368, at *38, 42, 2009 WL 1401642 (use of chemical agent on noncompliant inmate did not constitute excessive force).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's summary judgment motion (Dkt. No. 162), be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2632600

**Reeder v. Hogan, Not Reported in F.Supp.2d (2013)**

2013 WL 2632600

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3636138
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,
v.
Dale ARTUS, Superintendent; Thomas Lavalle,
Deputy Superintendent; Steven Racette, Deputy
Superintendent of Security; Tara Brousseau, I .G.P.
Supervisor; D. Holdridge, Captain; Uhler, Lieutenant;
Lamora, Lieutenant; Lynch, Lieutenant; Hicks,
Sergeant; Menard, Sergeant; Baker, Sergeant; Matott,
Sergeant; Marcil, Sergeant; Gregory Savage, Mental
Health Counselor; J. Sprenger, Chaplain; Ronald
Durmont, Registered Nurse and Examiner; Moller,
Correctional Officer; Tucker, Correctional Officer;
Martin, Correctional Officer; Shutts, C.O.; Grom, C.O.;
Poupore, Correctional Officer; Boulrice, C.O.; Moseley,
C.O.; Trudeau, Correctional Officer; R. Trudeau,
Correctional Officer; Allen, Correctional Officer;
Miner, Correctional Officer; Gittens, Correctional
Officer; Besaw, Correctional Officer; Tetreault,
C.O.; John Doe, C.O.;[1] Bodet, Correctional Officer;
Richard Roy, Inspector General; Nunez, Inspector
General; James Morgan, Associate Director of Quality
Management; Joanne Waldron, Unit Chief; and Maureen
Bosco, Forensic Program Administrator, Defendants.

[1]      Defendant John Doe has neither appeared nor
     been served. Fed.R.Civ.P. 4(m) requires that a
     complaint be served upon a defendant within 120
     days after the complaint is filed or the complaint
     may be dismissed as to any unserved defendant
     without prejudice. *See also* N.D.N.Y.L.R. 4.1(b).
     The complaint here was filed on May 18, 2009.
     Compl. No summons was executed upon the
     defendant. More than 120 days have passed
     since the complaint was filed. Accordingly, it is
     recommended that the complaint be dismissed as to
     John Doe without prejudice pursuant to Rule 4(m)
     and Local Rule 4.1(b).

No. 09–CV–575 (DNH/DRH).
|

July 27, 2010.

**Attorneys and Law Firms**

Raszell Reeder, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Justin C. Levin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[2]

[2]      This matter was referred to the undersigned for
     report and recommendation pursuant to 28 U.S.C.
     § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Raszell Reeder ("Reeder"), an inmate in
the custody of the New York State Department of Correctional
Services ("DOCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants, thirty-eight DOCS employees,
violated his constitutional rights under the First, Eighth, and
Fourteenth Amendments. Compl. (Dkt. No. 1). Presently
pending are the moving defendants'[3] motion for judgment
on the pleadings pursuant to Fed.R.Civ.P. 12(c). Dkt. No. 65.
Reeder opposes the motion. Dkt. No. 69. For the following
reasons it is recommended that defendants' motion be granted
in part and denied in part.

[3]      *See* note 1 *supra.*

## I. Background

The facts are related herein in the light most favorable to
Reeder as the non-moving party. *See* subsection II(A) *infra.*

### A. Excessive Force

On April 22, 2009, Reeder assaulted defendant Poupore,
a corrections officer. by throwing feces on him during the
breakfast hour. Compl. ¶ 17; Dkt. No. 69, ¶ 14. Defendant
Hicks, a Sergeant, was notified to respond to the assault, but
defendant Menard, also a Sergeant, reported to Reeder's cell
instead. Compl. ¶ 17. At Reeder's cell, Menard observed that
the lights in the back of the cell were off, a safety hazard which

also precluded video recording. *Id.* ¶¶ 4, 11, 22; Dkt. No. 69, ¶ 2.

After the assault on Poupore occurred, Reeder informed defendants Matott, a sergeant, and Sprenger, a chaplain, as well as mental health staff, and Menard that he would comply with their orders and exit his cell without resistance. Compl ¶¶ 10, 21. Nevertheless, Menard deployed chemical weapons and an extraction team into Reeder's cell because Reeder allegedly failed to comply with Menard's direct orders to release his food tray and a carton of milk in which the feces were believed to have been stored. *Id.* ¶¶ 3, 8, 18; Dkt. No. 69, ¶ 7. Reeder contends that there was never a container of milk with feces in his possession and this was solely a ploy to allow Menard to dispense chemical agents into his cell. Compl. ¶ 18; Dkt. No. 69, ¶¶ 2, 7. Menard responded to the call instead of Hicks to retaliating against Reeder and to cause Reeder serious injury. Compl. ¶ 19.

After Menard deployed the chemical agents, an extraction team composed of defendants Martin, Shutts, Tucker, Grom, and Moller, all corrections officers, entered the cell. Compl. ¶¶ 4, 8–9, 20, 22, 25–26. When the team entered the cell behind a plexi-glass shield, Reeder pushed the shield from his cell in self-defense and then lay on the floor without further resistance. *Id.* ¶ 11. The incident report indicated that Martin pushed Reeder to the floor and took control of his upper torso and head area; Shutts assisted with the restraints; Tucker took control of Reeder's arms and placed them behind his back; and Moller videotaped the entire extraction. *Id.* ¶¶ 8–9. Reeder alleges that Martin punched him in the face, slammed his head on the ground, kneed him in the head, and continued to assault him as he lie on the ground; Shutts attempted to pull his left knee out of his socket; Tucker squeezed his left hands with great force, attempting to break them; Grom used his body to block the camera's view of the attack; and Moller stood in the dark portion at the back of his cell, purposefully omitting the recording or certain events during the extraction. *Id.* ¶¶ 4, 8, 9, 22, 24–26. Reeder contends the assault was in retaliation for his assault on Poupore. Dkt. No. 69, ¶ 2.

## B. Medical Care

 **\*2**  After the incident, Reeder was examined by defendant Durmont, a nurse. Compl. ¶¶ 5, 12. Durmont's report indicated that he examined Reeder, his eyes were reddened from exposure to the chemical agents, and Reeder was sweating. *Id.* ¶ 12. Durmont found nothing wrong with Reeder

during the examination. *Id.* ¶ 5. However, Reeder alleges this examination was cursory as Durmont failed to note the blood coming out of his ear, his swollen fingers, knee and face, his scars, his blackened eyes, or the pain in his fingers, face and neck. *Id.* ¶ 5; Dkt. No. 69, ¶ 6. Additionally, Durmont never reexamined Reeder after April 22 to ensure that there were no new injuries and that the pre-existing ones had not worsened. Compl. ¶ 12.

## C. Conditions of Confinement

After the examination, Reeder was given a cell depravation order and was placed into a cell with no hygiene supplies, no state clothing, and no grievance forms, pens, paper, or regular diet for six days. Dkt. No. 69, ¶ 14. Additionally, from April 22 until May 12, 2009, Reeder's food was inadequate in that it either was not delivered or was completely frozen, very hot, or contaminated with dirt. Compl. ¶ 2. Defendant Boulrice, a corrections officer, dropped Reeder's milk on the floor, refused to replace it, and refused to feed him breakfast on April 18 as well as refusing to feed him breakfast, lunch, and dinner on April 23 and dinner on April 24. *Id.* ¶¶ 13, 28, 30, 31; Dkt. No. 69, ¶ 8); (2. Defendant Moseley, a corrections officer, did not give Reeder a new tray after Reeder fought with Boulrice on April 18, denied him breakfast on April 18 and 23, and denied him lunch on April 22 and 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Defendants Holdridge, a Captain, and Baker, a Sergeant, failed to act after Reeder complained about not receiving food on April 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Defendant Gittens, a corrections officer, denied him dinner on April 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8); (5. Defendant Trudeau, a corrections officer, denied him dinner on both April 24 and 29. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Poupore denied him dinner on April 29. Compl ¶ 13; Dkt. No. 69, ¶ 8); (7. Allen denied him breakfast and lunch on May 1. Compl. ¶¶ 13, 31; Dkt. No. 69, ¶ 8); (8. Defendants Tetreault and Besaw, corrections officers, denied him breakfast and lunch, serving him the wrong meals on May 3 and falsifying the feed up sheet to indicate he was properly fed. Compl. ¶¶ 13, 31; Dkt. No. 69, ¶ 8); (9. Defendants R. Trudeau and Miner, corrections officers, denied Reeder food meals. Compl. ¶¶ 13, 31; Dkt. No 69 ¶ 8. Defendants Artus, Lavalle, and Racette, the Superintendent and Deputy Superintendents, failed to act after being notified specifically about the food situation. Compl. ¶ 13.[4] Reeder also contends that on April 25 through 28, April 30, and May 2, the food that he received was scarce and also tainted. Compl. ¶ 13.

Reeder also asserts that defendants Uhler, Lynch, Hicks, Marcil, Allen, and Bodet were involved in his denial of meals; however no specific dates or meals were alleged.

### D. Property

**\*3** Reeder also alleges that Hicks and an unknown officer stole his personal property, lying about the fact that it was allegedly contaminated and required disposal in the garbage. Compl. ¶ 32; Dkt. No. 69, ¶ 13. Hicks' actions were approved by Menard. Dkt. No. 69, ¶ 13. These actions were in retaliation for the assault on defendant Poupore. *Id.*

### E. Grievances

Reeder contends that "Clinton Prison Administration is a facility that hid evidence and agree with inmates being assaulted, harass [sic], never showing concern, accepting captains, Lts., Sgts., Correction Officers falsifying investigation reports. They always doing incomplete investigations, it is a facility administration and with corrections personnel thats committed to retaliation conspiracy." Compl. ¶ 14. Reeder alleges that Artus, Lavalle, and Racette received constant complaints and took no action, refused to approve the initiation of investigations which were essential for inmates filing grievances, and failed to intervene in any way when the other named defendants denied Reeder food for almost a month. Dkt. No. 69, ¶¶ 3, 10. Additionally, Uhler, Holdridge, Lynch, Hicks, Marcil, Baker, Menard, and Matott also allegedly knew about Reeder's deprivation of meals and failed to remedy the situation. *Id.* ¶ 3. Lastly, defendant Brousseau failed in her duties as IGP Supervisor to act on grievances in a timely and appropriate manner and provide inmates with investigations when they filed grievances, as defendants Artus and Racette were notorious for unanimously rejecting any request for an investigation. *Id.;* Compl. ¶ 7.

### F. Other Claims

Reeder also contends that while incarcerated, defendants tampered with his mail. Compl. ¶ 14. Additionally, as the administration was aware of the many investigations Reeder was seeking, their summary denials and their refusal to intervene in the alleged retaliation deprived Reeder

of his Equal Protection rights. *Id.* ¶ 16. Moreover, the administration failed in their duties to file criminal charges against employees on behalf of inmates, like Reeder, who were subjected to retaliation. *Id.* ¶ 1. Lastly, Reeder contends that he was constantly harassed by R. Trudeau, Poupore, and Martin because they would loudly bang on his cell in retaliation for his assault on Poupore. Dkt. No. 69, ¶ 4.

### II. Discussion

Reeder contends that his First Amendment rights were violated when defendants retaliated against him by subjecting him to excessive force, denying him food, and refusing to provide him with investigations and tampered with his mail. Reeder contends his Eighth Amendment rights were violated when various defendants subjected him to excessive force, when Durmont was deliberately indifferent to his serious medical needs, and denied him to acceptable conditions of confinement. Reeder finally claims that his Fourteenth Amendment rights were violated when defendants confiscated his property without due process and denied him equal protection. Defendants contend that Reeder has failed to state any constitutional claims; Reeder has failed to allege the personal involvement of Waldron, Roy, Morgan, and Bosco; and they are entitled to qualified immunity.

### A. Legal Standard

**\*4** "The standard for granting a Rule 12(c) motion ... is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills,* 259 F .3d 123, 126 (2d Cir.2001) (citations omitted). Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

**\*5** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se, ...* a court is obliged to construe his pleadings liberally.' " (citations omitted)).

## B. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials

may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Roy

Reeder claims that defendant Roy, the DOCS Inspector Generally, was personally involved in his constitutional violations by failing to respond, or investigate, any of the assault claims which Reeder provided to him. Compl. ¶¶ 16, 33; Dkt. No. 12. Receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that the proposed defendants took any action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted). Accordingly, this contention is insufficient to establish personal involvement. As no other bases for involvement were advanced, and the record does not indicate that any other exist, defendants' motion should be granted on this ground.

### 2. Waldron, Morgon, and Bosco

In his response, Reeder alleges that these three defendants denied him mental health treatment for his mental health condition which subsequently worsened. Dkt. No. 69, ¶ 11. The complaint fails to indicate or establish any theory of personal involvement. The gravamen of Reeder's complaints are that these defendants "knew" about the things that were occurring within the correctional facility and failed to act. Compl. ¶ 34. This essentially attempts to establish personal involvement based upon the supervisory role these defendants occupied, which is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement). The complaint does not contend that they were personally involved in the alleged violations, created unconstitutional policies, or were grossly negligent in supervising subordinates. As such, Reeder has failed to establish their personal involvement and defendants' motion on this ground should be granted.

### C. First Amendment

### 1. Retaliation [5]

[5]  Defendants also contend that the intracorporate doctrine shields them from liability. Defs. Mem. of Law (Dkt. No. 65–1) at 9–10. It is recommended herein that this claim be denied on the merits and, therefore, this contention will not be further addressed.

**\*6** Reeder claims that he was assaulted, denied proper medical treatment and food, and had his property stolen and mail tampered with in retaliation for his assault on Poupore. Compl. ¶ 2, 13, 19; Dkt. No. 69, ¶¶ 2, 13–14. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,*

549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Reeder has failed to allege facts sufficient to support a retaliation claim. First, his actions in assaulting another corrections officer are not the sort of thing protected by the constitution. Thus, for any subsequent incident for which Reeder asserts the assault was the basis of the retaliation, such claims are without merit. Second, even if can be said that Reeder filed grievances in the form of requests for investigations, such actions are inadequate to establish an actionable cause. While filing grievances and lawsuits are actions protected by the First Amendment, Reeder has failed specifically to alleged who he filed grievances against and when they were filed. Third, Reeder has also failed to allege any facts to establish that any of defendants' alleged adverse actions were motivated by, or temporally related to, any constitutionally protected conduct. Thus, all Reeder has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct. These conclusory allegations, without more, are insufficient to maintain the present claims. *Jackson,* 549 F.Supp.2d at 214.

Accordingly, defendants' motion should be granted as to these claims.

### 2. Mail Tampering

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citations omitted). While legal mail is afforded the greatest protection, [6] "greater protection [is afforded] to outgoing mail than to incoming mail." *Id.* (citations omitted). "Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved." *Id.* (citations omitted). However, in this case Reeder has failed to plead with any sort of particularity with what mail defendants tampered. Accordingly, defendants cannot reasonably specify the reasons, if any, why Reeder's mail was impeded or opened. As there are only conclusory allegations without reference to time, place, person, or manner of tampering, such allegations are insufficient to establish a constitutional violation.

6    "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 (1996)). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation.... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

In this case, there are no contentions, and the record does not support a finding, that the mail in question was legal mail. Accordingly, while increased protections would apply had the mail been legal in nature, there is no reason to presume this is the case. Even if the mail was legal, there have been no allegations, nor would the record support, the conclusion that defendants caused Reeder any actual injury as he has successfully communicated with the court and participated in discovery and motion practice. Accordingly, defendants' motion should be granted as to any claim that the mail in question was legal mail.

**\*7** Accordingly, defendants' motion should be granted as to this claim.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St.*

*Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, defendants do not challenge that Reeder was suffering from a serious medical condition. Instead, they assert that Reeder has failed to allege deliberate indifference by defendant Durmont. Reeder contends that Durmont's examination was intentionally quick and cursory, there was no follow up, and Durmont did not note or acknowledge his complaints of swelling on his face and blackness around his eyes. Compl. ¶ 12. Additionally, Reeder contends that the photographs taken immediately after the incident document these injuries, in addition to the swelling he sustained in his hand and knee. Dkt. No. 69, ¶ 6. Construing these facts in the light most favorable to Reeder, he has advanced a claim that Durmont's actions rose past a level of mere disagreement to one of intentional disregard.

**\*8** Accordingly, defendants' motion on this ground should be denied.

### 2. Excessive Force

Menard seeks judgment on Reeder's claim that Menard's use of mace during the extraction constituted the use of excessive force. [7] Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

[7]  Other defendants do not seek judgment on this claim which alleges that Martin, Shutts, and Tucker used excessive force against him. To the extent that Reeder claims that any other defendants were involved in the excessive force, such claims are meritless because he has failed to identify which defendants were involved, or how they were involved. Therefore, he has failed to establish the subjective prong of the Eighth Amendment analysis. Accordingly, Reeder's failure to plead any

such occurrences with any specificity is fatal to his claim.

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 2010 WL 596513 (2010) ("The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*9** Liberally construing Reeder's complaint, he has satisfied the objective component of the excessive force inquiry. Reeder alleges that he suffered from excruciating pain in his fingers, face and neck; a swollen face, knee and fingers; black eyes; and a bloody ear. Compl. ¶¶ 5, 12; Dkt. No. 69, ¶ 6. While these injuries are not attributable to Menard spraying mace in Reeder's face, the deployment of chemical weapons

solely for the purposes of harming an inmate who had planned to cooperate and voiced such intentions to multiple parties represents a malicious use of force which would constitute a *per se* Eighth Amendment violation. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513. Therefore, construing the facts in the light most favorable to Reeder, he has alleged an Eighth Amendment claim against Menard for his malicious and intentional use of chemicals solely for the purpose of causing Reeder harm. Compl. ¶¶ 9, 10, 18, 19, 21; Dkt. No. 69, ¶¶ 2, 7.

Accordingly, defendants' motion as to Menard on this claim should be denied.

### 3. Failure to Intervene

Liberally construing Reeder's complaint, he has alleged that defendants Grom and Moller were at the scene when he was assaulted and failed to intervene. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

Viewing the facts in the light most favorable to Reeder, he has stated facts sufficient to contend that Grom and Moller failed to intervene. While the two defendants may not have had advanced warning that Reeder would be assaulted during the extraction, it became clear when Reeder was saying he was going to be cooperative, laying on the ground, and not resisting, that Grom and Moller should intercede to prevent additional harm when they observed three officers punching and kicking a defenseless inmate. Additionally, as discussed *infra,* a reasonable person in the officer's position would be well aware that such a use of force was contrary to an individual's constitutional rights. Thus, crediting Reeder's contentions, by standing idly by, Grom and Moller failed to take reasonable steps to intervene and terminate the violation of Reeder's constitutional rights.

Therefore, defendants' motion on this ground should be denied.

### 4. Failure to Protect

Eighth Amendment obligations also include the duty to protect prisoners from known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834 (*citing Helling v. McKinney,* 509 U.S. 25, 31–32 (1993)).

 **\*10** As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). To state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison office must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Matthews v. Armitage,* 36 F.Supp.2d 121, 124–25 (N.D.N.Y.1999) (internal citations and quotations omitted).

Reeder claims that defendant Nunez failed to protect him because Reeder contact Nunez about the assault by staff, Nunez indicated that he would be transferring Reeder to a different facility, the transfer never occurred, and Reeder continued to be assaulted. Compl. ¶¶ 16, 33; Dkt. No. 69, ¶ 9. These allegations suffice to state the elements of a constitutional claim. Reeder was assaulted once by the corrections staff and the animosity continued. Reeder alerted Nunez to this problem and Nunez indicated he would resolve it by having Reeder transferred from the facility. Therefore, Nunez was aware that Reeder was in danger. Nunez failed to timely act and Reeder was allegedly subjected to more assaults. Liberally construing these allegations, Reeder has pleaded a claim for Nunez's failure to protect. Accordingly, defendants' motion as to Nunez should be denied.

Reeder also claims that Artus, Lavalle, and Racette had an executive "duty to protect inmates" with which they too failed to comply. Compl. ¶ 1. Such contentions are insufficient to allege an Eighth Amendment claim. Reeder fails to identify how these three individuals knew of any serious risk specific to his health and safety. As such, Reeder has failed to allege facts sufficient to establish the objective prong of the analysis as to these defendants. Accordingly, defendants' motion as to Artus, Lavalle, and Racette on this claim should be granted.

### 5. Conditions of Confinement[8]

[8]  To the extent that Reeder's claims surrounding his cell deprivation could be construed as a conditions of confinement claim, such contentions are meritless. Dkt. No. 69, ¶ 14. First, such contentions were not advanced in his complaint and even a liberal reading of the complaint fails to indicate the allegation of any such claim. Moreover, even if such a claim was advanced, Reeder's temporary loss of his personal effects fails to allege that Reeder was deprived of any single, identifiable human need.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly,* 76 F.3d at 480 (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

**\*11**  The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the

> deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (citations omitted).

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). "While no court has held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation ... may well be recognized as being of constitutional dimension." *Id.* (citations omitted). In this case, Reeder specifically alleged that he failed to receive food on April 18, 22, 23, 24, 29, and May 1 and 3. Compl. ¶¶ 13, 28, 30, 31. Construing all allegations in the light most favorable to Reeder, seven days without meals in a twelve day period suffices to allege a constitutional deprivation.

Reeder names ten defendants who specifically participated in the denial of, or ignored his complaints regarding the failure to provide, his meals. With respect to Moseley, Boulrice, Holdridge, Gittens, Baker, C. Trudeau, Poupore, Allen, Tetreault, and Besaw, Reeder has sufficiently alleged facts to establish deliberate indifference and a culpable state of mind. Compl. ¶¶ 13, 28, 30, 31. Accordingly, the motion as to those defendants should be denied.

However, Reeder also contends that Artus, Lavalle, Racette, Uhler, Lynch, Hicks, Marcil, Menard, and Matott, were generally and summarily informed of the deprivation of food but failed to intervene or correct it. Compl. ¶ 13; Dkt. No. 69, ¶ 3. Additionally, Reeder contends that R. Trudeau and Miner denied him food meals, but fails to allege with specificity any dates or times of such meal denials. Compl. ¶¶ 13, 31. This is in stark contrast to the previously identified defendants

as to whom Reeder alleged date and meals. Accordingly, with respect to these remaining eleven defendants, Reeder has failed to allege facts which would constitute deliberate indifference and defendants' motion as to these defendants should be granted.

### E. Fourteenth Amendment

#### 1. Equal Protection [9]

[9]

In his response, Reeder contends that defendants R. Trudeau, Poupore, and Martin constantly harassed him by banging on his cell. Such actions, without more, are similar to those cases alleging only verbal harassment. These claims are insufficient to allege a constitutional violation. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ( "The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Reeder did not assert, nor does the record support, any allegations of physical injury. Therefore, even viewing the facts in the light most favorable to Reeder, these alleged statements, without more, are insufficient to state a constitutional claim.

**\*12** The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly

situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted).

In this case, Reeder has only offered one statement mentioning equal protection, though it fails to establish how he was treated differently than other inmates. There are no contentions, and the record does not show, that Reeder was treated differently by staff than other inmates. All Reeder offers is a single, vague, conclusory allegation. This allegation, without more, is insufficient. *See, e.g., John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d 345, 353 (S.D.N.Y.2000) ("[A]ssertions of selective enforcement and racial animus [that] are wholly conclusory and unaccompanied by any supporting factual allegations ... are insufficient to state a claim under either the Equal Protection Clause or 42 U.S.C. § 1983.") (citations omitted).

Accordingly, defendants' motion should be granted on this ground.

#### 2. Confiscation of Property

Reeder contends that Hicks and Menard were involved in the unlawful confiscation and destruction of his personal property. Compl. ¶ 32; Dkt. No. 69, ¶ 13. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of

the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

**\*13**  In this case, Reeder contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 [10] procedure exists and affords an adequate state court remedy. Second, because Reeder is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court.

[10]  N.Y. C.P.L.R. art. 78 (McKinney 1994 & Supp.2007) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

Accordingly, defendants' motion should be granted as to this claim.

### F. Failure to State a Claim [11]

[11]  To the extent that Reeder has alleged "negligent action" by the named defendants, such allegations are meritless as they are not a cognizable basis for relief under § 1983. *See e.g., Davidson v. Williams,* 474 U.S. 327, 328 (1986) (holding that negligent acts are insufficient to trigger liability in constitutional claims).

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

### 1. Right to an Investigation

Reeder contends that Artus and Racette summarily denied requests for investigations. Even viewing the facts in the light most favorable to Reeder, he has failed to state a claim upon which relief can be granted because he has no constitutional right to an investigation. *See Carrasquillo v.*

*City of N.Y.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered"). Accordingly, defendants' motion as to this claim should be granted. [12]

[12]  To the extent that such contentions can be construed to allege that Reeder should be compensated for defendants' failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law ....").

### 2. Faulty Grievance Procedures

"Prisoners, including pretrial detainees, have a constitutional right of access to the courts ...." *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821–22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citations omitted); *see also Cancel v. Goord,* No. 00–CV–2042 (LMM), 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell,* 365 F.Supp.2d at 370 (citations omitted).

In this case, Reeder cannot establish that he had a liberty interest which required constitutional protection. Reeder has only alleged complaints about the grievance process as a whole, stating specifically that defendant Brousseau did not act upon grievances quickly enough or advocate strenuously enough for the inmates. Compl. ¶ 7; Dkt. No. 69, ¶ 3. Accordingly, defendants' motion on this ground should be granted.

### 3. Right to Criminal Investigations
### on Correctional Officers

**\*14** Additionally, there exists no constitutionally protected right to file criminal charges against another. *See Langworthy v. Dean,* 37 F.Supp.2d 417, 422 (D.Md.1999) ("[A] right to compel the prosecution of criminal activity does not exist."). Thus, to the extent that Reeder claims administrative defendants should have been acting upon any of his requests to compel criminal prosecution of any of the other named defendants, such claims are not cognizable on federal review. Defendants' motion on this ground should be granted.

### G. Qualified Immunity

Defendants claim that even if Reeder's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Reeder's Eighth Amendment excessive force, medical indifference, failure to intervene, failure to protect, and conditions of confinement claims. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Reeder's constitutional rights.

There is no question that it was well settled on May 18, 2009 that the Eighth Amendment (1) prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate (*Hudson,* 503 U.S. at 9–10), and (2) required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting all of Reeders' allegations as true, qualified immunity cannot be granted to (1) DuMont for his involvement with Reeder's medical care; (2) Menard, Martin, Shutts, and Tucker for their alleged assertion of excessive force during the extraction; (3) Grom and Moller for their alleged failure to intervene to assist Reeder during the extraction; (4) Nunez for his alleged failure to protect Reeder from further assaults; and (5) Moseley, Boulrice, Holdridge, Gittens, Baker, Trudeau, Poupore, Allen, Tetreault and Besaw for their alleged failure to provide Reeder with adequate nutrition or respond to his complaints that he was being denied food. However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III. Conclusion

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for judgment on the pleadings (Dkt. No. 65) be:

1. **DENIED** as to Reeder's claims of:

   A. Medical indifference against defendant Durmont;

   B. Excessive force against defendants Menard, Martin, Shutts, and Tucker;

   C. Failure to intervene against defendants Grom and Moller;

   D. Failure to protect against defendant Nunez;

   E. Deprivation of food against defendants Moseley, Boulrice, Holdridge, Gittens, Baker, C. Trudeau, Poupore, Allen, Tetreault and Besaw; and

2. **GRANTED** as to all other claims and all other moving defendants; and

**IT IS FURTHER RECOMMENDED** that the complaint be **DISMISSED** without prejudice as to defendant John Doe.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ...

recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3636138

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3636132
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,

v.

Dale ARTUS, Superintendent; Thomas Lavalle, Deputy
Superintendent; Steven Racette, Deputy Superintendent
of Security; Tara Brousseau, I .G.P. Supervisor; D.
Holdridge, Captain; Uhler, Captain; Lamora, Lt.;
Lynch, Lt.; Hicks, Menard, Baker, Matott, Marcil, Each
Sergeant; Gregory Savage, Mental Health Counselor;
J. Sprenger, Chaplain; Ronald Durmont, Registered
Nurse and Examiner; Moller, Tucker, Martin, Shutts,
Grom, Poupore, Boulrice, Moseley, Trudeau, R.
Trudeau, Allen, Miner, Gittens, Besaw, Tetreault,
John Doe, and Bodet, Each Corrections Officer;
Richard Roy, Inspector General; Nunez, Inspector
General; James Morgan, Associate Director of Quality
Management; Joanne Waldron, Unit Chief; and Maureen
Bosco, Forensic Program Administrator, Defendants.

No. 9:09–CV–0575.
|
Sept. 9, 2010.

## Attorneys and Law Firms

Raszell Reeder, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General,
Justin C. Levin, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

## *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Raszell Reeder, brought this civil rights action
in May 2009, pursuant to 42 U.S.C. § 1983. By Report–
Recommendation dated July 27, 2010, the Honorable David
R. Homer, United States Magistrate Judge, recommended that
defendant's motion for judgment on the pleadings be denied as
to plaintiff's claims of medical indifference against defendant
Durmont; excessive force against defendants Menard, Martin,
Shutts, and Tucker; failure to intervene against defendants

Grom and Moller; failure to protect against defendant Nunez;
deprivation of food against defendants Moseley, Boulrice,
Holdridge, Gittens, Baker, C. Trudeau, Poupore, Allen,
Tetreault, and Besaw; and granted as to all other claims and all
other moving defendants; and that the complaint be dismissed
without prejudice as to defendant John Doe. No objections to
the Report–Recommendation have been filed.

Based upon a careful review of the file, and the
recommendations of Magistrate Judge Homer, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for judgment on the pleadings is
DENIED as to plaintiff's claims of medical indifference
against defendant Durmont;

2. Defendants' motion for judgment on the pleadings is
DENIED as to plaintiff's claims of excessive force against
defendants Menard, Martin, Shutts, and Tucker;

3. Defendant's motion for judgment on the pleadings is
DENIED as to plaintiff's claims of failure to intervene against
defendants Grom and Moller;

4. Defendants' motion for judgment on the pleadings is
DENIED as to plaintiff's claims of failure to protect against
defendant Nunez;

5. Defendants' motion for judgment on the pleadings is
DENIED as to plaintiff's claims of deprivation of food against
defendants Moseley, Boulrice, Holdridge, Gittens, Baker, C.
Trudeau, Poupore, Allen, Tetreault, and Besaw; and

6. Defendants' motion for judgment on the pleadings is
GRANTED as to all of plaintiff's other claims and all other
moving defendants;

7. The complaint is DISMISSED without prejudice as to
defendant John Doe; and

8. The file is to be returned to the Magistrate Judge for all
further pretrial proceedings.

IT IS SO ORDERED.

2010 WL 3636132

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3636132

---

**End of Document**                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.